121u1davc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          11-CR-424  (NRB)

EARL SETH DAVID, GULAY CIBIK,
REFAEL BRODJIK, ALEXANDRA
URBANEK, ABRAHAM FLAM, ARYEA
YEHUDA FLOHR, ANDRE HERBST,
NATHAN SCHWARTZ, HAROLD
TISHLER, CHAIM WALTER, MAYER
WEBER,

                Defendants.                 Conference

------------------------------x

                                            New York, N.Y.
                                            January 30, 2012
                                            4:11 p.m.


Before:

                HON. NAOMI REICE BUCHWALD,

                                            District Judge

121u1davc

                              APPEARANCES

 1

 2   PREET BHARARA
          United States Attorney for the
 3        Southern District of New York
     JOHN M. REH
 4        Assistant United States Attorney

 5   MOSKOWITZ & BOOK
          Attorneys for Defendant Earl Seth David
 6   BY:  AVRAHAM C. MOSKOWITZ, ESQ.

 7   DONALDSON & CHILLIEST
          Attorneys for Defendant Gulay Cibik
 8   BY:  X.R. DONALDSON, ESQ.

 9   DONALD duBOULAY, ESQ.
          Attorney for Defendant Refael Brodjik

10
     KOSTELANETZ & FINK
11        Attorneys for Defendant Alexandra Urbanek
     BY:  SHARON MCCARTHY, ESQ.
12        JULIET FINK, ESQ.

13   JAMES T. MORIARTY, ESQ.
          Attorney for Defendant Abraham Flam

14
     ROGER BENNETT ADLER PC
15        Attorneys for Defendant Aryea Yehuda Flohr
     BY:  ROGER B. ADLER, ESQ.

16
     DAVID GORDON, ESQ.
17        Attorney for Defendant Andre Herbst

18   PETER C. BRILL, ESQ.
          Attorney for Defendant Nathan Schwartz

19
     PAUL GREENFIELD, ESQ.
20        Attorney for Defendant Harold Tishler

21   JACOB LAUFER P.C.
          Attorneys for Defendant Chaim Walter
22   BY:  JACOB LAUFER, ESQ.

23   HAFETZ NECHELES & ROCCO
          Attorneys for Defendant Mayer Weber
24   BY:  SUSAN NECHELES, ESQ.
          NOAH SHELANSKI, ESQ.

25

121u1davc

1          (In open court)

2          (Case called)

3          THE CLERK:  Is the government present and ready to

4     proceed?

5          MR. REH:  Yes.  Good afternoon, your Honor.  John Reh

6     on behalf of the government.  I'm joined at counsel table by

7     Special Agent Deirdre Gordon from Homeland Security

8     Investigations and Special Agent Ryan Gibbs from the United

9     States Department of Labor.

10         THE COURT:  Is counsel for defendant Earl Seth David

11    present and ready to proceed?

12         MR. MOSKOWITZ:  Yes.  Good afternoon, your Honor.

13    Avraham Moskowitz for Mr. David, who's seated to my left.

14         THE CLERK:  Is counsel for defendant Gulay Cibik

15    present and ready to proceed?

16         MR. DONALDSON:  Yes.  For Mr. Cibik, Xavier R.

17    Donaldson.  He's seated in the back.

18         THE CLERK:  Is defendant Refael Brodjik present and

19    ready to proceed?

20         MR. duBOULAY:  Yes.  Good afternoon, your Honor.

21    Donald duBoulay for Mr. Brodjik, who's present.

22         THE CLERK:  Is defendant Alexandra Urbanek present and

23    ready to proceed?

24         MS. McCARTHY:  Yes.  Good afternoon, your Honor.

25    Sharon McCarthy and my associate Juliet Fink, and Ms. Urbanek

121u1davc

1    is also in the courtroom.

2            THE CLERK:  And counsel for defendant Abraham Flam,

3    are you present and ready to proceed?

4            MR. MORIARTY:  Yes, your Honor.  James Moriarty for

5    Mr. Flam, who's seated in the gallery.

6            THE CLERK:  And counsel for defendant Aryea Yehuda

7    Flohr, are you present and ready to proceed?

8            MR. ADLER:  Good afternoon, your Honor.  Roger Bennett

9    Adler, 233 Broadway, New York, New York.  I don't know if

10   Mr. Flohr has gotten here yet because I had it written down as

11   4:30, and I may have given him misinformation.  So I assume

12   he'll arrive shortly.  But we did speak to him today and he did

13   verify he was coming.  If there's any fault, it's mine.  I

14   apologize.

