D1n1cib1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                         11-CR-424 (NRB)

5   GULAY CIBIK, REFAEL BRODJIK,
    a/k/a "Rafi," NATHAN SCHWARTZ,
6   HAROLD TISCHLER, a/k/a
    "Hershy,"
7
                Defendants.              Jury Trial
8
    ------------------------------x
9
                                         New York, N.Y.
10                                       January 23, 2013
                                         9:10 a.m.
11

12  Before:

13                HON. NAOMI REICE BUCHWALD,

14                                       District Judge

15
                          APPEARANCES
16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  JANIS ECHENBERG
    JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
    MICHAEL DINET, Paralegal Specialist
20
    DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
    BY:  XAVIER R. DONALDSON, ESQ.
22
    LAWRENCE D. GERZOG, ESQ.
23  JEREMY L. GUTMAN, ESQ.
         Attorneys for Defendant Refeal Brodjik
24

25

D1n1cib1

                              APPEARANCES
                             (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D1n1cib1

```
 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  Is it necessary to talk about specific

 4    issues?

 5              MR. DONALDSON:  I don't think so.

 6              MR. PASTORE:  I don't think so, either.

 7              Just for the record, we've handed up and handed to

 8    defense counsel the duress issue that we had previously flagged

 9    for your Honor, in particular that it's some type of defense

10    that was presented in opening that if Ms. Cibik was merely

11    being obedient to authority, I believe the words were

12    unyielding obedience to authority, that that would somehow

13    excuse her actions, and the letter sets out why we believe that

14    that is an inappropriate defense and why a curative jury

15    instruction may be appropriate in light of the opening

16    statement.

17              THE COURT:  All right.  Well, Mr. Donaldson, you now

18    have two things that you need to address.  I don't know if

19    you're planning on doing it in writing or orally or --

20              MR. DONALDSON:  The second one today is a little more

21    voluminous and has a lot more caselaw than the first one

22    regarding -- from yesterday.  I think that can be taken care of

23    orally.  Neither one needs to be taken care of I don't think

24    right now.

25              THE COURT:  Okay.  Why don't we maybe pick up at least
```

D1n1cib1

1    on yesterday's issue at the end of today.  Okay?

2              MR. PASTORE:  Your Honor, should we put the witness in

3    the box?

4              THE COURT:  Sure.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1n1cib1

1           (Jury present)

2           THE COURT:  Good morning, everyone.

3           THE JURORS:  Good morning.

4           THE COURT:  At least it's warmer in here than it is

5    outside.

6           Okay.  Mr. Pastore, you may continue.

7           MR. PASTORE:  Thank you, your Honor.

8    DAVID GRYNSZTAJN, resumed.

9    DIRECT EXAMINATION CONTINUED

10   BY MR. PASTORE:

11   Q.  Good morning, Mr. Grynsztajn.

12   A.  Good morning.

13   Q.  Yesterday when we left off, we were talking about

14   Mrs. Schlickoren.  Do you remember that?

15   A.  Yes.

16   Q.  Okay.  Before we get there, I'm going to approach and show

17   you a few different exhibits.

18           I want to focus your attention on the board.  This

19   individual who is next to Mr. Flam, what names did you know

20   that individual by?

21   A.  Ansel Herbst or Erwin Herbst.

22   Q.  Ansel Herbst or Erwin Herbst?

23   A.  Yes.

24           MR. PASTORE:  Your Honor, at this time the government

25   offers 18B and 18C, which are nameplates consisting of Erwin

1   Herbst and Ansel Herbst.

2              THE COURT:  Received.

3              (Government's Exhibits 18B and 18C received in

4   evidence)

5   Q.  Okay.  And this individual who is underneath Mr. Gomaa and

6   Mr. Basit, what name did you know him by?

7   A.  Alex Lev or Alex Levitt.

8              MR. PASTORE:  Okay.  And your Honor, the government

9   offers 30E, which is a nameplate with Alex Lev on it.

10             (Government's Exhibit 30E received in evidence)

11  Q.  And finally, up here, the individual who's labeled Robert

12  Salamon, do you remember him by any other names?

13  A.  Sam Salamon.

14             MR. PASTORE:  The government offers 8B, a nameplate,

15  Sam Salamon.

16             (Government's Exhibit 8B received in evidence)

17  Q.  Okay.  I'm now going to show you what's been marked for

18  identification as Government's 23.  If you could take a look at

19  that and tell us if you recognize that.

20  A.  Yes, that's Moishe Rosenberg.

21  Q.  And is it a fair and accurate depiction of Mr. Rosenberg as

22  he appeared at the time you knew him during your work at the

23  law firm?

24  A.  Yes.

25  Q.  And remind us:  What services, if any, did he provide in

1    connection with the law firm?

2    A.   Provided a sponsor, filling out forms.

3    Q.   And filling out forms?

4    A.   Yes.

5           MR. PASTORE:   Okay.  Government offers 23 as well as

6    accompanying nameplate 23A.

7           THE COURT:   Received.

8           (Government's Exhibits 23 and 23A received in

9    evidence)

10   Q.   Okay.  I now want to turn back to Mrs. Schlickoren's

11   application.  Do you remember that we were discussing that;

12   right?

13   A.   Yes.

14   Q.   Okay.  I'm now going to hand you -- I'm now going to hand

15   you what's been marked for identification as 1113-14, -4, and

16   -5, as well as -3.

17          MR. DONALDSON:   As well as dash?

18          MR. PASTORE:   -3.

19   Q.   Starting with the first document, 1113-14, do you recognize

20   that?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's request for additional evidence from the USCIS.

24   Q.   And how do you recognize it as such?

25   A.   I've seen many of them.

1   Q.  Is there a date on this particular request?

2   A.  August 3rd, 2004.

3           MR. PASTORE:  Government offers 1113-14.

4           MR. DONALDSON:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 1113-14 received in evidence)

7           MR. PASTORE:  If we could just publish that to the

8   jury.

9   Q.  And while we're doing that, Mr. Grynsztajn, if you can tell

10  us, in general, when you received or the law office received

11  requests for additional information, what steps, if any, would

12  you take?

13  A.  The first thing we'd do, we'd call the client.

14  Q.  Okay.  Why did you call the client?

15  A.  Most of the time it's a request for the thousand-dollar

16  penalty, and another form has to be prepared.

17  Q.  And what additional form has to be prepared?

18  A.  The I-485 A supplement.

19  Q.  And from time to time would additional information aside

20  from the Supplement A and the $1,000 penalty be required?

21  A.  Yes.

22  Q.  What types of other information would be required?

23  A.  Either a job offer letter or employment letter or sometimes

24  tax returns, personal tax return.

25  Q.  Okay.  So either a job offer letter, did you say personal

D1n1cib1                              Grynsztajn - direct

1    tax returns and what other kind of letter?

2    A.  Or employment letter.

3    Q.  What's an employment letter?

4    A.  Employment letter shows that the person is working, and the

5    job offer letter is only a job offer.

6    Q.  Okay.  Let's look at Government's 1113-4.  Do you recognize

7    that?

8    A.  Yes.

9    Q.  What is it?

10   A.  That's Supplement A to the I-485.

11   Q.  How do you recognize it as such?

12   A.  I prepared many of them.

13   Q.  And is this particular supplement related to any person?

14   A.  Yes.

15   Q.  Who is it related to?

16   A.  Schlickoren, Ita.

17            MR. PASTORE:  Government offers Government 1113-4.

18            THE REPORTER:  Could you spell that name.

19            THE WITNESS:  S-C-H-L-C-K-O-R-E-N.

20            MR. PASTORE:  And your Honor, was the document

21   received into evidence?

22            THE COURT:  Yes.

23            MR. PASTORE:  Thank you.

24            (Government's Exhibit 1113-4 received in evidence)

25            MR. PASTORE:  If we could publish that to the jury.

1           Okay.  Oh, so in looking at this document, I notice,

2    just in terms of the last name, the spelling for the court

3    reporter, I believe it's S-C-H-L-I-C-K-O-R-E-N.  I don't know

4    if we had the "I" before.  If we did, I apologize.

5           Okay.  So in terms of this Supplement A, do you see

6    Part B where it says Eligibility and then box d is checked?

7    A.  Yes.

8    Q.  Can you please tell us, if you know, what box d is.

9    A.  It shows that the case was filed before April 30, 2001.

10   Q.  Okay.  That's the priority date that you were telling us

11   about yesterday?

12   A.  Yes.

13   Q.  Okay.  If we go to the next page of this document.

14          All right.  And who, if anyone, appears in the

15   signature block?

16   A.  Ita Schlickoren.

17   Q.  And right below that, do you see the name Jed David

18   Philwin?

19   A.  Correct.

20   Q.  Is that name familiar to you?

21   A.  Yes.

22   Q.  Who is Jed David Philwin?

23   A.  Jed Philwin was the attorney who took over the office after

24   Mr. David left.

25   Q.  And you mentioned earlier that Mr. David prepared, among

D1n1cib1                          Grynsztajn - direct

1    other things, experience letters and job offer letters.  Did

2    Mr. Philwin do that as well?

3    A.  I did not see that.

4    Q.  What did you see Mr. Philwin doing?

5    A.  Signing forms.

6    Q.  Okay.  So do I understand correctly -- was that all you saw

7    him doing?

8    A.  Signing forms, signing receipts.

9    Q.  Okay.  So essentially he was just signing the documents,

10   doesn't sound like you saw him creating documents; do I

11   understand that correctly?

12   A.  That's correct.

13   Q.  All right.  Now if we can turn to Government's 1113-5 and

14   -3.  We'll take them together.

15           First, if you can tell us what -5 is.

16   A.  It's a job offer letter.

17   Q.  How do you recognize it as such?

18   A.  I've seen many of them.

19   Q.  So what company does this job letter relate to?

20   A.  Abe's Vending.

21   Q.  Is there an address listed for Abe's Vending?

22   A.  1501 Pine Park Avenue.

23   Q.  And does this job offer letter relate to a particular

24   individual?

25   A.  Yes.

D1n1cib1                        Grynsztajn - direct

1    Q.  To whom does it relate?

2    A.  Ita Schlickoren.

3    Q.  Looking at this job letter, can you tell who or how it was

4    prepared?

5    A.  It was prepared in the office.

6    Q.  How do you know that that letter was prepared at the

7    office?

8    A.  The wording of it, the layout.

9    Q.  Okay.  When you say the wording of it, what do you mean?

10   A.  The way that this -- the way this letter was written.

11   Q.  And how have you seen -- have you seen that wording before?

12   A.  Yeah, I see it all the time.

13   Q.  Where have you seen it all the time?

14   A.  In the office.

15   Q.  When you said the layout, what do you mean by that?

16   A.  The way the spread, Abe's Vending, I've seen that before.

17   Q.  Okay.  So the way the letterhead is placed?

18   A.  Yes.

19          MR. PASTORE:  Government offers 1113-5.

20          THE COURT:  Received.

21          (Government's Exhibit 1113-5 received in evidence)

22          MR. PASTORE:  Okay.  And if we can publish that

23   document.

24   Q.  Is there a date on this particular document?

25   A.  8/9/04.

D1n1cib1                        Grynsztajn - direct

1    Q.  All right.  And when you were talking about the layout,

2    were you referring to where it says Abe's Vending, 1501 Pine

3    Park Avenue, Lakewood, New Jersey, and then it has a phone

4    number?

5    A.  Correct.

6    Q.  And when you were referring to the wording that you saw in

7    the office all the time, is that where it says, "She will

8    perform the following duties and responsibilities:  Bake

9    bagels, pastries, bread, donuts, cake, using hand and machine

10   tools"?  Is that the wording that you're referring to?

11   A.  Yes.

12   Q.  Do you recognize the name Abraham Flam?

13   A.  Yes.

14   Q.  How do you recognize it?

15   A.  I dealt with a lot of cases with Mr. Flam.

16          MR. PASTORE:  Okay.  Let's go now to Government's

17   1113-3, please.

18   Q.  What is that document?

19   A.  This is an employment letter.

20   Q.  Okay.  So this is -- in other words, the last one was a job

21   offer letter, this is an employment letter; is that right?

22   A.  Correct.

23   Q.  And does it relate to a particular company?

24   A.  Yes.

25   Q.  What company?

D1n1cib1                           Grynsztajn - direct

1    A.  Abe's Vending.

2    Q.  Does it relate to a particular individual, and if so, who?

3    A.  Ita Schlickoren.

4    Q.  And is it -- does a name appear in the signature block; if

5    so, whose name?

6    A.  Abe Flam.

7    Q.  And looking at this letter, can you tell how it was

8    prepared.

9    A.  It was prepared in the office.

10   Q.  How do you know that?

11   A.  The layout of it.

12           MR. PASTORE:  Government offers 1113-3.

13           THE COURT:  Received.

14           (Government's Exhibit 1113-3 received in evidence)

15           MR. PASTORE:  Okay.  If we could publish that document

16   as well, and if it's possible to bring up, please, 1113-5 and

17   -3 side by side.

18   Q.  Okay.  So on the last -- what's the date of the employment

19   letter?

20   A.  November 22nd, '04.

21   Q.  Okay.  And during what time period in the process, the

22   immigration process, would an employment letter typically be

23   prepared, in your experience?

24   A.  Towards the end of the case.

25   Q.  Why would it typically be prepared towards the end of the

1    case?

2    A.   Usually when you send in with the thousand-dollar penalty.

3           THE COURT:   Why do you incur this thousand-dollar

4    penalty?

5    Q.   Do you know why you incur the thousand-dollar penalty?

6    A.   That's for the people that are here without visa or with an

7    expired visa.   There's a whole Section 245 that says that --

8    Q.   So is it your understanding that under Section 245, if you

9    were here illegally, then you have to pay a thousand-dollar

10   penalty fee so you don't have to leave the country to come back

11   inside?

12   A.   Correct.

13   Q.   Okay.  And is that something that the law firm created or

14   is that something that immigration created?

15   A.   Immigration.

16   Q.   Okay.  So you guys did not collect a penny of that $1,000

17   penalty; right?

18   A.   No.

19   Q.   Okay.  You mentioned earlier that you're familiar with an

20   individual named Rachel Brodjik.  Can you just remind us who

21   Rachel Brodjik is.

22   A.   The wife of Mr. Brodjik.

23   Q.   When you say Mr. Brodjik, you're referring to the defendant

24   Refeal Brodjik?

25   A.   Yes.

D1n1cib1                          Grynsztajn - direct

1    Q.  Did you ever work on an immigration application related to

2    the Brodjiks?

3    A.  Yes.

4    Q.  Tell us how that came about.

5    A.  Mr. Brodjik started assisting Mr. David with his --

6    publishing his book, then Mr. -- I don't know what period of

7    time he did it, then Mr. -- Mr. David asked me, he said --

8    Mr. David said to me, he said he's gonna help me with the book

9    over there, with everything, so let's switch one case to him,

10   let's help him get the green card faster.

11   Q.  Okay.  Mr. David told you, let's switch a case to

12   Mr. Brodjik to help him get a green card faster?

13   A.  Correct.

14   Q.  Where did that conversation take place?

15   A.  I believe in the conference room.

16   Q.  In the conference room at 110 Wall Street?

17   A.  Yes.

18   Q.  Who was present for the conversation where Mr. David told

19   you to switch a case into Mr. Brodjik's name?

20   A.  Mr. David, Mr. Brodjik, and me.

21   Q.  And when you say switch a case, tell us what you mean by

22   switching a case.

23   A.  Take approved case and substitute the alien.

24   Q.  Okay.  And what was your understanding at that time whether

25   substitutions were allowed under the law?

1    A.  Yes.

2    Q.  They were allowed?

3    A.  Yes.

4    Q.  And did an application ultimately get filed in

5    Mr. Brodjik's name?

6    A.  No.

7    Q.  Whose name was the application filed in?

8    A.  Mrs. Brodjik.

9    Q.  Did anyone ever tell you why the application was being

10   filed in Mrs. Brodjik's name?

11   A.  Mr. David said when it comes to cook, the baker, in cases,

12   in an interview, it would be a lot easier for a woman to

13   explain.

14   Q.  Okay.  And when you say baker or cook, what are you

15   referring to?

16   A.  The job, the job, on the case.

17   Q.  And what job or what sponsor, if you know, was used for

18   Mrs. Brodjik's application?

19   A.  I believe it was one of the Flam companies.

20   Q.  Handing you what's been marked for identification as

21   Government's 400-1, and I'll retrieve from you the 1113 series.

22           Do you recognize the document that's in front of you?

23   A.  Yes.

24   Q.  Is it a multipage document?

25   A.  Yes.

D1n1cib1                          Grynsztajn - direct

1    Q.   Okay.  We're going to go through each page, so if you could

2    remove it from the plastic sleeve.  And if you can, tell us

3    what the first page of Government's 400-1 consists of.

4    A.   The letter that says that the case has been certified.

5    Q.   Okay.  Is that a labor certification that -- like the ones

6    that you previously told us about?

7    A.   Yes.

8    Q.   In whose name is this labor certification issued?

9    A.   Swierzewski.

10   Q.   Can you spell that for the court reporter.

11   A.   S-W-I-E-R-Z-E-W-S-K-I.

12   Q.   And is the labor certification dated?

13   A.   Yes.

14   Q.   What is the date on the labor certification?

15   A.   October 12, 2000.

16   Q.   Does the labor certification relate to a particular

17   company?

18   A.   Yes.

19   Q.   What company?

20   A.   Lakewood Bakery.

21   Q.   Do you recognize that company?

22   A.   Yes.

23   Q.   How do you recognize it?

24   A.   I've seen it before.  I had cases with it.

25   Q.   When you say you had cases with it, what do you mean by

D1n1cib1                          Grynsztajn – direct

1  that?

2  A.  I had other cases with the Lakewood Bakery.

3  Q.  Where it was used as a sponsor?

4  A.  Yes.

5  Q.  And is there a particular name associated with Lakewood

6  Bakery?

7  A.  Can you repeat?

8  Q.  Sure.  Is there a particular name associated with Lakewood

9  Bakery on the labor certification that you're looking at?

10  A.  Yes.

11  Q.  What name is associated with Lakewood Bakery?

12  A.  Abraham Flam.

13  Q.  If you could go to the next page and tell us what the next

14  page consists of.

15  A.  ETA 750A.

16  Q.  And to whom does this ETA 750A relate?

17  A.  Mr. Swierzewski.

18  Q.  And what company, if any, is listed on this Part A?

19  A.  Lakewood Bakery.

20  Q.  Is there a Part B to this particular application?

21  A.  Yes.

22  Q.  How many Part Bs are there for this particular application?

23  A.  There are three here.

24  Q.  Okay.  Tell us the first one.

25  A.  First part Mr. Swierzewski.

D1n1cib1                    Grynsztajn - direct

1   Q.  And again, is that Lakewood Bakery listed on there?

2   A.  Yes.

3   Q.  Tell us the second part B.

4   A.  Brodjik, Rachel.

5   Q.  And finally, the third Part B.

6   A.  Brodjik, Rachel.

7   Q.  So there's two copies of the Part B for Mrs. Brodjik; is

8   that right?

9   A.  Correct.

10  Q.  Why would there be a Part B for -- I think you told us

11  yesterday, but remind us.  Why would there be a Part B for

12  Mrs. Brodjik with someone else's name on the original Part B?

13  A.  When you substitute the case, it's a requirement you have

14  to file the two new ETA 750B forms for the new alien.

15          MR. PASTORE:  Okay.  Government offers 400-1.

16          MR. DONALDSON:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 400-1 received in evidence)

19          MR. PASTORE:  And if we could bring up 400-1 on the

20  screen.

21          If we could -- all right.

22  Q.  So this is the labor certification that we're looking at

23  currently displayed on the screen; is that right?

24  A.  Yes.

25          MR. PASTORE:  And if we could go to the next page.

1    Q.  This is the Part A that you were just describing?

2    A.  Yes.

3    Q.  And the address listed here for Lakewood Bakery, that's

4    225 Second Street; is that right?

5    A.  Yes.

6            MR. PASTORE:  Okay.  If we could keep going, please.

7            To the Part B.  One more page.

8    Q.  This is the initial Part B; is that right?

9    A.  Yes.

10           MR. PASTORE:  And if we can go to the second Part B,

11   please.  One more page.

12   Q.  And is this the -- this is Mrs. Brodjik's Part B?

13   A.  Yes.

14           MR. PASTORE:  And if you could go one more page,

15   please.

16   Q.  Okay.  And this is the job -- well, what is this

17   information here?

18   A.  The duties that she would perform.

19           MR. PASTORE:  And finally, if you could go to the next

20   page.

21   Q.  Is this the copy or the third Part B that you were

22   describing for us before?

23   A.  Yes.

24   Q.  Now the original alien's name --

25           MR. PASTORE:  If we could just jump back to Part 1 --

1    I'm sorry –– the first page.

2    Q.   The original alien, had you ever personally met that

3    original alien?

4    A.   Yes.

5    Q.   Where did you meet that alien?

6    A.   I met him at the office.

7    Q.   And was he one of your clients or someone else's client or

8    why was he in the office?

9    A.   He was Mr. David's client.

10   Q.   At any time did that client –– at any time did you

11   introduce that client or point out that client to anyone in the

12   office?

13   A.   Yes.  I pointed him out.

14   Q.   Who did you point him out to?

15   A.   Mr. Brodjik.

16   Q.   And what, if anything, did you tell Mr. Brodjik about this

17   client?

18   A.   That he had his case.

19   Q.   What, if anything, did Mr. Brodjik say or do after that?

20   A.   Few times when Mr. Swierzewski would come into the office,

21   he used to call him the alter kocker.

22   Q.   Okay.  Can you describe what that means.  Can you translate

23   that for us.

24   A.   In English?  He's an old fart.

25   Q.   So Mr. Brodjik would call him the old fart?

1   A.  Yes.

2   Q.  Now handing you what's been marked for identification as

3   Government's 400-3 and 400-4.  Do you recognize those?  Let's

4   start with 400-3.  Sorry.

5   A.  Yes.

6   Q.  What is Government's 400-3?

7   A.  I-140 petition.

8   Q.  How do you recognize it as such?

9   A.  I've seen them before.

10  Q.  And to whom did this particular I-140 relate?

11  A.  Rachel Brodjik.

12  Q.  Is there a particular company on this I-140?

13  A.  Lakewood Bakery.

14  Q.  And what is the address listed here for Lakewood Bakery?

15  A.  1501 Pine Park Avenue.

16  Q.  Are you familiar with that address at all?

17  A.  Yes.

18  Q.  How are you familiar with that address?

19  A.  I had a client that went down there to see.

20  Q.  Tell us what happened.

21          MR. GUTMAN:  Objection.  Hearsay.

22          MR. PASTORE:  Goes to state of mind, your Honor.

23          THE COURT:  I'll allow it.

24  Q.  Tell us what the client -- what happened with the client.

25  A.  The client went there, went to see the company; he came

D1n1cib1                        Grynsztajn – direct

1    back to the office screaming that the only thing what he found

2    was a private residence.

3    Q.   Have you ever been to 1501 Pine Park?

4    A.   No.

5    Q.   So if you can continue on this I-140, is it signed by

6    anyone?

7    A.   Mr. Flam.

8    Q.   And what is the date on this particular application?

9    A.   9/30/02.

10            MR. PASTORE:  Government offers 400-3.

11            MR. GUTMAN:  No objection.

12            THE COURT:  Received.

13            (Government's Exhibit 400-3 received in evidence)

14            MR. PASTORE:  If we could publish that on the screen.

15   Q.   And Mr. Grynsztajn, we're going to bring it up on your

16   screen for you.

17            First, I want to focus your attention on Part 2,

18   Petition Type.  Can you see that?

19   A.   Yes.

20   Q.   Okay.  And I know there's some writing over it, but can you

21   see which box is checked.

22            And if it's easier, Mr. Grynsztajn, I think it

23   should -- is it displayed on your screen?

24   A.   Yes.

25   Q.   Okay.  So if you look at what's zoomed in, can you tell

D1n1cib1                         Grynsztajn - direct

1    whether box a, b, c, d, e, g, or i is checked?

2    A.  E.

3    Q.  Okay.  And why is box e checked on this application?

4    A.  This job requires at least two years' experience.

5          MR. PASTORE:  And if we could zoom out and go to the

6    next page of this document, please.

7    Q.  I want to focus you in on Part 5, Additional Information.

8    Do you see where it says, Date Established, Current Number of

9    Employees, and Gross Annual Income?

10   A.  Yes.

11   Q.  Where would you get that information from?

12   A.  Usually from tax return.

13          MR. PASTORE:  Okay.  And finally, if we could go to

14   the last page of this document, please.

15   Q.  All right.  And are these the signatures that you were

16   discussing?

17   A.  Yes.

18   Q.  All right.  If we can go now to Government's 400-4, please.

19          What is Government's 400-4?

20   A.  Case for I-485.

21   Q.  How do you recognize it as such?

22   A.  I've seen many before.

23   Q.  And to whom does this particular I-485 relate?

24   A.  Rachel Brodjik.

25          MR. PASTORE:  Government offers 400-4.

1          MR. GUTMAN:  No objection.

2          (Government's Exhibit 400-4 received in evidence)

3          MR. PASTORE:  All right.  If we could publish 400-4.

4   Q.  I'm going to focus your attention on Part 2.  Where it says

5   Application Type, remind us, or tell us why box a is checked in

6   this case.

7   A.  Because she was the main person and the visa was available,

8   so she got in that part.

9   Q.  Okay.  If Mrs. Brodjik was applying with an I-140 and an

10  I-485, how, if at all, would that be beneficial to Mr. Brodjik?

11  A.  If they married, the spouse gets the -- the spouse and the

12  children go on the case.

13  Q.  I'm handing you now what's been marked for

14  identification -- we'll be going through Government's 400-10,

15  400-7, 400-5, and 400-8, and 9.  Let's start with each of --

16  let's start with 400-5.  Can you tell us what that is.

17  A.  That's a request from the immigration department for the --

18  for additional information.

19  Q.  And 400-7, what is that?

20  A.  Also request for additional information.

21  Q.  And how do you recognize each of these documents?

22  A.  I've seen many of them.

23  Q.  To whom does each of these documents relate, if you can

24  tell?

25          MR. GERZOG:  Objection, your Honor.  He hasn't said

D1n1cib1                    Grynsztajn - direct

1    that he has ever seen this document before, except perhaps in

2    the presence of the U.S. Attorney.  He said it looks like

3    documents that he's seen before, and that was being asked about

4    this specific document.

5            MR. PASTORE:  Your Honor, this is precisely the

6    objection we talked about.

7            THE COURT:  Go ahead.

8    Q.  Go ahead, Mr. Grynsztajn.  Who do these documents relate

9    to?

10   A.  The first document, Exhibit 5, belongs to Lakewood Bakery.

11   Q.  Okay.  So -5 belongs to -- is addressed to Lakewood Bakery;

12   do I understand that correctly?

13   A.  Yes.

14   Q.  And -7?

15   A.  To Rachel Brodjik.

16           MR. PASTORE:  Okay.  Government offers 400-7 and

17   400-5.

18           MR. GERZOG:  Subject to previous objection.

19           THE COURT:  Received.

20           (Government's Exhibit 400-7 and 400-5 received in

21   evidence)

22   Q.  And what is the date on --

23           MR. PASTORE:  If we could just publish it for the

24   jury, please.

25   Q.  What is the date -- what is the date that's listed on

1    400-7?

2    A.  October 20, 2004.

3    Q.  And what's the date that's listed on 400-5?

4    A.  October 20, 2004.

5    Q.  Now if you could look at Government's 400-8, please.

6    A.  Yes.

7    Q.  What is Government's 400-8?

8    A.  That's Supplement A to the I-485.

9    Q.  To whom does it relate?

10   A.  To Brodjik, Rachel.

11   Q.  Does this contain anything other than supplement I-485 A?

12   A.  A receipt for a thousand dollars.

13   Q.  And who is the receipt from?

14   A.  The immigration.

15   Q.  And how are you familiar with the I-485 Supplement A and

16   that receipt?

