D1t1cib1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          11-CR-424 (NRB)

5   GULAY CIBIK, REFAEL BRODJIK,
    a/k/a "Rafi," NATHAN SCHWARTZ,
6   HAROLD TISCHLER, a/k/a
    "Hershy,",
7
               Defendants.                 Jury Trial
8
    ------------------------------x
9
                                           New York, N.Y.
10                                         January 29, 2013
                                           9:23 a.m.
11

12  Before:

13                 HON. NAOMI REICE BUCHWALD,

14                                         District Judge

15                        APPEARANCES

16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  JANIS ECHENBERG
    JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
    MICHAEL DINET, Paralegal Specialist
20
    DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
    BY:  XAVIER R. DONALDSON, ESQ.
22
    LAWRENCE D. GERZOG, ESQ.
23  JEREMY L. GUTMAN, ESQ.
         Attorneys for Defendant Refeal Brodjik
24

25
```

D1t1cib1

```
 1                              APPEARANCES
                                (Continued)
 2
    BRILL LEGAL GROUP, P.C.
 3       Attorneys for Defendant Nathan Schwartz
    BY:  PETER E. BRILL, ESQ.
 4
    PAUL GREENFIELD, ESQ.
 5       Attorney for Defendant Harold Tischler

 6  ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
                   RYAN GIBBS, Special Agent, U.S. Dept. of Labor
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

D1t1cib1                          Salamon – direct

1          (Trial resumed)

2          (In open court; jury present)

3          THE COURT:  Let me apologize for being sick yesterday.

4    We've got to blame somebody else, the person I caught it from.

5    So I'm really sorry, but I'm back, I'm here, and we'll carry

6    on, try to wrap this up.

7          You may proceed, Ms. Echenberg.

8          MS. ECHENBERG:  Thank you, your Honor.

9     ROBERT SALAMON, resumed.

10   DIRECT EXAMINATION CONTINUED

11   BY MS. ECHENBERG:

12   Q.  Mr. Salamon, I want to start by turning your attention to

13   the defendant Refeal Brodjik.  You testified that Mr. Brodjik

14   got a green card through the law firm; is that right?

15   A.  Yes.

16   Q.  And that green card was based on the sponsorship of Abraham

17   Flam, one of the individuals who's up on the board?

18   A.  Yes.

19   Q.  Do you know whether Abraham Flam was ever paid by the law

20   firm to be a sponsor?

21   A.  Earl David said he paid him, yes.

22   Q.  Earl David told you he paid Abraham Flam to be a sponsor?

23   A.  Yes.

24   Q.  And you testified that Mr. Brodjik expressed concern that

25   he might lose his green card if Earl David's girlfriend went to

D1t1cib1                          Salamon - direct

```
 1   the authorities; is that right?
 2   A.   Yes.
 3   Q.   And who was that girlfriend that you were referring to?
 4   A.   At that time it was already his wife, Libney Milano.
 5   Q.   Libney Milano.  And what was her role, if any, in the law
 6   firm?
 7   A.   She used to work in the firm for couple years and then she
 8   went with Earl David to Toronto, Canada.
 9   Q.   And what, if anything, did she know that would allow her to
10   threaten --
11            MR. GUTMAN:  Objection.
12   Q.   What specifically were her threats?
13   A.   Excuse me?
14   Q.   What specifically were her threats?
15            MR. GUTMAN:  Objection.
16            MR. GERZOG:  Objection.  Unless he overheard them, how
17   would he know?
18            MS. ECHENBERG:  I believe he testified, but I can
19   clarify.
20   A.   How would Libney Milano know?  She was involved in the
21   business many years and she knows exactly what's going on, and
22   Earl David said everything that was going on to her in the
23   office.
24   Q.   And what, if anything, did Mr. Brodjik say to you about
25   these threats?
```

D1t1cib1                          Salamon - direct

1    A.  One time he told me, we were outside in the street, he told

2    me, oh -- I heard him yelling at Earl, "Why did you tell her?

3    Now my green card is going to go down.  She's going to go to

4    the authorities."  I asked him what was going on, so Rafi said

5    to me, "Well, she -- Earl told her about the green card, she's

6    threatening now to go to authorities."

7    Q.  And did Mr. Brodjik do any other work in the office other

8    than what you've already testified to, which was preparing

9    experience letters for R-1s and the collection of money from

10   individuals, including you?

11   A.  At one point I know he opened up a file case for a client.

12   Q.  When you say he opened up a case for a client, what do you

13   mean?

14   A.  Client would come in and wanted a green card, and I don't

15   know how the client got to him, but I know he opened up a case.

16   Q.  How do you know he opened up a case?

17   A.  'Cause I had to take over the case once Rafi Brodjik left

18   the office.

19   Q.  Under what circumstances did you take over the case?

20   A.  I had to follow up.  The client came screaming and yelling,

21   "Where does Rafi live?  Where is he?  Look what he did to me.

22   He just left me like that."  So I took over the case, me and

23   Lipa Teitelbaum worked on the case afterwards.

24   Q.  Did Rafi Brodjik assist Earl David with anything other than

25   related to the immigration work?

D1t1cib1                    Salamon - direct

1   A.  He helped him with website, he helped him with his private

2   website for his book Code of the Heart, and it was like his

3   personal assistant, so --

4           MS. ECHENBERG:  If we could put on the screen

5   Government Exhibit 3608, please.  And if we could enlarge it

6   starting with Rafi Bar in the middle.

7   Q.  Mr. Salamon, do you recognize this e-mail?

8   A.  Yes.

9   Q.  How do you recognize it?

10  A.  I was copied on this e-mail.

11  Q.  And if you could start with -- do you see where it's been

12  enlarged and it says Rafi Bar and then there's an e-mail

13  address?

14  A.  Yes.

15  Q.  Do you recognize that e-mail address?

16  A.  Yes.

17  Q.  Whose e-mail address is that?

18  A.  Rafi Brodjik.

19  Q.  If you could start by reading the first paragraph under

20  that e-mail.

21  A.  "My first reaction after I received your e-mail was simply

22  not to answer at all and just to ignore you.  But when I read

23  your pathetic accusations, I decided to follow the words of the

24  apostles --" (Reading in Hebrew.)

25  Q.  And Mr. Salamon, what does that mean, if you know?

D1t1cib1                              Salamon - direct

1  A.  That's a word of the -- of our Torah in the Bible that, "I

2  want to come clean."

3  Q.  If you could continue.

4  A.  "And I will go on the record and defend myself.  I have no

5  intention of getting into a pissing match with you.  You write

6  better than me and it's easier for you to express yourself in

7  English than it is for me."

8  Q.  Let me stop you there.  Do you understand what is meant by

9  "it's easier for you to express yourself in English than for

10 me"?

11 A.  Yes.  He's telling Earl that he doesn't know such good

12 English because he wasn't born in this country so Earl is

13 better in English, plus he's an attorney so he knows better

14 English.

15 Q.  Continue, please.

16 A.  "But this is what I have to say.  Let's get to the point.

17 I have no intention of letting Sam get away with the money he

18 stole from me and still owes me.  I will do everything that I

19 have to do to get what he owes me and my family."

20 Q.  Let me stop you there.  Do you know who the Sam he's

21 referring to is?

22 A.  Yes, me.

23 Q.  And what is he talking about?  What did you understand him

24 to be talking about?

25 A.  Again, he's complaining the monies that I did not report

1    fully the percentage to Earl David and he got affected from

2    that percentage, so he claims that I owed him money.

3    Q.   And why would he get affected by that percentage?

4    A.   Because he would get a less cut, a lesser cut.  He got fix

5    amount from the gross that he collected for Earl David, and if

6    I reported less to Earl David and I gave less to Earl David, he

7    got a less percentage of it -- a lesser amount.

8    Q.   Okay.  If you could go to the next line, please.  Starting

9    with, "I find it."

10   A.   "I find it amazing how you try to manipulate the situation

11   to make it sound like I'm trying to squeeze money out of some

12   nebuch who is one step away from having to rely on Tomchei

13   Shabbos."

14   Q.   Let me ask you if you know what nebuch and Tomchei Shabbos

15   is.

16   A.   Nebuch means a pity case and Tomchei Shabbos is an

17   organization for people who cannot afford the Sabbath meals.

18   Q.   And do you know what Mr. Brodjik is referring to here?

19   A.   He's saying that he makes it sound like I want to take out

20   money from someone that doesn't have any money and can't afford

21   meals on the Sabbath.

22   Q.   And who is he referring to?

23   A.   To me.

24   Q.   And were you in need of meals at that time?

25   A.   No.

D1t1cib1                            Salamon - direct

1   Q.  What was your financial situation at that time?

2   A.  Pretty good.

3   Q.  If you could go on to the -- starting with "When."

4   A.  "When I read your pathetic cries of poverty, I didn't know

5   whether to laugh or cry."

6   Q.  Moving on, after number 1.

7   A.  "When Sam continuously, week after week, stole from you

8   amounts of money that were double and triple the amount we are

9   talking about, I never heard you open your mouth or do

10  anything.  You just sat there and took it up the rearend,

11  smiled and carried on.  Where were your cries of poverty then?

12  Now you cry when I want what's rightfully mine?"

13  Q.  If you could go on.

14  A.  "The checks.  Let me tell you exactly what happened with

15  the checks.  When I had bills to pay, all I did was deposit the

16  cash and immediately issue you a check to buy a few days.

17  There have been several checks that had been paid and paid to

18  you on time.  Do you honestly think if I wanted to screw you, I

19  could have -- I could have -- I could have done it a hundred

20  thousand other occasions, from fake deductions or simply making

21  money disappear like everyone else screw you.  I couldn't --

22  like everyone -- like everyone else screw you.  I couldn't have

23  done it --"

24  Q.  No.  I think, "disappear like everyone else does."

25  A.  "If I was a thief, I would be sitting on a million dollars

D1t1cib1                          Salamon - direct

1    like everyone else and would have screwed you so badly, you

2    wouldn't have known your --" I don't know if I should say the

3    word.

4    Q.  You can.

5    A.  I could?

6            THE COURT:  Yes.

7    A.  "-- your ass from your elbow.  I'm the only one in that

8    office that's ever been honest with you.  When I complained to

9    Sam the other week about there being no money and he started

10   mumbling and making up bullshit excuses, then he told you to

11   tell me if I come into the office, I will make money."

12   Q.  And let me stop you there.  Do you know what he's referring

13   to when he said, "he told you to tell me that if I come into

14   the office, I will make money"?

15   A.  Yeah, I told him that if he comes into the office, I can

16   give him a job, 'cause he was crying poverty, doesn't have no

17   money, so I said, "If you come into the office, I'll give you a

18   job to work."

19   Q.  If you could go to the next line.

20   A.  "I went to the office and what did I get?  A hundred

21   dollars.  Yes, a hundred lousy dollars.  That's on a night that

22   I took in -- that's the night that took in almost $5,000.  This

23   is the night that I personally witnessed these people going

24   into the bathroom to count money."

25   Q.  Let me stop you there.  Do you know what he's referring to

1    when he says "people going into the bathroom to count money"?

2    A.  Yeah.  We used to count cash in the bathroom.

3    Q.  Go on, please.  Starting with, "What the hell."

4    A.  "What the hell is wrong with you?  Wake up and smell the

5    coffee.  Do you think I'm stupid?  Does Sam think I was born

6    yesterday?  No wonder your checks bounced.  If I'm counting on

7    income and it's being stolen from me under my nose, what the

8    hell do you think -- what the hell did you think would happen?

9    Be careful before you accuse me of stealing from you.  I could

10   have taken you to the cleaners a hundred times and never ever

11   did.  If for once in your pathetic life you would wake up and

12   stand up for me who has been always loyal to you, you wouldn't

13   find yourself in this predicament.  For a change speak your own

14   mind instead of sending me e-mails based on what people around

15   you tell you to write."

16   Q.  Okay.  Go on now to paragraph 3, please.

17   A.  "About your expenses.  Your expenses are nobody's but your

18   problem.  You are the one in control of expenses.  If you feel

19   the need to pay the world salaries and let them rip you off,

20   you have no one but yourself to blame.  I have always been

21   there to help you cut costs.  When we moved from W90, who was

22   it that moved the office for you?"

23   Q.  Let me stop you there.  Do you know what he's referring to

24   when he talks about moving the office?

25   A.  He helped him move to Canada.

D1t1cib1                          Salamon - direct

1    Q.   He helped who?

2    A.   Earl David.

3    Q.   How do you know that?

4    A.   Earl told me and he told me as well, he just came back from

5    Canada.

6    Q.   Mr. Brodjik told you he had just come back from Canada?

7    A.   Yes.

8    Q.   And what, if anything, did he do in Canada?

9    A.   He helped him set up the whole office there.

10   Q.   What do you mean he helped him set up a whole office there?

11   A.   We need to have communications between my office and him

12   through the internet and faxes and so forth.

13   Q.   And so what did Mr. Brodjik do?

14   A.   He set up the office -- the computer, the network, the

15   computer, and the e-mail -- you have to set up his office.

16   Somebody had to do it.

17   Q.   Okay.  If you could start with "Myself."

18   A.   "Myself and my wife worked like dogs to move the office to

19   save you money for movers.  Yes.  Me and my wife, like Mexican

20   workers.  Did you pay me for that?  Did you so much as thank

21   me?  Shame on you.  When I went to Marcy Printing and picked up

22   four pallets of books, schlepped them myself and took them to

23   storage, how much did you pay for me that?  Shame on you.  Did

24   you even pay for the truck I rented?  No.  And the storage.  I

25   have paid out of my own pocket $400 a month for the last six

D1t1cib1                           Salamon - direct

1    months.  Did you ever stop and think why the hell I should be
2    paying to store your stuff?  Did you ever offer to reimburse me
3    for that?  No.  Shame on you."
4              MS. ECHENBERG:  If you can go to the next page,
5    please.
6    Q.  Okay.  If you could continue at the top.
7    A.  "Do you remember the first time I had to take the chance of
8    coming to Toronto to bring your car?  I had to sit for an hour
9    under investigation for your crap?  Who else would have done
10   that for you?  Lipa?  Sam?  Greenstein?  Sharoni?  Your wife?"
11   Q.  Let me stop you there again, Mr. Salamon.  Who is Lipa?
12   A.  Lipa Teitelbaum that worked in the office with me.
13   Q.  Who is Sam?
14   A.  That's me.
15   Q.  Who was Greenstein?
16   A.  David Grynsztajn.
17   Q.  Who is Sharoni?
18   A.  Another employee that worked in my office.
19   Q.  Go on.
20   A.  "Where is your appreciation?  Shame on you.  And you want
21   me to feel bad for you?
22              "About my house, let me take you back to a
23   conversation we had at W90 when you sat and looked at me in the
24   eye and said, Everyone here has bought a house, what about you?
25   What does that tell you?  And you accuse me of having an

D1t1cib1                          Salamon - direct

1    extravagant lifestyle.  Yes, maybe.  I made a mistake buying

2    the house (especially knowing that I was financially dependent

3    on people like Sam)."

4    Q.  Let me stop you there.  What did you understand him to mean

5    by being "financially dependent on people like Sam"?

6    A.  He's saying he bought a house and he couldn't afford the

7    expenses so he said he made a mistake buying the house since he

8    have to depend like people like me.

9    Q.  And what did you understand him to mean by depending on

10   people like you?

11   A.  That they're going to help him out, they're going to make

12   him money.

13   Q.  Okay.  I'm going to just expedite things.  You could skip

14   down to paragraph 7 and read that, please.

15   A.  "You make it sound like all I did for you -- you make it

16   sound like all I did was go into the office and collect money.

17   Well, let me tell you this.  If I did not go, you would have

18   nothing at all.  I sat in the office and fought for every penny

19   of your money.  I was the only one you could trust, and it was

20   me that enabled you to go sit in Canada.  You know yourself you

21   didn't and don't trust anyone there.  If I was not for me, you

22   would have gotten nothing from that office.  Your whole hookup

23   with the office and your ability to operate remotely was my

24   idea, my setup, against all the losers in the office who said

25   it would never work."

D1t1cib1                    Salamon - direct

1   Q.  Go on to paragraph 8, please.

2   A.  "About Sunrise Food.  I sent out the file to immigration.

3   If they didn't cash the check, it's not my problem."

4   Q.  And let me stop you there.  Are you familiar with Sunrise

5   Food?

6   A.  I can't remember that, no.

7   Q.  Okay.  Go on.

8   A.  "So now you're trying to accuse me of cashing the

9   immigration checks for myself?  I did what I was supposed to

10  do.

11          "About Bonei, you and Greenstein got the money for

12  this."

13  Q.  Let me stop you there again.  Bonei, is that familiar to

14  you?

15  A.  No.

16  Q.  Go on.

17  A.  "You each took $500, and what did I get for my work?  Zip,

18  diddly squat.  Yes, she did give me the check which I gave to

19  give to Greenstein.  If you don't find a record of that money,

20  perhaps you should look to Greenstein for answers, or maybe you

21  just want to accuse me of stealing that as well."

22  Q.  Okay.  And if you could go on to paragraph 9, please.

23  A.  "One more thing, which I personally don't need an answer

24  for, but look at yourself in the mirror and answer yourself.

25  The $10,000 you took from Gulay and got me involved?  You cried

D1t1cib1                          Salamon - direct

1    to her that you were in the streets and took advantage of her

2    feeling for you."

3    Q.  Let me stop you there.  Do you have any understanding of

4    what he's referring to when he says, "The $10,000 you took from

5    Gulay"?

6    A.  I remember him telling me that he took money from Gulay.

7    Q.  Who telling you?

8    A.  Earl David.

9    Q.  You remember Earl David telling you he took money from

10   Gulay?

11   A.  Yes.

12   Q.  For what purpose?

13   A.  I can't remember the purpose.  I know he needed money, so

14   he told me that Gulay helped him out with money.

15   Q.  Go on.

16   A.  "Not only that, but before she left the country, you once

17   again tried to get money from her.  Your justification to me

18   was she doesn't need it.  Did she not work hard for the money?

19   18 hours a day at two jobs?  When you come to give me musser,

20   make sure your own hands are clean."

21   Q.  So let me ask you two questions.  One, do you know what

22   he's referring to when he says, "18 hours a day at two jobs"?

23   A.  Yes.  Gulay worked many hours in the office, and as far as

24   I know, she had two jobs, yes.

25   Q.  Two jobs at the office or --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1t1cib1                    Salamon - direct

1   A.  No.  She had another job, then she came into the office to

2   work.

3   Q.  What hours did she come into the office to work?

4   A.  In the afternoon.  I can't remember exactly what time.

5   Q.  And do you know what "musser" means?

6   A.  Lecture.

7   Q.  Lecture?

8   A.  Yes, to lecture someone.

9   Q.  Okay.  If you could just read paragraph 10, and then I

10  think we'll be done with this e-mail.

11  A.  "To summarize, I once considered you my friend, but you

12  have shown your true colors and made your feelings very clear.

13  Well, here are mine.  I don't give a crap anymore about what

14  happens to you or to your office.  After reading your last

15  e-mail I no longer feel any moral, ethical, halachic, or

16  emotional reason to do anything to help you or the office."

17  Q.  Let me stop you there.  What does "halachic" mean?

18  A.  "Halachic" means a religious obligation or Jewish law

19  obligation.

20  Q.  Okay.  If you could continue, please.

21  A.  "You wanted a fight, you got it.  Please make sure that

22  within the next seven days you get yourself out of storage.  I

23  refuse to pay another penny to keep it there and I'm not taking

24  responsibility for anything if you choose to do nothing."

25  Q.  And I'm going to have you read paragraph 11 as well.

D1t1cib1                        Salamon - direct

1   A.  "I refuse to get into a lengthy e-mail argument

2   correspondence with you.  You win.  I will deposit the money

3   that you think I stole from you into your account as soon as I

4   can.  Enjoy it and spend it wisely."

5              MS. ECHENBERG:  Okay.  If we could bring up Government

6   Exhibit 3611, please.

7   Q.  Do you recognize this e-mail?

8   A.  Yes.

9   Q.  And how do you recognize it?

10  A.  It was copied into me.  It was sent to me and copied into

11  Lipa Teitelbaum.

12  Q.  And if you could read, looking at the message below -- do

13  you see where it says, "Note:  Forwarded message attached"?

14  A.  Excuse me?

15  Q.  Do you see where it says, "Note:  Forwarded message

16  attached"?

17  A.  Yes.

18  Q.  Then below that it's from who?

19  A.  Earl David.

20  Q.  And the subject is?

21  A.  Gulay.

22  Q.  And it's to?

23  A.  Arye1998@yahoo.com.

24  Q.  Whose e-mail is that?

25  A.  Rafi Brodjik.

D1t1cib1                        Salamon - direct

1    Q.  And if you could read this e-mail, please.

2    A.  "What right do you have to say anything about this lady?

3    She made 100,000 off me.  Moreover, what right did you have to

4    get $5,000 from her?"

5    Q.  And let me stop you there.  Do you have any idea what

6    Mr. David is referring to when he says, "What right did you

7    have to get $5,000 from her?"

8    A.  He's saying that she made enough money so why are you

9    complaining, so she gave me $10,000, and that he took 5,000,

10   Rafi took $5,000 from Gulay as well.

11   Q.  Are you aware of Rafi ever taking $5,000 from Gulay?

12   A.  I can't remember.

13   Q.  Go on to the next line, please.

14   A.  "Gulay told me that your wife was busy licking her ass to

15   get that money and after that, she never picked up the phone

16   for Gulay anymore.  So you are talking to me about being a

17   user, look at your own actions before you accuse others.

18           "Gulay said that you and your wife took her for a

19   ride.  Those are her words.  She even told me that she has your

20   checks to deposit and wants to put in right away.  You are

21   asking me to look in the mirror.  What about yourself?

22           "Why do you keep diverting from the fact you did

23   something wrong but you are too proud and arrogant to admit

24   that you deceived me with those checks.  Just admit it, move on

25   with your life.  Stop bringing up other issues that have

D1t1cib1                          Salamon - direct

1    nothing to do with it.

2             "I have never tried to pick a fight with you or

3    anyone.

4             "About Canada, excuse me but I was born there.  How

5    can this be your idea?"

6    Q.  And do you have any understanding about what Earl David is

7    referring to when he says, "you are too proud and arrogant to

8    admit that you deceived me with those checks"?

9    A.  He's claiming that he borrowed or laid out money for him

10   and this check, there was no funds in those checks.

11   Q.  Who borrowed money from who?

12   A.  Earl David to Rafi Brodjik.

13   Q.  Earl David borrowed money from Rafi Brodjik or Earl David

14   provided --

15   A.  To -- to -- laid out money or borrowed money to Rafi

16   Brodjik.

17   Q.  And then checks bounced?  I'm not following.

18   A.  That's what he's saying.  There was no check -- when he put

19   in the check, there was no funds in there.

20   Q.  When he put in what checks?

21   A.  When he put in his checks, Earl David's checks -- or Rafi's

22   checks in his account.

23   Q.  Okay.  So I'd like to turn now to focus on --

24             MS. ECHENBERG:  We could take that down.

25   Q.  Turn your attention now to defendant Gulay Cibik.  Was

1  there anyone else named Gulay in the office, the law firm
2  office?
3  A.  No.
4  Q.  And do you know how Ms. Cibik came to work in the office
5  initially?
6  A.  I'm not sure.
7  Q.  And what was Ms. Cibik's role in the office?
8  A.  She attended to clients, mostly from -- that spoke Turkish,
9  Turkish clients, from Turkey, and consulting them and with
10 green cards.
11 Q.  When you say she attended to clients, specifically what
12 would she do?
13 A.  She would open up their case, she would try to find -- she
14 would find the sponsors, she would get the paperwork, she would
15 do -- what I would do for the Spanish and for the Israeli
16 people, she would do for Turkish.
17 Q.  When you say she would find a sponsor, what do you mean?
18 A.  If they wouldn't have a sponsor, she provided them a
19 sponsor.
20 Q.  How would she go about providing a sponsor?
21 A.  She would go to Earl or to me or to Lipa.
22 Q.  And do what?
23 A.  And say, "You have a sponsor in mechanic," or, "You have a
24 sponsor for construction?"
25 Q.  Did she ever come to you directly for a sponsor?

D1t1cib1                          Salamon - direct

1    A.  Yes.

2    Q.  And the best of your recollection, how many times did she

3    come to you for a sponsor?

4    A.  I would say directly to me, maybe two or three times.

5    Q.  And what, if anything, did she say to you when she would

6    come to you for a sponsor?

7    A.  "Sam, do you have a company for mechanic?"  "Do you have a

8    company for construction?"

9    Q.  What did you say in response?

10   A.  Yes, for money, I have.

11   Q.  And for money.  What do you mean?

12   A.  That she has to pay me for the sponsor.

13   Q.  And did she pay you for the sponsor?

14   A.  Yes.

15   Q.  How much did she pay you?

16   A.  $700.

17   Q.  And approximately how many occasions did she pay you $700

18   for a sponsor?

19   A.  As far as I remember, two or three times.

20   Q.  And did she go to other people for sponsors?

21   A.  Yes.

22   Q.  How do you know that?

23   A.  I saw her talking to Lipa Teitelbaum about sponsorship.

24          MS. ECHENBERG:  If we can bring up Government 700,

25   page 137, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1t1cib1                        Salamon - direct

1              If we can look at that top check.

2   A.  Yes.

3   Q.  Do you recognize that check?

4   A.  Yes.

5   Q.  How do you recognize it?

6   A.  Because I remember, she paid me for a sponsorship.

7   Q.  This is a check she paid you for a sponsorship?

8   A.  Yes.

9   Q.  And if you could look at the bottom check in this series.

10  A.  Yes.

11  Q.  Do you recognize the word written in the line, "Pay to the

12  Order of"?

13  A.  Yes.

14  Q.  What is that?

15  A.  Hygia.

16  Q.  What is Hygia?

17  A.  It's a company that used to sponsor people as well.

18  Q.  Is there any person associated with that company?

19  A.  Yes.  Anshi Herbst.

20  Q.  And is that -- we'll come back to that.

21          Who is Anshi Herbst?

22  A.  A person that used to sponsor people for something.

23  Q.  Was he paid in exchange for sponsorship?

24  A.  Yes.

25          MS. ECHENBERG:  If we could bring up Government

D1t1cib1                        Salamon - direct

1    Exhibit 3609, please.

2    Q.  Do you recognize this e-mail?

3    A.  Yes.

4    Q.  How do you recognize it?

5    A.  It was sent to me, sammy110wall@aol.com.

6    Q.  If you could go down to the message that was forwarded to

7    you.  Do you see that it starts, "Dear Earl"?

8    A.  Yes.

9    Q.  Who is that message from?

10   A.  That message is from Gulay Cibik to Earl.

11   Q.  And if you could read that message, please.

12   A.  "Dear Earl, Please ask Sam about his substitution

13   beneficiary 2001 case.  Beneficiary --" I can't pronounce the

14   set of letters.  "Thanks, Gulay."

15   Q.  What is this e-mail in reference to?

16   A.  This is a 2001 case that I-140 was approved and you're

17   allowed to do substitutions, so she's asking Earl to ask me,

18   since I used to work at Digital Copier Systems, in 2001, if

19   they could do a substitution on it.

20   Q.  You used to work at Digital Copier Systems?

21   A.  Yes.

22   Q.  What is that?

23   A.  That's United Photocopy and was sold afterwards to Digital

24   Copiers.  So the original was under United Photocopy, the one

25   that I mentioned that I signed in 2001, so that was one of the

D1t1cib1                         Salamon - direct

1   clients.

2   Q.  And was Digital Copier Systems sponsoring anyone at this

3   point?

4   A.  I can't remember.  Digital Copiers, United Photocopy, I

5   can't remember.

6   Q.  Okay.  But was whatever the company was called sponsoring

7   anyone in January of 2006?

8   A.  No.

9   Q.  How do you know that?

10  A.  Because I worked in the company, I was part owner of the

11  company with my father.

12         MS. ECHENBERG:  If you could put up Government

13  Exhibit 3610.

14  Q.  And while we're doing that, I'm showing you Government

15  Exhibit 18.  Do you recognize that?

16  A.  Yes.

17  Q.  Who is that?

18  A.  Anshi Herbst.

19  Q.  And does he go by any other names?

20  A.  Andre Herbst, maybe.

21  Q.  And this is the individual you were discussing who is

22  connected to Hygia?

23  A.  Yes.

24  Q.  Okay.  So if we can look now at Government Exhibit 3610,

25  which is on the screen.  Who is this e-mail from?

D1t1cib1                        Salamon - direct

1    A.  Gulay Cibik.

2    Q.  And who is it to?

3    A.  Earl David and sammy110wall@aol.com.  That's me.

4    Q.  If you could read this e-mail, please.

5    A.  "Dear Earl, This is my last memorandum to you.  Where is

6    Mr. Vago, Mr. Cohen?  Think about why suddenly they disappear

7    from their market.

8            "If I am trying to tell you --"

9    Q.  Sorry.  I'm sorry.  Let me stop you there.  Who is Mr. Vago

10   and Mr. Cohen, if you know?

11   A.  Mr. Vago used to work in the office.  He used to prepare

12   the false tax returns for all the companies.

13   Q.  Who is Mr. Cohen?

14   A.  Was also an accountant, but I wasn't there when he was

15   working there.

16   Q.  And do you know what she's referring to when she says,

17   "Think about why suddenly they disappeared from their market"?

18   A.  I know why she was thinking Mr. Vago because he -- at that

19   time he got arrested or was under investigation.

20   Q.  If you could turn to the next paragraph, please.

21   A.  "If I am trying to tell you don't do business with certain

22   people or in certain conditions, I don't want you to have bad

23   time for your future, which already you had more than enough.

24           "I am so sick and tired to repeat same advice last

25   four years.

D1t1cib1                          Salamon - direct

1          "If you want to continue to listen to others evil and

2     mental sick money animal people --"

3     Q.  Let me stop you there.  Do you understand what Ms. Cibik is

4     saying there?

5     A.  She said that shouldn't deal with certain people because

6     you can end up -- he's going to end up -- there's a reason why

7     Mr. Vago and Mr. Cohen left, so he's only going to get into

8     problems to continue working with those people.

9     Q.  Okay.  Go on.  Starting with, "As always."

10    A.  "As always, told you go ahead, that's your life, your

11    future, you can do whatever you want to do.

12         "Good luck and happy and healthy safety life.

13         "Sincerely yours, Gulay."

14         MS. ECHENBERG:  We could take that down, please.

15    Q.  How much direct interaction did you have with Ms. Cibik in

16    the office when you were both at 110 Wall Street?