15           THE CLERK:  Is counsel for defendant Andre Herbst

16   present and ready to proceed?

17           MR. GORDON:  Yes.  David Gordon for Mr. Herbst.  He's

18   here.

19           THE CLERK:  Is counsel for defendant Nathan Schwartz

20   present and ready to proceed?

21           MR. BRILL:  Yes.  Good afternoon.  Peter Brill on

22   behalf of Mr. Schwartz.  Mr. Schwartz indicated he was going to

23   be a few minutes late, your Honor.

24           THE CLERK:  Is counsel for defendant Harold Tishler

25   present and ready to proceed?

121u1davc

MR. GREENFIELD:  Yes, your Honor.  Paul Greenfield.
Good afternoon.  Mr. Tishler is here in court.

THE CLERK:  Is counsel for defendant Chaim Walter
present and ready to proceed?

MR. LAUFER:  Good afternoon, your Honor.  Jacob Laufer
appearing for Mr. Walter, and Mr. Walter is present in the
courtroom.

THE CLERK:  And is counsel for defendant Mayer Weber
present and ready to proceed?

MS. NECHELES:  Good afternoon, your Honor.  Susan
Necheles and Noah Shelanski from Hafetz Necheles & Rocco, and
Mr. Weber is here in court.

THE COURT:  Okay.  Mr. Reh, how are we doing?

MR. REH:  Your Honor, to date the government has
produced roughly just over 50,000 pages' worth of documents
that are responsive to the matter.  In addition to that, we
plan on turning over at least two more batches of discovery,
one today and one probably within the next two weeks, which
comprises the lion's share or all of the computer evidence that
was seized as a result of searches that were conducted at the
law offices of Earl David & Associates in 2009.  That
information, we currently have it on hard drives, and having
spoken to the folks at forensics for Department of Labor and
ICE and the folks working here at the Southern District of New
York, we're trying to come up with the best way to give that to

121u1davc

1    each individual defendant without them having to have any

2    specific forensic capabilities of their own, meaning we're

3    going to have to extract data files, PFC files from those

4    computers and turn those over, and we anticipate that happening

5    within the next two weeks, your Honor.

6         THE COURT:  Did you say you were going to make

7    production today?

8         MR. REH:  Yes.  We did already extract e-mails off of

9    all of the computers that were seized at the various law firm

10   locations.  Those will be turned over, as well as a postarrest

11   statement that was made by one of the defendants in this case,

12   your Honor.

13        THE COURT:  And it's hard drives that are coming?

14        MR. REH:  Yes, your Honor.  Those hard drives have

15   been copied.  It's just a matter of me now working with the

16   forensics folks here at SDNY.  It's somewhat complicated, your

17   Honor, but what we're planning to do -- and this is something I

18   can address with counsel as well -- is to extract the data

19   files that are on those hard drives.  If any of the attorneys

20   are still interested in seeing the entire hard drive, we can

21   make copies of that as well, but that will require them, if

22   they don't have the capabilities, to purchase software in order

23   to read those materials.  We have done this in past cases.

24   When I say data files, it's most of the files, you know,

25   including Word documents, picture documents, things of that

121u1davc

1    nature, that we'll be pulling off of those computers and

2    distributing within the next two weeks.

3           THE COURT:  You don't produce the end of the line

4    programs?

5           MR. REH:  Yes, most of them are system files, your

6    Honor, so whatever the computer needs to run on, you know,

7    those files aren't generally included.  However, having said

8    that, we're willing, as long as they're willing to give us

9    their hard drive, to make a copy of the entire hard drive for

10   them.

11          THE COURT:  So counsel, you'll be done reviewing this

12   in about four weeks; right?

13          That was a joke.

14          So does someone want to speak on behalf the array of

15   defendants and come up with either a comment or a suggestion

16   about when we ought to come back?

17          MS. NECHELES:  Maybe if I could, because I think that

18   there's still some question that all the defense counsel had.