17   A.  I've filled out many of them and I've seen receipts.

18   Q.  How often would you actually see those receipts?

19   A.  Not too often.

20   Q.  But you have seen them before?

21   A.  Yes.

22   Q.  In the course of your work at the law firm; is that right?

23   A.  Yes.

24   Q.  To whom does this particular supplement A relate?

25   A.  Brodjik, Rachel.

1          MR. PASTORE:  Government offers 400-8.  And if we

2     could publish that.

3          THE COURT:  Received.

4          (Government's Exhibit 400-8 received in evidence)

5          MR. PASTORE:  If we could publish that to the jury as

6     well.

7          Okay.  And if we could go to the second page.

8          And Mr. Dinet, is the receipt on the third page?

9     Q.  All right.  So the receipt that we were discussing, is that

10    what's displayed on the screen here?

11    A.  Yes.

12         MR. PASTORE:  Your Honor, with the court's permission,

13    I'd actually like to publish this to the jury by passing it?

14         THE COURT:  Oh, okay.

15    Q.  Okay.  If you can turn your attention now to 400-10, if

16    you'll let us know what that's about.

17    A.  That's a tax return.

18    Q.  To whom -- to what company or individual do these tax

19    returns relate?

20    A.  Lakewood Bakery.

21    Q.  Have you seen these tax returns before?

22    A.  Yes.

23    Q.  When have you seen these tax returns?

24    A.  In the office.

25    Q.  And under what circumstances have you seen these?

D1n1cib1                      Grynsztajn - direct

1    A.  When I was working on another case with Lakewood Bakery.

2              MR. PASTORE:  Government offers 400-10.

3              THE COURT:  Received.

4              (Government's Exhibit 400-10 received in evidence)

5              MR. PASTORE:  And if we could publish 400-10.

6    Q.  Mr. Grynsztajn, how many -- have you taken it out of the

7    plastic sleeve?

8    A.  Yes.

9    Q.  How many years' worth of tax returns are included here?

10   A.  Two.

11   Q.  What two years are included?

12   A.  '96 and 2000.

13   Q.  Okay.  And earlier you mentioned that you would take

14   information off the tax returns to prepare the I-140.  Where

15   would that information appear on the tax returns, if at all?

16   A.  Can you repeat the question, please?

17   Q.  Sure.  On the I-140 you mentioned that, for example, the

18   date established for Lakewood Bakery, that you got that

19   information off tax returns.  Did you get it off of these tax

20   returns?

21   A.  Yes.

22   Q.  Where would you get that information on these tax returns?

23   A.  On the right side.

24   Q.  Is that Section C, where it says Date Incorporated?

25   A.  Yes.

D1n1cib1                          Grynsztajn - direct

1   Q.  Can you tell from looking at the tax returns who created

2   them; and if so, how can you tell that?

3   A.  Mr. Vago.  No signature and Copy stamp.

4   Q.  If we look at the bottom right next to the government

5   exhibit sticker, where it says Copy, is that the Copy stamp

6   that you're referring to?

7   A.  Yes.

8   Q.  Now let's take a look at Government's 400-9.  Do you

9   recognize that?

10  A.  Yes.

11  Q.  What is it?

12  A.  Job offer letter.

13  Q.  Does it relate to a particular individual?

14  A.  Brodjik.

15  Q.  Mrs. Brodjik?

16  A.  Yes.

17  Q.  And is there a particular company listed?

18  A.  Lakewood Bakery.

19  Q.  Is there a particular date on this letter?

20  A.  November 10, '04.

21          MR. PASTORE:  Government offers 400-9.

22          MR. GUTMAN:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 400-9 received in evidence)

25          MR. PASTORE:  And if we could publish 400-9 side by

1    side with 1113-3.

2              Okay.  It's a little small.

3    Q.  Okay.  Can you tell how 400-9 was prepared.

4    A.  Prepared at the office.

5    Q.  How do you know that?

6    A.  I've seen many of them.

7    Q.  And aside from seeing them prepared, is there anything else

8    that tells you it was prepared in the office?

9    A.  The layout, the wording.

10   Q.  And when you say the wording, are you referring to where it

11   says, for example, bakes pastries, cookies, cakes, including

12   seven-layer cakes, that wording?

13   A.  Yes.

14   Q.  And Lakewood Bakery, what's the address listed for Lakewood

15   Bakery in November of 2004?

16   A.  1501 Pine Park Avenue.

17   Q.  And jumping over to 1113, what is the address listed for

18   Abe's Vending also in November of 2004?

19   A.  Also 1501 Pine Park Avenue.

20   Q.  So do you know whether in fact there was a real job for

21   Mrs. Brodjik at Lakewood Bakery?

22             MR. GUTMAN:  Objection to the form, your Honor.  No

23   foundation for this witness' information in this regard.

24             THE COURT:  No, I'll allow it.

25   A.  There was no job.

D1n1cib1                        Grynsztajn - direct

1  Q.  How do you know that?

2  A.  Because the bakery did not exist.

3  Q.  And did you personally --

4          MR. GUTMAN:  Same objection, your Honor.

5          MR. PASTORE:  Your Honor, I'm happy to go -- I believe

6  the foundation has been laid.  Mr. Grynsztajn has testified,

7  among other things, that he paid for use of Lakewood Bakery,

8  that the taxes were phony, and that he personally used it on

9  applications and paid to use it on applications.  So that was

10 the foundation.  I know we laid that yesterday.

11         THE COURT:  Okay.

12 Q.  So did you personally use Lakewood Bakery on some of your

13 clients' applications?

14 A.  Yes.

15 Q.  Okay.  I want to go now to Government's 410-1, 410-2,

16 410-3.

17         All right.  Mr. Grynsztajn, starting with 410-1, do

18 you recognize that document?

19 A.  Yes.

20 Q.  What is it?

21 A.  It's a G-28.

22 Q.  How do you recognize it as such?

23 A.  I've seen them, I've prepared many of them.

24 Q.  You've seen them and prepared many of them, did you say?

25 A.  Yes.

1    Q.  And does this particular G-28 relate to a particular

2    individual?

3    A.  Yes, Mr. Brodjik.

4    Q.  I'm sorry.  Which?  Mr. or Mrs. Brodjik?

5    A.  Mr. Brodjik.

6    Q.  Is it dated?

7    A.  September 30, '02.

8            MR. PASTORE:  Government offers 410-1.

9            MR. GERZOG:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 410-1 received in evidence)

12           MR. PASTORE:  And if we could publish that for the

13   jury.

14   Q.  While we're publishing that, Mr. Grynsztajn, if you can

15   look at Government's 410-2.

16           Okay.  Do you see on the screen now the G-28 that you

17   were just describing?

18   A.  Yes.

19   Q.  What is Mr. Brodjik's middle name as listed on this

20   document?

21   A.  Arie Noach.

22   Q.  And under what circumstances -- do you know under what

23   circumstances a G-28 would be filed?

24   A.  To show that Mr. Brodjik is represented by attorney.

25   Q.  And can you tell from looking at this G-28 which attorney

D1n1cib1                          Grynsztajn - direct

1    is representing Mr. Brodjik.

2              MR. PASTORE:  If we can scroll down a little bit.

3    Q.  Can you tell from this G-28 which attorney is representing

4    Mr. Brodjik, according to the G-28?

5    A.  Yes.

6    Q.  Who?

7    A.  Mr. David.

8    Q.  Okay.  Take a look at Government's 410-2, tell us if you

9    recognize that; if so, what it is.

10   A.  Application for adjustment of status.

11   Q.  Is that the I-485?

12   A.  Correct.

13   Q.  To whom does it relate?

14   A.  Mr. Brodjik.

15   Q.  How do you recognize it as an I-485?

16   A.  I prepared many of them.

17             MR. PASTORE:  Government offers 410-2.

18             MR. GUTMAN:  No objection.

19             THE COURT:  Received.

20             (Government's Exhibit 410-2 received in evidence)

21   Q.  And I want to direct your attention on this 485 for

22   Mr. Brodjik to Part 2, and if you could look at what box is

23   checked in Part 2 and explain, if you know, why that box is

24   checked.

25   A.  B, that's a part where the spouse and the children go.

1    Q.   That's a part where the spouse and the children go?

2    A.   Yes.

3    Q.   So for Mr. Brodjik, do you know whether an I-140 was filed

4    in connection with Lakewood Bakery?

5    A.   No.

6    Q.   Why was -- do you know why an I-140 was not filed for

7    Mr. Brodjik?

8    A.   I-140 goes only to one person, the main person.

9            MR. PASTORE:  And if we could publish that for the

10   jury.  And Mr. Dinet, could you bring up the second page, with

11   the -- you know what, if we can just switch to the Elmo,

12   because I think the box is blotted out.

13   Q.   Mr. Grynsztajn, I'll direct your attention to your screen.

14   Apologize for the poor copy.

15           Okay.  Can you see that on your screen,

16   Mr. Grynsztajn?

17   A.   Yes.

18           MR. PASTORE:  And if we could focus in on --

19   underneath where it says Application Type -- appears to be a

20   little bit out of focus.

21           Okay.

22   Q.   Okay.  Box b, can you read what box b states.

23   A.   "My spouse or parent applied for adjustment of status or

24   was granted lawful permanent residence in an immigrant visa

25   category that allows derivative status for spouses and

D1n1cib1                    Grynsztajn – direct

1    children."

2    Q.  Okay.  And so in your understanding that's a reference to

3    the I-140 filed for Mrs. Brodjik; is that right?

4    A.  Correct.

5    Q.  If you could turn now to Government's 410-3.

6         What is Government's 410-3?

7    A.  A request for additional information.

8    Q.  And from whom is this request sent?

9    A.  USCIS.

10   Q.  How do you recognize it as such?

11   A.  Yes.

12   Q.  How do you -- how do you recognize it as such?

13   A.  I've seen them before.

14   Q.  And to whom did this particular document relate, if you can

15   tell?

16   A.  Mr. Brodjik.

17            MR. PASTORE:  Okay.  Government offers 410-3.

18            MR. GERZOG:  No objection.

19            (Government's Exhibit 410-3 received in evidence)

20            (Continued on next page)

21

22

23

24

25

D1NLCIB2                         Grynsztajn – direct

1    BY MR. PASTORE:

2    Q.  As that's being published, I'm handing to the witness

3    what's been marked for identification as 410-4.

4           Okay.  Do you recognize that document?

5    A.  Yes.

6    Q.  Can you tell us what Government's 410-4 is?

7    A.  Supplement A to the I-485.

8    Q.  How do you recognize it as such?

9    A.  I prepare many of them.

10   Q.  To whom does this document relate?

11   A.  Mr. Brodjik.

12   Q.  Does it contain anything other than the supplement A?

13   A.  Receipt.

14   Q.  And can you describe the receipt for us?  I'm sorry.  Let

15   me rephrase that.

16          Do you recognize the receipt?

17   A.  Yes.

18   Q.  How do you recognize it?

19   A.  I seen it before.

20   Q.  And what type of a receipt is it?

21   A.  It's receipt from immigration.

22          MR. PASTORE:  Government offers 410-4.

23          MR. GERZOG:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 410-4 received in evidence)

1            MR. PASTORE:  And if we could publish 410-4, please.

2    And if we could go to the next page, please.  And, finally, the

3    third page.  Okay.

4            So again, your Honor, I'll just ask the Court's

5    permission to publish this to the jury by passing it into the

6    jury box.

7            As I do that, I'm also handing the witness

8    Government's 14.

9            MR. GERZOG:  I'm sorry, what number?

10           MR. PASTORE:  Government's 14.

11   Q.  Do you recognize Government's 14?

12   A.  Yes.

13   Q.  What is it?

14   A.  Mr. Philwin.

15   Q.  And what is Mr. Philwin's full name?

16   A.  Jed David Philwin.

17   Q.  And does it fairly and accurately depict Mr. Philwin as he

18   appeared during the time period that you worked at the law

19   firm?

20   A.  Yes.

21           MR. PASTORE:  Government offers 14.

22           MR. GERZOG:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 14 received in evidence)

25   Q.  And you said that Mr. Lev you also knew as Mr. Levit; is

1   that right?

2   A.  Yes.

3           MR. PASTORE:  Government offers 30D which is a name

4   plate that says Alex Levit on it.

5   Q.  With respect to Mr. Brodjik, how often would you see him in

6   the office?

7           MR. GERZOG:  Time period, your Honor.

8           MR. PASTORE:  Pardon?

9           THE COURT:  He asked you to put a time period into

10  your question.

11  Q.  During the time -- you began working in the office in 2000;

12  is that right?

13  A.  Yes.

14  Q.  I'm sorry, you began in 1999, you began preparing petitions

15  in 2000; is that right?

16  A.  Correct.

17  Q.  When did Mr. Brodjik begin working in the office?

18  A.  I think sometime 2003.

19  Q.  Approximately when did you leave the office?

20  A.  I left in 2006.

21  Q.  So between 2003, when Mr. Brodjik started working in the

22  office, and 2006, when you left of the office, how often would

23  you see Mr. Brodjik in the office?

24  A.  Almost a daily basis.

25  Q.  When you saw Mr. Brodjik in the time period after Mr. David

1   left, in general why were you seeing Mr. Brodjik?

2              MR. GUTMAN:  Objection to the form.

3              THE COURT:  Why -- it doesn't work.

4   Q.  When you saw Mr. Brodjik, did you discuss anything with

5   Mr. Brodjik?

6   A.  Yes.

7   Q.  Did he ask you for anything?

8   A.  Yes.

9   Q.  What did he ask you for?

10  A.  For money for Mr. David.

11  Q.  In general, what words did he use to ask you for money for

12  Mr. David?

13  A.  "Do you have any gelt?"

14  Q.  Any guilt?

15             THE COURT:  Gelt, G-E-L-T.

16             MR. PASTORE:  Thank you.

17  Q.  I'm handing you what's been marked for identification as

18  411, as Government's 411, 602, and 603.

19             MR. DONALDSON:  Judge, I'm sorry.  The last word,

20  gelt?

21             THE WITNESS:  Gelt, G-E-L-T.

22             THE COURT:  It's Yiddish for money, like Hanukkah

23  gelt.

24             MR. DONALDSON:  You know, I should know that.  I'm

25  sorry.

1          THE COURT:  If you're hanging around New York long

2     enough -- sometimes the Hanukkah gelt comes in little chocolate

3     coins.  Those are very good too.

4          MR. DONALDSON:  Got it.

5     Q.  All right.  Mr. Grynsztajn, let's take a look at

6     Government's 411.  Do you recognize that?

7     A.  Yes.

8     Q.  What is it?

9     A.  It's a photograph of Mr. Brodjik.

10    Q.  And does it fairly and accurately depict Mr. Brodjik as he

11    appeared in the time period 2003 to 2006 when you were working

12    with him?

13    A.  Yes.

14         MR. PASTORE:  Government offers 411.

15         MR. GERZOG:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 411 received in evidence)

18         MR. PASTORE:  And if we could bring it up on the

19    screen, and I'm also going to publish it to the jury by handing

20    it to them.

21    Q.  Okay.  Do you know where this picture was taken?

22    A.  At the law office.

23    Q.  How do you know it was taken at the law office?

24    A.  I recognize the books and where the computer was.

25    Q.  Okay.  When you say you recognize where the computer is,

D1NLCIB2                          Grynsztajn – direct

1    tell us in this photo where the computer is?

2    A.  That was in the conference room.

3    Q.  And where in this photograph, if you can just point to it,

4    where is the computer in this photograph?

5    A.  It's on the left side with the plastic cover.

6    Q.  It's with a plastic cover?

7    A.  Yes.

8    Q.  In general, do you remember who used that computer?

9    A.  Mr. Flam.

10   Q.  When you say Mr. Flam, which Mr. Flam are you talking

11   about?

12   A.  Josh Flam.

13   Q.  Okay.  So do you see the green light on the overhead

14   projector?

15   A.  Yes.

16   Q.  Is that the computer you're referring to?

17   A.  Yes.

18   Q.  And behind Mr. Brodjik, you said there were law books.  I'm

19   panning back and forth with the green light.

20           Are those the law bookings you're referring to?

21   A.  Correct.

22   Q.  And you recognize this generally as the conference room; is

23   that right?

24   A.  Yes.

25   Q.  Okay.  If you can take a look at the next Government

D1NLCIB2                       Grynsztajn - direct

1    Exhibit, what exhibit are you holding in your hand there?

2    A.   A photograph of Mr. Moin.

3    Q.   And what Government Exhibit number is that?

4    A.   602.

5    Q.   And who is Mr. Moin?

6    A.   He worked together with Mr. David.

7    Q.   And does it fairly and accurately depict Mr. Moin as you

8    knew him during your time at the law firm?

9    A.   Yes.

10   Q.   Government offers -- is it 602, Mr. Grynsztajn?

11   A.   602.

12           MR. PASTORE:  Government offers 602.

13           MR. GERZOG:  No objection.

14           (Government's Exhibit 602 received in evidence)

15           THE COURT:  How do you spell that name?

16   Q.   Can you spell that name for us?

17   A.   M-O-I-N.

18   Q.   M-O-I-N.  And do you know what Mr. Moin's role was at the

19   law firm, what he did at the law firm?

20   A.   Filing labor cases, filing H1s.

21   Q.   What's an H1?

22   A.   It's a working visa.

23   Q.   Is that -- is your understanding that that is the name of

24   the visa associated with these labor certs that you were

25   dealing with?

D1NLCIB2                        Grynsztajn - direct

1    A.  No.

2    Q.  Okay.  What is the H1?

3    A.  H1 is not a green card.  It's people are allowed to work

4    for three years, somebody with a bachelor's degree.

5    Q.  So it's something different from the labor certification

6    process?

7    A.  Correct.

8            MR. PASTORE:  And if we could publish 602 to the jury.

9    Q.  And then looking at 602, do you see, if you can take a look

10   at the overhead projector, and do you see where the laser

11   pointer is over the sort of head of Mr. Moin?

12   A.  Yes.

13   Q.  What do you have up there, what are those?

14   A.  Files.

15   Q.  And if we could go to 603, please.

16           Do you recognize Government's 603?

17   A.  Yes.

18   Q.  What is it?

19   A.  Photograph of Mark Vago.

20   Q.  Does it fairly and accurately depict -- let me ask you, did

21   you know Mark Vago from your time at the law office?

22   A.  Yes.

23   Q.  Do you know what his duties and responsibilities were at

24   the law office?

25   A.  Filing labor cases.

D1NLCIB2                          Grynsztajn - direct

1   Q.  You mentioned a name earlier, David Vago.  Is Mark Vago in

2   any way related to him?

3   A.  Mark Vago is the son.

4   Q.  It's David Vago's son?

5   A.  Correct.

6   Q.  Does this picture fairly and accurately depict Mark Vago as

7   you knew him during your time at the law firm?

8   A.  Yes.

9           MR. PASTORE:  Government offers 603.

10          MR. GERZOG:  No objection.

11          THE COURT:  No objection.  Received.

12          (Government's Exhibit 603 received in evidence)

13          MR. PASTORE:  If we could bring it up on the screen,

14   please.

15   Q.  All right.  Looking at Government's 603, can you actually

16   tell where this picture was taken?

17   A.  This is Mr. David's office.

18   Q.  It was in Mr. David's office?

19   A.  Yeah.

20   Q.  Do you see behind Mr. Vago's head, can you tell us do you

21   see where the laser pointer is, Mr. Grynsztajn?

22   A.  Yeah, folders.

23   Q.  Okay, the folders?

24   A.  Yeah.

25   Q.  Are you referring to where I have the laser pointer?

D1NLCIB2                          Grynsztajn - direct

1    A.  Yes.

2    Q.  Okay.  How was it that you came -- well, do you know how

3    the government got these photos?

4    A.  I'm not sure.

5    Q.  Well, were they ever in your possession?

6    A.  Yes.

7    Q.  Did you provide them to the government?

8    A.  Yes.

9    Q.  And how did you come to have possession of these

10   photographs?

11   A.  Somebody gave it to me.  I'm not sure.

12   Q.  Somebody gave it to you, and was that someone associated

13   with the law firm, friend?

14   A.  When I was working there, somebody, one of the coworkers,

15   somebody took the picture and gave it to me.

16   Q.  Okay.  And so you had these pictures in your possession; is

17   that right?

18   A.  Yes.

19   Q.  I want to turn now to an individual named Avinash Dev, are

20   you familiar with that individual?

21   A.  Yes.

22   Q.  How are you familiar with that individual?

23   A.  I seen this case in the office.

24   Q.  Under what circumstances have you seen his case?

25   A.  We did some work on his case.

D1NLCIB2                          Grynsztajn - direct

1    Q.  You did some work on his case?

2    A.  I assisted him.

3    Q.  Okay.  I'm going to hand you what's been marked for

4    identification as 1106-5, -6, -8, -1, and -10.

5           Starting with the first document, 1106-5, do you

6    recognize that document?

7    A.  Yes, it's a cover letter.

8    Q.  Does the cover letter have a date on it?

9    A.  Yes.

10   Q.  Does the cover letter mention a particular name?

11   A.  Yes.

12   Q.  What name does it mention?

13   A.  Avinash Dev.

14   Q.  Does it mention a particular company?

15   A.  Baker's Delight.

16   Q.  Are you familiar with that company?

17   A.  Yes.

18   Q.  How are you familiar with that company?

19   A.  I had cases before with that company.

20   Q.  Meaning you used it to sponsor your clients?

21   A.  Yes.

22   Q.  Can you tell from looking at this cover letter whether

23   there is a name in the signature block?

24   A.  Yes.

25   Q.  What name is appears there?

1   A.  Mr. David's.

2              MR. PASTORE:  Government offers 1106-5.

3              THE COURT:  Received.

4              (Government's Exhibit 1106-5 received in evidence)

5              MR. PASTORE:  If we could publish it to the jury.

6   Q.  Okay.  So looking at this cover letter, it says please find

7   enclosed I-140/I-485 petition with supporting documentation.

8              So you mentioned yesterday at one point the I-140 and

9   the I-485 could be filed together; is that right?

10  A.  Yes.

11  Q.  And do you see where it says case type, concurrent filing,

12  is that what that is a reference to?

13  A.  Yes.

14  Q.  If we could go to Government's 1106-6.  Can you tell us

15  what that is?

16  A.  That's a labor ETA 750A.

17  Q.  To whom does it relate?

18  A.  Dev Avinash.

19  Q.  How do you recognize it as an ETA 750A?

20  A.  I've seen it before.

21  Q.  Does it have a part B associated with it?

22  A.  No.

23             MR. PASTORE:  Government offers 1106-6.

24             MR. GERZOG:  No objection.

25             THE COURT:  Received.

D1NLCIB2                          Grynsztajn - direct

1                    (Government's Exhibit 1106-6 received in evidence)

2        Q.  And while that's being published to the jury, if you could

3        look at 1106-8 and tell us what that is?

4        A.  I-140 petition.

5        Q.  To whom does it relate?

6        A.  Dev Avinash.

7        Q.  And how do you recognize it as an I-140 petition?

8        A.  I've seen them before.

9                    MR. PASTORE:  Government offers 1106-8.

10                   THE COURT:  Received.

11                   (Government's Exhibit 1106-8 received in evidence)

12       Q.  So I want to stay on 1106-6 for a moment.

13                   Baker's Delight, do you see where it says name of

14       employer on this document, Baker's Delight, and then it's got

15       an address?

16       A.  Yes.

17       Q.  What's the address that's listed there?

18       A.  225 2nd Street.

19       Q.  In Lakewood, New Jersey; is that right?

20       A.  Correct.

21       Q.  Do you recognize that address as being associated with any

22       other companies that we've discussed yesterday or today?

23       A.  Yes.

24       Q.  Do you remember what companies?

25       A.  I believe Lakewood Bakery.

1    Q.  Now let's take a look at and publish 1106-8, please.

2              As you're looking at 1106-8, can you tell us if it's

3    dated, Mr. Grynsztajn?

4    A.  Yes.

5    Q.  What's the date on it?

6    A.  8/26/02.

7    Q.  And now if you look at what's on the screen, part 1, where

8    it says Baker's Delight, what's the address listed now for

9    Baker's Delight on this application?

10   A.  1501 Pine Park Avenue.

11   Q.  Do you recognize that address as being associated with any

12   other companies we discussed yesterday or today?

13   A.  Yes.

14   Q.  Do you remember what companies?

15   A.  Lakewood Bakery, My Favorite Bakery, Abe's Vending.

16   Q.  If we can go to Government 1106-1, please, and if you could

17   tell the jury what that document is, how you recognize it, and

18   to whom it relates.

19   A.  That's I-485 application for adjustment of status.

20   Q.  How do you recognize it as such?

21   A.  Yes.

22   Q.  How do you recognize it as such?

23   A.  I prepare many of them.

24   Q.  To whom does this particular I-485 relate?

25   A.  Dev Avinash.

1      MR. PASTORE:  Government offers 1106-1.

2      THE COURT:  Received.

3      (Government's Exhibit 1106-1 received in evidence)

4   Q.  And looking at 1106-10, I believe it's two-page document,

5   if you could remove it from the sleeve and tell us what it is.

6      MR. PASTORE:  And, in the meantime, if we could

7   publish 1106-1, please.

8   Q.  Okay.  Looking for a moment at 1106-1, you said that

9   relates to Avinash Dev.  Can you tell that from the part 1

10  information?

11  A.  Yes.

12  Q.  And is this particular document dated on the last page?

13  A.  Yes, 8/20/02.

14  Q.  Okay.  If we go now to Government's 1106-10, which I

15  believe you've removed from the plastic sleeve, can you tell us

16  what each those documents are, if you recognize them?

17  A.  G-28s.

18  Q.  To whom do each of those G-28s relate, if you can tell?

19  A.  One to Baker's Delight, one to Avinash Dev.

20      MR. PASTORE:  Government offers 1106-10.

21      MR. GERZOG:  Without objection.

22      THE COURT:  Received.

23      (Government's Exhibit 1106-10 received in evidence)

24  Q.  While that's being published to the jury, I'm going to hand

25  you 1106-7, 1106-3, and 1106-2.

1          1106-7 is a multipage document so I'll ask you to

2     remove it from the sleeve.

3          Okay.  Looking at the first page of 1106-7, can you

4     tell us what it is and how you recognize it?

5     A.  It's a cover letter.

6     Q.  Does it relate to a particular individual?

7     A.  Yes.

8     Q.  To whom does relate?

9     A.  Dev Avinash.

10    Q.  And how do you recognize it as a cover letter?

11    A.  I've seen them before.

12    Q.  That's the first page of 1106-7, right?

13    A.  Yes.

14    Q.  What is the second page of 1106-7?

15    A.  It's a experience letter.

16    Q.  How do you recognize it as such?

17    A.  I seen letters like this before.

18    Q.  Looking at this experience letter, can you tell how whether

19    it was prepared at the law firm, and if so, why or why not?

20    A.  It was not done in the office.

21    Q.  What makes you say it was not done in the office?

22    A.  The way it's prepared, the wording of it, and the layout,

23    totally different.

24    Q.  Okay.  And if we could go now to 1106-7, the next page,

25    please.  What is that page?

D1NLCIB2                        Grynsztajn - direct

1    A.  That's tax returns.

2    Q.  Tax returns for what company or individual?

3    A.  My Favorite Bakery.

4    Q.  It's from My Favorite Bakery?

5    A.  Yes.

6    Q.  Is there a DBA listed on the tax returns?

7    A.  Yes, Baker's Delight.

8    Q.  Have you seen these tax returns before?

9    A.  Yes.

10   Q.  Where have you seen them?

11   A.  The office.

12   Q.  And do you know how many years of tax returns are included

13   in 1106-7?

14   A.  Two years.

15   Q.  What two years?

16   A.  2000 and '98.

17           MR. PASTORE:  Government offers 1106-7.

18           MR. GERZOG:  Without objection.

19           THE COURT:  Received.

20           (Government's Exhibit 1106-7 received in evidence)

21           MR. PASTORE:  If we could publish 1106-7.  And I want

22   to go, please, to the second page.