17    A.  I used to see her coming down to my office, yelling and

18    screaming.  I used to see her when she used to come to work.

19    Q.  When you say yelling and screaming, what do you mean?

20    A.  She used to come down to my office and just yell at Earl

21    this and Earl was a lunatic, Earl is going to go down, I'm

22    going to bring everybody down.  She was just jealous of Earl

23    and his marriage, with Libney Milano.

24    Q.  Let me break that down a little bit.  When you say she

25    said, "I'm going to bring everybody down," did you hear her say

1   that once or more than once?

2   A.  More than once.

3   Q.  Approximately how many times, if you know?

4   A.  I would say ten times.

5   Q.  And in what context would she say that?

6   A.  She would just yell -- come out there to my office saying,

7   "Earl did this and this, and this is what I'm going to do," and

8   then she would call Earl, "I'm going to bring you down.  I'm

9   going to bring everybody down."

10  Q.  What did you understand her to mean when she said, "I'm

11  going to bring everybody down"?

12  A.  She was going to go to the government.

13  Q.  And what sorts of cases did she work on?

14  A.  Labor cert -- labor sponsorship, based on sponsorship, and

15  extraordinary ability.

16  Q.  And if you could remind us what extraordinary ability cases

17  are.

18  A.  These are for people that have -- they're very, very

19  talented.  I would say would be a singer that sings best in

20  2 million.  And the government would provide passes for green

21  card for them to get a green card 'cause they have a certain

22  talent that a million people don't have.

23  Q.  And did you have many clients at the firm that had

24  extraordinary abilities, as far as you know?

25  A.  Me personally?

D1t1cib1                         Salamon – direct

1    Q.  Your knowledge of the firm in general.

2    A.  Yes.

3    Q.  Were there clients in the firm that had extraordinary

4    ability?

5    A.  No.

6            MS. ECHENBERG:  If we could turn to Government

7    Exhibit 3032-5.

8    Q.  If we could look at those two checks at the top.  Do you

9    see they're made out to Y.M. Pollack?

10   A.  Yes.

11   Q.  Who is Y.M. Pollack?

12   A.  That's a bank account that Lipa Teitelbaum used to use.

13   Q.  And do you see that there's a notation next to the first

14   two checks with "Sam"?

15   A.  Yes.

16   Q.  Do you know why there would be a notation next to those

17   checks with "Sam"?

18   A.  Well, Lipa did -- he collected checks from people that

19   wanted to cash a check, so he made a certain percentage for

20   every check he cashed.  He charged a percentage.

21   Q.  Okay.  Then why would the word "Sam" be written next to

22   those two checks?

23   A.  He had to keep track from where he was getting the checks

24   just in case the check would bounce, where would he know who

25   gave him the check, so this is his notation, Sam gave me the

D1t1cib1                        Salamon - direct

1   check, so if this particular check bounced, it comes back to me

2   and collecting the money.

3   Q.   And these were checks from who?

4   A.   This is from our client Alumitech, sponsor one of the

5   workers.

6   Q.   And as far as you know, is this a legitimate sponsor?

7   A.   Yes.

8   Q.   And the check below, do you know who that check is from?

9   A.   That's from a client.

10  Q.   Do you remember that client?

11  A.   I remember the name, yes.

12        MS. ECHENBERG:  We could take that down, please.

13  Q.   Are you familiar with a company American Girl Fashion?

14  A.   I have heard that name, yes.

15  Q.   In what context have you heard the name?

16  A.   I know Lipa and Leiby Walter used to sponsor people on that

17  company.

18  Q.   And you mentioned Leiby Walter.  What, if anything, did he

19  have to do with American Girl Fashion?

20  A.   He owned that company.

21  Q.   And do you know whether he was paid in exchange for the use

22  of that company?

23  A.   I have never seen any transactions so I can't say.

24        MS. ECHENBERG:  If we could look at Government

25  Exhibit 706, please.

D1t1cib1                              Salamon - direct

1    Q.   Do you see the name in the "Pay to the Order of" on that

2    check?

3    A.   Yes.

4    Q.   What is that?

5    A.   Mazel & Bracha Publishing.

6    Q.   What is Mazel & Bracha Publishing?

7    A.   That's the corporation name, the book that he wrote, and he

8    sold under Mazel & Bracha Publishing.  The name of the book was

9    Code of the Heart and the corporation name for that company was

10   Mazel & Bracha Publishing.

11   Q.   Handing you what's been marked as Government Exhibit 3017,

12   3026, and 3022.

13            MS. ECHENBERG:   I believe 3022 is already in evidence.

14   Q.   If you could look at Government Exhibit 3022.  Do you

15   recognize that?

16   A.   Yes.

17   Q.   What is it?

18   A.   We used to use letterheads to -- for the corporations to

19   write, such as this corporation, this sponsor is willing to

20   hire this person, so we used to write it in a nicer piece of

21   paper for immigration.

22   Q.   And were those truthful letters?

23   A.   No.

24            MS. ECHENBERG:   Your Honor, if I could publish this to

25   the jury, please.

D1t1cib1                       Salamon - direct

1              (Pause)

2    Q.  If you could look now at Government Exhibit 3017 and 3026.

3    Do you recognize those documents?

4    A.  Yes.

5    Q.  How do you recognize them?

6    A.  Because Maritza needed certain paperwork when she was

7    doing -- Maritza Diaz, the lawyer that used to work together

8    with Earl David, she wanted some certain -- she used to work on

9    deadlines for me and Earl, so she needed more information to --

10   Q.  Let me just stop you there.  What, in general, are these

11   documents?

12   A.  That she's telling me that she needs tax returns from the

13   following companies, Rolling Acres, all these companies.

14   Q.  And how do you recognize these documents?

15   A.  Because Maritza gave it to me.

16   Q.  You've seen them before.

17   A.  Yes.

18   Q.  And are these -- are these the actual documents you've seen

19   before?

20   A.  This one, yes.

21   Q.  And 3026?

22   A.  Yes.

23            MS. ECHENBERG:  The government moves to admit

24   Government Exhibit 3017 and 3026.

25            MR. GERZOG:  Without objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1t1cib1                          Salamon - direct

1        THE COURT:  Received.

2        (Government's Exhibits 3017 and 3026 received in

3   evidence)

4        MS. ECHENBERG:  If we could publish 3017 and 3026 side

5   by side on the board, please -- excuse me -- on the screen.

6   Q.  And so now what's up there on the screen?  If you could

7   explain to the jury what they are.

8   A.  Maritza Diaz writes to me, "I need tax returns for 2001,

9   2003 for all employees, position, salary, and daily work

10  schedule.  Proof of the tax ID number for the following."  And

11  then she goes on, "Since I do not know the total number of

12  people sponsor by these companies, you'd better make sure that

13  there is sufficient income to sponsor all the aliens, whether I

14  have the deadline or not.  I have indicated below how many

15  deadlines I have for each company.  Check your records."  So

16  she goes on to the following companies, these are the things

17  she needed.

18  Q.  So let me stop you there.  In general what is she asking

19  you for?  What are these related to?

20  A.  She's asking me the company's tax returns and daily work

21  schedules from all the employees of the company and proof of

22  tax ID number, which the government provides.  It's a -- it's a

23  government provided -- it's the tax ID number.

24  Q.  And why did she need this information?

25  A.  To answer deadlines needed for immigration or labor

D1t1cib1                          Salamon – direct

1    department when they used to ask for it.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1TLCIB2                      Salamon - direct

1            MS. ECHENBERG:  If we could take those down, please.

2    Q.  I want to turn your attention now to defendant Nathan

3    Schwartz.  You testified that you've been friends on and off

4    with Mr. Schwartz for many years; is that right?

5    A.  Yes.

6    Q.  And have you ever met any members of his family?

7    A.  Excuse me?

8    Q.  Have you ever met any member of his family?

9    A.  Yes.

10   Q.  And are you familiar with someone named Abraham Schwartz?

11   A.  No.

12   Q.  You testified last week that you would pay Mr. Schwartz --

13   A.  Excuse me, I do remember Abraham Schwartz, yes.

14   Q.  Who is Abraham Schwartz?

15   A.  It's his son.

16   Q.  You testified last week that you would pay Mr. Schwartz for

17   Department of Labor approvals; is that right?

18   A.  Yes.

19   Q.  Between 2006 and 2009, how often were you paying him?

20   A.  Every two weeks, every three weeks.

21   Q.  What would it depend on?

22   A.  Depend on whenever he had the labor approval.

23   Q.  And did he ever receive any denials?

24   A.  Yes.

25   Q.  And what if anything was his reaction to receiving denials?

1            MR. BRILL:  Objection, asked and answered.

2            THE COURT:  Overruled.

3            MR. BRILL:  On last week, on Friday.

4            THE COURT:  Overruled.

5            MR. BRILL:  I didn't hear.  I'm sorry.

6    Q.  Would you like me to repeat the question?

7    A.  Yes, please.

8    Q.  What if anything was his reaction to receiving denials?

9    A.  He was upset.  He was just throwing the denials over here,

10   this is denials, what's going on, how come I'm not getting any

11   approvals.

12   Q.  How would he know if it was a denial or approval?

13   A.  After a while he used to open up the envelopes and he used

14   to see this is denial, this is approval.  He knew which is

15   approval, which is denial.

16   Q.  You mentioned when you testified last week that there were

17   multiple companies that Nathan Schwartz provided to sponsor

18   clients; is that right?

19   A.  Yes.

20   Q.  Do you remember the names of those companies?

21   A.  CFI, Contour Framing, Olympia York, Bliss 39, and Smart

22   Shopper -- I don't remember the exact name right now.

23   Q.  And who provided you the information that you needed to

24   make, to prepare Department of Labor applications for using

25   each of those companies?

D1TLCIB2                          Salamon - direct

1    A.  Nathan Schwartz.

2    Q.  How did you come to use multiple companies?

3    A.  As I mentioned, there's a certain amount of sponsors,

4    aliens, that a client actually we can put on each company.  And

5    Earl would say, listen, we filed ten already on this company,

6    it's going to show a red flag, get me another company.

7    Q.  What would you do when Mr. David would say something like

8    that in relation to a Nathan Schwartz company?

9    A.  I would call him up and say --

10   Q.  Call who?

11   A.  Call Nathan Schwartz.

12   Q.  And say what?

13   A.  Do you have another company, I cannot book, I cannot file

14   so many applications on the same company.

15   Q.  What did he say in response when you said that?

16   A.  He said he'll get me one.

17   Q.  Would he ultimately get you one?

18   A.  Yes.

19   Q.  Did you ever send a firm client to meet with Nathan

20   Schwartz?

21   A.  No.

22   Q.  Did Nathan Schwartz every tell you what skills he looked

23   for in employees?

24   A.  No.

25   Q.  Other than the two employees that Nathan Schwartz referred

D1TLCIB2                           Salamon - direct

1   to the firm which we talked about last week, are you aware of

2   any other firm clients meeting Nathan Schwartz in person?

3   A.  No.

4   Q.  To your knowledge, were any of the companies, any of Nathan

5   Schwartz's companies that were used as sponsors intending to

6   hire any of the aliens other than the two employees he brought

7   to the firm?

8   A.  No.

9          MS. ECHENBERG:  I'd like to turn to some client files

10  now.  I'm putting in front of the witness Government

11  Exhibit 3104, 3105, 3107.

12  Q.  Looking at this folder, do you recognize it?

13  A.  Yes.

14  Q.  How do you recognize it?

15  A.  I see Lipa Teitelbaum's handwriting on it.  It was a file

16  that I was involved.

17  Q.  And what sort of file is it?

18  A.  It's immigration file, labor file for -- we call it the

19  case file.  When a client comes in, all the documents go in

20  here, anything from immigration, anything from the labor

21  department, experience letters, everything goes into the file.

22  Q.  Where were these case files maintained?

23  A.  In our office.

24  Q.  In the law firm?

25  A.  Yes.

D1TLCIB2                              Salamon - direct

1    Q.  If you could turn to Government Exhibit 3104-1, please, and

2    if we could bring that up on the screen.

3              What is this document?

4    A.  This document is when a client used to come in, we used to

5    have him fill out the alien part, the bottom part of the

6    application.

7    Q.  And who would fill out the top part?

8    A.  We would decide, me or Lipa would decide which company

9    we're going to file this particular client on.

10             MS. ECHENBERG:  And if we could show this screen in

11   full, please.

12   Q.  Do you see where it says name of company and occupation?

13   A.  Yes.

14   Q.  And that appears to be written in a different handwriting

15   than the rest --

16   A.  Yes.

17   Q.  -- of the handwriting.  Why is that?

18   A.  Because we decided once we spoke to the client what would

19   fit him best, to put him in as a carpenter or cook or

20   construction.  So this particular one was occupation,

21   carpenter, and the company we put him in would be CFI.

22   Q.  Was this client actually a carpenter, if you know?

23   A.  I wouldn't be able to say.

24   Q.  Who would have written carpenter there?

25             MR. DONALDSON:  Objection.

D1TLCIB2                          Salamon - direct

1    A.  Lipa Teitelbaum.

2             MR. DONALDSON:  Objection.

3             THE COURT:  If you know.

4    Q.  Do you recognize the handwriting for CFI and carpenter?

5    A.  Yes.

6    Q.  Whose handwriting is that?

7    A.  Lipa Teitelbaum.

8    Q.  You can move on to Government Exhibit 3104-2, please.  Do

9    you have that in front of you?  Do you have it in front of you?

10   A.  Yes.

11   Q.  And what is this document?

12   A.  As I mentioned before, before we can do anything with a

13   client, we have to have some kind of experience.  They have to

14   be a skilled worker.  So they have to show they have experience

15   in that particular field.  And they have to show it would be

16   two years before they entered in the country that they had two

17   years prior to that entering into the country, they had

18   experience in that particular skilled job.

19   Q.  So what is this document?

20   A.  This is a sample that I would give to clients that they

21   would have to either bring me or we provided them with

22   experience letter.

23   Q.  When you say they would either have to bring you, what do

24   you mean bring you?

25   A.  They have to try to get one from their home country or, if

D1TLCIB2                          Salamon - direct

1    they couldn't get it, we would charge them extra for it and get

2    them experience letter.

3    Q.   So they had to first try to get something from their home

4    country that said something similar to this?

5    A.   Yes.

6    Q.   And if they couldn't do that, then you would charge them to

7    prepare one?

8    A.   Yes.

9    Q.   And if you can move on to Government Exhibit 3104-3,

10   please.

11   A.   Yes.

12   Q.   What is this document in general?

13   A.   This is delivery confirmation for priority mail that we

14   sent to Texas, immigration processing center in Texas.

15   Q.   Are there multiple documents, multiple pages in Government

16   Exhibit 3104-3?

17   A.   Yes.

18   Q.   What is the whole package?

19   A.   Once it gets approved from the labor department, the

20   experience letter goes in there, the tax returns go in there,

21   and sent off to immigration to get the I-140 and then get the

22   client approved for permission to work and eventually for green

23   card.

24   Q.   So let's go through this page by page.

25          The first page you just said was the copy of the

1  mailing envelope?

2  A.  Yes.

3  Q.  And it looks like it's to USCIS in Texas and from CFI

4  Framing at 46 Main Street?

5  A.  Yes.

6  Q.  Was it actually mailed from that address?

7  A.  Excuse me?

8  Q.  Was this package actually mailed from that address?

9  A.  No.

10 Q.  Why is that address written there?

11 A.  Lipa was very particular.  If we got a labor approval that

12 didn't have an agent on it, the law firm on it, he would

13 sometimes put CFI, 46 Main Street, and to show for the

14 government that it's more legit coming straight from the

15 sponsor to the immigration.

16 Q.  So to make it look like it was being mailed from the

17 sponsor themselves?

18 A.  Yes.

19 Q.  But in fact the law firm was mailing it?

20 A.  Yes.

21 Q.  If we could go to the second page of this exhibit.  What is

22 this document?

23 A.  This is a form I-140, immigration petition for alien

24 worker, and information from the company and from the client

25 have to be filled in.

D1TLCIB2                    Salamon - direct

1    Q.  What is the purpose of this form, if you know?

2    A.  In order, again, to proceed with the process.  This is one

3    of the requirements of immigration, to get I-140 application

4    and then an approval.

5    Q.  If we could go to -- I believe the next page is the second

6    page of this document, is that right, the I-140?

7    A.  Yeah.

8    Q.  If we go past that, and do you see here where it says

9    Nathan Schwartz and there's a signature?

10   A.  Yes.

11   Q.  Who signed that?

12   A.  Me.

13   Q.  If you go to the next document, please.  What is this

14   document?

15   A.  This is an experience letter, as I mentioned, that they

16   have to show they have two years experience prior to coming

17   into the country.  So this is experience letter for that

18   skilled particular job from the client.

19   Q.  If we could go to the next page.  What is this?

20   A.  This is the cover letter.

21   Q.  Cover letter of what?

22   A.  Of a labor approval.

23   Q.  Go to the next page.  What is this document?

24   A.  Yes.

25   Q.  What is this document?

1   A.  This is the Department of Labor saying that this particular

2   alien has been certified, labor approval has been approved.

3   Q.  And looking at this document, can you tell where the

4   certification was sent?

5   A.  CFI Framing Developers, care of Nathan Schwartz, 46 Main

6   Street, Suite 226, Monsey, New York 10952.

7   Q.  And do you recognize that address?

8   A.  Yes.

9   Q.  What is that address?

10  A.  That's a P.O. box that Nathan Schwartz had.

11  Q.  Go to the next document, please.  And what is this?

12  A.  This is the application.  We fill it in.  This, fill it in,

13  and this is the labor approval.

14  Q.  And is this the original labor approval?

15  A.  No.

16  Q.  How can you tell?

17  A.  Because the original labor approval comes bluish and it has

18  a watermark coming down the middle.

19  Q.  Do you know whether the original labor approval was sent to

20  immigration?

21  A.  Yes.

22  Q.  Yes, it was, or yes, you know?

23  A.  Yes, it was sent.

24  Q.  How do you know that?

25  A.  Because otherwise it would have been rejected.

D1TLCIB2                          Salamon - direct

1    Q.  And where did you get the original labor approval in order

2    to send it to immigration?

3    A.  From Nathan Schwartz.

4    Q.  How do you know that?

5    A.  He came over.  How would I be able to get it?  There's no

6    other way for me to get the labor approval unless he gives it

7    to me.

8    Q.  If you could go to the last, the signature page of this

9    document, please.

10            And do you see the signature under Nathan Schwartz

11    there?

12   A.  Yes.

13   Q.  Whose signature is that?

14   A.  My signature.

15   Q.  And why would you sign these documents rather than having

16   Mr. Schwartz sign them?

17   A.  It's possible at times I gave him to sign.  But most of the

18   times, I used to just get the labor approvals, and before we

19   send it in, I used to sign sponsor's name.

20   Q.  And did you do that with all of the sponsors that you

21   worked with?

22   A.  Not all of them but some, yes.

23   Q.  How would you make the decision about whether you were

24   going to sign or have the sponsor sign?

25   A.  Once, if I get a labor, original labor approval, the

D1TLCIB2                          Salamon - direct

1    sponsor knows I'm going to send it in to the immigration.  I'm

2    not going to keep it in my office for decoration.  He knew.  So

3    I didn't make a big thing of him signing because he knew that I

4    was going to be sending it in to immigration.

5    Q.  Under what circumstances would you have a sponsor actually

6    sign the document?

7    A.  If it would be true, legit sponsor, he would sign it, yes.

8    Q.  And what percentage of the time was there a true, legit

9    sponsor connected with law firm client applications?

10   A.  10 percent.

11   Q.  If we could go on to the next page, please.  What is this?

12   A.  This is tax returns.

13   Q.  And why did tax returns have to be included in this

14   package?

15   A.  That's what immigration required.

16   Q.  Are these legitimate tax returns?

17   A.  No.

18   Q.  How do you know that?

19   A.  Because Nathan Schwartz never provided me with tax returns.

20   Q.  Did Nathan Schwartz know that you were including phony tax

21   returns in these applications?

22   A.  I don't think so.

23   Q.  If we could go past the tax returns, please.  Okay.  If we

24   could take that document down.

25              And, Mr. Salamon, I believe you have in front of you

D1TLCIB2                           Salamon - direct

1    Government Exhibit 3105.  It's another folder, 3105.

2    A.   Oh, another folder.

3    Q.   So you can close that one up.  Put it off to the side.

4         Do you see 3105 in front of you?

5    A.   Yes.

6    Q.   Is this another client file?

7    A.   Yes.

8    Q.   How do you recognize it?

9    A.   This is one of my clients.  Me and Martha used to work on

10   this file.

11   Q.   And if you can look at now and bring up on the screen

12   3501-1.

13   A.   Yes.

14   Q.   What is 3105-1, in general, the whole package?

15   A.   Once a labor approval gets approved, we send in all the

16   documents in to immigration.  This was sent in to Texas.

17   Q.   And are the same type of documents included in this package

18   as what we just went through?

19   A.   Yes.

20   Q.   If we could turn now to the labor approval that's in this

21   package.  Actually, if you could go back.  Start with this

22   page.

23         Do you see that page, Mr. Salamon?

24   A.   Yes.

25   Q.   And, again, what is this document?

D1TLCIB2                              Salamon - direct

1    A.   A labor approval.

2    Q.   And where was it sent?

3    A.   It was sent to CFI Framing Developers, care of Nathan

4    Schwartz, 46 Main Street, Suite 226, Monsey, New York 10952.

5    Q.   And the original was sent to Mr. Schwartz?

6    A.   Correct.

7    Q.   And what follows this document?

8    A.   Excuse me?

9    Q.   What comes after?  Go to the next page.  What comes after

10   this document, what is this?

11   A.   This is part of the labor approval.

12   Q.   And do you see how agent or attorney information is left

13   blank?

14   A.   Yes.

15           MS. ECHENBERG:  If you could go back I think to the

16   second page of this exhibit, please.  Right there.  Sorry.

17   Q.   What is this document?

18   A.   G-28.

19   Q.   What's a G-28?

20   A.   Whoever is representing the client and who's representing

21   the client, which means the law firm.

22   Q.   So in connection with this file, law firm is sending in a

23   form saying David Schlacter is representing this client?

24   A.   Yes.

25   Q.   And David Schlacter is one of the lawyers up on the board

D1TLCIB2                          Salamon - direct

1    who worked for the law firm?

2    A.  Yes.

3    Q.  Now, in this stage of the process, an attorney is sending

4    in a form saying he's representing, but back at the Department

5    of Labor stage that we were just looking at, that

6    agent/attorney was left blank; is that right?

7    A.  Yes.

8    Q.  Why is that?

9    A.  There was a point, there was a time that we didn't get too

10   many approvals and we were thinking that the government is

11   watching having red flags.  So we always try to do ways to see

12   how we could get labor approvals, especially there were times

13   we didn't get them like constantly every week, two weeks.

14          So Earl David said better have straight -- don't put

15   the agent's name or lawyer's name on it because they know David

16   Schlacter and Earl David and Jed David Philwin file so many

17   cases.  As much as you could put just the sponsor, just leave

18   it on the sponsor name.

19   Q.  And if you put just the sponsor name on the Department of

20   Labor application, what was the result of that?

21   A.  We got approvals.

22   Q.  If there was no attorney listed, where would the original

23   approval be sent?

24   A.  To the sponsor.

25   Q.  To the sponsor directly?

D1TLCIB2                          Salamon - direct

1    A.  Yes.

2    Q.  If you could look now at I believe what is in front of you,

3    Government Exhibit 3107-1.

4    A.  It's a new file?

5    Q.  3107 is the whole folder, and if you could turn to 3107-1.

6    A.  Yes.

7    Q.  What is this package?

8    A.  Again, this is another package that was sent in to

9    immigration after the labor got approved, was sent in to Texas

10   processing center.

11   Q.  And what is included in that package, in general?

12   A.  In general, the labor approval, tax returns of the company,

13   and experience letters.

14   Q.  And if we could go again to the cover page for the labor

15   approval, where was this original labor approval sent?

16   A.  CFI Framing and Developers, care of Nathan Schwartz, 46

17   Main Street, Suite 226, Monsey, New York 10952.

18   Q.  Okay.  And if we could go to the final page on this one.

19   A.  Yes.

20   Q.  Whose signature is that?

21   A.  My signature.

22   Q.  I'm going to be handing you Government Exhibits 3109.  I'm

23   handing you three more exhibits, 3109, 3110, and 3111.  If you

24   could start with 3109, please.

25          MS. ECHENBERG:  If we could bring 3109-2 up, please.

D1TLCIB2                    Salamon - direct

1   Q.  And is there more than one page in this exhibit?

2   A.  Excuse me?

3   Q.  In front of you, 3109-2 --

4   A.  Yes.

5   Q.  -- is there multiple pages?  In general, what's there?

6   A.  Labor approval.

7   Q.  And where was this labor -- if you can go to the second

8   page on the screen, please.

9           Again there's the agent is left blank here, right?

10  A.  Yes.

11  Q.  If we could go back to the first page.

12  A.  Yes.

13  Q.  Looking at this cover page, where was this labor approval

14  sent?

15  A.  To Nathan Schwartz, care of -- Olympia York Builders and

16  Developers, care of Nathan Schwartz, 455 Route 306, Suite 119,

17  Monsey, New York 10952.

18  Q.  If we could go to the signature page of this document.

19  A.  Yes.

20  Q.  Do you recognize that signature?

21  A.  No.

22  Q.  Is that your signature?

23  A.  No.

24  Q.  If you could turn now to Government Exhibit 3109-4, please.

25  A.  Yes.

D1TLCIB2                          Salamon - direct

1    Q.  Who is this email from?

2    A.  From Department of Labor.

3    Q.  Who is it to?

4    A.  To OlympiaYorkbuilders@yahoo.com.

5    Q.  Do you recognize that email address?

6    A.  Yes.

7    Q.  What is that email address?

8    A.  We created, for every sponsor, we created the email

9    address.  We got emails, a lot of emails from the labor

10   department.  So we used to go into that email and check if the

11   labor department requires any additional info.

12   Q.  Did Nathan Schwartz have access to that email address?

13   A.  No.

14   Q.  If we could bring up Government Exhibit 3109-5, please.

15   A.  Yes.

16   Q.  And do you see at the top the word Olympia?

17   A.  Yes.

18   Q.  Whose handwriting is that?

19   A.  Lipa's, Teitelbaum.

20   Q.  Who would have made the decision to assign this client to

21   Olympia?

22   A.  Usually me or Lipa and Earl David.

23   Q.  If you could look now at Government Exhibit 3110.

24   A.  I don't know where.

25   Q.  It's another file.

D1TLCIB2                         Salamon - direct

1    A.  Oh.

2    Q.  Do you have that from in front of you?  Do you have 3110 in

3    front of you?

4    A.  Yes.

5    Q.  Are these all client files from the law firm?

6    A.  Yes.

7    Q.  If you could look at 3110-1, please.

8    A.  Yes.

9    Q.  In general, what is this exhibit?

10   A.  Again, this is once the labor gets approved, it gets sent

11   into immigration or sent into immigration at the Texas

12   processing center.

13   Q.  And if we could just go directly to the labor approval,

14   please.

15   A.  Yes.

16   Q.  And where was this labor approval sent?

17   A.  Olympia York Builder and Developer, care of Nathan

18   Schwartz, 455 Route 306, Suite 119, Monsey, New York 10952.

19   Q.  And if we could go to the signature page on this one.

20   A.  Yes.

21   Q.  Do you recognize that signature?

22   A.  Yes.

23   Q.  Whose signature is that?

24   A.  My signature.

25   Q.  And if we could go quickly to 3110-2.

D1TLCIB2                          Salamon - direct

1    A.  Yes.

2    Q.  Do you recognize the handwriting under name of company?

3    A.  Yes.

4    Q.  Whose handwriting is that?

5    A.  Lipa Teitelbaum.

6    Q.  And under occupation, do you recognize that handwriting?

7    A.  Lipa Teitelbaum as well.

8    Q.  If you could look now at the next file in front of you

9    which is 3111.

10   A.  Yes.

11   Q.  If you could look at 3111-3, please.

12   A.  Yes.

13   Q.  What is this?

14   A.  It's labor approval.

15   Q.  And where was it sent?

16   A.  Olympia York Builder and Developers, care of Nathan

17   Schwartz, 455 Route 306, Suite 119, Monsey, New York 10952.

18   Q.  And I'm putting in front of you Government Exhibit 3121 and

19   3122.  If you can first look at 3121.  If you can look, is this

20   another client file?

21   A.  Yes.

22   Q.  If you can look at 3121-1, please?

23   A.  Yes.

24          MS. ECHENBERG:  If we could blow up just the little

25   box to the left that says carpenter.

1   Q.  So, in general, what is that document, the whole document?

2   A.  The labor department required also to advertise in the

3   paper sometimes to show that the company was looking for

4   workers in United States here and they couldn't find any

5   workers in the United States.  That's why they're looking to

6   hire somebody that came in from a different country.

7   Q.  So would the law firm actually publish these

8   advertisements?

9   A.  Not every time, no.

10  Q.  In some cases, would advertisements be published?

11  A.  Sometimes it would be published.  Sometimes we just make

12  this up.

13  Q.  Do you know whether any ads were ever published with this

14  455 Route 306 address being the address to send resumes?

15  A.  I can't remember.

16  Q.  And if you can look now at Government Exhibit 3123.  That's

17  the other folder that I put in front of you.

18  A.  Yes.

19  Q.  If you can look at 3123-1.

20  A.  3123-1?

21  Q.  3123-1.  Is that folder 3123 in front of you?

22  A.  3122.

23  Q.  Okay.  Hold on.

24          Okay.  If you can now look at 3123-1.

25  A.  Yes.

D1TLCIB2                          Salamon - direct

1    Q.  Do you have that in front of you?

2    A.  Yes.

3    Q.  And what is that?

4    A.  That's another client's file and this is original labor

5    approval.

6    Q.  Why would the original labor approval be in the file?

7    A.  At times they used to get denied, so we used to refile it

8    under a different company name, or at times we did not know

9    which was going to get approved first, so we used to file two

10   applications, one for this company and one for this company.

11   And if we didn't need that particular approval, we used to keep

12   it in the file.

13   Q.  And where was this original labor approval sent?

14   A.  CFI Framing and Developers, care of Nathan Schwartz, 46

15   Main Street, Suite 226, Monsey, New York 10952.

16          MS. ECHENBERG:  And, your Honor, may I publish this

17   exhibit to the jury?

18   Q.  Mr. Schwartz, excuse me, Mr. Salamon, have you reviewed

19   other client files related to Nathan Schwartz's companies?

20   A.  Yes.

21   Q.  And, in general, have you seen other similar documents to

22   what we've reviewed in those files?