19   Last time we were here we talked about two things, I think.

20   One was the spreadsheet that the government was going to give

21   and another was the actual discovery.  The spreadsheet -- as

22   your Honor is aware of, this case involves a tremendous amount

23   of different files.  Many of the defendants are charged with

24   having written letters, being employers, and written false

25   letters, so we ask for the government to tell us which of the

121u1davc

1   aliens those defendants wrote letters for.  For example,

2   Mr. Weber, his only involvement, his only alleged involvement

3   in this case was to have written false letters that were then

4   submitted by the law firm.  So we asked for identification of

5   that.  We received two spreadsheets with a lot of things, with

6   a lot of names on it, and we have some questions which we'd ask

7   the government about which exact cases, and I expect we'll be

8   getting more answers from the government on that to be able to

9   straighten that out.

10            But then there is a whole second question about what

11   files go with each of the alien files, what actual documents go

12   with the files.  So we have spreadsheets which list, for

13   example, about 350 files, total, or 380, I think, just for my

14   client alone, alien files, and I have no way right now of

15   figuring out, or I can't really tell, have you produced

16   documents relating to that?  As far as I can figure out, the

17   only documents related to those 385 files that have been

18   produced are computer records, I think from the government

19   files.  But there must be, or I think there must be, actual

20   hard copies.  And that's extremely significant in this case

21   because the real issue here is whether my client actually

22   submitted these or whether his name was forged on these

23   documents, whether this was created by someone else and blamed

24   on my client.  So until we sort of get some sense of that --

25   and I'm not hearing, in what is being said right now, anything

121u1davc

1   about where the actual documents are, where the hard copies

2   are, not the computer files, and when will the hard copies be

3   produced.  So that's one question, I think.

4          And then the next question that comes up really is the

5   same, and I think it's a question for many of the defendants as

6   well, is, what *Brady* material is there on this specific issue

7   of whether files were forged, whether names were forged by

8   other people, by co-conspirators, alleged co-conspirators.

9          So I think those are two issues that we've written the

10  government about, and I know we just wrote them on Friday, so

11  before we can even really go much further forward, we sort of

12  need those answered.

13         And then I think there will be significant motions

14  here about whether this is really one big conspiracy or a spoke

15  and wheel.  For example, for all of the employer defendants

16  who, all they're alleged to have done was submitted letters,

17  why are they conspiring with each other?  And if they're not

18  one big conspiracy, this case is improperly joined under

19  Rule 8(b).  They should all be separate, and all of the

20  defendants who are employers defendants, just because it's a

21  similar act or same type of thing, would not make joinder

22  proper here.

23         MR. ADLER:  Judge, just briefly, just to add to what

24  Ms. Necheles has said, I specifically, in a customized informal

25  discovery letter that I never got a direct response to, made

121u1davc

1   that distinction between what was filed and what you heard

2   today was what was seized from the law firm computer.  What's

3   in the law firm computer may have some interest, but (A) it

4   wasn't responsive to what I asked for, and (B) it isn't

5   dispositive as to the case where there may have been, as

6   Ms. Necheles indicated, a number of situations in which

7   information having been shared with the law firm and perhaps

8   improper filings made on hypothetically six cases, that the law

9   firm, for its own reasons and for monetary compensation, used

10  and recycled that information without the knowledge, consent,

11  or participation of the employer defendants.  So when I heard

12  today about this massive production, if you listen carefully,

13  what the source of the production was, it troubles me, because

14  it's not responsive.

15          THE COURT:  What about the first 50,000 pages that

16  Mr. Reh produced?  What about those?

17          MR. DONALDSON:  The 50 or 15?

18          THE COURT:  I thought it was 50, but maybe I'm wrong.

19          MR. REH:  50, yes, your Honor.

20          MS. NECHELES:  We have looked through a lot of stuff,

21  I mean, it's all on a computer file, and we have found only one

22  actual hard copy with respect to our client.  Now the 385

23  files, there is one copy that we have, only one document, which

24  is actually a handwritten document or a document that is not

25  from a computer, that we've been able to locate out of all of

121u1davc

1    this with respect to our client.  Maybe it's somewhere I

2    haven't found in discovery because it's obviously difficult to

3    go through this much on a disc, but I don't think that this

4    stuff has been produced to us.