23   Q.  I'm sorry, Mr. Grynsztajn, did you say there were two years

24   of tax returns or are there three years of tax returns in

25   1106-7?

D1NLCIB2                        Grynsztajn - direct

1    A.  Sorry, there's three.

2    Q.  Three years, okay.  And what -- are the three years '98,

3    '99, and 2000?

4    A.  Yeah, '99 I missed.

5    Q.  Is this the experience letter that you were discussing?

6    A.  Yes.

7    Q.  If the experience letter -- let me ask you this.  Did you

8    have instances in which you had clients who did not need

9    experience letters provided for them by the firm?

10   A.  Correct.

11   Q.  In those circumstances, did they ever tell you how they got

12   the experience letters?

13   A.  They said they would get it from their country.

14   Q.  And did the clients in fact provide you with experience

15   letters that they had gotten from their country?

16   A.  Yes.

17   Q.  I want to turn now to the next exhibit that's before you.

18   Go ahead and pick it up.  It should be 1106-3.  Do you

19   recognize it?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's an employment letter.

23   Q.  It's an employment letter?

24   A.  It's a job offer letter.  I'm sorry.

25   Q.  So 1106-3 is a job offer letter?

D1NLCIB2                        Grynsztajn – direct

1    A.  Correct.

2    Q.  Does it relate to a particular individual?

3    A.  Yes.

4    Q.  Who does it relate to?

5    A.  Avinash Dev.

6    Q.  Does it mention a particular company?

7    A.  Yes.

8    Q.  What company does it mention?

9    A.  Oneg Bakery.

10   Q.  And from looking at this, can you tell whether the fake job

11   offer letter was prepared in the office?

12   A.  Yes.

13   Q.  And was it prepared in the office?

14   A.  Yes.

15   Q.  What makes you say that?

16   A.  Because I know who provided the company.

17   Q.  Who provided the company?

18   A.  Mr. Teitelbaum.

19            MR. PASTORE:  Okay.  Government offers 1106-3.

20            MR. GERZOG:  No objection.

21            THE COURT:  Received.

22            (Government's Exhibit 1106-3 received in evidence)

23            MR. PASTORE:  And if we could display it.  Mr. Dinet,

24   can we do three documents at the same time?  No.  Just two.  If

25   we can display it with 1113-5 side by side.

1    Q.  Aside from knowing that the Oneg Bakery was one of

2    Mr. Teitelbaum's companies, was there anything else about this

3    letter that tells you it was prepared at the law firm?

4    A.  The layout, the wording.

5    Q.  The layout and the wording?

6    A.  Yeah.

7    Q.  Okay.  And with respect to the signature, do you see the

8    name Chaim Walter in the signature block?

9    A.  Yes.

10   Q.  Is that name in any way familiar to you?

11   A.  Mr. Teitelbaum told me that's his friend.

12   Q.  All right.  Now I'd like to turn to 1106-2, please.  Do you

13   recognize that document?

14   A.  Yes.

15   Q.  Please tell us what it is.

16   A.  It's a job offer letter.

17   Q.  Does it relate to a particular individual?

18   A.  Yes.

19   Q.  Who does it relate to?

20   A.  Avinash Dev.

21   Q.  And does it relate to a particular company.

22   A.  Oneg Bakery.

23            MR. PASTORE:  Government offers 1106-2.

24            MR. GERZOG:  Without objection.

25            THE COURT:  Received.

 1              (Government's Exhibit 1106-2 received in evidence)

 2              MR. PASTORE:  And if we could publish 1106-2 again

 3   side by side with 1113-5.

 4   Q.  Looking at 1106-2, can you tell how it was prepared?

 5   A.  It's prepared in the office.

 6   Q.  And what makes you say it was prepared in the office?

 7   A.  I seen this letter being prepared many times.

 8   Q.  Okay.  Is that, on the left, is that Oneg Bakery letter

 9   that you were just describing?

10   A.  Yes.

11   Q.  I'm handing you what's been marked for identification as

12   Government's 3036.  And it's I believe been admitted into

13   evidence already.

14              Can you tell us do you recognize this, if so, what is

15   it?

16   A.  It's a file folder.

17   Q.  When you met with clients, did you maintain documents

18   related to those clients?

19   A.  Yes.

20   Q.  How did you maintain those documents?

21   A.  File folders.

22   Q.  Can you describe in general what the file folders looked

23   like?

24   A.  Legal size, different colors.

25   Q.  Legal size and different colors?

D1NLCIB2                    Grynsztajn - direct

1   A.  Yes.

2   Q.  And what do you have before you as Government's 3036?

3   A.  I have a green folder, legal size.

4   Q.  I'm sorry, did you say?

5   A.  A green folder, legal size.

6   Q.  And have you seen these types of folders before?

7   A.  Yes.

8   Q.  Where have you seen them?

9   A.  In the office.

10  Q.  And so who does this appear to you to be?

11  A.  A client's file.

12  Q.  Can you tell what client it relates to?

13  A.  Dev Avinash.

14  Q.  If we can go to what's been marked inside, if you can open

15  the client file.  If we can go to 3036-1, which has already

16  been admitted into evidence.

17          MR. PASTORE:  If we could publish it on the screen,

18  please.

19  Q.  Mr. Grynsztajn, can you tell us what 3036-1 is?

20  A.  It's a request from New Jersey Department of Labor for

21  additional information.

22  Q.  Okay.  Can you tell us -- this is not the U.S. Department

23  of Labor, this is the New Jersey Department of Labor?

24  A.  Yeah, this is the local level.

25  Q.  At the local level?

D1NLCIB2                        Grynsztajn – direct

1    A.  Correct.

2    Q.  In your experience, why did the local level get involved in

3    the application process?

4    A.  That's how the system work.  First the local department,

5    then they would transfer.

6    Q.  I couldn't hear you.

7    A.  First the local department, the local Department of Labor,

8    then they would transfer to the U.S. Department of Labor which

9    make the final determination.

10   Q.  And you had mentioned earlier in your testimony I believe

11   yesterday that sometimes resumes would be routed to the

12   Department of Labor; do you remember that testimony?

13   A.  Yes.

14   Q.  What Department of Labor were you referring to, the local

15   level or the U.S. Department of Labor?

16   A.  Sometimes it would be both.

17   Q.  Sometimes both?

18   A.  Yes.

19   Q.  Why don't you take a look at 3036-2, and if we could bring

20   that up on the screen.  What is 3036-2?

21   A.  It's a request for more information from the Department of

22   Labor.

23   Q.  I'm sorry, do you see what's on the screen right now?

24   A.  It's a cover letter.

25   Q.  Okay.  And that's 3032-2?

1    A.  Yes.

2    Q.  And do you see it says, Please be advised that there were

3    no response to the posted notice which was on company bulletin

4    board.

5            Let me ask you, what is your understanding of a notice

6    on a company bulletin board, are you familiar at all with that?

7    A.  Yes.  There was a requirement that the company should have

8    a posted notice for ten days that they're looking for a worker.

9    Q.  So the company was supposed to post internally the job

10   offer; is that right?

11   A.  Correct.

12   Q.  And then the reference to there was no response to

13   newspaper advertisement, are you familiar with newspaper

14   advertisements being used in this process at all, if so, how?

15   A.  Yes.

16   Q.  How?

17   A.  It has to be advertised for three days a week.

18   Q.  Just having a little difficulty hearing you so if you could

19   lean up.

20           Let's look at the next page of this document, please.

21   Do you recognize what this is?

22   A.  It's a notice of job offer.

23   Q.  And how -- are you familiar with how these notice of job

24   offers would be used in the process?

25   A.  It's supposed to be posted at the employment place.

1    Q.  So this is a copy of what's supposed to be posted in the

2    place of employment?

3    A.  Correct.

4    Q.  And the next page, please.  If you could continue on.  Next

5    page.

6            All right.  What are we looking at here?

7    A.  It's a copy of the advertisement.

8    Q.  So yesterday you testified about tear sheets.  Is this what

9    you were referring to?

10   A.  Yes.

11   Q.  If we could look at the next page, please.  And is this --

12   what is this, a second advertisement?

13   A.  Yes.

14   Q.  And one more page.  Finally, what do we have here?

15   A.  The third one.

16   Q.  And what was your understanding of how many times the job

17   was required to be advertised in the paper?

18   A.  Three times.

19   Q.  If we can look at 3036-3 now, please.  What is this?

20   A.  It's a letter of finding from the U.S. Department of Labor.

21   Q.  Are you familiar with these based on your experience at the

22   law firm?

23   A.  Yes.

24   Q.  In general, what would these notice of findings relate to?

25   A.  Usually get a denial and they give you like a certain

1  amount of time to respond to it.

2  Q.  Would the law firm ever respond to denials?

3  A.  Oh, yeah, many times.

4  Q.  Let's take a look at Government's 3036-4.

5        MR. PASTORE:  And before I move on, sorry, Mr. Dinet.

6  Q.  The date on this letter, do you see it's March 6, 2002?

7  A.  Correct.

8  Q.  Okay.  Now let's look at 3036-4.  Okay.  First, what's the

9  date on this letter?

10  A.  May 1, '02.

11  Q.  So after the U.S. Department of Labor document we were just

12  looking at, right?

13  A.  Correct.

14  Q.  And what do you recognize what this document is?

15  A.  It's a cover letter.

16  Q.  And in particular where it says, Please be advised that we

17  did not receive resumes from the USDOL.  We also checked with

18  employer and he did not receive resumes.  The resumes were not

19  sent by certified mail, so there is no proof that letters were

20  actually sent to out to this office nor the employer.  As such,

21  we are respectfully requesting your office to grant the

22  permission to readvertise again.

23        Are you familiar with letters such as these?

24  A.  Yes.

25  Q.  What is this letter?

1  A.  The labor department was intending to deny the case.  He's

2  saying there's no proof that they send any resume to the

3  office, so he ask permission don't deny the case but let us

4  advertise again.

5  Q.  Are you familiar -- I'm want to turn now to an individual

6  named Imran Sadiq.  Are you familiar with Imran Sadiq?

7  A.  He was a client of mine.

8  Q.  And what type of client was he, in other words, what type

9  of applications, if any, did you file for him?

10  A.  Labor case.

11  Q.  Okay.  Going to be handing you several documents.  For

12  defense counsel it's marked Government's 1114-20, -3, -13, -4,

13  -2, -16, -17, -19, and -8.

14          All right.  Starting with the first document, which is

15  -20, do you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a cover letter.

19  Q.  Does it relate to a particular individual?

20  A.  Yes.

21  Q.  To whom does it relate?

22  A.  Imran Sadiq.

23  Q.  Does it mention a particular company?

24  A.  My Favorite Bakery.

25  Q.  And do you -- how do you recognize this as a cover letter?

 1    A.  I seen many before.

 2              MR. PASTORE:  Government offers 1114-20.

 3              THE COURT:  Received.

 4              (Government's Exhibit 1114-20 received in evidence)

 5    Q.  Okay.  Let's take 1114-4 and -13 together while -20 is

 6    being published, please.

 7              Starting with -4, can you tell us what that is?

 8    A.  ETA form 750A.

 9    Q.  Who does it relate to?

10    A.  Shohel Mohammed.

11    Q.  And what about -13, what is that?

12    A.  That's a ETA B form.

13    Q.  Who does that relate to?

14    A.  Sadiq Imran.

15    Q.  Are you familiar with both of these because you've seen

16    them many times before in your practice at the Earl David or

17    work at the Earl David law office?

18    A.  Yes.

19              MR. PASTORE:  Government offers 1114-4 and -13.

20    Q.  Before we publish those, I just want to look at the cover

21    letter.

22              Do you see where it says Imran Sadiq and then in

23    parentheses it says replacing Mohammed Shohel?

24    A.  Correct.

25    Q.  What's going on there?

1    A.  This mean the company is withdrawing the case, they're

2    withdrawing Mr. Shohel Mohammed, and replacing him with

3    Mr. Imran Sadiq.

4    Q.  Are these one of the substitutions you've previously

5    identified for us?

6    A.  Yes.

7    Q.  Let's publish -4 and -13.  What's going on, why is there an

8    ETA part 750 for Mohammed Shohel and then a part B for Imran

9    Sadiq?

10   A.  Mr. Sadiq was replacing Mr. Shohel, so there was a need for

11   the new ETA B forms.

12   Q.  And with respect to Government's 1114-3, can you tell us

13   what that is?

14   A.  A letter that the case had been certified by the Department

15   of Labor.

16   Q.  Labor certification relating to who?

17   A.  Mohammed Shohel.

18   Q.  Is that the original labor certification related with

19   Government's 1114-4?

20   A.  Yes.

21          MR. PASTORE:  Government offers 1114-3.

22          THE COURT:  Received.

23          (Government's Exhibit 1114-3 received in evidence)

24          MR. GERZOG:  No objection.

25   Q.  Let's take a look at Government's 1114-2.  What's that

D1NLCIB2                        Grynsztajn – direct

1    document?

2    A.  It's G-28.

3    Q.  Who does it relate to?

4    A.  Imran Sadiq.

5    Q.  So that's one G-28 related to Imran Sadiq, what about the

6    second one?

7    A.  My Favorite Bakery.

8    Q.  Are both of those G-28s dated?

9    A.  Yes.

10   Q.  What's the date?

11   A.  January 15, '03.

12   Q.  So that's the same date as the cover letter that we were

13   just discussing that's Government's -20?

14   A.  Yes.

15           MR. PASTORE:  Government offers 1114-2.

16   Q.  So now if you could draw your attention to 1114-16.  Tell

17   us what that document is, how you recognize it, and to whom it

18   relates?

19   A.  I-140 petition.

20   Q.  How do you recognize it?

21   A.  I seen it before.

22   Q.  And to whom does it relate?

23   A.  Sadiq Imran.

24   Q.  Company listed?

25   A.  My Favorite Bakery.

1            MR. PASTORE:  Government offers 1114-16.

2            MR. GERZOG:  No objection.

3            THE COURT:  Received.

4            (Government's Exhibit 1114-16 received in evidence)

5            MR. PASTORE:  If we can publish that document.

6    Q.  Okay.  What's the address listed here for My Favorite

7    Bakery?

8    A.  225 2nd Street.

9    Q.  And if you could go to -- is this document signed by anyone

10   and dated?

11           MR. PASTORE:  If we could flip to the second page on

12   the screen, please.

13   Q.  Whose name appears in the top signature block?

14   A.  Avraham Flam.

15   Q.  And whose name appears in the second signature block?

16   A.  Mr. David.

17   Q.  What date are we dealing with here?

18   A.  January 15, '03.

19   Q.  Now if you look at Government 1114-17.  Can you tell us

20   what that is?

21   A.  That's application for adjustment of status.

22   Q.  To whom does relate?

23   A.  Sadiq Imran.

24   Q.  Is it dated?

25   A.  January 15, '03.

1            MR. PASTORE:  Government offers 1114-17.

2   Q.  Now if you could draw your --

3            THE COURT:  Received.

4            (Government's Exhibit 1114-7 received in evidence)

5   Q.  Now if you could draw your attention to Government's 1114-8

6   and -19.  Could you tell us what each of those documents are or

7   is?

8   A.  Tax returns.

9   Q.  Related to what company or individual?

10  A.  My Favorite Bakery.

11  Q.  What years are the tax returns for?

12  A.  2000 and '98.

13  Q.  And are these the same tax returns that we've previously

14  discussed in connection with other clients here today?

15  A.  Yes.

16            MR. PASTORE:  Government offers -8 and -19.

17            THE COURT:  Received.

18            (Government's Exhibits 1114-8, 1114-19 received in

19  evidence)

20  Q.  Okay.  While those are being published on the screen, I'm

21  going to hand you what's been marked for identification as

22  Government's 1114-9, -1, -6, -10 and -7.

23            Starting with 1114-9, do you recognize that document?

24  A.  Yes.

25  Q.  What is it?

1   A.  It's a cover letter.

2   Q.  To whom does it relate?

3   A.  Sadiq Imran.

4   Q.  Is there a date on the cover letter?

5   A.  September 23, '03.

6          MR. PASTORE:  Government offers 1114-9.

7          MR. GERZOG:  Without objection.

8          THE COURT:  Received.

9          (Government's Exhibit 1114-9 received in evidence)

10         MR. PASTORE:  If we could publish this cover letter on

11  the screen.

12  Q.  Can you tell us looking at this cover letter who at the law

13  firm prepared this cover letter?

14  A.  I would say this would be prepared by Maritza Diaz.

15  Q.  What makes you say this cover letter would be prepared by

16  Maritza Diaz?

17  A.  She was only one in the office that would list all the

18  documents the way they were being sent.

19  Q.  So it's the listing of the documents?

20  A.  Correct.

21  Q.  And how do you know that Maritza Diaz would list documents

22  like this?

23  A.  Because I seen them before.

24  Q.  And in what context did you see it, why did you see a cover

25  letter from Maritza Diaz?

D1NLCIB2                         Grynsztajn - direct

1   A.  When she had some deadlines for my clients.

2   Q.  So she personally prepared cover letters for you?

3   A.  Correct.

4   Q.  So let's take a look at 1114-1.  It's a two-page exhibit.

5          If you could tell us what each page is and to whom it

6   relates?

7   A.  It's G-28s.  One is for Mr. Sadiq.  And one is for My

8   Favorite Bakery.

9   Q.  Are they dated?

10  A.  September 23, '03.

11         MR. PASTORE:  Government offers 1114-1.

12         MR. GERZOG:  No objection.

13         THE COURT:  Received.

14         (Government's Exhibit 1114-1 received in evidence)

15  Q.  Let's take a look at 1114-10.  Do you recognize that?

16  A.  Yes.

17  Q.  What is it and to whom does it relate?

18  A.  Mr. Sadiq.

19  Q.  And what is it?

20  A.  It's I-140 petition.

21         MR. PASTORE:  Government offers 1114-10.

22         MR. GERZOG:  Without objection.

23         THE COURT:  Received.

24         (Government's Exhibit 1114-10 received in evidence)

25  Q.  Looking at Government's 1114-6.  Do you recognize it?

D1NLCIB2                          Grynsztajn - direct

1    A.   Yes.

2    Q.   What is it?

3    A.   Application for adjustment of status, I-485.

4    Q.   To whom does it relate?

5    A.   Sadiq Imran.

6              MR. PASTORE:  Government offers 1114-6.

7              MR. GERZOG:  Without objection.

8              THE COURT:  Received.

9              (Government's Exhibit 1114-6 received in evidence)

10   Q.   All right.  So the dates on the I-140, if you look at

11   page 2, if we could bring it up on the screen.

12             What's the date on the I-140, and then on page 4 of

13   the I-485, what is the date on that?

14   A.   I-485 is --

15   Q.   It's Government's 1114-10.  I'm sorry, it's the third page

16   of the I-140.  What's the date here?

17   A.   September 23, '03.

18   Q.   So do I understand correctly that both the I-140 and I-485

19   are dated September 23, 2003?

20   A.   Yes.

21   Q.   Take a look at Government's 1114-7.  Do you recognize it?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's a job offer letter.

25   Q.   To whom does it relate?

1    A.  Imran Sadiq.

2    Q.  Is there a particular company listed for this job offer

3    letter?

4    A.  Benny's Kosher Cafe.

5    Q.  Looking at this job offer letter, can you tell if it was

6    prepared in the law office, and if so, how?

7    A.  It was prepared in the office.

8    Q.  What makes you say that?

9    A.  Same layout, same wording.

10   Q.  Is there anything else about this particular document that

11   makes you believe it was prepared at the law office?

12   A.  The stationery.

13   Q.  What do you mean by the stationery?

14   A.  This paper, I usually kept it in my office.

15   Q.  You kept that kind of paper stock in your office?

16   A.  Yes.

17              MR. PASTORE:  Government offers 1114-7.

18              MR. GERZOG:  Without objection.

19              THE COURT:  Received.

20              (Government's Exhibit 1114-7 received in evidence)

21              MR. PASTORE:  If we could publish it.

22   Q.  Let me just show you what's been marked as Government's

23   3022.  It's two pages.  Do you recognize 3022?

24   A.  Yes.

25   Q.  What is it?

D1NLCIB2                       Grynsztajn – direct

```
 1   A.  Stationery.

 2   Q.  And how do you recognize that stationery?

 3   A.  Something I kept in the office.

 4   Q.  It's stationery you kept in the office?

 5   A.  Yes.

 6           MR. PASTORE:  Government offers 3022.

 7           MR. GERZOG:  No objection.

 8           THE COURT:  Received.

 9           (Government's Exhibit 3022 received in evidence)

10           MR. PASTORE:  Your Honor, with the Court's permission,

11   I'll publish 1114-7 and 3022 by passing them to the jury.

12   Q.  I'm handing you what's been marked for identification but

13   not yet admitted as Government's 3035.

14           Do you recognize that?

15   A.  It's a folder like we kept in the office.

16   Q.  You mean one of the client files that you kept in the

17   office?

18   A.  Yes.

19   Q.  To whom does this particular client file relate?

20   A.  Sadiq Imran.

21   Q.  And does it appear to be in the same or substantially the

22   same condition as when you saw it in the office?

23   A.  Yes.

24           MR. PASTORE:  Government offers 3035 and the contents

25   therein.
```

D1NLCIB2                        Grynsztajn – direct

1             MR. GERZOG:  No objection.

2             THE COURT:  Received.

3             (Government's Exhibit 3035 received in evidence)

4             MR. PASTORE:  If we look at 3035-1, please, and if we

5    bring it up on the screen.

6    Q.  Why don't you go ahead and take it out of the plastic

7    sleeve.  Okay.  What is Government's 3035-1?

8    A.  G-28, you have the I-485 application for adjustment of

9    status.

10   Q.  That's the second page, the I-485?

11   A.  Yes.

12   Q.  Let me ask you, whose handwriting appears, if we could go

13   to the next page, whose handwriting appears here?

14   A.  That's mine.

15   Q.  Okay.  And if we could go to the next page of this

16   document, your handwriting again?

17   A.  Yes.

18   Q.  Page 4, please.  Page 5.

19             Okay.  Before you testified here today, do you see the

20   signature Imran Sadiq and the date on here, what's the date on

21   here?

22   A.  January 15, '03.

23   Q.  Is that the same date or different date than what appears

24   in the I-485 I previously showed you?

25   A.  Same date.

D1NLCIB2                    Grynsztajn - direct

1   Q.  Why don't we continue on --

2            MR. GERZOG:  Your Honor, he said '03.  It looks to me,

3   anyway, like '07.

4            THE COURT:  I would tend to agree with you.  I would

5   agree with counsel.

6            MR. GERZOG:  So.

7            THE COURT:  That looks like a seven.

8            MR. GERZOG:  So I would object to the testimony that

9   it's '03.  Ask that it be stricken.

10           THE COURT:  Why don't we look at some of the other

11  dates on the document.

12           MR. PASTORE:  Okay.

13  Q.  Why don't we go ahead to the next page.  What are we

14  looking at here?

15  A.  I-765, work authorization.

16  Q.  It's for work authorization, you said?

17  A.  Correct.

18  Q.  Does your handwriting appear here?

19  A.  Yes.

20  Q.  If we go down to the date on this particular document, can

21  you make out this date?

22  A.  January 15, '03.

23  Q.  Okay.  All right.  Let's go on to the next page, please.

24           What are we looking at here?

25  A.  I-131, application for travel document.

D1NLCIB2                    Grynsztajn - direct

1              MR. DONALDSON:  I what?

2              THE WITNESS:  131.

3   Q.  You said it's an application for travel document?

4   A.  Correct.

5   Q.  And, again, it's your handwriting; is that right?

6   A.  Yes.

7   Q.  If we could back out, zoom out of the document.  Okay.

8   Next page, please.

9              What are we looking at here?

10  A.  G325A.

11  Q.  Remind us, you talked about this yesterday, but remind us

12  what a G325A is?

13  A.  Biographic information.

14  Q.  And, again, whose handwriting appears in this document?

15  A.  Mine.

16  Q.  If we could go to the next page.  What are we looking at

17  here?

18  A.  It's approval for visa extension.

19  Q.  So this is this something -- who would send this document

20  to you?

21  A.  Immigration.

22  Q.  And the last couple pages of this document, please.

23  A.  Copy of a passport.

24  Q.  Would copies of passports or other identification documents

25  be required to be submitted along with immigration

1  applications?

2  A.  Yes.

3  Q.  All right.  If we could go on to the next exhibit, please,

4  3035-2.

5          THE COURT:  Can we just go back and resolve the seven

6  versus three issue?

7          MR. PASTORE:  Certainly.

8          THE COURT:  That was the point, right?

9          MR. PASTORE:  Certainly.

10  Q.  Mr. Grynsztajn, having looked at these documents, do you

11  remember before we were talking about is it a seven or a three?

12  What's your understanding, what is your view of what's written

13  there?

14  A.  Three.

15  Q.  Three.  Okay.

16          MR. GERZOG:  Your Honor, there's another place on the

17  document that again to my eye --

18          THE COURT:  Okay.

19          MR. GERZOG:  -- looks like a seven, so I don't know if

20  you would go back to the document.

21          THE COURT:  Is there a date on the document that came

22  from the government that's part of this file, the visa

23  extension document?

24          MR. PASTORE:  Well, actually, I think the next

25  document may be helpful in sort of resolving or shedding some

D1NLCIB2                        Grynsztajn - direct

1    light on this.  If we could bring up the next document on the

2    screen, 3035-2.

3    Q.  What's the date of this cover letter?

4    A.  January 15, '03.

5    Q.  Okay.  And did you compare this cover letter to the cover

6    letter that I previously showed you that was admitted into

7    evidence?

8    A.  Yes.

9    Q.  And how did they compare?

10   A.  Same.

11   Q.  And this cover letter, do you see where it says, Dear

12   sir/madam, and then it says please find enclosed I-140/I-485

13   petition?

14   A.  Yes.

15   Q.  Are there any other pages with respect to this document?

16   A.  No.

17   Q.  Let's move on to 3035-3, please.  Can you tell us what this

18   document is?

19   A.  That's labor ETA 750B form.

20   Q.  And have you compared this document to the document that I

21   previously showed you, the part B we previously were

22   discussing?

23   A.  Yes.

24   Q.  How do they compare?

25   A.  Same.

D1NLCIB2                          Grynsztajn - direct

1   Q.  And if you could turn to the next page of this document,

2   look at the date and tell us if you can make out the date

3   there?

4   A.  1/15/03.

5   Q.  Government's 3035-4, please.  Can you tell us what this

6   document is?

7   A.  It's a G-28.

8   Q.  And who does it appear on the bottom, whose name appears in

9   the signature block in the very bottom, please, at the very

10  bottom, please?

11  A.  Abraham Flam.

12  Q.  And what's the date on this document?

13  A.  1/15/03.

14  Q.  Government's 3035-5, please.  What is this document?

15  A.  It's a I-140 petition.

16  Q.  And does it -- is there a particular name on this document

17  somewhere?

18  A.  My Favorite Bakery.

19  Q.  And what about part 3, if we scroll down a little bit.

20  A.  Sadiq Imran.

21  Q.  Have you compared this I-140 to the I-140 that we

22  previously were discussing?

23  A.  Yes.

24  Q.  And how do they compare?

25  A.  The same.

1    Q.  And if you look at the third page of this document, in the

2    signature block, is there a date?

3    A.  1/15/03.

4    Q.  And if you look at 3035-6, can you tell us what that is?

5    A.  It's a G-28.

6    Q.  And what's the next page?

7    A.  G-28.

8         MR. PASTORE:  I'm sorry, the next page, please.  It's

9    not loaded.  If we can switch to the overhead for a minute.

10   Q.  And do you have 3035-6 in front of you, Mr. Grynsztajn?

11   Because I want to make sure what's on the overhead is what

12   you're seeing.

13   A.  Yes.

14   Q.  Can you describe what the second page looks like for us?

15   A.  It's I-485, application for adjustment.

16   Q.  Okay.  And if you can go to the last page of the I-485

17   application for adjustment, is there a signature there?