23   A.  Yes.

24   Q.  You mentioned last week that Nathan Schwartz did some

25   construction on your house.  Do you remember that?

D1TLCIB2                          Salamon - direct

1    A.  Yes.

2              MS. ECHENBERG:  I'd like to bring up Government

3    Exhibit 3002, please.  If we could go to page 3 of this

4    document, please.

5    Q.  What is this document, Mr. Salamon?

6    A.  This is document that Nathan Schwartz, he was doing the

7    construction on my house, on the kitchen, actually, and he was

8    dealing with a cabinet company that does the cabinets for the

9    kitchen.

10   Q.  And what is this document?

11   A.  The details, the footage and the square footage of the

12   kitchen and how the sizing and the measurements of the

13   cabinets.

14   Q.  And if you can look in the top right corner, there two

15   phone numbers; do you see those?

16   A.  Yes.

17   Q.  Starting with the first phone number that starts 845, what

18   is written above that phone number?

19   A.  It's written in Hebrew, Nuchem, and the last name Schwartz.

20   Q.  And what is that phone number?

21   A.  (845)721-7455.

22   Q.  And then what's next to that?

23   A.  My phone number, Sam Salamon, (917)846-4083.  That used to

24   be my cell phone number.

25   Q.  And during what time period was that your cell phone

D1TLCIB2                          Salamon - direct

1    number?

2    A.  I would say during 2001 till end of 2009.

3    Q.  And if you can look at the bottom, there are two

4    signatures?

5    A.  Yes.

6    Q.  Do you recognize those signatures?

7    A.  One is from the cabinet company, one is from Nathan

8    Schwartz.

9    Q.  Which one is from Nathan Schwartz?

10   A.  The one to the second, to the right.

11   Q.  The one more to the right?

12   A.  Yes.

13   Q.  And that's the bottom row of this exhibit?

14   A.  Yes.

15   Q.  Okay.  I'm handing you Government Exhibit 503.  Start with

16   this one, Government Exhibit 503, and then I'm also handing you

17   Government Exhibits 503-1, 503-2, 503-3, and 503-4.  If you

18   could look at all four of those exhibits.

19       Let's start with Government Exhibit 503, if you want

20   to take that out of the bag and let me know if you recognize

21   it.  Do you recognize that?

22   A.  Yes.

23   Q.  What is it?

24   A.  That used to be my cell phone.

25   Q.  How do you recognize it?

D1TLCIB2                        Salamon - direct

1    A.  By the crack.  I remember it had a crack.

2    Q.  And during what time period did you have this cell phone?

3    A.  This particular cell phone, I would say 2006 or 2007 to end

4    of 2009.

5            MS. ECHENBERG:  Government moves to admit Government

6    Exhibit 503.

7            MR. GERZOG:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibit 503 received in evidence)

10   Q.  And if you can look now at I'm going to hand you a few

11   more.  You have in front of you 503-1 through -4, and I'm

12   handing you 503-6 and 503-7 as well.

13           Can you tell me in general what these are?

14   A.  These are snapshot pictures from my contact list on my

15   phone, on the phone I used to have.

16   Q.  The phone we were just talking about?

17   A.  Correct.

18   Q.  And are these true and accurate copies of the contact lists

19   in that phone?

20   A.  Yes.

21           MS. ECHENBERG:  The government moves to admit

22   Government Exhibit 503-1, 503-2, 503-3, 503-4, 503-5, 503-6.

23           MR. GERZOG:  No objection.

24           THE COURT:  Received.

25           (Government's Exhibits 503-1, 503-2, 503-3, 503-4,

D1TLCIB2                         Salamon - direct

1    503-5, 503-6 received in evidence)

2    Q.  Starting with Government Exhibit 503-1, if we could put

3    that up on the screen, please.

4          Who are the three contacts, Nuchem, Nuchem 2, and

5    Nuchem home?

6    A.  Nathan Schwartz.

7    Q.  Why do you have three contacts for Nathan Schwartz?

8    A.  One was for his home, one was one cell phone number, and

9    one was another cell phone number.

10   Q.  Can we go to 503-2, please.

11   A.  Yes.

12   Q.  What is this?

13   A.  This is Nuchem's, used to be his cell phone number.

14   Q.  And do you know during what time period this was his cell

15   phone number?

16   A.  I can't remember the date when it got shut off, but it was

17   time from 2007, 2008 to 2009.

18   Q.  And when you called this number, did anyone other than

19   Nathan Schwartz ever answer?

20   A.  No.

21   Q.  Go to the 503-2, please.  Sorry, 503-3.

22   A.  Yes.

23   Q.  What is this?

24   A.  Another cell phone number for Nuchem Schwartz, Nathan

25   Schwartz.

D1TLCIB2                          Salamon - direct

1    Q.   And when you called this other cell phone number, did

2    anyone other than Nathan Schwartz ever answer?

3    A.   No.

4    Q.   And during what time period was this cell phone in use, if

5    you know?

6    A.   I can't remember.

7    Q.   If you could look at 503-4, please.  What is that number?

8    A.   That's Nathan Schwartz's phone number.

9    Q.   And if you can look at 503-5, please.  What is that number?

10   A.   That's from the labor department in Philadelphia.

11   Q.   In where?

12   A.   I think in Philadelphia, I'm not sure.  In Pennsylvania, I

13   don't remember.  This is the phone number for the labor

14   department.

15   Q.   Why did you have this phone number on your phone?

16   A.   I used to have clients come over to my office want to talk

17   to the labor department, really the ones that I said, the

18   10 percent of legit sponsors, they sponsor their own workers.

19   So they used to call me, give me the number, give me the

20   number.  So I kept the contact number.  When it come up, I used

21   to write the phone number, give it to your boss to call the

22   labor department.

23   Q.   What was in Pennsylvania that they would be calling?

24   A.   The labor department.

25   Q.   If we can go to 503-6, please.  What is that?

D1TLCIB2                          Salamon - direct

1    A.   That's Lipa Teitelbaum's cell phone number.

2    Q.   During what period did you use that number to contact him?

3    A.   From '02 to '09.

4    Q.   And was this the primary number that you used to contact

5    him?

6    A.   Yes.

7    Q.   I want to turn your attention now to defendant Harold

8    Tischler.

9         I believe you testified last week that Mr. Tischler

10   also provided with you multiple companies to use in Department

11   of Labor applications; is that right?

12   A.   Yes.

13   Q.   And how did you become aware of multiple companies to use?

14   A.   Again, I needed more companies.  I could not file that many

15   applications on the same company.  I was always looking for new

16   companies.  So I told him, Do you have another company you

17   could sponsor people?  He said yes.

18   Q.   And how many times did you go to him asking for another

19   company to sponsor people?

20   A.   Four or five times.

21   Q.   And what was his response each of those times?

22   A.   I will get you, or he gave it to me when he came to the

23   office.  He used to tell me, here's the information I will get

24   you and give me the information.

25   Q.   And what were the names of those companies that

D1TLCIB2                         Salamon - direct

1   Mr. Tischler provided?

2   A.  Vintage Partners, Vintage Builders, Fix Anything

3   Construction.  I don't remember all the names by heart.

4   Q.  And I believe that you testified that initially you were

5   paying him per signature; is that right?

6   A.  Yes.

7   Q.  Do you know how many signatures you paid him for?

8   A.  No.

9   Q.  And at some point did the arrangement change?

10  A.  Yes.

11  Q.  And what was the arrangement when it changed?

12  A.  When he gets labor approval, that's when he gets paid.

13  Q.  Why did it change?

14  A.  Because the whole labor department changed.  It was not

15  anymore manually.  We had to deal with it online.

16  Q.  And when was that changed?

17  A.  In 2005.

18  Q.  And after that you were paying him per blue labor approval;

19  is that right?

20  A.  Per original labor approval.

21  Q.  So I'm going to hand you a few more files.  Okay.  So I'm

22  handing you 3201, 3202, 3204, and 3211.

23          Okay.  If you can start with Government Exhibit 3211

24  in front of you.

25  A.  Yes.

D1TLCIB2                        Salamon - direct

1              MS. ECHENBERG:  If you could bring up on the screen

2      3211-1, please.

3      Q.  What is this document?

4      A.  This is a labor approval.

5      Q.  And let me take a step back.

6              Are the folders that I just put in front of you, are

7      these more client files?

8      A.  Yes, my clients and Martha's.

9      Q.  How can you tell that they're your clients and Martha's

10     clients?

11     A.  I see Martha's handwriting.

12     Q.  Turning to 3211-1, what is this document?

13     A.  This one is a labor approval.

14     Q.  Where was this labor approval sent?

15     A.  Fix Anything Construction and Plumbing, care of Harold

16     Tischler, 4316 17th Avenue, Brooklyn, New York 11209.

17     Q.  Is there anything that follows this document?

18     A.  Excuse me?

19     Q.  Is this a single exhibit or is there other papers behind

20     it?

21     A.  Then there's papers sent in to Texas.

22     Q.  Is that 3211-2?

23     A.  Correct.

24     Q.  And what is that?

25             MS. ECHENBERG:  If we could bring that up on the

D1TLCIB2                        Salamon - direct

1    screen, please.

2    A.   Labor approval being sent in to immigration to Texas

3    processing center.

4    Q.   And is there a cover letter in this?

5    A.   Yes.

6    Q.   If you could go to this cover letter, what does this cover

7    letter say?

8    A.   Fix Anything Construction and Plumbing, beneficiary Wilson

9    J. Leon is preplacing Fausto Cabrera.

10   Q.   What does that mean?

11   A.   At that time, immigration allowed to do substitution for

12   another client.  So Fausto Cabrera for some reason maybe got

13   another labor approval.  So we sent the letter to immigration

14   we're replacing it.

15   Q.   And that Fausto name, was that the labor approval that we

16   were just looking at?

17   A.   Yes.

18   Q.   If we could go on to 3201, which should be in front of you.

19   A.   Talking about a different file?

20   Q.   It's a different file.  So if you could close that file,

21   put it to the side.

22             If you could go to 3201-1, please.

23   A.   Yes.

24   Q.   What is this?

25   A.   Another client's file.

D1TLCIB2                      Salamon - direct

1    Q.  This is that same filing sheet you talked about before?

2    A.  Excuse me?

3    Q.  Is this the same filing sheet that you would have clients

4    fill out?

5    A.  Looking at that already.  I'm sorry.  I wasn't looking at

6    that.

7    Q.  You're looking at 3201-1?

8    A.  Yes.

9    Q.  What is this document?

10   A.  This is, again, when the client came in, we had the client

11   fill out the bottom of the sheet, their information, where they

12   live, the date of birth.

13   Q.  And whose handwriting is that at the top where it says

14   Vintage Builders?

15   A.  Mine.

16   Q.  And why did you write that there?

17   A.  Because that's where Fabian Arias was filed under, Vintage

18   Builders.

19   Q.  So Vintage Builders was made to be his sponsor?

20   A.  Yes.

21   Q.  Was Vintage Builders really sponsoring Fabian Arias?

22   A.  No.

23   Q.  If you could turn to 3201-2.

24   A.  Yes.

25   Q.  What is that?

1          MS. ECHENBERG:  If we could go to the second page,

2     please.

3     Q.  What is this?

4     A.  Labor approval.

5     Q.  And where was this labor approval sent?

6     A.  387 Quincy Associates, care of Harold Tischler, 4316

7     17th Avenue, Brooklyn, New York 11204.

8     Q.  So the PERM sheet says Vintage Builders, but this is for

9     387 Quincy Associates.  What does that mean?

10    A.  Could be that Earl said there was too many at that time --

11         MR. GREENFIELD:  Objection to the hearsay.

12         THE COURT:  Excuse me, it is speculative.

13    Q.  Do you know, were there times when what was written on the

14    PERM sheet was different than what the application ultimately

15    was made under?

16    A.  Yes.

17    Q.  And why was that?

18    A.  Earl would get -- he was in Canada and he would call up,

19    you know what, right now, there's too many applications pending

20    right now in a certain company.  Can I put on this company, can

21    I put on that company.  So I would say yes.

22    Q.  And if we could turn now to I think 3202 is in front of

23    you, another file.

24         If you could look at 3202-1, please.

25    A.  Yes.

D1TLCIB2                        Salamon - direct

1    Q.  And if you could go to the next page, please.

2          Where was this labor approval sent?

3    A.  To 110 Wall Street.

4    Q.  And if you look at the date, this is November of 2005?

5    A.  Yes.

6    Q.  You had mentioned earlier that at a certain point Earl

7    David wanted the approvals sent directly to the sponsor as

8    opposed to the law firm; do you remember that?

9    A.  Yes.

10   Q.  Do you remember around when Earl David made that decision?

11   A.  I would say end of 2007, beginning of 2008.

12   Q.  If we could go to 3202-2, please.  If we could go to the

13   next page, please, and do you see at the bottom there's a CC

14   there?

15   A.  Yes.

16   Q.  What does that CC say?

17   A.  387 Quincy Associates.

18          MS. ECHENBERG:  Your Honor, can I have one moment.

19   Q.  Okay.  I'm showing you what's been marked as Government

20   Exhibit 507.  Do you recognize that?

21   A.  Yes.

22   Q.  How do you recognize it?

23   A.  It's Harold Tischler's cell phone number.

24   Q.  What is this document?

25   A.  Snap shot of my contact list in my old phone that I used to

D1TLCIB2                          Salamon – direct

1    have.

2    Q.  The same phone we were just talking about, Government

3    Exhibit 503?

4    A.  Yes.

5    Q.  And is this a fair and accurate photograph of the contacts

6    from your phone?

7    A.  Yes.

8           MS. ECHENBERG:  The government moves to admit

9    Government Exhibit 507.

10          MR. GERZOG:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 507 received in evidence)

13          MS. ECHENBERG:  If you can bring that up on the

14    screen, please.

15   Q.  This is a contact number for who?

16   A.  Harold Tischler.

17   Q.  I'm showing you what's been marked as Government

18   Exhibit 3004.

19   A.  Yes.

20   Q.  Do you recognize that?

21   A.  Yes.

22   Q.  In general, what is it?

23   A.  Chat on America Online.

24   Q.  Between who and who?

25   A.  Harold Tischler and me.

D1TLCIB2                        Salamon - direct

1    Q.  How do you recognize this chat?

2    A.  Because I remember the chat.

3    Q.  Does this fairly and accurately represent the chat that you

4    remember?

5    A.  Yes.

6            MS. ECHENBERG:  Government moves to admit Government

7    Exhibit 3004.

8            MR. GERZOG:  No objection.

9            THE COURT:  Received.

10           (Government's Exhibit 3004 received in evidence)

11           MS. ECHENBERG:  Can you bring this up on the screen,

12   please.  If you can enlarge it, if possible.

13   Q.  So first the document that you're holding in front of you,

14   what is that?

15   A.  I pasted and copied the chat that I had with Harold

16   Tischler and me to be able to print it out.

17   Q.  And you printed it?

18   A.  Yes.

19   Q.  And that is the printout of that chat?

20   A.  Yes.

21   Q.  And do you remember when this chat occurred, approximately?

22   A.  I think end of 2009.  I'm not sure.

23   Q.  Okay.  So if you could start -- and the words "Harold

24   Tischler" at the top, did you type that?

25   A.  No.

D1TLCIB2                         Salamon - direct

1   Q.  Where did that come from?

2   A.  From the chat log from America Online.  The box says, it

3   has Harold Tischler on top.

4   Q.  See where it says "8:26 p.m. Sam"?

5   A.  Yes.

6   Q.  What's below that?

7   A.  You want me to read it?

8   Q.  Why don't you go ahead and read it.

9   A.  Excuse me?

10  Q.  Go ahead and read it, please.

11  A.  "How do you know Yona Abenson."

12  Q.  Who is speaking in the chat at this point?

13  A.  I'm asking him, Harold Tischler, how do you know Yona

14  Abenson.

15  Q.  Who is Yona Abenson?

16  A.  Client that I had.

17  Q.  A law firm client?

18  A.  Yes.

19  Q.  And what's the next -- you can keep reading.

20  A.  "He told me you spoke very bad about me."

21  Q.  And what follows?

22  A.  Then Harold says "yep."

23  Q.  And then how do you respond?

24  A.  I said "yep?" with a question mark.

25          And I ask him "how do you know him?  Why you saying

D1TLCIB2                         Salamon - direct

1  lies about me.  I'm very hurt.  Wow never thought you will talk

2  bad about me."

3  Q.  And what follows after that?

4  A.  Harold answering back to me:  "I guess so.  He came into my

5  office to sell me something.  I don't ever only say good.  I

6  say you're a good man.  I love you.  I say you did not cheat

7  anyone, only help.  You were screwed.  Call me.  I never say a

8  bad word.  Call me.  I'm going home.  Call me on my cell phone.

9  (718)288-7844."

10          So I'm writing back:  "Okay.  Why did he say diff."

11          So he answers:  "He came in.  I said I don't know if

12  he owes you 5,000 or not.  I said you're a good guy.  He says

13  you cheated him.  I said you only help people."

14  Q.  Go to the next page, please.  And it looks like it repeats

15  the language again; is that right?

16  A.  Yes, because I copied and pasted it.

17  Q.  If you could pick up where it says "I only help people,"

18  where we were on the other page.

19          Do you see that?

20  A.  "He said -- he said can I help him.  I said I have nothing

21  to do with it.  He asked me if he can say he spoke to me.  I

22  said sure.  I am not worried.  I love you.  Always put him on

23  the phone".

24  Q.  And then what is your response?

25  A.  "How come my name came up."

D1TLCIB2                          Salamon - direct

1   Q.  What is his response?

2   A.  "He brought it up.  Said he was at your house.  I said I

3   know you well and you're a very close friend."

4   Q.  And what was your response?

5   A.  "How did he know you know me."

6   Q.  And what follows on the next page?

7   A.  He's answering:  "Won't be talking to him again.  I had two

8   lawyers call me this week too.  I said call my lawyer, leave me

9   alone.  I trust you wish."

10  Q.  And do you know what he's referring to, what is this text

11  message about?

12  A.  I had a client, his name is Yona Abenson.  He came to my

13  house and said, Sam, I want a refund.  I said right now my

14  office is shut down.  The government -- I don't have -- whoever

15  had my money said it's frozen.  I cannot touch.  I don't have a

16  dime.  And the minute I have money, I'll try to pay you back as

17  much as I can.  And so one day he says somebody is talking very

18  bad about you.

19  Q.  Who said that?

20  A.  Yona Abenson.  And you're saying you're a good guy and

21  everything, you're such a good guy, somebody is badmouthing you

22  very bad.  I said who.  So he said Harold Tischler.  I said

23  what did he say?  I said I met him.  He said you're a bad

24  person.  He cheated a lot of people.

25  Q.  This text message was in response to that?

D1TLCIB2                        Salamon - direct

1    A.  This chat, yes.

2    Q.  And you were just talking about the government's raid at

3    your offices at Maiden Lane; is that right?

4    A.  Yes.

5    Q.  After that raid, did you have any discussions with Harold

6    Tischler about finding a new work space?

7    A.  Yes.

8    Q.  What did you discuss?

9    A.  He said he had space in Brooklyn.  Maybe I should open up a

10   office there.

11   Q.  Did he ever offer you work space before?

12   A.  Yes.

13   Q.  When was that?

14   A.  When I moved from -- I wanted to move from 17 Battery.  I

15   wanted to move out.

16   Q.  Did you want to move out or --

17   A.  Being evicted.  When we had to move out from 17 Battery.

18             (Continued on next page)

19

20

21

22

23

24

25

D1t1cib3                           Salamon – direct

1   BY MS. ECHENBERG:

2   Q.   Okay.  And what happened?

3   A.   So he offered -- it was talk that me and Moishe Rosenberg

4   maybe to move the offices to one of his locations that he said

5   it's going to be finished.  It wasn't finished on time.

6           MS. ECHENBERG:  Can I have one moment, your Honor.

7           (Pause)

8   Q.   Showing you what's been marked as Government Exhibit 222.

9   Take it out of the envelope and take a look at it.

10          Do you recognize that?

11  A.   Yes.

12  Q.   How do you recognize it?

13  A.   'Cause sometime in 2006, like July, August of 2006, I got

14  called from a lot of sponsors said they got subpoenaed by the

15  government.

16  Q.   And what is this document, in general?

17  A.   This document?

18  Q.   The whole set of documents, in general.

19  A.   So they are calling me to come down to the office.

20  Q.   Mr. Salamon, before you tell us --

21  A.   These are documents we sent in as a result of the subpoena.

22  Q.   Government -- and are these the actual documents that were

23  sent in in response to the subpoena?

24  A.   Copies of the documents we sent in.

25  Q.   Are they fair and accurate copies -- or true and accurate

D1t1cib3                         Salamon – direct

1   copies of the documents that were sent in?

2   A.  Yes.

3            MS. ECHENBERG:  Government moves to admit Government

4   Exhibit 222.

5            MR. GREENFIELD:  Can I have a brief voir dire, just a

6   couple questions?

7            THE COURT:  Sure.

8   VOIR DIRE EXAMINATION

9   BY MR. GREENFIELD:

10  Q.  Mr. Salamon, are you saying that you mailed in documents in

11  response to the government subpoena in 2006?

12  A.  Yes.  In front of Mr. Harold Tischler in my office.

13  Q.  In front of him.

14  A.  Yes.

15  Q.  Where were you when you mailed in the documents?

16  A.  In my office in Battery Place.

17  Q.  And who brought you the documents, Mr. Tischler?

18  A.  Yes.

19  Q.  What's the return address on the -- on the envelope?

20  A.  Vintage Partners, P.O. Box 9103, Brooklyn, New York 11209.

21  Q.  And it was a subpoena from the government to Vintage

22  Partners; is that right?

23  A.  Correct.

24            MR. GREENFIELD:  I object to this witness testifying

25  to this document.

D1t1cib3                         Salamon - direct

1           THE COURT:  Overruled.

2           (Government's Exhibit 222 received in evidence)

3           MS. ECHENBERG:  Is it admitted, your Honor?

4           THE COURT:  It is.

5           MS. ECHENBERG:  If we could bring 222 up on the

6     screen, please.

7           If we could go to the second page, please.

8     BY MS. ECHENBERG:

9     Q.  If you can find -- there should be a cover letter.

10    A.  Cover letter?

11    Q.  Yes.

12          What is this letter?

13    A.  It's a letter that Earl David wrote, typed and that was

14    supposed -- we had to send it in to the US Immigration and

15    Customs Enforcement.

16    Q.  How do you know Earl David typed this letter?

17    A.  'Cause he's the one putting it together and telling me what

18    I need to get from the sponsor in order -- what the government

19    wants.

20    Q.  And let me put these back in front of you.

21          What does this document say at the top right there?

22    A.  Grand jury subpoena.

23    Q.  And who is the grand jury subpoena to?

24    A.  To Vintage Partners New York, LLC 4316 17th Avenue,

25    Brooklyn, New York 11204.

D1t1cib3                        Salomon - direct

1   Q.  Why is Earl David responding to a subpoena to Vintage

2   Partners at that address?

3   A.  Because he has to send in the paperwork.  Once we got the

4   paperwork, he had to write it and he had to bring up the

5   documents, what was sent in.

6   Q.  So let me take a step back.  Was that subpoena served on

7   the law firm?

8   A.  No.

9   Q.  So how did Earl David come to know about that subpoena?

10  A.  Harold Tischler came to the office and brought it over.

11  Q.  What, if anything, did he say?

12  A.  He said, "What's going on over here?"  I said, "I will

13  speak to Earl David and find out what's needed."  So then I

14  called him, I said, "Relax.  Bring me whatever is needed."  And

15  we sent it in.

16  Q.  Okay.  Last week we went over --

17          MS. ECHENBERG:  Well, actually, if we could bring up

18  Exhibit 505A, please.

19  Q.  Do you remember last week we talked about a text message

20  with Mr. Tischler where he expressed frustration about being

21  made to wait and having to come back to the office?

22  A.  Yes.

23  Q.  And that was this text message?  Do you remember that?

24  A.  Yes.

25  Q.  And did you ever have any conversations with Mr. Tischler

1   about denials?

2   A.  Yes.

3   Q.  What were those conversations?

4   A.  When he used to come up to the office and I used to open

5   them up, there was denials over there, and he said, "I'm coming

6   over from Brooklyn.  You got to take care of me."

7   Q.  And what, if anything, did you do?

8   A.  I would give him money.

9   Q.  And did he ever raise his voice in those conversations?

10  A.  He was mad at getting denials, yes.

11          MS. ECHENBERG:  I have nothing further, your Honor.

12          THE COURT:  Okay.  Why don't we just stop a few

13  minutes before the normal break and remind the jury to keep an

14  open mind and not to talk about the case.

15          (Jury excused)

16          THE COURT:  Okay.  See you at 20 of.

17          (Recess)

18

19

20

21

22

23

24

25

D1t1cib3                          Salamon - cross

1              (In open court; jury present)

2              THE COURT:  Mr. Donaldson, you may proceed.

3    CROSS-EXAMINATION

4    BY MR. DONALDSON:

5    Q.  Good morning, sir.

6    A.  Good morning.

7    Q.  I am going to need you to speak up so that the last person

8    over here in the jury box can hear you.  Okay?

9    A.  Yes.

10   Q.  And I'm going to ask you a series of questions.  If you can

11   answer them yes or no, please do so.

12   A.  Yes.

13   Q.  There you go.  That's a good start.

14              My name is Mr. Donaldson, Xavier Donaldson, and I

15   represent Ms. Cibik here.  You identified her in your

16   testimony.  You recognize Ms. Cibik?

17   A.  Yes.

18   Q.  And you recognize her from the law firm at 110 Wall Street?

19   A.  Yes.

20   Q.  Several times in your testimony on Friday and today you

21   said -- you said it several times -- 90 percent fraud,

22   90 percent fraud, then today you said -- I believe you said

23   10 percent, which would equate to 90 percent.  You said

24   10 percent is legit.  Do you recall saying that?

25   A.  Excuse me?

D1t1cib3                          Salamon - cross

1   Q.  Do you recall saying that?

2   A.  Yes.

3   Q.  Today 10 percent, the other day 90 percent.  You did meet

4   with the government several times over the course of three

5   years; correct?  You met with the government several times?

6   A.  Yes.

7   Q.  You talked to them about the case?

8   A.  Yes.

9   Q.  Told them what you know?

10  A.  Yes.

11  Q.  To the best of your ability?

12  A.  Yes.

13  Q.  And on one of those occasions you told them that there was

14  a 75 percent fraud.  Do you recall saying that?

15  A.  Possible.

16  Q.  So you're at 90 percent fraud Friday, you're at 90 percent

17  today, and you're 10 percent.  You're exaggerating a little bit

18  now?

19  A.  Not at all.

20  Q.  Just changing it up a little bit?

21  A.  No.

22  Q.  So when you said 75 percent to the government and

23  90 percent now, that's --

24  A.  I would have to see where I said 75 percent.

25  Q.  Okay.  Now you also -- one second.

D1t1cib3                         Salamon - cross

1          I believe it was when you talked about the -- your

2     screen shots on your phone, you spoke about the Department of

3     Labor.  Do you recall seeing that?

4          You had a telephone number in there for the Department

5     of Labor.  Do you recall seeing that in evidence?

6     A.   Yes.

7     Q.   And you said on direct, asked you what number was that for,

8     and you said the number in Philadelphia.  Do you recall saying

9     that?

10    A.   Yes.

11    Q.   The number in Pennsylvania.  Do you recall saying that?

12    A.   Yes.

13    Q.   And you said it from memory, you testified that was the

14    number for Pennsylvania; correct?

15    A.   I remember, I know of the number for the Department of

16    Labor.

17    Q.   Well, you said -- when they asked you, you said -- I

18    believe your question was, what's the office, you said that's

19    the Philadelphia office, you said that's the Pennsylvania

20    office.

21    A.   Yes, as far as I can remember.

22    Q.   As far as you can remember.

23    A.   As far as I can remember, that was the phone number.

24    Q.   That's a 404 area code; correct?

25    A.   Yes.

D1t1cib3                         Salamon – cross

1    Q.  And that 404 area code you're saying goes to the

2    Pennsylvania office.

3    A.  I'm not sure.

4    Q.  You're not sure now.

5    A.  No.

6    Q.  On direct you were sure it was Pennsylvania, now you're not

7    sure?

8    A.  I was not sure on direct either.

9    Q.  Would it be fair to say you're guessing on that?

10   A.  I don't remember the phone number I called for the

11   Department of Labor.

12   Q.  So when they asked you where it came from and you said

13   Philadelphia, were you guessing?

14   A.  I wasn't guessing.  I could not remember.

15   Q.  Why did you say Philadelphia?

16   A.  That's what came to my mind.  That's what I remembered is

17   it was Philadelphia.

18   Q.  But you're not sure.

19   A.  I was not sure.

20   Q.  So then you were guessing.

21   A.  If you want to say that.

22   Q.  I don't want to say.  I'm asking.  You were not sure but

23   you gave the Pennsylvania answer.

24   A.  I remember at that time it was Philadelphia.

25   Q.  You remembered at that time the 404 number was for the

D1t1cib3                        Salamon - cross

1    Philadelphia office.

2    A.  That's what I remember, yes.

3    Q.  Now back in -- I believe you said on direct in 2006 at some

4    point Mr. Grynsztajn told you he was being investigated;

5    correct?

6    A.  Yes.

7    Q.  So then as early as 2006 you knew that someone in this law

8    firm was being investigated by law enforcement; correct?

9    A.  Yes.

10   Q.  You knew they were being investigated for some kind of

11   fraud; correct?

12   A.  Yes.

13   Q.  Because that's what you were doing, you were engaged in

14   fraud; correct?

15   A.  Yes.

16   Q.  And you were engaged in fraud with Mr. Grynsztajn; correct?

17   A.  Yes.

18   Q.  So when he told you he was being investigated back in 2006,

19   at that point you knew you were being investigated for -- at

20   least he was being investigated for fraud; correct?

21   A.  Yes.

22   Q.  And after having this knowledge of this investigation, you

23   continued to commit this fraud; correct?

24   A.  Yes.

25   Q.  So knowing that you were -- you or your co-conspirator were

D1t1cib3                         Salamon - cross

1    being investigated for this immigration fraud by the federal

2    government, you continued committing this fraud.

3    A.  I was not investigated.

4    Q.  Well, he showed you a card; correct?

5    A.  Yes.

6    Q.  And the card was from a federal government official;

7    correct?

8    A.  Yes.

9    Q.  And you were involved in fraud with Mr. Grynsztajn;

10   correct?

11   A.  The same office.

12   Q.  Same office.  So at that point you knew that that office

13   was being investigated for fraud; correct?