5          MR. ADLER:  The second piece, I had made a specific

6    *Brady* request.  I won't go through it all, but Ms. Necheles has

7    summarized it in terms of, is there information that the

8    government knows about which would be favorable to the

9    defendants, consistent with Ms. Necheles' description?

10         For instance, there's a proffer session.  Did people

11   who were working with the firm sometimes submit applications

12   without the express written consent and signature of the

13   employers?  So there's a genesis and a good faith basis to have

14   made the request.  I never received a response to my *Brady*

15   request, either in the initial informal discovery letter in

16   November or to the one filed I believe earlier this year.

17         MR. MORIARTY:  Your Honor, James Moriarty for

18   Mr. Flam.  Just a brief suggestion.  I think the actual number

19   is closer to 60,000 documents that we have so far.  My guess

20   is, we're talking at least another 10, 20, 30,000 documents.

21   Seems to me that this is one of the classic cases where there's

22   obviously a huge number of documents that at some point in time

23   the government is going to have to cull down these documents, I

24   think -- I'm not telling them how to run this case, obviously.

25   I cannot imagine them approaching this court and the jury,

121u1davc

1    saying, "By the way, there are a thousand documents you're

2    going to have to go through."  My guess is that sooner or

3    later, maybe the answer to a lot of the questions is the

4    government would go through these and figure out, Mr. Flam,

5    this is what we have against you, we intend to use against you,

6    this is the theory behind this.  Right now, for instance, I

7    have lots of documents but very few of them seem to be

8    relevant.  For instance, two, three years' worth of banking

9    statements that have no particular significance that I can see.

10   But why should folks spend lots of time going through documents

11   we don't even know what they're about.  So my sense is, if the

12   government is able to step forward and say, look, we're going

13   through this process and this is what we think we're going to

14   use against you and you, it might solve a lot of time problems.

15        MR. LAUFER:  Your Honor, if I may, simply to

16   underscore this *Brady* issue that Ms. Necheles and Mr. Adler

17   were referring to, we have gone through so many of these

18   documents.  There are companies with which my client had been

19   associated, and the applications that were made, as we have

20   seen them, your Honor, were made from addresses in South

21   Dakota; in Bellingham, Washington; Wilmington, Delaware; and

22   the like.  We've sought, so far in vain, for documents bearing

23   our client's signature.  There's a hundred or more of such

24   applications, many of them apparently with correspondence going

25   back and forth between the authorities and this company name in

121u1davc

1    South Dakota, and in Bellingham, Washington.  So I simply rise

2    to tell your Honor, this *Brady* issue is really quite

3    significant.  Not to suggest the government is withholding

4    *Brady*.  I'm not suggesting that at all.  What I'm saying is,

5    there's real concern here that a lot happened behind my

6    client's back and apparently the backs of other clients here.

7            THE COURT:  Mr. Reh, do you want to speak at this

8    point?

9            MR. REH:  Sure, your Honor.  Let me first start with,

10   if I can take a step back for a second.

11           With respect to the -- there's a difference between A

12   files and applications that were originally submitted to the

13   Department of Labor.  Those applications that were originally

14   submitted to the Department of Labor, which required a

15   sponsorship from an employer -- that's the employer defendants

16   that are in this case -- while they may eventually have become

17   part of an A file, we believe that the fraud was committed when

18   those applications were submitted.  All of those applications,

19   to my knowledge, have been turned over to each respective

20   defendant with respect to any connection they may have had to

21   that application; namely, their name being on the application,

22   a business that they were known to be associated with on that

23   application.  The last production that we had made to the

24   defendants included a spreadsheet with the applications that

25   were submitted with either a company that was associated with

121u1davc

1    their defendants or that had their defendant's name on it.

2         THE COURT:  Did you give a different spreadsheet to

3    each defendant?

4         MR. REH:  We gave every spreadsheet to every

5    defendant.

6         So for example, with respect to Mr. Weber, he got

7    everybody's spreadsheet, including his own.  Now in Mr. Weber's

8    case -- and I can talk about this with Ms. Necheles off line --

9    there were some applications with roughly 84 applications that

10   were not included on his spreadsheet, and we're going to work

11   that issue out.  I don't believe that happened with respect to

12   any of the other defendants.