18   A.  Yes.

19   Q.  Whose signature appears there?

20   A.  Imran Sadiq.

21   Q.  Okay.  And can you make out the date on this document?

22   A.  January 15, '03.

23        MR. PASTORE:  With the Court's permission, your Honor,

24   I'd like to publish to the jury by handing it to them --

25   unfortunately, we don't have it and the overhead -- 1114-17,

1    which is the I-485 previously admitted, together with

2    Government's 3035 that the witness has.

3           THE COURT:  Okay.

4    Q.  Mr. Grynsztajn, did you compare the signature that appears

5    on 3035-6 with the signature that appears on 1114-17?

6    A.  Yes.

7    Q.  What if anything did you determine?

8    A.  They're the same.

9           MR. DONALDSON:  I'm sorry?

10           THE COURT:  Signatures are the same.

11   Q.  Okay.  If we could finally look at 3035-7, do you recognize

12   that?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's a cover letter.

16   Q.  Is there a date on the cover letter?

17   A.  Yes.

18   Q.  What's the date on the cover letter?

19           MR. PASTORE:  And we could bring it up.

20   A.  September 2, 2003.

21           MR. PASTORE:  And do we have that?  Let's bring that

22   up on the overhead, please.

23   Q.  Okay.  Do you see it says, Please be advised that it is

24   impossible for us to provide your office with the original ETA

25   750 approval as it was originally sent to you with Mr. Shohel.

D1NLCIB2                        Grynsztajn – direct

1    And then it says Ho is being replaced by the beneficiary.

2              Do you see that?

3    A.  Yes.

4    Q.  Do you have any idea who Ho is?

5    A.  I believe he was a client of Ali Gomaa.

6    Q.  But the beneficiary lists Imran Sadiq; is that right?

7    A.  Correct.

8    Q.  Are you familiar with an individual named Dina Abouzeid?

9    A.  It was a client in the office.

10   Q.  Do you know what type of client she was?

11   A.  She was from Morocco, I believe.

12   Q.  Okay.  And do you know what type of application or

13   applications were filed for Ms. Abouzeid?

14   A.  I believe she got substitution case.

15   Q.  Do you remember the alien's name that she was substituted

16   for?

17   A.  Not offhand.

18   Q.  Okay.  1112 series, –10, –9, –2, –8, –4, –3, and –6.

19              Okay.  Looking at 1112–10, do you recognize that?

20   A.  Yes, it's a cover letter.

21   Q.  To whom does it relate?

22   A.  Abouzeid.

23   Q.  Does it mention a particular company?

24   A.  My Favorite Bakery.

25   Q.  And who is this cover letter –– is there a name in the

D1NLCIB2                              Grynsztajn – direct

1   signature block?

2   A.   Yes.

3   Q.   What name is in the signature block?

4   A.   David Klug.

5   Q.   Are you familiar with David Klug?

6   A.   Yes.

7   Q.   Who is David Klug?

8   A.   One of the attorneys in the office.

9   Q.   And are you familiar with what his role or duties and

10  responsibilities were in the office?

11  A.   Mostly to go to the interviews with people.

12  Q.   How do you know that he went to interviews with people?

13  A.   Because I referred clients to him.

14            MR. PASTORE:  Government offers 1112-10.

15            MR. GERZOG:  Without objection.

16            THE COURT:  Received.

17            (Government's Exhibit 1112-10 received in evidence)

18            MR. PASTORE:  All right.  If we could publish that

19  document.

20  Q.   Okay.  Now, looking at this document, can you tell which

21  alien Dina Abouzeid replaced?

22  A.   Yes.

23  Q.   Which alien?

24  A.   Sadiq Imran.

25  Q.   And who had Imran Sadiq replaced?

1    A.  Abouzeid, Dina.

2    Q.  I'm sorry, do you remember if Mr. Sadiq's application was

3    also based on a substitution?

4    A.  Yes.

5    Q.  Do you remember what alien Mr. Sadiq was substituting for?

6    A.  I think Mr. Mohammed Shohel.

7    Q.  Take a look at Government's 1112-9.  Tell us what that is.

8    A.  That's a ETA 750A form.

9    Q.  For who?

10   A.  Shohel Mohammed.

11   Q.  And what is Government's 1112-2?

12   A.  ETA 750B.

13   Q.  To whom does that relate?

14   A.  Abouzeid, Dina.

15           MR. PASTORE:  Government offers each of 1112-9 and -2.

16           MR. GERZOG:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibits 1112-9, 1112-2 received in

19   evidence)

20           MR. PASTORE:  If we could use the overhead for a

21   minute.

22   Q.  1112-9, is there a stamp on that document?

23   A.  Yes.

24   Q.  What's your understanding of what that stamp is?

25   A.  That the case was approved, certified by the U.S.

D1NLCIB2                          Grynsztajn - direct

1     Department of Labor.

2     Q.  What color or colors is this stamp?

3     A.  Green and pink.

4     Q.  So what if anything -- so it's not black and white, in

5     other words?

6     A.  No.

7     Q.  So what if anything does that mean to you?

8     A.  This one would be the original.

9     Q.  Looking at the overhead, are you talking about the stamp

10    here where it says October 30, 2001?

11    A.  Yes.

12              MR. PASTORE:  Since it's difficult to see on the

13    overhead, I'll ask the Court's permission to publish by passing

14    it to the jury, 1112-9 to the jury.

15    Q.  And why was a part B prepared for Ms. Abouzeid but the

16    part A says Mohammed Shohel?

17    A.  That's a requirement when you substitute somebody.

18    Q.  1112-8, do you recognize that?

19    A.  Yes.

20    Q.  What is it?

21    A.  That's a labor approval from Department of Labor.

22    Q.  To whom does it relate?

23    A.  Mohammed Shohel.

24              MR. PASTORE:  Government offers 1112-8.

25              THE COURT:  Received.

1                 (Government's Exhibit 1112-8 received in evidence)

2     Q.   Looking at 1112-4, can you tell us what that is?

3     A.   G-28.

4     Q.   To whom does it relate?

5     A.   My Favorite Bakery.

6     Q.   And is there a name in the signature block?

7     A.   Yes.

8     Q.   What name?

9     A.   Abe Flam.

10              MR. PASTORE:  Government offers 1112-4.

11              MR. GERZOG:  No objection.

12              THE COURT:  Received.

13              (Government's Exhibit 1112-4 received in evidence)

14    Q.   Is that dated, the G-28?

15    A.   Look like November 30, '04.

16    Q.   November 30, '04?

17    A.   Yes.

18    Q.   1112-3, can you tell us what that is and to whom it

19    relates?

20    A.   I-140 petition, My Favorite Bakery, and Abouzeid Dina.

21              MR. PASTORE:  Government offers 1112-3.

22    Q.   Is the I-140 dated?

23    A.   Yes.

24    Q.   What's the date?

25    A.   November 30, '04.

D1NLCIB2                          Grynsztajn – direct

1  Q.  And, now, 1112-6, if you could tell us what it is and to

2  whom it relates?

3  A.  It's application for adjustment of status, relates to

4  Abouzeid Dina.

5              (Continued on next page)

D1n1cib3                          Grynsztajn - direct

1           MR. PASTORE:  Government offers 1112-6.

2           MR. GERZOG:  No objection.

3           THE COURT:  Received.

4           (Government's Exhibit 1112-6 received in evidence)

5    Q.  Okay.  And again, is this I-485 dated?

6    A.  Yes.

7    Q.  What's the date?

8    A.  November 30, '04.

9           MR. PASTORE:  And Mr. Dinet, if we could bring up

10   1112-3 on the screen.

11   Q.  I'm handing you what's been marked for identification as

12   Government's 1112-11 and 1112- -- I'm sorry -- yeah, -13

13   through 20.

14          Let's start with 1112-11.  Do you recognize that?

15   A.  Yes.

16   Q.  What is it?

17   A.  Cover letter.

18   Q.  Now does this cover letter have a client or an alien's name

19   on it?

20   A.  Yes.  It has the name of the -- of the company.

21   Q.  Oh, okay.  Does it have an individual's name?

22   A.  No.

23   Q.  Okay.  What company is listed there?

24   A.  My Favorite Bakery.

25   Q.  And what's the date on this cover letter?

D1n1cib3                        Grynsztajn - direct

1   A.  March 2nd, '06.

2   Q.  And does a name appear on the signature block?

3   A.  Yes.

4   Q.  What's the name?

5   A.  Jed David Philwin.

6           MR. PASTORE:  Government offers 1112-11.

7           THE COURT:  Received.

8           (Government's Exhibit 1112-11 received in evidence)

9           MR. PASTORE:  And if we could bring up side by side

10  1112-11 with -3.  If we could zoom in on the Re line.

11  Q.  Okay.  Can you tell by looking at the March 2nd, 2006

12  cover letter to whom it relates?

13  A.  My Favorite Bakery.

14  Q.  And below, where it says Case Number EAC 0505652205, have

15  you seen that number before?

16  A.  I'm not sure.

17  Q.  Okay.  Do you know what an EAC number is?

18  A.  Stands for the Vermont center.

19  Q.  It's a receipt that was sent from the Vermont center?

20  A.  From immigration Vermont center.

21  Q.  Okay.  What do you mean by that?

22  A.  Each center has a different -- different first letters.

23  Q.  How do you know that?

24  A.  Because I've seen many.

25  Q.  Okay.  Looking at the I-140 that's to the left, do you see

D1n1cib3                         Grynsztajn - direct

1   an EAC number on there?

2   A.  Yes.

3        MR. PASTORE:  And could we now have it zoomed in on

4   the bar code.

5   A.  Yes.

6   Q.  And how does the EAC number listed on the I-140 for Dina

7   Abouzied compare to the EAC number in this cover letter that is

8   Government's 1112-11?

9   A.  Same number.

10  Q.  So what does that tell you, if anything, about the cover

11  letter?

12  A.  That it belongs to that client.

13  Q.  Okay.  Taking a look at Government's 1112-20.  What is

14  Government's 1112-20?

15  A.  Letter from accountant.

16  Q.  When you say a letter from an accountant --

17  A.  Yes.

18  Q.  -- is there a name listed for the accountant?

19  A.  A & A Accounting Corporation.

20  Q.  And is the document signed and is there a name in the

21  signature block?

22  A.  Yes.

23  Q.  What name appears there?

24  A.  Angelica Yonayev.

25  Q.  Are you familiar with that name?

1    A.  Yes.

2    Q.  How are you familiar with that name?

3    A.  I met her in the office.

4    Q.  And what role and responsibilities did she have in

5    connection with the law firm?

6    A.  Preparing tax returns.

7    Q.  Remind us, did she -- what type of tax returns did she

8    prepare?

9    A.  With signature and with certified by IRS.

10   Q.  Okay.  So this is a letter from that accountant; is that

11   right?

12   A.  Correct.

13           MR. PASTORE:  Government offers 1112-20.

14           MR. GERZOG:  No objection.

15           (Government's Exhibit 1112-20 received in evidence)

16           MR. PASTORE:  If we could publish that letter.

17   Q.  Okay.  Do you see the letter says, "I'm the accountant for

18   My Favorite Bakery & Café"?  Then it goes on to say, "My

19   Favorite Bakery & Café is doing business as Bakers Delight.

20   Both are the same entity.  As such, there is a lawful

21   relationship between My Favorite Bakery & Café and Bakers

22   Delight."  Are you familiar with both of those companies'

23   company names?

24   A.  Yes.

25   Q.  Now take a look at Government's 1112-13 through -20.  Tell

1    us what each of those documents are.

2    A.   Those are tax returns.

3    Q.   For what company?

4    A.   My Favorite Bakery.

5    Q.   And is there another company also listed on those tax

6    returns?

7    A.   Yes.

8    Q.   What company?

9    A.   Bakers Delight.

10   Q.   And are the tax returns for the years '98, 1998 through

11   2004?

12   A.   Correct.

13           MR. PASTORE:  Government offers 1112-13 through -19.

14           THE COURT:  Received.

15           (Government's Exhibit 1112-13 through 1112-19 received

16   in evidence)

17           MR. PASTORE:  And if we could publish -13, please.

18   Q.   Okay.  Taking a look at these tax returns, can you tell

19   whether Mr. Vago prepared them?

20   A.   No.

21   Q.   What makes you say that?

22   A.   Mr. Vago had no signature.  This one has a signature and

23   stamp, IRS stamp.

24   Q.   Okay.  Is the IRS stamp where it says, "Received

25   June 23rd, 2005"?  Do you see that in the middle of the page?

1    A.  Yes.

2    Q.  And the signature that you're referring to --

3            All right.  So we've just zoomed in on it.  That's the

4    stamp; right?  Is that right?  That's the stamp that we just

5    showed?

6    A.  Yes.

7    Q.  And the signature, is that where it says Sign Here and then

8    it's signed and dated?

9    A.  Yes.

10           MR. PASTORE:  Okay.  And if we could go to the first

11   page of each of 1112-14 through –19, just very briefly, just

12   the first page, please.

13   Q.  Again, do you see the certification stamp and signature; is

14   that right?

15   A.  Yes.

16           MR. PASTORE:  Next exhibit, please, –15.

17           And –16, please.

18           –17, please.

19           –18, please.

20           And –19, please.

21   Q.  So is it fair to say that each of the documents I just

22   showed you had certification stamps and were in fact signed?

23   A.  Yes.

24   Q.  I'm handing you what's been admitted as Government's 3065.

25   Could you please just tell the jury what 3065 is, in general.

D1n1cib3                    Grynsztajn - direct

1    A.  File folder.

2    Q.  One of the client's file folders from the law office?

3    A.  Yes.

4    Q.  To whom does it relate?

5    A.  Dina Abouzied.

6    Q.  Okay.  Let's take a look first at 3065-1, please.

7           All right.  What are we looking at here from the

8    client file?

9    A.  Cover letter.

10   Q.  And what's the date on this cover letter?

11   A.  November 30, '04.

12   Q.  And how does it compare to the cover letter that we

13   previously were discussing?

14   A.  Same.

15   Q.  Now if you can take a look at -- are there other documents

16   behind -- behind this, if you go to page 2, 224, first page,

17   224?

18   A.  I-140 petition.

19   Q.  For Ms. Abouzied; is that right?

20   A.  Correct.

21   Q.  And here My Favorite Bakery & Café, the address is listed

22   as 1501 Pine Park; is that right?

23   A.  Correct.

24          MR. PASTORE:  Okay.  Next page, page 5, please.

25   Q.  Is this a copy of the original labor certification for

D1n1cib3                        Grynsztajn – direct

1    Mohammed Shohel?

2    A.  Yes.

3    Q.  And pages 6 to 7, if you could tell us, Mr. Grynsztajn,

4    what they are.

5    A.  This is Part –– ETA 750, Supplement B.

6    Q.  On page 6, do you see the stamp October 30th, 2001?

7    A.  Yes.

8    Q.  In your copy that's in front of you in the client file, is

9    that in color or is it black and white?

10   A.  It's in color, I think.

11          (Pause)

12   Q.  Are you able to find the document, Mr. Grynsztajn?

13   A.  No.

14   Q.  Okay.  Let me ––

15          MR. PASTORE:  Okay.  For the record, I'm removing from

16   the sleeve 3065-1, I am showing the witness, directing his

17   attention to several pages into the document.

18   Q.  Do you see that?

19   A.  That's in black.

20   Q.  So it is not in color, the stamp?

21   A.  Correct.

22   Q.  Let me just pull out –– if you can look at 3065-4 for us.

23          MR. PASTORE:  And if we can bring that up on the

24   screen, please.

25   Q.  First, do you recognize the handwriting in this document?

D1n1cib3                        Grynsztajn – direct

1    A.  Yes.

2    Q.  Whose handwriting is it?

3    A.  Mr. Teitelbaum.

4    Q.  During your employment at the law office did you have an

5    opportunity to observe Mr. Teitelbaum's handwriting?

6    A.  Yes.

7    Q.  On approximately how many occasions?

8    A.  On many occasions.

9    Q.  Okay.  Reading at the top, it says Angelica.  Did you know

10   anyone associated with the law firm by the name of Angelica?

11   A.  Yes.

12   Q.  And would that be the accountant we were just discussing?

13   A.  Yes.

14   Q.  And then it says, "I need 2004 tax & stamp, sample," and

15   then what is that next word?

16   A.  "From 2003 enclosed."

17   Q.  Okay.  And then 2, it says, "Enclosed letter need it in

18   your letterhead, need all for tomorrow."  And then it says

19   Lipa.  Do you know anyone at the law office who went by the

20   name Lipa?

21   A.  Yes.

22   Q.  Who went by the name Lipa?

23   A.  Mr. Teitelbaum.

24   Q.  Do you recognize that particular phone number –– do you see

25   where it says 718-219, and I believe it's 6800?  Do you

D1n1cib3                    Grynsztajn - direct

1   recognize that phone number?

2   A.  Yes.

3   Q.  Whose phone number is it?

4   A.  Mr. Teitelbaum.

5   Q.  How do you recognize it as Mr. Teitelbaum's phone number?

6   A.  I had his phone number.

7   Q.  If you could turn to the second page of this document, and

8   we'll bring it up on the screen for you, to make it a little

9   easier.

10          Okay.  Do you see it says, "I am the accountant for

11  Bakers Delight.  Bakers Delight purchased all of the assets and

12  liabilities of My Favorite Bakery & Café.  As such, there is a

13  lawful relationship between Bakers Delight and My Favorite

14  Bakery & Café."

15          And you told us you're familiar with both those

16  companies; is that right?

17  A.  Yes.

18  Q.  Okay.  And if you look at pages 3 through 7.  Let's start

19  with page 3.

20          Okay.  What is page 3?

21  A.  Tax return.

22  Q.  And does that run through about page 7?

23  A.  Yes.

24  Q.  Okay.  This is 3065-4.

25          Now if you could look at 3065-5.

1          MR. PASTORE:  If we could bring that up on the screen,

2     please.

3     Q.  All right.  Do you recognize this letter?

4     A.  Yes.

5     Q.  And where have you seen it before?

6     A.  Sample letter.

7     Q.  Okay.  The sample letter, you said?

8     A.  Yes.

9     Q.  And then if we look at 3065-6.

10         MR. PASTORE:  And if we could bring that up on the

11    screen, please.

12    Q.  Okay.  So we'll go back to the document, 3065-6.  Can you

13    see it in your -- hang on one second.

14         MR. PASTORE:  Just for the record, I'm directing the

15    witness' attention to 3065-6-A, -B, and -C.

16    Q.  What is 3065-6-A?

17    A.  Tax return.

18    Q.  Okay.  And 3065-6-B, what's that?

19    A.  Also tax return.

20    Q.  And 3065-6-C has a first page.  What's the front page?

21    A.  Request for additional information.

22    Q.  To whom does it relate?

23    A.  Dev Avinash.

24    Q.  And behind that page, what do we have?

25    A.  Tax return.

D1n1cib3                         Grynsztajn – direct

1          MR. PASTORE:  I'm going to publish these, your Honor,

2     with the court's permission, to the jury by handing them in,

3     3065-6-A, -6-B, and -6-C.

4               Now if we could take a look at 3065-9.

5               THE COURT:  I think it's time for our break.

6               MR. PASTORE:  Oh, sure.

7               THE COURT:  All right.  We'll take our break.

8     Remember the rules:  Don't talk about the case, keep an open

9     mind.

10              (Jury excused)

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1n1cib3

 1                    (In open court; jury not present)

 2                    THE COURT:  Were you able to work out a schedule?

 3                    MR. BRILL:  I was going to bring that up, Judge.  It

 4       doesn't look like it's going to work out.

 5                    THE COURT:  Okay.  So let's try to shorten our break

 6       to try to do 20 minutes so we'll move a little --

 7                    MR. BRILL:  Judge, it's tomorrow, not today.

 8                    THE COURT:  Today is not Wednesday?

 9                    MR. BRILL:  What I said, I said the 24th and I also

10       said Wednesday.

11                    THE COURT:  I'm sorry.  All right.  I'm not crazy?

12       All right.  Good.  That's all I want to know.

13                    MR. BRILL:  No.  It's the 24th.

14                    THE COURT:  All right.

15                    MR. PASTORE:  It was a hot topic of debate in our

16       trial whether it was tomorrow or today.

17                    THE COURT:  I just remember Wednesday.  I do it by

18       days of the week, not dates.

19                    MR. BRILL:  Sorry about that.

20                    THE COURT:  All right.

21                    MS. ECHENBERG:  So when should we be back, your Honor?

22                    THE COURT:  Ten of, I guess.

23                    (Recess)

24

25

D1n1cib3

```
 1                   (In open court; jury not present)

 2                   MR. BRILL:  Your Honor, we just received some

 3      additional 3500 material from the government regarding

 4      Mr. Schwartz which contains an allegation that Mr. Schwartz --

 5      excuse me -- Mr. Salamon smoked marijuana in Mr. Schwartz's

 6      house.

 7                   MS. ECHENBERG:  That's not what it says.

 8                   THE COURT:  Okay.

 9                   MR. GERZOG:  We also have a witness here.

10                   THE COURT:  The witness can leave for a moment.

11                   MR. PASTORE:  I'm sorry, Mr. Grynsztajn.

12                   THE COURT:  Okay.

13                   (Counsel conferring)

14                   MR. BRILL:  Never mind.

15                   THE COURT:  Never mind?

16                   MS. ECHENBERG:  Messy handwriting.

17                   THE COURT:  I was going to say who cares, but all

18      right.

19                   (Continued on next page)

20

21

22

23

24

25
```

D1n1cib3                         Grynsztajn – direct

1          (Jury present)

2          THE COURT:  You may continue.

3          MR. PASTORE:  Thank you.

4   BY MR. PASTORE:

5   Q.  All right.  Mr. Grynsztajn, prior to the lunch break, we

6   were discussing Ms. Abouzied.  Do you remember that?

7   A.  Yes.

8   Q.  Okay.  Before we get back to her, I'm just going to

9   approach with several government exhibits -- Government

10  Exhibit 14A, 24, 19, and 10.  I'm sorry.  24, 10, and 14A.

11          First, can you see the individual that I'm pointing to

12  next to Earl David?

13  A.  Yes.

14  Q.  What name did you know him as?

15  A.  Jed Philwin.

16  Q.  Jed Philwin?

17  A.  Yes.

18  Q.  Did you ever know him as Jed Matthew Philwin?

19  A.  I seen it also as Jed Matthew Philwin.

20          MR. PASTORE:  Okay.  Government offers 14A, which is a

21  nameplate that says Jed Matthew Philwin.

22          MR. DONALDSON:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 14A received in evidence)

25  Q.  Okay.  Now I'm going to hand you Government's 24 and 10.

D1n1cib3                        Grynsztajn - direct

1   Starting with Government's 10, do you recognize that?

2   A.  That's Angelica Yonayev.

3   Q.  And does it fairly and accurately depict her as she

4   appeared when you knew her while you were working at the law

5   firm?

6   A.  Yes.

7              MR. PASTORE:  Government offers 10.

8              THE COURT:  Received.

9              (Government's Exhibit 10 received in evidence)

10             MR. PASTORE:  And the accompanying nameplate,

11  Government's 10B.

12             Your Honor, 10B has been received as well?

13             THE COURT:  Yes.

14             (Government's Exhibit 10B received in evidence)

15  Q.  Okay.  And Government's 24, could you tell us?

16  A.  Photograph of Mark Vago.

17  Q.  And does it fairly and accurately depict Mark Vago during

18  the time period that you knew him while you were working at the

19  law firm?

20  A.  Yes.

21             MR. PASTORE:  Government offers 24 and 24B, an

22  accompanying nameplate.

23             THE COURT:  Received.

24             (Government's Exhibits 24 and 24B received in

25  evidence)

D1n1cib3                      Grynsztajn - direct

1    Q.  Okay.  And remind us what Mr. Vago did at the law firm?

2    A.  File cases, labor department cases, immigration cases.

3    Q.  What time of the day did Mr. Vago work?

4    A.  Usually during the day.

5    Q.  What time of day did you usually work?

6    A.  Evening hours, night hours.

7    Q.  Do you know if Mr. Vago collected money from clients?

8    A.  To my knowledge, yes.

9    Q.  How do you know that?

10   A.  Because I seen him when I was there.

11   Q.  You saw him collect money?

12   A.  Yes.

13   Q.  Do you know what Mr. Vago did with the files or

14   applications related to some of those clients?

15   A.  Some he would file, some he would put in the cabinet.

16   Q.  He would put them in the cabinet?

17   A.  Yes.

18   Q.  How do you know that some of the applications wouldn't be

19   filed, that they'd be put in a cabinet?

20   A.  Because years later we found out when we went to -- when

21   the clients came into the office looking for their files, we

22   pulled it out.  The case was never filed.

23   Q.  Okay.  So do I understand correctly clients came back to

24   you asking what happened to the file and then you actually

25   found the file in the cabinet, never having been submitted to

D1n1cib3                          Grynsztajn - direct

1    labor or immigration?

2    A.   Correct.

3    Q.   Okay.  Prior to the break we were looking at Government's

4    3065-6-A, B, and C.  Do you remember that?

5    A.   Yes.

6            MR. PASTORE:  Okay.  And do we have them on the -- for

7    the overhead?

8    Q.   Okay.  So looking at these tax returns, can you tell us who

9    prepared these and why.

10   A.   Mr. Vago.

11   Q.   And how do you know Mr. Vago prepared them?

12   A.   There was no signature, with the Copy stamp.

13   Q.   Okay.  So if you could look at -A and then the front page

14   of -B, 3065-6-B.

15           Okay.  Again, who prepared these taxes and how do you

16   know that?

17   A.   Mr. Vago.

18   Q.   And finally, -6 -- I'm sorry -- 65-6-C.

19           Is this the cover letter that you were referring to

20   before?

21   A.   Request for evidence.

22           MR. GERZOG:  I didn't hear that.

23   Q.   Sorry.  Mr. Grynsztajn, can you --

24   A.   This is a request for evidence from immigration.

25   Q.   And to whom does it relate?

D1n1cib3                          Grynsztajn - direct

1    A.  To Bakers Delight.

2    Q.  And below that what name is listed?

3    A.  Dev Avinash.

4    Q.  Okay.  And the next page of this document, what is that?

5    A.  That's tax return.

6    Q.  And who is this tax return for?

7    A.  Abraham Flam and Hannah Flam.

8    Q.  Now if we could look at Government's 3065-9.  Do you have

9    that in front of you?

10            MR. PASTORE:  Let me get -- approach the witness, your

11   Honor.

12            If we could display on the overhead -- and I'm also,

13   for the record, retrieving 3065-9.

14   Q.  Okay.  If you could remove 3065-9 from the sleeve.  Is it a

15   multipage exhibit?

16   A.  Yes.

17   Q.  Okay.  What do each of the pages consist of?

18            MR. PASTORE:  And Mr. Dinet, if we could just scroll

19   through each page.

20   A.  They all contain the front pages of the tax returns.

21   Q.  Only the front pages of the tax returns for My Favorite

22   Bakery?

23   A.  Correct.

24   Q.  And these tax returns -- how, if at all, do these front

25   pages differ from the tax returns that we were just looking at?

1    A.  They're signed and certified by IRS.

2              MR. PASTORE:  Your Honor, may I publish 3065-9 to the

3    jury by handing it through the jury box?

4              THE COURT:  Yes.

5    Q.  Okay.  Looking at Government's 3065-10.

6              MR. PASTORE:  And if we could bring that up on the

7    screen, please.  I believe it's -10-A.

8    Q.  Okay.  And is it fair to say that -10-A, 10-B, 10-C, and so

9    on are each full copies of tax returns for My Favorite Bakery &

10   Café?

11   A.  Yes.

12   Q.  Okay.  And do you have them in front of you,

13   Mr. Grynsztajn?

14   A.  Yes.

15   Q.  Okay.  And are they for -- what years are the tax returns

16   for?  1998 year --

17             MR. PASTORE:  If we could bring up 10-B, please.

18             And 10-C.  So we have 1998, 1999, 2000.

19             If you could bring up -D, please.

20             -E, please.

21             -F, please.