14   A.  I knew that he was being investigated.

15   Q.  Did you stop committing the fraud at that point?

16   A.  No.

17   Q.  You kept going.

18   A.  Yes.

19   Q.  Now at some point you moved to 125 Maiden Lane; is that

20   right?

21   A.  Yes.

22   Q.  But before that you moved to 17 Battery Place; correct?

23   A.  Yes.

24   Q.  And when you moved to 17 Battery Place, you moved there

25   knowing that at this point the law firm or members of the law

D1t1cib3                        Salamon - cross

1    firm were being investigated for fraud; correct?

2    A.  Yes.

3    Q.  So then when you moved to 117 Battery Place, you moved

4    there knowing that the law firm that you were a part of was

5    being investigated for fraud.

6    A.  Yes.

7    Q.  You continued doing fraud.

8    A.  Yes.

9    Q.  Even though you knew you were being investigated.

10   A.  Yes.

11   Q.  At some point, after two years or so, you moved to

12   125 Maiden Lane?

13   A.  Yes.

14   Q.  And you moved there after the 17 Battery Place was closed

15   down?

16   A.  Yes.

17   Q.  And again you knew that fraud was still continuing;

18   correct?

19   A.  Yes.

20   Q.  And you knew you were being investigated for fraud;

21   correct?

22   A.  At that time I didn't know that they continued doing it.  I

23   knew that they were.  I thought maybe -- the government got

24   quiet, didn't hear anything, so I kept on going.

25   Q.  Oh, right.  So you thought the government just stopped

1    investigating; right?

2            I can't hear you.

3    A.  Yes.

4    Q.  So you -- when you left 17 Battery Place, it was your

5    belief in your brain that:  Well, they're not investigating

6    anymore so I can just keep going with the fraud.

7    A.  Yes.

8    Q.  When you left 110 Wall Street, you maintained contact with

9    some of the persons in the firm; correct?

10   A.  Hmm?

11   Q.  You left 110 Wall Street, the firm, you maintained contact

12   with some of the persons in that firm; correct?

13   A.  Yes.

14   Q.  And you did it through e-mails and telephone calls and

15   things of that sort; correct?

16   A.  Yes.

17   Q.  You didn't e-mail Ms. Cibik, did you?

18   A.  Excuse me?

19   Q.  Did you e-mail Ms. Cibik?

20   A.  Directly, no.  I can't remember e-mailing directly to her.

21   Q.  You talked about on your direct that you -- you have a

22   cooperation agreement.

23   A.  Yes.

24   Q.  And I believe you said that you're facing how many years?

25   A.  70 years.

D1t1cib3                              Salamon - cross

1    Q.  You pled guilty, or prior to or simultaneous with that

2    cooperation agreement; correct?

3    A.  Yes.

4    Q.  You're not incarcerated right now, are you?

5    A.  No.

6    Q.  You haven't been incarcerated since you signed that

7    cooperation agreement, have you?

8    A.  No.

9    Q.  So you pled guilty and you're facing 70 years, but you're

10   still out, right now?  You're out of jail right now?

11   A.  Yes.

12   Q.  And when you say you're facing 70 years, sounds like a lot.

13   That's a lot; right?

14   A.  Yes, it is.

15   Q.  But you're also facing zero; correct?

16   A.  No.

17   Q.  So what's your -- do you have a minimum?

18   A.  I don't have -- I don't have the sentencing years, how

19   many -- how many years I'm going to get.

20   Q.  Are you facing -- yeah, but did the government or anybody

21   tell you that you have a minimum that you're facing?

22   A.  Nobody told me any minimum.  They said it's up to the

23   judge.

24   Q.  Right.  So it's possible that you can get zero.

25   A.  I never heard zero, no, I never heard that word.

D1t1cib3                          Salamon – cross

1    Q.  Between 2001 when you started -- strike that.

2            You started working there in 2001; correct?

3    A.  Yes.

4    Q.  When I say "there," I mean the law firm, correct, at 110

5    Wall Street; is that right?

6    A.  Yes.

7    Q.  And you earned -- I believe you said a few minutes ago --

8    well, an hour ago -- you were earning a lot of money; right?

9    A.  Yes.

10   Q.  250,000 a year sound about right?

11   A.  Yes.

12   Q.  Maybe more?

13   A.  Possible.  Possible.

14   Q.  Maybe more?

15   A.  I don't remember.

16   Q.  But it's possible?

17   A.  I don't remember.

18   Q.  You don't remember how much you made?

19   A.  No.

20   Q.  And you said that you -- you bought a house; correct?

21   A.  I bought a house?

22   Q.  Did you buy a house with your time of working at the firm?

23   A.  No, no.

24   Q.  Do you own a house?

25   A.  I own a house, yes.

D1t1cib3                          Salamon - cross

1   Q.  Do you have a car?

2   A.  Yes.

3   Q.  What kind of car do you have?

4   A.  I drive a Hyundai, a Hyundai.

5   Q.  No, not now.  What kind of car did you drive back then?

6   A.  Oh, an Audi.

7   Q.  Audi.

8   A.  Yes.

9   Q.  What year was that Audi?

10  A.  It was the current year, whatever year it was.

11  Q.  Big Audi or little Audi?

12  A.  It was the normal-sized Audi.

13  Q.  A8?

14  A.  Yes.

15  Q.  That's a big Audi.  Yes.  Yes?

16  A.  Bigger one is the L, so --

17  Q.  But you were driving the A8, though; correct?

18  A.  Yes.

19  Q.  The A8 is about what, 95,000?

20  A.  I wouldn't know.  I didn't pay cash for it.

21  Q.  At 125 Maiden Lane, you paid David Schlachter, Esq., to use

22  his name; correct?

23  A.  Yes.

24  Q.  And you did that -- why did you do that?

25  A.  Because I always had attorneys, whether Wall Street,

1    whether Maiden Lane, just to have attorney on file, on record

2    to send in for immigration, also for the clients, show them

3    that I have a law firm.

4    Q.  I think you said you wanted to look more prestigious;

5    correct?

6    A.  Yes.

7    Q.  That was to get more clients in there?

8    A.  Possibly, yes.

9    Q.  You also wanted to avoid the headache that occurred at

10   17 Battery Place; correct?

11   A.  Yes.

12   Q.  This was your idea?

13   A.  I can't remember whose idea it was.

14   Q.  So would it be fair to say you identified a problem, being

15   that you had an office and you wanted to get a lawyer's name

16   over there; correct?

17   A.  Yes.

18   Q.  And you formulated a scheme to fix this problem; correct?

19   A.  No, it was not a scheme.  When I went, entered in

20   125 Maiden Lane, I had a -- I said I will use another law firm.

21   Q.  Was it a law firm?

22   A.  Excuse me?

23   Q.  Was it a law firm?

24   A.  Yes.

25   Q.  Who was the lawyer?

D1t1cib3                         Salamon – cross

1    A.   David Schlachter was the lawyer.

2    Q.   And you forged someone's name on that lease?

3    A.   Yes.

4    Q.   Whose name did you forge?

5    A.   Harold Tischler's.

6    Q.   And you did that to save money?

7    A.   Yes.

8    Q.   You also thought that Lipa owed you some money, correct, at

9    some point?

10   A.   That who?

11   Q.   Lipa.  Lipa, Leo.

12   A.   Yes, yes, he owed me money, after I got shut down from the

13   office, yes.

14   Q.   How much did he owe you?

15   A.   175 to 200.

16   Q.   175 what?

17   A.   Thousand.

18   Q.   To 200 what?

19   A.   Thousand.

20   Q.   You lent him 175,000 to $200,000?

21   A.   Yes.

22   Q.   Cash?

23   A.   Yes.

24   Q.   Was that at one time or over a period of time?

25   A.   Over a period of time I gave him money to put away.

D1t1cib3                          Salamon - cross

1    Q.   Over how much of a period of time did you give Lipa almost

2    $200,000 to put away, cash?

3    A.   Couple of years.

4    Q.   And that money that you gave him came from the fraud?

5    A.   Yes.

6    Q.   So the 200,000 that you gave Lipa to hold for you came from

7    the fraud.

8    A.   Yes.

9    Q.   And this was in addition to the money that you were making

10   as well.

11   A.   Yes.

12   Q.   And I believe you said on direct that when you asked for it

13   back, he didn't give it back to you.

14   A.   No.

15   Q.   So at that point in time you decided you would get that

16   money back.

17   A.   I wanted to get it back, yes.

18   Q.   And you devised a plan to get that money back; correct?

19   A.   Yes.

20   Q.   This was a plan of deception; correct?

21   A.   Yes.

22   Q.   So -- and this plan of deception was to make up fake

23   checks.

24   A.   Yes.

25   Q.   And then you would deposit these fake checks into his

D1t1cib3                        Salamon - cross

1    account and take the money out; correct?

2    A.   Yes.

3    Q.   Not only were you deceiving him, you were deceiving the

4    bank?

5    A.   I'm not deceiving him.  He was -- I sent someone to tell

6    him that I have a way how to take out the money, and he said,

7    "If you have a way, fine."

8    Q.   So you deceived the bank.

9    A.   Yes.

10   Q.   Did it work?

11   A.   It worked the first three checks, then the rest got froze.

12   Q.   So the first two checks were for how much, 15, 20,000?

13   A.   Yes, 15,000.

14   Q.   So your deception was successful.

15   A.   Yes, some of it.

16   Q.   You were not only able to deceive the bank but you were --

17   you and Lipa were able to deceive the Department of Labor;

18   correct?

19   A.   Yes.

20   Q.   And you did this by -- strike that.

21          Well, how did you do it?  How did you deceive the

22   Department of Labor?

23   A.   How?  By sending in sponsors that weren't really looking

24   for workers.

25   Q.   But you also did something with some kind of dates;

D1t1cib3                         Salamon - cross

1    correct?

2    A.   Not me.  Not me personally.  The US officials from the

3    Department of Labor and Lipa and some other people.

4    Q.   Did that plan work?

5    A.   It worked for a while.

6    Q.   So you and Lipa and someone from the Department of Labor

7    were able to deceive the Department of Labor?

8    A.   Yes.

9    Q.   Would it be fair to say that you began -- let's say you

10   began doing immigration work around 2000?

11   A.   2000?

12   Q.   Yes.

13   A.   No.

14   Q.   2001?

15   A.   What do you mean?  Can you clarify.  What do you mean

16   immigration work?

17   Q.   When you began doing immigration paperwork, filling out

18   paperwork, sending information in, talking to clients about

19   immigration.

20   A.   I never filled out paperwork.  That was not my job.

21   Q.   You didn't fill out paperwork?

22   A.   No.

23   Q.   When did you get involved in the immigration process?

24   A.   I would say January of 2001.

25   Q.   When did you stop doing -- or you removed yourself from the

D1t1cib3                         Salamon - cross

```
 1   immigration work?
 2   A.   2009, January.
 3   Q.   From 2001 to 2009, would it be fair to say you became
 4   proficient in immigration paperwork or immigration processes?
 5   A.   I knew how the process worked, yes.
 6   Q.   Would it also be fair to say between 2001 and 2009 you had
 7   well over a thousand clients or applicants you had to deal
 8   with?
 9   A.   Yes.
10   Q.   And during this time period between 2001 and 2009 it would
11   also be fair to say that you engaged in deception with a
12   significant amount of those clients?
13   A.   What do you mean by deception?
14   Q.   Well, did you deceive -- well, strike that.
15          Did you engage in deception between 2009 -- 2001 and
16   2009 as part of your immigration process that you talked about?
17   A.   Did I deceive whom?
18   Q.   Did you deceive the Department of Labor?
19   A.   Yes.
20   Q.   Did you deceive sponsors?
21   A.   No.
22   Q.   You didn't lie to the sponsors?
23   A.   Lie to sponsors when?
24   Q.   Did you lie to any sponsors about whether or not you were
25   signing their name, whether or not you were taking out
```

1    additional workers for them or anything of the sort?

2    A.  I did not tell them that I'm signing their names, no.

3    Q.  Is that considered a lie?

4    A.  Yes.

5    Q.  Okay.  So did you deceive these sponsors, sir?

6    A.  Yes.

7    Q.  Okay.  So let's put that question again.  So between 2001

8    and 2009, would it be fair to say that you deceived several

9    sponsors?

10   A.  Yes.

11   Q.  Would it also be fair to say between 2001 and 2009 that you

12   deceived Department of Labor several times?

13   A.  Yes.

14   Q.  Would it be fair to say that because of that eight or nine

15   years of deception, you're pretty proficient at this point in

16   deception?

17   A.  With regard to immigration and labor, yes.

18   Q.  So with regard to immigration and labor, you're good at

19   deception, but everything else you're not.

20   A.  (Gesturing.)

21   Q.  I don't know what that means.

22   A.  I don't know what you're saying.  What are you asking me?

23   Q.  Would you have, between 2001 and 2009, practiced deceiving

24   or deception practically on a daily basis?  Would that be fair

25   to say?

D1t1cib3                    Salamon - cross

1   A.  Yes.

2   Q.  So, I don't know, roughly 2700 times you acted in a

3   deceiving manner; correct?

4   A.  I didn't count how many times.

5   Q.  You also -- you filled in United Immigration -- United

6   Immigration's bank account, is that your account?

7   A.  Yes.

8   Q.  What bank account is that from?

9   A.  Excuse me?

10  Q.  What bank is that from?

11  A.  Chase.

12  Q.  Did you open that account using accurate information?

13  A.  I can't remember.

14  Q.  Do you remember any information you used to open that

15  account, sir?

16  A.  No.

17  Q.  Now Lipa, Leo Teitelbaum -- Lipa, as you call him -- he was

18  your partner for several years; correct?

19  A.  Yes.

20  Q.  He shared an office with you downstairs on the 16th

21  floor?

22  A.  Yes.

23  Q.  Just you and him and two desks; correct?

24  A.  Me and him, it was Martha, there was David Grynsztajn,

25  several people.

D1t1cib3                        Salamon - cross

1   Q.  And this partner, Mr. Teitelbaum, Lipa, I believe you

2   already said you stole from him; correct?

3   A.  I stole from him?

4   Q.  Yeah.  You took money from his account.  That's stealing.

5   A.  Oh, yes.  It was my money, so I don't know if you want to

6   consider it stealing.

7   Q.  So you're justifying that because the money in an amount

8   was yours, you had the right to take it back?

9   A.  No, I had no right.  It's fraud.  I had no right to do

10  that.  It was my money, I'm just saying.

11  Q.  Your money.

12  A.  It was my money.

13  Q.  The money that you took -- that you got from the fraud.

14  A.  Yes.  It was my money that he held, and I did a fraud and

15  made checks to get that money, and that was fraud what I did.

16  Q.  The money that you say was yours was money that you got

17  from fraud, though; correct?

18  A.  From immigration, yes.

19  Q.  And you wanted that money back.

20  A.  Yes.

21  Q.  Because you earned it.

22  A.  Because I -- yes.

23  Q.  Now would it be fair to say -- I believe you testified

24  about Nathan Schwartz.  You lied to Nathan Schwartz as well;

25  correct?

D1t1cib3                          Salamon - cross

1    A.  Lied about what?

2    Q.  I'm sure he'll get into that, but a whole lot of things.

3    A.  I don't remember lies.

4    Q.  You never lied to Nathan Schwartz?

5    A.  I can't remember lying to him.

6    Q.  Forged Harry Tischler's name?

7    A.  Excuse me?

8    Q.  You forged Harry Tischler's name?

9    A.  Yes.

10   Q.  Did you lie to Harry Tischler as well?

11   A.  I did not tell him that I forged his name, but I forged his

12   name on the lease, yes.

13   Q.  I believe on direct you -- or you were talking on Friday

14   when you were talking to the government -- they put the e-mails

15   up regarding David Grynsztajn.  You remember David Grynsztajn;

16   correct?

17   A.  Yes.

18   Q.  You've lied to him as well; correct?

19   A.  Lied to him about what?

20   Q.  Well, during the e-mail conversation you said that you were

21   doing certain things that you didn't do then, you said that you

22   lied, so do you recall saying that?

23   A.  I have no idea what you're talking about.

24   Q.  Okay.  Now the money that you -- this $200,000 you're

25   talking about, I believe you said on direct that you hid that

D1t1cib3                          Salamon - cross

1   from your wife; is that correct?

2   A.  I did not -- when I was getting divorced, I was seeing

3   money missing, so I took it away.  I wasn't hiding anything.  I

4   gave her full settlement, whatever I had to give her.

5   Q.  The $225,000 you gave to Lipa, or that you said you gave to

6   Lipa, this was before 2007; correct?

7   A.  Yes.

8   Q.  That $225,000, you hid from your wife, you're saying

9   because of the divorce; correct?

10  A.  Because I was getting divorced, I opened up the safe and I

11  saw money missing, so that's why I said I cannot keep it home.

12  Q.  So you took it from the house and put it somewhere else?

13  A.  And gave it to Lipa, yes.

14  Q.  So your wife wouldn't get it?

15  A.  Yes.

16  Q.  You hid the money from your wife?

17  A.  If you want to call it hiding.  She knew I took it out.

18  Q.  I believe you said on direct that you -- you had a Facebook

19  page.  Do you recall saying that?

20  A.  Yes.

21  Q.  And I believe you said you put untrue information on the

22  Facebook page?

23  A.  What untrue information?

24  Q.  Untrue being false information, not correct information.

25  Do you recall saying that?

D1t1cib3                        Salamon - cross

1   A.  I -- yes.

2   Q.  You also I believe you said misled girls to make them

3   believe you were a lawyer; is that right?

4   A.  Who?

5   Q.  Girls, to make them believe you were a lawyer; yes?

6   A.  Yes.

7   Q.  And the purpose of doing that was so that you can -- what

8   was the purpose of doing that again?

9   A.  Excuse me?

10  Q.  Why?

11  A.  To impress her.

12  Q.  So you lied to girls to impress them?

13  A.  Yes.

14  Q.  To get dates, to -- whatever?

15  A.  Yes.

16  Q.  Okay.  Did you get any girls?  Did you meet any girls as a

17  result of that lie, of those lies?

18  A.  I can't remember.

19  Q.  You also -- I believe you said you put up a website in

20  regard to being a lawyer and was asked to take that down?

21  A.  Yes.

22  Q.  But when you put it up, you held yourself out as a lawyer.

23  A.  I presented myself as a lawyer, yes.

24  Q.  Excuse me?

25  A.  I presented myself -- the wording over there, I don't

D1t1cib3                          Salamon - cross

1    remember exactly, but it sounded like I'm -- I presented myself

2    as an attorney.

3    Q.  It sounded like you presented yourself as an attorney.

4    A.  Yes.

5    Q.  You lied.

6    A.  Yes.

7    Q.  And your purpose of that lie was to mislead people and get

8    more clients?

9    A.  Not necessarily, because I had lawyers.  I don't know why I

10   did it at that time.  I can't remember.  It was in 2002, so I

11   can't remember why I did it.

12   Q.  So in this situation you're saying you lied and you have no

13   reason why you lied.

14   A.  I can't remember why.  I know it was -- I put it up, and I

15   was told to take it down and I took it off.

16          MR. DONALDSON:  Your Honor, if I can, can I --

17   government -- can you put up Government Exhibit 700, please.

18          Could you go to page 94.

19   Q.  Do you see page 94 on the screen?

20   A.  Yes.

21   Q.  Do you see where it says Y.M. Pollack on the top?

22   A.  Yes.

23   Q.  Do you see where it says Y.M. Pollack on the bottom?

24   A.  Yes.

25   Q.  Would you agree that that Pollack, both Pollacks are in

D1t1cib3                          Salamon – cross

1    different handwriting?

2    A.  What?

3    Q.  Would you agree that those Pollacks are in different

4    handwriting?

5    A.  It's possible.

6            MR. DONALDSON:  Go to page 95.

7    Q.  Would you agree that the top Y.M. Pollack is different than

8    the Pollack on the previous page, 94?

9            MR. DONALDSON:  Can you put both up.

10   Q.  The Pollack on the bottom right-hand corner where it looks

11   like it's in cursive, and then the Pollack on the top where the

12   Pollack is P-O capital L, capital L, A-C-K, would you agree

13   that that's different handwriting?

14   A.  Looks different a little bit, yes.

15           MR. DONALDSON:  I want to go to page 99, please.

16   Q.  Look at the Pollack on the bottom of that one.  Would you

17   agree that that Pollack is different than the other three

18   Pollacks we just saw?

19   A.  Possible.

20           MR. DONALDSON:  We can take that down.

21   Q.  Now you mentioned something about extraordinary ability.

22   Do you recall saying that?

23   A.  Yes.

24   Q.  And I believe you -- you have never done those; right?

25   A.  No.

D1t1cib3                            Salamon – cross

1   Q.  Have you ever actually seen an extraordinary ability

2   application?

3   A.  Yes.

4   Q.  Where?

5   A.  On immigration files, the forms.

6   Q.  Who did those files?

7   A.  Earl used to show me the forms, what -- when I questioned

8   him about it, he said, "You have to fill these out and you have

9   to do this in order to do that."

10  Q.  Earl told you that; correct?

11  A.  Yes.

12  Q.  You never saw Ms. Cibik fill out any extraordinary

13  application forms, did you?

14  A.  I didn't see it, no.

15  Q.  And when you asked Earl about it, he told you what needed

16  to be done to do that; correct?

17  A.  Excuse me?

18  Q.  When you asked Earl about these applications, he told you

19  what needed to be done to do that; correct?

20  A.  If I wanted to do that.  Because he told me that a certain

21  person is doing it, Gulay's doing it, so I asked him, "Maybe I

22  should do it," he said, "This is what you need to do."

23  Q.  He said that Gulay Cibik is doing it.

24  A.  Yes.

25  Q.  And when did this happen?

D1t1cib3                        Salamon - cross

1    A.  I would say sometime in 2000 -- sometime in 2005, end of

2    2005, 2006.  I'm not sure exactly.

3    Q.  End of 2005, 2006, he was saying --

4    A.  Beginning of 2006, end of 2005.  Probably sometime in 2005,

5    I would say.

6    Q.  And you're saying that you were looking at some

7    extraordinary ability files; is that what you just said?

8    A.  Excuse me?

9    Q.  You said you were looking at extraordinary ability files?

10   A.  I was not looking at files.

11   Q.  Tell me --

12   A.  I was looking at forms, because Earl said that, "Gulay

13   Cibik is doing it, maybe you should do it as well," and we were

14   discussing it.

15   Q.  Did you say you were looking at files as well?  Did you say

16   files?

17   A.  Forms.

18   Q.  So you had not seen an actual extraordinary ability file

19   from that office?

20   A.  I can't remember directly.

21   Q.  And he had this conversation with you over the phone?

22   A.  Yes.

23   Q.  No e-mail?

24   A.  No.  We discussed a lot -- everything on the phone, so --

25   Q.  So there's no e-mail correspondence between you and Earl

D1t1cib3                      Salamon – cross

1  David talking about Ms. Cibik and an extraordinary ability

2  form.

3  A.  I don't think so.

4  Q.  Now would it be fair to say you spoke to Earl David at

5  least twice a week after you left 110 Wall Street?

6  A.  Yes.

7  Q.  Did Earl David -- you had this -- strike that.

8          How many conversations did you have with Earl David

9  about Ms. Cibik and this extraordinary ability form?

10  A.  Couple times.

11  Q.  Couple times.

12  A.  Yes.

13  Q.  And you say that couple times happened sometime between --

14  A.  I can't remember exactly what it -- I think it was sometime

15  in 2005.  I don't remember exact the time, the date, or the

16  year, exactly what month.

17  Q.  And this was during the time period when you were having

18  two, three phone calls per week with Earl David.

19  A.  We used to talk more than that.

20  Q.  About the firm and about the business and about --

21  A.  Yeah.

22  Q.  -- everything?

23  A.  Couple times a day.

24  Q.  And you remember a conversation with Earl David about Cibik

25  doing forms.

D1t1cib3                        Salamon - cross

1    A.  Yes.

2    Q.  And there was no other conversation about what forms, what

3    files were done?

4    A.  Not names of files, no.

5    Q.  You said earlier that Mr. Grynsztajn shared an office with

6    you downstairs on the 16th floor; correct?

7    A.  Yes.

8    Q.  And after you all left 110 Wall Street, did he go with you

9    to 17 Battery?

10   A.  No.

11   Q.  He being Mr. Grynsztajn, he did not go with you?

12   A.  No.

13   Q.  And you got to 17 Battery I believe around June of 2006?

14   A.  Correct.

15   Q.  And you left 17 Battery in 2008; correct?

16   A.  Yes.

17   Q.  Now while at 17 Battery, Aleksandra Urbanek was there;

18   correct?

19   A.  Yes.

20   Q.  And while at 17 Battery Place, Aleksandra Urbanek ran the

21   show for Grynsztajn; correct?

22   A.  Yes.

23   Q.  And in fact, for Mr. Grynsztajn, Aleksandra Urbanek was

24   filing paperwork, taking money from clients, filing PERMs, and

25   following up on old clients; correct?

D1t1cib3                          Salamon - cross

1    A.  I don't know what exactly she did, but I know she was

2    following up with clients.

3             MR. DONALDSON:  Can I have one second, please, your

4    Honor.

5             (Pause)

6             MR. DONALDSON:  May I approach the witness, please.

7             THE COURT:  Yes.

8    Q.  I just want to show you what's called 3502-11, page 3 --

9    that was given to me by law -- to refresh your recollection.

10            Please review these to refresh your recollection as to

11   what Aleksandra Urbanek was doing at 17 Battery Place.

12   A.  (Witness reviews exhibit.)  Yes.

13   Q.  Does it refresh your recollection as to what --

14   A.  Yes.

15   Q.  So would it be fair to say that Ms. -- while at 17 Battery

16   Place, for Mr. Grynsztajn, Ms. Urbanek was filing paperwork,

17   taking money from clients, filing PERMs, and following up with

18   old clients?

19   A.  Yes.

20   Q.  Earlier this afternoon I asked you about the -- whether or

21   not you told the government that instead of being 90 percent

22   fraud, it was 75 percent fraud.  Do you recall me asking you

23   that question?

24   A.  Yes.

25   Q.  I was mistaken.

D1t1cib3                     Salamon - cross

1        MR. DONALDSON:  I apologize, your Honor.

2   Q.  Isn't it true that you informed them that it was 70 percent

3   fraud, not 75 percent?

4   A.  Possible that I said that, yes.

5        MR. DONALDSON:  Let me approach the witness with

6   3205-3.

7   Q.  Are you saying it's possible that you said it?

8   A.  Yes.

9   Q.  Do you know if you said it or not?

10  A.  It's possible I said it.

11  Q.  It's possible that you told the government that it's

12  70 percent.

13  A.  70, yes.

14  Q.  So then when you were testifying today and Friday about

15  this 90 percent, 10 percent, would it be fair to say you were

16  exaggerating a little bit?

17  A.  Not exaggerating.  I was thinking over after when I spoke

18  to the government, during when I was speaking to the government

19  that everything I'm saying, I want to be more accurate, so

20  thinking, I would say 90 percent was fraud.

21  Q.  So when you were talking to the government and then after

22  having talked with the government, you then said to yourself,

23  you know, let me think about it some more, it's not 70 percent,

24  it's 90 percent.

25  A.  Yes.

D1t1cib3                          Salamon - cross

1   Q.  And the first time you're saying that would be in court;

2   correct?

3   A.  Excuse me?

4   Q.  Strike that.

5          When you told them it was 70 percent, you told them

6   that back on October 13th, 2009; correct?

7   A.  I have to see the paper if it was that date, October 13,

8   2009.  I don't remember.  I don't remember the date.

9   Q.  You don't remember the date?

10  A.  No.

11          MR. DONALDSON:  I want to show the witness 3502

12  subsection 3, first page.

13  Q.  I'm showing you what's marked as 35 -- it's not marked --

14  3502-3 to refresh your recollection as to the date of your

15  interview.  Please, if you don't mind, pay attention to the

16  blue brackets.  Does that refresh your recollection as to the

17  date?

18  A.  Yes.

19  Q.  I want to show you the blue brackets on the second page.

20  Does that refresh your recollection as to what you said on that

21  date?

22  A.  Yes.

23  Q.  Okay.  So I ask, 3502 subsection 3, first page and second

24  page, does that refresh your recollection as to when you said

25  the amount of fraud and the date that you said that?

D1t1cib3                    Salamon – cross

1  A.  Yes.

2  Q.  So after reviewing that, what date was it?

3  A.  October 2009.

4  Q.  And what did you say was the amount of fraud?

5  A.  70 percent.

6  Q.  Okay.  So now you're saying that that was closer in time to

7  the actual fraud; correct?

8  A.  Yes.

9  Q.  So would it be fair to say that since it was closer in

10  time, your memory would be better than worse; correct?

11  A.  Possible.

12  Q.  So then back when it was closer in time, you told the

13  government that it was 70 percent, and today, four years later,

14  you're saying you thought about it, you wanted to be more

15  accurate, you added 20 percent.

16  A.  I didn't add.  I just rethought of it and concluded it must

17  have been 90 percent fraud.

18  Q.  So your recollection is better now over time than it was

19  closer to the event.

20  A.  I don't know recollection.  I'm saying I just rethought of

21  it and I would say 90 percent.

22          (Continued on next page)

23

24

25

D1TLCIB4                         Salamon - cross

1    BY MR. DONALDSON:

2    Q.  I guess my -- repeat my question.

3    A.  My percentage is not accurate.  It could be 85 percent, 75.

4    Q.  It could be 60 percent?

5    A.  No.  Most of the filing was fraud.

6    Q.  My question is, sir, is your recollection today now better

7    than it was in 2009, close to the event, yes or no?

8    A.  Certain things yes, certain things no.

9    Q.  Which certain things are no?

10   A.  You ask me something.  My recollection is 90 percent was

11   fraud.

12            MR. DONALDSON:  Can you put up 601-1, please.

13   Q.  You testified regarding that on direct; do you recall that?

14   A.  Yeah.

15   Q.  This email was from Earl David?

16   A.  Yes.

17   Q.  And there was another email attached to it from I believe

18   Mr. Grynsztajn; is that right?

19   A.  Yes.

20   Q.  And this was in March of 2006?

21   A.  Yes.

22   Q.  So would it be fair to say that Mr. Grynsztajn is asking

23   you about clients in March of 2006?