13        Having said that, there were also then files that were

14   kept at the law firm that were associated with each of those

15   applications.  When we first met here, we had said to all of

16   the defense attorneys that they were at any time able to come,

17   to come look at those files, the files that were seized that

18   corresponded to those applications.  Only one attorney to date

19   has actually taken us up on that offer and come to take a look

20   at those files, and I can tell you that there was hundreds -- I

21   think there's 400, over 400 boxes -- and from looking at those

22   files myself, a lot of those files include original documents

23   which would otherwise be included in an alien file.  Maybe

24   perhaps it didn't make it to the alien file.  So those are

25   documents that are at their disposal, they can come look at.

121u1davc

1          THE COURT:  And those are A files or those are --

2          MR. REH:  Those are client files that are in the

3    possession of Homeland Security Investigations, and those

4    client files correspond, in some instances, or in all

5    instances, with respect to each defendant, to the applications

6    that they submitted.  So the application to Labor will begin

7    there and then perhaps any subsequent documents that were filed

8    to United States Citizenship and Immigration Services as a

9    result of an approval, etc.  So those files are available.

10         Now with respect to the issue that was being addressed

11   regarding individual signatures on applications, your Honor, we

12   have a number of witnesses in this case, cooperating witnesses,

13   and just witnesses in general, who will testify, with respect

14   to each defendant in this case, that these individuals came to

15   the law office, were paid for sponsoring aliens who they knew

16   they were never going to hire, okay, and that they were not

17   otherwise qualified to fill these jobs.

18         In addition, we will have evidence from witnesses who

19   will testify that all of these individuals actually brought

20   mail that was brought to their businesses to the law firm in

21   order to get the money from the law firm.  We'll have witnesses

22   who will say that they actually paid these individuals or saw

23   these people, these individuals getting paid.

24         So while I understand sort of the cry for, hey, we

25   want to see whether or not these signatures were theirs,

121u1davc

1    ultimately, once these individuals signed up to be sponsors,

2    knowing what they knew, the fraud was committed then.   It's

3    sort of irrelevant if at some point these signatures were

4    written by other people.

5         Now having said that, okay, there's no evidence in the

6    possession of the government that we know of that any of these

7    defendants' names were signed by other people without their

8    knowledge.   In fact, quite the contrary, the evidence that we

9    have through various witnesses will show that these individuals

10   continued to get paid for applications as they were submitted.

11   This law firm, your Honor, operated from 1996 till 2005.   It

12   operated at times 24 hours a day, seven days a week.   You can

13   imagine, when we went and seized this stuff, it was chaotic

14   there.   Is there a possibility that names were signed when the

15   people weren't there?   That's a possibility.   However, having

16   said that, we don't have any evidence right now that we've

17   uncovered that suggests that that actually happened.

18         MS. NECHELES:   Your Honor, I can address these two

19   things.

20         First, with respect to the *Brady*, I heard just now

21   that they have no evidence that these were signed by other

22   people without the defendants' consent, but I believe that if

23   they have evidence that the names of my client were signed on

24   documents.   Even if the person who is saying this is saying

25   that my client had consented, it's still *Brady*, because it's

121u1davc

1    still evidence that I could use that would be exculpatory.

2    Someone else signed the client's name.  So whether they believe

3    it or not, you know, that would be *Brady*.

4         MR. REH:  And that's my point.  We turned over those

5    applications, your Honor.  I mean --

6         MS. NECHELES:  No, your Honor.  What they turned

7    over -- and this is the distinction I was making before.  The

8    computer file says that somewhere in our office, the law firm

9    that's submitting it, has the signed document.  That document

10   has not been turned over.  I hear the government --

11        THE COURT:  But you can go and look at it.

12        MS. NECHELES:  Right.  But what the government said

13   last time -- and I went back and reviewed this a couple times

14   to try to remember, you know, what exactly happened, because it

15   was a while ago -- what they said last time was, there's 400

16   boxes of documents, they were going to begin going through them

17   and provide us with some sort of overall inventory, which is

18   why we haven't been down.  If we have to, we'll have to do

19   that.  What we spoke about last time and what I understood was

20   that the government seized all these documents, they were going

21   to have to go through them anyway for their case, and that they

22   would begin to, as part of the discovery, provide us with an

23   inventory because it's tens of thousands of cases.  So for us

24   to begin to go through and try to find --

25        THE COURT:  But you're not interested in tens of

121u1davc

1  thousands of cases.