22             And -G, please.

23   Q.  Okay.  So is it fair to say that each of these consists of

24   the entire tax returns, not just the front page?

25   A.  Yes.

1    Q.  And these are all located in Dina Abouzied's client file;

2    is that right?

3    A.  Yes.

4    Q.  I'm handing you what's been admitted as Government's

5    Exhibit 3219.  And I'm showing you 3219-2, and I'm showing you

6    in particular the fourth page of 3219-2.  Do you recognize that

7    document?

8    A.  Yes, it's G-28.

9    Q.  I'm sorry.  You said it's a G-28?

10   A.  Yes.

11   Q.  And if you could lean into the microphone a little bit

12   so --

13   A.  G-28.

14   Q.  Okay.  Is there a particular company listed on this G-28?

15   A.  Yes.

16   Q.  What company is listed on this G-28?

17   A.  387 Quincy Associates.

18   Q.  Did you say 387 Quincy Associates?

19   A.  Yes.

20   Q.  Okay.  I'm sorry, Mr. Grynsztajn.  I'm still having trouble

21   hearing you.

22          Do you recognize that company?

23   A.  I had cases before with them.

24   Q.  And what do you know about 387 Quincy Associates?

25   A.  That the company was owned by Mr. Tischler.

D1n1cib3                        Grynsztajn – direct

1    Q.   Okay.  Do you know what other companies Mr. Tischler owned?

2    A.   Old Country Plumbing, something like that.

3    Q.   I'm sorry.  Did you say some kind of plumbing company?

4    A.   Yes, Old Country Plumbing or something to do with plumbing.

5    Q.   Okay.  Something to do with plumbing?  What makes you say

6    that 387 Quincy is one of Mr. Tischler's companies?

7    A.   I had cases before with this company.

8    Q.   Okay.  And where did you get that company from?  Did you

9    work directly with Mr. Tischler?

10   A.   No.

11   Q.   So how did you come to use Mr. Tischler's company for your

12   cases?

13   A.   I got it from Sam Salamon.

14   Q.   You got it from Sam Salamon?

15   A.   Yes.

16   Q.   Is there an address listed for 387 Quincy?

17   A.   Yes.

18   Q.   What address is listed for 387 Quincy Associates?

19   A.   4316 17th Avenue.

20   Q.   Have you seen that address before in connection with your

21   work at the law firm?

22   A.   Yes.

23   Q.   In what context have you seen it?

24   A.   I've seen it under a few different companies.

25   Q.   Okay.  When you say a few different companies, what do you

D1n1cib3                          Grynsztajn – direct

1   mean by that?

2   A.  The names of different companies there that was sponsoring

3   people.

4   Q.  And how were the names of those different companies that

5   were sponsoring people related to 4316 17th Avenue?

6   A.  They all had the same address.

7   Q.  Sir, do I understand correctly that each of the various

8   companies had 4316 17th Avenue as their address?

9   A.  Correct.

10  Q.  And when you saw -- and did you see Mr. Tischler in the

11  office meeting with Sam Salamon?

12  A.  Yes.

13  Q.  And what, if anything, did you hear them discussing?

14  A.  Mr. Tischler was complaining that there was too many cases

15  assigned for one company, that he was discussing the money,

16  that he wasn't getting paid enough money.

17  Q.  Okay.  Are you familiar with a company named American Girl

18  Fashion?

19  A.  I heard the name before.

20  Q.  In what context have you heard the name American Girl

21  Fashion?

22  A.  I believe I had one or two cases with this company.

23  Q.  Do you know which sponsor or sponsors were associated with

24  American Girl Fashion?

25  A.  No.

D1n1cib3                        Grynsztajn - direct

1   Q.   Okay.  Do you know where that -- in other words, how did

2   you come to use that company?

3   A.   From Mr. Teitelbaum.

4   Q.   Mr. Teitelbaum provided you with that company?

5   A.   Yes.

6   Q.   Did you have to pay Mr. Teitelbaum to use that company?

7   A.   Yes.

8   Q.   I'm handing you what's been marked for identification as

9   Government's 3018 but not yet admitted.  3018 -- do you

10  recognize the first page of 3018?

11  A.   Yes.

12  Q.   I'm sorry?

13  A.   The first page, yes.

14  Q.   What is the first page of 3018?

15  A.   It's a stationery.  It's a cover letter.

16  Q.   Okay.  And how do you recognize it as a cover letter or a

17  stationery?

18  A.   I've seen it before.

19  Q.   In what context have you seen it before?

20  A.   One of the files.

21  Q.   And what type of file have you seen it in connection with?

22  A.   I'm not sure.

23  Q.   Okay.  In other words, do you know whether it was a labor

24  certification file?

25  A.   It could have been.

D1n1cib3                    Grynsztajn - direct

1    Q.  It could have been but you're not sure?

2    A.  I'm not sure.

3    Q.  Are there any names on Government's 3018?

4    A.  Yes.

5    Q.  Do you recognize any of the names on 3018?

6    A.  One name.

7    Q.  What name do you recognize on 3018?

8    A.  Rabbi Josepy.

9    Q.  Rabbi Josepy?

10   A.  Yes.

11   Q.  How do you recognize that name?

12   A.  I met Rabbi Josepy.

13   Q.  In what context did you meet Rabbi Josepy?

14   A.  Came to the office.

15   Q.  Did he tell you or did you know why he came into the

16   office?

17   A.  He came in to sign for some -- few companies.

18   Q.  He signed for a few companies?

19   A.  Yes.

20   Q.  So in general, how would you describe Mr. Josepy's role in

21   connection with the law firm?

22   A.  Providing sponsors.

23   Q.  Okay.  So if I understand correctly, Rabbi Josepy provided

24   sponsors to you to use in connection with your clients?

25   A.  Correct.

D1n1cib3                          Grynsztajn - direct

1    Q.  Okay.  You mentioned earlier that Mr. Brodjik collected

2    money from you and others to remit to Earl David; is that

3    right?

4    A.  Yes.

5    Q.  Did Mr. Brodjik ever discuss with you what else, if

6    anything, he was doing at the law firm?

7    A.  Yes.

8    Q.  What else did Mr. Brodjik tell you he was doing at the law

9    firm?

10   A.  That he was filing R-1s.

11   Q.  Did Mr. Brodjik tell you or do you know what an R-1 is?

12   A.  I know what an R-1 is.

13   Q.  What is an R-1?

14   A.  It's a visa for a religious worker.

15   Q.  Do you know what form or forms are used to file R-1s,

16   religious worker visas?

17   A.  I'm not sure.

18   Q.  What did Mr. Brodjik tell you about the filing of R-1

19   immigrant visas?

20   A.  Can you repeat the question?

21   Q.  Sure.  What did Mr. Brodjik tell you about his filing of

22   R-1 religious worker visas?

23   A.  "I'm going upstairs.  I got a few clients to take care of."

24   Q.  I'm sorry?

25   A.  He said, "I'm going upstairs."  I was on the 16th floor.

D1n1cib3                          Grynsztajn – direct

1    Went to the 21st floor.  He said he had some clients waiting

2    to do R–1s.

3                MR. GERZOG:  Your Honor, could we get a date and time

4    frame.

5    Q.  During what time period did you hear Mr. Brodjik telling

6    you that he was going upstairs to file R–1s for some clients?

7    A.  Has to be towards the end of 2005.

8    Q.  Towards the end of 2005?

9    A.  Yes.

10   Q.  Okay.  Did you ever discuss with Mr. Brodjik why he was

11   going upstairs to file the R–1s?

12   A.  Yes.

13   Q.  What did he tell you?

14   A.  Because he didn't want Sam to know that he's doing R–1s

15   also because he's going to get mad.

16   Q.  Mr. Brodjik said that Sam was going to get mad?

17   A.  Yes.

18   Q.  Do you know whether Sam was filing R–1s?

19   A.  Yes.

20   Q.  Was he filing R–1s?

21   A.  Sam, yes.

22   Q.  Did Mr. David ever discuss with you Mr. Brodjik's filing of

23   R–1s?

24   A.  Yes.

25   Q.  What did Mr. David tell you about Mr. Brodjik's filing of

1   R-1s?

2   A.  Tell me he's going to have some clients; he wants to do

3   them upstairs, not downstairs.

4   Q.  Mr. David told you that he wanted --

5   A.  Yes.

6   Q.  -- Mr. Brodjik to do the clients upstairs, not downstairs?

7   A.  Yes.

8   Q.  Did Mr. David ever tell you why he wanted the clients to be

9   handled upstairs and not downstairs?

10  A.  Because Mr. Brodjik was complaining that he was not making

11  enough money, so instead of Mr. David sending the clients for

12  the R-1 to Sam, Mr. Salamon, he would send them to -- to Rafi.

13  Q.  And Mr. David told you that?

14  A.  Yes.

15  Q.  And did Mr. David ever explain to you why he wanted the

16  clients handled on a different floor than Mr. Salamon?

17  A.  Yeah, because he didn't want Mr. Salamon to get mad.

18  Q.  Okay.  Did Mr. Brodjik ever assist you in other ways at the

19  law firm?

20  A.  Yes.

21  Q.  What did Mr. Brodjik do to personally assist you at the law

22  firm?

23  A.  Set up my computer.

24  Q.  I'm sorry.  You said he set up your computer?

25  A.  Yes.

1   Q.  What do you mean by that?

2   A.  When I get my first computer, he set it up.

3   Q.  And what specifically did Mr. Brodjik do for you?

4   A.  He installed all the immigration forms.

5   Q.  When you say he installed all the immigration forms, what

6   do you mean by that?

7   A.  It was a special program with all the immigration forms.

8   Q.  And Mr. Brodjik installed that for you?

9   A.  Yes.

10  Q.  Did you ever see Ms. Cibik interacting with anyone else in

11  the office besides you?

12  A.  Yes.

13  Q.  Who did you see her interacting with in the office?

14  A.  Mr. Teitelbaum, Mr. Salamon.

15  Q.  Where were you physically located when you saw Ms. Cibik

16  interacting with Mr. Teitelbaum and Mr. Salamon?

17  A.  I was in the same office.

18  Q.  Approximately how far away were you from Ms. Cibik at that

19  time?

20  A.  15, 20 feet.

21  Q.  Could you hear -- and when I say at that time, what time

22  period are we referring to?

23  A.  Sometime in '05.

24  Q.  Sometime in '05?

25  A.  Yes.

D1n1cib3                    Grynsztajn - direct

1   Q.  And what did you hear Ms. Cibik and Mr. Salamon -- I'm

2   sorry.  It was Mr. Salamon.  What did you hear Mr. Salamon and

3   Ms. Cibik talking about?

4   A.  How much Mr. Salamon was going to charge her for

5   sponsorship.

6   Q.  How much Mr. Salamon was going to?

7   A.  Charge her for sponsorship.

8   Q.  Okay.  And what was the tone of the conversation?

9   A.  Started nice and then became loud, arguing, screaming.

10  Q.  Could you hear -- who was screaming?

11  A.  Ms. Cibik.

12  Q.  Could you hear what Ms. Cibik was screaming to Mr. Salamon?

13  A.  "You skimming money from everybody."

14  Q.  Did she say anything else?

15  A.  That she's going to close down the office.

16  Q.  She said she's going to close down the office?

17  A.  Yeah, she was going to put everybody away.

18  Q.  She said she was going to put everyone away?

19  A.  Yes.

20  Q.  Approximately how many times did you hear Ms. Cibik saying

21  she was going to put everyone away?

22  A.  Few occasions.

23  Q.  To whom did you hear Ms. Cibik say she was going to put

24  everyone away?

25  A.  She was just yelling at everybody.

D1n1cib3                          Grynsztajn - direct

1    Q.  Did you ever see her yelling or arguing with

2    Mr. Teitelbaum?

3    A.  Yes.

4    Q.  On the occasions that you saw her yelling or arguing with

5    Mr. Teitelbaum, how far away were you?

6    A.  Very close.

7    Q.  Give us an estimate of how many feet.

8    A.  10 -- 10, 15 feet.

9    Q.  Could you overhear what they were arguing about?

10   A.  Always about money.

11   Q.  And what, if anything, did you hear Mr. -- I'm sorry -- did

12   you hear Ms. Cibik tell Mr. Teitelbaum?

13   A.  "You are a thief."

14   Q.  "You are a thief"?

15   A.  Yes.

16   Q.  And did you hear Ms. Cibik say anything else to

17   Mr. Teitelbaum?

18   A.  Then she went on continuing -- complaining about Mr. David.

19   Q.  Complaining about Mr. David?

20   A.  His wife.

21   Q.  What, in general, were the complaints about Mr. David's

22   wife?

23   A.  Cibik was madly in love with Mr. David.

24   Q.  Okay.  And she was complaining about his wife?

25   A.  Yes.

1   Q.  And did you hear Ms. Cibik say anything else to

2   Mr. Teitelbaum?

3   A.  Yes, she -- she was using dirty language.

4   Q.  She was using dirty language?

5   A.  Yeah.

6   Q.  And did you hear her say -- you said that you heard her

7   say, "I'm going to take everyone down," to Mr. Salamon.  Did

8   you ever hear her saying anything like that to Mr. Teitelbaum?

9   A.  Yeah.  She was saying it to everybody.  She was running

10  from room to room screaming.

11              MR. PASTORE:  Your Honor, may I have a moment?

12              THE COURT:  Sure.

13              (Pause)

14  Q.  Just a few more questions, Mr. Grynsztajn.

15              Rabbi Josepy, when he was referring sponsors, do you

16  know if the sponsors were paid for saying they were going to

17  employ people?

18  A.  I believe Sam would pay.

19  Q.  Why do you believe Sam would pay?

20  A.  Because one company, this bakery, already was supplied by

21  Mr. Josepy, but Mr. David --

22  Q.  I'm sorry.  Originally it was?

23  A.  Was supplied by Mr. Josepy.

24  Q.  Was certified, did you say?

25  A.  One of the companies, a bakery --

D1n1cib3                      Grynsztajn - direct

1    Q.   Yes.

2    A.   -- was referred by Rabbi Josepy.

3    Q.   Was referred by Rabbi Josepy.  Oh.

4    A.   To Mr. -- to Mr. David, but Mr. David would deliver the

5    money personally to him, for sponsors.

6    Q.   Mr. David personally delivered money to sponsors that were

7    referred by Rabbi Josepy?

8    A.   Yes.

9    Q.   Okay.  With respect to all these applications that you

10   personally worked on, did your name appear anywhere on those

11   applications?

12   A.   My name?

13   Q.   Your name.

14   A.   No.

15   Q.   Why, if you worked on the applications, would your name not

16   appear on the applications?

17   A.   Should be the attorney's name over there.

18   Q.   Should be the attorney's name over there?

19   A.   Yes.

20   Q.   So the person at the law firm who prepared the application

21   would not be listed on the application; is that correct?

22   A.   Correct.

23   Q.   With respect to --

24          MR. PASTORE:  If we can bring up 3036-2 and focus on

25   page 8.

D1n1cib3                          Grynsztajn – direct

1              Okay.  So let's focus on 3036-2, and if we could zoom

2      in on the advertisement itself.

3      Q.  Do you see where it says, "Send résumé or letter of

4      experience in duplicate to Business & Worker Development," then

5      it's got a P.O. Box number?

6      A.  Yes.

7              (Continued on next page)

1    BY MR. PASTORE:

2    Q.  Do you know whether that P.O. box is associated with the

3    law firm?

4    A.  No.

5    Q.  Do you know what that P.O. box is associated with?

6    A.  Department of Labor.

7    Q.  That's the Department of Labor's P.O. box?

8    A.  Yes.

9    Q.  So if people responded to this ad, what is your

10   understanding of where resumes would actually be sent?

11   A.  To the labor department.

12   Q.  If you could --

13            MR. PASTORE:  Your Honor, with the Court's permission,

14   I'd like to ask the witness to step down from the stand to the

15   four boxes that are in front of him.

16            THE COURT:  Okay.

17   Q.  Mr. Grynsztajn, directing your attention to these four

18   boxes which are labeled Government's 3066, 3067, 3068, and

19   3069, before you testified here today, did you have a chance to

20   go through the documents in these boxes?

21   A.  Yes.

22   Q.  Can you tell the jury in general what types of documents

23   were contained in those boxes?

24   A.  All different types of immigration receipt, labor letters,

25   labor inquiries, immigration inquiries.

D1NLCIB4                          Grynsztajn – direct

1  Q.  And, in fact, did your handwriting appear on some of the

2  documents?

3  A.  Yes.

4  Q.  And from your review of the documents, could you tell

5  whether they came from the law firm?

6  A.  Yes.

7          MR. PASTORE:  Your Honor, may I have a moment?

8          THE COURT:  Sure.

9          MR. PASTORE:  Your Honor, no further questions at this

10  time.

11          THE COURT:  All right.  Is there an order that you've

12  chosen?

13          MR. DONALDSON:  I get to go first.

14          THE COURT:  Congratulations.

15          MR. DONALDSON:  Can I have one second.

16  CROSS-EXAMINATION

17  BY MR. DONALDSON:

18  Q.  Good afternoon, sir.

19  A.  Good afternoon.

20  Q.  What I'm going to need you to do is speak up so that the

21  last person back here in this jury box can hear you.

22          Can you do that?

23  A.  Yes.

24  Q.  There you go.  Speak so we all can hear you.  You ready?

25  A.  Yes.

1    Q.  I'm going to try to ask you some yes or no questions.  If

2    you don't understand the question, just say you don't

3    understand.  Okay?

4    A.  Yes.

5    Q.  Very good.  That's a good start.

6               What's -- what is a 485?

7    A.  Application for adjustment of status.

8    Q.  And what's a 485A?

9    A.  It's a supplement to the 485.  That goes along with a

10   thousand dollars penalty.

11   Q.  Goes along with that?

12   A.  With a thousand dollars penalty.

13   Q.  And what's a 765?

14   A.  That's for work authorization.

15   Q.  For what?

16   A.  Work authorization.

17   Q.  What's a G-325?

18   A.  Biographic information.

19   Q.  What do you mean by biographic information?

20   A.  Information the person, where he lives, information where

21   he live now, where he live before, list all the family members

22   and everything.

23   Q.  What's an I-140?

24   A.  That's immigrant petition for alien worker.

25   Q.  And what goes into that form?

D1NLCIB4                          Grynsztajn - cross

 1    A.  Information on the company and the alien.

 2    Q.  And what's a H1?

 3    A.  H1 is a working visa.

 4    Q.  What goes on that form?

 5    A.  I'm not sure.

 6    Q.  What's a 245?

 7    A.  Excuse me?

 8    Q.  A 245.

 9    A.  You mean Section 245?

10    Q.  Yes.

11    A.  It's the law that allow the person to adjust here.  If they

12    were physically present here before December 21, 2000, and they

13    file a case before April 30, 2001, they be able to adjust here.

14    Q.  What's an I-131?

15    A.  That's the travel document, application for the travel

16    document.

17    Q.  What's an EAC number?

18    A.  EAC number, that's a receipt number when you send to

19    immigration.  EAC would be from Vermont center.

20    Q.  Vermont center?

21    A.  Right.

22    Q.  What is the Vermont center?

23    A.  There was a Vermont center where you see EAC.  Nebraska

24    center where you see SRC.  Different center, they need to use

25    different words in front.

D1NLCIB4                          Grynsztajn - cross

1    Q.   And what's a G-28?

2    A.   It's a form that the client agree to be represented by the

3    attorney or the company agreed to be represented by attorney.

4    Q.   Okay.  You know Earl David for over 25 years, correct?

5    A.   Yes.

6    Q.   When you first got to the Earl David law firm, he trained

7    you, correct?

8    A.   Yes.

9    Q.   He provided you -- he let you sit with him while he was

10   doing interviews with clients, right?

11   A.   Yes.

12   Q.   And you did this for several months, correct, he trained

13   you for several months, didn't he?

14   A.   Yes.

15   Q.   And this was hundreds of hours of training, correct?

16   A.   I don't know if hundreds.

17   Q.   Well, several months of training; would that be fair to

18   say?

19   A.   Yes.

20   Q.   And before you got to the Earl David firm, you did not do

21   immigration, did you?

22   A.   Correct.

23   Q.   Correct, you did not do it, or correct, I did do it?

24   A.   I did not do it.

25   Q.   And throughout this training, Mr. David showed you how to

1    fill out immigration forms, correct?

2    A.  Yes.

3    Q.  And prior to him leaving 110 Wall Street, you had performed

4    lots of interviews on clients or immigrants or aliens, correct?

5    A.  What do you mean by interviews?

6    Q.  Did you talk to aliens or immigrants about their

7    immigration status or their paperwork prior to Mr. Earl David

8    leaving the law firm?

9    A.  Yes.

10   Q.  Hundreds, correct?

11   A.  Yes.

12   Q.  I believe you told the government well over 700, correct?

13   A.  It's possible, yes.

14   Q.  And you -- before he left 110 Wall Street, you actually

15   filled out or helped fill out several ETA 750s, correct?

16   A.  Physically I did not do them.

17   Q.  Did you not prior to Mr. David leaving the law firm or

18   before that -- strike that.

19           When did Mr. David leave 110 Wall Street, what year?

20           I'll ask a different way.  Isn't it true Mr. David

21   left the law firm in 2004?

22   A.  Correct, yes.

23   Q.  All right.  So prior to him leaving the law firm, is it not

24   true that you and he or he and you did seven -- ETA 750 forms?

25   A.  Let me answer this in two ways.

1    Q.  I don't want you to answer two ways.  I want you to answer

2    yes or no.

3              Isn't it true you and Mr. David, prior to him leaving

4    110 Wall Street, filled out, completed ETA 750 forms, yes or

5    no?

6    A.  Mr. David would fill out.  2004, Mr. David would fill out.

7    Q.  Between 2000 and 2004, did you help Mr. David fill out ETA

8    750 forms?

9    A.  Between 2000 and 2004, until the PERM system came out.

10   Q.  Is that a yes or no?  Did you or did you not assist

11   Mr. David fill out ETA 750 forms between 2000 and 2004, yes or

12   no?

13   A.  Yes, 2000 to the time the PERM came out.

14   Q.  Now, you're saying that in -- I believe you said on direct

15   that when the PERM, this is what you call them, PERMs came out,

16   you didn't do that anymore?

17   A.  Right.  I did not file those cases.

18   Q.  And you said on direct that you saw Ms. Cibik file those

19   cases for Mr. David; is that correct?

20   A.  Yes.

21   Q.  Do you recall saying on direct that you know Ms. Cibik

22   filed, filled those out because you sat next to her while

23   Mr. David was teaching her; do you recall that?

24   A.  No, I never said I sat next to.

25   Q.  Did you not say on direct that you know Ms. Cibik filled

1    out these 9089 PERM forms with Mr. David because you were

2    sitting there while he was teaching her?

3           MR. PASTORE:  Objection.  Mischaracterizes the prior

4    testimony.

5           THE COURT:  I don't remember exactly what it was.  If

6    you have a page reference, I'd be happy to look.

7    Q.  Did you not say that yesterday?

8    A.  No.  I said I was in the room.  I did not say I was sitting

9    next to them watching them together.

10   Q.  Oh, you were in the room?

11   A.  Yeah.

12   Q.  Watching Mr. David teach Ms. Cibik how to do these 9089

13   forms?

14   A.  I might have walked in, I might have walked out.  I walk

15   from room to room.

16   Q.  So you might have walked in and then walked out because you

17   go from room to room.  And upon you walking in and walking out,

18   that's when you saw Mr. David teaching Ms. Cibik how to do

19   these 9089 forms.  Is that what you're saying?

20   A.  Yes.

21   Q.  So when you walked in and then walked out, what did you

22   see, what was the teaching part that you saw, what did you see?

23   A.  I saw Ms. Gulay sitting next to Mr. David while he was

24   doing the labor form and showing exactly how to do it.

25   Q.  And this happened in the process of you walking in and

D1NLCIB4                           Grynsztajn – cross

1   walking out?

2   A.  Yeah.

3   Q.  Okay.  And this was after, of course, you had been taught

4   by Mr. David for several months how to do other forms, correct?

5   Correct?

6   A.  It's wrong.

7   Q.  It's not wrong.  That's wrong?

8   A.  Repeat the question.

9   Q.  You're saying that Mr. David taught Ms. Cibik how to do

10  these 9089 forms, that's what you're saying, correct, you said

11  that, right?

12  A.  Yes.

13  Q.  And you're saying you don't know how to do them -- you said

14  yesterday you don't know how to do them because you were never

15  taught how to do them.  Correct?

16  A.  Because I never taught, I never wanted to do them.

17  Q.  But you know about the G-28, the I750, the 485, the 285,

18  the I21, and just about every other form in the immigration

19  network, but you don't know about the 9089; is that what you're

20  saying?

21  A.  Yes.

22          MR. PASTORE:  Objection.  Objection.  There are some

23  forms in there that I don't think were part of any testimony.

24          MR. DONALDSON:  I'm sorry.  I apologize.

25  Q.  You know about the 485, the 485A, the 765, the 325, the

D1NLCIB4                          Grynsztajn - cross

1    I-140, the H1, excuse me, the I-131, EAC number, and a G-28,

2    but you're saying that you didn't learn how to do a 9089?

3    A.   Correct.

4    Q.   And you're saying that you know Ms. Cibik knows how to do

5    it because you walked in and out of the office and happened to

6    see Mr. David teaching her one day?

7    A.   Correct.

8    Q.   And even though you have been taught for months about how

9    to do immigration fraud, on this particular day you weren't

10   taught how to do 9089; is that your testimony?

11   A.   Yes.

12   Q.   Now, you started working I believe you said with the firm

13   in 1999; is that right?

14   A.   Yes.

15   Q.   And you came to the firm from a shelter; is that correct?

16   A.   Yes.

17   Q.   I believe you said a Bronx shelter; is that correct?

18   A.   Yes.

19   Q.   Homeless, not homeless, that was your home, the shelter?

20   A.   Yes.

21   Q.   And you came to Mr. David's firm to work, correct?

22   A.   Yes.

23   Q.   You call him or he calls you?

24   A.   I came to visit him.

25   Q.   You came to visit him at the firm?

1    A.  Yes.

2    Q.  Saw it was a nice firm going on, you wanted to work; is

3    that right?

4    A.  I knew him for many years.

5    Q.  So you saw your old friend from many years ago and you

6    wanted to work, correct?

7    A.  I went to him, yes.

8    Q.  And he gave you a job as a copy boy?

9    A.  He said he needed somebody to make copies.  So you want to

10   make a few dollars, stick around here.

11   Q.  This was in 1999?

12   A.  Approximately, yes.

13   Q.  And then in 2000, your job duties went from copy boy to

14   immigration fraud?

15   A.  If you want to call that, yes.

16   Q.  If I want to call it, is that what you said?

17   A.  Yes.

18   Q.  Was it fraud?

19   A.  Yes.

20   Q.  So you're admitting that you were committing immigration

21   fraud, correct?

22   A.  Yes.

23   Q.  Now, you said you stopped working there in April or

24   May 2006; would that be fair to say?

25   A.  That would be correct.

D1NLCIB4                         Grynsztajn - cross

1    Q.  January 2006 you were approached by law enforcement,

2    correct?

3    A.  Yes.

4    Q.  Federal agents, correct?

5    A.  Yes.

6    Q.  And these -- did they reach out to you or did you reach out

7    to them?

8    A.  They reached out to me.

9    Q.  So you didn't go up to them and tell the federal

10   government, listen, I'm feeling really bad about what I'm

11   doing, I want to report my bad conduct to the federal

12   government; you didn't say that, right?

13   A.  No.

14   Q.  They called you one day and told you to come to the office?

15   A.  They came to visit me.

16   Q.  They came to visit you where?

17   A.  In the house.

18   Q.  At a house, the house?

19   A.  Yes.

20   Q.  House where?

21   A.  Where I live.

22   Q.  So you went from living in a shelter to living in a house?

23   A.  Yes.

24   Q.  And this was based upon your work at the Earl David firm?

25   A.  Correct.

D1NLCIB4                         Grynsztajn - cross

1   Q.  You went from making no money to making enough money to own

2   a house?