24   A.  David Grynsztajn is sending to Earl David.

25   Q.  Is it fair to say that Mr. Grynsztajn asked Mr. David about

D1TLCIB4                        Salamon - cross

1   clients in March 2006 and that email got forwarded to you;
2   would that be fair to say?
3   A.  Yes.
4   Q.  Did you respond to Mr. Grynsztajn about that email?
5   A.  Grynsztajn never sent me the email.
6   Q.  Did you respond to Earl about the email?
7   A.  I don't know, possible.  I don't remember.
8   Q.  Did you help Mr. Grynsztajn out about this client?
9   A.  I can't remember.
10  Q.  Would it be fair to say then in the spring, March of 2006,
11  Mr. Grynsztajn was still working or assisting or helping out
12  with clients in March 2006?
13  A.  It's possible, yes.
14  Q.  You talked about 80-82 Wall Street; do you recall
15  testifying about that a little bit this morning or Friday?
16  A.  Yeah.
17  Q.  Where is that located?
18  A.  On Wall Street.
19  Q.  Have you ever been there?
20  A.  Maybe once at night.
21  Q.  What did you see when you were there?
22  A.  I didn't see anyone.
23  Q.  When did you go?
24  A.  Again, it's very hard to remember year, but I would say
25  probably in -- after I moved out from Wall Street.

1    Q.  You moved out of Wall Street June 2006.  When did you go to

2    80-82?

3    A.  I would say 2006, 2007.

4    Q.  Did you see Ms. Cibik at 80-82 Wall Street?

5    A.  No.

6    Q.  Did you receive any documentation that she was at 80-82

7    Wall Street?

8    A.  No.

9    Q.  Did you look at any client files or anything that suggested

10   she was at 80-82 Wall Street?

11   A.  No.

12   Q.  Did you receive any email communications saying that she

13   was at 80-82 Wall Street?

14   A.  No.

15   Q.  Did she call you and tell you she was at 80-82 Wall Street?

16   A.  No.

17   Q.  Did you call her and ask her if she was at 80-82 Wall

18   Street?

19   A.  No.

20   Q.  So when you said on direct that she went to 80-82 Wall

21   Street, your basis for that was what somebody told you?

22   A.  Earl David told me.

23   Q.  Earl David told you she was at 80-82 Wall Street, is that

24   what you're saying?

25   A.  Yes.

D1TLCIB4                         Salamon - cross

1    Q.  When did he tell you that?

2    A.  When I was talking to him on the phone.

3    Q.  When was that?

4    A.  After I left Wall Street.

5    Q.  So sometime between June 2006 and 2009 you spoke to him on

6    the phone?

7    A.  Excuse me?

8    Q.  Sometime between June 2006, when you left Wall Street, and

9    January 2009, when you got arrested, that's when you spoke to

10   Earl David?

11   A.  Yes.

12           MS. ECHENBERG:  Objection.

13           MR. DONALDSON:  I'll modify the question.

14   Q.  Where after June 2006 did you speak to Earl David and he

15   told you that she was at 80-82 Wall Street?

16   A.  When I left, when I left Wall Street.

17   Q.  When you left 110 Wall Street?

18   A.  Yeah.

19   Q.  That would be June 2006, correct?

20   A.  Yes.

21   Q.  So when after that?

22   A.  Month later or month before even.

23   Q.  Month before?

24   A.  Yeah.  He would tell me who's going to 82 Wall Street and

25   who's coming with me.

D1TLCIB4                        Salamon - cross

1   Q.  He would tell you who's going to 82 Wall Street, who's

2   coming with him or him as in you?

3   A.  Me.

4   Q.  So he told you who to take to -- he told you who to take to

5   82 Wall Street?

6   A.  We were discussing who's going to come with me.

7   Alexksandra is going to come with me and Sharoni.  I said where

8   is everybody else going to go?  Gulay and everybody else is

9   going to go to 80-82 Wall Street.

10  Q.  So now you're saying that prior to you leaving there was a

11  discussion that she might be going to 82 Wall Street?

12  A.  Not saying might.  That's what he told me.

13  Q.  That she would be going?

14  A.  Yes.

15  Q.  But you never had a conversation that she was there and you

16  never saw her there?

17  A.  No.

18  Q.  Okay.  So when you testified earlier today or yesterday

19  that you spoke to Earl David and he said she was there, you

20  really meant that you had discussion beforehand that she might

21  be going there?

22  A.  Again, I might have had more than one discussion.  But Earl

23  David said to me, before he left, that's what I wanted to say,

24  and also, he said to me where is everybody else.  He said Gulay

25  is there and who's there and who's by my office.  That's it.

D1TLCIB4                        Salamon - cross

1    Q.  Mr. Salamon, it's very important to -- are you assuming

2    that she went there or are you --

3    A.  Earl David told me.  I don't know if he told me he might go

4    there or she's there.  I don't remember the exact word.

5    Q.  The exact wording earlier in your direct was that he told

6    you she was there; do you recall saying that?

7    A.  Yes.

8    Q.  So now you're saying you don't recall exactly what he told

9    you, he may have told you she might be going there?

10   A.  He might have told me twice before leaving and after I left

11   Wall Street.

12   Q.  So then when you made that definitive statement that Earl

13   David told you she was go -- she was at Wall Street, you were

14   guessing?

15   A.  Not guessing.  He told me that she's going there.

16   Q.  If you were to give us a total grand total between 2001 and

17   2009 how much money you made from this fraud, what would it be?

18   A.  I didn't count it.  I don't know.

19   Q.  You can't, you don't?

20   A.  I don't know.  I don't keep -- a lot of money came in and I

21   distributed half of it to Lipa Teitelbaum, 30 percent to my

22   secretary, 10 percent to this one.  So by the time I got left,

23   I can't count.  80 percent went away to people.

24   Q.  You remember all the percentages that went to people,

25   20 percent here, 20 percent there, 10 percent --

D1TLCIB4                          Salamon - cross

1   A.  I can't remember exactly.

2   Q.  You remember the percentages, correct?  You just said it.

3   A.  My people that I distributed money I would know.

4   Q.  Okay.  So how much?

5   A.  Martha got like 30 percent and Lipa got 50 percent and the

6   rest I did.

7   Q.  Did you just say Martha got 30 percent and Lipa got

8   50 percent?

9   A.  From certain clients, yes.

10  Q.  So you're saying you took 20 percent?

11  A.  I'm saying from certain clients Martha got from my client

12  30 percent, she got half, and certain clients Martha did not

13  get the 30 percent and Lipa got 50 percent of certain clients.

14  Q.  So are you suggesting, sir, that you have no idea of how

15  much money you made between 2001 and 2009, no idea?

16  A.  I can't recall.  I don't want to lie under oath so I don't

17  know how much money.

18  Q.  I don't want you to lie under oath.  You did say you made

19  minimum 250 a year though, correct?

20  A.  I would say that, yes.

21  Q.  250 a year times eight years is at least $2 million?

22  A.  Yes.

23  Q.  Minimum?

24  A.  I would say yes.

25  Q.  That was cash?

D1TLCIB4                          Salamon - cross

1    A.  What do you mean by cash?

2    Q.  You made about 2 million cash?

3    A.  No, there were checks.  A lot of them were checks from

4    clients.

5    Q.  So there probably is a record or account of about 2 million

6    in checks to you?

7    A.  The checks were not made out to me.

8    Q.  Had you ever been to -- do you know where Ms. Cibik lived

9    while she was there?

10   A.  Yes.  I don't know exactly the apartment.  But -- I don't

11   know exactly the street, but I once took her home, yes, in my

12   car.

13   Q.  To an apartment?

14   A.  To her apartment where she lives, yes.  Not inside her

15   apartment, in front of her building.

16   Q.  And you said you took her home, right?

17   A.  Yes.

18   Q.  But she didn't have a car, did she?

19   A.  No as far as I know.  I took her home.

20   Q.  So you had A8 Audi.  Lipa had a red BMW.  Correct?

21   A.  I doesn't think it was red.

22   Q.  What color was it?

23   A.  I think it was white, last one.

24   Q.  My fault.  And Grynsztajn had a house in Staten Island.

25   Earl David, he made a lot of money too, right?

D1TLCIB4                           Salamon - cross

1   A.  Yeah.

2   Q.  And Ms. Cibik had an apartment and no car?

3   A.  She lived in the city.

4   Q.  When you were -- when the agents first contacted you was in

5   January of 2009, right?

6   A.  Yes.

7   Q.  And they came to your house?

8   A.  Yes.

9   Q.  Do you recall if that was the day that you gave handwriting

10  exemplar -- do you know what handwriting exemplar is?

11  A.  Yes.

12  Q.  Did you do one?

13  A.  As far as I remember, yes.

14  Q.  And that's where you write down something on a piece of

15  paper so they can determine what your handwriting is?

16  A.  Yes.

17  Q.  And these agents did that to you, correct?

18  A.  Yes.

19  Q.  Twice, right?

20  A.  I don't remember twice.  I remember once for sure.

21  Q.  You also mentioned on direct Ms. Cibik -- strike that --

22  somebody picking up or collecting money in the office.

23          Do you recall testifying about that?

24  A.  Yes.

25  Q.  And you also said something about you would be in the

D1TLCIB4                    Salamon - cross

 1  bathroom counting money so other people couldn't see it; do you
 2  recall saying that?
 3  A.  Clients and other people, yes.
 4  Q.  Do you recall saying that?
 5  A.  Yes.
 6  Q.  This would be cash money, correct?
 7  A.  Yes.
 8  Q.  I would presume you would be in the men's bathroom,
 9  correct?
10  A.  Excuse me?
11  Q.  I would presume you'd be in the men's bathroom?
12  A.  Yes.
13  Q.  Ms. Cibik didn't go in the bathroom with you to count this
14  money, correct?
15  A.  No.
16  Q.  You never saw Ms. Cibik give anybody any money for any
17  pickup, did you?
18  A.  Excuse me?
19  Q.  You never saw that woman, Ms. Cibik, give anybody any money
20  for any pickups; isn't that correct?
21  A.  What's pickups?
22  Q.  Well, you mentioned these -- Mr. Brodjik was collecting
23  money, correct?
24  A.  Yes.
25  Q.  You never saw him collect money from Ms. Cibik, correct?

D1TLCIB4                          Salamon - cross

1   A.  No.

2   Q.  You never saw her open up a case either, correct?

3   A.  Yes, I seen her upstairs.

4           Excuse me?

5   Q.  Did you see her opening up any cases, Mr. Salamon?

6   A.  I didn't see her actually writing up a case.

7   Q.  Yes or no?

8   A.  No.

9   Q.  Did you see my client, Ms. Gulay Cibik, opening up any

10  cases, yes or no?

11  A.  No.

12  Q.  But you told these jurors that my client opened up cases,

13  right?

14  A.  Yes.

15  Q.  But you never saw that, did you?

16  A.  I seen her file --

17  Q.  Did you see her open any cases?

18  A.  No.

19          MR. DONALDSON:  I thank you for your time.

20          MR. BRILL:  Ready, your Honor?

21          THE COURT:  I'm ready.

22  CROSS-EXAMINATION

23  BY MR. BRILL:

24  Q.  Good afternoon, Mr. Salamon.

25  A.  Good afternoon.

D1TLCIB4                        Salamon - cross

1    Q.  My name is Peter Brill.  I represent your friend,

2    Mr. Schwartz.  He was your friend, right?

3    A.  Yeah, he was.

4    Q.  And good friend, right?

5    A.  For a certain period of time.  Depends.  On and off.

6    Q.  You've known him for well over 30 years, right?

7    A.  On and off.

8    Q.  You'd say he was your best friend for a good portion of

9    that time, wasn't he?

10   A.  Good friend.

11   Q.  Good friend.  When did that stop, when he found out you

12   were testifying against him?

13   A.  When did it stop initially?

14   Q.  No.  Most recently.

15   A.  Recently, when he broke something -- he came something with

16   my pool and I don't know what happened, something altercation

17   about the pool.

18   Q.  So the 30-year friendship that you had with him ended

19   because of a problem with this pool?

20   A.  No, we had many -- it was a love and hate relationship.

21   Many times in 30 years that probably every six months we had a

22   fight, even before the whole thing with immigration.

23   Q.  You said you speak some Yiddish, right?

24   A.  Yes.

25   Q.  What is the word shaifeleh?

1    A.  Shaifeleh?

2    Q.  Yeah.

3    A.  In a nice way, in a friendly way.

4    Q.  What does it mean?

5    A.  Shaifeleh, I don't know.  When we like each other, when one

6    friend likes each other, we say shaifeleh.

7    Q.  And you called Mr. Schwartz shaifeleh, right?

8    A.  It's possible.

9    Q.  You saw the text message that you turned over to the

10   government, right?

11   A.  Yes.

12   Q.  And you know you called him shaifeleh a lot in those text

13   messages, right?

14   A.  It's possible.

15   Q.  You even shortened that on occasion, you called him shify,

16   right?

17   A.  Shify, no.  Shify has nothing to do with it.  Maybe I was

18   talking to him about a girl shify.

19   Q.  You were talking to him about a girl, you weren't calling

20   him shify?

21   A.  No, I call him shaify.  Shaify or shaifeleh.

22   Q.  I'm not going to get into the debate.

23        But it's true up until this point that you had your

24   pool incident that you had a very high opinion of him?

25   A.  Excuse me?

D1TLCIB4                        Salamon - cross

1    Q.  You had a very high opinion of him?

2    A.  High opinion?  We were friends.  I don't think we had a

3    high opinion of each other.

4    Q.  He's a loyal friend to you, right?

5    A.  Loyal?  No, I wouldn't say he was loyal.  I wouldn't see

6    it, no.

7    Q.  He had you to his house?

8    A.  Excuse me?

9    Q.  He had you in his home?

10   A.  So did I have him in my house.

11   Q.  How many times did he have you in his home?

12   A.  I can't count.

13   Q.  Because it was a lot?

14   A.  A lot, yes, it was a few times, yes.

15   Q.  A few or a lot?

16   A.  What's a few and what's a lot?

17   Q.  Less than five, more than five?

18   A.  More than five.

19   Q.  How about more than 50?

20   A.  Fifty.

21   Q.  Over 30 years?

22   A.  I don't know.  I didn't count.

23   Q.  How many meals did you have with him?

24   A.  I had a couple meals, yes.

25   Q.  How many holidays did you spend with him?

1    A.   A few holidays.

2    Q.   How many Shabbos dinners did you have with him?

3    A.   Yeah, I did.

4    Q.   In fact, there was a time when you didn't have a synagogue

5    that you could attend and he invited you to his to be a member,

6    right?

7    A.   Excuse me?

8    Q.   He invited you into his synagogue?

9    A.   He has a synagogue?

10   Q.   Not the one he owned, the one he attended.

11   A.   I didn't have a synagogue where to go -- I can't remember

12   that.  Sorry.

13   Q.   He encouraged his son-in-law to go into business with you,

14   right?

15   A.   There was a discussion, yes.

16   Q.   It's a business you're still involved in, right?

17   A.   Yes.

18   Q.   To this day you're still in business with his son-in-law?

19   A.   Yes.

20   Q.   And when you first found out that you were in trouble here,

21   he even lent you money so you could hire a lawyer?

22   A.   Excuse me?

23   Q.   When you found out that you were in trouble here, he even

24   lent you money so you could hire a lawyer?

25   A.   Wrong.

D1TLCIB4                          Salamon - cross

1    Q.  That didn't happen?

2    A.  I lent him.

3    Q.  You lent him?

4    A.  Not lent him.  I gave him.

5    Q.  Ah.  And even after he found out you were in trouble, he

6    still stuck by you, right?  He went to chemo with you?

7    A.  I had to beg him.  I had to cry to him.  But he came, yes.

8    Q.  He went?

9    A.  One time.

10   Q.  One time.  Took you to doctor's appointments?

11   A.  I remember he came with me to chemo to the hospital one

12   time.

13   Q.  He even came to your house because you had a mouse in your

14   home?

15   A.  Yes.

16   Q.  You have a nickname, right, you said, Shmuel?

17   A.  Yes.

18   Q.  Who calls you Shmuel?

19   A.  People that know me from years ago when I grow up together

20   and my father, my mother, my brothers.

21   Q.  Nathan calls you Shmuel?

22   A.  Sam, Shmuel, yeah.

23   Q.  But you weren't a good friend to him, were you?

24   A.  I said we had an off-and-on relationship, a love-and-hate

25   relationship, you want to call that.

D1TLCIB4                        Salamon - cross

1   Q.  And you lied to him repeatedly, right?

2   A.  No.

3   Q.  Up until a few weeks ago, isn't it true that you repeatedly

4   swore to him on the lives of your children that you wouldn't be

5   testifying against him?

6   A.  I swore to him?  I didn't speak to him.

7   Q.  How about his family member, how about your business

8   partner, his son-in-law?

9   A.  I don't remember.

10  Q.  Don't remember if that conversation happened?

11  A.  I can't remember.

12  Q.  You said you have cancer?

13  A.  Yes.

14  Q.  Chronic lymphoma leukemia, right?

15  A.  I see you did your research, yes.

16  Q.  What's your prognosis?

17  A.  We don't know.  There's no -- I have incurable cancer.

18  Q.  Is it --

19          MS. ECHENBERG:  Objection, your Honor.  I'm not sure

20  where this is going.

21          THE COURT:  Isn't this a little overly personal?

22          MR. BRILL:  I don't need to ask any more questions

23  about it.

24          THE COURT:  Okay.

25  Q.  Given your love-and-hate relationship with Mr. Schwartz,

D1TLCIB4                         Salamon – cross

1   knowing that you have a chronic disease, it's a good

2   opportunity to settle scores with the people that you have this

3   love-and-hate relationship with, isn't it?

4            MS. ECHENBERG:  Objection.

5            THE COURT:  You can answer that.

6   A.  What do you mean to settle scores?

7   Q.  Do you have any scores to settle with Mr. Schwartz?

8   A.  Explain what you mean by settling scores.  Because I have

9   cancer I'm settling scores, what does that mean?

10  Q.  The question is do you have any scores to settle with

11  Mr. Schwartz.  If you don't understand that, I can explain that

12  to you?

13  A.  Yes, please explain it.

14  Q.  Do you have any grudges against Mr. Schwartz?

15  A.  I'm not best friends with him.

16  Q.  You had a business dispute about this printing business,

17  right?

18  A.  Yes.

19  Q.  You had a business dispute or rather another dispute about

20  the pool, right?

21  A.  Yes.

22  Q.  Now, you pleaded guilty in this case, correct?

23  A.  Yes.

24  Q.  And as you told Mr. Donaldson and as you told

25  Ms. Echenberg, you're facing 70 years in prison potentially?

D1TLCIB4                         Salamon - cross

1    A.  Yes.  Excuse me?

2    Q.  Seventy years in prison potentially, right?

3    A.  Yes.

4    Q.  Another good reason to cooperate with the government,

5    right?  You're hoping that with your cooperation here you'll

6    earn some --

7    A.  Leniency, I'll get some leniency.

8    Q.  When did you meet Mr. Schwartz?

9    A.  When did I meet, what do you mean when did I meet?

10   Q.  When did you meet him.  You said something about a coat?

11   A.  Oh, I can't remember exactly, but I was about 17 years old.

12   Q.  And where was that, in Brooklyn?

13   A.  Yeah.

14   Q.  And tell me about him, tell me about his character.

15   A.  His what?

16   Q.  Tell me about his character.  You've known him for 30

17   years.  What type of person is he?

18   A.  Very nervous person.

19   Q.  Nervous.  Trusting person?

20   A.  I don't think he ever stole from me.

21   Q.  You don't think he ever stole from you?

22   A.  Trusting, I would not say trusting, no.

23   Q.  Did he trust you?

24   A.  You'd have to ask him.

25   Q.  Did he seem to you that he trusted you?

1    A.  Possibly, yes.

2    Q.  And he had big ideas, right?

3    A.  Big ideas?

4    Q.  He had big plans, likes to make big plans; is that right?

5    A.  Please explain what that means.

6    Q.  He had a bunch of different business ideas over the years,

7    right, that he tried to explore?

8           You know him, Mr. Salamon.  You've been friends with

9    him for many years.  You know about his life, don't you?

10   A.  Again, I didn't speak to him for ten years.  So if you're

11   talking those ten years or 12 years I didn't speak to him, I

12   don't know what plans you're talking about.

13   Q.  That gives you ten years before and ten years after?

14   A.  Ten years after?  I became friends with him end of 2005, so

15   it's not ten years.

16   Q.  So the ratio is off.  Fifteen years before, eight years

17   after?

18   A.  I didn't speak to him for a long time.  So I don't know

19   what plan he had, what plans he didn't have.

20   Q.  When you became friends with him, what did he do before you

21   had this break, he worked for his father's lumber business,

22   right?

23   A.  Yes.

24   Q.  And then he actually came to work for your father's copy

25   machine business, right?

D1TLCIB4                          Salamon - cross

1   A.  Yes.

2   Q.  And what did he do after that?

3   A.  I think he went to winery with his father.

4   Q.  And how long did that last?

5   A.  I don't know because that's where the point that we had the

6   big falling out.

7   Q.  And the next time that you got in touch with him, he had

8   this framing business, right?

9   A.  Yes.

10  Q.  And what about you, you're not a lawyer, right?

11  A.  Excuse me?

12  Q.  You're not a lawyer?

13  A.  No.

14  Q.  Never went to law school?

15  A.  No.

16  Q.  As Mr. Donaldson asked you, you told girls that you were a

17  lawyer, right?

18  A.  Yes.

19  Q.  And you're currently selling, as you said, some sort of

20  printing supplies or printer suppliers, right?

21  A.  Monitoring software device for printers.

22  Q.  Now, as a result of your arrest in this case, you pleaded

23  guilty, right?

24  A.  No, I plead not guilty first.

25  Q.  And then you pleaded guilty?

D1TLCIB4                        Salamon - cross

1   A.  Correct.

2   Q.  And that was a requirement of your cooperation agreement

3   with the government, right?

4   A.  My lawyer told me that's what I have to do, so I did it.

5   Q.  The lawyer told you that's what you have to do?

6   A.  Yeah.

7   Q.  And you did what the lawyer told you?

8   A.  Yes.

9           MR. BRILL:  Can we put Exhibit 500 up on the screen,

10  please.  It's not in evidence.

11  Q.  Who's the first call, who was the first person you called

12  that day when you were arrested?

13  A.  My lawyer.  My son, I'm sorry.  My son.

14  Q.  Your son.  You called Mr. Schwartz?

15  A.  I can't remember calling him.

16  Q.  No.  Well, it's part of this agreement that you made with

17  the government -- you signed a cooperation agreement, right?

18  A.  Yes.

19  Q.  You reviewed that cooperation agreement before you signed

20  it, correct?

21  A.  Yes.

22  Q.  And, in fact, you went over that cooperation agreement with

23  your lawyer prior to signing it as well, right?

24  A.  Yes.

25  Q.  Now, one of the agreements that you made with the

D1TLCIB4                        Salamon - cross

1    government was that you'll make restitution in an amount to be

2    specified by the court with regard to your fraud, correct?

3    A.  Yes.

4    Q.  What type of assets do you have available to pay this

5    restitution?

6    A.  Right now I have no assets.

7    Q.  You have a house, right?

8    A.  It's not in my name.

9    Q.  It's not in your name.  Purchased by you but in someone

10   else's name?

11   A.  Yes, because I had to -- I owed the guy money, that person.

12   Q.  Not to shield that asset from the government though, right?

13   A.  I'm not shielding anything.  It was before, when I got

14   divorced, before the whole arrest.  It was under this person's

15   name, so I wasn't shielding anything.

16   Q.  But not before you started the fraud?

17   A.  No, it was in my wife's name.  My ex-wife's name.  Sorry.

18   Q.  And it was also part of this agreement that you file

19   accurate tax returns, right, from 2003 to 2008; do you recall

20   that part of your agreement?

21   A.  Yes.

22   Q.  Now, you just told Mr. Donaldson that you have no way of

23   knowing how much you actually made between 2003 and 2008; is

24   that correct?

25   A.  I said I don't know exactly.  He asked me 250 a year, I

1    said possibly.

2    Q.  But you have no way of actually checking that, right,

3    because there are no records that you could refer to?

4    A.  I would have to sit down with an accountant and see if I

5    can figure it out.

6    Q.  How do you figure it out with an accountant if you don't

7    actually have records to give to the accountant?

8    A.  When I go to the accountant every year to figure it out,

9    going to a lawyer, seeing more or less how much that I made.

10   Q.  You think you actually have the ability to file accurate

11   taxes at this point?

12   A.  I'll try my best.

13   Q.  And as you said you also agreed to forfeit $2 million,

14   right?

15   A.  Yes.

16   Q.  $2 million that you don't have?

17   A.  Yes.

18   Q.  $2 million that you have no reasonable prospect of ever

19   getting get, right?

20   A.  I don't know where I'm going to get money.  But it's part

21   of the deal, I have to give restitution.

22   Q.  You might hit the lottery, right, you never know?

23   A.  I'm working, so there's going to be restitution, I assume.

24   Q.  As part of this agreement you told the government that you

25   will truthfully and completely disclose all information with

1    respect to the activities of yourself and others concerning all

2    matters about what you're asked by the government, right?

3    A.   Yes.

4    Q.   You agree that you will cooperate fully with them, with

5    Immigration Customs Enforcement, Department of Labor, and any

6    other law enforcement agency that they said you should

7    cooperate with, right?

8    A.   If that's what it says in the agreement, yes.

9    Q.   Do you want to take a look at it, do you need to refresh

10   memory?

11   A.   If it said any other law enforcement, yes.

12   Q.   How many other agencies have you helped out since you

13   started cooperating?

14   A.   I just spoke to the government here.

15   Q.   It says you shall attend all meetings, you agree you would

16   attend all meetings at which the U.S. Attorney's Office

17   requests your presence; do you remember that?

18   A.   Yes.

19   Q.   As far as the agreement.  And so since you started –– you

20   didn't have this cooperation agreement originally, right, you

21   didn't sign this cooperation agreement until you were pretty

22   deep in the case; is that correct?

23           MS. ECHENBERG:  Objection.

24           THE WITNESS:  Yes.

25           MS. ECHENBERG:  Characterization.

D1TLCIB4                          Salamon - cross

1              MR. BRILL:  I'll rephrase.

2              THE COURT:  What does deep in the case mean?

3    Q.  You didn't sign it until 2010, right?

4    A.  Yes.

5    Q.  And you were first arrested when?

6    A.  In May 2009.

7    Q.  And between May 2009 and July of 2010 -- withdrawn.

8         Do you recall that July 2010 was the time you signed

9    this agreement?

10   A.  Yes.

11   Q.  So from May 2009 to July of 2010, approximately how many

12   meetings did you have with government agents and prosecutors?

13   A.  I didn't count.  I don't know.

14   Q.  Can you estimate?

15   A.  Excuse me?

16   Q.  Can you estimate?

17   A.  Ten, 15 probably.

18   Q.  And from July of 2010 until yesterday -- you met with the

19   government yesterday, right?

20   A.  Yesterday?

21   Q.  Yesterday, 28th.

22   A.  Yes.

23   Q.  So from July of 2010 up until yesterday, approximately how

24   many other meetings do you think you had with government agents

25   and prosecutors?

D1TLCIB4                         Salamon - cross

1   A.  I would say another eight meetings, ten meetings.  All

2   together, maybe 20 meetings all together.

3   Q.  So ten or 15 in the year or so from the time you were

4   arrested until the time you signed the cooperation agreement,

5   and then over the course of the next two and a half years, only

6   another eight?

7   A.  Ten times.

8   Q.  Ten times.  Isn't it true that leading up to this trial

9   alone, that is, in the weeks right before the trial, you met

10  with them about five to ten times?

11  A.  Possible, yes.

12  Q.  So it's got to be more than just ten times over the

13  following year and a half, two years, right?

14  A.  I didn't count how many.  Sorry.

15  Q.  Now, over the course of those meetings, your purpose was to

16  provide the government with information, right?

17  A.  To be truthful what I did, yes.

18  Q.  Provide information about what you did, as you just said,

19  right?

20  A.  Yes.

21  Q.  But also your agreement requires provide information about

22  what other people did, correct?

23  A.  Yes.

24  Q.  And you knew that in order to successfully cooperate with

25  the government, you had to provide information about what other

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1TLCIB4                        Salamon - cross

1    people did, as well as what you did, right?

2    A.  If I was asked.

3    Q.  That is, you weren't getting this cooperation agreement

4    based upon you simply telling the truth about your own fraud,

5    right?

6    A.  Correct.

7    Q.  You had to deliver other people for prosecution, right?

8            MS. ECHENBERG:  Objection.

9            THE COURT:  Sustained.

10   Q.  You had to provide information about other people and

11   criminal activity that they did as well, right?

12   A.  Deliver people or deliver information that I did with them?

13   Q.  You had to provide information.

14   A.  I provided information what I did with them, not I

15   delivered new people, no.

16   Q.  And there was a certain amount of pressure every time you

17   came back to one of these meetings to provide additional

18   information, wasn't there?

19           MS. ECHENBERG:  Objection.

20           THE COURT:  Sustained.

21   Q.  Did you give the government all of the information that you

22   knew in the first meeting you had with them?

23   A.  I can't remember it was one time or two times, over the

24   period of a couple times they asked me how the fraud was, who

25   was involved in the fraud.

D1TLCIB4                          Salamon - cross

1    Q.   Isn't it true that over the course of each of those

2    meetings, you provided additional information up until

3    yesterday?

4    A.   Additional, I don't remember.  I don't remember when I gave

5    them additional.  But as we went along, I gave them

6    information, yes.

7    Q.   At the end of your cooperation, you're anticipating that

8    the government will provide a letter to your sentencing judge,

9    correct?

10   A.   Yes.

11   Q.   And that's a different judge, not the judge who's sitting

12   in this courtroom today, right?

13   A.   I have no idea.

14   Q.   You've been in front of that judge before when you pleaded

15   guilty, right?

16   A.   Excuse me?

17   Q.   You've been in front of a different judge, you appeared in

18   front of a judge --

19   A.   Yes.

20   Q.   -- to plead guilty, right?

21   A.   But I was never told what judge I'm going to be in front of

22   at sentencing.

23   Q.   I see.  And who determines at the end of the day whether

24   the government gives you that letter to the judge?

25   A.   Who determines gives the letter?

D1TLCIB4                         Salamon - cross

1    Q.  Do you make that decision that the government should give

2    you that letter?

3    A.  I hope the government is going to give the letter to the

4    judge so I have some leniency, yes.

5    Q.  The question is who makes that decision that you're going

6    to get the letter.  Do you make that decision?  You're not the

7    one who's going to say --

8    A.  I cannot tell the government give me the letter.  I was

9    promised if -- I was told that if I fully say the truth and

10   everything, the only thing the government can do is give, write

11   a letter to the judge and hopefully the judge will have

12   leniency.