2          MS. NECHELES:  Right, right.

3          THE COURT:  You have a client who's associated --

4          MS. NECHELES:  But how do I find those files?

5          MR. REH:  Your Honor, we turned over the inventory to

6  the boxes which include the client files.  There's over 400

7  pages of inventory sheets which explain what's in each and

8  every individual client file.

9          MS. NECHELES:  I don't believe that was turned over.

10          MR. MOSKOWITZ:  No.

11          MS. NECHELES:  I don't believe we've seen all of that.

12          MR. MORIARTY:  No.  Your Honor, I kept a pretty tight

13  tab on discovery we have.  Perhaps I have 16 or 17 pages of

14  inventory.  400, absolutely not.  Nothing close to that.

15          MR. REH:  Well, your Honor, unless I'm mistaken --

16  I'll go back and look at that, but we have logs, inventory logs

17  that were made at the time those boxes were initially reviewed,

18  they were done by agents, and they wrote down essentially what

19  the contents of those files were.  And I'm almost certain --

20          THE COURT:  Wrote down the contents of the boxes by

21  name?

22          MR. REH:  By client name and by what was in the file,

23  your Honor.

24          THE COURT:  Literally?

25          MR. REH:  Literally.  They were very, very --

121u1davc

1          THE COURT:  No.  Give me a second.

2          I just want to be clear.  I'm not on withering cross.

3   Are you saying that if there's a file like this that the agent

4   started at document one and wrote down, you know, this is the

5   case name, first document, superseding indictment, second one,

6   letter dated January 12th --

7          MR. REH:  No, your Honor.

8          THE COURT:  I didn't think so.

9          MR. REH:  But there is an inventory of each.

10         THE COURT:  So basically the inventory is files,

11  United States v. David; right?  Or the inventory is Joe Jones.

12         MR. REH:  Right.  Yes, your Honor.

13         THE COURT:  Okay.  And therefore, and you know which

14  box, from 1 to the 400 -- are there 400 boxes?

15         MR. REH:  Yes, your Honor.  325.

16         THE COURT:  Okay.  325 boxes.  And so if Ms. Necheles

17  or anyone wanted to figure out where the file for Joe Jones

18  was, you look at the list of 325 boxes, look for the name Joe

19  Jones, and then you'd go to box 68 and that's it; is that fair?

20         MR. REH:  Yes.  Yes, your Honor, it is.  I mean, they

21  would have to look at the inventory list to find the name.

22         THE COURT:  I understand that.  You have to look at

23  the inventory list.  So has there been a failure of

24  communication?

25         MS. NECHELES:  Yeah.  I hear the government.  I think

121u1davc

1   that they're mistaken, that that was not turned over, but I

2   assume now they'll turn it over and we'll be able to review

3   these documents.

4           MR. REH:  If it hadn't been turned over, your Honor,

5   then I apologize and it can be done in short order, because I

6   know for a fact that somebody individually scanned the

7   inventory.

8           THE COURT:  Well, I think all counsel are saying they

9   didn't get it; is that fair?

10          DEFENSE COUNSEL:  Yes.

11          THE COURT:  Okay.  I'm glad we had this little chat.

12          Okay.  So the bottom line was that the place to find

13  those hard copies was someplace in that 325 boxes, once you've

14  identified which folder is in which box.

15          MS. NECHELES:  It sounds to me, your Honor, like after

16  this we'll be able to go back and see, you know, before the

17  next court appearance, whether we are able to finish obtaining

18  the discovery.  Now we'll be able to go down and look through

19  those files and speak with the government if it's not, but

20  hopefully we will be able to find what we need.

21          MR. REH:  And one more thing, your Honor, is that the

22  files, the alien files which we're referring to, which would be

23  now essentially a third file, there were eventually some alien

24  files.  We've requested as many as we can.  We requested 400 of

25  them, and we've received I believe about 90 of them.  I know it

121u1davc

1    seems sort of odd that you request them and you don't receive

2    them, but a lot of these files are stored in the National

3    Records Center, a lot of them are held at service locations

4    across the United States.  However, I think that, from having

5    reviewed the client files myself, I believe there's ample

6    information that we'll address the concerns of the defense

7    counsel, although we will continue to try to locate any alien

8    files that actually were eventually made or brought by the --

9            THE COURT:  And as to this issue of who's signing,

10    presumably if counsel looked for the actual law firm files, the

11    client files, you would be able to pull out and see the

12    different documents that were either actually signed or

13    allegedly signed by your client and see if it appears to be

14    different signatures.