3   A.  Yes.

4   Q.  And you also owned your car?

5   A.  At that time I had a leased car.

6   Q.  So you went from shelter to house and car working at the

7   David firm, correct?

8   A.  Yes.

9   Q.  Fair to say you made you a lot of money, correct?

10  A.  Yes.

11  Q.  Roughly how much a year, a hundred thousand, 200,000 a

12  year, 300,000?

13  A.  I can't estimate.

14  Q.  400,000?

15  A.  No, sir.

16  Q.  500,000?

17  A.  Don't know how much.

18  Q.  Don't know how much, but you won't say it wasn't 500,000?

19  A.  You talking about over the years or are you talking about

20  for one year?

21  Q.  One year.  Give me one year.  How much you made in 2000?

22         2001, how much did you make in 2001?

23  A.  I don't know.  Around 100, 150,000, I don't know.

24  Q.  And you were just getting starting 2001.  How much did you

25  make in 2002?

D1NLCIB4                        Grynsztajn - cross

1    A.  Less.

2    Q.  You made less in 2002?

3    A.  Yeah.

4    Q.  A hundred thousand?

5    A.  Probably less.

6    Q.  How much did you make in 2003?

7    A.  Even less.

8    Q.  How much you made in 2004?

9    A.  I'm not sure, not much.

10   Q.  So you started making 150,000 -- strike that.

11          You started making little to nothing as a copy boy, I

12   presume, correct?

13   A.  Yes.

14   Q.  And then you went to 150,000 in one year; is that correct?

15   A.  Yes.

16   Q.  Somehow you made enough money to buy you a house, to get

17   you a house in one of these counties in New York City, correct?

18   A.  The house was not bought with the money from the office.

19   Q.  Oh.  When did you -- did you pay your taxes on the money

20   you made in 2001?

21   A.  In 2001, no.

22   Q.  2002?

23   A.  I'm not sure what year, but a few years I have to pay.

24   Q.  A few years you have to pay?

25   A.  Yeah.

1   Q.  But you're sure you didn't pay the taxes for the year you

2   made the most money?

3   A.  I'm not sure what years I didn't pay.  I got to check.

4   Q.  Now, when you -- you said that federal agents or federal

5   government, somebody reached out, came to your house to talk to

6   you, correct?

7   A.  Yes.

8   Q.  And they knocked on the door and you let them in, correct?

9   A.  Yes.

10  Q.  You knew they were federal agents and you let them in,

11  correct?

12  A.  Yes.

13  Q.  And they started asking questions about your work at the

14  Earl David firm, correct?

15  A.  Correct.

16  Q.  This was in January of 2006; is that right?

17  A.  Yes.

18  Q.  And when they came into your door, they sat down and

19  started asking you questions, you said you knew they were the

20  federal government, correct?

21  A.  Yes.

22  Q.  They told you you need to tell them the truth about what's

23  going on at the Earl David firm, correct?

24  A.  Yes.

25  Q.  They told you you were in a little bit of trouble, correct?

D1NLCIB4                        Grynsztajn - cross

1    A.  They said something like that, yeah.

2    Q.  They said it's probably good to help yourself out, correct?

3    A.  It wasn't a long conversation.  I stopped them.  I told

4    them I want to speak to my attorney and then I will get back to

5    them.

6    Q.  So you spoke to your attorney, then you got back to them;

7    is that correct?

8    A.  Yeah.

9    Q.  Got back to them again in January 2006, correct?

10   A.  Something like that.

11   Q.  And where did you all meet that next time?

12   A.  The U.S. Attorney's Office.

13   Q.  And at that point it was a lot more formal, correct, lot

14   more formal structure, correct?

15   A.  Yes.

16   Q.  And you told them -- they told you it's time to tell us

17   what's going on, correct?

18   A.  My attorney at that time advised me to tell them everything

19   that I knew.

20          MR. PASTORE:  Objection.

21          MR. DONALDSON:  I'm not asking about --

22          MR. PASTORE:  Goes into potential attorney-client

23   privilege.  Move to strike.

24          THE COURT:  Don't tell us what your attorney told you.

25   Okay?

D1NLCIB4                          Grynsztajn - cross

1             THE WITNESS:  Okay.

2   Q.  When you were sitting down in the U.S. Attorney's Office,

3   the U.S. Attorney's Office and their representatives told you

4   to tell them the truth, correct?

5   A.  Yes.

6   Q.  And that was that first meeting you had with them in this

7   office, in the U.S. Attorney's Office, correct?

8   A.  Yes.

9   Q.  And at that meeting they told you the most important part

10  is to tell the truth, correct?

11  A.  Yes.

12  Q.  And they told you -- well, strike that.

13            They began to ask you questions about the Earl David

14  law firm, correct?

15  A.  Yes.

16  Q.  And people that work in the law firm, correct?

17  A.  Yes.

18  Q.  And people that were -- the duties and responsibilities of

19  certain people in the law firm, correct?

20  A.  Yes.

21  Q.  How long did that meeting last, if you recall?

22  A.  I'm not sure.  I don't remember.

23  Q.  Estimate, hour, two hours, three hours?

24  A.  Maybe two hours.

25  Q.  Maybe two hours.  That was in 2006, January 2006?

D1NLCIB4                         Grynsztajn - cross

1    A.  Yes.

2    Q.  So it was about two-hour meeting?

3    A.  I don't recall how long the first meeting was.

4    Q.  During that meeting they asked you about -- they asked you

5    about -- they asked you whether or not you knew about people

6    who made or had anything to do with false tax returns or W-2

7    forms, do you recall them asking you that question?

8    A.  I don't recall them asking me specific that question.

9    Q.  Isn't it true on that first meeting you told them that you

10   didn't have any information or know anything about anybody that

11   did -- let me make sure I'm right.  One second, Judge.

12          Isn't it true that you told them you had no idea where

13   companies or aliens could obtain tax returns, W-2s, and other

14   supporting documentation in the event that legitimate ones did

15   not exist?

16   A.  Can you repeat that question?

17   Q.  Isn't it true that you told them the federal government

18   after being told to tell them the truth that you had no idea

19   where companies or aliens could obtain tax returns, W-2s, and

20   other supporting documentation in the event that legitimate

21   ones do not exist?

22   A.  I don't recall that.

23          MR. DONALDSON:  May I show.  I'll approach with

24   3501-1, second page, last sentence of the first paragraph.

25   Q.  Do you want me to direct you to read on top of where the

1   phone numbers are, second page.  First full paragraph, right

2   above where the phone numbers are in the part where it says he

3   has no idea.

4   A.  I think I was misquoted here.

5   Q.  You think you were misquoted there?

6   A.  Yeah.

7   Q.  Misquoted by whom?

8   A.  I don't know.  They took down the notes, I don't know.

9   Q.  So the person who took down the notes misquoted you on

10  whether or not you had any idea about all these tax forms that

11  you've been testifying about; is that your testimony?

12  A.  Yes.

13  Q.  Since we're talking about tax forms, you mentioned

14  different tax forms, Vago's and two other people's tax forms;

15  do you recall that testimony?

16  A.  Yes.

17  Q.  And you said you can tell which one is which, right?

18  A.  What I seen in the office, yes.

19  Q.  So now tell me again -- strike that.

20        Tell the jury how can you tell which one is Vago and

21  which one is the other person's by merely looking at it?

22  A.  Mr. Vago tax return would never, would never be signed.  He

23  would come into the office with the empty one and he would

24  stamp it.

25        The other accountant would bring them, stamp, and

1    certify by IRS.  There was two different.

2    Q.  And you remember that based upon you seeing that?

3    A.  I tell Mr. Vago for years.

4    Q.  So the way that we test that to be true is by you saying

5    that?

6              MR. PASTORE:  Objection.

7              MR. DONALDSON:  I'll withdraw it.

8    Q.  I believe you said your hours of work was generally 6 p.m.

9    to 2 a.m., correct?

10   A.  Yes.

11   Q.  Now, between -- you said you left the law firm in May,

12   April or May 2006; is that right?

13   A.  Yes.

14   Q.  And you started speaking with the government in

15   January 2006, correct?

16   A.  Yes.

17   Q.  So between January 2006 and April or May of 2006, you still

18   were going back and forth to work, correct?

19   A.  Give me the dates again?

20   Q.  You said that you spoke to or began speaking with the

21   government in January of 2006, correct?  Right?

22   A.  Yes.

23   Q.  You also said that you stopped working or going to work at

24   the law firm, Earl David law firm, around April or May 2006,

25   correct?

D1NLCIB4                        Grynsztajn - cross

1    A.  Yes.

2    Q.  So that means between January 2006 and April or May of

3    2006, you were still going to work, correct?

4    A.  Yes.

5    Q.  And you were going to work between the hours of 6 p.m. and

6    2 a.m., correct?

7    A.  Yes.

8    Q.  You weren't, while you were going to work, you weren't

9    wearing any kind of recording device, were you?

10   A.  No, sir.

11   Q.  You weren't wearing any type of video equipment, were you?

12   A.  No, sir.

13   Q.  So it's fair to say that whatever you were doing at the

14   David firm between January 2006 and April or May 2006, while

15   you were talking to the government, was not being monitored by

16   the government, correct?

17   A.  Not from my side.  I was not wired.

18   Q.  You were still collecting money while you were working

19   there, correct?

20   A.  Yes.

21   Q.  And you were collecting money from the work that you had

22   been doing there, correct?

23   A.  Yes.

24   Q.  So between January of 2006, when you were speaking to the

25   government, and May of 2006, you were still collecting money

D1NLCIB4                          Grynsztajn - cross

1    from fraud; is that correct?

2    A.   Yes.

3    Q.   While you were speaking to the government?

4    A.   Yes.

5    Q.   So did you give -- did you give the government the money

6    that you were collecting?

7    A.   No.

8    Q.   Did you turn that fraudulent money back over to the

9    clients?

10   A.   No.

11   Q.   So while you were talking to the government, you were still

12   participating in a crime by keeping the money?

13   A.   Yes.

14   Q.   Did you tell the government how much money you received?

15   A.   No.

16   Q.   Does anyone know how much money you received?

17   A.   No.

18   Q.   Did you keep any receipts for that?

19   A.   It would be in the files.

20   Q.   What files?

21   A.   Whatever is in the office.

22   Q.   So the money that you made is in some files?

23   A.   The client, for every case, the client would get a receipt.

24   Q.   Now, in July of -- strike that.

25        You weren't calling the government on a daily basis

1     between January of 2006 and April or May of 2006, were you?

2     A.  No.

3     Q.  You weren't filling out any daily activity reports telling

4     them what you were doing?

5     A.  No, sir.

6     Q.  So you were going to work, you were still -- were you still

7     recruiting clients?

8     A.  Yes.

9     Q.  So let me get this correct.  You started talking to the

10    government January of 2006.  And while you're talking to them,

11    you're still recruiting clients for the fraud that you were

12    doing.  Is that what you're saying?

13              MR. PASTORE:  Judge, asked and answered.

14              MR. DONALDSON:  I didn't say recruiting part.  I

15    haven't been to my recruiting part yet.

16              THE COURT:  Okay.  Overruled.

17              THE WITNESS:  Can you repeat the question?

18    Q.  Sure.  Between January 2006 and April or May of 2006, and

19    while you were talking to the government, you were still

20    recruiting immigrants or aliens for the fraud that you were

21    doing?

22    A.  Yes.

23    Q.  Is that fair?

24    A.  Yes.

25    Q.  Yes, is that a yes?

1   A.  Yes.

2   Q.  Didn't they tell you, the government tell you not to commit

3   any more crimes?

4           MR. PASTORE:  Objection.  Time, as to timing.

5           THE COURT:  I think we're in the January 2006, April,

6   May 2006 time frame.

7   Q.  Didn't the government tell you stop committing criminal

8   activity?

9   A.  No.

10  Q.  So when you met with them the first time and then the

11  second time -- strike that.

12          How many times did meet with them between January 2006

13  and when you left?

14  A.  I have no recollection.

15  Q.  You don't know?

16  A.  I didn't count how many times I met with them.

17  Q.  But you remember a conversation from 2005 in the bottom of

18  your office between my client and Mr. Lipa?

19  A.  That is something you can remember, something you forget.

20  Q.  So meeting with the government about your participation in

21  the fraud and possible prison time is something that you can

22  forget?

23          MR. PASTORE:  Objection.  That mischaracterizes his

24  testimony.  What he said was he didn't remember how many times

25  he met with the government.

```
 1              THE COURT:  Sustained.

 2              MR. DONALDSON:  I'll move on.

 3   Q.  Now, eventually, after 2006, you pled guilty, correct?

 4   A.  Yes.

 5   Q.  You pled guilty to fraud, immigration fraud, things like

 6   that, correct, I believe you said three counts, right?

 7   A.  Yes.

 8   Q.  This was in 2007?

 9   A.  Yeah, June 2007.

10   Q.  June 2007?

11   A.  Yes.

12   Q.  Before you pled guilty or sometime around that time, you

13   entered into a cooperation agreement, correct?

14   A.  Yes.

15   Q.  And pursuant to that cooperation agreement, you agreed to

16   fully cooperate; is that right?

17   A.  Yes.

18   Q.  You agreed to not commit any further criminal conduct; is

19   that right?

20   A.  Yes.

21   Q.  You entered into this agreement hoping to get less prison

22   time, correct?  Or strike that.

23              I believe you said yesterday you did it so that you

24   would get probation; is that correct?  Didn't you say that

25   yesterday?
```

1    A.  I said I entered agreement with the government to tell the

2    truth, yeah.

3    Q.  Lift your head up.

4            Did you not say yesterday that you wanted to get

5    probation, did you not say that yesterday?

6    A.  I said I hope to get probation.

7    Q.  Okay.  And you hope to get probation as a result of your

8    cooperating, correct?

9    A.  Yes.

10   Q.  And when you signed this cooperation agreement and pled

11   guilty, you were told that you were facing 20 years, correct?

12   A.  Yes.

13   Q.  And you were told that if you mess up or do something in

14   violation of this cooperation agreement, they're going to rip

15   the cooperation agreement up, correct?

16   A.  Yes.

17   Q.  And that you will be facing 20 years, correct?

18   A.  Yes.

19   Q.  So then the motive for you not to mess up or to tell the

20   truth or to not to commit any more crimes is that or the

21   incentive is so that you may not face those 20 years, correct?

22   I'll rephrase the question.

23           The reason for you signing the cooperation agreement

24   in your mind was to avoid 20 years, correct?

25   A.  Yes.

D1NLCIB4                         Grynsztajn - cross

1    Q.  You're also not a citizen, correct?

2    A.  That's correct.

3    Q.  You're from I believe you said Russia?

4    A.  I came from Poland.

5    Q.  Poland.  And you've been here since the sixties I believe?

6    A.  Yes.

7    Q.  Family here?

8    A.  Family?

9    Q.  Family here in the U.S.?

10   A.  Yes.

11   Q.  Children here?

12   A.  Yes.

13   Q.  You also I believe testified that you hope to get a letter

14   sent to immigration to assist you with staying here, correct?

15   A.  That's if I'm put through deportation proceeding.

16   Q.  So you also hope as the result of your cooperation not to

17   be put in deportation proceedings?

18   A.  Correct.

19   Q.  So then when you pled guilty and signed a cooperation

20   agreement, you were trying to avoid 20 years and you were also

21   trying to avoid being put in deportation proceedings, correct?

22   A.  Yes.

23   Q.  Mr. Mayer Weber, do you know him?

24   A.  Mayer Weber was one of the providers of sponsors.

25   Q.  And he was someone that participated in committing

D1NLCIB4                         Grynsztajn - cross

1   fraudulent immigration conduct, correct?

2   A.  Yes.

3   Q.  He worked with Earl David, correct?

4   A.  Yes.

5   Q.  I believe you said he provided fake sponsors?

6   A.  Yes.

7   Q.  And he got paid to do this, correct?

8   A.  Yes.

9   Q.  And you knew that at the time when Mr. Weber and Mr. David

10  were doing this fake sponsor thing, you knew that was fraud,

11  correct?

12  A.  Yes.

13  Q.  So now after you pled guilty, you were still speaking to

14  Mr. Earl David, correct?

15  A.  Yes.

16  Q.  And during one of those conversations with Earl David, he

17  suggested that you get into or start a business, correct?

18  A.  He said he has a couple clients for me.

19  Q.  As a matter of fact, during one of your conversations with

20  Earl David, he suggested you get into a business with Mayer

21  Weber, correct?

22  A.  Something like that.  He said we should do some cases.

23  Q.  Something like that.  Isn't it true that after you pled

24  guilty, after you signed the cooperation agreement, you spoke

25  to Earl David and he suggested that you and Mayer Weber join

1    together and get an immigration consulting business; isn't that

2    true?

3    A.  Yes.

4    Q.  So the person who started the fraud, this immigration

5    fraud, and another person who was part of the fraud -- strike

6    that.

7            The person who started this fraud suggested you, after

8    pleading guilty and cooperating, start up a new business in

9    immigration with the former person in fraud?

10   A.  Yes.

11   Q.  And the name of this company I believe was Immigration

12   Consultants Inc. or something like that?

13   A.  I have no idea.

14   Q.  Well, you did start a company with Mayer Weber, correct?

15   A.  I think Mayer Weber started, not me.

16   Q.  Okay.  So Mayer Weber started the company and you joined

17   the company, correct?

18   A.  I just joined it for the two cases and I didn't even know

19   they were using name.

20   Q.  Did you join a company with Mayer Weber related to

21   immigration consulting after you pled guilty and after you

22   signed a cooperation agreement?  Yes or no, sir.

23   A.  I met Mr. Weber for two cases, but I don't know what

24   company you're talking about even.

25   Q.  Did you not tell the federal government in one of your many

D1NLCIB4                          Grynsztajn - cross

1    meetings that you and Mayer Weber started a company called

2    Immigration Consultants, yes or no?

3    A.  I think Mr. Weber started the company.

4    Q.  Were you a partner in the company?

5    A.  I knew about the company, but I don't think I was on the

6    paper, the corporation or anything like that.

7    Q.  So you weren't part of the incorporation papers?

8    A.  If it was incorporated, I have no idea.  I have no

9    recollection of it today.

10   Q.  You helped with the company, did you help the company?

11   A.  I helped Mayer Weber.

12   Q.  You helped Mayer Weber.  You helped Weber with this

13   immigration company.  Is that better?

14   A.  I don't recall this case being filed even with the company

15   name.

16   Q.  What case are you talking about?

17   A.  The two cases that were filed.

18   Q.  What two cases are those?

19   A.  There was one for -- one was construction.

20   Q.  What's the client's name?

21   A.  The client name?

22   Q.  Yes.

23   A.  I don't remember the client name.

24   Q.  You don't remember the client's names?

25   A.  I remember the sponsor in one case.

D1NLCIB4                          Grynsztajn – cross

1    Q.  Didn't you say -- strike that.

2              On yesterday you said to the federal government on

3    direct examination that you've had hundreds of cases; do you

4    recall saying that?

5    A.  Yes.

6    Q.  Do you recall telling the federal government and the jury

7    yesterday that I remember most of my clients' names in my

8    cases; do you recall saying that?

9    A.  I might have, yes.

10   Q.  And now you're saying you forgot this one?

11   A.  I just don't recall the name.

12   Q.  Did you send Earl David a client's name related to Mayer

13   Weber's immigration company?

14   A.  I might have or Mr. Weber did.  I'm not sure.

15   Q.  You pled guilty again, didn't you?

16   A.  Yes.

17   Q.  January 4, 2013?

18   A.  I think January 13 or something.

19   Q.  January 13 you pled guilty again?

20   A.  Yes.

21   Q.  And you pled guilty to participating in immigration fraud,

22   correct?

23   A.  Correct.

24   Q.  And you pled guilty to participating in immigration fraud

25   that occurred after you pled guilty and entered the cooperation

D1NLCIB4                        Grynsztajn – cross

1    agreement back in 2007; is that correct?

2    A.  Yes.

3    Q.  So then knowing that you were facing 20 years, knowing that

4    you were facing deportation, you still participated in

5    immigration fraud; is that correct?

6    A.  Yes.

7    Q.  So the 20 years and the deportation didn't stop you from

8    committing crimes?

9    A.  There was a reason behind it.

10   Q.  So there's a reason behind you committing your crimes; is

11   that what you said?

12   A.  Mr. David was --

13   Q.  I didn't ask you that.  Is there a reason behind you

14   committing your criminal activity?

15   A.  There was a reason behind these two cases that were filed.

16   Q.  So the two cases that you don't remember the aliens for,

17   there's a reason behind that; is that right?

18   A.  Yes.

19   Q.  And the reason behind that was the 20 years and the

20   deportation didn't concern you, correct?

21   A.  No, sir, that's not true.

22   Q.  Because something was more important than that to you,

23   correct?  Correct?

24   A.  Correct.

25   Q.  You were willing to risk 20 years, deportation, to commit

1   more criminal activity?

2   A.  That's not true.

3   Q.  And you pled guilty again, you're facing 25 years now,

4   correct?

5   A.  Yes.

6   Q.  And you're saying that we're telling the truth now,

7   correct?

8   A.  Yes.

9   Q.  And we believe -- the jury believes that because you're

10  saying it?

11          MR. PASTORE:  Objection, your Honor.  The jury will

12  draw its own conclusions.

13  Q.  You said something on direct this morning, 1501 Pine Park

14  Avenue; do you recall saying that?

15  A.  Yes.

16  Q.  You know that address, right?

17  A.  Yes.

18  Q.  That's an address of what?

19  A.  Mr. Flam's residence.

20  Q.  Abraham Flam's residence?

21  A.  Yes.

22  Q.  I believe you said on direct that a client or alien came

23  running back to you mad at you because he went there and there

24  was no business, correct?  Did you not say that on direct?

25  A.  I never said the client came to me.

D1NLCIB4                         Grynsztajn - cross

1    Q.  Who did the client come to?

2    A.  I said he came to the office screaming.

3    Q.  He came to the office screaming?

4    A.  Yes.

5    Q.  Was it your client?

6    A.  It might have been.

7    Q.  Might have been your client?

8    A.  I'm not sure.

9    Q.  Strike that.  You said the client came to the office,

10   correct?

11   A.  Yeah.

12   Q.  You were in the office and you saw him, correct?

13   A.  Yes.

14   Q.  So now you're telling the jury he might have been your

15   client?

16   A.  No.  He was the client, the client was -- I'm not sure he

17   was my client.

18   Q.  So you saw this person in the office screaming about this

19   address, and you don't know whether or not he was your client

20   or not; is that your testimony?

21   A.  I don't recall.

22   Q.  You don't recall that either?

23   A.  I don't recall it was my client.

24   Q.  Now, you said you prepared G-28s; do you recall saying that

25   today?

1   A.   Yes.

2   Q.   You prepared these G-28s, correct?

3   A.   Yes.

4   Q.   Do you know what a G-28 is?

5   A.   Yes.

6   Q.   Tell the jury.

7   A.   G-28 is a form that authorize the client or the sponsor

8   sign it to be represented by.

9   Q.   Speak into the mike and say that again.

10  A.   It's a representation form.

11  Q.   A what kind of form?

12  A.   Representation.

13  Q.   Representation form?

14  A.   Yeah.

15  Q.   It's an authorized representation form, correct?

16  A.   Correct.

17  Q.   Signed by an attorney or an authorized representative,

18  correct?

19  A.   Yes.

20  Q.   Who is representing the alien, correct?

21  A.   Yes.

22  Q.   And you prepared these forms, correct?

23  A.   Correct.

24  Q.   And you're not an attorney, are you?

25  A.   No, I did not sign them.

D1NLCIB4                          Grynsztajn - cross

1   Q.  You just prepared them?

2   A.  Yes.

3   Q.  Prepared them for who to sign?

4   A.  For the attorney to sign.

5   Q.  What attorney?

6   A.  And the client.

7   Q.  After you left this law firm, the Earl David law firm, I

8   believe you said you began or you kept communicating with Sam

9   Salamon, Earl David, Mayer Weber, those persons you kept in

10  contact with, correct?

11  A.  Yes.

12  Q.  But you also kept -- lean up to the mike.  Come on.  There

13  you go.

14          But you also kept in contact with an attorney named

15  Klug, correct?

16  A.  I might have spoke to him a couple times.

17  Q.  And you kept in contact with these people via email,

18  correct?

19          Did you not say on direct that you kept in contact

20  with Sam Salamon, Earl David, Mayer Weber via email, in person,

21  or by phone?

22  A.  Yes.

23  Q.  You never contacted Ms. Cibik via email, correct, after you

24  left?

25  A.  No.

D1NLCIB4                          Grynsztajn - cross

1    Q.  Never contacted her by phone either after you left, did

2    you?

3    A.  No.

4    Q.  Never contacted her in person after you left, did you?

5    A.  No.

6    Q.  But a few months after you left the firm, you asked Sam,

7    Lipa -- Lipa is Mr. Teitelbaum, correct?

8    A.  Correct.

9    Q.  You asked Sam, Lipa, and Earl for some money, correct?

10   A.  Yes.

11   Q.  And I believe on direct you said you were looking for

12   approximately $25,000, correct?

13   A.  Yes.

14   Q.  You also asked him for attorney's fees, correct?  Isn't it

15   true, sir, that after you left the law firm, you asked either

16   Sam, Lipa, or Mayer for attorney's fees?

17   A.  I don't recall that.

18   Q.  You don't recall that?

19   A.  No.

20   Q.  Did you not tell the government during one your meetings

21   that you spoke to Sam or Lipa or Sam or Lipa and asked them for

22   attorney's fees?

23   A.  I might have.

24   Q.  You might have?

25   A.  Yeah.

D1NLCIB4                          Grynsztajn - cross

1    Q.  What was the 25,000 for?  You gave a specific number that

2    you wanted, $25,000.  What was the 25,000 for?

3    A.  For the referrals of clients to the office, for the

4    approvals that Gulay took from me.

5    Q.  So you wanted -- not only were you getting -- strike that.

6              You wanted $25,000 from Sam, Lipa or Mayer for work

7    that you had done while you were at the firm; is that correct?

8    A.  Yes.

9    Q.  So you wanted -- this work that you had done at the firm

10   was fraudulent conduct, correct?

11   A.  Yes.

12   Q.  So even after you left the firm and in 2007, well, sometime

13   after you left the firm, you still wanted to collect money from

14   your fraudulent conduct?

15             MR. PASTORE:  Objection.

16   Q.  After you left the firm, you wanted $25,000 for the work

17   that you had did, correct?

18   A.  Yes.

19   Q.  I believe you said -- you didn't say this -- but you did

20   meet Sam somewhere after you left the firm, correct?

21   A.  Yes.

22   Q.  I think you met him out in the street by the deli

23   somewhere, right?

24   A.  Yes.

25   Q.  And Sam gave you some money, correct?

D1NLCIB4                      Grynsztajn - cross

1    A.  Yes.

2    Q.  This was money related to the work that you had did at the

3    law firm?

4    A.  Yes.

5    Q.  Lean in some.

6    A.  Yes.

7    Q.  You got a receipt for that money?

8    A.  No.

9    Q.  How much money was it?

10   A.  I think around 1,500.

11   Q.  And no receipt for the 1,500?

12   A.  No.

13   Q.  Did you -- that was criminally obtained or fraudulent

14   money, proceeds of fraud, that was proceeds of fraud?

15   A.  I didn't say that.

16   Q.  The money that he gave you was a result of the fraudulent

17   conduct that you were committing at the firm, correct?

18   A.  Yes.

19   Q.  So that would be fraudulent proceeds, correct?

20   A.  That's what you call it.

21   Q.  You got that money or you were still talking to the

22   government or meeting with the government when you got that

23   money, correct?

24   A.  Yes.

25   Q.  Did you give it to them?  What did you do with the money?

1   A.  I did not give the money to the government, no.

2   Q.  He paid you this money in cash?

3   A.  Yes.

4   Q.  So other than you telling us it was 1,500, there's no

5   receipt or record for the exact amount of that money?