13   Q.  Again, it's not your decision whether you get the letter,

14   right?

15   A.  I don't know.  I didn't ask my lawyer.  I would have to ask

16   my lawyer.

17   Q.  It's not your lawyer's decision about whether you get the

18   letter, right?

19   A.  I don't know whose decision it is.  I'm sorry.  I'm not a

20   lawyer.  I don't know whose decision it is.

21   Q.  Let me ask you, do you recall in your agreement -- if you

22   need to refresh your recollection with the agreement, just let

23   me know -- but do you recall agreeing that if this office,

24   being the United States Attorney's Office, determines that the

25   defendant has provided substantial assistance in an

D1TLCIB4                         Salamon - cross

1    investigation or prosecution and if he has fully complied with

2    the understandings specified in this agreement, then this

3    office will file a motion requesting the court sentence the

4    defendant in light of the factors set forth?

5    A.  Yes.

6    Q.  So it's the government's decision --

7    A.  Yes.

8    Q.  -- whether you get that letter, right?

9    A.  Yes.

10   Q.  It's the government who determines whether you fully

11   cooperated, right?

12   A.  Yes.

13   Q.  It's the government who determines whether your information

14   was valuable, right?

15   A.  Yes.

16   Q.  You had an incentive, did you not, to please the government

17   in those meetings?

18            MS. ECHENBERG:  Objection.

19            THE COURT:  Ultimately, the jury will decide what

20   motivated the witness one way or the other.

21            MR. BRILL:  Should I re-ask the question, judge?

22            THE COURT:  You can answer.

23   Q.  It was in your best interest to make sure that the

24   information you provided to the government was information that

25   the government wanted from you?

D1TLCIB4                          Salamon – cross

1   A.  I provided them, exactly said to them what I did, who was

2   involved with me in the fraud.

3   Q.  Did you have any contact with Mr. Teitelbaum after your

4   arrest?

5   A.  Not directly.

6   Q.  How about indirectly?

7   A.  Yes.

8   Q.  What does that mean exactly?

9   A.  I would send a friend.  I once send Nuchem Schwartz to

10  speak to him.

11  Q.  Were you aware that he was arrested as well?

12  A.  Excuse me?

13  Q.  Were you aware that he was arrested as well?

14  A.  I was told, yeah.

15  Q.  And you were aware what happened with Mr. Teitelbaum?

16  A.  What happened, what do you mean what happened?

17          MS. ECHENBERG:  Objection.  Can we have a side bar,

18  your Honor?

19          THE COURT:  Yes.

20          (Continued on next page)

21

22

23

24

25

D1TLCIB4                            Salamon - cross

1                    (At the side bar)

2                    MS. ECHENBERG:  So I'm not sure where Mr. Brill is

3       going right now, but I thought he might be going to the fact

4       that Leo Teitelbaum attempted suicide.  I don't think that's

5       relevant.  And he also cooperated, and I'm not sure any of

6       those things are relevant.  In fact, his cooperation is

7       currently in question, so I don't think we should.

8                    MR. BRILL:  Currently in question.

9                    I don't think this witness knows enough about the

10      cooperation issue to even go there.  I wasn't intending to go

11      there.

12                   MS. ECHENBERG:  He certainly doesn't know anything

13      about it.

14                   MR. BRILL:  As to the suicide issue, I wasn't getting

15      into it at this specific point, but it does bear on an issue

16      later on in my cross.  So if we want to talk about that now.

17                   THE COURT:  Let's talk about that.

18                   MR. BRILL:  Mr. Schwartz went to see -- this whole

19      thing with the checks on the computer, that's where

20      Mr. Teitelbaum was in the hospital.  He was in the hospital for

21      the suicide attempt at the time of this whole check incident.

22      So I think it's important at that point to bring out that

23      Mr. Schwartz went to visit Mr. Teitelbaum not to be an emissary

24      because he was having his gallstones taken out, but in fact

25      Mr. Salamon was preying on a person who had just attempted

1    suicide.

2         MS. ECHENBERG:  I don't think there's any evidence of

3    that.

4         MR. GREENFIELD:  You don't think there's a fair

5    inference for a jury to draw?  Here's a guy in the hospital

6    having committed suicide and his first reaction is to see if he

7    can make up some phony checks and see if he can cash them out

8    of his account.  You don't think that's relevant?

9         MS. ECHENBERG:  That's information coming from your

10   client.  I don't think that's relevant.  I think the fact is

11   the money was frozen by the government and he was trying to

12   access the money.  I don't think the circumstances around it.

13        THE COURT:  Well, I mean of course there's the

14   other -- may put the witness in a bad light, but it surely

15   talks to Mr. Teitelbaum's guilt.  So I'm not sure.

16        MS. ECHENBERG:  Mr. Teitelbaum's guilt or

17   Mr. Schwartz?

18        THE COURT:  Mr. Teitelbaum.  He's the one who tried to

19   commit suicide, right?  That's a pretty decent demonstration of

20   guilt.

21        MR. BRILL:  I don't think there's any dispute with

22   anybody here that Mr. Teitelbaum was guilty.

23        THE COURT:  Well.

24        MR. DONALDSON:  I'm disputing that he's guilty.

25        MR. GREENFIELD:  I haven't seen him.  I don't know

D1TLCIB4                           Salamon - cross

1    that he exists other than on paper.

2              MR. BRILL:  I take it.

3              MS. ECHENBERG:  I think it's a distraction talking

4    about suicides.

5              MR. BRILL:  Just to be clear, I was not getting into

6    it now.  It was at the point where I was going to address the

7    issue with the checks.

8              THE COURT:  The whole point is the minute you bring

9    out somebody else, you know, pled guilty, the jury gets an

10   immediate instruction that decisions of other individuals --

11             MR. BRILL:  I won't get into any result of

12   Mr. Teitelbaum or any other defendant's case.  It was purely

13   the suicide attempt.  That is I think relevant to the time at

14   which Mr. Salamon was attempting to get money out of

15   Mr. Teitelbaum's account.

16             MS. ECHENBERG:  Your Honor, while we're here, can I

17   raise one other thing.  It seems that Mr. Brill is baiting

18   Mr. Salamon to mention the affair.

19             MR. BRILL:  No.

20             MS. ECHENBERG:  He's talked about loyalty.  He keeps

21   going to that point in time where they didn't speak.  So I want

22   to be especially careful that he's not baiting him into raising

23   something that we were specifically instructed we were not to

24   raise.

25             MR. BRILL:  Pretty much past that anyway.

D1TLCIB4                           Salamon - cross

1             THE COURT:  I hope so.  There was enough of that
2    anyway.
3             MR. DONALDSON:  Can we ask him to stop with the
4    clicking thing at the bench.  It's aggravating the hell out of
5    me.
6             THE COURT:  Sorry about that.
7             (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

D1TLCIB4                          Salamon - cross

1            (In open court)

2    Q.   Did you ever read Code of the Heart?

3    A.   I might have peeked into it.

4    Q.   There were a lot of copies around.  I'm assuming they could

5    have been given out at Hanukkah gifts, right?  Never took a

6    look at it?

7    A.   Not really.

8    Q.   Okay.  Now, you used to sell copy machines, right?

9    A.   Yes.

10   Q.   That was your father's business?

11   A.   I was partners.

12   Q.   He was a 90 percent owner, I think you were a 10 percent

13   owner at some point?

14   A.   I was a 10 percent partner.

15   Q.   Was he the 90 percent partner?

16   A.   No.

17   Q.   There were other partners as well?

18   A.   Yes.

19   Q.   Your father was the majority partner though?

20   A.   I can't remember.  I think so.

21   Q.   And how -- what year did you start working for your father?

22   A.   Again, I was a partner there, so I wouldn't call it working

23   for him.  Working together, you mean.

24   Q.   So you went in to the business when you first started

25   working there as a partner?

D1TLCIB4                          Salamon - cross

1    A.  Yeah.

2    Q.  So when did you start working with him?

3    A.  1990.

4    Q.  Had your father built the business up prior to you joining?

5    A.  No.

6    Q.  So you went into business with him at the same time, 1990

7    approximately?

8    A.  Yes.

9    Q.  And you said that Earl David had approached you initially

10   for a copy machine, right?

11   A.  Yes.

12   Q.  And as a matter of fact, your brother-in-law worked for

13   Earl David prior to that, no?

14   A.  Ex-brother-in-law.  No, he didn't work for him directly,

15   but he was involved with him.

16   Q.  So you had known about Earl David at least prior to the

17   copy machine inquiry, right?

18   A.  I didn't know his name.  I wasn't involved with Earl David,

19   so I wouldn't know him.

20   Q.  You didn't know his name.  You didn't know the name Earl

21   David?

22   A.  Like I mentioned, I just saw messages.  Sometimes Earl

23   David used to call.  I didn't know what involvement he had with

24   him.

25   Q.  You said in the early nineties.  So prior to 1995, if we

D1TLCIB4                         Salamon - cross

1    use the common definition of early nineties, you were

2    approached by a coworker who said that if you agreed to say

3    that you were looking for technicians and essentially get

4    involved in this immigration fraud, that you would get paid,

5    right?

6    A.  Didn't say anything immigration fraud, so.

7    Q.  How was it explained to you exactly?  You just say you're

8    looking for technicians and you'll get 300 bucks?

9    A.  Yes.

10   Q.  What does that mean looking for technician?

11   A.  He knew I had ads in the newspaper always looking for

12   technicians at that time.  So he said if you're willing to hire

13   technicians, you will just sign and I will give you $300 for

14   each signature.  It was two signatures so it was like $600.

15   Q.  So you only did it twice?

16   A.  Yes, at that time.

17   Q.  So this is within five years of you starting this business

18   with your father, right?

19   A.  Yes.

20   Q.  And --

21   A.  Again, I don't know if it was 1995.

22   Q.  You said early nineties on direct; do you remember that?

23   A.  1990s.  I don't remember exactly the year.

24   Q.  Sometime within the decade?

25   A.  Of 1990, yes.

1  Q.  And so what did you think was happening there, what did you

2  think you were getting involved in when you were making, when

3  you were signing those things?

4  A.  I'm signing looking for workers.  And I was looking at that

5  time for technicians.  I did have an ad in the newspaper

6  looking for technicians.

7  Q.  So you had ads in the newspaper, which you paid the

8  newspaper for, right?

9  A.  Yes.

10  Q.  The newspaper didn't pay you when you put an ad in, right?

11  A.  Yes.

12  Q.  And the newspaper didn't pay you when you signed the worker

13  who responded to those ads, right?

14  A.  I don't know how many responded to that ad.  That's why.

15  Q.  The question is:  The newspaper didn't say, hey, good for

16  you, you got a new employee, here's some money back, right?

17  A.  No.

18  Q.  So someone was paying you, this other person you worked

19  with, for what exactly?

20  A.  The ad.  And he said as long as -- are you looking for

21  workers?  I said yes.  Are you looking for technicians?  Just

22  sign over here that you're looking for technicians and you

23  might get technician because Earl David used to advertise also

24  in the paper.  So you might get technicians.

25  Q.  So I'm going to give you 300 bucks and it won't benefit me,

D1TLCIB4                        Salamon - cross

1    it will benefit --

2    A.  Who is me?

3    Q.  This coworker of yours.

4    A.  Of course it's going to benefit him.

5    Q.  How did it benefit him?

6    A.  He made money.

7    Q.  How do you know he made money?

8    A.  He told me how much he's making.  He didn't tell the truth

9    how much it is, but he did say I'm getting so much and I'll

10   give you out of that so much.

11   Q.  So what was he making money for?

12   A.  Excuse me?

13   Q.  What was he making money for, what did he tell you?

14   A.  To bring in people that are looking for workers.

15   Q.  Bring in people from where?

16   A.  I don't know.  I didn't ask him.  He came over to me.  He

17   said -- sorry, I didn't go into details what, when, where.

18   Q.  So you knew nothing at that time about immigration, right?

19   A.  Nothing.

20   Q.  You knew nothing about an immigration fraud, correct?

21   A.  Nothing.

22   Q.  You were in the copy business, right?

23   A.  Yes.

24   Q.  Much like Nathan Schwartz was in the framing business,

25   correct?

D1TLCIB4                         Salamon - cross

1    A.  Yes.

2    Q.  And you got your 600 bucks and that was it for a bunch of

3    years, right?

4    A.  What do you mean a bunch of years?

5    Q.  You didn't have any more involvement with Earl David for

6    years after that, right?

7    A.  No.

8    Q.  You continued in the copy business, right?

9    A.  Yes.

10   Q.  As you said, you would get mail from time to time regarding

11   these people you signed up for, right?

12   A.  I got once mail.

13   Q.  And what did you do with it?

14   A.  My father got very upset, what's going on.  I said, no,

15   it's nothing.  What do you mean nothing?  I'm getting stuff

16   from the labor department.  So I just told him you're not going

17   to get no more mail.  I'll tell this coworker, whatever, he

18   should try to stop everything coming in the mail.

19   Q.  You threw the mail out, right?

20   A.  Yes.

21   Q.  Now, at what point was it that you had this conversation

22   with Earl David about getting companies for him?

23   A.  In 2001, after I start signing for him, and after a couple

24   days he started talking about it.

25   Q.  So you went down to the Earl David law firm at the time and

D1TLCIB4                          Salamon - cross

1    let me -- this was the early nineties when you first started

2    signing the --

3    A.  Signing, I signed two applications.  You're making it sound

4    like there's hundreds or 20 or ten.

5    Q.  You had the two applications.  Then you had a ten-year gap,

6    and then you had thousands after that.  Right?

7    A.  Yes.

8    Q.  So let's talk about the two.  From your information, Earl

9    David was behind the two in the early nineties, right?

10   A.  At that time I didn't know who was behind.

11   Q.  Did you find out later?

12   A.  Yes.

13   Q.  And you found out those two came from Earl David, right?

14   A.  And, yes, in 2001.

15   Q.  You found out in 2001 that the two from the early nineties

16   were from Earl David, right?

17   A.  Yes.

18   Q.  So Earl David's fraud at that point had been going on at

19   least a decade before you became involved, yes?

20   A.  Yes.

21   Q.  And he brings you in technically to sell him a copier,

22   right?

23   A.  He called me up, he needs a copy machine.

24   Q.  And you just happened to fall into a conversation where he

25   proposed to you that you start committing immigration fraud

D1TLCIB4                          Salamon - cross

1   with him?

2   A.   After a while we were talking, yes.

3   Q.   Humble copy salesman comes in -- how does that go?  Hey,

4   this is a great copier, write you a check?

5   A.   No, I will repeat again.  He called me up in 2001.  Hey,

6   Sam.  Your name is Sam?  I said yes.  I need a copy machine.

7   Q.   Right.

8   A.   I said okay.  No, come down, come down.  And so I went down

9   that night, next night, I don't remember.  And I met Mr. Earl

10  David.  And he asked me how much a copy machine is going to be.

11  At that time I think it was 4,000, 4500, I don't remember exact

12  amount.  And he pulled out a check.  Here, you have it.

13         By the way, do you remember like five, six years ago

14  you signed something for your coworker?  So I said yes, I

15  remember something.  Well, you need to sign again because now

16  there's an amnesty, I'm going to put it in again.  So if you

17  sign, I'll give you $600 for each signature.

18  Q.   Okay.  Did you think there was anything wrong there?

19  A.   After I left that time, I started saying that it's not 300,

20  now it's $600, and something is not kosher there.

21  Q.   You knew actually back in the early nineties that something

22  wasn't kosher, right?

23  A.   I really didn't think into it.  I wasn't really going for

24  it.  But now I came to his office and I saw so many people over

25  there I just -- I just didn't feel that something is right.

D1TLCIB4                         Salamon - cross

1    Q.   But you took the money?

2    A.   Yes.

3    Q.   And was it the money then that was tempting, is that why

4    you went back?

5    A.   Yes.

6    Q.   Paid better than the copy business?

7    A.   Yes.

8    Q.   Of course, you didn't have to commit fraud to sell copy

9    machines, right?

10   A.   Excuse me?

11   Q.   You knew you were going to be engaging from that point on

12   in illegal activity, right?

13   A.   As I went along, yes, I realized it's fraud, yes.

14   Q.   As you went along.  You said you realized right there at

15   the beginning?

16   A.   I said I felt, sensed something is wrong, he paid me $600.

17   But after a couple days and weeks, as we went on, I knew

18   there's more fraud.  As I was doing my own files I knew, yes,

19   there's a lot of fraud.

20   Q.   So you didn't wash your hands of it at that point, right?

21   A.   No.

22   Q.   You didn't say I'm getting out of this, this is not right?

23   A.   No.

24   Q.   The money was too good, right?

25   A.   Yes.

D1TLCIB4                         Salamon - cross

1   Q.   And business increased from there, right?  The Earl David

2   firm got very, very busy very quickly?

3   A.   In 2001.  Not because of me.  It was an amnesty.

4   Q.   I'm not saying because of you, but it got very busy?

5   A.   Yes, until about April 30, 2001.

6   Q.   You said there were people sleeping in the halls as a

7   matter of fact, right?

8   A.   I don't know sleeping in the halls.  There was a long line

9   to get into the office.

10  Q.   And the office ran what, 12, 18 hours a day?

11  A.   Excuse me?

12  Q.   The office was open for 12, 18 hours a day?

13  A.   I wasn't fully working until the end of 2009 for him full

14  time.  But, yes, it was open late hours.

15  Q.   So you weren't working for him full time in 2009?

16  A.   I didn't say that.  I said until the end of 2001.

17              (Continued on next page)

18

19

20

21

22

23

24

25

D1t1cib5                          Salamon - cross

1   BY MR. BRILL:

2   Q.  Now how long was your father involved in the copy business?

3   A.  I don't know.  Probably till 2005, 2006.

4   Q.  And he sold the business or -- to another company, I think

5   you mentioned?  The business was sold to a different company?

6   A.  To a few employees of the company.

7   Q.  He retired or got out of it?

8   A.  He got out of it.

9   Q.  Do you know if he had a stake in it after he sold it?

10  A.  I think they paid him off every year.  He was still working

11  there.

12  Q.  And how long did he continue to work there?

13  A.  Couple years.

14  Q.  Until when?

15  A.  I don't remember.

16          MR. BRILL:  Can we put Exhibit 3609 up, please.

17          That's the wrong one.  I'm sorry.

18          I'm not going to waste time.

19  Q.  How many applications -- well, what was the name of the

20  company that your father and you owned?

21  A.  United Photocopy.

22  Q.  And it changed its name to Digital Copier Systems; correct?

23  A.  United Photocopy did d/b/a afterwards.  It changed over to

24  d/b/a Digital Copier Systems.

25  Q.  Who changed it over?

D1t1cib5                              Salamon - cross

1    A.  My father.

2    Q.  And you actually submitted applications on behalf of

3    Digital Copiers; correct?

4    A.  I would have to check.

5    Q.  We saw one earlier.  That's what I was trying to look for.

6    But you remember seeing one up on the screen?

7    A.  Yes, but it was an April 30, 2001 case.  It's on United

8    Photocopy and now it's called Digital Copiers.  So those were

9    2001 cases, wanted to be substituted to somebody else.  But the

10   individual went under United Photocopy, yes.

11   Q.  Okay.  But even if they were back in 2001, you filed

12   applications under Digital Copier Systems; correct?

13   A.  United Photocopy d/b/a Digital Copier Systems, yes.

14   Q.  And those were not legitimate applications; correct?

15   A.  No.

16   Q.  Is it fair to say that over the course of your time with

17   Earl David you were filing fraudulent applications on behalf of

18   your father's company?

19   A.  There was these two applications from 2001.  There was

20   these filed from -- from back 1995, I would say.

21   Q.  So just the two.

22   A.  Yes.

23   Q.  There were no other applications on behalf of Digital

24   Copier Systems.

25   A.  Not as far as I remember.

1  Q.  So you spared your father from being further involved in

2  the fraud other than those two; right?

3          MS. ECHENBERG:  Objection.

4  Q.  Did you withdraw those two applications when you started to

5  work for Earl David?

6  A.  No.

7  Q.  You had to provide false experience letters for those two

8  applications?

9  A.  Me?  Provide?  Again, these were Earl David's clients, so I

10  didn't deal with his clients.

11  Q.  Do you know if false experience letters were created for

12  those clients?

13  A.  I don't know.

14  Q.  Why were the experience letters in general not created by

15  the false sponsors?  Or the fraudulent sponsors; let's put it

16  that way.

17  A.  Can you repeat your question?

18  Q.  Sure.  Over the course of years you came up with dozens if

19  not hundreds of sponsor companies that would agree to

20  fraudulently sponsor applicants for immigration services;

21  right?  That's what your testimony was.

22  A.  Correct.

23  Q.  It was also your testimony that most, if not all, of the

24  documents in those files were made up by the various employees

25  of the law firm; correct?

D1t1cib5                              Salamon - cross

1    A.   Yes.

2    Q.   Tax returns, for example, were made up by -- oh, I don't

3    remember which one of these people.  Lev, something like that?

4    A.   Who?

5    Q.   Somebody in the firm made up false tax returns; right?

6    A.   Yes.

7    Q.   Who was that?

8    A.   Who was that?  There were a couple people.  David Vago.

9    Q.   Oh.  And the experience letters, they were made up by

10   people in the firm as well; right?

11   A.   Yes.  Some of it.

12   Q.   All right.  And they were signed by people in the firm;

13   right?

14   A.   Excuse me?

15   Q.   They were signed by people in the firm as well; correct?

16   A.   What do you mean signed by people?  No, they were not

17   signed by people in the office.

18   Q.   They were signed by the sponsors, or were the signatures of

19   the sponsors forged on the experience letters?

20   A.   If you would show it to me, because I don't know what

21   you're referring to.

22   Q.   In general.  You know what we're talking about with

23   experience letters; right?

24   A.   Yes.

25   Q.   Okay.

D1t1cib5                          Salamon - cross

1   A.  Experience letters from some other company, not from --

2   Q.  So it was a prior company; right?  So there would be a

3   prior employer, or you would seek to find a prior employer who

4   could attest to this applicant's --

5   A.  Let me explain to you the process.

6   Q.  You don't have to explain to me the process.  Just answer

7   my question.  You would ask the applicant -- listen for a

8   second.  You would ask the applicant to provide a letter saying

9   that they had experience for the job that they were allegedly

10  seeking on this application; right?

11  A.  Yes.

12  Q.  Okay.  And the first step would be, go back to your home

13  country or reach out to somebody in your home country to see if

14  you can get an actual experience letter; right?

15  A.  Correct.

16  Q.  Often that did not happen, often they were not able to do

17  that; correct?

18  A.  Correct.

19  Q.  All right.  Where did the fake experience letters come

20  from?

21  A.  Created by people in my office.

22  Q.  Okay.  And then signed by people in your office forging the

23  signature of a -- whether it's a real person or a fake person,

24  correct, on those letters?

25  A.  Yes.

D1t1cib5                          Salamon - cross

1    Q.  Okay.  Similarly, the tax returns that Mr. Vago created

2    were not signed by the actual owner of the company but signed

3    by someone in the law firm; correct?

4    A.  Yes.

5    Q.  And again, unless there was a legitimate application,

6    the -- all of the immigration paperwork was signed by someone

7    in the law firm as opposed to the sponsor; correct?

8    A.  I have no idea what you just said.

9    Q.  Well, you signed how many different immigration

10   applications instead of the owner of the sponsor company?

11   A.  Immigration applications or labor certifications?

12   Q.  Labor application, let's say.

13   A.  I signed for whom?

14   Q.  Well, for how many different people?

15   A.  If it's a legitimate company, they'd sign themselves.

16   Q.  Right.  And if it was an illegitimate company, as 70 to

17   90 percent of your work was, who signed?

18   A.  I used to sign them at times.

19   Q.  And then if not you, then someone else in the firm; right?

20   A.  Or maybe the sponsor himself sometimes.

21   Q.  How often did that happen?

22   A.  I don't know offhand.  I don't remember.

23   Q.  10 percent of the time, 5 percent of the time?

24   A.  I would have to go through every file to see which one I

25   filed, which one the sponsor filed.

D1t1cib5                        Salamon - cross

1    Q.   And the ones the government showed you today, they were all

2    your signatures; right?

3    A.   Not all of them, no.

4    Q.   Most?

5    A.   Yes.

6    Q.   So you would go to your friends and when you started

7    working with Mr. David, you'd offer them -- you'd say, "I'll

8    give you a certain amount of money for each approved labor

9    application that you get for me"; right?

10   A.   Yes.

11   Q.   And then when you ran out of friends, you would go to

12   friends of friends; correct?

13   A.   Whoever -- whoever I could, yes.

14   Q.   Because it came to a point where this was a snowballing

15   business that you were quickly running out of sponsors you

16   could use; right?

17   A.   Yes.

18   Q.   So you had to reach out that network farther and farther so

19   you could get more and more sponsors; right?

20   A.   Again, I dealt with -- compared to the sponsors we have, I

21   had a lot of recruiters, a lot of people talking to other

22   people, so I probably dealt with 15, 20 sponsors over the years

23   direct.

24   Q.   But it was like a pyramid; right?  You dealt with 15 or 20,

25   and from what you know, then those people dealt with other

D1t1cib5                          Salamon - cross

1    people, who came back to you; right?

2    A.  Yes.

3    Q.  And specifically as to Mr. Schwartz, you kept a record,

4    from what you're telling us, of the payments that you made to

5    him; right?

6    A.  People that I dealt with directly, yes.

7    Q.  So the 15 to 20 people that you dealt with directly.

8    A.  I mean, 15 to 20 over ten years.

9    Q.  Okay.  Of the people that you dealt with directly, you kept

10   a record; right?

11   A.  I tried, yes, I always had a record at my house.

12   Q.  And that was a pad that you kept on your porch, I think you

13   testified to; right?

14   A.  Yes.

15   Q.  And was that pad -- withdrawn.

16            Did federal agents ever come to your home?

17   A.  Yes.

18   Q.  All right.  And did they search your home?

19   A.  Yes.

20   Q.  And that pad wasn't there, was it?

21   A.  I don't know.

22   Q.  You can't locate it; right?

23   A.  I can't locate it, no.

24   Q.  You haven't seen it since you were arrested; right?

25   A.  I don't remember when the last time I saw it.

D1t1cib5                          Salamon - cross

1    Q.   We don't have it.

2    A.   Excuse me?

3    Q.   You don't have it.

4    A.   No.

5    Q.   Isn't it true that you didn't need to tell the legitimate

6    sponsors that you were engaged in fraud using their companies?

7    A.   Can you explain that question?

8    Q.   Let's use Contour Framing.

9    A.   Yes.

10   Q.   Mr. Schwartz came to you with two legitimate employees;

11   right?

12   A.   Yes.

13   Q.   Mr. Castillo is one of them, I believe?

14   A.   Yes.

15   Q.   And Francisco was the first name of the other one; right?

16   A.   Excuse me?

17   Q.   Henry, Francisco, do you remember the first name?

18   A.   Yes.

19   Q.   And you actually met Henry and Francisco; right?

20   A.   I don't know which one I met.  I met one of them at my

21   house.  I don't know which one it was.

22   Q.   He worked on your kitchen; right?

23   A.   One of them.

24   Q.   So these were the first people who Mr. Schwartz approached

25   you with; right?

D1t1cib5                          Salamon - cross

1    A.  Can't remember.

2    Q.  And when Mr. Schwartz approached you with Henry and

3    Francisco to see if he could sponsor them to work for his

4    company, you took all of the Contour Framing corporate

5    information that you needed for the application; right?

6    A.  Not me.  My -- Lipa Teitelbaum.

7    Q.  Oh.  Who you worked with closely; right?

8    A.  Yes.

9    Q.  And you proceeded to file how many fraudulent applications

10   under the Contour Framing name?

11   A.  I don't know.  I would have to count it.  I would have to

12   see.

13   Q.  Dozens; right?

14   A.  Yes.

15   Q.  There was no requirement that you tell Mr. Schwartz that

16   you were filing all of those fraudulent applications under

17   Contour Framing; right?

18   A.  I told him we used the company.  I didn't tell him

19   particular aliens, no.

20   Q.  Which you have no record of; right?

21   A.  No record of what?

22   Q.  No record of any conversation you had with Mr. Schwartz;

23   right?

24   A.  Such as?

25   Q.  No e-mails; right?

D1t1cib5                          Salamon - cross

1   A.  There's other e-mails but not this particular e-mail, no.

2   Q.  No text messages?

3   A.  I have text messages.  I don't know.  Not --

4   Q.  Not talking about Contour Framing; right?

5   A.  As far as I can remember, no.

6   Q.  Not talking about any of Mr. Schwartz's companies; right?

7   A.  I would have to check all the e-mails, but I don't

8   remember, no.

9   Q.  So aside from what you're telling us, that you had this

10  conversation with Mr. Schwartz, all we know is that you used

11  the Contour Framing information to file dozens of fraudulent

12  applications; right?

13  A.  Yes.

14  Q.  And you came by the Contour Framing information

15  legitimately; correct?

16  A.  Yes.

17  Q.  Now most of the sponsors who you approached, the false

18  sponsors you approached, weren't actually looking for any

19  workers; right?

20  A.  No.

21  Q.  They were told that if you need, all you have to do is

22  just -- like happened with your copy business, just tell us

23  you're looking for workers, and so long as you confirm that

24  with the Department of Labor, then there shouldn't be a

25  problem; right?

D1t1cib5                          Salamon – cross

1    A.   Yes.

2    Q.   Now Mr. Schwartz's case, however, he actually was looking

3    for workers, he actually was trying to hire two workers; right?

4    A.   It was his workers, not trying to hire.

5    Q.   Okay.  But he had two workers he was trying to make --

6    A.   Get legal -- make them legal, yes.

7    Q.   And that was a legitimate avenue through the immigration

8    process; right?

9    A.   Yes.

10   Q.   Do you know a person named Mendy Gold?

11   A.   Yes.

12   Q.   Yes?

13   A.   Yes.

14   Q.   And were you -- did you have a conversation with Mendy Gold

15   about your use of his companies for sponsorship?

16   A.   Back in 2001, I think so, yes.

17   Q.   And did you use Mendy Gold's companies without his approval

18   to file false labor applications?

19   A.   No.  He knew we would be filing.

20   Q.   Do you have any proof of that?

21   A.   Yeah, ask him.

22   Q.   You said the blue labor certification was what you needed

23   from the sponsors in order to file these applications; correct?

24   A.   Yes.

25   Q.   And you also testified that the blue applications would be

D1t1cib5                          Salamon - cross

1   mailed to the sponsors; correct?

2   A.  Yes.

3   Q.  The fact is that the blue forms -- actually the entire

4   application process when you started back in 2001, 2002, 2003,

5   the addresses on those applications were addresses associated

6   with you and the Earl David firm; right?