15            MR. REH:  Yes, your Honor.

16            MS. NECHELES:  Yes.  And I think I just don't

17    understand this last distinction between -- what are these

18    other client files?

19            MR. REH:  No.  They were electronic applications that

20    were filed with the Department of Labor.  Those are just the

21    applications, the ones you had just pulled out.

22            Secondly, there were client files that were stored at

23    the law firm, which include a lot of original documents.

24            And then third, the Department of Homeland Security,

25    more specifically, United States Citizenship and Immigration

121u1davc

1    Services, also, they have their own A files, or alien files,

2    that they keep as part of their records.  So some of these

3    individuals who eventually went on to petition through

4    Citizenship and Immigration Services also had alien files.  So

5    we're making efforts to get all of those alien files as well.

6            MS. NECHELES:  And are those just computer records or

7    are those --

8            MR. REH:  Handwritten?  Some of each.  I mean, there

9    should be originals in those as well.

10           THE COURT:  Mr. Donaldson?

11           MR. DONALDSON:  I think that most of my questions have

12   been answered.  My only concern was in fact not the first file,

13   not the computer-originated file, but the actual A files,

14   because unfortunately, or fortunately, depending on what your

15   perspective is, I just did one of these big immigration fraud

16   cases, and the treasure trove of information came from me going

17   to the US Attorney's Office and looking through 20 boxes at the

18   actual A files, and the actual A files were a lot bigger with a

19   lot more information about the particular person and a lot more

20   handwritten personal, historical information, and that was, in

21   my opinion, the most important file because it had the most

22   information in it.  So if they're telling me that there were

23   400 and they have 90, you're going to have letters in about two

24   weeks saying that, you know, I went to check but the 310 that

25   are missing are the ones that I really need.  But that's

121u1davc

1   just --

2           THE COURT:  How long ago did you ask for those?

3           MR. REH:  We asked a while ago, your Honor.  Like I

4   said, the files that are in the possession of United States

5   Citizenship and Immigration Services aren't that easy to

6   procure, and I know from experience --

7           THE COURT:  Well, that's comforting.

8           MR. REH:  I understand that, your Honor, and we are

9   making efforts to get that.  Having said that, I've reviewed a

10  number of A files during the course of my time with the

11  Department of Homeland Security and I can attest to the fact

12  that the stuff that's in the client files is very similar to

13  the stuff that would be included in an alien file.  Granted

14  it's probably not the comprehensive, the entire picture, but

15  there is a lot of those documents.

16          THE COURT:  Every alien has a number; right?  Every A

17  file has a number.

18          MR. REH:  Yes, your Honor.

19          THE COURT:  Therefore, it's not that complicated to

20  trace things by number.  I mean, I appreciate that if it's

21  living in Iron Mountain or wherever things live, that it

22  probably takes some time to get it, but the mere fact that it's

23  in Denver doesn't move me very much.  It seems to me you have a

24  case for and on behalf of this agency that is not unreasonable

25  to ask them to double their efforts to find things that are

121u1davc

1   categorized by number and presumably filed numerically.  Now

2   that may be an odd concept, but I suspect that is how they do

3   it.

4           MR. REH:  Yes, your Honor.

5           MR. DONALDSON:  I have one more small issue,

6   logistically.  Well, on the last case, when I went to go see

7   these actual files, that's when I was told I can go see the

8   files at my leisure.  That's not quite right, because you have

9   to be placed in a room to see the files and you're sitting with

10  either an agent or paralegal or somebody with you.  So if we

11  have 400 files, presumably we have, I don't know, 12 lawyers, I

12  don't exactly know logistically how that would work.

13          THE COURT:  What I would suggest was that several of

14  you view it at once.  It certainly would reduce the amount of

15  agent or paralegal time sitting with you, you know?  I'm not

16  saying you have to talk about it with each other, but you can

17  all be in the room.