6   A.  Correct.

7   Q.  So it could have been more?

8   A.  I don't remember, 15; 1,700, something like that.  I don't

9   recall.

10  Q.  So now it goes to 1,700.  Could it have been 2,500?

11  A.  No.

12  Q.  You never asked Ms. Cibik to bring you any money, correct?

13  A.  I spoke with Mr. David about it.

14  Q.  You spoke and my question was -- well, that's the question.

15          You didn't ask Ms. Cibik for any money, did you?

16  A.  No.

17  Q.  But you're saying that you wanted money for the files that

18  you believe Ms. Cibik worked on; is that what you said?

19  A.  I said the ones she took from me.

20  Q.  The ones she took from you?

21  A.  Yeah.

22  Q.  How many were those?

23  A.  A lot.

24  Q.  What's the name of those?

25  A.  You want the name of the client?

1   Q.   You know the name?

2   A.   No.

3   Q.   You don't know the name of the clients?

4   A.   They were very hard Turkish names.  But when I see them, it

5   refreshes the memory.

6   Q.   When you see them, it refreshes the memory?

7   A.   Yes, sir.

8   Q.   So just so I'm clear, you're saying today that you -- when

9   you see the names, it would refresh your recollection that it's

10  a client she supposedly took from you, but you're saying that

11  you never asked her for any of the money?

12  A.   Correct.

13          MR. DONALDSON:  Can I have one second, your Honor.

14  Q.   While you were at the Earl David law firm, did you --

15  strike that.

16          You did commit forgery, correct?  Yes or no?

17  A.   I don't really understand this question.

18  Q.   You signed other people's names, didn't you?

19  A.   No, sir.

20  Q.   From 2000 to 2006, while you were working at the Earl David

21  law firm, isn't it a fact that you signed or put other person's

22  names, attorneys, people down on the 16th floor, put their

23  names on documents?

24  A.   Okay.  You're asking me two questions here.  Let me answer

25  you the first one.

D1NLCIB4                          Grynsztajn – cross

1    Q.  Feel free.

2    A.  I prepare the forms with the attorney's names, but I did

3    not sign the name.  The form was brought to the attorney to

4    sign it.

5    Q.  Okay.  So you never signed an attorney's name?

6    A.  No, sir.

7    Q.  Did you create retainer agreements?

8    A.  Repeat the question?

9    Q.  Did you create retainer agreements?

10   A.  I prepare retainer agreements.

11   Q.  What does that mean you prepared them?  You wrote them out,

12   you drafted the retainer agreements?

13   A.  Yeah, I typed it up, yes.

14   Q.  Do you know someone named Christoff Myerski?

15   A.  Christoff?

16   Q.  Myerski.

17   A.  Can you spell it?

18   Q.  M-Y-E-R-S-K-I?

19   A.  M?

20   Q.  Y-E-R-S-K-I?

21   A.  Rings a bell something.

22   Q.  Rings a bell something?

23   A.  Yeah.

24   Q.  Did you create the retainer for Christoff Myerski?

25   A.  I possibly prepared it.

1   Q.  Did you receive a $200,000 fee for retainer?

2   A.  Excuse me?

3   Q.  200,000.00.

4   A.  No.

5   Q.  Did you ever receive a $200,000 retainer fee?

6   A.  No.

7   Q.  Lean in some.

8   A.  No.

9   Q.  The job offers that you spoke of, you recall speaking about

10  those, correct?  Do you recall speaking about the job offers?

11  A.  Yes.

12  Q.  Job offer letters?

13  A.  Yes.

14  Q.  I believe the prosecutor showed you some evidence where

15  there were newspaper ads up; do you recall seeing those?

16  A.  Yes.

17  Q.  You know who Maritza Diaz is, correct?

18  A.  Yes.

19  Q.  She's the woman up there top third from the left, lawyer?

20  A.  Yes, the third one on the right.

21  Q.  Sorry.  Now, she worked at the Earl David law firm,

22  correct?

23  A.  Yes.

24  Q.  You and Ms. Diaz created fake newspaper advertisements,

25  correct?

D1NLCIB4                        Grynsztajn – cross

1   A.  Can you repeat that question?

2   Q.  You and Ms. Diaz created fake newspaper advertisements;

3   isn't that correct, sir?

4   A.  No, sir.  I was not involved in the newspaper

5   advertisement.

6   Q.  Did you not tell the government in one of your meetings

7   that you and Ms. Diaz created the newspaper articles?

8          MR. PASTORE:  Objection.  Improper impeachment.  We

9   need a date.  I'm not sure there's a good faith basis for this

10  question.

11         THE COURT:  I assume you have a reference?

12         MR. DONALDSON:  I have about 75 references, your

13  Honor, but I'll pull the specific one out.  I'll find the date.

14         THE COURT:  You're sure it's not there?

15         MR. DONALDSON:  I'm sure it's not?

16         THE COURT:  I'm asking the government.

17         MR. PASTORE:  Your Honor, I think it would be helpful

18  if there was a reference.  I know it's a lot of materials.

19         MR. DONALDSON:  I think the question was are you sure

20  it's not there.

21         THE COURT:  Before we go through this exercise, are

22  you sure that he didn't say it?

23         MR. PASTORE:  I don't personally recall seeing it.

24         MR. DONALDSON:  He'll be up there for a while.  I'll

25  get back to it.  I'll pull it out for you.

1           THE COURT:  Okay.

2    Q.  You and Ms. Diaz also -- not also, get back to that --

3    created fake Yahoo accounts, correct?

4    A.  No, sir.

5           MR. DONALDSON:  Can I have one second, please.

6    Q.  You met with the government in May of 2006, correct?

7    A.  It's possible.

8    Q.  Possible?

9    A.  Yes.

10   Q.  In May of 2006, did you speak to them about the Earl David

11   law firm?

12   A.  Yes.

13   Q.  So let me ask you, when you say -- did you put down any

14   Yahoo accounts in any newspaper advertisements?

15   A.  I did not set up any Yahoo accounts.

16          MR. DONALDSON:  Can I have one second please, your

17   Honor.

18   Q.  Earlier today you said that you -- and yesterday, I

19   believe -- you paid Brodjik by cash almost every night; do you

20   recall saying that?

21   A.  Yes.

22   Q.  Now, you were working on the 16th floor, correct?

23   A.  Yes.

24   Q.  And Lipa and Salamon were working on the 16th floor with

25   you, correct?

D1NLCIB4                         Grynsztajn – cross

1   A.  Correct.

2   Q.  I believe you said the office had two desks in it, correct?

3   A.  Yes.

4   Q.  You sat in one desk, I believe you said Salamon sat in the

5   other desk, correct?

6   A.  Correct.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1n1cib5                          Grynsztajn - cross

1    BY MR. DONALDSON:

2    Q.  And I believe you said Lipa stood up and wrote his notes on

3    top of a counter or a desk or cabinet; is that correct?

4    A.  Yes.

5    Q.  So there were only two desks in the office.

6    A.  That's all we had.

7    Q.  When did you start -- when did you begin in your office?

8    When was your first time in the office on the 15th floor?

9    A.  You're talking about the -- the date when I started work?

10   Q.  Yes.

11   A.  When we moved there, I think '05.

12   Q.  I'm sorry?

13   A.  I said we moved there 2005.

14   Q.  You moved to the 16th floor in 2005?

15   A.  2004, 2005, yeah.

16   Q.  So sometime between -- well, when did you start in the

17   collection -- this cash collection, when did that start out?

18   A.  When Mr. David was suspended.

19   Q.  You also said on direct that you saw Mr. -- saw Mr. Brodjik

20   collecting from Ms. Cibik.  Do you recall saying that?

21   A.  Yes.

22   Q.  Ms. Cibik was on the 21st floor; correct?

23   A.  I would see Ms. Cibik almost every day on the 16th floor

24   too.

25   Q.  So Ms. Cibik was -- happened to be on the 16th floor at

D1n1cib5                        Grynsztajn - cross

1   the time that Brodjik was on the 16th floor collecting money

2   from you all?

3   A.  Some days would happen he would collect the money from her

4   on the 16th floor.

5   Q.  But you're sure you saw him collecting money from

6   Ms. Cibik.

7   A.  Yes.

8   Q.  Did you not tell the government on December 5th, 2012

9   that you were unsure if Rafi ever collected money from Gulay?

10          Did you not tell the government on December 5th,

11  2012, about a month and a half ago, that you were unsure

12  whether Rafi collected any money from Ms. Cibik?

13  A.  I said he was collecting from everybody.  That was his job.

14  I might have been misquoted here.

15          MR. DONALDSON:  Can I have a second, please, your

16  Honor?

17          THE COURT:  Yes.

18          (Pause)

19  Q.  The firm -- excuse me -- the offices on the 16th floor,

20  did they have anything in them that suggested they were

21  connected to the Earl David law firm?  By that I mean, was

22  there a placard outside the door, anything in the office walls

23  that said Earl David Law Firm, Part of Earl David Law Firm,

24  Associate of Earl David Law Firm, anything of the sort?

25  A.  I don't recall, but I think at one time there might have

1   been a sign.

2   Q.  When was that?

3   A.  When we were first moving there.

4   Q.  When you first moved there, 2005, you said you believed

5   there was a sign up on the 16th floor.

6   A.  Might have been a sign, yes.

7   Q.  How many computers were on the 16th floor?

8   A.  Depends what period of time you're talking about.

9   Q.  2005, 2006, how many computers on the 16th floor?

10  A.  About three, four.

11  Q.  These computers, were they password protected?  Did you

12  need a password to sign in to get on the computer?

13  A.  I believe so, yes.

14  Q.  You did.

15  A.  Yes.

16  Q.  Okay.  Ms. Cibik didn't have a password for her computer,

17  did she?

18  A.  I don't know.

19  Q.  So you said you saw her on the 16th floor.  You recall

20  saying that; correct?  You recall saying that; right?

21  A.  I said what?

22  Q.  Do you recall saying you saw Ms. Cibik come to the 16th

23  floor?  You recall saying that; correct?

24  A.  She came many times to the 16th floor.

25  Q.  Many times.

D1n1cib5                        Grynsztajn - cross

1    A.  Yes.

2    Q.  And when she came, according to you, did she use these

3    computers?

4    A.  She might have.

5    Q.  Might have.

6    A.  Yeah.

7    Q.  Do you recall seeing her use the computers?

8    A.  If the computer was open there, she might have used it.

9    Q.  You don't have any independent recollection of seeing

10   Ms. Cibik using the computer down there, did you?

11   A.  No, sir.

12   Q.  What was Sam's and Lipa's hours of work, from 2005 to 2006?

13   A.  What was the hours?

14   Q.  Yes.  What was their hours?

15   A.  I think they used to come around 6, 6 p.m., and stay -- by

16   the time I left, they were still there.

17   Q.  So Sam and Lipa got in at 6 p.m. as well?

18   A.  Yes.

19            MR. DONALDSON:  Your Honor, if I may, could I ask the

20   government to put up 3035-2 and 3035-4.

21   Q.  Mr. Grynsztajn, I'm showing you what you identified earlier

22   today, 3035-2 and 3035-4.  Do you recall testifying about those

23   documents?

24   A.  Yes.

25   Q.  I believe the government also showed you some documents to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    ask you regarding -- ask you questions regarding handwriting.

2    Do you recall that?

3    A.  Yes.

4    Q.  I want you to look at 3035-2, signed by Earl David, and

5    look at 3035-4, signed by Earl David.  In your experience are

6    those the same signatures?

7              Strike that.  Who signed them?

8              Who signed 3035-2, who signed 3035-4?

9    A.  Earl David.

10   Q.  In your experience are those two signatures the same?

11   A.  No.

12   Q.  No?

13   A.  No.

14   Q.  They're different signatures?

15   A.  They look different.

16   Q.  So who signed -- you just said Earl David.  So Earl David

17   signed both of them?

18   A.  I don't know.  I did not sign it.

19   Q.  Who signed it?

20              Who signed it?

21   A.  I don't know.

22   Q.  You don't know.

23              MR. DONALDSON:  Okay.  Could you put up 1113-5 and

24   1113-3, please.

25              1113-5 says Abraham Flam, President; 1113-3 says

D1n1cib5                          Grynsztajn - cross

1    Abraham Flam, President.  Who signed 1113-5?

2    A.  It says here Abe Flam.

3    Q.  Who signed 1113-3?

4    A.  It says Abe Flam.

5            THE COURT:  That's not really the question.

6            MR. DONALDSON:  I'm sorry, Judge.

7            THE COURT:  You're asking not what it purports to be,

8    you're asking if he knows who actually signed these, or am I

9    wrong?

10           MR. DONALDSON:  Yes, sorry.  That's correct, yes.

11   Q.  Do you know who signed these documents?

12   A.  No, I don't know.

13   Q.  Does it appear to have the same signatures?

14   A.  They appear different.

15           MR. DONALDSON:  You can take that down.

16   Q.  You testified that you got your clients by referrals.  Do

17   you recall testifying to that, Mr. Grynsztajn?

18   A.  Yes.

19   Q.  You also indicated that Ms. Cibik -- you testified that

20   Ms. Cibik -- Ms. Cibik advertised in the Turkish paper.  Do you

21   recall saying that?

22   A.  Yes.

23   Q.  When was that advertisement?

24   A.  I'm not sure.

25   Q.  How long did she have it running?

D1n1cib5                         Grynsztajn - cross

1   A.  I have no idea.

2   Q.  What's the name of the paper?

3   A.  Turkish paper.

4   Q.  What did the advertisement say?

5   A.  I have no idea.

6   Q.  Who put the advertisement in the paper?

7           Who put it in the paper?  Who put the advertisement in

8   the paper?

9   A.  Gulay told me she was advertising in the Turkish paper.

10  Q.  Gulay told you that.

11  A.  Yes.

12  Q.  When did she tell you that?

13  A.  A long time ago.

14  Q.  2002, 2001, 2003?  When did she tell you this?

15  A.  Maybe 2003.

16  Q.  2003 she told you that.

17  A.  Approximately.

18  Q.  Where were you when you all had this conversation?

19  A.  I have no recollection.

20  Q.  You have no recollection.

21  A.  No.

22  Q.  You also just spoke about American Girl.  Do you recall

23  testifying about that?

24  A.  Can you repeat the question?

25  Q.  You also -- just recently this afternoon, you testified

D1n1cib5                        Grynsztajn - cross

1    regarding American Fashion Girl.  Do you recall that?

2    A.  Yes.

3    Q.  I believe you said you heard of it before; correct?

4    A.  Yes.

5    Q.  You said you believed you had clients associated with it;

6    correct?

7    A.  Yes.

8    Q.  What clients?

9    A.  I remember having couple of cases with this -- with this

10   company.

11   Q.  What clients?

12   A.  I don't remember the names.

13   Q.  When was the client?

14   A.  Had to be sometime during 2005.

15   Q.  You said Lipa provided you with this company; correct?

16   A.  Yes.

17   Q.  How did he do that?

18   A.  By giving me the information.

19   Q.  What do you mean he gave you -- oh, you were sitting in the

20   office with him; correct?  This was when you were on the 16th

21   floor; correct?

22   A.  Yes, yes.

23   Q.  And he was sitting there next to you; correct?

24   A.  Maybe he was standing.  I don't know.

25   Q.  But he was in the office with you.

1   A.  Yes.

2   Q.  And you asked him for the documents.

3   A.  Yes.  I asked I need a sponsor, he provided me the

4   information.

5   Q.  What do you mean provided?  So he told you the name of the

6   sponsor?

7   A.  Yes.

8   Q.  And then you did what with that information?

9   A.  I would send it over to Mr. David.

10  Q.  So you didn't need the sponsor, Mr. David needed the

11  sponsor.

12  A.  Mr. David was doing the PERM cases for me.

13  Q.  So am I understanding correctly, when you say they were

14  your clients, Mr. David was doing the work?

15  A.  I would send him the information, he would prepare the case

16  for me.

17  Q.  What do you mean by sending him the information?

18  A.  The client information, the company information.

19  Q.  This was in 2005?

20  A.  Yes.

21  Q.  This was the PERM cases?

22  A.  Yes.

23  Q.  So then you would do what exactly?  You said you would do

24  the client information, you would do the company information.

25  What other kind of --

D1n1cib5                          Grynsztajn - cross

1    A.  I would give him the information.

2    Q.  What other kind of information would you give Mr. David?

3    A.  Whatever was needed to file the PERM case.

4    Q.  So then you knew how to file the PERM case.

5    A.  No, I didn't know.  I only knew what information to send

6    over to him, but I didn't know how to -- how to work the

7    system, the job bank or anything like that.

8          MR. DONALDSON:  One second, your Honor.

9    Q.  When Mr. David left the office in 2004, he went to another

10   office; is that correct?

11   A.  Yes.

12   Q.  What office was that?

13   A.  90 Washington Street.

14   Q.  Sorry?

15   A.  90 Washington Street.

16   Q.  And you went to 90 Washington Street sometimes; correct?

17   A.  Yes.

18   Q.  And how often did you go to 90 Washington Street?

19   A.  Not often.

20   Q.  It was not often.

21   A.  Maybe once a week.

22   Q.  And how long did you do that?

23   A.  Till Mr. David left to Canada.

24   Q.  When was that?

25   A.  I don't know the date exact.

1    Q.  What month?

2    A.  I have no idea.

3    Q.  What year?

4    A.  I don't know exactly when he left.

5    Q.  Well, what were you doing at 90 Washington?

6    A.  I was meeting with Mr. Philwin and clients.

7    Q.  You were doing what?

8    A.  Meeting with Mr. Philwin and clients.

9    Q.  So you would go to 90 Washington once a week, meet with

10   Mr. Philwin and clients, and then after that you would go back

11   over to 110 Wall Street and meet with clients as well?

12   A.  Yes, some cases we don't want Mr. Salamon to see that, some

13   substitution cases, and there were files over there in that

14   office.

15   Q.  So you were hiding stuff from Mr. Salamon.

16   A.  Some cases, yes.

17   Q.  And the reason you were doing that was because you wanted

18   to what?

19   A.  Nothing, but Mr. Salamon wanted everything, so Mr. David

20   said, "Bring them over there, Mr. Rafi will let you in, he has

21   the key to the office, and you do the case over there."

22   Q.  You spoke about experience letters.  Do you recall speaking

23   about that?

24        Do you recall speaking about experience letters?

25   A.  Yes.

D1n1cib5                          Grynsztajn - cross

1    Q.  Would you lean in, please.

2    A.  Yes.

3    Q.  Thank you.  And you -- well, you've written experience

4    letters; correct?

5    A.  No, sir.

6    Q.  You've never drafted experience letters?

7    A.  No.

8    Q.  Didn't Earl David teach you how to draft experience letters

9    when he gave you that several-month training?

10   A.  No.  He said there was samples, sample, how an experience

11   letter should look.  That's it.

12   Q.  He gave you samples.

13   A.  Yes.

14   Q.  Did you actually see Earl David creating fake letters of

15   experience?

16   A.  Yes.

17   Q.  Would it be true or isn't it a fact that you and Maritza

18   Diaz actually sent people to get fake documents and letters

19   made?

20   A.  Repeat that question?

21   Q.  Is it true that you and Maritza Diaz actually sent people

22   to get fake documents and fake letters made?

23   A.  Yes.  If somebody needs an experience letter, I would send

24   them to -- if someone was Polish, then Aleksandra Urbanek to

25   get an experience letter.

D1n1cib5                          Grynsztajn - cross

1    Q.  But you would send them other places as well; correct?

2    A.  I don't recall.

3    Q.  Now you also said on direct yesterday I believe that you

4    saw Ms. Cibik making up experience letters.  Do you recall

5    saying that?

6    A.  Yes.

7    Q.  When was that?

8    A.  It was a few occasions.

9    Q.  When?  Name one.

10   A.  I can't give you exactly the date.

11   Q.  Give me the month.

12   A.  We're talking about years.

13   Q.  You don't have a memory of that particular situation?

14   A.  No.

15   Q.  What client was it?

16   A.  Turkish client.

17   Q.  Turkish client.

18   A.  Yeah.

19   Q.  Name, issues, anything like that?  No?

20   A.  No.

21   Q.  Did you give the government a name or date of when you saw

22   Ms. Cibik supposedly creating these experience letters?

23   A.  No.

24   Q.  But you just said you saw her.  Where was she doing it?

25   A.  Can you repeat the question?

1    Q.  Where did she create these experience letters?

2    A.  She was sitting in the office where she always sat.

3    Q.  Where is that?

4    A.  It was 21st floor.

5    Q.  So she always sat on the 21st floor.

6    A.  She always sat there.  Her office was on the 21st, but

7    she spent a good time on the 16th floor too.

8    Q.  So on one of the days when she was either sitting or on the

9    16th floor, you happened to see her creating an experience

10   letter.

11   A.  I might have brought the client up to her.

12   Q.  You might have brought the client to her.

13   A.  Yes.

14   Q.  Which client was that?

15   A.  Was a Turkish client.

16   Q.  And when you -- you also mentioned -- well, you were

17   specific about this.  You said you saw her do a job offer

18   letters.  Do you recall saying that too?

19   A.  No, I don't recall.

20   Q.  You don't recall saying she did job offer letters?

21   A.  I don't recall it.

22   Q.  So it's fair to say she didn't do that; correct?

23   A.  I don't recall.

24   Q.  You spoke about sponsors as well.  Do you recall speaking

25   about sponsors?

```
 1   A.  Can you repeat that?

 2   Q.  Sponsors, people that supposedly -- businesses that

 3   supposedly sponsored.

 4   A.  Yes.

 5   Q.  You know what sponsors are?

 6   A.  Yes.

 7   Q.  And you said -- I believe you said Lipa and -- strike that.

 8   Did Lipa create the sponsors?  Did he create companies that

 9   acted as sponsors?

10   A.  Yes.

11   Q.  And he did this while you were sitting in the office with

12   him on the 16th floor?

13   A.  Yes.

14   Q.  And Salamon was there as well?

15   A.  Yes.

16   Q.  And these companies that he created were made to look as

17   real as possible; is that fair to say?

18   A.  Yes.

19   Q.  Did you see any that he created?

20   A.  They asked me to chip in money for the corporation and the

21   offices that they were renting, and I refused.

22   Q.  And you refused.

23   A.  Yeah.

24   Q.  Why did you refuse?

25   A.  If my clients are already paying for the sponsor, why do I
```

D1n1cib5                        Grynsztajn - cross

1    have to pay for the rent for the company too?

2    Q.  You felt you were getting robbed by other thieves?

3    A.  Correct.

4    Q.  There was -- well, not there was.  Was there any legitimate

5    business going on?  Strike that.

6         There was a legitimate business going on as well;

7    right?

8    A.  Very little.

9    Q.  Very little.

10        MR. DONALDSON:  Judge, can I have one second, please?

11        THE COURT:  Sure.

12        (Pause)

13   Q.  You spoke about substitution.  Do you recall speaking about

14   that?

15   A.  Yes.

16   Q.  And it was your belief that substitution was legal;

17   correct?

18   A.  As far as the regulation, was legal to substitute, yeah.

19   Q.  Would you -- do you know Gulay Cibik's handwriting?  I'll

20   say it a different way.

21        MR. PASTORE:  Your Honor, if the witness can be given

22   a chance to answer, I think -- it looks like he's thinking

23   through his answer.

24        THE COURT:  The question is clear enough.

25   A.  I probably could recognize Gulay Cibik's handwriting.

D1n1cib5                         Grynsztajn – cross

1    Q.  And I believe you said right at the end of direct you went

2    through all four of those boxes, the ones in front of you?

3    A.  Yes.

4    Q.  You went through several of the boxes in the US Attorney's

5    Office?

6    A.  Yes.

7    Q.  Reviewed lots of documents?

8    A.  Yes.

9    Q.  How many times did you tell them you recognized Ms. Cibik's

10   handwriting?

11   A.  Maybe couple of times.

12   Q.  Couple times.

13   A.  Yeah.

14   Q.  Where was that?  Where was that?

15   A.  I don't recall where.

16   Q.  You also stated that you heard Ms. Cibik screaming, or you

17   saw her screaming on the 16th floor; correct?

18   A.  Yes.

19   Q.  When was this?

20   A.  Excuse me?

21   Q.  When was this?

22   A.  Before I left the office.

23   Q.  Before you left the office?

24   A.  Yeah.

25   Q.  Sometime in 2006?

1    A.  Could be 2005.

2    Q.  Are you saying she was -- you also I believe said she was

3    madly in love with Earl David?

4    A.  Yes.

5    Q.  You said she was screaming from room to room; is that what

6    you said?

7    A.  Yes.

8    Q.  Yelling all kinds of profanity?

9    A.  Yes.

10   Q.  She was mad at who?  Earl David wasn't there; correct?

11   A.  If he wasn't there, it would be Sam and everybody,

12   screaming.

13   Q.  Just screaming.

14   A.  Yes.

15   Q.  Room to room; is that correct?

16   A.  Yes.

17   Q.  And this was on the 16th floor or 21st floor?

18   A.  On the 16th floor.

19   Q.  How many rooms were on the 16th floor?

20   A.  It was two rooms.

21   Q.  When did you first see Ms. Cibik?

22   A.  Excuse me?

23   Q.  What year did you first see Ms. Cibik?

24   A.  I don't understand your question.

25   Q.  What, you got there '99; correct?

D1n1cib5                        Grynsztajn - cross

1   A.   Yeah.

2   Q.   When did you first see Ms. Cibik?

3   A.   I don't recall the year, but I started helping out her case

4   with -- she was a client, and David asked me to help her out.

5   Q.   When was that?

6   A.   I'm not sure what year.

7   Q.   She started out as a client -- she started out as a client

8   is what you're saying, and then she became a translator;

9   correct?

10  A.   Correct.

11  Q.   And as a translator, she was on the 21st floor; correct?

12  A.   Yes.

13  Q.   She was sitting outside the office; correct?

14       Correct?

15  A.   Yes.

16  Q.   And she was -- didn't have an office; correct?

17  A.   No.

18  Q.   She had an office as a translator?

19  A.   No.

20  Q.   So, well, how long was she a translator?

21  A.   I don't know.

22  Q.   What hours did she come to the office?

23  A.   I have no idea how many hours.

24  Q.   What part of the day did she start?

25  A.   She used to come usually in the evening.

1    Q.  When did that occur?

2    A.  I don't know.

3    Q.  Sorry?

4    A.  I don't know.

5    Q.  You talked about or spoke about someone named -- well,

6    strike that.

7             Do you know someone named Y.M. Pollack?

8    A.  I saw the name on the check.

9    Q.  You saw the name on the checks.

10   A.  Yeah.

11   Q.  Did you ever write Y.M. Pollack on a check?

12   A.  Yes.

13   Q.  And you did that because someone told you to?

14   A.  Yes.

15   Q.  Who told you to?

16   A.  Mr. Teitelbaum.

17   Q.  And he told you to, I believe you said on the record,

18   because he wanted to build credit for Mr. Pollack?

19   A.  Checking, credit cards for the guy, that's what he told me.

20   Q.  Are you aware of whether or not there's any relationship

21   between Mr. Pollack and Mr. Earl David?

22   A.  No, sir.

23   Q.  You're not aware of that?

24   A.  Is there any relationship between them?  No.

25   Q.  Not family relationship.  Is there any business

1   relationship between Earl David and Y.M. Pollack?

2   A.  I have no idea.

3   Q.  This law firm that you were part of, did you all have any

4   meetings, any office meetings?

5   A.  I don't know what you mean by meetings.

6   Q.  Did you, Ms. Diaz, Earl David, Jed Matthew Philwin, Robert

7   Salamon, Leo Teitelbaum, Ali Gomaa, Abdul Basit Choudary, Mark

8   Vago, Alex Lev, did you all get together and have meetings to

9   discuss the business of the day?

10  A.  No.

11  Q.  What about conference calls?

12  A.  No.

13  Q.  Did you and Earl and Mr. Philwin ever have a meeting at

14  90 Washington Street?