7   A.  Can you repeat your question?

8   Q.  Sure.  The applications in the early days went to the Earl

9   David law firm or went to the post office boxes in Brooklyn or

10  other addresses that were associated with the Earl David firm;

11  right?

12  A.  Real sponsors went to sponsors, and if it was not real,

13  they came to the office.  I wasn't involved in 2001 in every

14  single case, but yes.

15  Q.  And it only became a problem when Earl David said that

16  there's scrutiny on us now so now you need to send them

17  directly to the sponsors.

18  A.  You're talking about online or -- because till 2005 it was

19  not online, so I don't know what your question means.

20  Q.  After 2005, when the PERM system came in.

21  A.  Okay.

22  Q.  Mr. David became concerned about government scrutiny.

23  A.  Yes.

24  Q.  So he said:  Now we have to change our tactics, we have to

25  figure out another way to do this and now the sponsors have

D1t1cib5                              Salamon - cross

1    to --

2    A.  No.  We didn't want to get denials and we didn't want to

3    raise that flag to the labor department because that's why at

4    one point we used to send it, make sure that there's no law

5    firm name on that application.

6    Q.  So you didn't want to get caught.

7    A.  What do you mean by caught?

8    Q.  Well, you knew that too many denials would raise red flags,

9    just as you said; right?

10   A.  Yes.

11   Q.  What does a red flag mean, to you?

12   A.  The flag that we're going to get denials received from a

13   company, one company, one law firm sending in so many

14   paperwork, so Earl David's idea was, have us -- no law firm

15   should be on the application.

16   Q.  Because people are going to start asking questions, we need

17   to change what we do.

18   A.  It might raise red flags, yes.

19   Q.  This was again a way to enable you to continue the fraud

20   and avoid detection; right?

21   A.  Yes, possibly.

22   Q.  You mentioned that you called Mr. Schwartz Nuchem; right?

23   A.  Yes.

24   Q.  Again, nickname or term of affection; right?

25   A.  Not a term of affection.

D1t1cib5                         Salamon – cross

1          THE COURT:  Asked and answered.  Let's move on.

2          MR. BRILL:  I'm sorry?

3          THE COURT:  I said asked and answered.  Let's move on.

4    Q.  Did you call Mr. Tischler by a nickname?

5    A.  Possibly.  Heshy, Heshaif, whatever.

6    Q.  Do you call Jacob Koenig by a nickname?

7    A.  What do you mean by nickname?

8    Q.  By -- like Nuchem; right?  Nathan is a first name, Nuchem

9    is a nickname.

10   A.  Yes, Yaki, Heshy, yes.

11   Q.  How about this guy Mike who you didn't know his last name

12   from the glass shop, did you call him by a nickname?

13   A.  Might have called him.  I don't know.

14   Q.  Jacob Landau, did you call him by a nickname?

15   A.  Yiddish name, Yakov Landau.

16   Q.  Mayer Weber?

17   A.  I don't know.

18   Q.  You said that Mr. Schwartz never came into the office,

19   right, either office?

20   A.  What?

21   Q.  You said that Mr. Schwartz never came into the office,

22   right, either office that you had?

23   A.  No, I never said that.

24   Q.  Mr. Schwartz came into your office?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1t1cib5                              Salamon - cross

1    Q.  How many times?

2    A.  I saw him at least once.

3    Q.  When was that?

4    A.  When he came to bring his two workers to the office.

5    Q.  Oh, when he came in for the legitimate application; right?

6    A.  Yes.

7    Q.  When he thought you were a lawyer; right?

8    A.  Never thought I'm a lawyer.

9    Q.  You charged, you said, $6500 if the applicant didn't need a

10   sponsor; right?

11   A.  Yes, something around that number.

12   Q.  You charged somewhere between 15 and $18,000 for someone

13   who needed a sponsor.

14   A.  Yes.

15   Q.  You were kicking back $500 to the actual sponsor.

16   A.  Yes.

17   Q.  So you were -- you and the law firm were clearing somewhere

18   in the vicinity of 8 to $11,000 for creating these false

19   sponsors; correct?

20   A.  Yeah, but this was in extent till the person gets the green

21   card, and the green card could take five years.

22   Q.  Right, but the same thing with the 6500; right?

23   A.  Yes.

24   Q.  So you were charging a significant amount more money

25   because it was a significant amount more risk; correct?

D1t1cib5                        Salamon - cross

1    A.  More risk?  I don't know more risk.  I would have to get

2    tax returns, have to pay an accountant.  It's not only the

3    sponsorship that would cost.  It would cost the firm more

4    money.

5    Q.  Because the creation of the documents instead of actually

6    getting legitimate documents took more work?

7    A.  Yes, you have to pay the sponsor, you have to pay the

8    taxes, you have to pay an accountant.

9    Q.  You had pretty much everybody right there at the firm;

10   right?

11   A.  They didn't work at the firm.  They did work in the firm

12   but we had to pay them.  Didn't do it for free.

13   Q.  In fact, 15 or $18,000 wasn't the most that you would

14   charge; right?  If you could get more, you would get more.

15   A.  We.

16   Q.  You would get $25,000 retainers; right?

17   A.  There were some, yes.

18   Q.  $50,000 retainers even; right?

19   A.  I don't remember.

20   Q.  You don't remember it as in it didn't happen or you just

21   don't remember?

22   A.  I never saw any retainer for $50,000.

23   Q.  But 25 was not uncommon; right?

24   A.  It was not something we did usually, but there were some

25   for 25.  Fewer than 18.

D1t1cib5                        Salamon - cross

1    Q.  And so let's just take one of the $15,000 retainers.  How

2    much of that would actually wind up in your pocket?

3    A.  Again, depending, if I have to deal with Martha or I have

4    to deal with Lipa.

5    Q.  Okay.  And what was the difference between Martha and Lipa?

6    A.  Martha got 30 percent, Lipa got 50 percent.

7    Q.  For the same work?

8    A.  For the same work, following up on the case.

9    Q.  Why was that?

10   A.  Why is that?  'Cause that's what he wanted.  "You want me

11   to work and open up cases, I want 50 percent of every client

12   that I -- that I have -- I open up and I follow up."

13   Q.  So he just negotiated a better deal than Martha did?

14   A.  Martha started with 10 percent actually, and she started

15   wanting more and more and more.

16   Q.  But she stopped at 30.

17   A.  I mean, she would have gone beyond.  She would have wanted

18   50 as well, because she kept on asking every year for more

19   money, more percentage.

20   Q.  But you personally, you didn't actually do the paperwork,

21   you weren't good at paperwork; right?

22   A.  No.  I was good at directing and knowing about paperwork,

23   but really sitting down at a computer, no, I -- I am just not

24   good at it.

25   Q.  When you say directing, that means what?  Good with people?

D1t1cib5                         Salamon - cross

1  A.  With the people, with the clients, speaking to clients,

2  telling Lipa this way, do that.

3  Q.  So basically it's sales, schmoozing, stuff like that;

4  right?

5  A.  Correct.

6  Q.  Okay.  Could it -- and soothing, say, upset clients, if

7  they got upset about things?

8  A.  That too.

9  Q.  Which involves a fair amount of lying to the clients;

10  right?

11  A.  Whatever.

12  Q.  When you're involved in a wholesale fraud, most of what you

13  were talking to clients about was a lie; right?

14          MS. ECHENBERG:  Objection.

15          THE COURT:  You can answer.

16  A.  I was explaining just about the case.  I don't know what

17  you're talking about fraud.  Explain the process, why didn't he

18  get permission to work, if he got permission to work, how long

19  will it take, just explaining the process.

20          MR. BRILL:  Could we look at 3031-2, please.

21  Q.  Would it be fair to say, Mr. Salamon, that in 2006 you felt

22  almost like you were a victim in this scheme, you were losing

23  money?

24  A.  There was a time that I did not make so much money,

25  everybody was taking their part, so working with clients, they

D1t1cib5                          Salamon - cross

1    had two, three clients for $15,000.

2    Q.  So you meant, "You know I'm a sucker, everybody sucks from

3    me"?

4    A.  Yes.

5              MR. BRILL:  And 3031-3, please.

6    Q.  Again, same conversation; right?  This is around the same

7    time.

8    A.  Yes.

9    Q.  "You know I'm a sucker here.  How much money goes out of my

10   pocket?  Sam this, Sam that."  What does the rest of it mean?

11   I know you don't like to say bad words.  What does, "Now we're

12   all fucked" mean?

13   A.  What can I do?  I have all the expenses in the office.  I

14   am the sucker here.  How much money goes out from my pocket?

15   Sam this, Sam that.  Everybody's asking me for money.  Now we

16   are all F'd and no office.  So let me know what we can work

17   out.  Everyone should be happy."

18   Q.  I mean, this was your e-mail; right?  You wrote this?

19   A.  I wrote it, yes.

20   Q.  You just don't like saying it out loud?

21   A.  Excuse me?

22   Q.  You don't like saying the word out loud?

23   A.  F'd up.  I don't like to, in front of --

24   Q.  I just want to make sure.

25   A.  I can say it, but I don't say things -- yes.

D1t1cib5                          Salamon - cross

1    Q.  That's fine.  That's fine.

2            In 2006, you thought that this venture was coming to a

3    close; right?

4    A.  No.

5    Q.  You said you had no office, right, because David called up

6    and complained to --

7    A.  David?

8    Q.  David Grynsztajn had said something to Mr. Tischler so you

9    didn't get your office; right?

10   A.  Excuse me?  I don't know what you're talking about.

11   Q.  Somebody had called Mr. Tischler, and you -- there was some

12   issue with your lease when you were moving in 2006?

13   A.  I don't know.  If you could explain, break it down for me,

14   please.

15   Q.  Sure.  2006.  You said right here in this e-mail, "Now I

16   have no office as well."  And you explained on direct what that

17   meant.  Do you remember what that was?

18   A.  Yes.

19   Q.  What was it?

20   A.  You're asking me?

21   Q.  Sure.

22   A.  Oh, okay.  That was that Rafi Brodjik called Harold

23   Tischler, not David Grynsztajn.

24   Q.  I see.  So you knew Mr. Brodjik was leaving at this point;

25   right?  You thought he was leaving; right?

D1t1cib5                         Salamon - cross

1    A.  It was in that time that we had some modifications, yes.

2    Q.  Mr. Grynsztajn had received a visit from the federal

3    government around the same time; right?

4    A.  I would say early in January.

5    Q.  Okay.  So you were under the belief in 2006 --

6    A.  Excuse me?

7    Q.  You were under the belief that in 2006 things were falling

8    apart; right?

9    A.  Things happening, I -- somebody called up Tischler about

10   the office, yes, I felt it -- yes.

11   Q.  And you continued doing it for another three years; right?

12   A.  Yes.

13   Q.  In fact, you didn't even trust the people you were working

14   with, did you?

15   A.  Not all of them.

16          MR. BRILL:  Can we look at 3031-4, please.

17   Q.  Based upon this e-mail -- if you want to take a look at it

18   for a minute to refresh your memory -- you were trying to make

19   a deal to cut out Lipa Teitelbaum and Earl David and start your

20   own venture; right?

21   A.  Where is that here?  If you can point it out to me.

22   Q.  Why don't you take a look at it.  I think you explained

23   this on direct.  You offered --

24   A.  I explained on direct that I was looking for my own

25   venture?

1   Q.  Well, you said, "I offered you a job."

2   A.  I don't know where this is coming from.

3   Q.  Okay.  Let me find it.  It says, "I offered you a job."

4   A.  "I offered you a job.  You can make, on top of what you

5   make from Earl, extra 1,000 to $1500 a week."

6   Q.  So you were offering him a position that had nothing to do

7   with Earl David; right?

8   A.  No.  It said on top of what you're making right now, offer

9   you a job, you can work -- he can work from his house, even at

10  one point, I told him he can work from the house because he was

11  scared to come into the office.  He can work from his house.

12  No, I had nothing to do with no venture.

13  Q.  You would pay Rafi Brodjik, according to your testimony, to

14  work for you; right?

15  A.  To work for an extra 1,000, 1500 a week, he can fax it to

16  Earl the PERM.  So it has nothing to do with some different

17  venture.  It says immigration.  PERM is the Department of

18  Labor.  "From your house."  So --

19  Q.  So if it wasn't 2006, then at what point did you decide

20  that Earl David shouldn't be making money from your work?

21  A.  Shouldn't be making?

22  Q.  Should not be making money from your work.

23  A.  I never decided he should not.  I just decided he should

24  make less, not shouldn't at all; otherwise, he wouldn't do no

25  work for me.

D1t1cib5                              Salamon – cross

1   Q.  Your testimony was that Rafi Brodjik was a person who

2   collected money in the office; right?

3   A.  Yes.  For a period of time.  Just couple months.

4   Q.  And allegedly took a cut of that money and then gave the

5   rest to Earl David; correct?

6   A.  I don't know exactly how they did it, but he got a cut from

7   everything that he collected, from the office, yes.

8   Q.  And he was the person who was supposed to transmit the

9   money to Earl David somehow; right?

10  A.  Yes.

11  Q.  Okay.  At some point you decided not to give any more money

12  to Mr. Brodjik; right?

13  A.  I never gave to him, handed him money.  Lipa Teitelbaum

14  did.

15  Q.  You never -- at some point you decided that Rafi Brodjik

16  shouldn't be getting any more money.  Let's put it that way.

17  A.  Shouldn't be getting any more money?  He should get money

18  whatever he took with Earl.  Whatever.  I did not control his

19  money.

20  Q.  He shouldn't be getting any more money from the work that

21  you did.

22  A.  He left, so he's not going to make money if he leave the

23  office.

24  Q.  Before he left?

25  A.  Before he left, whatever he collected from Earl, I don't

D1t1cib5                          Salamon - cross

1   know.  I never paid him.  I have nothing to do.  I didn't hire

2   him.  He never worked for me directly.

3   Q.  And so wasn't it true at some point -- I think we already

4   covered this -- that a percentage of your work would go to Earl

5   David --

6   A.  Yes.

7   Q.  -- percentage of what you took?  Okay.  At some point did

8   that stop?

9   A.  No.  Earl made money all the time, till 2009, every day,

10  yes.

11  Q.  And that percentage never changed?

12  A.  Possibly changed, yes.

13  Q.  Did you decide to give him less at some point?

14  A.  Whatever we made up, we discussed, and he agreed to, that's

15  what I gave him, yeah.  'Cause otherwise he wouldn't do any

16  work for me.

17  Q.  Look at 3031-8, please.

18  A.  Yes.

19  Q.  One second.

20        Who's Alex, if you look at the third line, the third

21  paragraph?  Someone in Florida; right?

22  A.  Yes.

23  Q.  Who was it?

24  A.  Alex is a guy, friend of Lipa.

25  Q.  What happened with Alex?

D1t1cib5                         Salamon - cross

1    A.  Rafi Brodjik called up Alex and tell him that we're -- we

2    just playing with him and we're not serious with him, whatever

3    we're saying to him.

4    Q.  What was it that you were saying to him?

5    A.  He wanted money, he was trying -- Lipa was telling him he

6    was going to get money for him.

7    Q.  So you lied to him, basically.

8    A.  Lipa lied to him.  I did send him some money because I felt

9    bad.

10   Q.  After the fact?

11   A.  No.  Before the fact, when Rafi called him.  He called

12   Rafi, he needed something, I sent him a thousand dollars.

13   Q.  And what was the original deal that you had worked out with

14   him?

15   A.  With what?

16   Q.  Well, I don't know.  You tell me.

17   A.  No, Lipa was telling him that he's going to get money.  He

18   needed money.  I don't know.  He was very tight with money, and

19   Lipa said he was going to get him money.

20            MR. BRILL:  Can we look at 601-8, please.

21   Q.  Did you give Mr. Grynsztajn $1800?

22   A.  Yes.

23   Q.  Did you give him 1800 that time?

24   A.  Approximately, yes.  I gave him money.  I don't remember

25   exact amount.

1          MR. BRILL: Can we look at 601-9, please.

2     Q.   This was basically just to get Mr. Grynsztajn off your

3     back; right?

4     A.   Yes.

5     Q.   You were lying to him; correct?

6     A.   Lying to him?  At one point I was thinking I had too many

7     problems at that time already so I was thinking in my mind one

8     day to go back to my father to work.

9     Q.   But you didn't.

10    A.   No.

11    Q.   And you had money that day; right?

12    A.   That day?  I don't know.  I don't know how much money I

13    had.  I used to fluctuate.  Sometimes I didn't have much money.

14    Q.   Not that much, but there wasn't a day you didn't have any

15    money; right?

16    A.   What do you mean by money?  How much do you mean by money?

17    Q.   Money.

18    A.   I had money.  I was not poor in the street, no.

19    Q.   You said around this same time that Mr. Grynsztajn

20    threatened to call the sponsors; right?

21    A.   Yes.

22    Q.   Threatened to call them and tell them that you'd filed

23    false tax returns on their behalf; right?

24    A.   Yes.

25    Q.   Threatened to tell them that you filed other false

1    documents on their behalf; right?

2    A.  I don't remember any other -- other documents.  Tax

3    returns.

4    Q.  Just the tax returns.  Okay.

5    A.  Yes.

6    Q.  Now it's your testimony the sponsors knew what was going

7    on; right?

8    A.  Yes.

9    Q.  So that's an empty threat, isn't it?

10    A.  They didn't know about tax returns.

11    Q.  Oh.  So that was scary that if Mr. Grynsztajn told them:

12    Well, you know about all the other false documents that Sam

13    filed on your behalf but he filed false tax returns too, that

14    would be the straw that broke the camel's back?

15    A.  Oh, yeah.

16    Q.  It's okay to commit all sorts of other fraud, but if you

17    were committing tax fraud, that's it?

18    A.  I mean, yes, they would be -- they would tell me, you know,

19    what, what, I never authorized to file tax returns.

20         MR. BRILL:  Could we look at 601-10, please.

21    Q.  Another conversation you had with Mr. Grynsztajn.

22    A.  Yes.

23    Q.  Not true; right?

24    A.  That is true that I had refunds to give, yes.  I gave --

25    clients, they used to pile up refunds.  I used to meet with

D1t1cib5                          Salamon - cross

1    clients, yes.

2    Q.  No new clients?

3    A.  I didn't say that, but it used to pile up refunds, more

4    refunds than new clients.  It was a problem.

5    Q.  You said no new clients?

6    A.  That's what I said.

7    Q.  True?

8    A.  I just moved -- I didn't read it.  One second.

9          "I just moved -- I have $15,000 in refunds, it's like

10   dead over here.  Every one is waiting for the amnesty.  No new

11   clients."  For a period of time there was no clients.  I don't

12   know if this particular time there was no clients.  It used to

13   be slow time.  The summer used to be very slow.

14   Q.  Again, just another tactic to get him off your back; right?

15   A.  I just told him that I have no money for him.

16   Q.  All right.  And this is around the time that Mr. Grynsztajn

17   left; right?  This is why he was looking for money because he

18   was already gone from the firm?

19   A.  I think so, yes.

20   Q.  Were there other Davids, people -- other than Earl David,

21   whose last name was David, was there anyone else by the first

22   name of David who worked at the firm around this time, or after

23   this time?

24   A.  I would have to go through it.  I don't remember.

25   Q.  Well, think about it for a second.

D1t1cib5                          Salamon - cross

1    A.  Any other Davids?

2    Q.  Any other people with the name of David working at the

3    firm.

4    A.  At Wall Street?

5    Q.  Either one.  Let's say either location.  You knew who

6    worked at both locations; right?

7    A.  There was David Grynsztajn.

8    Q.  Right.

9    A.  Earl David.

10   Q.  Right.  Anybody else?

11   A.  That worked in my office?

12   Q.  You had a son named David; right?

13   A.  Yes.

14   Q.  Did he work for you?

15   A.  Work for me where?

16   Q.  At either firm.

17   A.  No.

18   Q.  Didn't answer the phones or anything; right?

19   A.  Excuse me?

20   Q.  Didn't answer phones or anything; right?

21   A.  No.

22   Q.  You said that you actually had your son David approach

23   Mr. Grynsztajn around this same time; right?

24   A.  What are you talking about?

25   Q.  You said that you had your son --

D1t1cib5                         Salamon - cross

1   A.  Grynsztajn?  Are you making up stories?  Rafi Brodjik.  Why

2   don't you get it --

3   Q.  Your son David approached Rafi Brodjik; right?

4   A.  Yes, that -- yes.

5   Q.  And the purpose there was to make Mr. Brodjik go away, stop

6   bothering you?

7   A.  Yes.

8   Q.  You don't know what happened there, though, do you?

9   A.  I only know what my son told me what happened.

10  Q.  He paid him off?

11  A.  Paid off who?

12  Q.  Mr. Brodjik?

13  A.  No way.

14  Q.  So it wasn't about money then at that point.

15  A.  I told my son, "This guy is extorting me, extorting,

16  extorting.  I'm not going to give it to him.  I offered a job,

17  I did everything."  I told him, "Just tell him to leave me

18  alone.  I just can't take it anymore."

19  Q.  And after your son visited him, he left you alone.

20  A.  Yes.

21  Q.  You said you had the name of David Schlachter up on the

22  door in one of the offices; right?

23  A.  Yes.

24  Q.  Did he actually ever work there?

25  A.  Excuse me?

D1t1cib5                              Salamon - cross

1    Q.  Did he actually ever work there?

2    A.  He didn't work there, no.  Just came by once a week to

3    collect the money.

4    Q.  How about Mr. Philwin, did he ever work there?

5    A.  Not at 125 Maiden.

6    Q.  You said he used to come to 17 Battery and Wall Street?

7    A.  Yes, he used to come and sign paperwork, yes.

8    Q.  Mr. Samuel was the other lawyer?

9    A.  He used to come to the office more often than David

10   Schlachter, yes.

11   Q.  But not to do any work, really; right?

12   A.  He might have done some relations for our clients.

13   Q.  But nothing legal.

14   A.  Excuse me?

15   Q.  Nothing legal, no legal work.  He was a lawyer.

16   A.  I mean legal work, he would have to sign his notary on it.

17   Q.  He did some notary work.

18   A.  Yes.

19   Q.  And again, you also said that you forged the --

20   Mr. Tischler's signature for your lease at Battery Place;

21   right?

22   A.  Yes.

23   Q.  And how did that work?

24          MS. ECHENBERG:  Objection.

25   A.  Not Battery Place.  I'm sorry.  It was Maiden Lane.

D1t1cib5                          Salamon - cross

1    Q.   Maiden Lane.  Did you have to ID yourself or somehow

2    identify yourself as Mr. Tischler in order to sign that lease?

3    A.   No.

4    Q.   The lease was sent over and you just signed it and sent it

5    back.

6    A.   Sent it over to the agent.  The agent sent it.

7    Q.   You spoke to the agent?  Did you have to say, "Hi, this is

8    Mr. Tischler, I need my lease signed"?

9    A.   Excuse me?

10   Q.   Did you have to -- how did you get the lease?  Did you have

11   to say, "I'm Mr. Tischler, send me the lease at this address,"

12   or the fax number?

13   A.   No.  I just said, "Give it to me and Mr. Tischler will sign

14   it."

15   Q.   You lied to that person.

16   A.   To whom?

17   Q.   To the agent, in order to get the lease.

18   A.   To whoever, yes.

19        MR. BRILL:  Can we look at Exhibit 504, please.

20   Q.   The memo line, "Short of advanced rent."

21   A.   Yes.

22   Q.   That was a lie; right?

23   A.   Yes, to cover up for what I gave him the check for.

24   Q.   Uh-huh.

25        MR. BRILL:  You can take that down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1t1cib5                          Salamon - cross

1           Oh, I'm sorry, no.

2     Q.  The 1301 47th Street in Brooklyn, that was the address --

3     was that a post office box or something at that address?

4     A.  We used to have an office there, just to get the mail.

5     Q.  So you actually had Department of Labor mail sent to that

6     address as well; right?

7     A.  I don't remember.

8                 MR. BRILL:  Judge, do you want me to stop or --

9                 THE COURT:  I would like you to finish.

10                MR. BRILL:  I've got a bit more, Judge.

11                THE COURT:  How much more?

12                MR. BRILL:  Quite a bit.

13                THE COURT:  Let's, if we can -- can we go a few more

14    minutes?  Okay.

15    BY MR. BRILL:

16    Q.  There came a time you wanted to get your money out of

17    Mr. Teitelbaum's account; right?

18    A.  Yes.

19    Q.  And it's your testimony you sent Mr. Schwartz to the

20    hospital to visit Mr. Teitelbaum; right?

21                MS. ECHENBERG:  Objection.  Mischaracterizes

22    testimony.

23                THE COURT:  I don't recall the testimony, so can you

24    help us out.

25                MS. ECHENBERG:  He didn't give any testimony about

D1t1cib5                          Salamon - cross

1    where he sent them.

2              THE COURT:  Did you send Mr. Schwartz to talk to

3    Mr. Teitelbaum?

4              THE WITNESS:  Yes, but I don't remember if it was in

5    the hospital, yes.

6    Q.  And you don't remember he was in the hospital; is that what

7    you said?

8    A.  It's possible he was in the hospital, yes, but I don't

9    remember that I sent him over there to talk to him, where.  I

10   sent him a couple times to talk to Mr. Teitelbaum.

11   Q.  Do you recall -- well, do you recall if he was in the

12   hospital or not?

13   A.  I recall he went to the hospital, but I don't know -- I

14   don't know he spoke -- I know he spoke to the brother-in-law,

15   not to Lipa Teitelbaum, no.

16   Q.  Is that based upon your information Mr. Schwartz spoke to

17   Lipa's brother-in-law --

18   A.  Yes.

19   Q.  -- at the hospital?

20   A.  I was in the car.  I don't know what they spoke about.  He

21   went outside to talk.

22   Q.  At the hospital.

23   A.  Yes.

24   Q.  And you know that Lipa was in the hospital at this time;

25   correct?

D1t1cib5                          Salamon - cross

```
 1    A.  I was told, yes.

 2    Q.  And do you know why Lipa was in the hospital at this time?

 3    A.  Yeah, he wanted to commit suicide.

 4    Q.  And it was at this time that you thought it was a good idea

 5    to ask him for your money back.

 6    A.  I thought of the idea before that as well.

 7    Q.  Okay.  But this was the opportunity that you decided to ask

 8    for it; right?

 9    A.  To speak to the brother-in-law, yes, that I wanted the

10    money.

11    Q.  And he had over $200,000 of your money; right?

12    A.  Yes.

13    Q.  Money that you had --

14    A.  Close to 200,000.  I don't remember exactly.

15    Q.  Money that you had hidden from your wife because your wife

16    was trying to take it during your divorce.

17    A.  I didn't hide it.  She knew my assets so -- and the monies

18    I had.  I didn't -- really didn't hide it.  But money was

19    missing, and that's why I gave it to Lipa.

20    Q.  Instead of opening a bank account and putting it in your

21    own name?

22    A.  Excuse me?

23    Q.  Instead of opening a bank account and putting it in your

24    own name; right?

25    A.  Yes.
```

D1t1cib5                              Salamon - cross

1    Q.  You said that around this time you had also gone to

2    Nathan's, Mr. Schwartz's office on Route 59 in Monsey?

3    A.  What time was that?

4    Q.  Around the time that you approached -- or had Mr. Schwartz

5    approach Mr. Teitelbaum for money.

6    A.  I don't remember when it was, but it was after my offices

7    were closed down by the government.

8    Q.  And you went there because it was your testimony that

9    Mr. Schwartz said he had the computer guy who could help you

10   with your banking issue; right?

11   A.  He said, "The computer guy will come and you speak to my

12   computer guy and let's see what we can do about the checks,"

13   yes.

14   Q.  And you told the computer guy that you had permission to

15   access this account; correct?

16   A.  Yes.

17   Q.  And you told -- as far as you know, Nathan Schwartz

18   believed that you had permission to access this account; right?

19   A.  He came back to me and spoke to Lipa, and I sent him to

20   Lipa to say that I have a way I could get that money, so he

21   said, "Sam, I spoke to Lipa.  He said if you have a way, go

22   ahead."

23   Q.  And you acted on this, thinking that you had permission

24   from Mr. Teitelbaum.

25   A.  Yes.

D1t1cib5                        Salamon - cross

1   Q.  At any time did Mr. Teitelbaum ever object to what you did?

2   A.  Yeah, afterward.

3   Q.  Did he call the police?

4   A.  No.

5   Q.  Did you pay him back?

6   A.  Who?

7   Q.  Did you pay Mr. Teitelbaum back?

8   A.  No.  It's my money.

9   Q.  What was the objection?

10  A.  Just did not want -- he said it's -- he got arrested, and

11  he doesn't want to have problems with the government, that any

12  monies are moving out from his account.

13  Q.  And as part of this, you pleaded guilty to bank fraud for

14  doing what you did; right?

15  A.  Yes.

16  Q.  Even though you had permission.

17  A.  Yes.

18  Q.  Because that's part of the deal that you had with the

19  government.

20  A.  No.  Because it's wrong what I did.  It's fraud what I did.

21  Even though he could have a million dollars for me, I cannot

22  forge somebody's signature and go into the bank and take out

23  money.

24  Q.  Even if you had permission.

25  A.  Yes.

D1t1cib5                          Salamon - cross

1    Q.  And you also, after your offices were closed, saw clients

2    at Nathan Schwartz's office.

3    A.  Yeah.

4    Q.  And describe Nathan Schwartz's offices to me -- to us.

5    A.  You come in, there's one big office, and there's another

6    room to the right, there's a bathroom.

7    Q.  And he kept his corporate information in the office; right?

8    A.  His corporate?  I don't know.  I haven't seen no -- I

9    didn't see no -- I saw plans of what he's doing, but I didn't

10   see no corporate information.

11   Q.  You didn't see the corporate books?

12   A.  No.

13   Q.  Never saw them at any time, whether it was there or

14   anywhere else?

15   A.  No.

16            MR. BRILL:  Can we take a look at 3100-7, please.

17   Q.  Do you recognize this?

18   A.  It looks familiar, yes.

19   Q.  You testified on direct that this was a fraudulent

20   document, a document that was prepared by cutting and pasting.

21   Do you recall that?

22   A.  Yes.

23   Q.  And this was done by whom, if you recall?

24   A.  I don't know what year this was.  Some of it was created by

25   a US official in the labor department.

D1t1cib5                        Salamon - cross

1    Q.  Okay.  But there came a time when that wasn't available to

2    you anymore; right?