18          MR. ADLER:  Judge, what about this?  I mean, I don't

19  think it would be so difficult to give the government a list.

20  I prepared a very simple one-page chart and simply saying,

21  here's the chart, this reflects the files that you seized off

22  of the law firm computer, and likely we'll get the boxes, here

23  are three available dates and times and we will come in --

24          THE COURT:  You know what?  I don't want to get into

25  this level of micromanaging the date book.

121u1davc

Okay.  So when do you think it makes sense to come back here?

MR. REH:  I'd say at least two months, your Honor.

MR. MORIARTY:  Your Honor, is the government seriously going to say here that they're going to deal with this case with 325 boxes of information, they're going to try to prosecute all of those individual cases of files?  Because we could be here an awfully long time if that's the case.  He's not saying perhaps 60 days from now come back and say we're going to cull this down to some way because we could -- having been at some of these cases, certainly it's been my experience that courts stress to the government that possibility.  Can't make them do it, obviously, but --

THE COURT:  I assure you that they will not be trying 325 or 400 files, because they would be destroying their own case because the jury would not be in their seats.  They would be snoozing on the floor.

MR. MORIARTY:  I don't disagree that your Honor is exactly right.  But in fact, they ought to make this culling sooner rather than later.

THE COURT:  Well, I assume -- maybe it's my naivete -- that before they indicted your clients, they collected evidence against each of them before they chose to, so I assume they have some kind of idea of what they want to pursue.  But seems to me, from listening to the defendants, that the defense at

121u1davc

1    least for some people is going to be that, hey, maybe my
2    client's name was used 20 times or a hundred times but actually
3    it wasn't authorized and they're not guilty of all that.   From
4    that perspective, does the defense need more rather than less?

5              MR. MORIARTY:  I suppose that's one perspective, your
6    Honor.

7              THE COURT:  Okay.

8              MR. MOSKOWITZ:  Your Honor, of course, I'm new to the
9    case and I haven't even gotten through the first production of
10   materials yet, so I think realistically, given the fact that
11   the government's first going to make at least one additional
12   production two weeks from now and then we still have to deal
13   with the physical documents, I think three months is probably
14   more realistic and certainly I think still optimistic.

15             THE COURT:  Well, I'm not assuming, by the way, that
16   the mere fact that you come back means that everything is done.
17   There's no point in coming back too soon in the sense of having
18   a repetition of the conversation we had.   The idea is, let's
19   create some sufficient data so that some progress is made,
20   maybe some new issues emerge and we can do something
21   constructive.   That's my only perspective on this.   So 90 days
22   is okay with me, 75 days is okay, whatever.

23             MR. MOSKOWITZ:  90 days I think is --

24             THE COURT:  Is there a consensus?  Do I hear 90?

25             DEFENSE COUNSEL:  Yes.

121u1davc

1          MR. GORDON:  The only problem is, I have a trial

2    April 23rd that's supposed to last several weeks.

3          THE COURT:  Okay.  Well, let's do this.  Shall we come

4    in the week before then and then ship you off?

5          MR. GORDON:  That's fine.

6          THE COURT:  Do you want to come in on Thursday,

7    April 19th, at 4:00?  Is that okay?

8          MR. MOSKOWITZ:  I think that would be fine.  I'm just

9    checking.

10          THE COURT:  4:00, April 19th.  Okay.  Hearing no

11    objection?

12          All right.  I assume that, given the state of

13    discovery, that there's no objection to excluding the speedy

14    trial time until the next conference?

15          MR. MOSKOWITZ:  No, your Honor.

16          THE COURT:  Again, hearing no objection, I find that a

17    continuance until April 19th serves the ends of justice and

18    outweighs the best interests of the public and the defendants

19    in a speedy trial in that it will permit additional time for

20    discovery to be made and for the defendants to review that

21    discovery.  Okay?

22          Very good.  Thank you.

23          ALL COUNSEL:  Thank you, your Honor.

24          MR. ADLER:  And I would like the record to reflect

25    that Mr. Flohr did arrive.

121u1davc

1          THE COURT:  Yes.  I saw some people come in.

2          MR. ADLER:  Yes.  I just wanted the record to reflect

3     that.

4          THE COURT:  Okay.

5                              oOo