15  A.  Not a meeting, but we did cases together over there.

16  Q.  Do you recall a situation where $14,000 was provided?

17  A.  I don't know the exactly the amount, but -- I was there on

18  a few occasions.

19  Q.  Isn't it true that you, Mr. David, and Mr. Philwin met at

20  90 Washington Street to discuss other people's duties and

21  responsibilities?

22  A.  No, sir.

23  Q.  Are you aware of the Manzi & Burchas (ph) account?

24          MR. BRILL:  Mazal & Bracha.

25          MR. DONALDSON:  Thank you.  Wait, say it again?  I'm

D1n1cib5                          Grynsztajn – cross

1    sorry.  Sorry.  I'm trying, Judge.  I really am.

2              THE COURT:  I know.  Well, you got gelt.

3              MR. DONALDSON:  I know.  I should know this.  I'm

4    working on it.  I'm working on it.

5              THE COURT:  It's a little more complicated.

6              MR. DONALDSON:  I know.  I'm working on it.

7    Q.  Mazal & Bracha?

8    A.  Mazal & Bracha.

9    Q.  Yeah, that, that.  You know what it is.  That.  That, you

10   know what it is; right?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's a publishing company that Earl David started.

14             MR. DONALDSON:  Can I have one second, please, your

15   Honor.  Going through my Yiddish.

16             THE COURT:  By the way, do those words have any

17   meaning?

18             THE WITNESS:  Good luck, mazel.

19             THE COURT:  Why don't you tell the jury.

20             MR. DONALDSON:  Say that again.

21             THE COURT:  They can be translated in English.

22             MR. DONALDSON:  What can be translated in English?

23             THE COURT:  Mazel u'bracha.

24             MR. DONALDSON:  Oh, really?  What?  My second word of

25   the day.

D1n1cib5                        Grynsztajn - cross

1              THE WITNESS:  It's like good luck or something.

2              MR. DONALDSON:  It means good luck.

3              THE WITNESS:  Something like that.

4              MR. DONALDSON:  Thank you.  Appreciate it.

5         I'm almost finished, Judge.  One second.

6         (Pause)

7              MR. DONALDSON:  I think I am finished.  I would like

8    the opportunity when I sit down to find what I was speaking of.

9    I do have it.  I just need to find it.

10             THE COURT:  Okay.  Who's in second place for

11   questioning purposes?

12             MR. GERZOG:  My colleague is asking me -- he's going

13   to be very brief and I think he can finish, so I defer to my

14   colleague.

15             MR. GREENFIELD:  I actually have some questions too.

16             THE COURT:  Don't worry.  No one will be left out.

17             Mr. Brill, do you want to go?

18             MR. BRILL:  Sure.

19   CROSS-EXAMINATION

20   BY MR. BRILL:

21   Q.  Good afternoon, Mr. Grynsztajn.

22   A.  Good afternoon.

23   Q.  Mr. Grynsztajn --

24             MR. BRILL:  Could we put up 601-5, please.

25   Q.  This is an e-mail, if you'll recall, you talked about

D1n1cib5                          Grynsztajn - cross

1    yesterday where you had written -- or you were corresponding

2    with Mr. David, I believe.  We'll take a look at it, see if you

3    can refresh your memory.

4              This is you, right, "david grin"?

5    A.  Yes.

6    Q.  And you were responding to an e-mail from Earl David?

7    A.  Yes.

8    Q.  And you were essentially threatening Mr. David; right?

9    A.  No, sir.

10   Q.  No?  You weren't blackmailing him, saying that you were

11   going to take him down?

12   A.  No, sir.

13   Q.  What was the -- what led up to this e-mail?  Obviously

14   Mr. David was responding to something that you had originally

15   said on the bottom here.  "I don't know what you want from me.

16   I helped you like no one else in the world."  Obviously you had

17   to have said something to him in a previous message of some

18   sort; right?

19   A.  I asked Mr. David to speak to Salamon, to get me money for

20   the -- for the cases and for the referrals to help Gulay and

21   him.

22   Q.  So this was money that you believed Mr. Salamon rightfully

23   owed you for your clients; right?

24   A.  Yes.

25   Q.  We've already discussed this, but you're not an attorney;

D1n1cib5                        Grynsztajn – cross

1    right?

2    A.  Right.

3    Q.  And so therefore you actually can't have, legally, clients;

4    right?

5            MR. PASTORE:  Objection, your Honor.  Lots of people

6    who aren't attorneys have clients.

7            MR. BRILL:  Not in law firms.

8            THE COURT:  Fair enough.  Okay.  You can answer.

9    Q.  You knew that; right?

10   A.  Repeat the question?

11   Q.  Well, let's put it this way.  Basically you were practicing

12   law without a license; right?

13           MR. PASTORE:  Objection.

14           THE COURT:  Well, that calls for a legal conclusion.

15   Q.  All right.  I'll go back to the original question.

16           You know that working in a law firm, the clients were

17   not yours; correct?

18   A.  I would say yes.  Yes.

19   Q.  But what -- you were expecting referral fees essentially

20   from legal fees that these clients were paying; right?

21   A.  Yes.

22   Q.  But that's not actually how the money was whacked up at the

23   Earl David firm; right?  Basically whatever clients you brought

24   in, you got the money from those clients and then you shot some

25   of it up the chain of command to Mr. David; right?

1    A.  I don't understand your question.

2    Q.  Okay.  Well, we saw the breakdown of fees on one of the

3    checks we looked at yesterday; right?

4    A.  Correct.

5    Q.  All right.  So on a client that you brought in, what

6    percent would you get?

7    A.  That depends what period of time.

8    Q.  Okay.  What's the highest percentage you would get?

9    A.  50 percent.

10   Q.  And who else would get the -- would take money out of the

11   other 50 percent?

12   A.  Mr. David.

13   Q.  Basically Mr. David would get 50 percent, you would get

14   50 percent?

15   A.  Sometimes a referral fee, whoever referred us the client.

16   Q.  And so this was the money that you were expecting to get a

17   piece of at the end of 2006, middle of 2006, when you were

18   looking to leave the firm; right?

19   A.  Yes.

20   Q.  And what did you -- what did you suggest that you were

21   going to do that led Mr. David to respond to you in this way?

22   A.  I actually said nothing.

23   Q.  You didn't threaten him in any way?

24   A.  I didn't threaten.

25   Q.  So this response is completely out of the blue from

D1n1cib5                    Grynsztajn - cross

1    Mr. David when he said --

2    A.  They knew I was meeting with the government.

3    Q.  You told him you were meeting with the government.

4    A.  Yes.

5    Q.  All right.  You had discussions with them about meeting

6    with the government; right?

7    A.  The only thing they knew, that the agents came to visit me.

8    Q.  So what did you say "but don't take others down" to mean at

9    the end of this e-mail?

10   A.  What's my answer?  "I'm not taking nobody down."

11   Q.  Right.  So you were lying; right?

12   A.  I'm testifying as part of an agreement with the government.

13   Q.  But you know the ultimate result of that agreement; right?

14   You were going to be required to testify?

15   A.  Yes.

16   Q.  And you -- the -- you had discussions with Mr. David, among

17   other people, about the fact that you were going to be

18   cooperating; right?

19   A.  No, sir.

20   Q.  So you didn't tell them that part.

21   A.  No, sir.

22   Q.  And it's your testimony that -- not to beat a dead horse,

23   Mr. Donaldson basically went over this, but you had -- you

24   prepared all of the immigration forms up to the point the PERM

25   system was instituted; right?

D1n1cib5                           Grynsztajn - cross

1    A.  Correct.

2    Q.  And at that point you just didn't want to be involved in

3    learning how to do PERM cases; right?

4    A.  I didn't want to deal with it anymore.

5    Q.  And then what year was that exactly?

6    A.  Don't recall the exact year.  Maybe '05, '06.

7    Q.  So for at least six months to a year, if not longer, you

8    decided that filling out the immigration forms was not

9    something you wanted to be involved in; right?

10          MR. PASTORE:  Objection.  Mischaracterizes.  PERM's

11   not an immigration form.

12   Q.  Entering data into the immigration system?

13          MR. PASTORE:  Renewed objection.

14          MR. BRILL:  I'll just rephrase it.  It's not a big

15   deal.

16   Q.  You didn't want to be involved in the PERM system for the

17   six months to a year or however long it was when that system

18   was instituted; right?

19   A.  Correct.

20   Q.  You maintained your employment at the firm but you divorced

21   yourself from that area that you used to work on; right?

22   A.  Yes.

23   Q.  You didn't just drop those cases; right?  If you had

24   clients that came in, you referred them to other people;

25   correct?

1   A.  Can you repeat the question?  Can you repeat the question?

2   Q.  If you had clients who came in, you didn't say, "Sorry, I

3   don't do that," you made sure that someone else in the firm

4   worked with the PERM system for those clients; right?

5   A.  Correct.

6   Q.  And in fact, when there were follow-ups either from those

7   clients or from the government, you maintained your involvement

8   with those clients; right?

9   A.  Repeat the question?

10  Q.  Sure.  When there was a follow-up on a PERM case, you

11  didn't say, "That's not my problem," you maintained your

12  involvement with that client; right?

13  A.  Yes.

14  Q.  So for example, if the government called to confirm

15  something, you would answer questions about that case; right?

16  A.  I'm confused with this question.

17  Q.  Okay.  Department of Labor would make calls to the law

18  firm; correct?

19  A.  I don't recall Department of Labor calling the law firm.

20  Q.  Never?

21  A.  I don't recall, no.

22          MR. BRILL:  Could we put up 101-30, please.

23          (Counsel conferring)

24          MR. BRILL:  Do you have 130-1-A?

25          (Counsel conferring)

D1n1cib5                      Grynsztajn - cross

1           MR. BRILL:  If we could switch to the overhead for one

2      second.

3      Q.   Now, Mr. Grynsztajn, you're familiar with this form?

4      A.   This is the new PERM application.

5      Q.   Okay.  You've seen these before; right?

6      A.   Yes.

7      Q.   And what is the sponsor's name on this form?

8      A.   CPI Framing & Developers.

9      Q.   Okay.  And what is the sponsor's phone number listed on

10     this form?

11     A.   845-721-7455.

12          MR. BRILL:  And just for the record, what we're

13     looking for -- looking at is 101-30.

14          Excuse me for one second.  It's a little out of order.

15     There we go.

16     Q.   Mr. Grynsztajn, your first name is David; right?

17     A.   Yes.

18     Q.   And you shared an office with Lipa Teitelbaum; correct?

19     A.   Yes.

20     Q.   And Lipa Teitelbaum also used the nickname Leo; correct?

21     A.   Yes.

22     Q.   And on January 3rd, 2008, did you receive a message from

23     the Department of Labor to have Nathan Schwartz give you a

24     call?

25     A.   Can you repeat the date?

D1n1cib5                          Grynsztajn – cross

1    Q.  You can see it right there in front of you, line 2.

2    January 3rd, 2008.

3    A.  I was not working in 2008 in the office.

4    Q.  You weren't working in 2008?

5    A.  No.

6    Q.  All right.  And was Leo still working with the firm in

7    January of 2008?

8    A.  I'm not sure who was working.

9    Q.  Okay.  Did you maintain contact with him in 2008?

10   A.  No, sir.

11   Q.  Were there any other Davids working at the Earl David law

12   firm, that is, other people with the first name David?

13   A.  Yes.

14           MR. PASTORE:  Could we just clarify the time period.

15   Q.  In January of 2008.  There was someone else named David?

16   A.  Oh, I'm not sure, 2008.

17   Q.  You left in 2006.

18   A.  I left 2006.

19   Q.  And was there someone else named David working for the firm

20   in 2006 when you left?

21   A.  Yeah, David Klug.

22   Q.  David Klug.  Okay.  And when did he leave, if you know?

23   A.  I have no idea.

24   Q.  To your knowledge was he still working there when you left?

25   A.  When I left he was still, yeah.

D1n1cib5                        Grynsztajn - cross

1    Q.   You said you had nothing to do with the creation of the

2    e-mail addresses for the sponsors?

3    A.   Correct.

4    Q.   Do you know who did?

5    A.   I know Mr. David would create some of them.

6    Q.   Okay.  Mr. David; correct?

7    A.   Yes.

8    Q.   These were Yahoo accounts; correct?

9    A.   We're talking about Earl David.

10   Q.   Right.  Yes, not --

11   A.   I don't know what addresses, I don't know what account.

12   Q.   But the accounts weren't created in some instances by the

13   sponsors, they were created by the law firm; correct?

14          MR. PASTORE:  Objection.  That mischaracterizes the

15   answer.

16          MR. BRILL:  He can answer for himself.

17          THE COURT:  You can answer.

18   A.   Repeat the question?

19   Q.   Sure.  At least in some instances the e-mail addresses were

20   created by the law firm or employee of the law firm and not the

21   sponsors; right?

22   A.   Yes.

23   Q.   What about the newspaper ads?  The newspaper ads were also

24   created by the law firm in at least some instances, right, if

25   not all instances; right?

D1n1cib5                          Grynsztajn - cross

1    A.  Yes.

2    Q.  They were created almost exclusively by the law firm;

3    correct?

4    A.  Yes.

5    Q.  And who was responsible for creating the ads?  I know you

6    said you weren't.

7    A.  Mr. David.

8    Q.  And who was responsible for placing the ads?

9    A.  Mr. David.

10   Q.  Now in terms of recordkeeping, did the firm keep records of

11   calls made to or received from the sponsors?

12   A.  To my knowledge, no.

13   Q.  How about fax logs or faxes that were sent and received?

14   A.  No, sir.

15   Q.  How about -- were the fax confirmation pages kept in the

16   file?

17   A.  No.

18   Q.  How about e-mail logs?  Any e-mail logs kept to document

19   e-mail conversations with clients or with sponsors?

20   A.  No.

21   Q.  How about return receipts?  Were return receipts routinely

22   required by the e-mails?  Is there a policy that you should use

23   return receipts?

24   A.  We used return receipts, yes.

25   Q.  And that's in terms of the e-mail return receipts or --

1    A.  No, the post office return receipts.

2    Q.  Oh, the post office return receipts.  Okay.

3    A.  Yes.

4    Q.  What about when you sent e-mails; would you request return

5    receipts?

6    A.  No.

7    Q.  And was there a policy for how e-mail was kept by the firm?

8    A.  No, sir.

9    Q.  Who distributed the money?  Was there someone specifically

10   responsible for that?

11   A.  What do you mean by distributing the money?

12   Q.  You talked about a lot of cash coming into the firm on a

13   regular basis; right?

14   A.  Right.

15   Q.  And you said something about Mr. Brodjik getting paid.  Was

16   there someone whose job that was to distribute money?

17   A.  If a client came to me, they paid to me.  If they came to

18   Gulay, they would pay to Gulay.

19   Q.  After that money came in, did it go to a central point or

20   was there just money flying all over the place?

21   A.  No.  Mr. Brodjik would come and collect the money from

22   everybody.

23   Q.  And then where would that money go?

24   A.  That would go to Mr. -- he would take out whatever belongs

25   to him, and then the rest he would deposit to Mr. David's

D1n1cib5                          Grynsztajn - cross

1   account.

2   Q.  What about the money that went to you?  You took that out

3   ahead of time?

4   A.  Yeah.  I would already take my share.

5   Q.  And what about all of the other employees in the firm?  Was

6   everyone just taking part of what they were bringing in?

7   A.  Correct.

8   Q.  There was no actual salaries or anything that's regular

9   about the compensation there?

10  A.  There were a couple people that were filing that they would

11  pay salaries.

12  Q.  Otherwise everyone was just --

13  A.  Yes.

14  Q.  -- taking a percentage?  So again, no recordkeeping of how

15  that money was distributed other than occasionally we saw some

16  notes on the checks; right?

17  A.  The only thing we kept was the receipt when the clients

18  paid.

19  Q.  But the clients -- if the clients paid in cash, you would

20  make receipts for the cash payments?

21  A.  Yes.

22  Q.  And those would be in every client file.

23  A.  They would be in the files, yes.

24  Q.  But beyond that, beyond what the employees of the firm

25  took, the money would go to Mr. David, and what happened after

D1n1cib5                         Grynsztajn - cross

1   that, you don't know.

2   A.  I don't know.

3   Q.  How about --

4              THE COURT:  Mr. Brill, you said you were going to be

5   very brief.

6              MR. BRILL:  I'm less brief than I thought, Judge.  I'm

7   sorry.

8              THE COURT:  Okay.  Well, we're past our witching hour.

9              MR. BRILL:  Okay.

10             THE COURT:  So if you have two more questions or

11  three --

12             MR. BRILL:  Sort of like five.  So why don't we start

13  tomorrow.  Let's --

14             THE COURT:  All right.

15             MR. BRILL:  I don't want to keep anybody any longer.

16             THE COURT:  Okay.  Well, they're going to be five

17  great questions.

18             MR. BRILL:  That's a lot of pressure, Judge.

19             THE COURT:  I know.  Self-inflicted.

20             All right.  Couple things.  One, the usual rules:

21  Don't talk about the case, keep an open mind.  And also,

22  tomorrow we're going to have to end at 1:00 because one of the

23  lawyers has an immovable serious family commitment.  So just

24  plan accordingly and we'll try to get a lot done anyway.

25             (Jury excused)

D1n1cib5

                    (In open court; jury not present)

1                    THE COURT:  Okay.

2                    MR. DONALDSON:  Your Honor, I have a -- oh, sorry.

3                    MR. PASTORE:  Your Honor, actually, two

4    witness-related issues.  One is, we've already advised

5    Mr. Grynsztajn that we can't speak with him this evening

6    because he's now on cross-examination.

7                    THE COURT:  All right.

8                    MR. PASTORE:  But second, we did want to ensure that

9    he is going to be here at 8:30 a.m. tomorrow so that we can

10   start promptly at 9.  I wanted to communicate that now, since I

11   can't talk to him later.

12                   THE COURT:  Sure.

13                   (Witness excused)

14                   THE COURT:  All right.  So I think we agreed that we'd

15   talk about the issue raised in the government's letter of

16   January 22nd about Mr. Donaldson's cross opening the door to

17   the introduction of Ms. Cibik's proffer statements.

18                   MR. DONALDSON:  Your Honor, I read it.  I'll be brief.

19   I relied on the court's order prior to beginning of the trial,

20   which was that the door -- the government's position was not

21   going to be able to be used unless and until Ms. Cibik took the

22   stand.

23                   Secondly, I wholeheartedly believe that my

24   cross-examination of Mr. Altintas was governed by my attempt to

D1n1cib5

1    completely discredit him as to his significant, what I would

2    consider fraudulent or incredible testimony.  I believe that

3    I'm allowed to do that, quite frankly I'm supposed to, so that

4    was my intent and that was what I was trying to accomplish.

5            MR. PASTORE:  Your Honor, in addition to the

6    questions -- as an initial matter, in addition to the questions

7    that we identified on cross-examination as being problematic,

8    in our letter dated January 23rd -- so this morning -- that

9    we handed up to the court, we also noted that in

10   Mr. Donaldson's opening statement, in addition to -- in

11   addition to invoking a defense based on this idea of obedience

12   to authority, Mr. Donaldson also said, "The evidence will not

13   show -- the evidence will not show that Ms. Cibik intended to

14   break any laws."  And that is on the transcript at pages 37 to

15   38.  So I think it's been very clearly fronted in opening that

16   Ms. Cibik's intent was going to be at issue, there's an

17   obedience to authority defense that was proposed, and then in

18   addition, the cross-examination implied and suggested that

19   Mr. Altintas was the genesis of this idea for a phony sponsor

20   rather than Ms. Cibik, that she had no knowledge that the

21   sponsor was phony.  Among other things, Mr. Donaldson suggested

22   that it was merely a coincidence that a fashion company had

23   been chosen when Mr. Altintas had background experience working

24   at a fashion company.  I think the only inference that the jury

25   could draw from that is that Mr. Altintas was the one who

D1n1cib5

 1    suggested the clothing company, not Ms. Cibik.  And for those

 2    reasons, we do believe, you know -- the proffer is very clear

 3    that Ms. Cibik knew that these letters were fraudulent.  The

 4    proffer is very clear that Ms. Cibik went to Mr. Salamon and

 5    Mr. Teitelbaum to get companies to use in the fraud.  Today we

 6    heard testimony from Mr. Grynsztajn that American Girl Fashion

 7    was in Mr. Teitelbaum's company.  So it works in lock step.

 8    It's very clear that Ms. Cibik went to Salamon and Teitelbaum

 9    to get these companies, including specifically American Girl

10    Fashion, and we believe the cross-examination and the opening

11    suggested that those companies came from sources that didn't

12    involve Ms. Cibik, that she didn't know about, and that she

13    didn't, as Mr. Donaldson said, "didn't intend to break any

14    laws."

15         MR. DONALDSON:  I have one response to that, and that

16    is, it's now concerning to me that we did brief this issue

17    prior to trial, we did -- the government's arguments are not

18    any different than what they said they thought might happen at

19    trial.

20         THE COURT:  Excuse me.  The court is still in session,

21    so everyone in the back stays mute.  Or leave.  Up to you.

22         MR. DONALDSON:  Again, we addressed this issue before.

23    I believe there was, not significantly -- well, significant

24    briefing regarding the issue, and the court ruled that, because

25    of a number of reasons, that the only way that the proffers

D1n1cib5

         1    could come in was via a -- Ms. Cibik testifying.  So if -- with

         2    that ruling in mind, notwithstanding the fact or even if

         3    accepting what the government is saying as true, and I'm not,

         4    but accepting what they say as true, that would be putting the

         5    defense in rather a catch 21 incredible position because we're

         6    relying on a belief that the only way that Ms. Cibik's proffer

         7    can come into evidence is if she testifies.  When the

         8    government argued before trial that Mr. Donaldson's going to

         9    argue intent etc., etc., we made our arguments, the court ruled

        10    that the only way it comes in is if she testifies.  So now that

        11    we're establishing our defense and putting on our case -- not

        12    putting on our case but arguing our case -- and the government

        13    says:  Well, you opened the door.  I think it's the

        14    government's rather creative way of just asking the court to

        15    reconsider its previous argument by suggesting that somehow we

        16    didn't address this issue before when we did.

        17         So while I understand the government's argument, I

        18    think it's a creative way of asking the court to reconsider its

        19    former decision on both the defense's argument and decision to

        20    start its case.  I think it puts the defense in a very unfair

        21    position, and in my opinion, I think the court already ruled on

        22    it, unless of course the government is asking the court to

        23    reconsider, but I do not believe they can, since we've already

        24    relied on the decision to support our case.

        25         THE COURT:  Let me say two things.  The comments

D1n1cib5

1    that -- I'll call them rulings -- that I made on January 4th

2    were in the context of what was briefed to me.  It was a fairly

3    limited argument.  That being said, I simply don't agree, in

4    any event, with the government's position in its January 22nd

5    letter.  I really don't think that, as I said when you first

6    raised it, that the take-away from someone listening to the

7    cross of Mr. Altintas would have been that Ms. Cibik was, you

8    know, an innocent bystander and, you know, Mr. Altintas was the

9    source and genesis of his false application.  As I said

10   earlier, I think the take-away was he was an enthusiastic, you

11   know, participant.  And I think that everyone really should

12   focus on actually what the caselaw is, which was not argued at

13   all in the government's letter, but you have Second Circuit

14   authority, *United States v. Roberts*, *United States v. Barrow*,

15   and there's supposed to be a contradiction of a factual

16   assertion, and it isn't sufficient to simply attack the

17   credibility of a witness or the sufficiency of the government's

18   proof.

19           So, all right.  I think that takes care of the

20   January 22nd letter.  I think we could also all agree that

21   there is no defense called obedience to authority.  I think

22   that went out with Nuremberg.

23           MR. DONALDSON:  It did?

24           THE COURT:  I believe so.  But I'll hear whatever else

25   you want to say on that.  Not now.  You wanted to --

D1n1cib5

1          MR. DONALDSON:  No, not now.

2          THE COURT:  Okay.  All right.  Anything else?

3          Okay.  Thank you.

4          (Adjourned to January 24, 2013, at 9:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   DAVID GRYNSZTAJN

 4   Direct By Mr. Pastore  . . . . . . . . . . . 812

 5   Cross By Mr. Donaldson . . . . . . . . . . . 931

 6   Cross By Mr. Brill . . . . . . . . . . . . . 998

 7                   GOVERNMENT EXHIBITS

 8   Exhibit No.                            Received

 9    18B and 18C  . . . . . . . . . . . . . . . 813

10    23 and 23A  . . . . . . . . . . . . . . . . 814

11    1114-8, 1114-19  . . . . . . . . . . . . . 876

12    1112-9, 1112-2  . . . . . . . . . . . . . . 892

13    24 and 24B  . . . . . . . . . . . . . . . . 911

14    8B   . . . . . . . . . . . . . . . . . . . 813

15    10   . . . . . . . . . . . . . . . . . . . 911

16    10B  . . . . . . . . . . . . . . . . . . . 911

17    14   . . . . . . . . . . . . . . . . . . . 846

18    14A  . . . . . . . . . . . . . . . . . . . 910

19    30E  . . . . . . . . . . . . . . . . . . . 813

20    400-1  . . . . . . . . . . . . . . . . . . 827

21    400-3  . . . . . . . . . . . . . . . . . . 831

22    400-4  . . . . . . . . . . . . . . . . . . 833

23    400-7 and 400-5  . . . . . . . . . . . . . 834

24    400-8  . . . . . . . . . . . . . . . . . . 836

25    400-10   . . . . . . . . . . . . . . . . . 837
```

GOVERNMENT EXHIBITS
(Continued)

Exhibit No.                                    Received

400-9    . . . . . . . . . . . . . . . . . 838

410-1    . . . . . . . . . . . . . . . . . 841

410-2    . . . . . . . . . . . . . . . . . 842

410-3    . . . . . . . . . . . . . . . . . 844

410-4    . . . . . . . . . . . . . . . . . 845

411    . . . . . . . . . . . . . . . . . . 849

602    . . . . . . . . . . . . . . . . . . 851

603    . . . . . . . . . . . . . . . . . . 853

1106-5    . . . . . . . . . . . . . . . . 856

1106-6    . . . . . . . . . . . . . . . . 857

1106-8    . . . . . . . . . . . . . . . . 857

1106-1    . . . . . . . . . . . . . . . . 859

1106-10    . . . . . . . . . . . . . . . 859

1106-7    . . . . . . . . . . . . . . . . 861

1106-3    . . . . . . . . . . . . . . . . 863

1106-2    . . . . . . . . . . . . . . . . 865

1112-10    . . . . . . . . . . . . . . . 891

1112-8    . . . . . . . . . . . . . . . . 894

1112-4    . . . . . . . . . . . . . . . . 894

1112-6    . . . . . . . . . . . . . . . . 896

1112-11    . . . . . . . . . . . . . . . 897

1112-20    . . . . . . . . . . . . . . . 899

```
 1                    GOVERNMENT EXHIBITS
                         (Continued)
 2
        Exhibit No.                           Received
 3

 4     1112-13 through 1112-19   . . . . . . . . . . 900

 5     1113-14   . . . . . . . . . . . . . . . . . 815

 6     1113-4   . . . . . . . . . . . . . . . . . . 816

 7     1113-5   . . . . . . . . . . . . . . . . . . 819

 8     1113-3   . . . . . . . . . . . . . . . . . . 821

 9     1114-20   . . . . . . . . . . . . . . . . . 872

10     1114-3   . . . . . . . . . . . . . . . . . . 873

11     1114-16   . . . . . . . . . . . . . . . . . 875

12     1114-7   . . . . . . . . . . . . . . . . . . 876

13     1114-9   . . . . . . . . . . . . . . . . . . 877

14     1114-1   . . . . . . . . . . . . . . . . . . 878

15     1114-10   . . . . . . . . . . . . . . . . . 878

16     1114-6   . . . . . . . . . . . . . . . . . . 879

17     1114-7   . . . . . . . . . . . . . . . . . . 880

18     3022   . . . . . . . . . . . . . . . . . . . 881

19     3035   . . . . . . . . . . . . . . . . . . . 882

20

21

22

23

24

25
```