3    A.  Yes.

4    Q.  That person got caught; correct?

5    A.  Correct.

6    Q.  And you continued to do it not through the Department of

7    Labor computer but simply by cutting and pasting.

8    A.  Correct.

9    Q.  Now if it wasn't in the computer when you put in this

10   April 30th, 2001 priority date -- right?  That's what you

11   were changing?  You were either changing the name of the

12   company or the date when it was certified so that it would

13   appear that the person had a priority date on or before

14   April 30th of 2001; right?

15   A.  What did I not change here?  Could you repeat that?

16   Q.  What was the purpose of this document?

17   A.  This document shows that the person filed a case in

18   April 30, 2001.

19   Q.  Right.  And the point of filing April 30th, 2001 was what

20   again?

21   A.  There was an amnesty in 2001, so that person should be

22   eligible to get a green card.

23   Q.  So what you would want to show on a number of these

24   immigration applications, or DOL applications, is that the

25   person had applied on or before April 30th of 2001; right?

D1t1cib5                          Salamon - cross

1    A.   Yes.

2    Q.   Okay.  But on the computer -- on the cut and pasted foreign

3    labor certification, those would not be changed in the DOL

4    computer; right?

5    A.   Again?

6    Q.   Some of them were changed by this corrupt government

7    official; right?

8    A.   Yes.

9    Q.   That stopped, and then you had to do it by hand; right?

10   A.   By computer.

11   Q.   Okay.  By a computer program within your office; right?

12   A.   I don't know how he did it, Mr. Teitelbaum.

13   Q.   Ah, Mr. Teitelbaum did it.

14   A.   Yes.

15   Q.   But after this government official was caught and stopped,

16   the information that was contained on these foreign labor

17   certifications was not --

18   A.   This is not a foreign labor certification.  It's just a

19   copy of that saying that it was filed.  This is not a labor

20   certification.  You cannot get a green card with this piece of

21   paper alone.

22   Q.   All right.  So what was this used for then?

23   A.   Just to show proof that a person filed a case on April 30,

24   2001.  This is the proof.

25   Q.   To show proof to whom?

D1t1cib5                        Salamon - cross

1    A.  To the immigration.

2    Q.  So you would take this document that was not reflected in

3    an actual Department of Labor computer; right?

4    A.  Yes.

5    Q.  And you would submit this to immigration for that purpose

6    that you just described; right?

7    A.  Not just this alone.  Labor certification, had to be with

8    the labor approval and this and taxes and experience letter,

9    and then you have a document.

10   Q.  Okay.  But if this document was ever checked, it would show

11   that it was not in the computer in this form; right?

12   A.  Exactly.

13   Q.  How did you know that it wouldn't be checked?

14   A.  I don't know if it would be checked or not.

15   Q.  Another risk that you had to take.

16   A.  Excuse me?

17   Q.  It was another risk that you had to take.

18   A.  I guess.

19        MR. BRILL:  Could we look at 3100-5, please.

20   Q.  This is what would appear on the -- in the window of the

21   mailing envelope; correct?

22   A.  Yes.

23   Q.  And whose address is that?

24   A.  I think it's one of Lipa's P.O. boxes that he used to have.

25   I'm not sure.  I did not see the P.O. box so I don't know.

D1t1cib5                          Salamon - cross

1               MR. BRILL:  Can we look at 3100-8, please.

2    Q.  Henry Fernando Castillo Gonzalez is one of the legitimate

3    applications that Mr. Schwartz filed; right?

4    A.  Yes.

5    Q.  Why did it not go then to Mr. Schwartz's address?

6    A.  You would have to ask the person that filled out the

7    paperwork together with Nathan Schwartz.  I wasn't there.

8    Q.  Oh.  Wasn't it because if this paperwork didn't go to his

9    address, you could then claim that there was a mailing error if

10   paperwork with other names went to his address instead?

11   A.  No.  Again, Henry Castillo was his worker, he was filling

12   out paperwork with Nathan Schwartz, so why they decided to go

13   over there, I don't know.

14   Q.  But Mr. Schwartz, to your knowledge, had no information

15   about a 1274 49th Street address in Brooklyn.

16   A.  I was not there when he opened up the file with Lipa

17   Teitelbaum and Henry Castillo so I cannot tell you what he knew

18   or what he did not know.

19   Q.  But you were involved in the continuing fraud using the

20   Contour Framing name; right?

21   A.  Excuse me?

22   Q.  You were involved in the continuing fraud using the Contour

23   Framing name; right?

24   A.  With his permission.

25   Q.  And Mr. Schwartz would ask you, "Why am I getting mail

D1t1cib5                          Salamon - cross

1    under different names"; right?

2    A.  I don't remember that.

3    Q.  You never told him, "Don't worry about it, it's a mailing

4    error, sometimes we put multiple names in --"

5    A.  No.  I never told him that.

6    Q.  "-- at the same time"?

7    A.  I never told him that.

8            MR. BRILL:  Can we look at 3100-10, please.

9    Q.  Looking at the employer information, it actually contains

10   the correct address information for Contour Framing; right?  If

11   you know.

12   A.  Correct information?  That's the P.O. box.  I don't know if

13   it's correct or not, but that's the P.O. box.  That's not his

14   offices.

15   Q.  But that's a P.O. box that you knew to be associated with

16   Mr. Schwartz; right?

17   A.  That he gave me the address, yes.

18   Q.  And he gave you that employer identification number as

19   well; correct?

20   A.  Yes.

21   Q.  But not the e-mail, if you look at the bottom of the page.

22   Right here (indicating).

23   A.  No, that e-mail he didn't give me.

24   Q.  That was created by Mr. David; correct?

25   A.  Correct.

1    MR. BRILL:  Okay.  Could we look at the next page of

2    this.

3    Next one after that, please.

4    Next one.

5    Keep going.

6    Keep going.

7    And one more.

8    Okay.  We can take that down.  Thanks.

9    Can we look at 3100-6, please.

10   Q.  As you testified to, legitimate applications would come

11   from -- would have checks from the employer; right?

12   A.  Usually, yes.

13   Q.  All right.  Similar to what Mr. Schwartz wrote here;

14   correct?

15   A.  Correct.

16   MR. BRILL:  Can we look at 3101-4, please.

17   Q.  It was your testimony on direct that -- did you make these

18   notes?

19   A.  No.

20   Q.  You testified about what they meant, though, on direct;

21   right?

22   A.  What?

23   Q.  You testified about what they meant on direct; correct?

24   A.  Probably I did.  I don't remember.

25   Q.  Do you know what they mean?

D1t1cib5                          Salamon - cross

1    A.  Yes.  $12,000 for the case.  I think it's 6,000 upon

2    receipt.  I don't know if that means to Sam.  No, to start.

3    6,000 to start the case, $6,000 -- upon receipt from

4    immigration, another $6,000.

5    Q.  And at the bottom?

6    A.  It says 8,000 for work authorization.

7    Q.  And what does the 8,000 represent?

8    A.  Again, this is not my handwriting, I didn't know, but

9    that -- I don't know.  I don't know.  8,000 for -- whether it

10   makes sense or not, it's not my handwriting, so I didn't know

11   the particulars.

12   Q.  But this doesn't represent any percentage that was paid to

13   Mr. Schwartz, a kickback; right?

14   A.  I can't say.

15             THE COURT:  Are we done with this exhibit?

16             MR. BRILL:  Yes.

17             THE COURT:  Okay.  Then let's break and pick up in the

18   morning.

19             I remind the jury to keep an open mind and not to talk

20   about the case.

21             (Jury excused)

22             (Witness excused)

23             (Continued on next page)

24

25

D1t1cib5

1          (In open court; jury not present)

2          THE COURT:  Mr. Donaldson, we've had that issue

3     hanging around.

4          MR. DONALDSON:  Yes, your Honor.

5          THE COURT:  It's the obedience to authority issue,

6     just so the record is clear.

7          MR. DONALDSON:  First, I have no intention of arguing

8     as a defense obedience to authority.

9          Secondly, in response to the government's memorandum,

10    I would object to the giving of the instruction as they

11    requested on page -- bottom of page 3, top of page 4.

12    Specifically, I believe the government's reliance on your

13    Honor's case, *United States v. Opide*, 11-CR-1106, as well as

14    *U.S. v. Caban*, 173 F.3d 89 -- the reason why I say both, the

15    government's reliance on both of those cases is particularly

16    misplaced because, as the court instructed the jury, the

17    government and defense counsel's statements during openings are

18    not evidence, and both these cases, I believe more particularly

19    in *Caban*, the defendant -- it was a co-defendant case -- the

20    defendants were charged with narcotics.  I believe that the

21    defendant on trial, Mr. Caban, actually testified about a

22    particular defense.  The court had given him a prior

23    instruction pretrial what would happen, gave him the option,

24    after testifying, to actually stop the testimony, saying,

25    "Listen, you have two options.  One, stop, and I won't give the

D1t1cib5

 1    instruction; or two, continue with your defense during the

 2    trial via evidence and I will have to give that instruction."

 3    And Caban, the defense, chose the latter, to continue to

 4    testify regarding that particular defense, at which point,

 5    because there was actual evidence submitted related to that

 6    defense, the court then gave that instruction.

 7           I believe the same thing happened in *U.S. v. Opide*.

 8    In that case, as the prosecutor, the government indicates, the

 9    defendant introduced evidence that he acted under duress.  The

10    defendant also testified, as in *Caban*.  In that case evidence

11    was actually introduced into the case regarding that.

12           In this case there has not been any evidence from the

13    defense, and as I said, I'm not going to argue that you should

14    find Ms. Cibik not guilty because she did this but she did it

15    because X, Y, Z.  That's not my defense.  As such, I do not

16    believe this instruction is appropriate.  I think it would be

17    more confusing and unnecessary.

18           So for those reasons, I think -- I argue, actually,

19    that the instruction should not be granted.

20           MR. PASTORE:  Very briefly, your Honor.

21           I think the primary concern the government had was

22    that we were here arguing similar to what we heard in opening,

23    that somehow there was this, as Mr. Donaldson had put it,

24    unyielding obedience to authority.  It sounds like that's not

25    going to happen.

D1t1cib5

1          THE COURT:  Forewarned is forearmed.

2          MR. PASTORE:  And in terms of a curative instruction,

3     I think it's probably less significant at this point.  We

4     raised it because your Honor has previously identified this as

5     an issue, and I think it was, you know, pretty clearly fronted

6     in the opening.  I think he called Mr. David -- Mr. Donaldson

7     called Mr. David I think a sort of -- essentially a sheep in

8     wolf's clothing.  This authority turned out to be a sociopath,

9     turned out to be a liar, said, "Come on in, come to my door,"

10    and basically used Ms. Cibik first as a translator sitting

11    outside the door, and then said, "Do this," and she did it.

12    "Fill out this form," and she did it.  So it's really been

13    raised to the jury.  So the point in suggesting the curative

14    instruction was we did feel it was fronted enough in openings

15    to put it into the jury's mind and to potentially raise the

16    issue, but if it's not going to be relied on in closing, I

17    think that I agree it forecloses it.

18         THE COURT:  Well, Mr. Pastore, I think there's one

19    thing we can agree you were right about and I was wrong about,

20    and that's the length of this trial.

21         MR. PASTORE:  Unfortunately for both of us.

22         THE COURT:  Right.  And therefore, I think given the

23    gap in time between his opening and his summation, if we don't

24    hear anything like this again, I think we can let it go.

25              (Continued on next page)

D1TLCIB6

1            MR. GREENFIELD:  I thought it was appropriate you said

2    the length of time.  I just -- I don't know if I'm asking for

3    guidance or just I notified everyone yesterday that I

4    anticipate calling three or four brief witnesses and I still

5    think that's the case.

6            THE COURT:  What we call fact witnesses or character

7    witnesses?  Or I don't know.

8            MR. GREENFIELD:  Certainly not fact in the classic

9    sense, but close to character witnesses, yes.  And I think that

10   all of them are ten minutes apiece.  They're working men, and

11   I've been telling them from day-to-day.  I have them coming

12   tomorrow.  I don't think they're going to be reached tomorrow,

13   and I would like to tell them to come Thursday.  And I'm basing

14   that on the fact there are two and a half more

15   cross-examinations, a redirect, and another witness that the

16   government anticipated would be two hours tomorrow.

17           So it's just hard for me to ask just regular guys who

18   work on an hourly basis to sit and I'm kind of stretching.  I

19   would like the Court to know that I intend to have them here at

20   9 o'clock Thursday morning.

21           THE COURT:  Well, can I get -- I'm frankly quite

22   surprised at the length of Mr. Brill's examination.  So I guess

23   I would be -- it would be helpful, particularly since you had

24   all this time to prepare, unfortunately, from my perspective,

25   if you could give me an idea of how long.

D1TLCIB6

 1            MR. GREENFIELD:  I think I'll have this witness for an

 2    hour.  I expect to be trying to get really organized.  And, you

 3    know, I have no excuse not to be since we have tonight.  So I

 4    would say about an hour on cross-examination of this witness,

 5    maybe a little bit less.

 6            THE COURT:  Mr. Gerzog.

 7            MR. GERZOG:  About an hour.

 8            THE COURT:  Since all my optimistic qualities have

 9    been dashed, why don't we just let your witnesses go on first

10    thing Thursday morning and, you know, wherever we are.

11            MR. GREENFIELD:  That will be great.  I'll have them

12    here for sure.  I just didn't want to bring them here tomorrow

13    and then have to bring them back on Thursday.  I know they lose

14    a day's pay.  Thank you.

15            THE COURT:  Mr. Pastore.

16            MR. PASTORE:  So the government should be prepared to

17    sum up on Thursday, should that be working assumption?

18            THE COURT:  Yes.

19            MR. PASTORE:  Every one should be prepared?  Okay.

20            THE COURT:  You could also -- I've gotten some chance

21    to get familiar with the various comments about the charge.  It

22    would be helpful for me to know from the government whether

23    there are any points that the defense made that you don't argue

24    about so that I don't have to, you know, spend time thinking

25    those through as thoroughly.

1          MR. PASTORE:  There were several things that our

2     initial reaction was we were surprised, actually, at the sort

3     of nature of the changes and the amount of the changes,

4     frankly.  But there were some changes we will certainly be

5     objecting to, others that I think we'll be okay with.  In going

6     through it's probably fairly obvious which changes the

7     government is going to object to.

8          In other words, the conscious avoidance we think is

9     absolutely necessary in this case, particularly as it pertains

10    to Harold Tischler and Nathan Schwartz.  We think there is no

11    doubt that there was a large volume of mail.  We've have phone

12    records that indicate repeated phone calls to them.  And we

13    believe that it should have been obvious to them that there was

14    a fraud going on, particularly if Mr. Schwartz is arguing that

15    he was familiar with the process because he had two legitimate

16    clients.

17         We also think that's the case for Mr. Brodjik and

18    Ms. Cibik that they were operating in this office and to the

19    extent that their argument is they had no idea that this fraud

20    was going on, we've heard from multiple witnesses about what

21    was going on in the office, about how rife the office was with

22    fraud.  And the only way you could not know what was going on

23    is by closing your eyes or by actively participating in it.

24         So to the extent they're going to argue knowledge and

25    intent, I think they are required to in closing, we believe

D1TLCIB6

1    that a conscious avoidance charge is appropriate because

2    Mr. Brodjik primarily was collecting money.  He knew where that

3    money was coming from.  Ms. Cibik was meeting with clients and

4    she had to know that when she went to Sam and Lipa and paid

5    them for sponsors that those sponsors were not legitimate.  So

6    we do think there is a basis for that.  I think that's probably

7    going to be the primary argument.

8            The other issue that jumped out at us was the changes

9    to the law enforcement techniques and investigation.  We think

10   your Honor is exactly right, it's of no concern to the jury how

11   the government proves its case or what techniques were used to

12   investigate it.  It's solely based on the evidence or lack or

13   evidence.  And so we again think that the Court's instruction

14   was and is the appropriate one.

15           So those were the two that I think that probably we

16   focused on most immediately.

17           THE COURT:  Do you agree -- I think the defendants

18   take the position that regardless of any evidence that they're

19   entitled to a charge of good faith.

20           MR. PASTORE:  The good faith charge I think is

21   probably appropriate.  I have to look at the -- it's the last

22   paragraph that struck me and I want to go back.  I'm sorry, I'm

23   doing this a little bit on the fly.  Ms. Echenberg was

24   primarily responsible.  So I know she was looking into it, so I

25   apologize for not being as good up at it.  But I do want it

D1TLCIB6

1    look at Sand.  I think good faith is probably an appropriate

2    charge.  I just don't know if the language that's been

3    proposed -- I want to look at Sand's.

4              THE COURT:  What about this position, if you can

5    respond, that the government is somehow I guess required to

6    specify false statements, in effect, like a bill of

7    particulars.

8              MR. PASTORE:  What we've done in our proposed charge

9    was simply take your Honor's suggestion as best we could

10   remember it from the bench and incorporate it into our proposed

11   charge.  We think that suffices because, of course, the jury

12   can decide there was some other false statement that the

13   government hasn't identified.  We'll of course be identifying

14   several of them in our closing argument, but I don't think

15   we're required to say these are the ten statements and submit

16   for some sort of a line item veto.

17             I think it's up to the jury to decide, as long as it's

18   unanimous.  We agree that although it wouldn't be reversible

19   error to refuse to charge on that, the better approach appears

20   to be to include that just to be sure there's no issue of a

21   lack of unanimity.  So on that, we don't have an objection, but

22   we think the Court's suggestion was the right one.

23             MR. BRILL:  Judge, if I could respond to one thing

24   Mr. Pastore said.  Mr. Schwartz is not arguing he had any

25   familiarity with the immigration system simply based upon his

D1TLCIB6

1    seeking to submit to a legitimate application.

2            THE COURT:  He may not be arguing that, but that's

3    certainly something the government can argue.

4            MR. BRILL:  I'm not saying the government can't argue

5    that.  But I believe that what Mr. Pastore said is it's an

6    argument coming from our side.  That's not the case.

7            THE COURT:  I think it's coming from government's

8    side.

9            MR. BRILL:  Sure.  That's fine.

10           MR. GUTMAN:  If I could just, I'm not going to add to

11   what we're already written, the case law we're relying on.  In

12   addition to the legal authority, there's particular concern

13   under the facts here from the way the evidence has come in,

14   there have been witnesses who have referred very vaguely to

15   Mr. Brodjik went upstairs and was working on R-1 applications.

16   They haven't identified an application.  There's nothing about

17   that that says it was fraudulent or not fraudulent.

18           So in the absence of specifying which statements

19   they're relying on, which statements the government is relying

20   on, there is a danger, there's a real danger in this case --

21           THE COURT:  I don't think there's any case authority

22   that says that in the context of the trial, the government is

23   required in effect to amend the indictment.  It seems to me

24   that it's either -- the law is either that in the indictment

25   you need to be absolutely specific and list the various false

D1TLCIB6

1    statements or it's not required.  But it isn't a matter of the

2    government at trial going or the judge in the context of the

3    charge becoming more specific.

4              The government will obviously in its summation point

5    out the specific, obviously, point out examples of statements

6    that it asserts are false and fraudulent.  But I don't think

7    there's any support and I don't think you've provided any that

8    in effect the indictment has to be amended, which is really

9    what you're asking for.

10             But we're in agreement on the unanimity point.  Okay.

11   Very good.  Thank you.

12             MR. PASTORE:  Judge, there is just one thing, and I

13   apologize in advance for this being a recurrent, perhaps a

14   recurrent issue.

15             At the conclusion of Mr. Donaldson's cross-examination

16   of Mr. Salamon, he asked him several questions:  You never saw

17   Ms. Cibik open a case, did you?  As far as you know, she never

18   opened the case, right?

19             Mindful of your Honor's prior direction to the case

20   law that there must be a specific fact that is contradicted, I

21   was looking at the notes from Ms. Cibik's proffer and the notes

22   provide as follows:  "Cibik opened approximately two to 300,

23   two to 300 new cases during her employment at the law firm.

24   And at least 50 percent of these cases, the client was

25   instructed to list a profession for which they had no

D1TLCIB6

1    experience either by Cibik at David's direction or by David

2    himself."

3        And so we think that is directly at odds with the

4    cross-examination today.  We think it's a specific fact that

5    has now very clearly been placed at issue.  And so to the

6    extent that it's now an issue, I think it's pretty clearly at

7    odds with what Ms. Cibik herself admitted during a proffer

8    session with the government on September 8, 2010.

9        MR. DONALDSON:  If I may respond.  This is what I'm

10   starting to see.  The government is putting up witnesses and

11   they're saying things in their direct and then expecting

12   whatever they say to not be confronted with questions.  So if

13   their witness gets up there and says that I know that X, Y, Z

14   happened, then it is incumbent upon me representing Ms. Cibik

15   to find out whether he actually knows that.  So I'm testing his

16   knowledge.

17       So if he says that I know she did X, Y, Z, the

18   government is now of the opinion that I cannot ask him whether

19   or not he knows that or how he knows that because if I do that,

20   then somehow I'm not doing what I'm supposed to be doing which

21   is testing his credibility in whether or not he is actually

22   truthfully saying what he knows.  So if -- and that's all I was

23   doing.  Again, it goes directly to his credibility in what he

24   says he knows based upon his observations.

25       So if he gets up there and says Ms. Cibik was

D1TLCIB6

 1    definitely at or she was at 82 Wall Street on direct, and then

 2    we get up there and question him about how he knows that,

 3    whether he knows that, then he starts vacillating,

 4    backtracking, that's called in my opinion proper

 5    cross-examination.  If he says that she opened cases, then I

 6    need to be able to ask him how he knows that.  And if he comes

 7    back and says I didn't see her open it, then in my opinion that

 8    goes directly towards his credibility and his ability to say

 9    that he knows she did something if he doesn't in fact know

10    that.

11            So that's all it goes to.  I just don't believe that

12    it's at this point -- well, I don't believe that the government

13    should be able to handcuff me in the nature or the method of

14    going towards and getting towards the credibility and the

15    possibly inconsistencies of this or a particular witness based

16    upon their testimony.

17            MR. PASTORE:  Your Honor, if I may.

18            THE COURT:  I have the exact -- it took me a few

19    minutes.  The question was:  You never saw her open up a case

20    either, correct?

21            Answer:  Yes, I seen her upstairs.

22            Answer -- this should be question -- excuse me?

23    "Q.  Did you see her opening up any cases, Mr. Salamon?

24    "A.  I didn't see her actually writing up a case.

25    "Q.  Yes or no?

D1TLCIB6

1    "A.  No.

2    "Q.  Did you see my client, Ms. Gulay Cibik, opening up any

3    cases, yes or no?

4    "A.  No.

5    "Q.  But you told these jurors that my client opened up cases,

6    right?

7    "A.  Yes.

8    "Q.  But you never saw that, did you?

9    "A.  I seen her files.

10   "Q.  Did you see her open any cases?

11   "A.  No."

12        I think he has a point.  Once the witness made a claim

13   on direct that he saw certain things, how does he attack that

14   if he can't ask those questions?  He's only asking did you see

15   her do it.  He's not asking did she do it.

16        MR. PASTORE:  I think that position from defense

17   counsel would have more force if his client didn't come in and

18   admit to opening two to 300 cases.  It's not the government

19   that's handcuffing.  There's a proffer agreement.  She was

20   represented by counsel at all stages.  She signed the proffer

21   agreement and admitted to criminal conduct.  And now to

22   cross-examine and take a position that's 180 degrees opposite

23   which is, you told the jury that you saw her open a case,

24   right?  But you didn't see her do that.

25        THE COURT:  But the witness acknowledges that his

D1TLCIB6

1    testimony when asked by the government that he saw her opening

2    cases is actually not based on his personal observation.  So

3    yes it is his, you know, judgment, and I'm not saying he's

4    lying in terms of that was his understanding.  But it seems

5    Mr. Donaldson is exploring whether the witness has direct

6    knowledge as defined by what we charge, seen and heard with his

7    own eyes.

8         MR. PASTORE:  I guess I'm just responding to the

9    tension of that cross-examination suggesting that it didn't --

10   not suggesting -- essentially stating that it didn't happen

11   versus Ms. Cibik admitting that it happened.  And in terms of

12   the handcuffing, absolutely Mr. Donaldson is handcuffed, but

13   that's not because of anything the government did.  That's

14   because his client made a decision to come in, take advantage

15   of the terms of a proffer agreement in an attempt to cooperate,

16   which was not successful, and in doing that, she admitted

17   certain facts which have now been placed at issue by

18   Mr. Donaldson's cross-examination.

19        MR. DONALDSON:  Can I just say one thing?  Then I'll

20   be finished.  The government's position is -- it's a dangerous

21   position for them to take, and I'm surely hoping they're not

22   trying to set some kind of precedent doing this.  The position

23   they're trying to take is that if they have information by

24   proffer or otherwise from the defendant that they did X, Y, Z,

25   whatever it may be, then they have a witness who has no direct

D1TLCIB6

 1    relationship to what she did or didn't see what they did, but

 2    comes in here and testifies that they did.

 3         Say, for example, they come in and say I didn't see

 4    her do X, Y, and Z, and that's a flat lie.  The government is

 5    saying that just because it did happen, if it in fact happened,

 6    even though the witness is lying, we can't confront the witness

 7    with that lie because it in fact happened, which is remarkable

 8    because that would mean that they're suggesting that we should

 9    allow the witness to possibly lie because the fact actually

10    happened.  They didn't see it, so they can get up there and

11    they can get up there and lie and we can't challenge that lie

12    or go into trying to challenge that lie because the fact

13    actually happened.  That can't be true because that can't be

14    what they really want to happen because that's two totally

15    different things.

16         When that witness testifies, his or her credibility is

17    at issue and I have the right and the obligation to test it.

18    If he gets up there and says one thing and I test him on it, it

19    has nothing to do with the actual facts.  It goes towards his

20    credibility.  And that's all that I've been doing and been

21    trying to do.  And I don't see how the government would try to

22    think that that should not happen because if that's what

23    they're doing, then they're not only handcuffing the defense,

24    then they're establishing some type of method that their own

25    witness's credibility can't be challenged if a fact exists

D1TLCIB6

1    someplace else.  And I'm sure they're not trying to do that,

2    but that's going to be the result of their argument if they're

3    successful with it today.  I'm sure that's not what they're

4    trying to do, but I think that's the unfortunate result.

5        MR. PASTORE:  Your Honor, Mr. Donaldson had a skillful

6    cross-examination.  He cut the witness off when the witness

7    said I've seen it in her files and that's how he knew that she

8    opened cases.  I believe that's what your Honor read back.  He

9    cut the witness off.  He said I seen it in her files.  He said

10   but you didn't see her in the act of opening cases.  It was

11   very skillful.

12       It also was not, to the extent that he's suggesting

13   the witness was lying, of course he's not.  He was asking about

14   perception of seeing Ms. Cibik in the act of opening files.

15   The witness was attempting to explain that he knew Ms. Cibik

16   opened the files because he had seen them in the office.

17   Mr. Donaldson, therefore, chose to go on the perception issue,

18   cut the witness off about his basis which was that he had seen

19   the files in the office, and that's how he knows that Ms. Cibik

20   was opening cases.

21       And he has chosen to do that when Ms. Cibik herself

22   has admitted to opening two to 300 new cases and supplying

23   false information in at least 50 percent of the cases.  He was

24   skillful, admittedly, but it also violated the terms of the

25   proffer agreement.

D1TLCIB6

1         THE COURT:  But the witness twice answered the

2    question, did you see her open, and twice said no.

3         MR. PASTORE:  Right.  That suggests that he lacked the

4    knowledge.  It's the seeing I think that was the focus.  And,

5    again, I'm not saying he did anything improper.  It was

6    skillful.  He focused on --

7         THE COURT:  But isn't that, isn't that his job?

8         MR. PASTORE:  It is.

9         THE COURT:  He has to be careful.  He knows that.

10        MR. PASTORE:  Right.  And I understand in this case by

11   suggesting that -- the take-away from that I think is that

12   Ms. Cibik did not open new files in the office.  I think that

13   was the take-away from that, and it's inconsistent with what

14   Ms. Cibik admitted to in her proffer agreement, knowing the

15   risks and the benefits that came along with entering into that

16   agreement.  So that's why the government again raises it.

17        MR. GUTMAN:  Your Honor, could I offer something as a

18   bystander with an interest in this issue.  This is exactly the

19   issue that was resolved by the Second Circuit.  I can't

20   pronounce the name although I think -- Oluwanisola, 605 F.3d

21   124 (2010).  And the court specifically referred to almost the

22   exact example.  I'm just trying to find it.  I'm quoting, there

23   is no inconsistency or contradiction between a defendant's

24   admission that he robbed the bank and his challenge to a

25   witness's testimony that the witness saw the defendant rob the

D1TLCIB6

1   bank.  And that I think answers the question.

2          MR. DONALDSON:  I didn't read that case, but I'm

3   thinking that's right.

4          THE COURT:  That's what we're taught to believe, that

5   the Second Circuit case is right.

6          MR. DONALDSON:  I didn't read it, but it makes sense

7   to me.

8          THE COURT:  Okay.  Those little computers are handy,

9   aren't they.

10         MR. PASTORE:  Your Honor, one final.  My understanding

11  is that no other defendants at this time intend to put on, just

12  for planning purposes, intend to put on defense cases.

13         MR. DONALDSON:  As of yesterday, I had another meeting

14  with Ms. Cibik and we have -- she has again confirmed to me

15  that she is not testifying, as of yesterday.  I told the

16  government that last night.

17         MR. PASTORE:  And Mr. Gerzog and Mr. Greenfield.

18         THE COURT:  He's spoken.

19         MR. PASTORE:  I'm sorry.

20         MR. BRILL:  We don't even look alike.

21         As of this moment, we are not putting on a case.

22         THE COURT:  We'll finish up the charge issues tomorrow

23  afternoon.  Okay.

24         (Adjourned to January 30, 2013, at 9 a.m.)

25

```
1                    INDEX OF EXAMINATION
2    Examination of:                        Page
3    ROBERT SALAMON
4    Direct By Ms. Echenberg . . . . . . . . . .1364
5    Cross By Mr. Donaldson . . . . . . . . . . .1441
6    Cross By Mr. Brill . . . . . . . . . . . . .1484
7                    GOVERNMENT EXHIBITS
8    Exhibit No.                          Received
9     3017 and 3026  . . . . . . . . . . . . . .1394
10    503-1, 503-2, 503-3, 503-4, 503-5,  . . . .1420
11            503-6
12    222  . . . . . . . . . . . . . . . 1438
13    503  . . . . . . . . . . . . . . . 1420
14    507  . . . . . . . . . . . . . . . 1430
15    3004  . . . . . . . . . . . . . . 1431
16
17
18
19
20
21
22
23
24
25
```