D1v1cib1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        11-CR-424 (NRB)

5   GULAY CIBIK, REFAEL BRODJIK,
    a/k/a "Rafi," NATHAN SCHWARTZ,
6   HAROLD TISCHLER, a/k/a
    "Hershy,"
7
               Defendants.              Jury Trial
8
    ------------------------------x
9
                                        New York, N.Y.
10                                      January 31, 2013
                                        9:15 a.m.
11

12  Before:

13                  HON. NAOMI REICE BUCHWALD,

14                                      District Judge

15                          APPEARANCES

16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  JANIS ECHENBERG
    JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
    MICHAEL DINET, Paralegal Specialist
20
    DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
    BY:  XAVIER R. DONALDSON, ESQ.
22
    LAWRENCE D. GERZOG, ESQ.
23  JEREMY L. GUTMAN, ESQ.
         Attorneys for Defendant Refeal Brodjik
24

25
```

D1v1cib1

                              APPEARANCES
                              (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D1v1cib1

1                    (Trial resumed)

2                    (In open court; jury not present)

3                    THE COURT:  Excuse me.  Mr. Greenfield, I don't want

4      to misstate anything to the jury.  We're still starting with

5      your --

6                    MR. GREENFIELD:  I've got my people in the conference

7      room.

8                    THE COURT:  Four, three, two, one?

9                    MR. GREENFIELD:  No, no.  There are four and a

10     character witness.

11                    THE COURT:  Okay.

12                    MR. GREENFIELD:  Four witnesses -- I spoke to the

13     government this morning.  One guy told me last night he wasn't

14     sure he's going to make it, so I scurried around for another.

15     Now they're both here.  So I can't imagine they'll be more than

16     three minutes on direct.

17                    THE COURT:  Okay.  Very good.  Okay.

18                    (Continued on next page)

19

20

21

22

23

24

25

D1v1cib1

1              (Jury present)

2              THE COURT:  Good morning, everyone.

3              THE JURORS:  Good morning.

4              THE COURT:  All right.  We're going to take some

5     witnesses out of turn.  These are some witnesses being called

6     on behalf of Mr. Tischler.  Since they're, should we call them

7     regular civilians, we want to respect their work schedule, and

8     so Mr. Greenfield's going to call them, and that will be our

9     first order of business.

10             MR. GREENFIELD:  Thank you.  The first witness I'm

11    going to call is Greg Talley.  I'll get him.  He's right

12    outside.

13             (Pause)

14             THE CLERK:  Could you just raise your right hand for

15    me.

16             (Witness sworn)

17             THE CLERK:  Could you please state and spell your last

18    name for the record.

19             THE WITNESS:  Gregory Talley, T-A-L-L-E-Y.

20             THE COURT:  Talley.

21             THE WITNESS:  Yes.

22             THE COURT:  Please come up and have a seat and talk

23    into the microphone, okay?

24             THE WITNESS:  Okay.

25     GREGORY TALLEY,

D1v1cib1

1          called as a witness by the Defendant Tischler,

2          having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. GREENFIELD:

5    Q.  Please make sure you speak into the microphone so that

6    everyone can hear you, okay?

7    A.  Sure.

8    Q.  Mr. Talley, where do you live?

9    A.  Queens.

10   Q.  How long have you lived in New York City?

11   A.  All my life.

12   Q.  How old are you?

13   A.  47.

14   Q.  Do you know Harold Tischler?

15   A.  Yes.

16   Q.  When did you meet Mr. Tischler for the first time?

17   A.  March 8, 1995.

18   Q.  Okay.  That's about 18 years ago.  How is it you remember

19   the specific date?

20   A.  I was out on work release and I needed a job, and by my

21   home, he was doing some work in the building, and I asked him

22   if he could hire me because they was gonna send me back to jail

23   if I didn't find a job.

24   Q.  Now you say you were on work release.

25   A.  Yes.

D1v1cib1                         Talley - direct

1    Q.  Have you ever been convicted of a crime?

2    A.  Yes, I was.

3    Q.  Was it a felony?

4    A.  Yes, it was.

5    Q.  Tell the jury what you were convicted of.

6    A.  I was convicted of controlled -- of illegal possession of a

7    controlled substance, criminal sale of a controlled substance,

8    and possession of a weapon.

9    Q.  And when was that?

10   A.  June 16th, 1992.

11   Q.  And did you serve time in state prison?

12   A.  I sure did.

13   Q.  How much time did you serve?

14   A.  I did --

15   Q.  Withdrawn.  What was your sentence?

16   A.  My sentence was three to six.

17   Q.  Three years to six years?

18   A.  Yes.

19   Q.  And did there come a time that you were released?

20   A.  Yes.

21   Q.  On work release?

22   A.  Yes.

23   Q.  When was that?

24   A.  It was sometime in March, but the first day that I came --

25   I was in the facility for about two weeks, and when I first

D1v1cib1                          Talley – direct

1    came out of the facility was March 8th, 1995.

2    Q.  And that's the day you say you met Mr. Tischler; is that

3    correct?

4    A.  Yes.

5    Q.  Tell me where he was when you met him.

6    A.  1536 President Street, Brooklyn, New York, between Troy and

7    Albany avenues.

8    Q.  And what was he doing when you first saw him?

9    A.  It was a toilet exchange program that New York City had

10   going on at that time.

11   Q.  And what did you observe him to be doing?

12   A.  He was unloading a truck, and I asked him did he need some

13   help.

14   Q.  And what did he say to you?

15   A.  He said yes.

16   Q.  And did he subsequently hire you?

17   A.  On the spot.

18   Q.  And for how long did you work for him?

19   A.  Till about 2001.

20   Q.  So that would be about six years?

21   A.  Yes.

22   Q.  Okay.  And was there a company that you worked for?

23   A.  Yes.  C&M Plumbing, First Choice Plumbing.

24   Q.  And that was Mr. Tischler who was your supervisor?

25   A.  Yes.

D1v1cib1                        Talley - direct

1  Q.  And what was the first job that he gave you, when he hired
2  you?
3  A.  He hired me as a helper.
4  Q.  And did you subsequently get promoted?
5  A.  Sure did.
6  Q.  And in the course of six years what jobs did you hold, what
7  positions did you hold?
8  A.  I was office manager.
9  Q.  Now in the course of your employment in that six-year
10  period, did you have occasion to see Mr. Tischler every day?
11  A.  Yes.
12  Q.  Did you ever observe Mr. Tischler to offer employment to
13  others?
14  A.  Yes.
15  Q.  Specifically, did you ever see him or observe him offer
16  employment to people on work release?
17  A.  Yes.
18  Q.  Can you tell us how many people you saw him hire on work
19  release.
20  A.  He hired 52 people.  The reason why I know is because I
21  passed out the checks, and when I was on work release, because
22  I would go home for five days and have to go back to the
23  facility for two days, there's a parole officer there that I
24  have to see, I have to let him know everything I'm doing, I
25  have to show him my paychecks, everything.  He asked me, do I

1  think that he would hire any more people.

2  Q.  When you say he, you mean?

3  A.  The parole officer, in the facility.  And that's how

4  everybody at the facility found out to go to Brooklyn, get a

5  job with Mr. Tischler.

6  Q.  Now were the people that he was hiring, were they

7  experienced people?

8  A.  No.  No.

9  Q.  And were they in the same circumstance that you were, that

10  is, that they needed to get a job or they have to go back to

11  state prison?

12  A.  Yes.

13  Q.  And you say he hired 52 people over the course of what

14  period of time?

15  A.  Like the first two months that I was there.

16  Q.  And did he continue to hire people?

17  A.  He continued to hire people after that.

18        MR. GREENFIELD:  Okay.  I have no further questions.

19  CROSS-EXAMINATION

20  BY MS. ECHENBERG:

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  My name is Janis Echenberg.  I'm one of the prosecutors in

24  this case.

25  A.  Okay.

D1v1cib1                          Talley - cross

1    Q.  So you said that you worked for Mr. Tischler from 1995 to

2    2001?

3    A.  Yes.

4    Q.  Did you have any contact with him after 2001?

5    A.  I didn't work for him, but I stayed in contact with him.

6    Q.  Were you at his job location between 2001 and 2009?

7    A.  Yes.

8    Q.  Were you familiar with who was working there during that

9    period?

10   A.  No, not really.  I don't know a lot of people, but I would

11   just go see him.  Some of the people that worked in the office

12   with him, I knew them.  Don't remember their names right now.

13   Q.  But you weren't working there between 2001 and 2009?

14   A.  No.

15   Q.  And you weren't handing out paychecks during that time?

16   A.  No, not me.

17   Q.  And you had nothing to do with hiring during that time; is

18   that right?

19   A.  Exactly.

20   Q.  And specifically between what date and what date did he

21   hire 52 people?

22   A.  I started February -- I mean March 8th, and like within

23   two months, there was like 52 people there from -- including

24   myself, from work release.

25   Q.  Okay.  So in 2001 he hired those people.

D1v1cib1                         Talley - cross

1    A.  No.

2              THE COURT:  1995.

3    A.  '95.

4    Q.  Excuse me.  1995.  Excuse me.  In 1995 he hired those

5    people.  Between 1996 and 2001, did he hire any more people?

6    A.  Yeah, he hired other people.  You know, people came and

7    they went, they came and they went.  I didn't keep track of

8    them.  But the only reason why I kept track of the 52 people

9    myself is I had something to do with that, you know, so --

10   Q.  What was the name of the company that was paying these

11   people?

12   A.  First Choice Plumbing, C&M Plumbing.

13   Q.  And were any of these people illegal immigrants?

14   A.  No.  They would have never got out of prison if they was.

15   Q.  And are you -- I'm just going to ask you if you're familiar

16   with several companies.

17              Are you familiar with 5318 16th Avenue Enterprises?

18   A.  I heard that address before.

19   Q.  Are you familiar with that company?

20   A.  Offhand, no.

21   Q.  Are you familiar with State to State?

22   A.  No.

23   Q.  Are you familiar with 387 Quincy Associates?

24   A.  No.

25   Q.  Are you familiar with Vintage Partners?

D1v1cib1                          Talley - cross

1   A.  No.

2   Q.  Are you familiar with Fix Anything Construction?

3   A.  No.

4   Q.  Are you familiar with BSD Contracting?

5   A.  No.

6   Q.  Are you familiar with Millennium Developers?

7   A.  No.

8   Q.  Are you familiar with Vintage Builders?

9   A.  No.

10  Q.  Are you familiar with L & T Realty?

11  A.  No.

12          MS. ECHENBERG:  I have nothing further.

13          MR. GREENFIELD:  Thank you, Mr. Talley.

14          THE COURT:  Thank you.  Have a good day.  Nicer to be

15  in court when you're not under indictment.

16          THE WITNESS:  Definitely is.  Have a good day,

17  everyone.

18          (Witness excused)

19          MR. GREENFIELD:  Your Honor, we call Koyle Thomas.

20          THE CLERK:  Would you remain standing and raise your

21  right hand.

22          (Witness sworn)

23          THE CLERK:  Please state your name and spell your last

24  name for the record.

25          THE WITNESS:  It's Koyle M. Thomas, T-H-O-M-A-S.

D1v1cib1                          Talley - cross

1           THE REPORTER:  Could you spell you first name for me

2   too, please.

3           THE WITNESS:  K-O-Y-L-E.

4    KOYLE M. THOMAS,

5        called as a witness by the Defendant Tischler,

6        having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MR. GREENFIELD:

9   Q.  Mr. Thomas, first of all, good morning.  Where do you live,

10  sir?

11  A.  Brooklyn, New York.

12  Q.  And where were you born?

13  A.  Grenada.

14  Q.  Grenada?

15  A.  Yes, Grenada.

16  Q.  Are you either a citizen or a permanent --

17  A.  I'm a permanent resident.

18  Q.  Of the United States?

19  A.  Of the United States.

20  Q.  And that means you have a green card?

21  A.  Yes, I do.

22  Q.  How long have you had that?

23  A.  Since '95.

24  Q.  What do you do for a living?

25  A.  I'm a self-contractor.

D1v1cib1                          Thomas - direct

1   Q.   In what sort of industry?

2   A.   Sheetrocking.

3   Q.   Construction job?

4   A.   Framing, construction, yes.

5   Q.   Do you know Harold Tischler?

6   A.   Yes, I do.

7   Q.   How long have you known Mr. Tischler?

8   A.   I've known him since 2002.

9   Q.   And tell the jury the circumstances under which you met

10  him.

11  A.   I just had a child in 2001, and I was looking for work, and

12  where I used to live at, Prospect Place in Brooklyn, he was one

13  of the managers at the building.  And I was standing there, he

14  showed up, and I asked him if -- if he needed any help, and he

15  told me yeah, he gonna need some help.  So I gave him my

16  number, I took his number.  He got back to me the next day and

17  told me that he got a job for me.

18  Q.   And when was that, in 2002?

19  A.   Yes.

20  Q.   And did you work for him after that?

21  A.   Yes, I did.

22  Q.   How long did you work for him?

23  A.   I worked for him for several -- ten years.

24  Q.   And was he on that job with you for ten years?

25  A.   No.  He left in -- he left in 2006.

D1v1cib1                         Thomas - direct

1    Q.  So for four years.

2    A.  Yeah, but he was still -- he was still around, yeah.

3    Q.  After 2006 he was still around?

4    A.  Yeah, right, he was still around.

5    Q.  But between 2002 and 2006 did you have occasion to see him

6    on a regular basis?

7    A.  Yes, every day.

8    Q.  And what sort of work did you do?

9    A.  Cleaning, mopping the buildings, repairing toilets,

10   whatever needs some repair.

11   Q.  Okay.  Now did you have occasion during that four-year

12   period to notice whether Mr. Tischler gave work to other

13   people?

14   A.  Yes, I did.

15   Q.  What did you observe?

16   A.  I observed -- he was working in the building in Bushwick,

17   and I used to go there probably once a week to see him.

18   Q.  And what did you see?

19   A.  I seen 25 people.  That's what I seen with my eyes, at

20   least 25 people working there.

21   Q.  And did you -- were you able to tell who was supervising

22   those people?

23   A.  Harold Tischler.

24            MR. GREENFIELD:  No further questions.

25

D1v1cib1                              Thomas - cross

1    CROSS-EXAMINATION

2    BY MS. ECHENBERG:

3    Q.  Good morning, Mr. Thomas.

4    A.  Good morning.

5    Q.  My name is Janis Echenberg.  I'm one of the prosecutors on

6    the case.

7              Mr. Thomas, where do you work currently?

8    A.  I work in Williamsburg.

9    Q.  And do you work for a company?

10   A.  Self-employed.

11   Q.  Okay.  What's -- is there a location where you work,

12   generally?

13   A.  Not really, no.

14   Q.  So you said you worked for Mr. Tischler between 2002 and

15   2006; is that right?

16   A.  Correct.

17   Q.  And what was the name of the company you worked for then?

18   A.  Lev Management.

19   Q.  Excuse me?

20   A.  Lev Management.

21   Q.  Lev Management?

22   A.  Right.

23   Q.  And what was Mr. Tischler's role at Lev Management?

24   A.  He was supervisor.

25   Q.  He was a supervisor.

D1v1cib1                          Thomas - cross

1    A.  Yeah, field supervisor.

2    Q.  Okay.  Who was the owner of Lev Management; do you know?

3    A.  Charles -- what's his name?  I can't remember his last

4    name.

5    Q.  Okay.  And you said Mr. Tischler left in 2006?

6    A.  Right.

7    Q.  And where did he go?

8    A.  I didn't know where he went, but we'd still keep in

9    contact.

10   Q.  Okay.  Were you continuing to work with him after 2006?

11   A.  No.

12   Q.  Okay.  Do you know what he was doing for work day in and

13   day out in 2006?

14   A.  No.

15   Q.  And do you know what he was doing for work from 2007

16   through 2009?

17   A.  No.

18   Q.  Okay.  And between 2002 and 2006 who paid you?

19   A.  Who paid me?

20   Q.  Who did your paychecks come from?

21   A.  Charles.

22   Q.  Charles.  Not Harold Tischler.

23   A.  No.

24   Q.  Okay.  And I'm just going to ask you if you're familiar

25   with some companies.

D1v1cib1                          Thomas - cross

1              Are you familiar with 5318 16th Avenue Enterprises?

2      A.  No.

3      Q.  Are you familiar with State to State?

4      A.  No, I'm not.

5      Q.  Are you familiar with 387 Quincy Associates?

6      A.  No.

7      Q.  Are you familiar with Vintage Partners?

8      A.  Yes.

9      Q.  What is Vintage Partners?

10     A.  Vintage Partners, that was -- ooh, how should I say this?

11     I don't know how to -- how to -- I don't know how to put it,

12     but --

13     Q.  How were you familiar with Vintage Partners?

14     A.  Well, they used to build -- they used to build buildings.

15     Q.  Do you know who owned Vintage Partners?

16     A.  I think it was Harold Tischler.

17     Q.  And how do you know that?

18     A.  Well, from what I see, that's what he -- that's what he

19     told me also.

20     Q.  Have you ever worked there?

21     A.  No.

22     Q.  Do you know how many employees they have?

23     A.  No.

24     Q.  And are you familiar with Fix Anything Construction?

25     A.  No.

D1v1cib1                          Thomas – cross

1  Q.  Are you familiar with BSD Contracting?

2  A.  No, I'm not.

3  Q.  Millennium Developers?

4  A.  No.

5  Q.  Vintage Builders?

6  A.  No.

7         MS. ECHENBERG:  Nothing further.

8         MR. GREENFIELD:  Thank you.  No further questions.

9         THE COURT:  Thank you for coming in.

10        (Witness excused)

11        MR. GREENFIELD:  We call Allan Ashby.

12        THE CLERK:  If you can just stand and raise your right

13  hand.

14        (Witness sworn)

15        THE CLERK:  Would you please state and spell your full

16  name for the record.

17        THE WITNESS:  Allan, A-L-L-A-N, Ashby, A-S-H-B-Y.

18        THE CLERK:  You can sit.

19   ALLAN ASHBY,

20      called as a witness by the Defendant Tischler,

21      having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MR. GREENFIELD:

24  Q.  Good morning, Mr. Ashby.

25  A.  Good morning to you, sir.

D1v1cib1                          Ashby - direct

1    Q.   Where do you live, sir?

2    A.   Presently I'm living in the Bronx, 1591 East 172nd Street

3    in the Bronx.

4    Q.   Okay.  I'm going to ask you to speak directly into the

5    microphone and nice and loud so everyone can hear you.  Okay?

6    A.   Okay.

7    Q.   How old are you, sir?

8    A.   I'm 57 years of age.

9    Q.   Okay.  Where were you born?

10   A.   I was born in Trinidad.

11   Q.   Okay.  What is your citizenship status in the United

12   States?

13   A.   Trinidadian.

14   Q.   Okay.  Are you -- do you have -- are you here as a

15   permanent resident?

16   A.   Yes, sir.

17   Q.   So you have a green card?

18   A.   Yes, I do.

19   Q.   And when did you get that green card?

20   A.   I think in the year of 2006.

21   Q.   Okay.  Now do you know Harold Tischler?

22   A.   Yes, I do.

23   Q.   And when did you meet Mr. Tischler for the first time?

24   A.   I met him in year of 2003, around -- between January and

25   February month of 2003.

D1v1cib1                          Ashby - direct

1   Q.  And where did you meet him?

2   A.  I met him in Brooklyn on a job site.

3   Q.  Describe the circumstances under which you first saw and

4   met Mr. Tischler.

5   A.  Okay.  I was -- I was employed by a friend of mine.  I was

6   doing work with a friend of mine.

7   Q.  What sort of work?

8   A.  Carpentry.  But things wasn't working out with the -- my

9   present employer at the time, things wasn't really working out

10  financially, so I saw Mr. Tischler, he had a project next door

11  to where I was working, and I saw him around 7 in the morning

12  on a Friday morning.  Around 7 a.m. in the morning, he came and

13  paid his crew, and I said to myself, this is a good man.  He

14  paying his crew this time of the day.  So I approached him and

15  asked him, "I'm looking for work.  I'm a carpenter."  So we

16  exchanged numbers then, and I kept calling him, maybe like for

17  two weeks after that, and he called me and he employed me.

18  Q.  And how long did you work for Mr. Tischler?

19  A.  I worked for Harold from that time, March 2003, to

20  approximately October 2004.

21  Q.  Okay.  And did you have occasion to see him on a regular

22  basis during that period of time?

23  A.  Sure, I did, yes.

24  Q.  And did you have occasion to notice whether he hired other

25  people besides you?

D1v1cib1                         Ashby - direct

1    A.  Yes.  He hired his workers, a lot more people, yes, he did.

2    Q.  Did you notice the circumstances under which he hired them?

3    Were they similar to what you just described?

4    A.  Of course.  People were looking for work and they would

5    approach him for work.  I brought in guys who asked me for

6    work, so I introduced guys to him and he hired them.

7    Q.  Okay.  Now you said there came a time in October of 2004

8    when you no longer worked for Mr. Tischler.

9    A.  Correct.

10   Q.  Did you -- did you do something professionally at that

11   time?  Did you obtain a crew of people that you --

12   A.  Yes, because he was subcontracting working.

13   Q.  Who was?

14   A.  Mr. Tischler was.

15   Q.  Now when you first worked for him, did you get a regular

16   paycheck?

17   A.  Yes I did.

18   Q.  And you say there came a time when he -- when you became a

19   subcontractor.

20   A.  Yes.  He gave me my own contract, I was subcontractor, so I

21   had my own crew working.

22   Q.  And did Mr. Tischler still provide the work that you had to

23   do?

24   A.  Yes, he did.

25   Q.  Now you said that you got your green card in 2006; is that

1  correct?

2  A.  Yes, I did.

3  Q.  So would it be fair to say that in 2005 you were here

4  without --

5  A.  Yes, yes.

6  Q.  Illegally; right?

7  A.  Yes.

8  Q.  How did you come to the United States?

9  A.  I came on a visa.

10  Q.  And did you overstay that Visa?

11  A.  I overstayed that visa.

12  Q.  But subsequently you got a green card; correct?

13  A.  Correct.

14  Q.  Now did you ever have a conversation with Mr. Tischler in

15  2005 or 2006 regarding your immigration status?

16          MS. ECHENBERG:  Objection.  Hearsay.

17          MR. GREENFIELD:  Hearsay?  I asked him whether he had

18  a conversation.  I didn't ask for the substance of it.

19          THE COURT:  Okay.  Go ahead.  You can answer that.

20  A.  Yes.  Around 2004, 2005, I approached him and told him that

21  if he could sponsor me to his company because I needed to get

22  my citizen regularized, yes.

23  Q.  And as a result of that conversation or any other

24  conversations you had with him about your immigration status,

25  did there come a time when he took you somewhere?

D1v1cib1                      Ashby - direct

1    A.  Yes, he did.

2    Q.  Where did he take you?

3    A.  He took me to this guy he knew who was a lawyer and he

4    gonna be able to sponsor me, but the other guy he knew who was

5    a lawyer might be able to do the paperwork for the sponsorship.

6    Q.  And did he take you somewhere?

7    A.  Somewhere in Manhattan.  I can't remember exact address,

8    but I knew it was in Manhattan.

9    Q.  Was it uptown or downtown?

10   A.  I'm not sure if it's up or down at that time.

11   Q.  All right.

12   A.  But it was in Manhattan.

13   Q.  Was it -- withdrawn.

14           Was it an office building that he took you to?

15   A.  It was an office building.

16   Q.  And did you go upstairs into an office with him?

17   A.  Yes.  I think the guy's name -- I remember the guy name.

18   It was Mr. Salamon, who was a lawyer.

19   Q.  Okay.  And how did you know that Mr. Salamon was a lawyer?

20   A.  Because Mr. Tischler told me that he knew a lawyer, that he

21   was a lawyer.

22   Q.  Did Mr. Salamon tell you he was a lawyer?

23   A.  Yes, in the office.

24   Q.  Now did you have a discussion with Mr. Salamon about

25   becoming -- getting -- becoming a permanent resident?

D1v1cib1                          Ashby - direct

1   A.  Yes, I did.

2   Q.  And it wasn't just you who was there; is that correct?

3   A.  No.  I took three other friends, my coworkers out there.

4   Q.  Was Mr. Tischler present in the room when you had this

5   conversation?

6   A.  No, he wasn't.  He just dropped us off to the office and he

7   had left us there.

8   Q.  Now did you end up hiring Mr. Salamon?

9   A.  No, we did not.  No, I did not.

10  Q.  Did Mr. Salamon tell you that he was going to do anything

11  illegal in order to help you?

12  A.  No, no.

13  Q.  Did Mr. Tischler suggest in any way to you that you -- that

14  you were going to have to do something illegal in order to

15  be -- get your green card?

16  A.  No.  That was not mentioned.

17  Q.  Now you subsequently got your green card through some other

18  method --

19  A.  Yes.

20  Q.  -- without using Mr. Salamon or Mr. Tischler.

21  A.  No, no.

22  Q.  Is that right?

23  A.  No, I never did.

24  Q.  Okay.  Have you stayed in touch with Mr. Tischler since

25  those days that you just testified to?

D1v1cib1                         Ashby - direct

1   A.  Yes, I did.

2   Q.  Do you consider him a friend?

3   A.  He is my friend.

4   Q.  During the time that you worked for him, either directly or

5   as a subcontractor, did you have occasion to notice whether he

6   hired other people?

7   A.  Yes.  Yes, I saw he hired more people.

8           MR. GREENFIELD:  I have no further questions.

9           MS. ECHENBERG:  One moment, your Honor.

10  CROSS-EXAMINATION

11  BY MS. ECHENBERG:

12  Q.  Good morning, Mr. Ashby.

13  A.  Good morning, Miss.

14  Q.  My name is Janis Echenberg.  I'm one of the prosecutors in

15  the case.

16  A.  Okay.

17  Q.  So when you worked for Mr. Tischler between March 2003 and

18  October 2004, what was the name of the company that you worked

19  for?

20  A.  I think it was Vintage.

21  Q.  It was Vintage.

22  A.  Vintage.

23  Q.  Vintage.  Okay.  And who was the owner of that company, if

24  you know?

25  A.  Mr. Tischler was.

D1v1cib1                          Ashby - cross

1    Q.  And did he pay you?

2    A.  Yes, he did.

3    Q.  How did he pay you, in what form?

4    A.  By check.

5    Q.  And did he take out taxes from those checks?

6    A.  Yes.

7    Q.  And you were here in the United States illegally during

8    that time; correct?

9    A.  Yes.

10   Q.  And did you have any discussions with Mr. Tischler at that

11   time about the fact that you were here illegally?

12   A.  Yes, I did.

13   Q.  So he knew that you were here illegally when he hired you.

14   A.  Yes, but I had my tax ID number, so that's how he was able

15   to pay me by check, because I had a tax ID number then.

16   Q.  Okay.  And after you finished working for him in 2004, you

17   started your own company?

18   A.  No.  I worked for a company that he was getting contracts

19   from.  He was getting --

20   Q.  What was the name of the company you worked for after --

21   A.  Lev Management.

22   Q.  Lev Management?

23   A.  L-E-V, Lev Management.

24   Q.  And who owned Lev Management?

25   A.  It was all a group of people.  I can remember one of the

D1v1cib1                         Ashby - cross

1   manager's name was Charles Worthman (ph).

2   Q.  Okay.  And so after October 2004 Lev Management paid your

3   wages?

4   A.  Yes, they did.

5   Q.  So after 2004 you were not working for Harold Tischler;

6   correct?

7   A.  No.  Working for Lev Management, yes.

8   Q.  But in 2005, Harold Tischler was willing to sponsor you for

9   your green card?

10  A.  2004.

11  Q.  2004.

12  A.  Before I left -- before he left the company, that's when,

13  2004, not 2005.

14  Q.  So when did you go to the law office with him?

15  A.  Was in 2004.

16  Q.  In 2004 when you were still working for --

17  A.  I was still working for him then.

18  Q.  -- Harold Tischler, that's when you went to the law office?

19  A.  Yes.

20  Q.  Okay.  And before you went to the law office Harold

21  Tischler told you that Sam Salamon was a lawyer?

22  A.  Yes.

23  Q.  And what specifically did Mr. Salamon say to you to

24  indicate that he was a lawyer?

25  A.  Okay.  We went to his office, he mentioned to us that -- me

D1v1cib1                          Ashby - cross

1    and three other guys -- that he's going to be able to do all

2    the paperwork if Mr. Harold Tischler was sponsoring through his

3    company.

4    Q.  Okay.  And did any of your three friends hire Mr. Salamon?

5    A.  No, we did not.

6    Q.  And ultimately Harold Tischler did not sponsor you;

7    correct?

8    A.  No, no.

9    Q.  And you said that you communicated with Harold Tischler by

10   phone; is that right?

11   A.  Yes.

12   Q.  Do you remember what phone number he was using at that

13   time?

14   A.  I think the number was 718-288-7844.

15   Q.  Okay.  Were there any other phone numbers that he was using

16   at that time?

17   A.  No.

18   Q.  And you said that during the time period you worked with

19   Harold Tischler -- let me ask you a different question.

20          You don't have any knowledge of Harold Tischler's

21   hiring after you stopped working for him; correct?

22   A.  I met guys who I knew and told me, "Oh, we work with Harold

23   Tischler," you know, after -- you know, after --

24   Q.  But you didn't have any direct knowledge of his payroll

25   after 2004; correct?

D1v1cib1                         Ashby - cross

1   A.  No.

2          MR. GREENFIELD:  Objection to direct knowledge.  She

3   asked him if he knew.  He said he met people who told him.

4          MS. ECHENBERG:  Let me ask it differently.

5   Q.  You didn't have any direct involvement in Harold Tischler's

6   payroll after 2004; correct?

7   A.  No.

8   Q.  And you never saw any list of his employees; correct?

9   A.  No.

10  Q.  And you didn't have any involvement in hiring for any of

11  these companies after 2004; correct?

12  A.  I recommended guys -- I send guys to him who approached me

13  for work, so I told them to go to Mr. Tischler, so I know I

14  sent over guys over there.

15  Q.  Were any of those people illegal immigrants?

16  A.  No.

17  Q.  And let me ask you about a few companies.

18          Are you familiar with 5318 16th Avenue Enterprises?

19  A.  No.

20  Q.  Are you familiar with State to State?

21  A.  No.

22  Q.  Are you familiar with 387 Quincy Associates?

23  A.  Quincy, no.

24  Q.  Are you familiar with Vintage Partners?

25  A.  Yes, I knew that name.

D1v1cib1                    Ashby - cross

1   Q.  That's the company you worked for?

2   A.  I think it was called that name at the time.

3   Q.  Okay.  Are you familiar with Fix Anything Construction?

4   A.  No.

5   Q.  Are you familiar with BSD Contracting?

6   A.  No.

7   Q.  Are you familiar with Millennium Developers?

8   A.  No.

9   Q.  Are you familiar with Vintage Builders?

10  A.  I think that's what the name I knew, Vintage.

11  Q.  Vintage.  Do you know if it was Vintage Partners or Vintage

12  Builders?

13  A.  No.

14  Q.  Just Vintage?

15  A.  Vintage.

16  Q.  And are you familiar with L & T Realty?

17  A.  No.

18  Q.  Yes?

19  A.  No.

20  Q.  No.

21          MS. ECHENBERG:  Okay.  One moment, your Honor.

22          (Pause)

23  Q.  And when you discussed Harold Tischler sponsoring you, did

24  you discuss paying him any sort of fee for the sponsorship?

25  A.  No.

D1v1cib1                          Ashby - cross

1                MS. ECHENBERG:  Nothing further.

2                MR. GREENFIELD:  No further questions.  Thank you.

3        You can step down.

4                THE COURT:  Thank you very much, sir.

5                THE WITNESS:  You're welcome.

6                (Witness excused)

7                MR. GREENFIELD:  We call Rudolph Jones.

8                THE CLERK:  Remain standing for me and raise your

9        right hand.

10               (Witness sworn)

11               THE CLERK:  Please state and spell your name for the

12       record.

13               THE WITNESS:  My name is Rudolph, Rudolph Jones.

14       Spell it?

15               THE CLERK:  Yes.

16               THE WITNESS:  R-U-D-O-L-P-H, J-O-N-E-S.

17               THE CLERK:  You may be seated.

18               THE COURT:  You may be seated.

19               THE WITNESS:  Thank you.

20        RUDOLPH JONES,

21            called as a witness by the Defendant Tischler,

22            having been duly sworn, testified as follows:

23       DIRECT EXAMINATION

24       BY MR. GREENFIELD:

25       Q.  Mr. Jones, I want to you lean forward, speak into the

D1v1cib1                         Jones - direct

1     microphone, and keep your voice up so we can all hear you,

2     okay?

3     A.   Thank you.

4     Q.   How old are you, Mr. Jones?

5     A.   63.

6     Q.   And where do you live?

7     A.   Okay.  I live Marcy, 623 Marcy Avenue.

8     Q.   In what borough is that?

9     A.   Brooklyn.

10    Q.   And how long have you lived there?

11    A.   Five and a half years.

12    Q.   And are you an American citizen, sir?

13    A.   That's right.

14    Q.   And where were you born?

15    A.   Barbados.

16    Q.   Do you know the -- do you know Harold Tischler?

17    A.   Yes, I do.

18    Q.   When did you meet him?

19    A.   I met him in '97.

20    Q.   And where did you meet him?

21    A.   Actually, I was going -- I was taking a walk with my son

22    that day.  I can't remember that, where I was.  And I saw

23    this -- at that time I wasn't working, but I saw this -- this

24    place.  I saw that place.  At that time I didn't know it was --

25    they wanted people to work, but then I look up, look at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1v1cib1                          Jones – direct

1    second time, and they started to put a sign up, Man Wanted, so

2    I decided I was going, and I went in, and that's when I met him

3    there then.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GREENFIELD:

2    Q.   And did you ask him for a job?

3    A.   Yeah, and his brother.

4    Q.   And his brother?

5    A.   Yeah.  So I ask him what type of job he have, you know, so

6    he tell me they do plumbing.  They also set up toilets and so

7    on for -- the toilets and stoves for the city.  In other words,

8    there were, they had a contract on the city.

9    Q.   To install or exchange toilets and stoves?

10   A.   And stoves and toilets.

11   Q.   For the City of New York?

12   A.   That's right.

13   Q.   And did you start working for him?

14   A.   Not that same day.  He told me to come back the following

15   day, which I did.

16   Q.   And did you start working then?

17   A.   Yeah, yeah.

18   Q.   And that was in 1997?

19   A.   That's right.

20   Q.   And how long did you work for him?

21   A.   I worked with that company for about, well, four and a half

22   years I would say.

23   Q.   And during that time, did you work with Mr. Tischler every

24   day?

25   A.   Yes, every day he was there.

1   Q.  And did you work in New York City projects?

2   A.  That's right.

3   Q.  And did you, during that time, did you have occasion to see

4   Mr. Tischler offer employment, that is, jobs, to other people?

5   A.  Of course.  I've seen him, I've seen him, he give like

6   anywhere between 50 to 60 people I've seen him give jobs to out

7   there.

8   Q.  And what sort of people was he giving jobs to?

9   A.  There were most of them for sure was color, my complexion.

10  Q.  I don't know mean that.  Were they experienced, did they

11  have skills?

12  A.  Well, I only realize that some of them didn't have the

13  skills or anything, you know, the more I saw them, you know,

14  and some of them did have skill.

15  Q.  As to the ones who didn't have skills, did he hire them

16  anyway?

17  A.  Yes, he did.

18  Q.  And did they work and learn a skill while they were there?

19  A.  Most of them, yeah, they work.  But they wasn't doing,

20  there wasn't doing like, what should I say, they wasn't doing

21  the mechanical work.  That's like had been taking the toilets

22  and things to the mechanics, you know, inside room.  They were

23  putting them, they were doing something different.

24  Q.  And who was supervising them?

25  A.  Hershy, actually Hershy was managing everything at that

D1VLCIB2                          Jones - direct

1    time.

2    Q.  So you knew him as Hershy; is that right?

3    A.  Yeah.

4    Q.  And you haven't worked with him since sometime in 2001 or

5    2002; is that right?

6    A.  What happened, like I said, I worked four and a half years

7    with that company with the brother.  But then he left his

8    brother and started some -- he started doing some work and

9    then, you know, like building people, people would call him and

10   ask him, you know, to fix their house and so on.  And he took

11   me with him.

12   Q.  So how long did you continue to work with him?

13   A.  About another four years.

14   Q.  Okay.  And so would it be fair to say you haven't worked

15   with him since 2007?

16   A.  No.  I leave -- I leave the -- actually this is what

17   happened is this guy, Jewish guy wanted him to do some work and

18   so on for him, Hershy.  Hershy asked if I would like to stay or

19   if I want to just quit the job.  And quitting was out of the --

20   quitting was the last thing I wanted to do.  So I said okay.  I

21   said I would work with you, work along with you.

22   Q.  So you worked along with Hershy?

23   A.  So I worked along with him, yeah.

24   Q.  When is the last time you worked with Hershy?

25   A.  The last time I worked with him would be like, this would

1   be like two years, two and a half years now that I wasn't

2   working, I'm not working with him.

3   Q.  So you worked with him up to say 2010?

4   A.  Exactly.

5   Q.  And have you stayed in touch with him since you stopped

6   working with him?

7   A.  I give him a call.  I'm working for a different guy now,

8   so.  But I usually give him a call to find out, give his mom a

9   call too, his mother, because we were all close.

10  Q.  So do you consider him a friend of yours?

11  A.  Of course.

12          MR. GREENFIELD:  I have no further questions.

13          THE COURT:  Are you saying that you worked with

14  Mr. Tischler for 13 years?

15          THE WITNESS:  Yeah.

16          THE COURT:  Okay.  Just want to make sure we got it

17  straight.  Okay.

18          THE WITNESS:  Yeah.

19  CROSS-EXAMINATION

20  BY MS. ECHENBERG:

21  Q.  Good morning, Mr. Jones.

22  A.  Good morning.

23  Q.  My name is Janis Echenberg.  I'm one of the prosecutors on

24  the case.

25          You said you're a United States citizen?

D1VLCIB2                          Jones - cross

1   A.  Excuse me?

2   Q.  You said you're a United States citizen now?

3   A.  Yes, I am.

4   Q.  When did you become a citizen?

5   A.  Well, I have my -- could I?

6   Q.  Sure.

7   A.  Thank you.  Usually walk with this.  Could I show you?

8   Q.  You want to show it to me?  Okay.

9         I just want to know roughly when you became a citizen.

10  Was it in the last few years or many years ago?

11  A.  It was like seven, eight, nine years.

12  Q.  Nine years ago, so that would be like 2002?

13  A.  That's right.

14  Q.  Okay.  And how did you become a citizen, were you sponsored

15  by someone, did you become a citizen through marriage?

16  A.  Yeah.  Actually, my wife was here before.  She was down

17  here before so I came after her.  So she filed for myself and

18  my two kids.

19  Q.  Okay.  And did she do that through a lawyer?

20  A.  Yeah, that's right.

21  Q.  And do you know what lawyer she used?

22  A.  No, I don't know that.  I don't know who.

23  Q.  Did Harold Tischler have anything to do with you being a

24  citizen, did he sponsor you in any way?

25  A.  No, no, no.

D1VLCIB2                      Jones - cross

1    Q.  Are you aware of him sponsoring any workers to become, to

2    get green cards or get citizenship?

3    A.  No.

4    Q.  And I just want to go through your -- actually, let me ask

5    you a different question.

6            Have you communicated with Harold Tischler by phone?

7    A.  Excuse me?

8    Q.  Do you communicate with Harold Tischler by phone, do you

9    call him on the phone?

10   A.  Tischler?

11   Q.  What's his phone number, if you know it?

12   A.  I don't know it like -- it's not number that I keep in my

13   mind really.  Occasionally I would, if I'm home relaxing or

14   anything like that, I would say let me search for his number

15   and give him a call.  I haven't heard him for a while or

16   something like that.

17   Q.  You don't know it by heart?

18   A.  No.

19   Q.  That's okay.  I don't remember phone numbers either.

20           Okay.  So I just want to make sure I understand your

21   employment history.

22           So from 1997 to 2001, what company did you work for?

23   A.  Well, I've been working now for -- I'm working for Jewish

24   guy I'm working for right now.

25   Q.  Is that Harold Tischler's brother?

D1VLCIB2                    Jones - cross

1    A.  No.  I don't work for Hershy or his brother anymore.  Like

2    I said, I leave that company now.

3    Q.  Right.  So let's go back to 1997, that first period that

4    you talked about when you were testifying.  From 1997 to 2001,

5    those four and a half years that you said you worked with

6    Mr. Tischler, do you remember the name of the company you

7    worked for?

8    A.  Vintage.

9    Q.  Vintage.  Okay.  And you got -- how were you paid, in cash

10   or by check?

11   A.  Well, I got paid with check because I used to pay taxes.

12   Q.  Okay.  And after you stopped working at Vintage, you said

13   you went with Mr. Tischler somewhere else; is that right?

14   A.  Yeah, because he, after he and his brother split up then --

15   I don't know what caused it.  The company was, the company went

16   out of action.

17   Q.  Vintage went out of business after that point?

18   A.  Yeah.  But I don't know what was cause or what caused it or

19   not.  But then Hershy, he, like I said, he -- there was a guy

20   approached him, Jewish guy, and ask him if he would like him to

21   do some houses and so on and.

22   Q.  Do you know the company that George had, do you know the

23   name of that company?

24   A.  I don't know the company straight off.

25   Q.  Jewish.  I misheard you.

D1VLCIB2                          Jones - cross

1           So after Vintage was no longer in operation, what was

2    the new company that you worked for, do you know the name of

3    that company?

4    A.  No, not really, not really.

5    Q.  Was there a company name even?

6    A.  It was -- I know I used to work with a guy named Mark.

7    That much I know.

8    Q.  A guy named Mark?

9    A.  His guy was Mark.  He told them there was a coworker,

10   copartnership and so on, but I can't remember the name of the

11   company.

12   Q.  Does the name Moses Weisz mean anything to you?

13   A.  Run that by me again?

14   Q.  Moses Weisz.

15   A.  No, I don't think that's the name.

16   Q.  So Vintage was out of business in 2001, you believe?

17   A.  I don't know the exact date that was.  But I know that that

18   they was -- it was out of business.  I don't know for what

19   reason really.

20   Q.  Okay.  But around 2001, 2002, that time period?

21   A.  Somewhere around there.

22   Q.  And then from whenever Vintage went out of business until

23   2005, who was paying you, what company or person were you

24   receiving payment from?

25   A.  What happened is that the company then, the company that

D1VLCIB2                              Jones - cross

1    Hershy was working for, like I said, there was another guy,

2    another Jewish guy with him.  He told him they was partners in

3    this business.  And they was paying me every week.

4    Q.  How were they paying you?

5    A.  I was getting paid by the same way like I was working the

6    company before.

7    Q.  Were you getting paid by check?

8    A.  Yeah.

9    Q.  And were the checks from the same, were the checks still

10   from Vintage?

11   A.  No, it was in the other company, the other guy, the other

12   guy's name.  I can't remember.

13   Q.  The checks were in a person's name?

14   A.  Yeah.

15   Q.  Some other Jewish person but you don't remember his name?

16   A.  Right.  Exactly.

17   Q.  And that was until 2005?

18   A.  Something like that.

19   Q.  And then who did you work for after 2005?

20   A.  Well, I'm still working for the guy that I am working for a

21   guy by the name of -- it's a guy that run the nursery and so

22   on.  He has the nursery up in -- I worked for this guy that I'm

23   working for now, I've been working for him for over three years

24   now.

25   Q.  Does the company bow four construction and development,

D1VLCIB2                           Jones - cross

1    does that sound familiar?

2    A.   Run it by me again?

3    Q.   Bow four construction and development?

4    A.   No.  That's not the name of it.

5    Q.   So I want to be clear, between 1997 and 2001, was Harold

6    Tischler your boss?

7    A.   2001, yeah, he was still my boss at that time.

8    Q.   After 2001 was he your boss?

9    A.   No because, like I said, I told him that I'm going -- I got

10   a offer from this other guy, this guy, you know.

11   Q.   So from 2001 to 2009 was Harold Tischler paying you, was

12   Harold Tischler the person you were receiving your weekly

13   paychecks from?

14   A.   No.

15   Q.   And do you know what company Harold Tischler was working

16   for between 2001 and 2009?

17   A.   I knew he was working for someone but not at that time he

18   wasn't -- I had left already.  I know for sure because there

19   were times that we would meet.  When I say meet I mean I would

20   run into him and he would ask me if I got a job yet or

21   anything.  I tell him yes, I'm working with a guy.  But he tell

22   me that -- I ask him if he's working too.  He said of course.

23   Q.   So I want to make sure that I'm a hundred percent clear.

24          Between 2001 and 2010, Harold Tischler was not your

25   boss?

D1VLCIB2                        Jones - cross

1    A.  No.

2    Q.  Is that right?

3    A.  No.

4    Q.  You were not working for him, you were not getting paid by

5    him?

6    A.  No.

7    Q.  And you don't have any idea who his employees were during

8    that time, correct?

9    A.  No.  I don't know who he was working.  But I know he said

10   that he was working with this other guy, you know, but I don't

11   know.  I never see him yet.

12   Q.  So you don't know who his employees were during that time

13   period from 2001 to 2010?

14   A.  No.

15   Q.  Okay.  And the people that you did see him give jobs to,

16   were these illegal immigrants?

17   A.  See him give jobs to like some guys and thing that was --

18   some guys that were was serve time in prison and so on.

19   Q.  Were they people who were here illegally as far as you

20   know?  Were they people who were here illegally in the United

21   States as far as you know?

22   A.  I don't know because I never used to be associate with

23   them.

24   Q.  I'm going to ask you if you know a few companies.  I'm

25   going to read a few names of companies and let me know if

D1VLCIB2                        Jones - cross

1    you've heard of them.

2              5318 16th Avenue Enterprises?

3    A.  Never heard.

4    Q.  State to State?  That's a no?  For the court reporter, you

5    just need to say your answer.

6    A.  I know some of the -- where some of the guys.  I don't know

7    where they live, but I knew that some of them was like live in

8    the Bronx.  I don't know that the number of the house or

9    anything like that.

10   Q.  Okay.  Are you answering my question about whether there

11   were people who were illegal working for?

12   A.  Illegal?

13   Q.  Let me start over.  I just want to make sure.  I was

14   confusing so let me start over.

15             Have you ever heard of a company called 5318

16   17th Avenue enterprises?

17   A.  No.

18   Q.  Have you ever heard of a company called State to State?

19   A.  No.

20   Q.  Have you ever heard of a company called 387 Quincy

21   Associates?

22   A.  Never, never hear about that.

23   Q.  Have you ever heard of a company called Vintage Partners?

24   A.  Vintage, I worked for Vintage.

25   Q.  That's the one you worked for?

D1VLCIB2                      Jones - cross

1    A.  Yeah.

2    Q.  Was it called Vintage Partners or Vintage Builders or do

3    you know?

4    A.  There's Vintage Builders.

5    Q.  Are you familiar with a separate company called Vintage

6    Partners?

7    A.  No, I don't know.  I only know that one Vintage.

8    Q.  Vintage Builders.  And have you heard of a company called

9    Fix Anything Construction?

10   A.  No.

11   Q.  Have you heard of a company called BSD Contracting?

12   A.  No.

13   Q.  Did you say no?

14   A.  No.

15   Q.  Have you heard of a company called Millennium Developers?

16   A.  No, I don't.

17   Q.  And what about a company called L&T Realty, have you heard

18   of that?

19   A.  What is that?

20   Q.  L&T Realty?

21   A.  No, no.

22          MS. ECHENBERG:  I have nothing further.  Thank you.

23   REDIRECT EXAMINATION

24   BY MR. GREENFIELD:

25   Q.  When you first started working for Mr. Tischler, was he in

D1VLCIB2                    Jones - redirect

1    partnership with his brother?

2    A.  Yes.

3    Q.  And was the name of that company Olympia, do you recall

4    that name?

5    A.  I recall, I recall Vintage, that name, you know.

6    Q.  Do you recall Olympia?

7    A.  Olympia.

8    Q.  You do?

9    A.  Yeah --

10            THE COURT:  Wait a second.  Let's get him to answer.

11            MR. GREENFIELD:  I'm trying.

12   A.  I know Olympia.  I think Olympia was run by his brother, by

13   his brother before he started to work and yeah.

14   Q.  That's my question to you.  The first company that you

15   worked for was the company that Mr. Tischler and his brother

16   both owned, correct?

17   A.  Okay, yeah.

18   Q.  What was the name of that company, if you remember?

19   A.  It was Vintage, Vintage.

20   Q.  And then you worked for Olympia?

21   A.  And then and then yeah.  Now you now call that name, I now

22   think it.

23            MR. GREENFIELD:  I have no further questions.

24            THE WITNESS:  Yeah, Vintage and Olympia, yeah.  That's

25   the two.

1              MR. GREENFIELD:  Okay.

2     RECROSS EXAMINATION

3     BY MS. ECHENBERG:

4     Q.  So when did you stop working for Vintage, if you can

5     remember, was that before 2001?

6     A.  Now I don't recall what year.  But I know for sure at least

7     I work at least four years, four years.

8     Q.  And those four years, was that both Vintage and Olympia

9     during that four-year period?

10    A.  Yes, most likely.  It was most likely it would be that.

11    What happened, I know the gentleman now mentioned that name, I

12    remember I also now remember that name.  But there was another

13    guy there and in that company in the same company that I don't

14    know if it was Hershy and that guy that was running that same

15    name that he now mentioned or if it is Hershy's brother and the

16    other guy that was running that because they were all in one,

17    it was all in one place.  Everything was operating this one

18    place, right.

19    Q.  Am I still correct though that between 2001 and 2010 Hershy

20    Tischler was not your boss?

21    A.  No, he wasn't my boss after.

22    Q.  He wasn't paying you during that time period?

23    A.  No.

24    Q.  And you don't know who was working for him during that

25    period?

D1VLCIB2                        Jones - recross

```
 1   A.  No.
 2              MR. GREENFIELD:  Objection.  Improper recross.
 3              THE COURT:  Come on.
 4              MR. GREENFIELD:  Okay.  Thank you.
 5              THE COURT:  Thank you, Mr. Jones, for coming in.  We
 6   appreciate it.
 7              (Witness excused)
 8              MR. GREENFIELD:  I have one more witness, your Honor.
 9   I call Yehezkel Fishbach.
10    YEHEZKEL FISHBACH,
11        called as a witness by the Defendant Tischler,
12        having been duly sworn, testified as follows:
13   DIRECT EXAMINATION
14   BY MR. GREENFIELD:
15   Q.  Good morning, Mr. Fishbach.
16   A.  Good morning.
17   Q.  Do me a favor.  When you speak, lean forward, speak into
18   the microphone so everyone can hear you.
19              Where do you live, Mr. Fishbach?
20   A.  I live 924 East 15th Street, Brooklyn, New York 11230.
21   Q.  How long have you lived there?
22   A.  Eight years.
23   Q.  And where were you born?
24   A.  I born in Israel.
25   Q.  Did there come a time when you came to the United States?
```

D1VLCIB2                          Fishbach - direct

1    A.   Yes.  27 years ago, after I finished Israeli army, I came

2    to United States.

3    Q.   Do you know Harold Tischler?

4    A.   Yes, I do.

5    Q.   When did you meet him?

6    A.   When I came, after I finished Israeli army, I came here to

7    United States and that weekend I went to synagogue on Saturday

8    morning and over there I met Harold Tischler.

9    Q.   And did you become friends with Harold Tischler?

10   A.   Yes, I do.

11   Q.   And how long have you been friends?

12   A.   Since then and now, we always been in touch.

13   Q.   Do you consider him a close friend of yours?

14   A.   Yes, I am.

15   Q.   Have you -- did you know Mr. Tischler well in 2005?

16   A.   Yes, I know him well.

17   Q.   I'm going to show you what's been marked Defendant HT-5 and

18   ask you if you, first of all, tell me what it is.

19   A.   This Hershy Tischler together with his son.

20   Q.   And do you recognize Mr. Tischler in that picture?

21   A.   Yes, I do.

22   Q.   And does that picture fairly and accurately represent what

23   Mr. Tischler looked like in 2005?

24   A.   Yes, it is.

25   Q.   And does it -- did he look the same in 2004?

1    A.  Yes.

2    Q.  And 2003?

3    A.  Yes.

4    Q.  And 2002?

5    A.  Yes.

6    Q.  2001?

7    A.  Yes.

8    Q.  2006, '07?

9    A.  I think, yeah.  He was -- I think he was in '05 or if I

10   remember, '05, '06, he had operation, I remember.  And he was

11   sick afterwards.  I went to visit him.  I think by the end of

12   '08 he start losing the weight.  But he was very heavy at that

13   time.

14   Q.  So he was heavy, to your recollection, as he appears in

15   that picture --

16   A.  Yes.

17   Q.  -- until sometime in 2008?

18   A.  By the end of '08, yes.

19   Q.  And do you see Mr. Tischler here in court today?

20   A.  Yes, I do.

21            MR. GREENFIELD:  Your Honor, I offer Defendant HT-5

22   into evidence.

23            MS. ECHENBERG:  No objection.

24            THE COURT:  Received.

25            (Defendant's Exhibit HT-5 received in evidence)

1           MR. GREENFIELD:  May I pass it among the jurors?

2           THE COURT:  Can I see it first?

3           MR. GREENFIELD:  Sure.

4           THE COURT:  Thanks.

5    Q.  You've known Mr. Tischler, as you said, for 22 years, and

6    you consider yourself a close friend; is that correct?

7    A.  Yes.

8    Q.  Have you had an opportunity in the course of the 22 years

9    to form an opinion as to his character for generosity?

10          MS. ECHENBERG:  Objection.

11          THE COURT:  Irrelevant.

12   Q.  Do you have an opinion as to whether he's a trusting

13   person?

14          MS. ECHENBERG:  Objection.

15          THE COURT:  Irrelevant.

16          MR. GREENFIELD:  May I be heard?

17          THE COURT:  Okay.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. GREENFIELD:  This is the central portion of

3    Mr. Tischler's defense is that he's a trusting and gullible

4    person who was taken in and deceived by Mr. Salamon.  And so I

5    think it's completely relevant and admissible.

6          THE COURT:  And exactly how do you propose on an

7    evidentiary basis to raise that?  What is the evidence?

8          MR. GREENFIELD:  What is the evidence?  The evidence

9    is Mr. Grynsztajn's testimony that he heard Mr. Salamon on the

10    telephone telling many sponsors excuses -- it's just a job

11    offer, you can throw the paper away -- when people complained

12    about getting a lot of mail.  It's the testimony of Mr. Salamon

13    on cross-examination by Mr. Brill that part of his job was to

14    schmooze and soothe people.

15          THE COURT:  Is there some testimony that all of those

16    calls and mail that was testified to yesterday that

17    Mr. Tischler called up and was soothed?

18          MR. GREENFIELD:  On every one of them, no, I don't

19    think that's necessary.

20          THE COURT:  Is there any?

21          MR. PASTORE:  No.  And I think your Honor's question

22    as to Nathan Schwartz and Harold Tischler, it was the opposite

23    of being soothed.  They wanted more money for applications.

24          THE COURT:  I'm sorry.

25          MR. GREENFIELD:  My defense is that Mr. Tischler was

1    deceived by Sam Salamon.  That's what I opened to the jury.

2    There is evidence in this record that Mr. Salamon, through his

3    own testimony and through the testimony of Mr. Grynsztajn, that

4    he told people lies.  He told sponsors lies.

5              THE COURT:  Do you have any testimony?  Go ahead.

6              MS. ECHENBERG:  The standard is a trait that's

7    pertinent to the crime charged.  The permanent trait here is

8    honesty or dishonesty.

9              MR. GREENFIELD:  That's not it.  405(b), when a

10   person's character trait is an essential element of a charge or

11   defense, the trait may also be proved by specific instances of

12   conduct.

13             THE COURT:  But you're not proving specific instance

14   of conduct.

15             MR. GREENFIELD:  I'll ask that.  If you want, I'll ask

16   him a specific instance.

17             THE COURT:  Give me the example.

18             MR. GREENFIELD:  Here's the exact example that this

19   witness told me.  He said that a guy came up to Harold Tischler

20   in his presence and said lend me $5,000 for a half an hour and

21   I'll pay it back to you.  And Tischler didn't know the guy.

22   And this guy said to him, what, are you crazy?  Don't do it.

23   And the guy said, don't worry, I'll give you a note.  Tischler

24   gave him a note.  The guy went off with the $5,000 and was

25   never seen again.

D1VLCIB2                          Fishbach - direct

1              MS. ECHENBERG:  It's all hearsay.

2              MR. GREENFIELD:  It was in his presence.  And wait a

3       second.  It can't be hearsay if it's admissible as a specific

4       instance of conduct.  It's one or the other.

5              MR. PASTORE:  It's hearsay.  It's what people said.

6              THE COURT:  It isn't that.  But how does this witness

7       testify that the other guy never gave Tischler the money?

8              MR. PASTORE:  That's what I was saying.

9              MR. GREENFIELD:  Okay, fine.

10              MR. PASTORE:  Sorry, Judge.  It's the conclusion of

11       it.

12              MR. GREENFIELD:  Okay.  I'm satisfied with he saw him

13       give him the money on the guy's promise.  Look, I don't

14       understand how it is not admissible when my defense -- you may

15       not think much of it and you say there's a lot of evidence to

16       the contrary, but to not be able to establish.

17              THE COURT:  I'll let you ask him the general question,

18       not the example.

19              (Continued on next page)

20

21

22

23

24

25

D1VLCIB2                          Fishbach - direct

1              (In open court)

2    BY MR. GREENFIELD:

3    Q.  Are you familiar with Mr. Tischler's character as it comes

4    to, as it pertains to gullibility, if you will?

5    A.  Yes.

6              THE COURT:  Hold on a second.

7              Your question and the one that was allowed, whether he

8    is a trusting person.

9    Q.  Okay.  Would you say that Mr. Tischler is a trusting

10   person?

11   A.  Yes.

12   Q.  What do you mean by that?

13   A.  He'll trust --

14             MS. ECHENBERG:  Objection.

15             THE COURT:  The word doesn't need to be defined.

16   Q.  Do you consider yourself a trusting person?

17   A.  Yes.

18   Q.  Do you consider Mr. Tischler the same kind of trusting

19   person that you are?

20   A.  No.  He's trusting much more than me.

21             MR. GREENFIELD:  I have no further questions.

22   CROSS-EXAMINATION

23   BY MS. ECHENBERG:

24             MS. ECHENBERG:  I apologize, your Honor.  One moment.

25   Q.  Good morning, Mr. Fishbach.

D1VLCIB2                          Fishbach - cross

1    A.  Good morning.

2    Q.  My name is Janis Echenberg.  I'm one of the prosecutors in

3    this case.

4            I just want to ask you about a few dates and know if

5    you were with Mr. Tischler on those dates.

6            Were you with him on January 25, 2007?

7    A.  With him?

8    Q.  Yes.

9    A.  No.  I don't remember the date.  I mean I cannot recall the

10   date, if I was that day with him or day before.

11   Q.  Okay.  Were you with him on May 14, 2008?

12   A.  Again, I cannot recall dates when I was with him.

13   Q.  Okay.  Do you remember ever being with him when he received

14   a call from the Department of Labor?

15   A.  No.

16           MS. ECHENBERG:  No further questions.

17   REDIRECT EXAMINATION

18   BY MR. GREENFIELD:

19   Q.  You were asked whether you were with Mr. Tischler on a

20   couple of specific dates that you can't recall.

21           Can you tell us how often you were with him during the

22   years 2001 through 2009?

23   A.  I used to see him at least two, three times a week.  We

24   used to go out to sauna almost every other week together.  We

25   used to be very much involved with each other.

D1VLCIB2                         Fishbach - redirect

1  Q.  Did you ever see him when he was working?

2  A.  He was, yes, I did.

3  Q.  Where did you see him?

4  A.  All over.  I saw every day he had other people working for

5  him, this guy, that guy.  I remember there was a program, the

6  toilet program, was working like crazy, out until night hours,

7  you know.

8  Q.  So you saw him at job sites that he was working at?

9  A.  I saw him all over, yes.  Whenever I used to call him, what

10  was going on.  He was working and working, yes.

11          MR. GREENFIELD:  No further questions.

12          MS. ECHENBERG:  Nothing, your Honor.

13          THE COURT:  Thank you very much for coming.

14          THE WITNESS:  You're very welcome.

15          (Witness excused)

16          MR. GREENFIELD:  I have no further witnesses to call

17  this morning, your Honor.  Thank you.

18          THE COURT:  Thank you.

19          MR. PASTORE:  United States recalls special agent

20  Deidre Gordon.

21   DEIRDRE GORDON, resumed.

22  DIRECT EXAMINATION (cont'd)

23  BY MR. PASTORE:

24          MR. PASTORE:  Your Honor, may I proceed?

25          THE COURT:  Yes.

D1VLCIB2                    Gordon - direct

1  Q.  Agent Gordon, do you recall yesterday we were talking about

2  several different call notes, do you remember that?

3  A.  Yes.

4  Q.  And do you remember talking about various companies

5  associated with the defendant Harold Tischler?

6  A.  Yes.

7  Q.  Are you familiar with a company named Millennium Developers

8  and General Contractors, Inc.?

9  A.  Yes.

10  Q.  Tell the jury in general how you're familiar with that

11  company, please.

12  A.  I've seen that company listed as a sponsor on Department of

13  Labor applications.

14  Q.  Okay.  I'm going to hand you what's been marked -- been

15  admitted as Government's 113-6-A together with 113-6, and if we

16  could bring that up on the screen.

17          And if you could just tell the jury what 113-6-A is

18  together with 113-6?

19  A.  113-6-A is a call note from the Department of Labor.  113-6

20  is an alien labor certification.

21  Q.  And does the alien labor certification list a particular

22  alien and a particular company?

23  A.  The company contact is Millennium Developers and General

24  Contractors, Inc.  And the alien, the alien's name is Danny

25  Gindi.

D1VLCIB2                        Gordon - direct

1    Q.   Is there contact information listed for Millennium

2    Developers and General Contractors?

3    A.   Yes.   The address is listed at 5318 16th Avenue in

4    Brooklyn, New York, telephone number, (718)871-0382, and the

5    contact's name is Harold Tischler.

6    Q.   And just to refresh our recollection from yesterday, you

7    personally have been to 5318 16th Avenue; is that right?

8    A.   That's correct.

9    Q.   And while you were there, who did you encounter?

10   A.   Harold Tischler.

11   Q.   With respect to this phone number, (718)871-0382, is this

12   the same phone number or a different phone number than what we

13   were looking at yesterday?

14   A.   Different.

15   Q.   Did you do any analysis to determine who this phone number

16   was subscribed to during the time period for the call note

17   that's 113-6-A?

18   A.   Yes, I did.

19   Q.   What did you do?

20   A.   Issued a subpoena.   Requested the issuance of a subpoena, I

21   should say.

22          MR. PASTORE:   At this time I'm going to read a

23   stipulation, S-16.   It is captioned with the caption of this

24   case.   It says Optimum Lightpath and it reads as follows:

25          "It is hereby stipulated and agreed by and among the

D1VLCIB2                      Gordon - direct

1   United States of America by Preet Bharara, United States

2   attorney for the Southern District of New York, James Pastore

3   and Janis Echenberg, assistant United States attorneys, of

4   counsel, and the below named defendants by and through their

5   attorneys that:

6               "If called as a witness, a custodian of records of

7   Optimum Lightpath would testify that Government Exhibit 224

8   consists of subscriber information and toll records for the

9   telephone assigned the telephone number (718)871-0382 for the

10  period December 1, 2008 through January 15, 2009 and that these

11  records:

12              "A.  Were made at or near the time of the occurrence

13  of the matters set forth in the records by, or from information

14  transmitted by, a person with knowledge of those matters;

15              "B.  Kept in the course of regularly conducted

16  business activity; and

17              "C.  Made by the regularly conduct business activity

18  as a regular practice."

19              It's dated January 15, 2013, signed by myself and

20  counsel for each defendant.

21              At this time the government offers S-16 as well as

22  Government's 224.

23              MR. GREENFIELD:  No objection.

24              THE COURT:  Received.

25              (Government's Exhibits S-16, 224 received in evidence)

D1VLCIB2                          Gordon - direct

1  Q.  Agent Gordon, I'm handing you what's just been admitted as

2  Government Exhibit 224 and I'd ask if we can publish it by

3  bringing it up on the screen.

4          What do the subscriber -- first tell us what these

5  are?

6  A.  Subscriber and toll records for (718)871-0382.

7  Q.  And what do those subscriber records indicate is the

8  subscriber for (718)871-0382?

9  A.  The subscriber is listed as 5318 16th Enterprises.

10 Q.  And is there a particular address listed for that company,

11 5318 -- I'm sorry.  Could you say that name one more time?

12 A.  5318 16th Enterprises is listed as the subscriber.

13 Q.  So it's missing the "avenue"; is that right?

14 A.  Yes.

15 Q.  But what is the address associated with that company?

16 A.  The address is 5318 16th Avenue, Suite 3, in Brooklyn, New

17 York.

18 Q.  Going now to the call note that's Government's 113-6-A, can

19 you make that out on your screen on the left-hand side?

20 A.  Yes.

21 Q.  And what does the call note indicate?

22 A.  Call note is dated December 12, 2008.  And it reads "spoke

23 with Harold Tischler.  Confirmed company as sponsoring Danny

24 Gindi as a worker.  Sponsorship passed."

25 Q.  Did you have an opportunity to examine the toll records

D1VLCIB2                        Gordon - direct

1    associated with the 5318 16th Enterprises phone?

2    A.  Yes.

3    Q.  Was there a toll record corresponding to this phone call on

4    December 12, 2008?

5    A.  Yes.  At 10:28 a.m., there's a 79 second phone call from

6    phone number (404)893-0101.

7    Q.  The Atlanta Department of Labor phone number we've been

8    discussing?

9    A.  Correct.

10             MR. PASTORE:  Do we have 224, if we can bring that up

11   on the screen.

12   Q.  Did do you see highlighted text on your screen?

13   A.  Yes.

14   Q.  Is that the record you were just referring to?

15   A.  Yes.

16   Q.  So 79, do you see where it says 79 in the column, is that

17   the number of minutes, seconds, can you tell?

18   A.  Seconds.

19   Q.  And in the far right, is that where you're getting the

20   number (404)893-0101 from?

21   A.  Yes.

22   Q.  I want to direct your attention now to Government's

23   113-10-A, and if we could bring it up side by side with 113-10.

24   I'm also for the record going to hand you a hard copy of the

25   document, 113-10-A.

1                Can you tell us what that is?

2    A.  Yes.  113-10-A is a call note from the Department of Labor.

3    Q.  And prior to your testimony, were you able to review 113-10

4    and determine whether it corresponds to the call note?

5    A.  Yes.

6    Q.  And are we dealing with the same company, Millennium

7    Developers and General Contractors?

8    A.  Yes.

9    Q.  And the address, 5318 16th Avenue, for the company?

10   A.  Yes.

11   Q.  And what phone number is listed for the company?

12                Actually, did you review it prior to your testimony?

13   A.  I did.

14   Q.  So just to expedite matters, is it (718)871-0382?

15   A.  Yes.

16   Q.  If you could look on your screen at the two call notes

17   here, and if we could start with the bottom call note, what

18   does the bottom call note say?  And if you can read the top

19   call note as well.

20   A.  Bottom call note is dated December 30, 2008.  It reads "at

21   11:21 a.m., left message with Diana for Harold Tischler."

22   Q.  And call note two?

23   A.  "Sponsorship confirmed by Harold Tischler for Mireya

24   Benavides."  Call note is dated January 22, 2009.

25   Q.  If we could go to Government's Exhibit 224-2 and if you

D1VLCIB2                          Gordon - direct

1    could tell the jury what that is.

2    A.  224-2 is part of the toll records associated with

3    (718)871-0382.

4    Q.  Is there a toll record corresponding to the call note that

5    you just read from December 30, 2008?

6    A.  Yes.  At 11:18 a.m., there's 117 second phone call from the

7    Department of Labor in Atlanta.

8    Q.  So that's about a two-minute phone call?

9    A.  Approximately, yes.

10   Q.  And the call note indicated I think 11:21; is that right?

11   A.  Yes.

12   Q.  And with respect to --

13   A.  I'm sorry, no, 11:18.

14   Q.  I'm sorry, 11:18.

15   A.  Yes.

16   Q.  That's in the highlighted?

17   A.  Yes.

18   Q.  If we could go now to Government's 224-3, and if you could

19   tell the jury what that is.

20   A.  It's more toll records from that same 718 phone number.

21   Q.  And, in particular, do you see what's highlighted on your

22   screen, can you tell the jury what that is?

23   A.  Yes.  It indicates that at 1:45 p.m., a phone call for 197

24   seconds from the Department of Labor in Atlanta.

25   Q.  And how if at all does that correspond to the call note

D1VLCIB2                          Gordon - direct

1    that we previously reviewed?

2    A.   The second record on the call note is dated the same date,

3    January 2, 2009.

4    Q.   I'm handing you what's now been marked for identification

5    as Government's 1342.  Could you please tell the jury what is

6    Government's 1342 and whether there are any Government Exhibits

7    marked within 1342?

8    A.   1342 is an A file for an alien by the name of Franklin

9    Maldonado Cantos, and there are Government 1342-1 and -2.

10   -1 is an original labor certification for Franklin Maldonado

11   Cantos, and 1342-1 is the accompanying I-140 filed with CIS.

12            MR. PASTORE:  Government offers 1341-1 and 1341-2.

13            THE COURT:  Received.

14            (Government's Exhibits 1341-1, 1341-2 received in

15   evidence)

16   Q.   We've been discussing or discussed yesterday some A files

17   connected with Harold Tischler companies.

18            Did you also review A files associated with Nathan

19   Schwartz companies?

20   A.   Yes, I did.

21   Q.   Directing your attention to the cart in front of you, the

22   smaller cart, are those Government Exhibits 1201 through 1217?

23   A.   Yes.

24   Q.   And can you tell us in general what are Government's 1201

25   through 1217?

D1VLCIB2                          Gordon - direct

1    A.  A files that relate to companies associated with Nathan

2    Schwartz.

3    Q.  And I'm handing you now what's been marked for

4    identification, well, I'm handing you now several files that

5    have been marked for identification as Government Exhibits.  If

6    you could look at Government 1207 and please tell the jury what

7    that is.

8    A.  Government Exhibit 1207 is an A file for an alien by the

9    name of Shiron Weinstein.

10   Q.  Are there Government Exhibits marked within that A file?

11   A.  Yes, exhibits one through seven.

12            MR. PASTORE:  Government offers 1207-1 through 1207-6.

13            THE COURT:  Received.

14            (Government's Exhibits 1207-1 through 1207-6 received

15   in evidence)

16   Q.  If we could turn to 1207-5, please, and if we could bring

17   that up on the screen.  If you could tell the jury what we're

18   looking at?

19   A.  1207-5 is an original labor certification for Shiron

20   Weinstein dated September 11, 2006.

21   Q.  Is there a particular employer listed for this alien?

22   A.  Contour Framing Incorporated.

23   Q.  Is there a particular address associated with Contour

24   Framing?

25   A.  214 Route 59, Suite 100, in Suffern, New York.

1           MR. PASTORE:  If we could bring that up on the screen,
2    I think it's a couple pages in.
3    Q.  Do you see what's on your screen right now?
4    A.  Yes.
5    Q.  And the information that you just read off, is that
6    reflected in sections C and D?
7    A.  Yes.
8    Q.  Now if you could go to 1207-2 and tell us what that is?
9    A.  1207-2 is an original labor certification for an alien by
10   the name of Erkan Akaya.
11   Q.  So this alien file you said earlier relates to Shiron
12   Weinstein?
13   A.  Correct.
14   Q.  But there is a labor certification for Erkan Akaya?
15   A.  Yes.
16   Q.  In looking through the A file, were you able to find any
17   documents that shed light on why Erkan Akaya's labor
18   certification is in this file?
19   A.  Yes.  Government Exhibit 1207-6 is a letter from USCIS
20   indicating that Erkan Akaya was being replaced by Shiron
21   Weinstein as a beneficiary for the labor certification.
22   Q.  I may have misheard you.  Did you say it's a letter from
23   CIS?
24   A.  I'm sorry, I think I did, but it's a letter to CIS from the
25   law offices of Zvi M. Samuels.

D1VLCIB2                        Gordon - direct

1  Q.  Is there an address listed for Zvi M. Samuels?

2  A.  1301 47th Street is what's listed on the letterhead.  No

3  city or state.

4  Q.  If we go to a couple pages in on the blue labor

5  certification, which is 1207-2, what is the company and contact

6  information listed in this application?

7  A.  Contour Framing Incorporated, 46 Main Street, Suite 226 in

8  Monsey, New York.

9  Q.  Are you familiar with the location 46 Main Street?

10  A.  Yes.

11        MR. PASTORE:  If we could bring up Government's 53.

12  Q.  If you could let us know, Agent Gordon, if you recognize

13  Government's 53?

14  A.  Yes.  That's a photo of 46 Main Street in Monsey.

15  Q.  And did you have occasion to visit that location during

16  your investigation?

17  A.  Yes, I did.

18  Q.  I want to direct your attention now to Government's 1207-7

19  and if you could tell the jury what that is?

20  A.  This is a letter from USCIS addressed to Contour Framing

21  Incorporated, attention Nathan Schwartz, 46 Main Street, Suite

22  226 in Monsey, New York.

23  Q.  Do you see the page that's displayed on your screen, on our

24  monitors right now?

25  A.  Yes, I'm sorry.  There are a number of pages in this

D1VLCIB2                          Gordon - direct

exhibit.  So, yes, I see the page that you're looking at which

is also part of 1207-7.

Q.  So do I understand correctly 1207-7 is a multipage exhibit?

A.  Yes.

Q.  And this page indicating that this is a courtesy copy only,

can you tell what it is a courtesy copy of?

A.  Yes.  It's a courtesy copy of the letter that I was just

describing, a letter from USCIS which indicates they -- the

decision that USCIS made with respect to that I-140 application

for Shiron Weinstein.

Q.  If we could go to the next page.  Is what's being displayed

on your screen now a -- the letter that you were discussing?

A.  Yes.

Q.  And who is this letter actually sent to?

A.  It's sent to Contour Framing, attention Nathan Schwartz, 46

Main Street in Monsey, New York.  It was also carbon copied to

Zvi M. Samuels, Esquire, law office of Zvi M. Samuels.

Q.  Do you see what the date is?

A.  January 25, 2010.

Q.  Can you tell what happened to this letter, is there any

information in 1207-7?

A.  Yes.  There's the original envelope from USCIS addressed to

Zvi Samuels with the yellow mark from the post office, yellow

sticker from the post office indicating that the copy that was

sent to the Zvi Samuels was returned to USCIS.

D1VLCIB2                          Gordon - direct

1   Q.  Is there any evidence in that A file that the copy sent to

2   Nathan Schwartz was returned?

3   A.  No, there is not.

4   Q.  In fact, when you reviewed 1201 through 1217, was there any

5   evidence that any mail sent to Nathan Schwartz' attention was

6   returned as undeliverable?

7   A.  No, there was not.

8   Q.  Were there any letters from Nathan Schwartz or anyone

9   associated with his companies withdrawing the petitions?

10  A.  No, there were not.

11          MR. PASTORE:  Your Honor, if I could just publish

12  1207-7 to the jury.

13          THE COURT:  Sure.

14          MR. PASTORE:  With the Court's permission.  I'll keep

15  it in the sleeve.

16          THE COURT:  Yes, it's fine.

17  Q.  Now if you could look at Government's 1209 and tell us what

18  we're looking at?

19  A.  1209 is an A file relating to an alien by the name of Henry

20  Castillo.

21  Q.  And are there Government Exhibits marked in there, 1209-1

22  through 1209-6?

23  A.  Yes.

24          MR. PASTORE:  The government offers 1209-1 through

25  1209-5.  I'm not going to offer six.

1             MR. BRILL:  No objection.

2             THE COURT:  Received.

3             (Government's Exhibits 1209-1 through 1209-5 received

4    in evidence)

5    Q.  If you could tell us what 1209-5 is, and we'll bring it up

6    on the screen at the same time, but, in general, if you could

7    tell us what it is?

8    A.  1209-5 is an original alien labor certification for Henry

9    Fernando Castillo Gonzalez.

10            MR. PASTORE:  If we could go to the second page on the

11   screen.  Continuing on.  Bring up the labor certification,

12   please.

13   Q.  Okay.  Is what's displayed on your screen what you were

14   just reading to the jury?

15   A.  Yes.

16   Q.  I want to direct your attention to the employer contact

17   information here.  Do you see the phone number that's listed

18   for Nathan Schwartz?

19   A.  Yes.

20   Q.  What phone number is listed?

21   A.  (845)354-5651.

22   Q.  And below that in Section D, the employer contact

23   information, what phone number is listed there?

24   A.  (718)219-6800.

25   Q.  And whose phone number is that?

D1VLCIB2                        Gordon - direct

1   A.  Leo Teitelbaum.

2   Q.  If we can now focus your attention on Section C again.  Do

3   you see where it says number of employees for Contour Framing,

4   Inc.?

5   A.  Yes.

6   Q.  How many employees does Contour Framing, Inc. have

7   according this document?

8   A.  Seventeen.

9   Q.  And if we can go to the next page and take a look at

10  Section H.  What is the primary work site listed in this

11  particular application for Henry Castillo?

12  A.  214 Route 59, Suffern, New York.

13  Q.  There's no suite number or any other address, just 215

14  Route 59?

15  A.  Correct.

16  Q.  I'm sorry, 214 Route 59.  I apparently can't read this

17  morning.  I've done that twice and I apologize.

18  A.  Correct.

19  Q.  Okay.  So if we can go to page 9 of the labor

20  certification.

21         Does this page indicate the date on which the labor

22  certification for Henry Castillo was filed?

23  A.  Was, filing date is listed as July 13, 2006.

24  Q.  Okay.  So according to this document, in July of 2006,

25  Contour Framing, Inc., was sponsoring Henry Castillo and had 17

1  employees?

2  A.  That's correct.

3  Q.  Is this document signed?

4  A.  It is.

5  Q.  And in section, not where it says U.S. government agency

6  use only, but above that in the signature block, whose name

7  appears there?

8  A.  Nathan Schwartz.

9  Q.  And is it dated?

10 A.  No, it is not.

11 Q.  If we could look at 1209-4 and bring that up on the screen,

12 please.  What is 1209-4?

13 A.  It's the I-140 application for Henry Castillo.

14 Q.  And can you tell from the date on this whether it

15 corresponds or is approximately around the same time as that

16 labor certification?

17 A.  Yes, it is.

18 Q.  If we can go to the next page of this document and focus in

19 on part 5.

20         Do you see where it says additional information about

21 the petitioner?

22 A.  Yes.

23 Q.  Employer, check, do you see that?

24 A.  Yes.

25 Q.  In terms of the other information that's requested, what

1    information if any is filled in?

2    A.  The date established is listed as 2005.

3    Q.  And other than that and the NAICS code, is any other

4    information filled out?

5    A.  No.

6    Q.  If we could go to the next page of this document, and if

7    you could tell us is it signed?

8    A.  Yes.

9    Q.  What name appears in the signature block?

10   A.  Nathan Schwartz.

11   Q.  What's the date here?

12   A.  October 31, 2006.

13   Q.  Do I understand correctly because these documents are in

14   the A file that means they reached immigration; is that right?

15   A.  That is correct.

16   Q.  And if we can go to the first page of the I-140 again, do

17   you see the bar code on the right-hand side?

18   A.  Yes.

19   Q.  Are you familiar -- and do you see the little date on the

20   bar code?

21   A.  Yes.

22   Q.  Are you familiar with what that date means?

23   A.  I believe that date is the date it is received at the

24   service center that's going to adjudicate the application.  In

25   this case it would be the Texas service center which is coded

D1VLCIB2                         Gordon - direct

1    as SRC.

2    Q.  What about other service centers, do you know what EAC

3    stands for?

4    A.  EAC is associated with the Vermont service center.

5    Q.  You know that based on your training and experience?

6    A.  Yes.  I've also been there.

7    Q.  Have you personally been there in connection with this

8    investigation?

9    A.  Yes.

10   Q.  Both the Vermont and the Texas service centers?

11   A.  That's correct.

12   Q.  If we could go to Government 1210, please, and if you could

13   tell us what it is, and if there are any Government Exhibits,

14   what the numbers are on those.

15   A.  Government Exhibit 1210 is an A file related to Jose

16   Francisco Torres and it contains exhibits 1210-1 through -4.

17            MR. PASTORE:  Government offers 1210-1 through -4.

18            THE COURT:  Received.

19            (Government's Exhibits 1210-1 through -4 received in

20   evidence)

21   Q.  If we could focus on 1210-2 and go ahead to the labor

22   certification page and, Agent Gordon, if you could tell us

23   whose name is this labor certification in?

24   A.  Pablo Antonio Avila Leon.

25   Q.  What section does that information appear?

 1    A.  Section J on page 5.

 2    Q.  You said this was the A file for, I'm sorry, Jose, what was

 3    the middle name?

 4    A.  Jose Francisco Torres.

 5    Q.  So this is Jose Francisco Torres's A file, but do I

 6    understand correctly that the blue labor certification is in

 7    Pablo Avila Leon's name?

 8    A.  That is correct.

 9    Q.  Does this labor certification indicate who is sponsoring

10    Pablo Avila Leon?

11    A.  Yes.  Section 1 lists the employer information as Contour

12    Framing Incorporated.

13    Q.  And we're bringing that up on the screen now.  Is that what

14    you were just reading off?

15    A.  Yes.

16    Q.  Section C, can you tell us what the address for Contour

17    Framing, Inc. is in this application?

18    A.  46 Main Street, Suite 226 in Monsey, New York.

19    Q.  And how many employees does Contour Framing have according

20    to this application?

21    A.  Seventeen.

22    Q.  And the phone number in the employer contact information,

23    Section D, what's the phone number here?

24    A.  (845)354-5651.

25             MR. PASTORE:  And if we could go to the next page,

D1VLCIB2                          Gordon - direct

1   please.

2   Q.  Do you see where it says wage offer information, Section G?

3   A.  Yes.

4   Q.  What does $18.93 indicate?

5   A.  The prevailing wage or the wage that they would be paying

6   the alien.

7   Q.  And job opportunity information, do you see Section H where

8   it says primary work site?

9   A.  Yes.

10  Q.  What's listed there?

11  A.  46 Main Street in Monsey, New York.

12  Q.  Any suite number or particular apartment or anything like

13  that listed?

14  A.  No.

15  Q.  And, again, if we can go to page 9.  Is the document signed

16  and, if so, whose name appears in the signature block?

17  A.  The document is signed and the name listed is Nathan

18  Schwartz.  The signature should be from Nathan Schwartz.

19  Q.  And the filing date on this application?

20  A.  July 13, 2006.

21  Q.  So am I correct, am I remembering correctly that's the same

22  as Castillo's filing date?

23  A.  Yes.

24  Q.  1210-1, please, if you could direct your attention to that

25  and we could bring it up on the screen.  What is 1210-1?

1  A.  It's the I-140 filed with USCIS for Jose Francisco Torres.

2  Q.  So do I understand -- does the date on this correspond to

3  the date on the labor certification for Pablo Avila Leon?

4  A.  Yes.

5  Q.  If we could go to the next page, please, and take a look at

6  Part 5.  And, again, does it appear -- well, are there blank

7  fields in Part 5?

8  A.  Yes, there are.

9  Q.  If we could go to 1210-4, and you could tell us what that

10  is?

11  A.  It is a letter from USCIS.  Basically it's a notice of

12  intent to deny the I-140 application for Jose Torres.

13  Q.  And prior to testifying, did you have a chance to review

14  this letter and read it?

15  A.  Yes.

16  Q.  Do you remember what reasons were given in this letter, if

17  any, for why CIS was going to deny the application?

18  A.  There were several reasons.  There was missing information

19  from several parts.  I don't know if you want to --

20          MR. PASTORE:  If we could go on to the next page.  I

21  think it's -- go a couple pages in.  Right here.

22  Q.  If you look at the bottom of the page, do you see where it

23  says submit a form?

24  A.  Yes.

25  Q.  If we could enlarge that.  Okay.  So what does that say

D1VLCIB2                        Gordon - direct

1    there?

2    A.  It says submit a form ETA 9089, application for permanent

3    employment certification, with the current beneficiary's

4    qualifications and original signature.

5    Q.  And a form ETA 9089, is that the form number that

6    corresponds to the blue labor certification?

7    A.  Yes, that is the form number of the blue labor

8    certification.

9    Q.  I want to talk to you about an A file that was previously

10   admitted, Government's 1334.  And if we could bring up 1334-3,

11   and I believe the A file may be in front of you?

12   A.  No, it's not.

13   Q.  It's not, okay.  If you could look on your screen, do you

14   see Government Exhibit 1334-3?

15   A.  Yes.

16   Q.  What is the address listed for Olympia York Builders and

17   Developers?

18   A.  455 Route 306, Suite 119 in Monsey, New York.

19   Q.  Are you familiar with that address?

20   A.  Yes.

21   Q.  Have you personally visited that address in connection with

22   this investigation?

23   A.  Yes.

24        MR. PASTORE:  If we can go to the next page, please.

25   And if we can continue on to the labor certification.

D1VLCIB2                         Gordon - direct

1    Q.  Okay.  What is the address listed for Olympia York

2    builders?

3    A.  455 Route 306, Suite 119 in Monsey, New York.

4    Q.  What is the phone number that's listed for Olympia York

5    builders?

6    A.  (845)721-7455.

7    Q.  And down below in the employer contact information, whose

8    name is there?

9    A.  Nathan Schwartz.

10   Q.  And I see the same address, 455 Route 306?

11   A.  Correct.

12   Q.  What is listed as Nathan Schwartz's phone number?

13   A.  (845)721-7455.

14   Q.  If we could now direct your attention and bring up on the

15   screen Government's 3613.  Do you recognize this document?

16   A.  Yes.

17   Q.  And did you review this document in the course of your

18   investigation?

19   A.  Yes.

20   Q.  After you reviewed the document, did you take any

21   investigative steps, if so, what were they?

22   A.  I conducted a database check to see if there was an

23   immigration application or applications or an A file related to

24   Lidia Chalen.

25   Q.  Handing you what's been marked for identification as

D1VLCIB2                    Gordon - direct

1    Government's 1218, do you recognize that, if so, please tell

2    the jury what it is.

3    A.  Yes.  These are applications associated with an alien by

4    the name of Lidia Chalen.  More specifically, it's a labor

5    certification and an I-485 filed with USCIS.  It's also, sorry,

6    an I-140 form.  Three documented related to Lidia Chalen.

7    Q.  Three documented related to Lidia Chalen.  I-485, that's

8    the green card application?

9    A.  Yes.

10   Q.  I-140, the visa petition?

11   A.  Yes.

12   Q.  And the labor certification as well?

13   A.  Yes.

14            MR. PASTORE:  Government offers 1218.

15            MR. BRILL:  I don't remember seeing it.  Can I take a

16   look at it for one second.

17            (Pause)

18            MR. BRILL:  No objection.

19            THE COURT:  Received.

20            (Government's Exhibit 1218 received in evidence)

21            MR. PASTORE:  If we could publish Government's 1218.

22   And go to the fourth page of the I-485.

23   Q.  Whose name is listed as the attorney here?

24   A.  David Schlacter.

25   Q.  And is there a individual by the name of David Schlacter on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    the board up to your left there?

2    A.  Yes.

3    Q.  Now if we could go to Government 3614 and bring that up on

4    the screen.  Do you recognize this document?

5    A.  Yes.

6    Q.  Can you tell us, please, what it is?

7    A.  An email from Sammy110wall to Nathan@Monseyframing.com.

8    Q.  And after you reviewed this document, did you take any

9    investigative steps?

10   A.  I had run checks to see applications relating to 106 Route

11   59.

12   Q.  I'm handing you what's been marked for identification as

13   Government's 116.  Why don't you review that while I read a

14   stipulation into the record.

15           MR. PASTORE:  Sorry, your Honor, may I have a moment?

16           THE COURT:  Sure.

17           MR. PASTORE:  Sorry.  There was a folder within a

18   folder.  I apologize.

19           All right.  The stipulation is Government's S-18.  It

20   is captioned with this case caption.  It says United States

21   Department of Labor.  It reads as follows:

22           "It is hereby stipulated and agreed by and among the

23   United States of America by Preet Bharara, United States

24   attorney for the Southern District, James Pastore and Janis

25   Echenberg, assistant United States attorneys, of counsel, and

D1VLCIB2                          Gordon - direct

the below named defendants by and through their attorneys that:

"1.  If called as a witness, a custodian of records of
the United States Department of Labor would testify that
Government Exhibit 116, 106-25-A and 103-36-A consist of
records of the United States Department of Labor which were:

"A.  Made at or near the time of the occurrence of the
matters set forth in the records by, or from information
transmitted by, a person with knowledge of those matters;

"B.  Kept in the course of regularly conducted
business activity; and

"C.  Made by the regularly conducted business activity
as a regular practice."

It's dated January 29, 2013, signed by Ms. Echenberg
and counsel for each defendant.

Government offers S-18 together with Exhibits 116,
106-25-A and 103-36-A.

MR. BRILL:  Judge, this is the one I mentioned I had
forgotten last night.  May we approach briefly?

THE COURT:  Yeah.

(Continued on next page)

1           (At the side bar)

2           MR. BRILL:  It's the list you just handed to Agent

3    Gordon, what is that?

4           MS. ECHENBERG:  116.

5           MR. BRILL:  The 116 is a list of from the Department

6    of Labor's website of the Levy's kosher and garden corporation

7    applications.  The connection the government is suggesting is

8    because Mr. Salamon had an email in a file in his computer that

9    he claims might have been sent -- I don't think he actually

10   said it was sent -- to Mr. Schwartz, that somehow this is proof

11   of Mr. Schwartz's involvement in some part of the application

12   process for Levy's kosher garden corporation.

13           No. 1, the government has never established it was

14   sent.  It was found in a folder that was not sent mail.  They

15   never established that email was ever received.  And simply the

16   fact that Mr. Schwartz's email address appears in the "to"

17   section of an email I would suggest is not sufficient nexus to

18   now introduce this in a case against Mr. Schwartz.

19           MR. PASTORE:  First, my recollection of Mr. Salamon's

20   testimony is different.  He testified it was sent and he

21   pointed out there was not only a date but also a time in the

22   email line.

23           Second, he testified that he would have Mr. Schwartz,

24   Mr. Schwartz would assist him in preparing phony applications,

25   specifically, the labor final approval certifications, that he

D1VLCIB2                        Gordon - direct

1    would do a cut and paste job.

2              MR. BRILL:  Right, but he never said specifically that

3    he did that one for this company.

4              MR. PASTORE:  I think that would go to the weight, not

5    the admissibility.  That's argument.

6              And, finally, the email address for Mr. Schwartz,

7    Nathan@Monseyframing.com, I'm sorry, yeah, Monseyframing.com is

8    in Government's 505A.  There was the screen shot with the

9    conversation between Mr. Salamon and Nuchem which he identified

10   as Mr. Schwartz and Mr. Schwartz wrote email me and then he

11   wrote Nathan@Monseyframing.com.

12             MR. BRILL:  That's 2009 or 2010.

13             MS. ECHENBERG:  The point is when Mr. Salamon

14   testified about these two emails, the Lidia Chalen email we

15   just looked at and the cook Levy email we just looked at, he

16   testified about those emails being examples of things he would

17   ask Mr. Schwartz to do specifically.  He would ask Mr. Schwartz

18   to take these final determination letters and sub in a new name

19   of alien and a new name of company.  It's the point of

20   Government 116 is to show that was one of the many companies

21   that were these phony sponsor companies for law firm.

22             MR. BRILL:  And it may be a phony sponsor company, but

23   there's no evidence linking it to Mr. Schwartz.  That's the

24   argument.

25             MR. PASTORE:  We have an email address.  It not only

1    says Levy kosher garden, it also says care of Shlomo Levy in

2    the email which is Government 3614.  And Government's 1162

3    lists not only applications filed for Levy kosher garden, but

4    specifically there's an application for Shlomo Levy.

5              MR. BRILL:  Sure.  But no one can testify or can

6    testify that email was either sent or received.

7              MS. ECHENBERG:  And, frankly, whether or not the email

8    was received, it was in Sam Salamon's computer.  Lidia Chalen

9    email was sent.

10             MR. BRILL:  But not in sent mail folder.

11             THE COURT:  But it wasn't sent, what folder was it in?

12             MR. BRILL:  It was in some other random folder which

13   their witness couldn't say whether it was sent or not.

14             THE COURT:  It wasn't in a waiting to be sent folder?

15             MR. BRILL:  It was in a folder their witness could not

16   testify as to what the purpose of the folder was.

17             MR. PASTORE:  I think also just as an offer of proof,

18   your Honor, there was multiple copies of that email that were

19   recovered on the F1 computer.  The one I happened to ask

20   Mr. Mirandona to do analysis on was in new mail.

21             MR. BRILL:  Mr. Pastore is now testifying.  If they

22   had evidence.

23             MR. PASTORE:  I'm making an offer of proof as to the

24   admissibility of a document which is totally appropriate for

25   the Court to consider.

D1VLCIB2                    Gordon - direct

1             The testimony we've already established is Mr. Salamon

2      has explained how these emails were used and what Schwartz's

3      role was in preparing phony documents and it shows that in fact

4      there were applications submitted for Levy kosher garden and,

5      in particular, for Shlomo Levy was mentioned in 3416.

6             MR. BRILL:  And government had proof that email was

7      actually sent, they should have provided that proof to the

8      Court and jury.  What they did is provided proof of an email in

9      a computer.

10            THE COURT:  Once it has a time.

11            MR. BRILL:  That's not what that witness testified to.

12     If -- and I appreciate the Court's understanding of email, but

13     that's not necessarily what the --

14            THE COURT:  Such as it is.

15            MR. BRILL:  We don't know how AOL works on that day at

16     that time.  They had an expert, allegedly, who testified that

17     he didn't even know how AOL works.

18            THE COURT:  That's because he's expert and I'm less so

19     so I use AOL.

20            MR. BRILL:  There you go, Judge.

21            MR. GREENFIELD:  Don't tell us you still pay.

22            THE COURT:  No, you don't have to pay.

23            MR. GREENFIELD:  My wife figured that out about six

24     months ago.

25            THE COURT:  Congratulations.

D1VLCIB2                         Gordon – direct

1           MR. BRILL:  I didn't object to Lidia Chalen.  I

2    understand the connection there.  This is a bigger problem.

3           MS. ECHENBERG:  Frankly I think --

4           THE COURT:  How much more do you have with this

5    witness?

6           MR. PASTORE:  Probably, realistically, probably about

7    an hour more.  I'm going to try to expedite it.

8           (In open court)

9           THE COURT:  Ladies and gentlemen, you should take your

10   break now.  Remember the rules:  Keep an open mind.  Don't talk

11   about the case.

12          (At the side bar)

13          THE COURT:  You need to show this to me on paper.

14   It's really close to impossible to follow your arguments.

15          MR. BRILL:  Sure.  They have the exhibit with the path

16   attached to it.

17          MR. GREENFIELD:  I can step out.

18          (Continued on next page)

19

20

21

22

23

24

25

D1v1cib3

1          (In open court; jury not present)

2          THE COURT:  All right.  We just want to review this

3   evidence issue, and anybody else who wants to leave, can.

4          MR. DONALDSON:  What time are we coming back?

5          THE COURT:  Ten of?

6          MR. DONALDSON:  Ten of?  Thank you.

7          MR. BRILL:  The e-mail that the government is seeking

8   to introduce as Exhibit 3614, it has another page that's also

9   attached to it and Mr. Mirandona testified to.

10          Mr. Dinet, if you could pull up the other page to the

11   exhibit.

12          And Judge, as you can see, the path on this page, it's

13   in a file called newmail, whereas the prior exhibit, I believe

14   it was Exhibit 3613, was --

15          THE COURT:  All right.  So maybe to my own knowledge,

16   you can --

17          MR. BRILL:  Sorry to interrupt, but Mr. Mirandona

18   testified -- or Agent Mirandona testified that, A, he didn't

19   know what this file -- what this folder specifically was and

20   that it was a manipulable folder, so he couldn't say how the

21   message got in there.

22          THE COURT:  What about the line that says e-mail and

23   that says log?

24          MR. BRILL:  There was no specific evidence about what

25   that meant.  I can understand the common sense interpretation

D1v1cib3

1    to it, but again, I don't know specifically what that --

2              THE COURT:  There's an e-mail date and time.

3              MR. BRILL:  Right.

4              THE COURT:  There's a from and a to.

5              MR. BRILL:  Correct.

6              THE COURT:  And what is so specific?

7              MR. BRILL:  Well, if -- Mr. Dinet, can you pull up

8    Exhibit 3613 for the path.

9              MR. PASTORE:  Judge, while we're doing that, I think

10   the fact that an e-mail was sent or not sent -- as your Honor

11   has already noted, there's a bunch of indicia that it actually

12   was sent.  Even had it not been sent and Sam had merely --

13   Mr. Salamon had merely drafted it, his testimony was that this

14   was information that he would provide to Nathan Schwartz for

15   the purpose of engaging in fraud.

16             MR. BRILL:  The question is:  Did he actually provide

17   information for this specific person.  This is the Lidia Chalen

18   e-mail, Exhibit 3613.  If you see here, Judge, the path is Mail

19   You've Sent, and that's the difference.  From the same

20   computer, in a different file.

21             And again, I didn't object to this e-mail -- either

22   this e-mail or the exhibits that the government just tried to

23   introduce -- or just introduced, I should say, relating to this

24   exhibit.

25             THE COURT:  Yeah.  I really think there's enough

D1v1cib3

1    argument that can be made from the path that they're not

2    sufficiently distinguishable to not permit the testimony.

3            MR. PASTORE:  And your Honor, just for the record, we

4    also note -- we have the transcript, page 1323, lines 17

5    through approximately 20 -- I'm sorry, it goes to the next

6    page, but:

7            "Ms. Echenberg:  If you could blow them up, if

8    possible.

9            "Q.  What are they?

10           "A.  I sent an e-mail from sammy110wall on June 23,

11   2008 to nathan@monseyframing that he should go ahead and put

12   one of the final determinations in Lidia Chalen.

13           "Q.  That's the name that you were asking him to put

14   on the altered final determination?

15           "A.  Yes.

16           "Q.  Okay.  And what is the other document?

17           "A.  It's another -- it's another e-mail in 2008 to

18   nathan@monseyframing, just complaining -- I told him I need a

19   cook and he could put -- and I gave him the corporation and I

20   gave him the address what exactly he should put on that final

21   determination.

22           "Q.  And what is that e-mail address,

23   nathan@monseyframing.com?

24           "A.  Yes.

25           "Q.  Whose e-mail address is that?

D1v1cib3

1           "A.  Nathan Schwartz."

2           MR. BRILL:  You have to take into account the

3    cross-examination on the question, Judge, which I don't have

4    right in front of me, but Mr. Salamon was significantly more

5    circumspect in whether that e-mail was actually sent.

6           MR. PASTORE:  In any event, we agree with the court

7    that --

8           THE COURT:  I think it's sufficient.

9           Okay.  Let's fuel up for our continued session.  All

10   right.  I'll give you back the exhibit.

11          MS. ECHENBERG:  Thank you, your Honor.

12          (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury present)

2            THE COURT:  You can continue, Mr. Pastore.

3            MR. PASTORE:  Your Honor, I believe we ended on an

4    objection, so at this point the government --

5            THE COURT:  It's overruled.

6            MR. PASTORE:  And are Governments 116, 106-25-A and

7    103-36 -- I'm sorry -- 102-36-A received in evidence?

8            THE COURT:  Yes.

9            (Government's Exhibits 116, 106-25-A, and 102-36-A

10   received in evidence)

11   BY MR. PASTORE:

12   Q.  Okay.  Agent Gordon --

13           MR. PASTORE:  If we could bring back up Government's

14   3614 on the screen, please, which is in evidence.

15   Q.  Okay.  So looking at this e-mail, do you see where it says

16   "cook any" and it says "Levy's Kosher Garden Corporation" and

17   on the next line it says "c/o Shlomo Levy"?

18   A.  Yes.

19   Q.  Can you tell us what Government's 116 is.

20           MR. PASTORE:  If we could bring that up on the screen,

21   please, side by side.

22   A.  Yes, 116 is a record from the Department of Labor listing

23   34 case records where the employer name is Levy's Kosher

24   Gardens Corporation.

25   Q.  Okay.  And as you look on that document, are there alien

D1v1cib3                    Gordon – direct

1   names listed anywhere on the document?

2   A.  Yes, there are.  An alien name corresponds to each case

3   number.

4   Q.  Is the alien Shlomo Levy listed anywhere in that document?

5   A.  Yes.

6   Q.  I want to direct your attention now to Government's 1213.

7   Is that in front of you?

8   A.  No.  Oh, yes.  Sorry.

9   Q.  Does that -- what is Government's 1213?

10  A.  Government's 1213 is an A file relating to an alien by the

11  name of Manuel Landi Moratz (ph).

12  Q.  And are there government exhibits within the A file, and if

13  so, what are they marked?

14  A.  1213-1 and 1213-2.

15          MR. PASTORE:  Government offers 1213-1 and 1213-2.

16          MR. BRILL:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibits 1213-1 and 1213-2 received in

19  evidence)

20  Q.  With respect to the A files for the companies associated

21  with Harold Tischler and Nathan Schwartz, were you able to

22  obtain all the A files associated with those companies?

23  A.  No, I was not.

24  Q.  Explain that to us.

25  A.  There are a lot of files that have live applications in

1    them, meaning they're still being adjudicated at one of the

2    service centers.  There are also alien registration files that

3    are in another unit such as the litigation unit and they're

4    needed for court, immigration court, or in a deportation unit

5    where there are active deportation proceedings going on.

6    Q.  So for the record, there are two trial carts in front of

7    you that have several A files which we've been discussing.  Do

8    I understand correctly there are other A files that you were

9    not able to obtain that relate to Harold Tischler and Nathan

10   Schwartz' companies?

11   A.  That's correct.

12          MR. PASTORE:  And if we could, I'm going to retrieve

13   Government's Exhibit 116 and display it on the overhead.

14   Q.  Agent Gordon, can you see that okay?

15   A.  Yes.

16   Q.  And --

17          THE COURT:  You can?

18   A.  No, not now.

19   Q.  It's just a little out of focus right now.

20          Government's 116, do you see where it says

21   Government's 116?

22   A.  Yes.

23   Q.  And is this what you were previously describing?

24   A.  Yes.

25   Q.  And can you tell us where on this document Shlomo Levy's

1    name appears?

2    A.   Fourth from the bottom, in the column that is third from

3    the left, Alien Name.

4    Q.   Am I pointing to it right there (indicating)?

5    A.   Yes.

6    Q.   And next to it, what name appears there?

7    A.   Zvi M. Samuels.

8    Q.   And above it, what name appears?

9    A.   Jed David Philwin appears before that three times.

10   Q.   Well, does it say Jed David Philwin?

11   A.   I'm sorry.  Jed D. Philwin.

12   Q.   And you're familiar with an individual named Jed David

13   Philwin in connection with the investigation?

14   A.   Yes.

15   Q.   Okay.  Yesterday we discussed some New York State tax

16   records associated with Mr. Tischler's companies.  Do you

17   remember that?

18   A.   Yes.

19   Q.   Were you able to get New York State tax records for any of

20   Mr. Schwartz' companies?

21   A.   Yes.

22   Q.   What company or companies?

23   A.   Contour Framing.

24   Q.   Handing you what's been admitted as Government's 306.

25             MR. PASTORE:  And if we could display that on the

D1v1cib3                    Gordon - direct

1    overhead.

2    Q.  If you could just tell the jury what 306 is.

3    A.  Government 306 is a quarterly report for Contour Framing.

4          MR. PASTORE:  If we can go to the next page, please.

5    Q.  What is the mailing address listed for Contour Framing,

6    Inc.?

7    A.  214 Route 59 in Suffern, New York.

8    Q.  Again, is there a suite or particular apartment number or

9    anything like that listed?

10   A.  No.

11   Q.  And is that the same address that appeared in the labor

12   certifications for both Jerome Weinstein and Henry Castillo?

13   A.  Yes.

14   Q.  Did you also obtain bank records from Mr. Schwartz?

15   A.  I'm sorry.  Did I also what?

16   Q.  Obtain bank records for Mr. Schwartz?

17   A.  Yes.

18   Q.  Did they link to any of the addresses in the labor

19   certifications?

20   A.  Yes.

21   Q.  Handing you what's been marked for identification -- I'm

22   sorry -- admitted into evidence as Government's 301, 302.

23          MR. PASTORE:  And if we could bring those up on the

24   screen, please.

25   Q.  Okay.  First, starting with Government's 301, can you just

1    tell the jury what we're looking at.

2    A.  Yes, they're bank records from Citizens Bank related to

3    Nathan Schwartz.  The first page is the signature card,

4    followed by bank statements.

5    Q.  And is there an address?

6    A.  Yes, 115 Norben Road in Monsey, New York.

7    Q.  In the course of this investigation, have you personally

8    been to 115 Norben Road?

9    A.  Yes, I have.

10   Q.  Handing you what's been marked for identification as

11   Government's 52.  Do you recognize that?

12   A.  Yes.

13   Q.  Could you tell us what it is.

14   A.  It's a photo of 115 Norben Road in Monsey, New York.

15   Q.  Does it fairly and accurately depict that address as it

16   appeared when you visited it?

17   A.  Yes, it does.

18            MR. PASTORE:  Government offers 52.

19            MR. BRILL:  No objection.

20            THE COURT:  Received.

21            (Government's Exhibit 52 received in evidence)

22            MR. PASTORE:  At this time the government is going to

23   read into evidence a stipulation marked S10.

24            It has the case caption and it says as follows --

25   reads as follows:

D1v1cib3                      Gordon - direct

1              "It is hereby stipulated and agreed by and between the

2      United States of America by Preet Bharara, United States

3      Attorney for the Southern District of New York, James Pastore

4      and Janis Echenberg, Assistant United States Attorneys, of

5      counsel, and the below-named defendants by and through their

6      attorneys, that:

7              "1.  During the time period from in or about 2006

8      through in or about 2009, Nathan Schwartz resided at 115 Norben

9      Road, Monsey, New York 10952.

10             "It is further stipulated and agreed that this

11     stipulation may be received in evidence at trial."

12             Dated January 15th, 2013, signed by Ms. Echenberg

13     and each of defense counsel.

14             Government now offers S10.

15             MR. BRILL:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibit S10 received in evidence)

18     BY MR. PASTORE:

19     Q.  Okay.  Going on to the next page of Government's 301.  Tell

20     us what this is.

21     A.  It's the bank -- the initial bank statement for this

22     account, starts June 4th, through June 12th.

23     Q.  And what address is listed here?

24     A.  455 Route 59, Suite 119, in Monsey, New York.

25     Q.  Are you familiar with that address at all?

D1v1cib3                          Gordon – direct

1   A.  No, I'm not.

2   Q.  At some point did the address for this bank account change?

3   A.  Yes.

4   Q.  Approximately when did it change?

5   A.  In February of 2010.

6   Q.  Okay.  If we could go to the statement for February 2010,

7   please.

8           Okay.  What did the address change to?

9   A.  455 Route 306, Suite 119, in Monsey, New York.

10  Q.  Now are you familiar with 455 Route 306?

11  A.  Yes, I am.

12  Q.  And what is at 455 Route 306, or was at Route 455?

13  A.  A Ship N Save mailbox facility.

14  Q.  We just scrolled through several bank statements.  Prior to

15  your testimony did you have a chance to review them?

16  A.  Yes.

17  Q.  How much account activity was there prior to February 2010

18  for this bank statement?

19          MR. BRILL:  Objection.  Vague.  How much account

20  activity?

21          THE COURT:  I think you can make it a little more

22  numerical.

23  Q.  Okay.  Approximately how many transactions did you see in

24  the bank statements from June 2009 to this date in February of

25  2010?

D1v1cib3                          Gordon - direct

1   A.  Approximately one, one a month.

2   Q.  And what was that one transaction a month?

3   A.  A dollar withdrawal that appears to be a bank fee.

4   Q.  And subsequent to February 2010 how many transactions do

5   you see, more, less, or the same?

6   A.  More.  After February -- after February 2010, there are

7   additional deposits and withdrawals.

8   Q.  Now let's look at Government's 302.  Do I understand

9   correctly that this is for a second Citizens Bank account?

10  A.  Yes.

11  Q.  And again, we see 115 Norben Road?

12  A.  Yes.

13  Q.  What are the addresses or what are the address or addresses

14  associated with the statements for this bank account?

15  A.  Same as the last bank account.  The initial statements from

16  June of 2009 go to 455 Route 59, Suite 119.

17  Q.  Okay.  Let me stop you there.

18          MR. PASTORE:  And if you could just bring that up.

19  Q.  Is that what's being displayed on the screen now?

20  A.  Yes.

21  Q.  And you said at some point it was changed.  What was it

22  changed to?

23  A.  455 Route 306, Suite 119, also in Monsey.

24  Q.  And approximately what date did that happen?

25  A.  January 2010.

D1v1cib3                      Gordon – direct

1           MR. PASTORE:  And if we could scroll forward and bring

2      that up.

3      Q.  And is that what we're seeing on the screen here?

4      A.  Yes.

5      Q.  And is that address, 455 Route 306, is that also the

6      address we previously spoke about as being listed for Olympia

7      York, the company Olympia York on a labor certification?

8      A.  Yes.

9      Q.  I'm handing you now what's been admitted into evidence as

10     Government's 309-A and B.  Could you just tell the jury what

11     309-A and B are.

12     A.  They're records from the New York State Department of

13     State.

14     Q.  Okay.  And do they relate to particular corporations?

15     A.  Yes.

16          MR. PASTORE:  If we can display 309-B on the screen,

17     please.

18     Q.  And if you could tell us, Agent Gordon, what company or

19     companies does this relate to?

20     A.  Contour Framing, Inc.

21     Q.  Okay.  And if you look at the first line, you see, "I

22     hereby certify that the records of this Department of State

23     show that Contour Frameworks, the certificate of incorporation

24     of which was filed on 6/16/2005"?

25     A.  Yes.

D1v1cib3                          Gordon - direct

1    Q.  And what's the next line?

2    A.  A certificate changing the name to Contour Framing,

3    Incorporated, that was filed on July 27th, 2005.

4    Q.  Is there a president listed anywhere in these documents for

5    Contour Framing, Inc.?

6    A.  Abraham Schwartz.

7    Q.  And where is that?

8    A.  Third page of this exhibit.

9    Q.  Is that what's displayed on the screen where it says

10   S/Abraham Schwartz?

11   A.  Yes.

12   Q.  And is there an address associated with Contour Framing,

13   Inc.?

14   A.  Yes, on the next page, it lists 214 Suite 59 *[sic]*,

15   Suite 210, in Suffern, New York.

16   Q.  214 Route 59, Suite 210; is that right?

17   A.  Yes.

18   Q.  And then is there another address associated with this

19   company?

20   A.  Yes, a few pages -- page 3.

21       MR. PASTORE:  Sorry.  If we could scroll forward a

22   couple of additional pages, please.  Okay.

23   A.  On page 3 it lists 214 Route 59, Suite 110, in Suffern, New

24   York.

25   Q.  Okay.  So Suite 110 instead of Suite 210?

D1v1cib3                    Gordon - direct

1    A.  Correct.

2    Q.  But both at 214 Route 59; is that correct?

3    A.  That's correct.

4    Q.  Is there an assumed name or a d/b/a associated with this

5    particular company, Contour Framing, Inc.?

6    A.  Yes, on the second to last page of the exhibit.

7         MR. PASTORE:  Okay.  If we can scroll forward a few

8    pages, please.

9         Back one.  Okay.

10   A.  Number 3, it says assumed name CFI.

11   Q.  And the address for principal place of business?

12   A.  214 -- oh.  214 Route 59, Suite 110, Suffern, New York.

13        MR. PASTORE:  If we can go to Government 309-A.

14   Q.  Tell us what that is.

15   A.  It is the certification of incorporation records for

16   company LKH Corporation filed on April 2nd, 2004, and then a

17   certificate changing the name to CFI Framing & Developers,

18   Incorporated, which was filed on August 17th, 2006.

19   Q.  Okay.  And the next page, is there an address associated

20   with this company?

21        MR. PASTORE:  I'm sorry.  A couple of pages forward.

22   Q.  Is there an address associated with this company?

23   A.  Yes.  46 Main Street, Suite 226, in Monsey, New York.

24   Q.  Okay.  And that's the mailbox location that you previously

25   testified about and saw a picture of; is that right?

D1v1cib3                        Gordon - direct

1    A.   That's correct.

2    Q.   Were you also able to obtain New York State Department of

3    Labor records for any companies associated with Mr. Schwartz?

4    A.   Yes.

5    Q.   What companies?

6    A.   Contour Framing.

7    Q.   Handing you what's been admitted as Government's

8    Exhibit 308.

9          MR. PASTORE:  If we could bring that up on the screen,

10   please.

11   Q.   First, the address on the top left, Contour Framing, Inc.?

12   A.   214 Route 59, Suite 110, Suffern, New York.

13   Q.   And am I correct that it is care of Nathan Schwartz?

14   A.   That is correct.

15         MR. PASTORE:  Okay.  Next page, please.

16         And finally, one more page.

17   Q.   What is the contact information listed?  I just want to go

18   through the right-hand column.  Do you see where it says

19   214 Route 59, Suite 110, where it begins --

20   A.   Yes.

21   Q.   Okay.  What is the contact information listed for Nathan

22   Schwartz?

23   A.   Are you talking about the agent information?  Nathan

24   Schwartz, 214 Route 59, Suite 110, Suffern, New York 10901.

25   845-721-7455.

D1v1cib3                        Gordon - direct

1    Q.  Okay.  So that last number that you read is a phone number

2    associated with Nathan Schwartz on this document?

3    A.  Correct.

4    Q.  All right.  I'm now going to turn your attention to some

5    bank records.  Were you able to obtain bank records associated

6    with Mr. Schwartz?

7    A.  Yes.

8            MR. PASTORE:  Your Honor, stipulation S8 was already

9    read into evidence, and at this time the government moves to

10   admit 307 and 307-1 through 307-3.

11           THE COURT:  Received.

12           (Government's Exhibits 307, 307-1 through 307-3

13   received in evidence)

14           MR. BRILL:  I have 307.  Is it broken up?

15           (Counsel conferring)

16           MR. BRILL:  No objection.

17           MR. PASTORE:  All right.  If we can bring up 307-1 on

18   the screen, please.

19   Q.  Okay.  What are we looking at here?

20   A.  A check from CFI Framing, Incorporated, 214 Route 59,

21   Suite 110, Suffern, New York.

22   Q.  And is there a phone number in the memo line of this check?

23   A.  In the memo portion, yes.  It's 845-721-7455.

24           MR. PASTORE:  If we could just zoom in on the memo

25   line, please.

D1v1cib3                          Gordon - direct

1    Q.  Okay.  Is that the number that you were just reading?

2    A.  Yes.

3    Q.  Same number that was associated with Mr. Schwartz in the

4    Contour Framing records?

5    A.  Yes.

6    Q.  Did that phone number, in connection with your

7    investigation, appear on any Department of Labor records?

8    A.  Yes.

9    Q.  I want to focus your attention on Government's 101-30-A and

10   101-30.

11        MR. PASTORE:  If you could bring those up on the

12   screen, please.

13        Handing the witness a hard copy of 101-30-A, together

14   with 101-30.

15   Q.  Okay.  Starting with 101-30-A, what is that depicting?

16   A.  That's the call notes from the Department of Labor relating

17   to CFI Framing & Developers.

18   Q.  And prior to testifying did you match up the A number that

19   appears in the case number field with the file from the

20   Department of Labor?

21   A.  Yes.

22   Q.  And is that what's displayed as 101-30?

23   A.  Yes.

24   Q.  And if we can look at the labor certification in 101-30.

25        Okay.  Do you see what's on your screen on the

D1v1cib3                           Gordon - direct

1    right-hand side?

2    A.  Yes.

3    Q.  Okay.  If we can focus in on Part C, what employer is

4    listed?

5    A.  CFI Framing & Developers.

6    Q.  And what is the contact information for this employer?

7            MR. PASTORE:  I'm sorry.  If we can scroll down where

8    it says D, Employer Contact Information.

9    A.  Nathan Schwartz, 46 Main Street, Suite 226, in Monsey, New

10   York.  845-721-7455.

11   Q.  Did you ever do any further investigation into the phone

12   number 845-721-7455?

13   A.  Yes.

14   Q.  What did you do?

15   A.  Subpoenaed phone records.

16   Q.  I'm going to hand you what's been marked for identification

17   as Government's 321.

18           Okay.  If you can review that document while I read

19   into evidence a stipulation marked Government's S15.

20           MR. PASTORE:  It has the case caption, says Verizon

21   Wireless, and it reads as follows:

22           "It is hereby stipulated and agreed by and between the

23   United States of America by Preet Bharara, United States

24   Attorney for the Southern District of New York, James Pastore

25   and Janis Echenberg, Assistant United States Attorneys, of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1    counsel, and the below-named defendants by and through their

2    attorneys, that:

3         "(1)  If called as a witness, a custodian of records

4    of Verizon Wireless would testify that Government Exhibit 321

5    consists of subscriber information and toll records for the

6    cellular telephone assigned the telephone number (845) 721-7455

7    during the time period January 1st, 2008 to January 1st,

8    2009, and that these records were:

9         "(a) made at or near the time of the occurrence of the

10   matters set forth in the records, by, or from information

11   transmitted by, a person with knowledge of those matters;

12        "(b) kept in the course of regularly conducted

13   business activity; and

14        "(c) made by the regularly conducted business activity

15   as a regular practice.

16        "(2)  The witness would further testify as follows:

17   (i) during the time period referenced above, if an incoming

18   call was not answered or went directly to voicemail, that call

19   would not be recorded in the toll records and (ii) if a caller

20   checked voicemail, that call would be reflected in the toll

21   records as the number 000-000-0086 having been dialed."

22        It's dated January 28, 2013, signed by Ms. Echenberg

23   and each of the defense counsel.

24        Government now offers S15 together with Exhibit 321.

25        MR. BRILL:  No objection.

D1v1cib3                    Gordon - direct

1            THE COURT:  Received.

2            (Government's Exhibits S15 and 321 received in

3   evidence)

4   BY MR. PASTORE:

5   Q.  Agent Gordon, could you please tell the jury, what is

6   Government Exhibit 321?

7   A.  It's subscriber information.

8   Q.  And are there additional records other than subscriber

9   information?

10  A.  Yes, I'm sorry.  Behind that are the -- are toll records.

11  Q.  For which phone number?

12  A.  845-721-7455.

13            MR. PASTORE:  And do we have 321 -- if we can bring

14  that up on the screen?

15            That's okay.

16  Q.  You can tell us, what does the subscriber record indicate?

17  A.  It indicates Abraham Schwartz, 126 Route 59, Armonk,

18  New York 10952.

19  Q.  So do I understand correctly the phone was subscribed to

20  Abraham Schwartz at 126 Route 59?

21  A.  Yes, from October 12, 2005 to February 9th, 2009.

22  Q.  Handing you what's been marked -- what's been admitted into

23  evidence as Government's 302, and I want to turn your attention

24  to page 3.

25            I'm sorry.  3002.  I apologize.

D1v1cib3                        Gordon - direct

1          Okay.  Do you recall -- can you just remind the jury

2      what Government Exhibit 3002 is.

3      A.  Yes.  It's an exhibit that was introduced during

4      Mr. Salamon's testimony relating to work that was done on a

5      kitchen.

6      Q.  Okay.  And what is the phone number that appears at the top

7      of the page where it says phone, and then you see it says

8      Schwartz?  What's the phone number there?

9      A.  845-721-7455.

10     Q.  And what's the phone number next to it?

11     A.  Sam Salamon, 917-846-4083.

12     Q.  Then if you go several pages in, I believe it's page 17 --

13          MR. PASTORE:  I'm sorry.  If you go to -- back one

14     page.

15     Q.  If you could flip through and tell me, was there an address

16     associated with Nathan Schwartz at any point?

17          MR. PASTORE:  Couple pages forward, please.

18          There we go.

19          Sorry.  I'm sorry.  Page 20.

20     Q.  Do you see that on the screen?

21     A.  Yes.

22     Q.  Okay.  What is the address associated with Nathan Schwartz?

23     A.  126 Route 59, Monsey, New York 10952.

24     Q.  And how did that compare to the address that the phone

25     number 845-721-7455 was subscribed in?

D1v1cib3                              Gordon - direct

1   A.  It's the same, with the exception that in the subscriber

2   information for the phone, it lists the city as Armonk as

3   opposed to Monsey, but same zip code, same street address.

4   Q.  Okay.  I want to go back to the call note that we were

5   looking at, Government's Exhibit 101-30-A.

6           Okay.  If you could take a look at the call note for

7   January 3rd, 2008.  Do you see that?

8   A.  Yes.

9   Q.  What does it say on January 3rd, 2008?

10  A.  It says, "Left message with David to have Nathan Schwartz

11  give me a call."

12  Q.  Okay.  And the very next call note says what?

13  A.  "Leo called back and confirmed sponsorship."

14  Q.  Did you search the phone records, the toll records for

15  845-721-7455?

16  A.  Yes.

17  Q.  Did you find a call that corresponds to this case note?

18  A.  Yes.

19  Q.  Directing your attention to Government's 321-1.

20          MR. PASTORE:  If we could bring that up on the screen,

21  please.

22  Q.  Okay.  What entry, if any, did you focus on when you were

23  reviewing these records?

24  A.  At 12:49 p.m., there's a four-minute incoming call from the

25  Department of Labor in Atlanta.

D1v1cib3                        Gordon - direct

1   Q.   Okay.  And is that being displayed on the screen?

2            MR. PASTORE:  I don't know if you can highlight it.

3   A.   Yes.

4   Q.   Is that the record you were referring to?

5   A.   Yes.

6   Q.   Okay.  Do you see -- six minutes later, do you see an entry

7   for 12:54 p.m.?

8   A.   Yes.

9   Q.   What does that indicate?

10  A.   An outgoing call to 917-846-4063.

11  Q.   Sorry.  Are you sure it's 63?

12  A.   Oh, 4083.

13  Q.   And whose phone number is 846-4083?

14  A.   Sam Salamon.

15  Q.   Focusing on the immediately following entry at 12:55 p.m.,

16  what does that indicate?

17  A.   A one-minute phone call to 718-219-6800.

18  Q.   And whose phone number is that?

19  A.   Leo Teitelbaum.

20  Q.   Okay.  Now going down the page, do you see the entries --

21           MR. PASTORE:  If we can highlight for 2:31 p.m.,

22  2:32 p.m., 2:33 p.m., 2:39 p.m., 2:39 p.m., 2:39 p.m.,

23  2:41 p.m.

24  Q.   Do you see all those entries?

25  A.   Yes.

D1v1cib3                          Gordon – direct

1   Q.  What phone numbers are those?

2   A.  They're all calls to Sam Salamon and Leo Teitelbaum.

3   Q.  Do those calls to Sam Salamon and/or Leo Teitelbaum

4   continue later in the day?

5   A.  I believe they do.

6           MR. PASTORE:  If we can look at the following page,

7   and I'm not sure that we have it in the -- oh, we do have it.

8   Q.  Focusing your attention on the entry for 3:57 p.m.  What

9   does that indicate?

10  A.  Yes.  A call to Sam Salamon.

11  Q.  Okay.  And 8:35 p.m.?

12  A.  A call to Sam -- a call from Sam Salamon.

13  Q.  And the very next line, 9:34 p.m.?

14  A.  A seven-minute call from Sam Salamon.

15  Q.  And again, 10:33 p.m.?

16  A.  A seven-minute call from Sam Salamon.

17  Q.  Okay.  I want to focus your attention now on 101-31-A.

18          MR. PASTORE:  And I'd ask if that could be brought up

19  on the screen.

20  Q.  What are we looking at here?

21  A.  A call note from the Department of Labor related to CFI

22  Framing & Developers.

23  Q.  And did you have an opportunity to look at the

24  corresponding labor file 101-31 prior to your testimony?

25  A.  Yes.

1           MR. PASTORE:  I'm sorry.  Do we have the correct call

2     note up now?

3     Q.  I apologize.  We didn't have the right one up before.  Can

4     you make that out on your screen?

5     A.  Yes.

6     Q.  So this call note, did you review the corresponding labor

7     file 101-31?

8     A.  Yes.

9     Q.  I'm going to hand you a hard copy of it.

10          If you remember, what did it indicate about the

11    company associated with this case as well as the telephone

12    number associated with this case?

13    A.  The sponsoring company is listed as CFI Framing &

14    Developers and lists the phone number of 845-721-7455.

15    Q.  Okay.  So that's the same as the call note that we were

16    just looking at?

17    A.  Correct.

18    Q.  And did you look at the toll records for 721-7455?

19    A.  Yes.

20    Q.  Turning your attention now to Government's 321-2.

21          MR. PASTORE:  And if we could put that up on the

22    screen.

23    Q.  Is there a -- you know what?  I apologize.  I jumped ahead.

24          If we could go back to the call note for one minute,

25    and if you could look at the entry for January 16th, 2008.

D1v1cib3                        Gordon - direct

1    Sorry about that.

2    A.   Yes.  Records read, "Receptionist will have someone call me

3    back as Nathan Schwartz is out of the office until February."

4    Q.   And did you have an opportunity to exam the toll records

5    for 7455?

6    A.   Yes.

7    Q.   Turning your attention now to Government's 321-2.  Did you

8    find a toll corresponding to that call note?

9    A.   At 12:15 p.m. there's a call, two-minute call from the

10   Department of Labor in Atlanta.

11   Q.   Okay.  And is that what's being highlighted on the screen a

12   little bit further down?

13   A.   Yes.

14   Q.   I want to focus your attention on what the very next call

15   is.  Do you see the entry for 12:17 p.m.?

16   A.   Yes.

17   Q.   What phone number is that?

18   A.   917-846-4083, Sam Salamon.

19   Q.   And again, if you look at 1:02 p.m. --

20   A.   Another call to 917-846-4083, Sam Salamon.

21   Q.   1:07 p.m., on the next page?

22   A.   917-846-4083, Sam Salamon.

23   Q.   And 8:22 p.m., is there another call to Sam Salamon -- I'm

24   sorry -- from Sam Salamon?

25   A.   Yes.  Sorry, yes.  An incoming call, five-minute phone

D1v1cib3                    Gordon - direct

1  call.

2  Q.  Now if we could turn your attention to Government's

3  101-19-A.  Do you see the call note on the screen?

4  A.  Yes.

5  Q.  And prior to testifying did you have an opportunity to look

6  at the labor file corresponding to this case note, 101-19?

7  A.  Yes.

8  Q.  And again, did it relate to Nathan Schwartz at CFI

9  Framing --

10  A.  Yes.

11  Q.  -- at 46 Main Street, with a telephone number of

12  845-721-7455?

13  A.  Yes.

14  Q.  And I want to focus in your attention to the call note

15  dated February 21st, 2008.  Do you see that?

16  A.  Yes.

17  Q.  What does it indicate?

18  A.  "Left voice message for Nathan Schwartz to give me a call."

19  Q.  Did you examine the toll records for 7455, the phone

20  number, for February 21st, 2008?

21  A.  Yes.

22  Q.  Were there any calls indicating that voice mail was checked

23  on that day?

24  A.  Yes.

25  Q.  Turning now to Government's 321-6.  Where on this document

D1v1cib3                           Gordon - direct

1    do you see a call to voice mail for 7455?

2    A.  At 5 p.m. there's a two-minute call into voice mail.

3    Q.  What about at 12:14 p.m.?

4            MR. PASTORE:  Sorry.  I think it's that next line.

5    A.  Yeah, sorry.

6            Yes, at 12:14 p.m. there's a three-minute call into

7    voice mail.

8    Q.  What is the very next phone call reflected on this

9    document?

10   A.  It's 12:22 p.m., a phone call from Sam Salamon.

11   Q.  At 12:26 p.m. what happens?

12   A.  A five-minute phone call from Sam Salamon.

13   Q.  Is there another voice mail call at 1:03 p.m.?

14   A.  Yes.

15           MR. PASTORE:  And highlighting that on the screen.

16   Q.  What is the very next phone call after the call to voice

17   mail?

18   A.  1:06 p.m., an incoming phone call from Sam Salamon.

19   Q.  And the call immediately following that?

20   A.  1:08 p.m., an incoming phone call from Sam Salamon.

21   Q.  Phone call immediately following that?

22   A.  1:11 p.m., an incoming phone call from Sam Salamon.

23   Q.  I want to direct your attention now to call note 101-2-A,

24   and again, just to expedite matters, prior to testifying did

25   you review the corresponding labor file and did it show that

D1v1cib3                          Gordon - direct

1    this was associated with CFI Framing & Developers at 46 Main

2    Street?

3    A.  Yes.

4    Q.  And again, was the phone number listed for that company the

5    7455 number we've been discussing?

6    A.  Yes.

7    Q.  Let's take a look at call -- the call note number 1, "Left

8    voice message for Nathan Schwartz concerning sponsorship."  Do

9    you see that, February 26, 2008?

10   A.  Yes.

11   Q.  When you reviewed the toll records, were there any calls

12   indicating that voice mail was checked on February 26, 2008?

13   A.  Yes.

14   Q.  Going to Government's 321-7, and if we could look at the

15   entry for 11:07.

16   A.  11:07 is a four-minute call to voice mail.

17   Q.  11:07 a.m. on 2/26?

18   A.  Yes.  It's on the next page, I believe.

19   Q.  Okay.  11:07 a.m., is that being highlighted there?

20   A.  Yes.

21   Q.  And we have another call to voice mail?

22   A.  Yes.

23   Q.  What happens approximately half an hour later?

24   A.  11:36 a.m., there's an incoming phone call from Sam

25   Salamon.

D1v1cib3                        Gordon - direct

1    Q.  Now I want to turn your attention to Government's 102-16-A,

2    together with 102-16.

3              MR. PASTORE:  I'm handing the witness a hard copy of

4    the document, and if we could also please bring it up on the

5    screen.

6    Q.  Okay.  Once again, is the document a call note?

7    A.  Yes.

8    Q.  And for this document -- we've been talking about CFI

9    Framing & Developers.  For this document, what company is the

10   call note associated with?

11   A.  Contour Framing.

12   Q.  So slightly different company than the one we've been

13   previously discussing?

14   A.  Yes.

15   Q.  Looking at the labor certification on the right-hand side,

16   if we could scroll to it, and if you could just tell the jury,

17   what is the address in the Employer Contact field?

18   A.  46 Main Street, Suite 226, in Monsey, New York.

19   Q.  Okay.  And that's the same address as CFI Framing &

20   Developers that we've been talking about?

21   A.  That's correct.

22   Q.  And the phone number here again is 845-721-7455; is that

23   right?

24   A.  That's correct.

25   Q.  If we can return now to the call note.  Directing your

D1v1cib3                    Gordon - direct

1    attention to the entry for May 14th, 2008, can you tell us

2    what it says there.

3    A.  "Left voice mail."

4    Q.  Did you examine the toll records for this day, and did it

5    reveal a call to voice mail?

6    A.  Yes.

7    Q.  Government's 321-8, please.  If you could take us to

8    12:10 p.m. and tell us what it indicates.

9    A.  12:10 -- excuse me.  12:10 p.m., there's a two-minute call

10   into voice mail.

11   Q.  Okay.  And actually, what else happens at 12:10 p.m.,

12   according to the next entry?

13   A.  At the same time there's an incoming call from Sam Salamon.

14   Q.  I want to direct your attention to the words that are

15   written next to peak.  Do you see that?

16   A.  Yes.

17   Q.  What does it say?

18   A.  "Plan Allow Call Voice Mail," and under that, In Allow Call

19   Waiting -- Call Wait."

20   Q.  Okay.  Is voice mail checked again on this day?

21   A.  Yes.

22   Q.  Is that at 5:35 p.m.?

23        MR. PASTORE:  If we could scroll to that entry.

24   Q.  Is that -- okay.  So if you could just tell the jury, at

25   5:35 p.m., what happens?

1  A.  Sorry.  I'm looking for that exhibit number, 321-8.

2  Q.  Oh, I'm sorry.  This is my fault.  It's 321-9.  It's a

3  separate exhibit, the following page.

4  A.  Okay.

5  Q.  Okay.  Now May 14th, what happened at 5:35 p.m.?

6  A.  Another call to voice mail.

7  Q.  And what's the immediately following call at 5:51 p.m.?

8  A.  5:51 p.m., call to Sam Salamon.

9  Q.  And the next call right after that?

10  A.  6:02 p.m., an incoming call from Sam Salamon.

11  Q.  Okay.  We've been talking about CFI Framing and Contour

12  Framing.  Are you familiar with a company known as Citi Car Van

13  and Truck Rental?

14  A.  Yes.

15       MR. PASTORE:  If we could bring up, please, 106-25-A,

16  and 106-25.

17       I'm going to hand you a hard copy as well.

18  Q.  While we're getting it up on the screen, to keep things

19  moving, can you tell us what 106-25-A is and what is indicated

20  on March 12th, 2008.

21  A.  106-25-A is a call note that relates to Citi Car Van and

22  Truck Rental Company.  On March 12th, 2008, there's a record

23  that reads, "Left message for Mr. Arnold Goldenberg to return

24  my call to verify sponsorship."

25  Q.  Okay.  You said Mr. Arnold Goldenberg?

D1v1cib3                          Gordon - direct

1    A.  Yes.

2    Q.  Okay.  If you it a look at 106-25, that's the corresponding

3    labor record; is that right?

4    A.  Yes.

5    Q.  The labor certification, does it indicate what company's

6    address Citi Car Van and Truck Rental is?

7    A.  Yes.  455 Route 306, Suite 119, in Monsey, New York.

8    Q.  Okay.  Have you seen that address before, on the right-hand

9    side?

10           MR. PASTORE:  If we could zoom in on it.

11   A.  Have I seen that address before?

12   Q.  Yes.

13   A.  Yes, yes.

14   Q.  Where have you seen it?

15   A.  I -- I've been to the address.  I've seen it used on

16   multiple labor certifications and immigration forms.

17   Q.  Have you seen it used on any labor certifications

18   associated with Nathan Schwartz?

19   A.  Yes.

20           MR. PASTORE:  If we can go to the -- bring up the

21   labor certification on the right-hand side, please.

22   Q.  Okay.  Do you see where it says Employer Contact

23   Information?  It says Arnold Goldenberg?

24   A.  Yes.

25   Q.  And then it has the phone number 845-721-7455?

D1v1cib3                        Gordon - direct

1    A.  Yes.

2    Q.  That's the same phone number we've been discussing?

3    A.  Yes.

4    Q.  And it's subscribed to who during this time period?

5    A.  Abraham Schwartz.

6    Q.  Okay.  And did you examine the toll records for

7    March 12th, 2008 for that phone?

8    A.  Yes.

9    Q.  Directing your attention to Government's 321-3, can you

10   tell us what that is.

11   A.  Yes.  It's a page of the toll records.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1VLCIB4                          Gordon - direct

1    BY MR. PASTORE:

2    Q.  And focusing on the entry for 12:25 p.m., can you tell us

3    if that corresponds to the call note?

4    A.  Yes.  12:25 p.m. there's a call from the Department of

5    Labor in Atlanta.

6    Q.  What happens at 1:01 p.m.?

7    A.  There's an incoming call from Sam Salamon.

8    Q.  Is that being highlighted on the screen, is that's what's

9    highlighted on the screen?

10   A.  Yes.

11   Q.  Are you familiar with a company known as Sharp Shopper?

12   A.  Yes.

13   Q.  If we could bring up Government's 105-4-A together with

14   105-4.  I'm going to hand you a copy.

15          First, if we could look at a call note 105-4-A, and

16   zooming in on the call note, do you see that first call note

17   dated October 23, 2008?

18   A.  Yes.

19   Q.  What does it say?

20   A.  "The telephone number for Nathan Schwartz (The Sharp

21   Shapper Incorporated) is not in service at this time.  Checked

22   the 9089 which is an online application.  Verification for

23   sponsorship could not be confirmed."

24   Q.  And what about the next entry, what does that read?

25   A.  "Telephone number (845)354-0616 has been disconnected at

1    this time.  Could not verify sponsorship and this is an online

2    application."

3    Q.  Is that dated October 27, 2008?

4    A.  Yes.

5    Q.  And, finally, the next entry, if you could read that?

6    A.  "Spoke with Mr. Nathan Schwartz at (845)354-0616, who

7    confirmed sponsorship."  And it's dated October 30, 2008.

8    Q.  Did you ever do any further investigation into the phone

9    number (845)354-0616?

10   A.  Yes.

11   Q.  What did you do?

12   A.  Received records from a subpoena.

13   Q.  I'm going to hand you what's been marked as Government's

14   313.

15          MR. PASTORE:  Okay.  And before we bring it up on the

16   screen, I'm going to read Government's S-13 into evidence.

17   It's a stipulation with the caption of the case and it says

18   Verizon and reads as follows:

19          "It is hereby stipulated and agreed by and between the

20   United States of America by Preet Bharara, United States

21   attorney for the Southern District, James Pastore and Janis

22   Echenberg, assistant United States attorneys, of counsel, and

23   the below named defendants by and through their attorneys that:

24          "If called as a witness, a custodian of records of

25   Verizon would testify that Government Exhibit 313 consists of

D1VLCIB4                          Gordon - direct

subscriber information for the cellular telephones assigned the

following telephone numbers during the following time periods:

            "1.  (845)356-5356 for the period October 19, 2007

through January 15, 2008;

            "2.  (845)354-0616 for the period August 6, 2007

through December 13, 2012; and (718)871-6628 for the period

January 1, 2005 through December 17, 2007, and that these

records were:

            "A.  Made at or near the time of the occurrence of the

matters set forth in the records by, or from information

transmitted by, a person with knowledge of those matters;

            "B.  Kept in the course of regularly conducted

business activity; and

            "C.  Made by the regularly conducted business activity

as a regular practice."

            Dated January 15, 2013, signed by Ms. Echenberg and

each of defense counsel.

            Government now offers S-13 together with Government

Exhibit 313.

            MR. BRILL:  Subject to my objection of yesterday

afternoon, your Honor.

            THE COURT:  Okay.  Received.

            (Government's Exhibits S-13, 313 received in evidence)

            MR. PASTORE:  If we could publish that, please.

Q.  And focusing on the second page, do you see where it says

D1VLCIB4                        Gordon - direct

1    (845)354-0616?

2    A.  Yes.

3    Q.  What is the company that is associated with this phone

4    number?

5    A.  Bliss 9 Limited.

6    Q.  What is the address associated?

7    A.  455 Route 306, Suite 129, Monsey, New York.

8    Q.  And I want to direct your attention, do you see down below

9    where it says no long distance calls found for this record

10   which was in service from June 19, 2008 to October 1, 2008?

11   A.  Yes.

12   Q.  And you see there's a gap of 26 days and then it says up

13   above, no long distance calls found for this account which was

14   in service from October 27, 2008 to January 15, 2009?

15   A.  Yes.

16           MR. PASTORE:  If we could just bring up again the call

17   note that we were previously looking at which is Government

18   105-4-A.  Okay.

19   Q.  So according to this, October 23, the telephone number was

20   disconnected.  Is that consist with what's in the phone

21   records?

22   A.  Yes.

23   Q.  Then October 27, the subscriber records indicated what for

24   that day?

25   A.  That it was back in service, coming back in service on that

D1VLCIB4                          Gordon - direct

1    date, October 27.

2    Q.  And then, finally, October 30, what do the subscriber

3    records indicate?

4    A.  That the phone was active, connected rather.

5    Q.  And what does the call note indicate for that day?

6    A.  "Spoke with Mr. Nathan Schwartz at (845)354-0616 who

7    confirmed sponsorship."

8    Q.  Now, you mentioned the subscriber records shows Bliss 9

9    Limited, right?

10   A.  Yes.

11   Q.  But the application is for Sharp Shopper?

12   A.  Correct.

13   Q.  Is Sharp Shopper -- well, let's bring up 105-4, please.

14          MR. PASTORE:  If you could go to the labor

15   certification page.  If you could scroll forward.  Thanks very

16   much.  Okay.

17   Q.  So Part C and D, do you see those?

18   A.  Yes.

19   Q.  Who is the employer contact for the Sharp Shopper?

20   A.  Nathan Schwartz.

21   Q.  And what address?

22   A.  455 Route 306 on the top.  Excuse me, the top lists Suite

23   129 in Monsey, New York.  In the employer information, the

24   employer contact lists the same address and Suite 119.

25   Q.  So Suite 129, is that the suite that appears in the

1  subscriber records for Bliss 9 Limited that we were just

2  looking at?

3  A.  Yes.

4  Q.  Did you also obtain Department of State records for Sharp

5  Shopper's incorporation?

6  A.  Yes.

7  Q.  Handing you what's already been admitted as 309-C.  And

8  I'll direct your attention to the I believe it's the fifth page

9  of that document, if you could bring it up.  Okay.

10          What is the process address listed here?

11 A.  115 Norben Road in Monsey, New York.

12 Q.  It's the defendant's home?

13 A.  Yes.

14          MR. PASTORE:  Next page, please.

15 Q.  Is there another address or other information listed as to

16 who filed this document?

17 A.  The page after this there is.

18 Q.  What does this document indicate or who does this document

19 indicate it was filed by?

20 A.  Nathan Schwartz, 46 Main Street, Suite 226 in Monsey, New

21 York.

22 Q.  Okay.  Now, Bliss 9 Limited, which the phone was subscribed

23 in, are you familiar with that company?

24 A.  Yes.

25 Q.  Were any labor certifications filed in that company's name?

1    A.   Yes.

2    Q.   Directing your attention to Government's 104-11.  I'm going

3    to hand you 104-11-A and 104-11.

4            All right.  So who's the contact information listed

5    for Bliss 9?

6    A.   Nathan Schwartz.

7    Q.   What address?

8    A.   455 Route 306, Suite 119, Monsey, New York.

9    Q.   If we could go to the labor certification, please.

10   A.   The labor certification also lists that same address and

11   lists Nathan Schwartz as the contact.

12   Q.   Okay.  And what is the phone number in Part D for the

13   employer contact information?

14   A.   (845)354-0616.

15   Q.   And that's the phone number that you have the subscriber

16   information for; is that right?

17   A.   Correct.

18   Q.   Is there a call note associated with Bliss 9?

19   A.   Yes.

20   Q.   Let's take a look at Government 104-11-A.  Okay.  If you

21   could turn your attention to the entry for August 21, 2008, and

22   I believe it's on the following page.

23   A.   "Left Nathan Schwartz a voice mail message."

24   Q.   And the one below that for August 19?

25   A.   "Called Nathan Schwartz.  He was unavailable so I left him

 1    a voice mail message."

 2    Q.  And August 28, 2008?

 3    A.  "Return call from Nathan Schwartz and he confirmed

 4    sponsorship for Christina Udmarliv.  This case has passed."

 5    Q.  I now want to direct your attention to one of the other

 6    defendants, Refeal Brodjik.  Did you conduct a search of 40

 7    McNamara Road?

 8    A.  Yes.

 9    Q.  Can you describe what 40 McNamara Road looks like?

10    A.  It's a private residence.

11    Q.  Handing you what's been marked for identification as

12    Government's 62.  Okay.  What is Government's 62?

13    A.  It's a photo of 40 McNamara Road in Monsey, New York.

14    Q.  Does it fairly and accurately depict that address as it

15    appeared on the day you did the search?

16    A.  Yes.

17            MR. PASTORE:  Government offers 62.

18            MR. GERZOG:  No objection.

19            THE COURT:  Received.

20            (Government's Exhibit 62 received in evidence)

21    Q.  When you conducted the search, who was it that you

22    encountered, if anyone?

23    A.  Refeal Brodjik.

24    Q.  When was the search conducted?

25    A.  February of 2009.

D1VLCIB4                        Gordon - direct

1  Q.  And what's being wheeled up to you, can you see

2  Government's 3066 through 3069?

3  A.  Yes.

4  Q.  What are those?

5  A.  Those are boxes that were recovered from 40 McNamara Road.

6  Q.  Have you had a chance to look through those boxes?

7  A.  Yes.

8  Q.  And after you recovered them from defendant Brodjik's home,

9  did you take out certain documents from those boxes?

10  A.  Yes.

11  Q.  Can you tell us in general what documents you saw contained

12  within the boxes?

13  A.  There were documents that related to immigration

14  applications.  There were also documents that did not.  There

15  were documents that related to the book, the Code of the Heart.

16  Q.  And are you familiar with the book Code of the Heart?

17  A.  Yes.

18  Q.  How are you familiar with it?

19  A.  It was written by Earl David.

20  Q.  I'm going to hand you what's been marked for identification

21  as Government's 3067-1, 3068-1, 3070, 3071.

22           Do you recognize each of those?

23  A.  I'm sorry, you said exhibit numbers 3067-1 through?

24  Q.  It should be 3067-1, 3068-1, 3070, and 3071.

25  A.  Okay.  There are additional exhibits up here.

D1VLCIB4                          Gordon - direct

1    Q.  Okay.

2    A.  But, yes.

3    Q.  Do you have those exhibits that I mentioned to you?

4    A.  I do.

5    Q.  Where did you obtain these documents or exhibits?

6    A.  3067-1, 3068-1, and 3070 were recovered from 40 McNamara

7    Road.

8    Q.  Are they in the same or substantially the same condition as

9    when you recovered them from defendant Brodjik's home?

10   A.  Yes.

11           MR. PASTORE:  Government offers 3067-1, 3068-1, 3070.

12           MR. GERZOG:  Voir dire, your Honor.

13           THE COURT:  Go ahead.

14   VOIR DIRE EXAMINATION

15   BY MR. GERZOG:

16   Q.  Did you discover those exhibits in the boxes that are in

17   front of the jury box?

18   A.  Yes.

19   Q.  And do you know who the boxes belong to?

20   A.  Do I know who the boxes belong to?

21   Q.  Correct.

22   A.  I know they were recovered from 40 McNamara Road.

23   Q.  Right.  But do you know who they belong to?

24   A.  Are you asking if I know where they had been previously?

25   Q.  Whose property it is.  The fact it's --

D1VLCIB4                          Gordon - direct

 1              THE COURT:  Don't argue, please.

 2   Q.  Do you know whose property it is?

 3              MR. PASTORE:  On your own person.

 4   Q.  From your own personal knowledge, do you know whose

 5   property it is?

 6   A.  From my own personal knowledge, do I know whose property it

 7   is?

 8   Q.  Yes, ma'am.

 9   A.  No.

10   Q.  And do the boxes say Earl on them?

11   A.  I can't see it from here.  I know at least one of them did.

12   Q.  And are you aware that the contents of 90 Washington Street

13   was moved first to a storage location and then to Mr. Brodjik's

14   house?

15              THE COURT:  I'm not sure that's voir dire.

16              MR. GERZOG:  Beg your pardon, your Honor?  Are you

17   sustaining an objection?

18              THE COURT:  No.  Go ahead.

19   Q.  Are you aware of that?

20   A.  Could you repeat the question?

21   Q.  Are you aware that the contents of the office at 90

22   Washington were moved to a storage area, a storage facility,

23   and then moved to Mr. Brodjik's house?

24              MR. PASTORE:  Your Honor, I think there's an issue

25   that we need to address at the side bar based on this question.

1    I hate to interrupt.

2              THE COURT:  Okay.

3              (At the side bar)

4              MR. PASTORE:  So it's a little bit of an awkward

5    situation I think for the agent, that's what we're seeing,

6    because she knows where these came from because defendant

7    Brodjik told her where they came from and he told her that in

8    the context of a proffer session.  So the questions that are

9    being asked call for statements from the proffer.  She knows

10   it.

11             MR. GERZOG:  The answer is they did come from 90

12   Washington and they went to the storage thing and went to his

13   house and they belonged to Earl David.

14             MS. ECHENBERG:  We don't dispute that.

15             THE COURT:  That's good enough.  Her testimony that

16   she found them there, they're Earl David's, is quite

17   sufficient.

18             MR. GERZOG:  I want to get it established they're Earl

19   David's.  That's all.

20             MS. ECHENBERG:  She only knows they're Earl David's

21   because Rafi Brodjik told in the context of a proffer session.

22   If you want to open the door.  She can testify they said Earl

23   David on them.

24             THE COURT:  Seems to me well beyond asking questions

25   that go to whether these documents may be admitted into

D1VLCIB4                              Gordon - direct

1    evidence at this point.  That's my problem.

2                MR. GERZOG:  Fine.

3                MR. PASTORE:  It's just a fair –– to the extent she's

4    asked about her knowledge, it opens the door to the proffer

5    session.

6                THE COURT:  Had a problem yesterday.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1VLCIB4                       Gordon - direct

1              (In open court)

2              MR. GERZOG:  No objection, Judge.

3              THE COURT:  They're received.

4              (Government's Exhibits 3067-1, 3068-1, 3070 received

5    in evidence)

6    BY MR. PASTORE:

7    Q.  Just so the record is clear, I believe we've now moved into

8    evidence 3067-1, 3068-1 and 3070, is that accurate, Agent

9    Gordon?

10   A.  Yes.

11   Q.  And I just handed you as I was walking up to the side bar

12   Government's 3014 through 3029.

13             Do you recognize those documents and, if so, can you

14   tell us what they are?

15   A.  Yes.  3014 through 3029 are all documents that were removed

16   from 40 McNamara Road.

17   Q.  Are they in the same or substantially the same condition as

18   when you removed them from 40 McNamara Road?

19   A.  Yes.

20             MR. PASTORE:  Government offers 3014 through 3029.

21             MR. GERZOG:  No objection.

22             THE COURT:  Received.

23             (Government's Exhibits 3014 through 3029 received in

24   evidence)

25   Q.  I'm handing you now what's been marked for identification

D1VLCIB4                         Gordon – direct

1  as Government's 3040.  Do you recognize it?

2              MR. GUTMAN:  What was the number?

3              MR. PASTORE:  3040.

4  A.  Yes.

5  Q.  What is it?

6  A.  3040 is a folder that contains documents, the folder and

7  the documents were also removed from 40 McNamara Road.

8  Q.  Are they in the same or substantially the same condition as

9  when you removed them from 40 McNamara Road?

10 A.  Yes.

11             MR. PASTORE:  Government offers 3040.

12             MR. GERZOG:  No objection.

13             THE COURT:  Received.

14             (Government's Exhibit 3040 received in evidence)

15 Q.  If we could bring up 3031-1 on the screen.  Do you

16 recognize this document?

17 A.  Yes.

18 Q.  How do you recognize it?

19 A.  A hard copy of this document was found at 40 McNamara Road,

20 and I've also seen it during the course of the trial.

21 Q.  Okay.  So, in fact, all of the emails that are in

22 Government's 3031-1 through 3031-10, did you recover hard

23 copies of each of those emails when you searched defendant

24 Brodjik's home?

25             I'm not sure, actually, if you're looking for the

D1VLCIB4                      Gordon - direct

1    file, I don't think it's in front of you.

2    A.  I was and I don't believe it is in front of me.

3           I know that there were -- there is a folder of hard

4    copy emails that were removed from Mr. Brodjik's home.

5    Q.  These emails were printed out, they were in color when they

6    were printed out?

7    A.  Yes.

8    Q.  And the emails themselves, did you hear testimony about

9    them while you were here in the courtroom?

10   A.  Yes.

11   Q.  Is it the same emails, is that what we're talking about?

12   A.  Yes.

13   Q.  I want to focus very briefly on Government's 3068-1, if we

14   could bring that up on the screen, 3018, and 3019.  Can you

15   take those documents together, Agent Gordon, if you've got the

16   hard copies in front of you.

17          Is there a particular organization that each of

18   3068-1, 3018, and 3019, is there a particular organization that

19   each of those documents is associated with?

20   A.  Yes.  It's listed as C-O-N-G, which I believe is

21   congregation, BMH.

22   Q.  So each of those documents, if we bring up 3018 now,

23   congregation BMH again?

24   A.  Yes.  This was congregation BMH Kosher Lemhadren.

25   Q.  And 3019?

1   A.  Again, congregation, what I believe to mean congregation

2   BMH.

3   Q.  And directing your attention to Government's 3020, 3021,

4   3025, 3070, is it fair to say each those documents is a labor

5   certification or some sort of mail from the Department of

6   Labor?

7   A.  21 through -- 3021 through?

8   Q.  3020, 3021, 3025, and 3070.  And --

9   A.  Yes.

10  Q.  And if we could bring up on the screen 3025.

11  A.  Yes.  They're all documents that relate to the Department

12  of Labor.

13  Q.  Okay.  Do you see this document relating to Hygia

14  Industries, Inc.?

15  A.  Yes.

16  Q.  Who is it sent care of?

17  A.  Erwin Herbst.

18  Q.  If you could direct your attention now to 3041, if you can

19  bring that up on the screen.

20          If you could tell the jury what 3041 is if you have it

21  in front of you?

22  A.  3041?

23  Q.  Yes.

24  A.  I don't believe I do have it in front of me.

25  Q.  I apologize.  All right.  If you could look at Government

D1VLCIB4                        Gordon - direct

1   3040 and just tell us what that is?

2   A.  3040 is a folder that was removed from Mr. Brodjik's home

3   that contains documents relating to an alien by the name of

4   Omer Ozkan.

5   Q.  Handing you now what's been marked for identification as

6   Government's 400 and 410.  I'm also going to hand you while I'm

7   at the witness stand 401 through 409.

8           Let's start with Government's 400.  What is

9   Government's 400?

10  A.  Government 400 is an A file relating to Rachel Brodjik.

11  Q.  Are there Government Exhibits within that A file marked

12  400-1 through 400-11?  I think there may also be a 400-12?

13  A.  Yes, up through 400-12.

14          MR. PASTORE:  Government offers 400-1 through 400-11.

15          MR. GUTMAN:  Could we just have a moment, your Honor?

16          Thank you.

17          THE COURT:  Does that amount to no objection?

18          MR. GUTMAN:  Yes.

19          THE COURT:  Received.

20          (Government's Exhibits 400-1 through 400-11 received

21  in evidence)

22  Q.  And Government's 410 and 410-1 through 410-4, what are

23  those?

24  A.  They're documents that relate to Rachel Brodjik from USCIS.

25          MR. PASTORE:  To the extent they're not already in

D1VLCIB4                        Gordon - direct

1    evidence, the government offers 410 and 410-1 through 410-4.

2              THE COURT:  Hearing no objection, they're received.

3              (Government's Exhibits 410 and 410-1 through 410-4

4    received in evidence)

5    Q.  I now want to focus your attention to Government 401

6    through 409 and I'm going to hand you 322.

7              Okay.  What are each of Government's 401 through 409

8    and 322?

9    A.  Income tax returns.

10   Q.  And to whom -- is 401 an income tax return?

11   A.  No, I'm sorry.  They relate to income tax returns.  401 is

12   a certification of a lack of record.

13   Q.  And 402 through 409, what are those?

14   A.  Tax returns that relate to Refeal and Rachel Brodjik, 40

15   McNamara Road, Spring Valley, New York.

16   Q.  And Government 322?

17   A.  Tax returns for the calendar year 2006 that relate to

18   Nathan and Varda Schwartz, 115 Norben Road in Monsey, New York.

19   Q.  Do each of those documents contain a raised seal and a

20   signature of an official?

21   A.  Yes.

22             MR. PASTORE:  Government offers 401 through 409 and

23   322.

24             MR. GERZOG:  No objection.

25             THE COURT:  Received.

1            (Government's Exhibits 401 through 409 and 322

2    received in evidence)

3            MR. PASTORE:  If we could bring up on the screen

4    3031-1 together with Government's 404.

5    Q.  Okay.  What is the date on the email 3031-1?

6    A.  May 18, 2006.

7    Q.  And then the tax records to the right, what year do they

8    relate to?

9    A.  2006.

10   Q.  Prior to testifying did you have a chance to review

11   Mr. Brodjik and Mrs. Brodjik's tax returns?

12   A.  Yes.

13   Q.  Is there any mention of working at the Earl David law firm?

14   A.  No.

15   Q.  What does Mr. Brodjik list his employment as in the 2006

16   tax returns?

17   A.  Unemployed.

18   Q.  And does he list income from any business or other

19   employment?

20   A.  No.

21           MR. PASTORE:  If we can focus now on Government's 410.

22   Replace 3031-1 with Government's 410, please.  And if we could

23   go to the next page, page 3, actually.

24   Q.  Do you see where the employment is listed down at the

25   bottom there, where it says self-employed and it's got the

D1VLCIB4                          Gordon - direct

1    dates January 1, 2006 through August 31, 2007, and then it says

2    gift packaging?

3    A.  Yes.

4    Q.  In Mr. Brodjik's 2006 tax returns, any mention of income

5    from gift packaging?

6    A.  No.

7            MR. PASTORE:  If we can go to Mr. Brodjik's 2007 tax

8    returns and replace Government 404 on the right with

9    Government's 405.

10   Q.  Prior to your testimony, did you have a chance to go

11   through Mr. Brodjik's 2007 tax returns?

12   A.  Yes.

13   Q.  Any mention of gift packaging?

14   A.  No.

15   Q.  Any mention of income from the Earl David law firm?

16   A.  No.

17   Q.  What did he indicate that he had income from?

18   A.  He listed his occupation as a driver.

19   Q.  What was the sponsor associated with Mrs. Brodjik's green

20   card application, if you remember?

21   A.  Lakewood Bakery.

22   Q.  And who was the owner or purported owner of that company?

23   A.  Abraham Flam.

24   Q.  I'm handing you now what's been marked for identification

25   as Government 1102, 1106, 1112, and 1113.

D1VLCIB4                          Gordon - direct

1          During your investigation, did you identify any alien

2    files, any alien files in which Abraham Flam acted as a sponsor

3    besides Mrs. Brodjik's alien file?

4    A.  Yes.

5    Q.  And are each of Government's 1102, 1106, 1112, and 1113

6    associated with sponsorships by Mr. Flam companies, by Abraham

7    Flam companies?

8    A.  Yes.

9    Q.  Within 1102 is there marked Government Exhibits 1102-1,

10   1102-3 through 1102-6?

11   A.  Yes.

12          MR. PASTORE:  Government offers 1102-1, 1102-3 through

13   1102-6 to the extent they haven't already been admitted into

14   evidence.

15          MR. GERZOG:  No objection.

16          (Government's Exhibits 1102-1, 1102-3 through 1102-6

17   received in evidence)

18   Q.  Looking at Government 1106, are they marked, are there

19   exhibits marked 1106-1 through 1106-8 and 1106-10?

20   A.  Yes.

21          MR. PASTORE:  Government offers.

22          MR. GERZOG:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibits 1106-1 through 1106-8 and

25   1106-10 received in evidence)

D1VLCIB4                          Gordon - direct

1   Q.  1112, in that file, are there exhibits marked 1112-1,

2   through 1112-20?

3   A.  Yes.

4           MR. PASTORE:  Government offers those exhibits.

5           THE COURT:  Received.

6           (Government's Exhibits 1112-1 through 1112-20 received

7   in evidence)

8   Q.  And, finally, 1113-1 through 1113-5 and 1113-8 through

9   1113-14.  Do you see those exhibits there?

10  A.  Yes.

11          MR. PASTORE:  Government offers those exhibits.

12          MR. GERZOG:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibits 1113-1 through 1113-5 and

15  1113-8 through 1113-14 received in evidence)

16  Q.  I'm now going to hand you what's been marked for

17  identification as Government's 1114-1 through 1114-20.

18          Can you tell us what 1114 is?

19  A.  It's an A file for an alien by the name of Imran Sadiq.

20  Q.  Are Government Exhibits 1114-1 through -20 contained within

21  the alien file for Imran Sadiq?

22  A.  Yes.

23          MR. PASTORE:  Government offers 1114-1 through -20.

24          MR. GERZOG:  No objection.

25          (Government's Exhibits 1114-1 through 1114-20 received

D1VLCIB4                        Gordon - direct

1    in evidence)

2            MR. PASTORE:  In each of those files -- I'm sorry, I

3    jumped the gun.

4            THE COURT:  You didn't do anything.

5    Q.  In each of these files, did you notice an address 1501 Pine

6    Park associated with several of the different sponsors?

7    A.  I'm sorry, have I seen the address 1501 Pine Park

8    associated with different sponsors?

9    Q.  With different sponsors contained within the alien files

10   that I just put up at the witness stand?

11   A.  Yes.

12   Q.  Have you ever personally been to 1501 Pine Park Avenue in

13   Lakewood, New Jersey?

14   A.  Yes, I have.

15   Q.  Handing you what's been marked for identification as

16   Government Exhibit 56, do you recognize that?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's a photo of 1501 Pine Park Avenue in Lakewood, New

20   Jersey.

21   Q.  Does it fairly and accurately depict that address as it

22   appeared when you visited it?

23   A.  Yes.

24           MR. PASTORE:  Government offers.

25           MR. GERZOG:  Can we get that date, Judge?

1          THE COURT:  The date she was there?

2          THE WITNESS:  The date I was there, I've been there

3     several times.  I know I was there on October 11, 2011.

4          MR. GERZOG:  When that photo was taken, if you recall.

5          THE WITNESS:  I'm not sure if that's the photo I took.

6     I took a photo in October of 2011 several days prior.  Let's

7     see.  I was there several days prior to October 11, 2011 to

8     take a photo.  I was there again on October 11, 2011.

9          MR. GERZOG:  Okay.  So the point is that photo was

10    taken in 2011 sometime?

11         THE WITNESS:  I'm not sure when this photo was taken.

12    It may have been taken by another agent.  I don't know this is

13    the photo that I took, but I know that it --

14         MR. GERZOG:  When you say it fairly and accurately

15    represents the home, at what time, when you saw it in 2011?

16         THE WITNESS:  I also saw it again several months ago.

17         MR. GERZOG:  Okay.  But you haven't seen it prior to

18    2011?

19         THE WITNESS:  Yes, I have.

20         MR. GERZOG:  So when you're testifying that it fairly

21    and accurately represents it, when?

22         THE WITNESS:  At the times --

23         MR. GERZOG:  Every time you've seen it?

24         THE WITNESS:  Every time that I've seen it, which was

25    at least once in 2006, twice in October 2011, and once several

D1VLCIB4                          Gordon - direct

1    months ago.

2                   MR. GERZOG:  Very good.  Thank you.

3                   No objection.

4                   THE COURT:  Received.

5                   (Government's Exhibit 56 received in evidence)

6                   MR. PASTORE:  If we can publish that to the jury.

7    BY MR. PASTORE:

8    Q.  Who if anyone did you encounter at 1501 Pine Park?

9    A.  Abraham Flam.

10   Q.  You said that you participated, you mentioned searches at

11   several locations.  Was one of those locations 7 Golar Drive in

12   Monsey, New York?

13   A.  Yes.

14   Q.  Approximately when was that search conducted?

15   A.  January 15, 2009.

16   Q.  That's the same day as other searches were being conducted

17   at 125 Maiden Lane and 80-82 Wall; is that right?

18   A.  That's correct.

19   Q.  What if anything did you do with the files and documents

20   that were recovered from 7 Golar?

21   A.  The items that were seized from 7 Golar were transported to

22   the offices of the Department of Labor at 201 Varick Street in

23   New York and entered into evidence.

24   Q.  What is at 7 Golar Drive?

25   A.  Leo Teitelbaum's residence.

D1VLCIB4                         Gordon - direct

1   Q.  Handing you what's been marked for identification as

2   Government 3032, portions of which have already been admitted

3   into evidence.

4           MR. GERZOG:  I'm sorry, Mr. Pastore.  My concentration

5   was broken.

6           MR. PASTORE:  Government 3032, portions of which have

7   already been admitted into evidence.

8   Q.  What is Government's 3032?

9   A.  Government's 3032 is a series of photocopies of checks that

10  have handwriting on -- handwriting on the paper in addition to

11  the checks themselves that were recovered from 7 Golar Drive.

12  Q.  And do they appear to be in the same or substantially the

13  same condition as when you pulled them out of 7 Golar Drive?

14  A.  Yes.

15  Q.  I'm now going to hand you what's been marked for

16  identification as Government's -- I'm sorry.

17          MR. PASTORE:  Government offers 3032 to the extent

18  that it has not already been admitted into evidence.

19          MR. DONALDSON:  No objection.

20          MR. GERZOG:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 3032 received in evidence)

23  Q.  I'm now going to show you what's been marked for

24  identification as Government's 3043 and 3071.

25          If you can tell us what each of those documents are,

D1VLCIB4                    Gordon - direct

1   do you recognize those?

2   A.  I'm sorry, 3043, and then there's a document that I don't

3   believe is marked that was --

4   Q.  Let me hand you the marked copy.  Is that the original that

5   you have in your hands there?

6   A.  Yes.

7   Q.  Is it identical to the mark on what's been marked as

8   Government's 3071?

9   A.  Yes.

10  Q.  And where did you obtain this document?

11  A.  3071 was removed from 7 Golar Drive.

12  Q.  And was 3043 also removed from 7 Golar Drive?

13  A.  No.

14  Q.  Where was that removed from?

15  A.  125 Maiden Lane.

16          MR. PASTORE:  Government offers 3071.

17          MR. GERZOG:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 3071 received in evidence)

20  Q.  You mentioned the name Imran Sadiq before as being

21  associated with an Abraham Flam sponsor company; do you

22  remember that?

23  A.  Yes.

24  Q.  Was he also associated with any other defendant?

25  A.  Yes.

D1VLCIB4                        Gordon - direct

1    Q.  What other defendant was he associated with?

2    A.  Gulay Cibik.

3    Q.  How was he associated with Gulay Cibik?

4    A.  Through a check.

5    Q.  If we could bring up Government's 700 and go to page 133,

6    please.  Okay.  The top of the page, that check, is that the

7    check you were referring to where it says Imran Sadiq in the

8    memo line?

9    A.  Yes.

10   Q.  Government 700, can you just remind the jury what

11   Government 700 consists of?

12   A.  Checks from a Commerce Bank account of Gulay Cibik.

13   Q.  Does it also include bank statements from the account for

14   Gulay Cibik?

15   A.  Yes.

16   Q.  I want to direct your attention to page 63 of this exhibit.

17   What is page 63 of the exhibit?

18   A.  It's a copy of a page of the bank statement.

19   Q.  In particular what month?

20   A.  September 2005.

21   Q.  What are the deposits into Gulay Cibik's account in

22   September 2005?

23   A.  $11,756.89.

24   Q.  If you could turn your attention now to page 66.  What

25   month is this statement for?

D1VLCIB4                          Gordon - direct

1    A.  October 2005.

2    Q.  What are the deposits into Ms. Cibik account for this

3    month?

4    A.  $12,487.50.

5    Q.  Turning your attention to page 69.  What month does this

6    statement relate to?

7    A.  November 2005.

8    Q.  And what are the deposits for this month?

9    A.  $20,594.61.

10   Q.  Page 72, please.  What month does this relate to?

11   A.  December 2005.

12   Q.  What are the deposits into Ms. Cibik's account in

13   December 2005?

14   A.  $37,845.33.

15   Q.  Page 75, please.

16   A.  January 2006.

17   Q.  And what are the total deposits?

18   A.  $22,581.31.

19   Q.  Page 79.

20   A.  Is from February 2006.

21   Q.  And what are the total deposits this month?

22   A.  $31,461.46.

23   Q.  Page 82, please.

24   A.  It's from March of 2006.

25   Q.  And what are the total deposits for this month?

D1VLCIB4                          Gordon - direct

1   A.  $20,474.93.

2   Q.  Page 85, please.

3   A.  Is from April 2006.

4   Q.  Total deposits?

5   A.  $41,646.20.

6   Q.  Page 88.

7   A.  It's from May 2006.

8   Q.  What are the total deposits?

9   A.  $29,015.64.

10  Q.  Now I want to draw your attention to the next line.

11          What are the withdrawals for May 2006?

12  A.  $35,834.01.

13  Q.  So the account was overdrawn at that point; is that right?

14  A.  That's correct.

15  Q.  Is that balance ever made up if you look at the statements

16  that come after this?

17  A.  No.

18  Q.  What happened on May 9, 2006?

19  A.  I interviewed Gulay Cibik.

20  Q.  I want to direct your attention to Government's 3032.  Just

21  remind us, what is Government's 3032?

22          MR. PASTORE:  If we could put it up on the screen,

23  please.

24  A.  3032 is it's a series of checks, copies of checks that were

25  removed from 7 Golar Drive, Leo Teitelbaum's house, and there's

D1VLCIB4                         Gordon - direct

1    handwriting on the white portion of the paper.

2    Q.  What does that handwriting indicate on this first page?

3    A.  The first page, Gulay.

4    Q.  Are there other pages that also have handwriting indicating

5    Gulay?

6    A.  Yes.

7    Q.  What investigative steps, if any, did you take after you

8    retrieved this from 7 Golar Drive?

9    A.  Checks where there was a notation of Gulay, I conducted

10   checks to see if there was an immigration file associated, if

11   appropriate, if the check was drawn on an account, ran the name

12   on the account to see if an alien file was related to it.  And

13   if there was an alien's name in the memo portion, did the same

14   kind of record check.

15   Q.  Okay.  So let's take a look at page 9 as one of the

16   examples of that.  And while we're getting there, I'm going to

17   hand you Government's 1501.

18           All right.  First, what's the name in the check there?

19   A.  Ilhan Altintas.

20   Q.  Did you manage to track down Mr. Altintas?

21   A.  Yes.

22   Q.  Directing your attention to Government's 1501-1 through

23   1501-4, 1501-6 and 1501-8 through 1501-12.  Are those documents

24   from Mr. Altintas's A file?

25   A.  Yes.

1          MR. PASTORE:  To the extent they've not already been

2     admitted, the government offers those exhibits.

3          THE COURT:  Received.

4          (Government's Exhibits 1501-1 through 1501-4, 1501-6

5     and 1501-8 through 1501-12 received in evidence)

6          MR. PASTORE:  If we could bring up Government 706.

7     Q.  And while we're doing that, when you spoke to Mr. Altintas,

8     without going into what he told you, did he provide you

9     anything?

10    A.  Yes.

11    Q.  What did he provide you?

12    A.  He provided copies, actually original carbon of his own

13    checkbook, and some bank statements.

14    Q.  Is Government 706 one of the copies of checks that

15    Mr. Altintas provided to you?

16    A.  Yes.

17    Q.  Do you see where it says Ismet Urkart in the memo line?

18    A.  Yes.

19    Q.  What if anything were you able to determine about him?

20    A.  That an alien registration file or an A file exists for

21    Ismet Urkart.

22    Q.  Handing you what's been marked for identification as

23    Government's 1504, if you can take a look at it, and can you

24    tell us what is Government's 1504?

25    A.  It's the A file for Ismet Urkart.

D1VLCIB4                         Gordon - direct

1    Q.  Are there particular Government Exhibits marked within that

2    A file?

3    A.  Yes.  1501-1 through 1501-4.

4             MR. PASTORE:  The government offers those exhibits.

5             MR. GERZOG:  No objection.

6             MR. DONALDSON:  No objection.

7             THE COURT:  Received.

8             (Government's Exhibits 1501-1 through 1501-4 received

9    in evidence)

10   Q.  I want to focus on 1504-2, can you tell us what it is?

11   A.  1504-2 is an I-140 application filed with CIS for Ismet

12   Urkart.

13   Q.  In part 1, can you tell us what the company is listed as

14   sponsoring Ismet Urkart?

15   A.  Hugh Road Auto Body Limited.

16   Q.  Does the I-140 indicate if this is a mechanic shop?

17   A.  Yes.  Part 5, which is on page 2, it says type of business,

18   auto mechanic shop.

19   Q.  Does it indicate whether Mr. Urkart is going to be employed

20   as a mechanic?

21   A.  The job title is for an auto service technician.

22   Q.  Is there a labor certification included in the alien file?

23   A.  Yes.

24   Q.  Does that relate to Hugh Road Auto Body as well?

25   A.  Yes.

D1VLCIB4                        Gordon - direct

1   Q.  Does it as well list the employer contact information for

2   the mechanic shop?

3   A.  Yes.

4   Q.  If we could bring that up on the, screen.  I believe it's

5   the same exhibit, couple pages?

6   A.  Correct.

7   Q.  Okay.  So the employer contact information together with

8   the employer information, so Part C and D, do you see that?

9   A.  Yes.

10  Q.  Who is the contact listed for the mechanic shop?

11  A.  Erwin Herbst.

12  Q.  And what email address is listed for Erwin Herbst?

13  A.  Hrab@Hygiaonline.com.

14  Q.  Were tax returns for the mechanic shop submitted in

15  connection with this immigration application?

16  A.  Yes.

17          MR. PASTORE:  If we can put on the screen Government's

18  1504-4, please.

19  Q.  What is this?

20  A.  It's the tax returns that were submitted to USCIS in

21  support of the I-140 application for Ismet Urkart.

22  Q.  How much income is reported for the mechanic?

23  A.  $1,285,583.

24  Q.  I want to turn your attention for a minute to 1501-8 from

25  Ilhan Altintas' A file.

D1VLCIB4                        Gordon - direct

1              MR. PASTORE:  If we could put that up on the screen,

2     please.

3     Q.  What is 1501-8, if you can see on the screen?

4     A.  1501-8 are the tax returns for American Girl Fashion that

5     were submitted to USCIS in support of Ilhan Altintas's

6     application.

7     Q.  How much income is reported for American Girl Fashion?

8     A.  $2,356,585.

9     Q.  So am I correct that's less -- I'm sorry -- more than

10    what's reported for the mechanic shop?

11    A.  Correct.

12    Q.  If we could put up Government's 705, please.  Do you see

13    the name Ozgur Suni in this check?

14    A.  Yes.

15    Q.  Did you search for an A file for Ozgur Suni?

16    A.  Yes.

17    Q.  Did you find any immigration records for him?

18    A.  No.

19    Q.  If we go back to Government's 3032, and just to expedite

20    matters, on page 10, is there a check for Selim Alyildiz?

21    A.  Yes.

22    Q.  Did you search for an alien file for that individual?

23    A.  Yes.

24    Q.  And did you succeed in finding an alien file for that

25    individual?

D1VLCIB4                          Gordon - direct

1    A.   Yes.

2    Q.   Do you have that in front of you, Government's 1505?

3         I'm going to hand you what's been marked for

4    identification as Government's 1502 and 1503.

5         What are Government's 1502 and 1503?

6    A.   1502 is an A file that relates to an alien by the name of

7    Alvin Birkan.  1503 is an A file that relates to an alien by

8    the name of Nimet Bulbul.

9    Q.   And did you -- why did you select these alien files?

10   A.   The names corresponded to names found on checks found in

11   the same exhibit.

12   Q.   Found in Government's 3032; is that right?

13   A.   Correct.

14   Q.   And within those two A files that you just mentioned are

15   Government Exhibits 1503-1 and 1503-2 and 1502-1 and 1502-2

16   marked separately as exhibits?

17   A.   Yes.

18            MR. PASTORE:  Government offers those exhibits.

19            MR. DONALDSON:  No objection.

20            THE COURT:  Received.

21            (Government's Exhibits 1503-1 and 1503-2 and 1502-1

22   and 1502-2 received in evidence)

23   Q.   If we can look at the I-140 for Nimet Bulbul, what

24   Government Exhibit is that?

25   A.   1503-1.

1  Q.  Can you tell from this I-140 what kind of an application

2  was filed for Nimet Oklurlar?

3  A.  Yes, an alien of extraordinary ability.

4  Q.  And where is that?

5  A.  I'm sorry, in Part 2 where it says petition type, box

6  letter A, the first box is checked.

7  Q.  And Alvin Birkan, 1502-1 is the I-140?

8  A.  1502-1, yes.

9       MR. PASTORE:  If we could bring that up on the screen.

10 Q.  What type of an application was filed for Alvin Birkan?

11 A.  Also an alien of extraordinary ability.

12 Q.  If we could bring up Government Exhibit 3032 and look at

13 page 12 and then page 15.

14       And in the meantime I'm going to hand Government

15 Exhibit 1505.  Okay.

16       So page 12, is that the check that led you to pull

17 Nimet Bulbul or Nimet Oklurlar's A file?

18 A.  Yes.  And just to be clear, both of those names, Oklurlar

19 and Bulbul, appear throughout the A file.

20 Q.  Throughout the A file that we were just discussing?

21 A.  Yes.

22 Q.  Same thing, page 15, Alvin Birkan, and is that the check at

23 the bottom with Gulay's name listed next to it?

24 A.  Yes.

25 Q.  Now if you can draw your attention to Government's 1505,

D1VLCIB4                          Gordon - direct

1    tell us what it is, if there are any exhibits marked, and if

2    so, what they are.

3    A.   1505 is an A file for an alien by the name of Selim

4    Alyildiz.  Exhibit 1501 is the I-140, and Exhibit 1505-2 is the

5    485 or green card application.

6    Q.   I think you said 1505-1 is the I-140?

7    A.   Yes.

8               MR. PASTORE:  Government offers.

9               MR. DONALDSON:  No objection.

10              THE COURT:  Received.

11              (Government's Exhibits 1505-1, 1505-2 received in

12   evidence)

13   Q.   1505-1, what kind of an I-140 is it?

14   A.   An alien of extraordinary ability.

15   Q.   I now want to hand you 3031, 3033, and 3041, which we

16   didn't cover before, as well as 3072 and 3073.

17              Let's start with 3031, 3033, and 3041.  Where do each

18   of those documents come from?

19   A.   From 40 McNamara Road.

20   Q.   Defendant Brodjik's home?

21   A.   Yes.

22              MR. PASTORE:  Government offers.

23              MR. DONALDSON:  Which number was that?

24              MR. PASTORE:  3031, 3041, and 3033.

25              THE WITNESS:  That's correct.

D1VLCIB4                          Gordon - direct

1          MR. GERZOG:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibits 3031, 3033, and 3041 received

4     in evidence)

5     Q.  Now, there were also two other documents at the witness

6     stand that we didn't address, 3072 and 3073.

7          Do you see those in the folders?

8     A.  Yes.

9     Q.  Where did those documents come from?

10    A.  From 7 Golar Drive, Leo Teitelbaum's house.

11    Q.  Are they in the same or substantially the same condition as

12    when you took them from Leo Teitelbaum's home?

13    A.  Yes.

14          MR. PASTORE:  Government offers.

15          MR. DONALDSON:  No objection.

16          THE COURT:  No objection.  They're received.

17          (Government's Exhibits 3072 and 3073 received in

18    evidence)

19    Q.  When you were at Leo Teitelbaum's home, did you seize any

20    United States currency?

21    A.  Yes.

22    Q.  Where did you seize that currency from?

23    A.  There was approximately $80,000 in total, 29,000 of which

24    was in a pillow case and the rest was in a safe.

25          MR. PASTORE:  Okay.  And if we can just bring up on

D1VLCIB4                          Gordon - direct

1    your screen alone Government's 3074-1 through 3074-3.  I just

2    ask that the witness be shown those on the screen.

3    Q.  Can you see those?

4    A.  Yes.

5    Q.  What are those?

6    A.  I'm looking at 3074-1.  It's a picture of money that was

7    laid out at Leo Teitelbaum's house, laid out before it was

8    counted and inventoried.

9    Q.  And -2 and -3?

10   A.  -2 is the same, not the same exact picture, but a picture

11   of the money being laid out before it was seized.

12   Q.  And -3?

13   A.  Same.  It's a picture of some of the money that was seized

14   from Leo Teitelbaum's house before it was actually seized.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. PASTORE:  Government offers 3074-1 to -3 and ask

2     that it be published to the jury.

3          MR. BRILL:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibits 3074-1 through 3074-3 received

6     in evidence)

7          MR. PASTORE:  If we could scroll through and show -2.

8     Q.  And what denomination are all these bills?

9     A.  $100 denominations.

10    Q.  -3.  Where was this money retrieved from and why is there a

11    bag next to it?

12    A.  This is the money that was retrieved from the safe as

13    opposed to the pillowcase, and also in that safe was jewelry.

14    That was in the bag.

15    Q.  And if we could go to Government's 3040 now.

16         MR. PASTORE:  If you could bring that up on the

17    screen, 304- -- 3040-1, please.

18    Q.  Okay.  What is this?

19    A.  It's an I-140 application for Omer Ozkan.

20    Q.  And what type of I-140 is it?

21    A.  An alien of extraordinary ability.

22    Q.  And you retrieved this from defendant Brodjik's house; is

23    that right?

24    A.  That's correct.

25    Q.  Drawing your attention to 3040-3.  Do you see where it says

D1v1cib5                          Gordon - direct

1    Attention?  What does it say?

2    A.  "Attention Ms. Gulay."

3    Q.  During your investigation of Earl David & Associates, how

4    many individuals did you encounter named Gulay?

5    A.  Only the defendant Gulay Cibik.

6    Q.  After you reviewed these files, did you take a look at

7    immigration records to see if in fact any documents had been

8    filed for Omer Ozkan?

9    A.  Yes.

10   Q.  Handing you what's been marked for identification as

11   3064-2.  What is 3064-2?

12   A.  They're applications that relate to an alien Omer Ozkan.

13   There's a copy of an alien labor certification as well as an

14   I-140 and a 485 green card application.

15            MR. PASTORE:  Government offers 3064-2.

16            MR. DONALDSON:  No objection.

17            THE COURT:  Received.

18            (Government's Exhibit 3064-2 received in evidence)

19   Q.  Prior to your testimony did you have a chance to compare

20   one of the I-140s in 3064-2 from the A file records with the

21   record that was recovered from defendant Brodjik's home?

22   A.  Yes, I did.

23   Q.  And how did it compare?

24   A.  They appear identical.

25            MR. PASTORE:  Your Honor, may I have a moment?

D1v1cib5                              Gordon - direct

```
 1                 THE COURT:  Yes.

 2                 (Pause)

 3    Q.  You said that you interviewed Gulay Cibik on May 9th,

 4    2006; is that right?

 5    A.  Yes.

 6    Q.  Where did that interview take place?

 7    A.  At her residence.

 8    Q.  Was she placed under arrest at that time?

 9    A.  No.

10    Q.  Did you identify yourselves -- well, who participated in

11    the interview?

12    A.  Myself and Special Agent Ryan Gibbs from the Department of

13    Labor.

14    Q.  Prior to the interview did you identify yourselves?

15    A.  Yes.

16    Q.  Did you ask Ms. Cibik whether she'd worked at the Earl

17    David law firm?

18    A.  Yes.

19    Q.  What did she tell you?

20    A.  Yes.  Actually, I believe we asked her where she worked,

21    and she told us that she worked at a travel agency during the

22    day and she worked at a law firm at night.

23    Q.  Did she tell you who she worked for at the law firm?

24    A.  Yes.

25    Q.  Who did she tell you she worked for?
```

D1v1cib5                    Gordon - direct

1   A.  She said that when she started, she was working for Earl

2   David, and that since the time of his suspension, she'd been --

3   the boss now was Jed David Philwin.

4   Q.  Did she say who else she worked with, if anyone?

5   A.  Yes, she also listed a couple of names of people who worked

6   there.

7   Q.  Do you remember any of the individuals that she identified

8   to you?

9   A.  Yes.  She mentioned David Grynsztajn, she mentioned the

10  Pakistani individual named Abdul, she mentioned Ali Gomaa, she

11  mentioned Sam and Lipa.

12  Q.  Was she able to provide last names for Sam and Lipa?

13  A.  No.

14  Q.  What, if anything, did she say about the location of the

15  work?

16  A.  She said that when she first started working there and when

17  she first went there, it was located at 110 Wall Street on the

18  21st and 16th floors, and that about a month prior to the

19  interview, the lease was up for the 21st floor.

20  Q.  Did she tell you where she went at that point?

21  A.  Yes.  She said that she and the other people who worked on

22  the 21st floor had moved to 80-82 Wall Street.

23  Q.  What did Ms. Cibik tell you about how she first met Earl

24  David?

25  A.  She said that she first met Earl David when she went to the

D1v1cib5                        Gordon - direct

1    law firm in connection with her own immigration application.

2    Q.  What did she tell you about how she began working with Earl

3    David?

4    A.  She said that she went there, again, for her own

5    immigration application and that at some point she started --

6    she was hired to work as a translator.

7    Q.  Did she -- what, if anything, did she say about her

8    responsibilities changing at the law firm over time?

9    A.  She said that she gained more responsibilities, her -- she

10   had placed an ad in the -- in a Turkish newspaper listing the

11   name and address of the Earl David law firm with her own

12   cellphone number that read, "We speak Turkish," and then at

13   some point had gotten very busy and had taken that ad out of

14   the paper, but continued to work at the firm.

15   Q.  Did Ms. Cibik tell you whether she charged aliens money?

16   A.  Yes.

17   Q.  What did she tell you?

18   A.  She said that aliens who could provide their own sponsor

19   were charged approximately $4,000, and aliens that needed a

20   sponsor to be provided for them were charged approximately

21   $7,000, 1500 of which was the deposit.

22   Q.  Did Ms. Cibik tell you how she was paid?

23   A.  How she was paid?

24   Q.  Yes.

25   A.  She said that she received some cash and some checks and

D1v1cib5                          Gordon - direct

1    that if she was paid by check, she would deposit that check and

2    then write a check to the law firm.

3    Q.  What services did Ms. Cibik tell you she provided for

4    aliens?

5    A.  She provided translation services, assisted them with

6    filling out the paperwork, and if they needed a sponsor --

7    excuse me -- she would obtain a sponsor for them by asking

8    either Sam or Lipa.

9    Q.  Did Ms. Cibik tell you what information Sam and Lipa would

10   give to her when an alien needed a sponsor?

11   A.  Yes.  She said they would provide her with the name of the

12   company and the tax ID number for that company.

13   Q.  What, if anything, did Ms. Cibik tell you about how an

14   individual's profession might affect their chances of being

15   approved for a green card?

16   A.  She said that she was aware of the fact that there was some

17   occupation that had a greater chance of getting approved for a

18   green card and that in some circumstances she had changed an

19   alien's real work experience to match that occupation, the

20   occupation, meaning the occupation they were being put in for

21   based on the sponsoring company that had been given to

22   Ms. Cibik.

23   Q.  Aside from having to change an alien's experience, did

24   Ms. Cibik tell you what else she did to help prepare these

25   applications?

D1v1cib5                     Gordon - direct

1  A.   Yes.   If an alien could not provide their own sponsor and

2  they were having a sponsor provided from the firm, they would

3  still need to show that they had work experience in that

4  profession from their own country, and so Ms. Cibik would

5  instruct them to get a letter from their home country

6  indicating that they had worked in that specific occupation,

7  and that then that letter that the alien would bring in from

8  their own country, Ms. Cibik would submit it with the

9  application to the government.

10 Q.   Did Ms. Cibik tell you whether there were any problems with

11 the sponsors provided by Sam and Lipa?

12 A.   In some occasions, yes, she said that there had been

13 occasions where she knew there was a problem because the alien

14 had come to Ms. Cibik and told her that they couldn't locate

15 the company that they were supposed to be working for.

16 Q.   When aliens would come and tell Ms. Cibik that they

17 couldn't find the company that they were supposed to be working

18 for and they had looked for it, did Ms. Cibik tell you what she

19 did?

20 A.   She said that she would ask Sam and Lipa about it and that

21 they would tell her that the company had moved.

22          MR. PASTORE:   Your Honor, may I have a moment?

23          THE COURT:   Yes.

24          (Pause)

25          MR. BRILL:   Judge, if Mr. Pastore is moving on from

D1v1cib5                         Gordon - direct

1    that topic, may we approach for a moment on that topic, the

2    previous topic?

3              THE COURT:  Okay.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1v1cib5                          Gordon - direct

1          (At the sidebar)

2          MR. GREENFIELD:  We're entitled to a limiting

3    instruction as to this confession.  She was arrested.

4          THE COURT:  She was not arrested.  She was not

5    arrested.

6          MR. GREENFIELD:  Oh, I thought she was.

7          MR. DONALDSON:  She was not arrested.

8          MR. GERZOG:  She wasn't arrested.

9          THE COURT:  Listen, you told me that this witness

10   would take two hours.  We're now in the third hour of today,

11   plus yesterday.

12         MR. PASTORE:  I apologize, your Honor.  I have one

13   question left, that's it.  Just two tax returns and we're done.

14         MR. BRILL:  I was just going to, when we had a break,

15   tell you, he went through 30 exhibits from my client alone.

16         THE COURT:  You know, cross is not the repetition of

17   direct, okay?

18         MR. BRILL:  I understand that, Judge.

19         THE COURT:  The last time it was pretty close.  So I'm

20   not sure why you necessarily want to highlight everything he

21   went through by going through it again.

22         MR. BRILL:  I appreciate the court's --

23         THE COURT:  Right?  I mean, there's supposed to be a

24   point that you want to make, not random questions.

25         MR. BRILL:  It may just take a while, Judge.  That's

D1v1cib5                         Gordon - direct

1    my point for now.

2                THE COURT:  You know, when the whole case goes because

3    we didn't finish, what do you want me to do?

4                MR. PASTORE:  I apologize.

5                MR. GERZOG:  It's of no concern to me because I'm not

6    hungry, but you had mentioned breaking at 2.  Is it still your

7    intention?

8                THE COURT:  Well, I may let you finish, let these guys

9    have their lunch hour.  It was not even going to be an hour

10   anyway.  Let the jury eat and let you guys get back on the

11   stand and do your cross.  We've got to finish.  We're supposed

12   to be doing summations today.

13               MR. GREENFIELD:  I'm sorry.  I didn't understand.

14   What's the plan?  I know what the plan was.

15               THE COURT:  The plan is, he's going to finish, you

16   guys are going to use your lunch hour to figure out your cross,

17   we're going to get it done quickly while the jury eats, then

18   we'll come back, we're going to go and use the hour.

19               MR. PASTORE:  Judge, I apologize.  When we did the

20   direct, you know, obviously the documents took a lot longer

21   than I anticipated, and I sincerely apologize.

22               THE COURT:  I don't think you were inefficient, but my

23   point is --

24               MR. PASTORE:  It was still a bad estimate.

25               THE COURT:  Yes.

1          MR. GERZOG:  So should we -- if you let the jury go to

2    say 2:30, just as an estimate --

3          THE COURT:  It will be earlier than that.  He's almost

4    done.

5          MR. PASTORE:  I'm done.

6          THE COURT:  He's done.

7          MR. GERZOG:  Okay.  It's 2:00.  So you'll say they can

8    leave till 2:30?

9          MR. GREENFIELD:  You were going to say an hour.

10         THE COURT:  No, they're going to get like a half hour.

11   I brought them lunch.  They don't have to go out.

12         MR. GERZOG:  All right.  And let's say the crosses

13   take till 4:00.  What would your Honor's plan be as far as the

14   summations?

15         THE COURT:  Get started.

16         MR. GERZOG:  So just let the government do theirs?

17   They said they have a two-hour summation.

18         THE COURT:  They'll do some of it today and they'll

19   finish it tomorrow.

20         MR. GERZOG:  I would object to that, Judge.  I would

21   want -- I would want at least --

22         THE COURT:  It's to your advantage.  You have an

23   hour's worth of transcript.

24         MR. GERZOG:  No, ma'am.  I respectfully disagree.

25         THE COURT:  Well, you are not going to be scheduling

D1v1cib5                          Gordon – direct

1    the order of summations, okay?

2              MR. GERZOG:  Okay.

3              THE COURT:  Period.  And however it works out, it

4    works out, whether you like it or you don't like it.

5              MR. GERZOG:  Well, I think it prejudices my client.

6    That's why I'm mentioning it.

7              THE COURT:  It absolutely does not.  No way.

8              (Continued on next page)

D1v1cib5                          Gordon - direct

1              (In open court)

2    BY MR. PASTORE:

3    Q.  I've just handed you what's been marked for identification

4    Government's 225 and 226.  Can you just tell the jury what each

5    of those documents are, or is.

6    A.  Yes.  Government Exhibit 225 is a certification of a lack

7    of records for taxes.

8    Q.  And does that have a seal on it and is it signed?

9    A.  Yes.

10   Q.  And Government's 226, is that also a tax record with a seal

11   and signed?

12   A.  Yes.

13              MR. PASTORE:  Government offers 225 and 226.

14              MR. GERZOG:  No objection.

15              THE COURT:  Received.

16              (Government's Exhibits 225 and 226 received in

17   evidence)

18              MR. PASTORE:  No further questions at this time.

19              THE COURT:  Okay.  Ladies and gentlemen, why don't we

20   take a lunch break.  As you know, things are taking longer than

21   I was told they were going to take, and that does happen

22   sometimes.  If I could limit your lunch break to 40 minutes, do

23   you think you can handle that?  Okay.  So let's get back in 40

24   minutes from now.

25              Remember the rules:  Don't talk about the case, keep

D1v1cib5                     Gordon - direct

1   an open mind.

2              (Jury excused)

3              (Continued on next page)

 1          (In open court; jury not present)

 2          THE COURT:  While the jury is not here, let me just

 3     tell you that we considered the letter submitted on behalf of

 4     Mr. Brodjik overnight or this morning, and I am not going to be

 5     inserting the requested charge.  I think that there is a clear

 6     distinction when you look at the cases about perjury in the

 7     context of testimony versus written statement, false statement

 8     and -- give me one sec.

 9          And that's clear when you read the Bronson (ph)

10     opinion in the first instance.

11          Let me just say -- and we can talk about it later --

12     that I thought that one of the constructive substantive

13     comments made during our discussion yesterday about the danger

14     in the unique charge against Mr. Brodjik is that in Count Four,

15     that the jury could possibly speculate about extortion and

16     other tax frauds or things, so it seems to me that a way to

17     avoid that possibility is to possibly consider adding language

18     such as -- and we'll just talk it out, talk about it later --

19     "You may not consider any alleged false statement other than

20     those the government enumerated in its summation with respect

21     to Count Four.  You should not speculate as to any other

22     possible misstatements based on the evidence you have heard

23     throughout the course of this trial."

24          MR. GERZOG:  Sounds good to us, your Honor.

25          MR. GUTMAN:  Thank you.

D1v1cib5                        Gordon – direct

1              THE COURT:  Okay.  Enjoy your lunch.

2              (Luncheon recess)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1v1cib5                        Gordon - cross

1             (In open court; jury present)

2             THE COURT:  Mr. Brill?

3             MR. BRILL:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. BRILL:

6    Q.  Good afternoon, Agent Gordon.

7    A.  Good afternoon.

8    Q.  Agent Gordon, does the Department of Labor Document and

9    Benefit Fraud Task Force -- what is the Department of Labor --

10   excuse me.  Withdrawn.

11            Does the Immigration Document and Benefit Fraud Task

12   Force have access to handwriting analysis?

13   A.  Yes.

14   Q.  Was handwriting analysis used on any of the files with

15   Nathan Schwartz' name on them?

16   A.  No.

17   Q.  Through your investigation was it determined that any

18   income of any of the corporations with Nathan Schwartz' name

19   associated with them was not reported to state or federal tax

20   authorities?

21   A.  No.

22   Q.  And --

23            THE COURT:  Can we clarify that.  Is the question did

24   they explore this issue or did they determine that all income

25   had in fact been reported?

1          MR. BRILL:  I went straight to determine, but I can

2     ask her explore.

3     Q.  Was that issue explored?

4     A.  I'm sorry.  Now can you repeat the question?

5     Q.  Was there any investigation into whether any of these

6     corporations associated with Mr. Schwartz' name had tax issues,

7     that you know of?

8          MR. PASTORE:  Judge, it may help, there are a number

9     of corporations involved, so it may be helpful if we can

10    identify which corporations.

11         MR. BRILL:  I can go through them each individually.

12    I was just trying to save some time.

13         THE COURT:  I think there's still this sort of

14    predicate that I'm just not sure what the witness is testifying

15    to.

16    Q.  Was there any -- as part of your investigation into -- you

17    testified on direct that -- about certain corporations

18    associated with Mr. Schwartz; correct?

19    A.  Yes.

20    Q.  As part of your investigation into those corporations

21    associated with Mr. Schwartz, was there a portion of that

22    investigation into any potential tax issues with those

23    corporations, criminal tax issues?

24    A.  Aside from requesting tax documents relating to those?

25    Q.  Correct.

1  A.  We did request and receive some tax documents related --

2  Q.  And were those tax documents examined for anything other

3  than connections with the individual people on those documents?

4  Let me rephrase.

5          Were those tax documents investigated for any

6  potential criminality regarding taxes or failure to pay tax or

7  failure to report income, anything like that?

8  A.  I'm not -- I'm not sure I understand exactly what you're

9  asking.

10  Q.  Was there any sort of investigation into any of his

11  corporations?

12  A.  Whether there are separate tax violations?

13  Q.  Correct.

14  A.  No.

15  Q.  Would it be fair to say that with respect to the

16  corporations that were associated with Mr. Schwartz that you

17  testified about on direct, you examined each one of the alien

18  applications under those corporate names?

19  A.  The ones that I was able to receive, yes.

20  Q.  Right.  And you testified about certain phone calls that

21  were made from the Atlanta Service Center to phone numbers that

22  you testified you believe were associated with Mr. Schwartz;

23  correct?

24  A.  Correct.

25  Q.  Of the phone records you were able to obtain, how many

D1v1cib5                        Gordon - cross

1    total phone calls were reflected from that Atlanta center on

2    phone records associated or that you believe to be associated

3    with Mr. Schwartz?

4    A.  I don't have an exact number for you.

5    Q.  Can you approximate?

6    A.  Not really.  I mean, we looked through many, many of those

7    call notes.  I believe that's what you're referring to?

8    Q.  Well, you looked at the call notes, correct, on the one

9    hand; right?

10   A.  Yes.

11   Q.  And the call notes reflect two different issues.  Some of

12   them say that calls were -- actually went through other than

13   voice mail; right?

14   A.  Correct.

15   Q.  And some of them said they went into voice mail; correct?

16   A.  Correct.

17   Q.  Let's take it one step at a time.  Were there toll records

18   requested from the Atlanta Service Center?

19   A.  No.

20   Q.  So there's no way, as part of your investigation, to tell

21   how many calls were placed to phone numbers associated with

22   Mr. Schwartz.

23   A.  That's correct.

24   Q.  Okay.  And in examining the toll records that you were able

25   to come up with for phone numbers that you believe were

1    associated with Mr. Schwartz, did you review those tolls with

2    regard to how many calls came in from the Atlanta Service

3    Center?

4    A.  Yes.

5    Q.  Okay.  And would it be fair to say that of the calls that

6    are reflected, that is, of the calls that show the 404 area

7    code associated with the Atlanta Service Center, there are

8    approximately four, maybe five that are actually included in

9    the tolls you were able to sift through?

10   A.  I think there were more than that, but I'd have to go back

11   and look at the toll records.

12          MR. BRILL:  Mr. Dinet, could you put up 1207-5,

13   please.

14   Q.  Agent Gordon, what I'm going to do, just so we're clear, is

15   I'm going to go back through some of the exhibits that

16   Mr. Pastore went through and just ask you some questions that I

17   think he may have not asked.

18          Could you go down to the application page that

19   contains the date of the application, please.  Are you able to

20   tell the date of the application from this form?

21   A.  From this page?  No.

22   Q.  Not from this page, necessarily, but is it in the 9089

23   form?  Is the date of the application somewhere in this form?

24          MR. GREENFIELD:  Excuse me, your Honor.  It doesn't

25   seem that the computers are working, the screens are working.

1          THE COURT:  How about yours?  They're okay?

2          THE JURORS:  Yes.

3          THE COURT:  Maybe you kicked something.

4          MR. GREENFIELD:  I don't know.  It's everybody in

5   front of me as well.

6          THE COURT:  Okay.

7          (Pause)

8          MR. GREENFIELD:  We got it.  Thank you.

9   A.  The application lists a filing date and a certification

10  date, if that's what you mean.

11  Q.  And where would you find the filing date on the 9089?

12  A.  I believe it's on the last page.

13         MR. BRILL:  Could we go to the last page, Mr. Dinet.

14  A.  Page 9.  Sorry.

15  Q.  Filing date is July 6, 2006; would that be accurate?

16  A.  Yes.

17         MR. BRILL:  And if we can look at 1207-2, please.

18  Q.  This, I think you testified to, was the substitution for

19  the original 1207 application.  Do you recall that?  Do you

20  want to look at the first page of the application?

21  A.  Yes, I need to look at the first page.

22  Q.  And the alien name I believe is on the second page; right?

23  Or no.

24         MR. BRILL:  Sorry.  Keep going.

25         There it is.

D1v1cib5                          Gordon - cross

1   Q.  Would that be accurate, that substitution?

2   A.  That there was a substitution involving Erkan Akaya, yes, I

3   remember that.

4   Q.  And there was an address change from 1207-5 and 1207-2, do

5   you recall that?  One was in one address in Monsey, the other

6   another address in Monsey?

7   A.  I'd like to see them, please.

8            MR. BRILL:  All right.  Go back -- since we're already

9   on 1207-2, can we go back to the first application page.

10  Q.  This is 46 Main Street, Suite 226; right?

11  A.  Correct.

12           MR. BRILL:  And if we could go back to page 9 on this

13  one so we're clear on the date.

14  Q.  August 8th of 2006, it was the 46 Main Street address;

15  correct?

16  A.  Correct.

17           MR. BRILL:  Can we go back to 1207-5, look at the

18  address on the first application page.

19  Q.  Or use this address here.  It's 214 Route 59, Suite 100;

20  right?

21  A.  That's the address on the document on the screen, yes.

22           MR. BRILL:  Let's look at the first application page

23  and confirm that.

24  Q.  So approximately two months after this 1207-5 was filed, a

25  substitution is filed -- less than two months, actually -- with

D1v1cib5                          Gordon – cross

1     a different date; correct?

2     A.  It appears that way, yes.

3          MR. BRILL:  Okay.  Can we look at 1209-5, please.

4     Q.  Now who's the employer contact information?  What is the

5     address of the employer contact information on this form?

6     A.  1274 49th Street, Suite 299, in Brooklyn, New York.

7     Q.  And have you been to that address?

8     A.  No, I have not.

9     Q.  Do you know if Mr. Schwartz has any connection to that

10    address?

11    A.  I do not.

12         MR. BRILL:  And can we look at page 9 of this one,

13    please.

14    Q.  You testified with Mr. Pastore that Nathan Schwartz' name

15    appears in the signature box.  Do you know whose signature is

16    in box 3?

17    A.  No.

18         MR. BRILL:  Can we look at 1209-4, please.

19    Q.  As to 1209-5, that exhibit we just looked at, and this

20    Exhibit 1209-4, do you know who filled out these forms?

21    A.  No.

22    Q.  And looking at the signature page for this form, this one,

23    do you know who signed this form?

24    A.  No.

25    Q.  In -- this is a Contour Framing application, if you recall,

D1v1cib5                    Gordon - cross

1    the back of the first page.  In your investigation of

2    Mr. Schwartz and his associated companies, do you know, at the

3    time of this application in 2006, approximately how many

4    employees Contour Framing actually had?

5    A.  No, I do not.

6    Q.  Do you know how many subcontractors Contour Framing

7    actually had?

8    A.  No.

9           MR. BRILL:  Can we look at 1210-2, page 11, please.

10   Q.  Again, do you have any idea as to -- Mr. Pastore asked you

11   whose name appears in the signature box.  Do you know who

12   actually signed on line 3?

13   A.  No.

14           MR. BRILL:  Can we look at page 13, please.

15   Q.  For José Francisco Torres Guarderas, do you know if this

16   was an application that was ever approved by immigration?

17   A.  Do I know if any application was approved for someone by

18   that name or --

19   Q.  Yes, correct.

20   A.  No.

21           MR. BRILL:  Can we look at 1334-3, please.

22   A.  Oh, I'm sorry.  Could we go back to the last question?

23   Q.  Sure, of course.

24   A.  I believe there was an A file for José Francisco Torres --

25   Q.  Okay.

1    A.  -- that was admitted into evidence.

2    Q.  Okay.

3    A.  And I believe ultimately he was deported.

4    Q.  Okay.

5    A.  So at some point perhaps something was approved along the

6    line.  I'd have to go through the file to look and see exactly

7    what.

8    Q.  Okay.

9           MR. BRILL:  Go to page 11, please.

10   Q.  And again, you don't know whose signature appears on line 3

11   there; right?

12   A.  That's correct.

13          MR. BRILL:  Can we look at 3613, please.

14   Q.  As part of your investigation, did you attempt to locate

15   any computers used or controlled by Nathan Schwartz?

16   A.  No.

17   Q.  Were any searches conducted of Mr. Schwartz' home or

18   business?

19   A.  No.

20   Q.  Is there any way to tell whether this e-mail was received

21   by Nathan Schwartz?

22   A.  No way from looking at it on the screen or --

23   Q.  Based on any of the other information.  I mean, you've been

24   investigating this case -- well, specifically Mr. Schwartz's

25   part of this case -- since when?

D1v1cib5                          Gordon - cross

1    A.  Mr. Schwartz I would say first came to our attention in or

2    about 2006.

3    Q.  Okay.  So over the past seven years, of all the information

4    that you know about Mr. Schwartz and this case, is there any

5    way to tell if that e-mail was ever received by him?

6    A.  No.

7           MR. BRILL:  Looking at Exhibit 1218, please, if that

8    was ever admitted.

9    Q.  This is a Lidia Chalen I-485; right?

10   A.  Correct.

11   Q.  And you've reviewed these documents as part of your

12   investigation; correct?

13   A.  Correct.

14   Q.  And looking through the Lidia Chalen documents, is there

15   any connection with any of these documents to Nathan Schwartz?

16   A.  No.

17          MR. BRILL:  Can we look at 3614, please.

18   Q.  You're familiar with this e-mail, you testified about it on

19   direct; correct?

20   A.  Correct.

21   Q.  The 36 -- excuse me.  Based upon, again, all the

22   information you have in this case, is there any indication that

23   you have that this e-mail was either sent or received -- it was

24   either sent -- we'll just say sent first.  Any information

25   about this exhibit having been sent?

D1v1cib5                          Gordon - cross

1    A.  No.

2    Q.  Any information about this exhibit having been received by

3    Nathan Schwartz?

4    A.  No.

5            MR. BRILL:  Looking at Exhibit 116, please.

6    Q.  Obviously Levy's Kosher Garden Corporation is the name that

7    was contained in that previous e-mail; right?

8    A.  Yes.

9    Q.  And in investigating the applications having to do with

10   Levy's Kosher Garden Corporation, did you come upon any

11   connection with Nathan Schwartz?

12   A.  No.

13   Q.  In your -- were you present for the various meetings that

14   the government had with -- or some of the meetings that the

15   government had with Sam Salamon?

16   A.  Some of them, yes.

17   Q.  During those meetings did Sam Salamon indicate which

18   clients of his he had met at Mr. Schwartz' offices in Monsey?

19   A.  I don't remember anything like that being said, which

20   specific names.  Again, I'd need to go back and look through

21   all of the reports that I was asked, if I'm forgetting

22   something, but I don't believe there were specific names ever

23   mentioned.

24   Q.  You mentioned -- I don't know if this is the right word

25   but -- there were a significant number of A files that you were

D1v1cib5                          Gordon - cross

1  unable to secure because they were being used in other

2  proceedings; right?

3  A.  Yes.

4  Q.  You mentioned, am I right, in the beginning of your

5  testimony something about the T files, the dummy files, when

6  you can't get the A files; right?

7  A.  T files are created when CIS cannot get hold of an A file.

8  Q.  Okay.  So this is not something that if -- say if you had

9  requested an A file, that they would make up a T file for you;

10  right?

11  A.  No.  A T file would contain an application, a live

12  application that was received when they didn't have an actual A

13  file to put it into.  They would just create a T file with that

14  same number with a T instead of an A so that ultimately they

15  could be consolidated.  But no, they wouldn't create one for

16  me.

17  Q.  So it's for a specific purpose that they would create a

18  dummy file, not any type of request, a law enforcement request?

19  A.  Correct.  And it's not a dummy file.  It contains a live

20  application.  They just don't literally -- literally do not

21  have the folder to put it into.  That's all that means.

22  Q.  I see.  So you don't have the T files or the A files for

23  the A files that you couldn't secure; correct?

24  A.  That's correct.

25  Q.  Okay.  And it goes without saying, but you don't have any

D1v1cib5                        Gordon - cross

1    information about what is or isn't in those missing files with

2    regard to Mr. Schwartz; right?

3    A.  That's correct.

4           MR. BRILL:  Can we look at Exhibit 301, please.

5    Q.  You reviewed the bank records that were put into evidence

6    as Exhibit 301; right?

7    A.  Yes.

8    Q.  And I believe you testified on direct that the actual

9    mailing address for these bank records started at 455 Route 59

10   in Monsey; right?

11   A.  Yes.

12   Q.  And did you try to locate 455 Route 59?

13   A.  No.

14   Q.  So you don't know if it exists or not; right?

15   A.  No.

16   Q.  But in February of 2010, on both Exhibit 301 and

17   Exhibit 302 -- this is the checking account, right, 301?  Do

18   you recall?

19   A.  I believe so, yes.

20   Q.  Okay.  And 302 is the savings account; right?

21   A.  Yes.

22   Q.  The first time that you've come across this address at

23   450 -- excuse me -- 455 Route 306, Suite 119 is February 2010;

24   right?

25   A.  As far as coming across it on --

D1v1cib5                           Gordon - cross

1    Q.  In the --

2    A.  -- bank records?

3    Q.  In the bank records.

4    A.  Yes.

5    Q.  Okay.  And you said that on the checking account, around

6    February of 2010, there started to be more transactions than

7    previously?

8    A.  Yes.

9           MR. BRILL:  Okay.  Can we look at the February 13,

10   2010 statement.

11          Actually, the bottom portion.

12   Q.  Looking through these transactions, Verizon Wireless, Shell

13   Oil, One Leslie Kosher, Mr. Broadway, Wal-Mart -- and obviously

14   I'm not going to go through every transaction, but was there

15   anything unusual about the transactions that you uncovered once

16   there happened to be more transactions?

17   A.  No.

18          MR. BRILL:  Could we go to Exhibit 309-A, please.

19   Q.  LKH Corp, as you said, changed its name to CFI Framing &

20   Developers on August 17th of 2006; right?

21   A.  Yes.

22   Q.  Now looking over --

23          MR. BRILL:  Can we go down to the next page.

24   Q.  These are the certificates of incorporation of LKH

25   Corporation; right?

D1v1cib5                          Gordon - cross

1  A.  Yes.

2  Q.  Which then changed its name, as you see, to CFI Framing &

3  Developers.

4           MR. BRILL:  Can we move on to the next corporation.

5           Not the next page, the next actual document in --

6  there's a set of corporate documents in here, right, in this

7  exhibit?

8           (Counsel conferring)

9           MR. BRILL:  Can we look at then 309-B, please.

10  Q.  So Contour Frameworks was established June 16th, 2005;

11  correct?

12  A.  Yes.

13  Q.  And then Contour Frameworks changed its name about a month

14  later to Contour Framing; right?

15  A.  Yes.

16  Q.  And it was dissolved, went out of business, whatever it

17  was, April 27th, 2011; right?

18  A.  Yes.

19  Q.  Now you found a d/b/a filing for CFI, right, as part of

20  this?

21  A.  As part of the same exhibit, yes.  I believe it's the last

22  page.

23  Q.  Is it on the last page?

24  A.  Or second to last page.

25  Q.  So would it be fair to say that in Rockland County, Contour

D1v1cib5                          Gordon - cross

1    Framing filed a assumed name application for CFI, basically

2    stating it was going to do business as CFI instead of Contour

3    Framing?

4    A.  Yes, yes, that's correct.

5    Q.  Now did you -- what's the date of the d/b/a?  I'm sorry.

6    Take a look at the following page, please.

7            It was approved here by the Department of State on the

8    lower right?

9    A.  Yes.  August 3rd, 2005.

10   Q.  And the address here is 214 Route 59, Suite 110 in Suffern,

11   New York; correct?

12   A.  Yes.

13   Q.  Have you been to that address?

14   A.  Yes.

15   Q.  What is that?

16   A.  Right now it's a restaurant.

17   Q.  Do you know what it was back in 2005 or at the relevant

18   times in this case?

19   A.  No, I do not.

20   Q.  Did you do any further checking into the history of the

21   location?

22   A.  Nothing that was successful.

23   Q.  Do you know if there were mailboxes back at this time or

24   during the relevant times of this case, such as Suite 110?

25   A.  I do not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1v1cib5                        Gordon – cross

1          MR. BRILL:  Going back to Exhibit 309-A then, briefly.

2     Q.  Did you attempt to verify the tax identification number

3     or -- for CFI Framing & Developers?

4     A.  No, I did not.

5          MR. BRILL:  Why don't we look at 307-1, please.

6     Q.  You testified earlier that this is the number that was

7     associated with the toll records from Verizon for Nathan

8     Schwartz; correct?

9     A.  Yes.

10         MR. BRILL:  Your Honor, pursuant to discussion I had

11    previously with the government counsel, I would ask that

12    Defense Exhibits NS1, NS2, NS3, and NS4 be stipulated into

13    evidence.

14         MR. PASTORE:  No objection.

15         THE COURT:  Received.

16         (Defendant's Exhibits NS1, NS2, NS3, and NS4 received

17    in evidence)

18    Q.  Taking a look at NS1 --

19         MR. BRILL:  Why don't we put it up here.

20         Zoom in on that bottom line.

21    Q.  Can you see it on your screen?

22    A.  Yes.

23    Q.  Looking at line 2 on March 18th of 2009, do you see,

24    "Final review completed by S. Solomon on 3/14/09"?

25    A.  Yes.

D1v1cib5                         Gordon - cross

1   Q.  Do you know what that means?

2   A.  Aside from what it says, no, I don't know what they mean

3   by, "Final review completed."

4   Q.  Do you know who S. Solomon is, in this case?

5   A.  In this case, Sam Salamon.

6   Q.  And which corporation is this related to?

7   A.  Bliss 9 Limited.

8   Q.  So would it be fair to say, based upon the information that

9   you had, that Sam Salamon had access to the file for Bliss 9

10  Limited on March 14th of 2009?

11  A.  I don't know what -- what he had access to.

12  Q.  Okay.  Because you don't know what "final review" means.

13  A.  In this case, correct.

14  Q.  In any case?  I mean, in the Department of Labor-related

15  cases, do you know what that means?

16  A.  A final review?  No, I don't.

17           MR. BRILL:  Could we look at 101-30-A, please.

18  Q.  Now a few minutes ago, Agent Gordon, you testified about

19  the file of José Francisco Torres.

20  A.  Yes.

21  Q.  Do you recall that?  And that was a application that was

22  approximately June to August of 2006.  Those were the dates

23  that we saw on the original application and the substitution;

24  right?

25  A.  Yes.

1   Q.  And how long would the process last from the time that that

2   application was filed to it going all the way through the

3   Department of Labor and through the immigration side of the

4   process?

5   A.  I really couldn't give you a time frame on that.  I mean,

6   the applications are adjudicated by CIS, so I --

7   Q.  Is there a general range?  Does it take six months or a

8   year, five years?

9   A.  I would imagine there -- an estimate could be given by an

10  adjudicator from CIS --

11  Q.  So that --

12  A.  -- during any given time period, but I could not.

13  Q.  Okay.  Based upon your involvement in this case, you

14  weren't able to -- you don't know that.

15  A.  I don't know.

16  Q.  Okay.  And based upon the information that you have in this

17  case, looking at line 2, on January 3rd, 2008, was Nathan

18  Schwartz associated with anybody named David in his business?

19  A.  I don't know.

20  Q.  Looking at line 3, do you know if Nathan Schwartz in his

21  business was associated with anybody named Leo?

22  A.  I know that the toll records indicated there were phone

23  calls made by Nathan Schwartz's phone to Leo Teitelbaum.  I

24  don't know what they were in reference to.

25          MR. BRILL:  Okay.  So if we can then look at 321-1,

D1v1cib5                           Gordon - cross

1    please.

2    Q.   101-30 was -- on direct you testified that this was a phone

3    call from -- on January 3rd, at 12:49 p.m., phone call from

4    that 404 number that is related to the Department of Labor

5    Atlanta Service Center; right?

6    A.   That's correct.

7    Q.   Now on 101-30-A -- that was the record that we just looked

8    at -- there was no time on the note from when the person,

9    Department of Labor employee actually called, or claimed to

10   have called Nathan Schwartz; right?

11   A.   Correct.

12   Q.   So there's no call log that you were able to find from

13   Department of Labor that had a time stamp on it; right?

14   A.   That's correct.

15   Q.   And -- you testified then that the 917-846-4083 number

16   belonged to Sam Salamon; correct?

17   A.   Correct.

18   Q.   And the 718-219-6800 number was -- belonged to Lipa

19   Teitelbaum, right, or Leo?

20   A.   Correct.

21   Q.   There was no recording of the call from the Atlanta Service

22   Center; right?

23   A.   I do not know.

24   Q.   Now based upon your investigation of this case, you know

25   that Nathan Schwartz and Sam Salamon were friends; right?

D1v1cib5                         Gordon – cross

1   A.  I've heard that.

2   Q.  How many calls on January 3rd did Sam Salamon make to

3   Nathan Schwartz, if you know?

4          Let me put it this way.  Were these the only calls

5   that Sam Salamon and Nathan Schwartz had on January 3rd?

6   A.  I have no idea without looking at Sam Salamon's phone

7   records.

8   Q.  Okay.  Well, based upon the phone records that we have

9   here -- did you go through them?  Let's make it simpler.

10  A.  There are three phone calls that appear on this page for

11  January 3rd.

12  Q.  Look at January 3rd at 12:28 p.m. -- excuse me --

13  12:22 p.m.  That's 27 minutes prior to the call from Atlanta.

14  Who did -- who was called from this phone number?

15  A.  Sorry.  Can you repeat that?

16  Q.  Sure.  At 12:22 p.m., on January 3rd, who was called from

17  this phone number?

18  A.  Sam Salamon.

19  Q.  In the course of your investigation would it be fair to say

20  that you uncovered hundreds of text messages between Nathan

21  Schwartz and Sam Salamon?

22  A.  I don't know if it would amount to hundreds, but text

23  messages.

24  Q.  Dozens?

25  A.  Yes.

D1v1cib5                          Gordon - cross

1    Q.  Do you know in any of these phone calls what Nathan

2    Schwartz and Sam Salamon discussed?

3    A.  No.

4    Q.  Do you know in any of these phone calls what Nathan

5    Schwartz and Lipa Teitelbaum discussed?

6    A.  No.

7    Q.  You don't know if Lipa Teitel -- if Nathan Schwartz called

8    up Lipa Teitelbaum and asked him, "What the hell is going on?

9    Why are these people calling me?"

10   A.  I don't know.

11   Q.  You don't know the same for Sam Salamon?  He could have

12   done the same thing; correct?

13   A.  Correct.

14   Q.  And again, fair to say that all of the calls following the

15   404 call were one or two minutes each; right?

16   A.  Based on this page, yes, and what I remember.

17   Q.  And unlike the Optimum records that we saw earlier

18   belonging to somebody else, the Verizon records that we have

19   don't indicate number of seconds; right?

20   A.  Correct.

21   Q.  And the smallest amount of the phone call on a Verizon

22   record is one minute; right?

23   A.  Correct.

24   Q.  So as far as we know, that could have been a 10-second

25   call, the one minute?

D1v1cib5                           Gordon - cross

1    A.  Yes, could have.

2           MR. BRILL:  Can we look at 101-31-A, please.

3    Q.  Again, Agent Gordon, on line 2, on January 16th of 2008,

4    do you know what number Yelena Arrington called, trying to

5    speak to Nathan Schwartz?

6    A.  No, I don't.

7    Q.  The fact that there is a number on the application, the

8    alien application under employer name doesn't necessarily mean

9    that that was the number that was called by Yelena Arrington;

10   correct?

11   A.  Correct.

12   Q.  And again, there's no log or computer link between the

13   alien application and the call log; correct?

14   A.  That's correct.

15   Q.  Now based upon your investigation did -- well, withdrawn.

16          Based upon your investigation Nathan Schwartz did not

17   in fact have a receptionist on January 16th, 2008; correct?

18   A.  I don't know if he did or did not.

19   Q.  And then on January 16th, 2008, Nathan Schwartz called

20   and verified sponsorship.  Do you see that on line 3?

21   A.  Yes.

22   Q.  Is there a toll record corresponding to a call from a phone

23   number belonging to Nathan Schwartz to a Department of Labor

24   phone number?

25   A.  I'm sorry.  Could you repeat that?

D1v1cib5                           Gordon - cross

1    Q.   Sure.   Is there a toll record from a phone that you believe

2    was associated with Nathan Schwartz to a Department of Labor

3    phone number on January 16th of 2008?

4         MR. PASTORE:   If we could just clarify we're talking

5    about toll records for 7455 that were -- I think that's the

6    question.

7         MR. BRILL:   No.

8    Q.   The question is:   Do you have -- based upon your

9    investigation, do you have any records that indicate a phone

10   call from any number associated with Nathan Schwartz to the

11   Department of Labor on that day?

12   A.   I would have to go back and look at all of the toll records

13   that we do have.   I don't remember one, though.

14   Q.   Take a look at 321-2, please.

15        On January 16th -- let's make it quicker this way.

16   Would it be fair to say that you have no idea how many times

17   Nathan Schwartz spoke to Sam Salamon on that day?

18   A.   That's correct.

19   Q.   And again, would it be fair to say that you have no idea

20   what the content of the conversations between Nathan Schwartz

21   and Sam Salamon were on January 16th?

22   A.   Correct.

23   Q.   Would I also be correct in saying that you don't know how

24   many calls between Nathan Schwartz and Sam Salamon exist in all

25   of Nathan Schwartz's phone records?

D1v1cib5                          Gordon - cross

1    A.  That's correct.

2              MR. BRILL:  Let's look at 101-19-A, please.

3    Q.  Again, line 1, "Left voice message for Nathan Schwartz to

4    give me a call."  Do you see that?

5    A.  Yes.

6    Q.  You don't know what number Therese Lawood claims to have

7    called on that day, do you?

8    A.  No, I do not.

9    Q.  Or what time?

10   A.  No.

11   Q.  On -- for 101-19-A, do you have any idea what number was

12   associated with the file A08028-18062?

13   A.  I do need to look at that application to see what phone

14   number is listed.

15   Q.  Okay.  Is it accessible?  Do you want to take a look for

16   it?

17   A.  I'm not sure where it would be, what exhibit it would be.

18             (Counsel conferring)

19             MR. BRILL:  Oh, 101-19.

20   A.  The number listed is 845-721-7455.

21             MR. BRILL:  If we could go back and look then again at

22   101-19-A.

23   Q.  Is there any way to know on February 21st of 2008 what

24   the outgoing voice mail message on that phone said?

25   A.  No.

D1v1cib5                          Gordon - cross

```
 1   Q.  And there's no way to know if the outgoing voice mail
 2   message identified itself as being Nathan Schwartz's phone;
 3   right?
 4   A.  That's correct.
 5            MR. BRILL:  Looking at 321-6.
 6            And if we could just zoom in on the entire list of
 7   calls.  Just blow it up a little bit, not just the ones that
 8   are highlighted.  Like half of them.
 9            Thank you.
10   Q.  In this section it looks like, at 12:14 p.m. and at
11   12:23 p.m., there are calls to voice mail -- right?
12   A.  Yes.
13            MR. BRILL:  Can you scroll down.
14   Q.  And there's additional calls to voice mail at 2 -- 12:36;
15   right?
16   A.  Yes.
17            MR. BRILL:  Is there a second page to this that is the
18   rest of February 21st?
19            So let's just go back to 221-6, please.  If you can
20   highlight the highlighted portion, the prehighlighted portion.
21   Q.  Now it was your testimony then that the -- after the call
22   from -- after a call to check voice mail there was an incoming
23   call from Sam Salamon; right?
24   A.  Yes.
25   Q.  Looking at this list of phone calls, were there any
```

D1v1cib5                          Gordon - cross

1   outgoing calls from this phone to Sam Salamon?

2   A.  I don't remember if there were any outgoing -- certainly

3   not on what's displayed right now, no.

4   Q.  Not on the part that Mr. Pastore showed you.

5          So the caller checked voice mail and then checks voice

6   mail again and in between gets an incoming call from Sam

7   Salamon's phone; right?

8   A.  That's correct.

9          MR. BRILL:  Let's take a look at 101-2-A, please.

10  Q.  On -- same thing.  We don't know as to line 1 what number

11  was called or what time that call was; right?

12  A.  Correct.

13  Q.  And as for line 2, we don't know what number called or who

14  called other than somebody identifying themself as Nathan

15  Schwartz; right?

16  A.  Correct.

17         MR. BRILL:  Can we look at 321-7.

18         Scroll down, please, 2/26.

19  Q.  How many times in this section on February 26 does voice

20  mail get checked?  I see one at 9:30 in the morning; right?

21  A.  Yes.

22  Q.  One at 10:12 in the morning, another one at 10:16 in the

23  morning; right?

24  A.  Yes.

25         MR. BRILL:  Can we scroll down.

1   Q.  And at what point on February 26 did you identify the call

2   coming in from the 404 number, if you recall?  Was that on the

3   second page of this exhibit?

4   A.  I believe it might be because I didn't see it on here.

5        MR. BRILL:  There we go.

6   Q.  Then again at 11:07 a.m. there's another check of the voice

7   mail; right?

8   A.  Yes.

9   Q.  And again, no outgoing call to Sam Salamon's phone but an

10  incoming call about a half an hour later; right?

11  A.  Yes.

12       MR. BRILL:  All right.  Can we go down, see if there's

13  any more checks of the voice mail.

14       Again, sorry.

15  Q.  6:59 p.m.; right?

16  A.  Yes.

17  Q.  Now looking at the phone records, were there any outgoing

18  calls to Sam Salamon immediately after voice mail was checked?

19  A.  On these, no.

20       MR. BRILL:  Can we look at 102-16-A, please.

21  Q.  The assumption here on line 1 is that Wanda Sanders left a

22  voice mail on a corresponding phone number; right?

23  A.  Correct.

24  Q.  And that sometime in between May 14th 2008 and

25  August 19th, 2008, something happened that allowed them to

D1v1cib5                    Gordon - cross

1    verify or certify this record; right?

2    A.  Yes.

3         MR. BRILL:  Okay.  Can we look at 321-8, please.

4    Q.  Other than the fact that there was a voice mail check at

5    12:10 p.m. and again an incoming call from Sam Salamon, is

6    there anything in here to indicate that there was in fact a

7    voice mail left by the Department of Labor on or around that

8    time for Nathan Schwartz?

9    A.  No, there's no way to tell what was left -- what messages

10   were on voice mail.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1VLCIB6                        Gordon - cross

1    BY MR. BRILL:

2    Q.  There's no way to tell the fact, based upon your

3    information, if in fact that voice mail was ever actually left,

4    right?

5    A.  I'm saying you can't tell who left a voice mail.

6    Q.  You can't tell if it in fact was ever left?

7    A.  Correct.

8    Q.  Now, it was pointed out I believe by Mr. Pastore that this

9    checking of the voice mail at 12:10 and the incoming call from

10   Sam Salamon's phone was also at 12:10, right?

11   A.  Yes.

12   Q.  And all that we can tell from the phone records is this was

13   a call that came in through call waiting, right?

14   A.  Yes.

15   Q.  There's no indication in these records that this was some

16   sort of conference call, right?

17   A.  Not that I'm aware of, no.

18   Q.  No indication that Mr. Salamon somehow was able to hear the

19   voice mail message, right?

20   A.  No.

21         MR. BRILL:  Again looking at 321-9, please.  Highlight

22   that.

23   Q.  And, again, we have a check of the voice mail at 5:35 and

24   two more incoming calls from Sam Salamon's phone, right?

25   A.  Yes.

D1VLCIB6                        Gordon - cross

1    Q.   No outgoing calls, right?

2    A.   Correct.

3    Q.   No outgoing call after the voice mail check, no outgoing

4    call to Sam Salamon after the voice mail check at 8:40 in the

5    morning the next day either, right?

6    A.   Correct.

7                MR. BRILL:   If we look at 106-25-A, please.

8    Q.   Who is Arnold Goldenberg?

9    A.   I don't know.

10   Q.   Over the course of the seven years that you've been

11   investigating Mr. Schwartz, did you ever attempt to locate

12   Mr. Goldenberg?

13   A.   No.

14   Q.   So Mr. Goldenberg's name is on a application that was

15   determined to be fraudulent, right?

16   A.   Believed to be fraudulent, yes.

17   Q.   And you didn't make any attempt to hunt him down?

18   A.   No.

19   Q.   Or check him out?

20   A.   No.

21   Q.   Never arrested?

22   A.   No.

23   Q.   Based upon the bank records of Mr. Schwartz that we looked

24   at, 301 and 302, you could determine as of February 2010 that

25   that address came back to Abraham -- Nathan Schwartz, excuse

D1VLCIB6                          Gordon - cross

1    me, Nathan Schwartz, right?

2    A.   The 455 Route 306.

3    Q.   Suite 119, right?

4    A.   Yes.

5    Q.   You testified earlier that City Car Van and Truck Rental in

6    its phone records used that same address in 2008, right?

7    A.   Yes.

8    Q.   Now, you were part of the team that located Mr. Eisenberg,

9    was it, who was the owner of the mailbox?

10   A.   Mr. Eisenbach.

11   Q.   Eisenbach, thank you, that was the owner of the mailbox

12   company at 455 Route 306, right?

13   A.   Yes.

14   Q.   And fair to say Mr. Eisenbach had no information about who

15   rented the boxes in his store or at what time those boxes were

16   rented, right?

17   A.   I believe that's correct, yeah.

18   Q.   So in 2008, you have no way of knowing who in fact was

19   renting Box 119, correct?

20   A.   That's correct.

21   Q.   The only time you can determine that mail for Nathan

22   Schwartz was being delivered is after February of 2010, right?

23   A.   I'd need to go back and look at records that we have from

24   that rental facility before I gave.

25   Q.   What type of records would you need to look at?

D1VLCIB6                          Gordon - cross

1    A.  I believe there are some records from that rental facility.

2    I may be mistaken.

3    Q.  There were records from the Main Street facility, Pearson

4    Printing, right?

5    A.  Yes.

6    Q.  Were there records that you recovered -- you were sitting

7    here for the testimony, right?

8    A.  For part.

9    Q.  Of Mr. Eisenbach?

10   A.  Part of it.

11   Q.  And do you recall Mr. Eisenbach saying that he destroyed

12   all of his records when he closed his business?

13   A.  I don't think I was there for that part of it.  I thought

14   we might have had some records from an earlier time period, but

15   I guess I'm mistaken if they're all destroyed.

16   Q.  Assuming for the sake of argument that those records, that

17   is, Mr. Eisenbach's records are destroyed, is there any other

18   record that would indicate mail in Nathan Schwartz's name going

19   to 455 Route 306, Suite 119, prior to February of 2010?

20   A.  Not that I'm aware of, no.

21   Q.  So for all we know, maybe Arnold Goldenberg had that

22   mailbox in 2008?

23   A.  It's possible.

24            MR. BRILL:  Look at 105-4-A, please.

25   Q.  What do you know, Agent, about the Sharp Shopper?

D1VLCIB6                        Gordon - cross

1    A.   Only that there were applications filed with the Department

2    of Labor listing the Sharp Shopper as a sponsor.

3    Q.   Okay.

4    A.   And the corporation records that I testified to earlier,

5    but no independent knowledge of the company itself.

6    Q.   So why don't we look -- let's just go to 309C first then

7    we'll talk about that.

8         These are the corporation records, right?

9    A.   Yes.

10   Q.   I think it's on the last page that you see Mr. Schwartz's

11   name, right?

12   A.   This page, yes.

13        MR. BRILL:   Now, if we could actually just come back a

14   little bit and look at the words on the left as well.  That's

15   fine.  Just if you could highlight the "filed by" along with

16   the Nathan Schwartz.

17   Q.   In your examination of the corporate records in this case,

18   no matter what defendant they were related to, do you know what

19   "filed by" means in New York State corporation records or

20   Department of State terms?

21   A.   Definitively, no, I don't.

22   Q.   In reviewing records, you've seen "filed by" with the names

23   of attorney's offices, right?

24   A.   I have.

25   Q.   So would it be fair to say that "filed by" does not

1  actually give the filer any legal relationship to the company

2  other than that was the person who actually filed the document?

3  A.  I wouldn't know.

4          THE COURT:  Objection sustained.  That's a legal

5  conclusion.

6          MR. BRILL:  Okay.

7          THE COURT:  Attorneys can't just go file without being

8  agents, right?

9          MR. BRILL:  Correct.  Maybe I need to clarify then.

10 Q.  Do you know specifically as to the Sharp Shopper if Nathan

11 Schwartz owned or had an ownership interest in that company?

12 A.  I don't.

13 Q.  Do you know if he owned stock in the company?

14 A.  I don't.

15 Q.  Do you know if he was an officer of the company?

16 A.  I don't.

17 Q.  Can we go back to 105-4-A, please.

18         This was interesting because on October 27, let's

19 start line 1.  So the telephone for Nathan Schwartz with the

20 Sharp Shapper is not in service.  So, again, going from the

21 application, you would come up with a phone number of

22 (845)354-0616.  Right?

23 A.  Yes.

24 Q.  And then at some time on October 27, Barbara Hall called

25 that number again after the first call on October 23, 2008,

D1VLCIB6                        Gordon - cross

1    right?

2    A.  Yes.

3    Q.  Based upon your information, the toll records on

4    Exhibit 313, we don't have to go there just yet, the phone was

5    actually turned back on at some point on October 27, right?

6    A.  Yes.

7    Q.  But, again, since there's no time stamp on this call note

8    No. 2, you don't know what time this call was made, right?

9    A.  That's correct.

10   Q.  Were you able to secure toll records for (845)354-0616?

11   A.  No.

12   Q.  So we don't in fact know if this phone call was ever even

13   made, right?

14   A.  That's correct.

15          MR. BRILL:  Can we look at Exhibit 313 now, please.

16   Page 2, I believe.

17   Q.  What is the address for Bliss 9 Limited?

18   A.  455 Route 306, Suite 129, Monsey, New York.

19   Q.  And the only address in February of 2010 that you have

20   associated with Nathan Schwartz is Suite 119, right?

21   A.  As far as what I saw listed on the --

22   Q.  On the bank records?

23   A.  Yes.

24   Q.  What -- do you see any mail, do you have any information of

25   any mail in Nathan Schwartz's name going to Suite 129?

D1VLCIB6                    Gordon - cross

1    A.  No.

2    Q.  So who subscribed, other than Bliss 9 Limited, to -- was

3    there an individual person who subscribed to this phone number

4    in October of 2008?

5    A.  I only have these records.  This is the totality of the

6    records sent by Verizon in response to a subpoena, so I don't

7    have any other information.

8    Q.  There's no application or credit check or anything else

9    that we can look at to determine who actually signed up for

10   this phone, right?

11   A.  No.  This is what they sent as everything that was

12   available.

13   Q.  And, again, there's no information about who actually

14   physically possessed the phone with the phone number

15   (845)354-0616 on October 27 or October 30, 2008, right?

16   A.  Correct.

17           MR. BRILL:  Can we look at 105-4, please, page 15.

18   Q.  So this, on direct, is what you used to determine the

19   relationship between Nathan Schwartz and the Sharp Shopper,

20   correct?

21   A.  Was this used to establish a relationship, yes.

22   Q.  That's what you testified to on direct.  Because the Nathan

23   Schwartz is in letter D and the Sharp Shopper is in letter C,

24   based upon this document, you would think there was a

25   relationship.  Right?

D1VLCIB6                        Gordon - cross

1    A.  Yes.

2    Q.  Again, do you know who filled this out?

3    A.  No.

4    Q.  Looking down the next to last page, take a look and see,

5    there's no signature on this one at all, right?

6    A.  Correct.

7    Q.  Do we have any information about who submitted this on

8    behalf of the Sharp Shopper?

9    A.  Correct.

10   Q.  We don't have any information?

11   A.  That's correct.

12            MR. BRILL:  Can we look at 104-11, please.

13   Q.  Again, would it be fair to say that this document or others

14   like it is how you came to make a connection between Nathan

15   Schwartz and Bliss 9 Limited?

16   A.  That's correct.

17   Q.  And, again, without belaboring the point, do we know who

18   filed this document?

19   A.  No.

20   Q.  Do we know who signed this document?

21   A.  No.

22            MR. BRILL:  Look at 104-11-A then.

23   Q.  Just read line 9, please, out.

24   A.  "HD 5/31/11 returned mail.  Denial letter.  Attempted to

25   gather employer address information.  No working phone number

1    and no response to email address after seven business days.

2    Processed to file in case file.  Per SME-M.H."

3    Q.  So at least as of June 10 of 2011, no one was picking up

4    the mail at Suite 119 or 129, whichever is the case, right?

5    A.  I couldn't say no one was ever picking this up.  This

6    indicates mail was returned, so.

7    Q.  On 5/31/11, right?

8    A.  Correct or -- yes.

9         MR. BRILL:  Put NS-2 up on the Elmo.

10   Q.  Agent Gordon, what company, if you can see, is this for?

11   A.  City Car Van and Truck Rental Incorporated.

12   Q.  And on line 2, what number was used to verify information?

13   A.  (718)219-6800.

14   Q.  And if you can -- as I recall, you know whose phone number

15   that belongs to, right?

16   A.  Yes.

17   Q.  And who's that?

18   A.  Leo Teitelbaum.

19        MR. BRILL:  If I could just put NS-3 up.

20   Q.  What company is this for?

21   A.  Contour Framing.

22   Q.  And can you read line 4, please?

23   A.  "Emp denial letter returned.  Undeliverable as addressed.

24   Filed."

25   Q.  What's the date of that?

D1VLCIB6                          Gordon - cross

1    A.  December 1, 2008.

2            MR. BRILL:  And if I could put up NS-4, please.

3    Q.  And, again, what company is that for?

4    A.  Contour Framing.

5    Q.  And can you just read the note, please?

6    A.  "Phone number listed is incorrect number.  Apparently the

7    number was changed.  Person on the phone said that he get many

8    calls for that company.  No contact made."

9    Q.  What is the date of that?

10   A.  May 9, 2008.

11           MR. BRILL:  Thank you.  Couple more things.

12           Can you put Exhibit 101 up, please.

13   Q.  CFI Framing and Developers, if you recall was -- correct me

14   if I'm wrong -- listed as 46 Main Street, Suite 226 in Monsey;

15   do you recall that?

16   A.  Yes.

17   Q.  And would it be fair to say on Exhibit 101 -- just pull

18   out, please -- two-page exhibit, approximately 34, 35

19   individuals listed on there, right?

20   A.  Yes.

21   Q.  And the first date is November 1, 2007 listed here, right?

22   A.  Yes.

23   Q.  And that would be the date it was received by the

24   Department of Labor, correct?

25   A.  Yes.

D1VLCIB6                          Gordon - cross

1              MR. BRILL:  And can we go to page 2, please.  Page 3.

2      I'm sorry.

3      Q.  And the final receive date is November 4, of 2008, correct?

4      A.  Yes.

5      Q.  Can you look at Exhibit 102, please.  In terms of Contour

6      Framing, there were multiple addresses, if you recall, right?

7      A.  Yes, yes.

8      Q.  There were some that went to an address in Suffern, right?

9      A.  Some documents, yes.

10     Q.  Some went to 46 Main Street, right?

11     A.  Correct.

12     Q.  Some went to an address in Brooklyn?

13     A.  Correct.

14     Q.  And some went to another address in Brooklyn, right, at

15     least one address in the Brooklyn?

16     A.  One address in Brooklyn that I.

17     Q.  And do you recall in terms of -- again, across page 1 and

18     could we look at page 2 briefly.  Page 3, sorry.

19              Again, there's somewhere in the vicinity of 30

20     applicants, right?

21     A.  It looks right, yes.  I think it's on there, written on

22     there, but yes.

23     Q.  How many went to Brooklyn, if you know, approximately?

24     A.  Looking at this document?

25     Q.  Well, if you know from your memory.  I'm not going to make

1    you go through each file individually.

2    A.  No, I don't.

3    Q.  It was more than one?

4    A.  More than one.

5         MR. BRILL:  Can we look at Exhibit 103, please.

6    Q.  Would it be fair to say, Agent Gordon, that every single

7    one of the three pages of applicants for Olympia York Builders

8    and Developers went to 455 Route 306, Suite 119?

9    A.  It's possible.  I can't tell from this document, and I

10   would need to look at each document to answer that.

11        MR. BRILL:  Can we look at Exhibit 104, please.

12   Q.  Again, if you recall, isn't it a fact that every single one

13   of the applications for Bliss 9 Limited lists an address at 455

14   Route 306, Suite 119?

15   A.  Again, the ones that I remember seeing did in fact go to

16   that address, but I would need to look at each application

17   because I couldn't say they all did.

18   Q.  Fair enough.  Can we look at Exhibit 105, please.  Again,

19   would it be fair to say that all of the Sharp Shopper

20   applications went to that same address?

21   A.  Again, I can say some of them did.  I would have to see the

22   documents to say it's fair to say they all did or what

23   percentage did.

24   Q.  And, again, as to Exhibit 106.  Can we look at 106.

25        Over the course of the two pages, again, would it be

D1VLCIB6                    Gordon - cross

1    fair to say that all of the applications for City Car Van and

2    Truck Rental went to Suite 119 at 455 Route 306?

3    A.  And, again, it's not fair to say anything without looking

4    at the actual applications.  Looking at this, there's no

5    indication of what address.  I know that some of them did, if

6    that's your question, but I'd need to look at.

7    Q.  They're all in evidence, right?

8    A.  Yes.  That's what I'm saying.  We could look.

9    Q.  Again, I don't want to spend two hours going through every

10   single application.  The jury only, obviously, can look at them

11   if they need to.

12          These were Arnold Goldenberg applications, right, City

13   Car?

14   A.  At least the one that we were looking at before, yes.

15   Q.  And you've seen others with Arnold Goldenberg's name on it

16   as well, right?

17   A.  I believe so.

18   Q.  All of the applications that we looked at, Exhibits 101,

19   102, 103, 104, 105, and 106, ended in 2008, right?

20   A.  I believe so.

21          MR. BRILL:  I have nothing further.  Thank you.

22   CROSS-EXAMINATION

23   BY MR. GREENFIELD:

24   Q.  Good afternoon, Agent Gordon.

25   A.  Good afternoon.

1    Q.  We've met before, haven't we?

2    A.  We have.

3    Q.  As a matter of fact, I was in your office some months ago

4    on a couple of occasions looking at documents; is that correct?

5    A.  I remember.

6          MR. GREENFIELD:  Your Honor, I have an agreement with

7    the government that Defendant's HT-7 and HT-12 may be

8    stipulated as in evidence.

9          MR. PASTORE:  No objection.

10          THE COURT:  Okay.  HT-7 and 12?

11          MR. GREENFIELD:  Yes.

12          THE COURT:  Okay.

13          (Defendant's Exhibits HT-7, HT-12 received in

14    evidence)

15    Q.  I'm going to show you what's been marked as HT-12 just ask

16    you if you recognize it and know what it is?

17    A.  I recognize it as the standard retainer agreement format

18    that I've seen related to this law firm.

19    Q.  And when you say this law firm, you're talking about the

20    law firm that is the subject matter of this litigation, is that

21    right, this case?

22    A.  Correct, which operated under some five or six, at least,

23    different names.  So I've seen this format.

24    Q.  This format?

25    A.  With different.

1    Q.  That one happens to say Philwin?

2    A.  Yes.

3    Q.  But you've seen it with other lawyers there?

4    A.  Correct.

5          MR. GREENFIELD:  Can I have it back.

6    Q.  Now, as you said a moment ago, this is the standard

7    retainer agreement that the law firms entered into with the

8    aliens who came to them for green card; is that correct?

9    A.  Correct.  And, again, when I say it's standard, I'm not

10   going word for word.  There may be variations.  But the format,

11   certainly the words that are in bold, client name, attorney,

12   start case, all of that looks pretty boilerplate.

13   Q.  Now, this particular retainer refers to a client by the

14   name of Segundo Gomez; is that right?

15   A.  Yes.

16   Q.  And am I correct that Mr. Gomez was paying $10,000,

17   according to this, to start the case?

18   A.  According to this, yes.

19   Q.  And is there anything in this retainer that indicates that

20   if he doesn't get a labor certification or green card the law

21   firm has to refund money to him?

22   A.  No.

23   Q.  And you said that you saw many retainers with at least in

24   the same physical layout of this one, correct?

25   A.  That's correct.

D1VLCIB6                         Gordon - cross

1   Q.  Do you recall any which said a refund had to be given?

2   A.  No, I don't.

3         MR. GREENFIELD:  Now I'm just going to put this right

4   up.  I'm going to ask that HT-7 be displayed.

5   Q.  Do you recognize HT-7?

6   A.  Aside from the other day, I believe, you were showing it.

7   Q.  To Mr. Salamon, yeah.

8   A.  Yeah.  No, aside from that I don't.

9   Q.  Do you recognize the name Teodoro Morocho?

10  A.  No, I don't.

11  Q.  Do you know whether Mr. Morocho was a client of this law

12  firm?

13  A.  I don't.

14  Q.  You do see the notation that it says "lawyer" on it?

15  A.  I do.  Aside from this, I have no knowledge of Mr. Morocho.

16        MR. GREENFIELD:  Thank you.  I'll take that back.

17  Q.  Would it be fair to say that in the course of your

18  investigation of this case -- withdrawn.

19        Did you hear Mr. Salamon testify that he gave

20  handwriting exemplars to the government?

21  A.  That he gave a handwriting exemplar, yes.

22  Q.  Okay.  Was a handwriting exemplar obtained for

23  Mr. Tischler?

24  A.  No.

25  Q.  Would it be fair to say that in the course of your

D1VLCIB6                           Gordon - cross

1   investigation of this case and your review of the files, you

2   saw at least 20 different signatures that purported to be

3   Mr. Tischler's?

4   A.  I don't know what you mean by 20 different signatures.

5   I've seen at least 20 signatures that are purported to be

6   Harold Tischler's.

7   Q.  Were they all the same, did they all appear to be the same

8   to you?

9   A.  No.

10  Q.  Do you think that you could identify Mr. Tischler's

11  signature?

12  A.  No.

13          MR. GREENFIELD:  Could we see Exhibit 204.

14  Q.  That's a document that you've seen before and that you

15  testified to; is that correct?

16  A.  Correct.

17  Q.  And does that document in the lower right-hand corner bear

18  a signature that purports to be Mr. Tischler's?

19  A.  Yes.

20  Q.  You don't know if that's actually his signature or not,

21  right?

22  A.  Correct.

23  Q.  But you do know, well, do you know when this application

24  was filled out?

25  A.  I believe there's a date somewhere on the application.  I

D1VLCIB6                        Gordon - cross

1    don't see it on the screen here but I believe I testified to

2    two of them and they were both dated.

3    Q.  I'll give you the original and ask you.  Frankly, I didn't

4    see it either.

5    A.  This one.  April 1, 2008.

6    Q.  Okay.  Thank you.  Great.

7            Now, this document, is it fair to say this document

8    wasn't created at the law office; isn't that right?

9    A.  I have no idea where it was created.

10   Q.  You think it might have been created at the law office?

11   A.  I don't know where it was created.

12           MR. GREENFIELD:  You can take that down.

13   Q.  Do you recall that in 2006 you mailed a subpoena to was it

14   Vintage Builders or Vintage Partners?  I don't recall.

15   A.  I believe it was Vintage Partners.

16   Q.  And you testified as to the response you got from that; is

17   that correct?

18   A.  Yes.

19   Q.  And you've been an agent for 21 years.  That's not the

20   first subpoena you served that requested corporate documents,

21   is it?

22   A.  No.

23   Q.  And do you know the difference between a closely held

24   corporation and a public corporation?

25   A.  No.

1    Q.   Do you know what a corporate kit is?

2    A.   My understanding, a startup kit?

3    Q.   Yes.

4    A.   That's my only understanding of what a corporate kit is.

5    Q.   In your experience, is it uncommon for you to receive a set

6    of corporate documents that haven't been filled out by the sole

7    shareholder of the company, the bylaws and all of that stuff?

8    A.   I'm sorry, I'm not sure I understand your question.  You

9    mean in response to a subpoena requesting documents?

10   Q.   Yeah.  When you subpoena the corporate papers -- perhaps we

11   should put up Exhibit 222.

12           MR. GREENFIELD:  Could you go to the cover letter.

13   That's not.  Is that another exhibit?

14           (Pause)

15           MR. GREENFIELD:  Apparently, everything but the cover

16   letter is able to be displayed.

17   Q.   So I'm going to show you the cover letter.

18           Does that letter indicate who the sole shareholder of

19   the company is?

20   A.   Yes.  It says "I, Harold Tischler, I am the sole

21   shareholder of Vintage Partners."

22   Q.   Okay.

23           MR. GREENFIELD:  Would you put up Exhibit 222, the

24   other documents that are on.

25   Q.   So the membership certificate that's blank, you wanted to

1    know who the members of Vintage Partners New York, LLC, were,

2    that was part of your subpoena, correct?

3    A.   Yeah, the subpoena was broad.  It was asking for all

4    documents related to Vintage Partners.

5    Q.   One of the things you wanted to know was who were the

6    members or shareholders, correct?

7    A.   Correct.

8    Q.   And the cover letter that you just looked at says, and I'm

9    reading now, "I, Harold Tischler, am the sole shareholder of

10   Vintage Partners NY, LLC."

11            So you got that information even though this specimen,

12   this membership certificate, wasn't filled out, correct?

13   A.   Correct.

14   Q.   Now, my question to you earlier was in your experience when

15   you subpoenaed other corporate or LLC documents, was it

16   uncommon for you to get a blank form from someone who was the

17   sole shareholder of the company?

18   A.   To get a blank form such as this one, no, but.

19   Q.   To get forms they hadn't bothered to fill out, is that

20   something that was not uncommon in your experience?

21            THE COURT:  This is your personal experience serving

22   subpoenas.

23   A.   In my personal experience, it's uncommon.

24   Q.   Uncommon, okay.  Can we go to the next document.

25            The minutes of Vintage Partners, do you know whether

D1VLCIB6                        Gordon - cross

1    that was part of the original corporate kit that one gets when

2    they form the corporation?

3    A.  I don't know.

4    Q.  Are you familiar with the term black beauty, did you ever

5    hear that, did anybody ever mention that to you in the course

6    of your official duties?

7            THE COURT:  I've actually never even heard of it.  I

8    don't know if she has.

9    Q.  We know that the judge hasn't.

10   A.  I haven't either.  Not in connection with what we're.

11           MR. GREENFIELD:  Can we go to the next document,

12   please.

13   Q.  This is a blank form of the minutes, correct?

14   A.  Correct.

15   Q.  But you already knew that Mr. Tischler was the sole member,

16   correct?

17   A.  Based on the cover sheet, yes.

18   Q.  Did you ever find out to the contrary, that there was some,

19   something to the contrary?

20   A.  No.  At the time I received these documents, yes.

21   Q.  By the way, did you ever contact Mr. Tischler after

22   receiving his response and ask him for additional documents or

23   follow-up in some way?

24   A.  No.

25           MR. GREENFIELD:  I'm sorry for this delay.

1  Q.  All right.  Just take a look at the signature on the cover

2  letter.  Can you see it?

3  A.  Yes.

4         MR. GREENFIELD:  Would you, could you put up the post

5  office Box 204 that you did display.  Take that one off now.

6         MR. PASTORE:  Judge, if the witness is going to be

7  asked to compare signatures, I think that's really an issue for

8  the jury.

9         THE COURT:  It is a lay issue.  She's not an expert.

10        MR. GREENFIELD:  I'm just going to ask her if it

11 appears similar to her.

12        THE COURT:  You can put them both up.

13        MR. GREENFIELD:  That's what I tried.  He said he

14 can't do it.  I don't know how he gets one up.

15        THE COURT:  He's been doing pretty well, don't you

16 think?

17        MR. GREENFIELD:  I think he's doing great.

18        THE COURT:  Me too.

19        MR. PASTORE:  It's his birthday.

20        THE COURT:  At the end of the day we'll all sing happy

21 birthday.  My present to him is that I won't sing.

22        MR. GREENFIELD:  So for whatever reason, we can't

23 display those two documents together; is that correct?

24        I'll move on.

25 Q.  Now, you testified that you requested certain tax records

D1VLCIB6                          Gordon - cross

1  from New York State; do you recall that?

2  A.  Yes.

3  Q.  And you said you found there were withholding records for

4  certain periods, is that correct, as to Vintage?

5  A.  I believe there were.  I'd need to see the tax records

6  again.  I don't remember exactly what was reported.

7  Q.  Tell me now whether you found any, whether New York State

8  did indeed find payroll tax records for Vintage Partners or

9  builders?

10         MR. PASTORE:  Just to be clear, I think he asked

11  Vintage Partners or builders.

12  Q.  Which one is that?

13  A.  This is for Vintage Builders and General -- and then it's

14  cut off, but I'm guessing.

15  Q.  So just tell me whether that, that's in evidence, but tell

16  me whether you're able to testify from looking at that whether

17  in fact there were tax records, payroll tax records filed by

18  Vintage Builders?

19  A.  I'm sorry.  This lists the number employees, it lists

20  unemployment insurance information, which there is some

21  withholding tax information.  There is some.

22  Q.  That's what I'm asking you.  It wasn't a situation where

23  New York State responded to you that there were no returns for

24  any period between 2001 and 2010?

25  A.  No, you're correct.

1    Q.  That's all.  This is in evidence, Exhibit 206.

2              Now, you testified at some length to these case notes

3    and the follow-up phone calls and the case notes listed, when

4    appropriate, apparently, that the case was approved; do you

5    recall that?

6    A.  Yes.

7    Q.  What did that actually mean?

8    A.  Again, I'm not sure when the Department of Labor in Atlanta

9    would call and verify and put in that it was approved exactly

10   what they meant, just as I don't know exactly what they meant

11   by final review.  I was testifying as to whether or not contact

12   was made as indicated by the call note.

13   Q.  There would come a point in time when the Department of

14   Labor would issue a labor certification; is that correct?

15   A.  Yes.

16   Q.  And did that mean that the alien whose labor certification

17   had been issued could go to work?

18   A.  Can you repeat that?

19   Q.  In other words, well, I'll repeat it.

20             When the labor certification was issued, did that mean

21   that the particular alien whose labor certification had now

22   been issued and approved, this blue copy, did that mean he

23   could go to work?

24             MR. PASTORE:  Sorry, objection.  Confusing.  Could go

25   to work.

1              MR. GREENFIELD:  I'll be more precise.

2    Q.  Did that mean he could then immediately go and work for the

3    sponsor?

4              MR. PASTORE:  Again, objection.

5              THE COURT:  Is the issuance of a labor certification a

6    certification that it is lawful for a sponsor to employ an

7    alien, is that the question?

8              MR. GREENFIELD:  That's exactly the question, at that

9    point in time.

10             THE WITNESS:  I'm not a hundred percent sure to be

11   honest with you.  I know that --

12             THE COURT:  The answer is if you don't know, you don't

13   know.  Don't speculate.

14             THE WITNESS:  I don't know.

15   Q.  There was testimony from a number of witnesses, I don't

16   know if you heard it or not, that it was appropriate, it was

17   allowed under the labor department rules to substitute one

18   alien for another under a sponsorship application; do you

19   recall that?

20   A.  Yes.

21   Q.  Is that your understanding as well?

22   A.  That there was a period of time during which that was

23   permittable or legal, yes.

24   Q.  Yes.  Okay.  And if such a substitution were issued, would

25   the sponsor have to reapply for the substituted person or they

1    would just substitute the one name for the other?

2    A.  I don't know the mechanics of how the substitution process

3    worked.

4    Q.  Did you ever see in the course of reviewing all the

5    documents in this case any kind of document that indicated that

6    a sponsor had consented to the substitution and authorized it?

7              MR. PASTORE:  Judge, are we talking about the labor

8    portion or the immigration portion or both?

9              MR. GREENFIELD:  Both.  I assume we're talking about

10   the labor portion.

11             THE COURT:  How do you just randomly substitute people

12   without establishing that the second person has the experience

13   letters to do the job?

14             MR. GREENFIELD:  That's what I'm asking the witness,

15   if she knows.

16             THE WITNESS:  Could you repeat the question, please.

17   Q.  My question to you was in the course of reviewing all the

18   documents that you did review in all of these files, did you

19   ever come across any document or letter or anything that

20   indicated that a particular sponsor had been advised of the

21   substitution of one alien for another and had approved it?

22             THE COURT:  The sponsor, you wouldn't advise the

23   sponsor.

24             MR. GREENFIELD:  Really that's what I think, but I'm

25   trying to establish from this witness that the sponsor had

1    nothing to do with the substitution.

2    Q.  Is that your understanding?

3          THE COURT:  No.  That makes -- I don't think that

4    makes sense, does it?  If the sponsor is the person who is

5    going to employ the worker, then it would seem to me just

6    abstractly that the sponsor would have to be the person to

7    agree that they were satisfied with worker two instead of

8    worker one, at least in the first instance.  And, secondly,

9    then the government should decide if worker two meets the

10   criteria for a sponsorship.

11         MR. GREENFIELD:  I agree.  I'm simply asking the

12   witness whether she's ever seen any government form, document,

13   or piece of paper that indicated that the sponsor wanted this

14   change to be made and had approved it.

15         THE COURT:  She doesn't work for the Department of

16   Labor.

17         MR. GREENFIELD:  No, but she looked at all the

18   documents she testified to in this case.  I'm simply asking her

19   whether she's seen any such document.  Maybe there is no such

20   document.  Maybe it's a letter or maybe I don't understand it

21   at all.  I don't know.  I'm just asking the witness if she's

22   ever seen such a document in connection with her review of the

23   documents in this case.

24         MR. PASTORE:  Your Honor has identified that on the

25   labor side it's one process.  On the I-140 side, it's the

1    sponsor who's submitting the document.  That's why I'm confused
2    as to what we're talking about.
3              THE COURT:  And the issue, the answer may be different
4    before the labor certification is granted and after it's
5    granted.  I don't know if she knows all of this.
6    Q.  Are you familiar with the immigration side as to when and
7    if a substitution was allowed under the law?
8    A.  No, I'm not.
9    Q.  What about the labor side, you said there was a time when
10   it was legal?
11   A.  Right, there was a time.  And it's my understanding that
12   the substitution actually occurred on the immigration side
13   because immigration is actually the agency that's going to
14   grant a benefit or grant work authorization.  The Department of
15   Labor can't grant work authorization.  So there was a period of
16   time and I have seen in these A files where a letter was
17   written indicating that one alien was going to replace a
18   different alien.
19   Q.  So that would go to the immigration people or to the labor
20   people?
21   A.  To the immigration people.
22   Q.  Now, you testified to the fact, and I believe we
23   stipulated, I did on behalf of Mr. Tischler, that certain bank
24   records related to his company could be admitted into evidence.
25   Do you recall that?

D1VLCIB6                          Gordon - cross

1    A.  Yes.

2    Q.  And do you recall that those bank accounts were for Vintage

3    Builders, Fix Anything, and the third company, do you recall

4    those?

5    A.  I believe the third company was Vintage Partners.

6    Q.  Okay.  And you reviewed all of those bank records, the

7    statements and the checks; is that correct?

8    A.  I'm not sure if I reviewed all of them.  I'm sorry, are you

9    talking about checks that or statements that were admitted into

10   evidence?  Then yes.

11   Q.  Yes.

12   A.  Then yes.

13   Q.  In any of those statements, did you see an indication that

14   a check drawn on the YM Pollack account and alleged to be paid

15   to Mr. Tischler, he was listed as the paid, was negotiated,

16   that is, deposited into any of those Citibank accounts?

17   A.  No.  You're talking about looking at the back of one of

18   those YM Pollack checks to see if that amount is withdrawn on

19   that date from one of the Harold Tischler bank statements, no.

20   Q.  No, deposited into.

21   A.  Deposited into, no.

22   Q.  You've got a check that says pay to the order of Harold

23   Tischler $500, and it's drawn on a YM Pollack account -- you

24   saw those checks?

25   A.  Yes.

1  Q.  Now, forgetting about whose signature is on the back, did

2  you ever see a corresponding deposit into any of the Citibank

3  accounts that you subpoenaed and reviewed in connection with

4  those three companies?

5  A.  Not that I recall, no.

6  Q.  And did you ever see an endorsement, not signature, but the

7  bank stamp that correlated to any of Mr. Tischler's banks or

8  accounts?

9  A.  Not that I recall.

10         THE COURT:  Did you ever see a bank stamp from any of

11  Mr. Tischler's accounts where?

12         MR. GREENFIELD:  I'm sorry, that's what I said, I

13  misspoke.

14  Q.  What I intend to ask you, in all of these Pollack checks,

15  and, indeed, there was another check that Mr. Salamon said he

16  wrote to Mr. Tischler was listed as the payee for $3,500; do

17  you recall that?

18  A.  Yes.

19  Q.  As to any of those checks, on the back, there was what

20  purported to be a signature by Mr. Tischler, correct?

21  A.  Yes.

22  Q.  And you don't know whether it was his signature or not

23  because you can't identify his signature or pick it out; is

24  that right?

25  A.  You're correct.

D1VLCIB6                            Gordon - cross

1   Q.  Now, in addition to a signature that may have said Harold

2   Tischler, were there also stamps on the back of these checks,

3   you know, from the bank that it was deposited into or the bank

4   that paid the check?

5   A.  Yes.

6   Q.  Okay.  Were any of those stamps on the back of the check,

7   those endorsements stamps, were any of those any of

8   Mr. Tischler's Citibank accounts banks that you reviewed?

9   A.  Not that I recall.

10  Q.  You told Mr. Brill that as to the missing A files, you

11  don't know what's in them, that would be the same as to

12  Mr. Tischler as well, right?

13  A.  It would be, yes.

14  Q.  Are you familiar with a corporation known as -- withdrawn.

15          You're aware, are you not, that there came a time when

16  Leo Teitelbaum opened accounts -- withdrawn -- formed

17  corporation solely for the purpose of creating sponsors?

18          MR. PASTORE:  Hearsay.

19          THE COURT:  Sustained.

20  Q.  You're familiar with a corporation known as BSD?

21  A.  I've heard the name, yes.

22  Q.  Have you seen the name BSD on any of the I-140s or

23  application or other applications or documents in your review

24  of this case?

25  A.  On I-140s, no.  But I have on alien labor certifications.

D1VLCIB6                      Gordon - cross

1    Q.  And aside from what is indicated -- withdrawn.

2              What connection are you aware of between Mr. Tischler

3    and BSD?

4    A.  Mr. Tischler's name and address and phone numbers with

5    which he was associated, I believe, were on the alien, on alien

6    labor certifications.  I'd have to go back and look at them and

7    see if all of that is correct in all cases, but that's how it's

8    associated.

9    Q.  Did you also check New York State Department of State

10   records as to who formed BSD or anything such as that, as you

11   did with other corporations?

12   A.  I don't believe we have the records, that I have records

13   for BSD.

14   Q.  So other than information created by the law firm, you're

15   not aware of any external connection between Mr. Tischler and

16   BSD; is that right?

17   A.  I don't know who created the -- who submitted the labor

18   certifications, if that's what you mean.  But, no, external

19   connection, I do not.

20   Q.  Outside of something that you know was created one way or

21   another by the law firm, is there any other record not

22   associated with the law firm that indicates to you that Harold

23   Tischler had anything to do with BSD?

24             MR. PASTORE:  Objection.  Witness hasn't testified

25   that she knows the labor certs were prepared by the law firm.

D1VLCIB6                        Gordon - cross

1    Q.  Other than what's contained in the A files and the law firm

2    files -- which you've reviewed all of them, right, both of

3    those categories?

4    A.  All that I've had access to, yes.

5    Q.  Okay -- are you aware of any other connection that links

6    BSD to Harold Tischler?

7    A.  Not that I can think of right now, no.

8    Q.  For example, a record of the New York State Department of

9    State indicating that he formed the corporation, filed the

10   corporation, that the address for the corporation was his,

11   you're not aware of anything that links those two; is that

12   right?

13   A.  Not that I remember right now, no.

14   Q.  And you could easily have obtained that record if you chose

15   to, correct, just as you obtained other records, correct?

16   A.  Requested it, yes.

17   Q.  Now, I ask you the same question for State to State.  Have

18   you seen the name State to State linked with Mr. Tischler

19   anywhere other than on A files or law firm files?

20   A.  No.  Or, obviously, I'm sorry, that includes Department of

21   Labor files, yes?

22   Q.  Right.  Anything -- what I'm looking for is some

23   information that would indicate to us that other than something

24   that was generated through this alien application process that

25   emanated from this law firm, anything that would link

1    Mr. Tischler so we could say he knew about that corporation or

2    he formed that corporation or listed his address or his name as

3    the place for it to be served with process or that he filed it,

4    you haven't seen anything of that, right, you're not aware of

5    anything?

6    A.  For those companies, no, as opposed to the other companies

7    where there are phone records and bank statements.  For those

8    two companies that you just mentioned, no, no external

9    documents that I remember.

10   Q.  But you testified to those companies on direct just as you

11   did to the other companies, correct?

12   A.  To what I knew about all of the companies, yes.

13   Q.  Yes.  The Citibank records that you looked at, did they

14   indicate to you that these were active accounts that were, you

15   know, receiving funds and writing checks on a regular basis?

16   A.  I believe so.  I'd like to look at them again.

17            MR. GREENFIELD:  207, I believe, 208, 209 and 214.

18   Q.  I'm going to show you Government Exhibits 207, 209, and

19   207-1.  Those are three separate accounts?

20   A.  Yes.

21   Q.  You have part of 208, all of 209, and here's Exhibit 210.

22   A.  Thank you.

23   Q.  My question to you is broad, and you don't really need to

24   examine them completely unless you want to, but those are

25   active account, right?

D1VLCIB6                          Gordon - cross

1           You testified to a check that paid a phone bill out of

2     those accounts, right?  Right on top.

3     A.   207, the Exhibit 207 is a copy of a check made payable to

4     Verizon, yes.

5     Q.   You testified yesterday about some other account that you

6     had subpoenaed the records for for some business and the only

7     activity was the $1 a month that the bank took out; do you

8     recall that?

9     A.   I do.

10    Q.   Do these accounts fall into that category in your mind or

11    are those active accounts?

12    A.   They appear to be active accounts.  I mean I only have --

13    only Exhibit 201 includes statements.  The rest of the

14    exhibits, 207 has one page of a statement.  207-1 appears to be

15    an active account.  209 and 210 are just copies of checks for

16    an undetermined period of time.  What I'm looking at, there is

17    activity, yes.

18           (Continued on next page)

19

20

21

22

23

24

25

D1v1cib7                          Gordon - cross

1    BY MR. GREENFIELD:

2    Q.  So you didn't -- did you come across anything that

3    indicated to you that these accounts were sham accounts that

4    were associated with a nonactive business or personal account?

5    A.  No.

6    Q.  I'll take that back.

7         Let me show you an exhibit, HT -- Defendant's HT9.

8    Defendant's HT9.  Take a look at that.  There's five separate

9    photographs.  Tell me if you recognize what they are, or what

10   they depict.

11   A.  They depict the outside of 5318 16th Avenue.

12   Q.  That's a place that you've been on how many occasions?

13   A.  I believe only once.

14   Q.  Ah, okay.  And did you testify that you saw Mr. Tischler

15   there on the occasion that you were there?

16   A.  Yes, I believe that's the location at which I served him

17   with a subpoena.

18   Q.  Ah, okay.  So you actually entered into the premises?

19   A.  Yes.

20   Q.  And what did you observe when you entered?  Was it a single

21   business office or more than one business office?

22   A.  I'm not sure.  There was a receptionist in the front and we

23   asked to speak to Mr. Tischler, and she called him, and he came

24   up front from somewhere in the back, but I didn't really see

25   much of the inside.

D1v1cib7                        Gordon - cross

1   Q.  Okay.

2              MR. PASTORE:  We have no objection to these being

3   entered.

4              MR. GREENFIELD:  Oh, I'm sorry.  I move them into

5   evidence.  Thank you.

6              THE COURT:  Received.

7              (Defendant's Exhibit HT9 received in evidence).

8   Q.  Do you see -- can you read the sign above 5318-A.  Maybe

9   you can read it on the screen in front of you.

10             (Counsel conferring)

11             MR. GREENFIELD:  I'm going to take it down and ask

12  instead for us to see Government's Exhibit 51, which is a

13  better picture than what I was just showing you.

14             (Counsel conferring)

15  Q.  Do you see the sign that says Vintage Builders?

16  A.  Yes.

17  Q.  Okay.  Do you see to the left there's some indication that

18  there's a law firm there in Suite 104?

19  A.  The sign says the legal firm, Suite 104, yes.

20  Q.  Do you see the sign that says Office Space for Rent?

21  A.  Yes.

22  Q.  You see the address, of course, 5318 16th Avenue?

23  A.  Yes.

24  Q.  Did you ever do any search to determine who the owner of

25  5318 16th Avenue is?

D1v1cib7                          Gordon - cross

1    A.  No.

2    Q.  Did you do a search to see who owns the -- withdrawn.

3          MR. GREENFIELD:  Can you -- you see where it says

4    Office Space for Rent on the lower left?  Can you just isolate

5    that, make that bigger.

6    Q.  Okay.  Can you read the two phone numbers under Office

7    Space for Rent?

8    A.  Sorry.  I really can't.

9    Q.  Okay.  I'm going to show you HT9, one of the pages, and ask

10   you if that helps you read them.

11   A.  Yes.

12   Q.  What are the numbers?

13   A.  718-871-0382 and 718-288-7844.

14   Q.  Do you know from your work in this case to whom those

15   numbers relate, or connect to?

16   A.  I believe they both connect to Mr. Tischler.

17          MR. GREENFIELD:  May I have just a moment, your Honor.

18   I believe I'm finished.

19          (Pause)

20          MR. GREENFIELD:  No further questions.  Thank you,

21   ma'am.

22          MR. DONALDSON:  How much time do I have?

23          THE COURT:  Just get started.

24

25

D1v1cib7                          Gordon - cross

1    CROSS-EXAMINATION

2    BY MR. DONALDSON:

3    Q.  Good afternoon.  Good late afternoon.

4    A.  Good afternoon.

5    Q.  I'm going to try to get to the point quickly.  It's been a

6    long day.

7               Very quickly, you spoke about handwriting twice.  You

8    said you -- well, you -- you didn't tell us what a handwriting

9    exemplar is, what the purpose of it is.  If you could just say

10   briefly what that is, what the purpose of it is, very briefly,

11   then I'll go on to another question.

12   A.  Briefly, it's a document -- the document that I use has

13   several different fields, makes -- requires someone to print

14   script, different letters, different capitals, small letters,

15   and it's used then for submission to a lab with another

16   original document for the lab to determine if the signature --

17   if something was written by the person who's the subject of the

18   investigation.

19   Q.  Okay.  Forgive me if I go fast.  I'm sorry.

20               You interviewed Mr. Altintas; correct?

21   A.  Yes.

22   Q.  And you interviewed him on January the 9th, 2013; that

23   would be correct?

24   A.  That sounds right.

25   Q.  If you recall, based on that interview, did Mr. Altintas

1    tell you that every time he went to the David office he paid

2    500, $600?

3    A.  He may have.

4    Q.  Can I show you your notes on that date to refresh your

5    recollection?

6    A.  Yes, please.

7            MR. DONALDSON:  I'm showing the witness January 9th,

8    2013 notes, page 9.

9    Q.  Yeah, does it refresh your recollection?

10   A.  Yes, it does.

11   Q.  Okay.  After reading that, does that refresh your

12   recollection as to whether or not Mr. Altintas -- excuse me for

13   running -- said he paid Ms. Gulay 500 to $600 every time he

14   won't to see her?

15   A.  Yes, that's what it says.

16   Q.  Is that what he told you?

17   A.  Yes.

18   Q.  You're not misquoting what he said?

19   A.  I don't believe so.  That's what I believe that he said.

20   Q.  Okay.  Now you also spoke to a Mr. Grynsztajn; correct?

21   A.  Yes.  On which occasion?

22   Q.  On the -- I believe the first occasion, January of 2006,

23   you spoke to him about this particular investigation; correct?

24   A.  Yes.

25   Q.  And I believe that you asked him whether or not he had any

D1v1cib7                         Gordon - cross

1    information on persons who needed to file taxes, legally or

2    illegally?  Do you recall that question, something like that?

3    A.  Regarding asking him about people who created fake tax

4    returns for submission to USCIS at all?  Yes, I do remember

5    that.

6    Q.  And is it true he told you he had no idea about that kind

7    of information?

8    A.  At the first meeting, January 23rd, 2006, yes, that's

9    what he said.

10   Q.  You're not misquoting him?

11   A.  No.

12   Q.  You're sure?

13   A.  I'm sure.

14   Q.  One second.  I'm almost there.

15          Again, you -- in your interviewing of Mr. Altintas,

16   you also interviewed him on January 16th, 2013; correct?

17   A.  That sounds right.

18   Q.  And on that date, is it true that Mr. Altintas told you

19   that Ms. Gulay found a sponsor for Ozkan, his cousin?

20   A.  I don't remember if he said that she found a sponsor

21   specifically for Ozkan.  I know other things that he said.

22   Q.  May I approach to refresh your recollection?

23   A.  Yes, you may.

24          MR. DONALDSON:  I mean -- sorry.  May I approach the

25   witness?

D1v1cib7                              Gordon - cross

1                   THE COURT:  Yes, yes.

2   Q.  You look very judicial up there right now.

3                   I'm sorry.  I'm rushing.

4                   Showing you what's January 16th, 2013, page --

5   second to last page.

6   A.  Yes.

7   Q.  Does that refresh your recollection as to whether or not

8   Mr. Altintas told you that he -- that Ms. Cibik found Ozkan a

9   sponsor as well?

10  A.  Yes.

11  Q.  Did he tell you that?

12  A.  Yes.

13  Q.  Are you sure?

14  A.  Yes.

15  Q.  You're not misquoting?

16  A.  Not misquoting, no, and it's my belief that he said that

17  and I wrote it down.

18  Q.  One second.

19                  You -- in your interviews of Mr. Grynsztajn, you may

20  have interviewed him over 15 times?

21  A.  Yes.

22  Q.  Over 20 times?

23  A.  I would estimate between 15 and 20 times.

24  Q.  You interviewed him regarding payments being picked up

25  from -- or by Rafi.  Do you recall talking about that?

1  A.  At some of the interviews, yes.

2  Q.  Isn't it true that Mr. -- speaking about Ms. Cibik and

3  picking up -- or picking up payments, is it not true that

4  Mr. Grynsztajn informed you that Ms. Cibik possibly gave Rafi

5  money?

6  A.  That's possible.

7          MR. DONALDSON:  One second.

8          (Counsel conferring)

9  A.  I believe that's correct.  If the question is whether or

10  not he actually saw it, I believe he didn't remember actually

11  seeing it but thought it was possible, but if --

12  Q.  I'll go with that.  I'll go with that.  You're not

13  misquoting him in telling you that?

14  A.  No.

15  Q.  He did not say he actually saw it, he said it's possible?

16  A.  That's what I -- that's what I remember.

17          MR. DONALDSON:  If I can have one second, your Honor.

18          (Pause)

19  Q.  You were testifying about some checks a minute ago.  Page

20  63, page 66, page 69, you were talking about deposits.  Do you

21  recall making those statements?

22  A.  Yes.

23  Q.  And I believe on page 63 you said deposit was 11,000 for

24  the month of September 2005.  Now the withdrawals for that same

25  month was approximately the same; correct?

D1v1cib7                          Gordon - cross

1    A.   That sounds about right.   I mean, I --

2    Q.   Would it be fair to say on each one of those months that

3    you mentioned, the ending balance of those -- well, strike

4    that.

5               On --

6               MR. DONALDSON:   Never mind.   I have no further

7    questions, your Honor.

8               MR. GERZOG:   Just a couple, your Honor.

9    CROSS-EXAMINATION

10   BY MR. GERZOG:

11   Q.   You testified about Government's Exhibit 404 and

12   Government's Exhibit 405.   404 is the 2006 tax return of the

13   Brodjiks, 405 is the 2007 tax return of the Brodjiks; correct?

14   A.   Yes.

15   Q.   And on page 2 of 10 -- of Form 1040, it says Occupation,

16   and on both returns it says for Mr. Brodjik UE, unemployed;

17   correct?

18   A.   Yes.

19   Q.   And then it also has a Schedule C, which is income from

20   business, from a self-employment; right?

21   A.   That sounds right.

22   Q.   And they both -- and for both 2006 and 2007 it says

23   computer repair; right?

24   A.   That sounds right.

25   Q.   Okay.   And when you said you found immigration-related

D1v1cib7                          Gordon - cross

1    documents in these boxes at Mr. Brodjik's house, you didn't

2    mean to suggest that you found government documents.  You found

3    photocopies of documents; right?

4    A.  I can't say whether there are originals or photocopies.

5    There are original documents in those boxes.

6    Q.  There are documents belonging to the government in those

7    boxes?

8    A.  Documents belonging to the government as an immigration

9    form?

10   Q.  Yes.  In other words, documents that had been submitted to

11   the government.

12               MR. PASTORE:  I object.  It's confusing.

13               THE COURT:  Yes.  Do you --

14   Q.  Well, it might be an original that never got filed, but

15   there's no originals -- you're not accusing Mr. Brodjik of

16   stealing government documents or having in his possession

17   government documents, are you?

18               MR. PASTORE:  Objection to government documents.  We

19   can -- I'll just say objection to government documents.

20   Q.  Documents that have been submitted to the government, those

21   are not in those boxes; right?

22               THE COURT:  In other words, whether documents in those

23   boxes that at one time in the past had been submitted to the

24   government and should still have been in government files?

25               MR. GERZOG:  Correct.  Exactly correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1v1cib7                          Gordon - cross

1    A.  Oh, no, I'm not saying that.

2    Q.  Okay.  Now an A file is a file that is established the

3    first time that an alien has contact with the immigration

4    service; correct?

5    A.  Correct.

6    Q.  And that follows that person throughout their life, so if

7    they get a visa at one point and then they get a special visa

8    and then they get naturalized, all that stuff goes into their A

9    file; right?

10   A.  Theoretically, yes.  In a perfect world, yes.

11   Q.  And you said that there was some A files that you were not

12   able to actually physically locate; correct?

13   A.  Correct.

14   Q.  Were -- are any of those A files A files related to the

15   Brodjiks?

16   A.  Related to Refeal and Rachel Brodjik themselves in their

17   own applications, no.

18   Q.  To the Brodjiks.

19   A.  No.

20   Q.  That's not what I asked you.  I asked you if you were not

21   able to locate A files related to the Brodjik family.

22   A.  Related to the Brodjik family, no.

23   Q.  No, you were?  I'm sorry.

24   A.  I was able to locate the files related to the Brodjik

25   family.

D1v1cib7                    Gordon – cross

1   Q.  You located all the A files related to the Brodjik family.

2   A.  Correct.

3   Q.  Okay.  Now you said that you found every e-mail at the

4   Brodjik house; correct?

5   A.  No, I didn't say I found every e-mail at the Brodjik house.

6   I'm not sure what you mean by that.

7   Q.  Well, didn't Mr. Pastore ask you if every e-mail that's

8   been admitted into evidence was found at the Brodjik house?

9            MR. PASTORE:  No.  Objection.

10           THE COURT:  He didn't ask that.

11           MR. GERZOG:  All right.

12  Q.  Do you happen to know if Government's Exhibit 3607 was

13  found at the Brodjik house?

14  A.  No.  I'd need to see Government Exhibit --

15           MR. GERZOG:  Can you put it up quickly.

16           THE COURT:  Wasn't your question directed to a

17  particular group of documents, or am I losing my mind?

18           MR. PASTORE:  Yes, your Honor.  For the record, it's

19  Government's Exhibit 3031-1 through 3031-10, which are actually

20  color exhibits, and so the 3600 series, which -- and again,

21  this is all in evidence.  That was introduced through Agent

22  Mirandona as things that were taken off of the computer F1 at

23  the law office.

24           MR. GERZOG:  But then he compared those documents that

25  were found at the Brodjiks to other documents, to other e-mails

D1v1cib7                    Gordon - cross

1   that were introduced into evidence.

2           We can just clear it up very quickly.  Would you

3   please put up 3607.

4   Q.  You didn't find this e-mail at the Brodjik house, did you?

5           MR. PASTORE:  Objection as to "this e-mail."  Was

6   Government's 3607 found at the house?  Is that the question

7   that's intended?

8           MR. GERZOG:  That's the question.

9           THE COURT:  If you know.

10  A.  I don't believe -- I don't think so.  If it was, it would

11  be contained in that exhibit that has the color copy of hard

12  copy e-mails that were found at the Brodjik residence.

13  Q.  And if it's not in there, it wasn't found at the Brodjik

14  house; correct?

15  A.  Correct.

16  Q.  Okay.  Now you know that Rafi Brodjik got his green card by

17  being the husband of Rachel Brodjik; correct?

18  A.  You mean riding along with her application, basically?

19  Q.  Yes.

20  A.  Yes.

21  Q.  In other words, it was Rachel Brodjik who applied for the

22  labor authorization or the labor permit or whatever it's

23  called, not Rafi Brodjik; correct?

24  A.  That's correct.

25  Q.  Okay.  And you -- were you present for the arrest of Sam

D1v1cib7                          Gordon - cross

1    Salamon?

2    A.  Yes, I was.

3    Q.  And did you put a lot of pressure on -- or did you put

4    pressure on Sam Salamon to cooperate with you?

5          MR. PASTORE:  Objection.

6          MR. GERZOG:  I withdrew a lot of.

7    Q.  Did you put pressure on Sam Salamon to cooperate with you?

8          Well, showing you what's been given to me by the

9    government as --

10         THE COURT:  Just put it more neutrally.  Did you

11   encourage him to cooperate?

12   Q.  -- Government Exhibit -- Government Exhibit 3502-2.  Did

13   you tell Sam Salamon that while he may not have been the

14   mastermind of the fraud scheme since his involvement was at a

15   very high level, it was in his best interest to cooperate with

16   the investigation?

17   A.  Yes.

18   Q.  And did he tell you he wanted to speak to his lawyer first?

19         MR. PASTORE:  Objection.

20         THE COURT:  No.  That's okay.

21   A.  Mr. Salamon did say that he wanted to speak with a lawyer,

22   at which point no other questions were asked of him, except for

23   how to -- I believe how to secure his residence.

24   Q.  And in fact, you said, "Okay, then don't say -- don't

25   answer any questions now," but then you said again, "But we

D1v1cib7                        Gordon - cross

1    really want to talk to you at some point"; right?

2    A.  Quite possible.

3    Q.  Now, finally, you were here when Mr. Salamon testified;

4    correct?

5    A.  For part of it, yes.

6    Q.  Okay.  You heard Mr. Salamon, when I -- you heard me ask

7    Mr. Salamon whether he acknowledged to you that the original

8    1999 work application he signed was fraudulent or not; correct?

9    A.  I'm not sure if I was here for that part of the testimony.

10   Q.  All right.  Mr. Salamon -- did Mr. Salamon say to you,

11   Earl -- referencing 25 -- 3502-22 -- "In or about 1999 Earl

12   David paid Salamon $350 for each of two applications that

13   Salamon signed.  The applications falsely indicated that United

14   Photocopy was looking to sponsor aliens for employment."  You

15   wrote that because Mr. Salamon said that; right?

16   A.  That sounds right, yes.

17   Q.  You didn't misquote him, did you?

18   A.  I don't believe so, no.

19        MR. GERZOG:  No further questions.

20        THE COURT:  Well, you know that old expression about

21   the best laid plans of mice and men?  Things don't quite always

22   work out.  I hope we'd make more progress but tomorrow we can.

23        Whoops.  I'm sorry.  You get to have a redirect.  Go

24   ahead.  I'm sorry.  Don't feel any pressure.

25        MR. PASTORE:  Your Honor, it's going to be very, very

D1v1cib7                         Gordon - redirect

 1  brief.

 2              There was a stipulation entered into in the last two

 3  minutes between defense counsel and the government.

 4              MR. BRILL:  Judge, can I just confer with the lawyers

 5  as to exactly what they're going to say.  We were whispering

 6  from table to table.

 7              (Counsel conferring)

 8              MR. BRILL:  No problem.  Thank you.

 9              MR. PASTORE:  It's -- there is no formal stipulation

10  other than stipulated by and between the government and defense

11  counsel that Government's 325 is a business record of the

12  Department of Labor and can be admitted as such.  And

13  Government Exhibit 325, which we now offer.

14              THE COURT:  Received.

15              (Government's Exhibit 325 received in evidence)

16              MR. PASTORE:  I'm going to hand it to the witness,

17  since she's never seen it before.

18  REDIRECT EXAMINATION

19  BY MR. PASTORE:

20  Q.  If you could just take a look at that and tell the jury

21  what it says at the top.

22  A.   United -- U.S. Department of Labor, DOL Wide Employee

23  Alphabetic Listing.

24              MR. PASTORE:  Okay.  And then I'm going to display it

25  on the overhead so that the jury can now see it.

D1v1cib7                          Gordon – redirect

1   Q.  I'll ask you to look at the highlighted line.

2          First, is that what you were just reading, the

3   highlighted line up there where it says U.S. Department of

4   Labor DOL Wide Employee Alphabetical Listing that's

5   highlighted?

6   A.  Yes.

7   Q.  And what is that name that's highlighted there?

8   A.  Sabrina Solomon.

9   Q.  And how is Solomon spelled on this document?

10  A.  S-O-L-O-M-O-N.

11  Q.  Do you remember being asked about business records -- I'm

12  sorry -- tax records for Vintage Builders and you were shown

13  tax records for Vintage Builders?

14  A.  Yes.

15  Q.  Do you know whether there were tax records for Vintage

16  Partners?

17  A.  I don't remember.

18          MR. BRILL:  Can we take that down.

19          MR. PASTORE:  Oh, and your Honor, just --

20  Q.  If the witness can read where this particular individual

21  Sabrina Solomon worked.

22  A.  Atlanta Foreign Labor Certification Immigration Program

23  Analyst.

24  Q.  Okay.  I'm handing the witness what's been admitted as

25  Stipulation S5, and if you could just read it to yourself

1    paragraph 2, first couple of lines there.

2              And then once you read stipulation S5, if you could

3    tell us whether there were any tax records for Mr. Tischler's

4    company Vintage Partners filed from 2003 through 2012.

5    A.   No records were found.

6              (Counsel conferring)

7    Q.   That's New York State Department of Taxation, that's wage

8    records; correct?

9    A.   Yes.

10   Q.   So no wages were reported for Vintage Partners -- there was

11   no record of wages for Vintage Partners being reported to the

12   New York State Department of Taxation and Finance; correct?

13   A.   That's correct.

14   Q.   Okay.  When you reviewed the phone records for

15   845-721-7455, that phone number we were discussing associated

16   with Mr. Schwartz -- do you remember that?

17   A.   Yes.

18   Q.   Did you review the toll records for 2008?

19   A.   I believe so.

20   Q.   Do you recall approximately how many calls there were

21   between that phone number and Leo Teitelbaum's phone number in

22   2008?

23   A.   There were approximately 30 phone calls, a little over 30

24   phone calls for the calendar year of 2008.

25             MR. PASTORE:  Your Honor, may I have a moment.

1              (Pause)

2    Q.  I'm just going to display on the overhead for you what's

3    previously been admitted as NS1, and we're going to focus in

4    where it says, "Final review completed by S. Solomon,"

5    S-O-L-O-M-O-N.  Are you familiar with how Sam Salamon spells

6    his last name, Salamon?

7    A.  Yes.  S-A-L-A-M-O-N.

8              MR. PASTORE:  Nothing further.  Thank you.

9    RECROSS EXAMINATION

10   BY MR. BRILL:

11   Q.  Agent Gordon, have you ever seen Sam Salamon spell his name

12   the same as this?

13   A.  I've seen variations of his name.  I don't know that I've

14   seen Mr. Salamon spell his name differently than that way that

15   I just spelled it.

16   Q.  So you don't recall if, in any of the other records you

17   reviewed, Mr. Salamon spelled his name in this way?

18   A.  I don't.

19             MR. PASTORE:  One more question, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. PASTORE:

22   Q.  303-1 through 303-10 *[sic]*, and I think I may have

23   neglected actually to admit 303-10 earlier.  But can you just

24   clarify for the jury, what are Government's 3031-1 through

25   3031-10?

1   A.   These are hard copies of e-mails that were found in Rafi

2   Brodjik's house.

3   Q.   And how do you recognize them as compared to Government

4   3600 that was shown?  How do you recognize these as the e-mails

5   recovered from the defendant's home?

6   A.   The typeface and they're in color.

7              MR. PASTORE:  Thank you, your Honor.

8              THE COURT:  Okay.  Thank you.

9              (Witness excused)

10             THE COURT:  All right.  Thank you to the jury for your

11  patience.  Okay.  Tomorrow we are actually going to get to

12  summations.  Remember that we can't stay past 2:30 tomorrow,

13  and there's one juror who has gone to exceptional lengths to be

14  able to be with us on Monday.  I will be able to take care of

15  the cost, okay?

16             And remember to keep an open mind.  Don't talk about

17  the case.

18             And let's try to get started promptly at 9 tomorrow so

19  we can make a lot of good progress.

20             (Jury excused)

21             (One juror present)

22             THE COURT:  Okay.  This is the juror we lose.  We lose

23  this juror because of her vacation.  So she's asked if she

24  could be excused today.  I think that's fine.  We thank you

25  really a lot, and we wish you a wonderful vacation, and we all

D1v1cib7

1   wish we were going with you.

2              JUROR:  Thank you.

3              (Juror discharged)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1v1cib7

1              (In open court; jury not present)

2              THE COURT:  Okay.  Many days ago I asked you for your

3      estimated summation times.  Given your wonderful track record

4      since then, I have gone back.  I have them.  I'm holding you to

5      them.  The government asked for a total of two and a half

6      hours.  As I say, you can use your time any way you like, but I

7      would expect that tomorrow that we will have the government sum

8      up and then break, on the theory that you're likely to use two

9      hours of your time, but if I'm wrong, we can move on to a

10     defense summation.

11             Mr. Donaldson asked for 45 minutes to an hour.  Do you

12     think you're closer to 45 now or --

13             MR. DONALDSON:  I've been streamlining too.  I -- I

14     can try.

15             THE COURT:  You get no more than an hour.

16             Same for Mr. Brill.  He gave me 45 to an hour.

17             Mr. Greenfield asked for half an hour to 45 minutes.

18             MR. GREENFIELD:  Well --

19             THE COURT:  That's what you asked for, sir.

20             MR. GREENFIELD:  I understand that.  So I would say I

21     would be less than an hour, probably around 45 minutes, but I

22     certainly don't want to be held to a half an hour.  I don't

23     know what I had in mind at that time.  I don't speak long.  I'm

24     not one of these guys who gives -- I'm not going to read the

25     phone book.  I'm going to be -- it's succinct, it's organized,

D1v1cib7

1    but I would say probably somewhere around 45 minutes.

2                THE COURT:  You can have the 45 you asked for, okay?

3                Now, Mr. Gerzog, you were covering yourself.  You

4    tried to reserve yourself an hour and a half but you said you

5    wouldn't take that much time.  Where are you currently at?

6                MR. GERZOG:  I'm currently thinking exactly the same

7    thing, that I need to reserve an hour and a half because it's

8    possible that it would take an hour and a half, but especially

9    given how long we've kept the jury, I will do my utmost to make

10   it less than that.

11               THE COURT:  So here's what we're going to do.  We're

12   going to start in the morning with the government.  If for some

13   reason they go less than they think, we can start a defense

14   summation.  If not, we'll try to do a break and then do as many

15   defense summations as we can get in before 2:30.  We still have

16   a full, you know, over two and a half hours, depending on

17   exactly how it works.  So let's assume the government ends at

18   11, we hold them to a short break, we have close to three

19   hours.

20               MR. BRILL:  So we would break at 11.

21               THE COURT:  Yeah, if we can break at 11, that's what I

22   would like.

23               MR. BRILL:  Whenever the government's done.

24               THE COURT:  Whenever the government's done, and since

25   we'll give them a little less time, because they really won't

D1v1cib7

1     need as much time because you'll be so scintillating, I'm sure

2     that you'll just keep them awake and, you know, it's a change

3     of pace.  It's not just documents coming in, which is hard.

4     And we'll get as far as we can, and it may wind up being that

5     Mr. Gerzog starts on Monday morning.  And I'm sorry if you're a

6     football fan, but that's the way it goes.

7              MR. GREENFIELD:  Oh, is there a game on that night?

8              MR. GERZOG:  I've been ready to sum up for about a

9     week, Judge, so that's not going to bother me.

10             THE COURT:  Well, I'm glad.  No, I don't think there's

11    a game.  But there's always a party.  I don't care about the

12    game.

13             MR. GUTMAN:  I just wanted to ask, in an abundance of

14    caution, for a clarification about the -- that I think was

15    implicit in the -- your Honor's proposed instruction about

16    limiting what the jury can consider to what the government will

17    sum up on.  I'm assuming that means that the government is not

18    going to sum up or will not be permitted to sum up on the

19    theory of any crime of -- Mr. Brodjik being guilty of any crime

20    other than ones charged in the indictment.

21             THE COURT:  No.  No.  Let me say that, with even a

22    little more reflection on it, that it cannot be the law that if

23    the question is, "Have you committed a crime for which you have

24    not been arrested?" and you say no, that that cannot be false

25    unless you're subsequently indicted and convicted beyond a

D1v1cib7

reasonable doubt, because that is totally ultimately illogical,
and so to the extent that I entertained that, I shouldn't have.
So, no.

          But I did think that you made a good point that in the
course of the trial that jurors could have heard testimony and
started to reach their own conclusions about other crimes, and
that would be wrong, because what would then happen is we have,
in a sense, no idea of the basis of their decision, so if we
limit it to what the government says, then we know what they
picked from, and if your position is that as a matter of law it
isn't sufficient, it's at least preserved.

          MR. GERZOG:  Judge, the only thing I have to say about
that is that if Mr. Pastore were to get up and say, for
example:  Mr. Brodjik committed these crimes, you heard Sam
Salamon say he extorted him, you see the tax returns in which
he claims to have been unemployed but we know he was employed,
then your Honor's going to have to charge whether those --
whether those are crimes and what the elements of those crimes
are and so forth.  The jury can't guess, when they're filling
in, whether writing UE where it says occupation is illegal or
tax fraud or anything else, and frankly, I don't think it is.
But if he intends to suggest that that's one of the crimes
Mr. Brodjik committed, your Honor will have to explain to --
will have to get into -- give them the law on whatever crimes
he suggests to them he may have committed.

D1v1cib7

1          MR. PASTORE:  Let me make it very -- we only intend to

2     argue the immigration fraud, which hopefully was clear.  But --

3     as far as the crimes.

4          The issue -- the issue with the false statements gets

5     a little complicated because the tax returns, there is a

6     specific question on there, "Do you owe any federal taxes?"

7     And to the extent that he failed to report his income from the

8     law firm, which he clearly did --

9          MR. GERZOG:  There's no evidence of that at all.

10    There's -- he may have failed to -- or he may have misdescribed

11    it, that's possible, I don't know, but there's no evidence that

12    he actually did not include his income from the law firm.  If

13    he said he got -- if he said the income was from being a

14    computer repairman but in fact it's from the law firm, that

15    doesn't make him guilty of income tax evasion.

16          THE COURT:  Well, every one of these arguments that

17    you make puts the government on notice of what they should be

18    careful about.

19          MR. GERZOG:  Finally, Judge, there's one thing -- and

20    I know we're here all a long time, but there's one thing I need

21    to ask you or speak to you about with the government and

22    without -- not when Agent Gordon is present.  So either we can

23    come up --

24          THE COURT:  We can just ask Agent Gordon to step out

25    for a minute.

D1v1cib7

1          MR. GERZOG:  If you don't mind.

2          (Agent Gordon excused from the courtroom)

3          MR. GERZOG:  Before we started out, I asked

Mr. Pastore that -- for permission to ask Agent Gordon a

question, which he gave me.  I asked Agent Gordon if some of

the missing A files were the Brodjik family files, and she told

me that they were.  Now she testified on the stand that they

aren't.  I'm not -- I'm not trying to get into a fight about --

about -- maybe I misunderstood.  That's fine.  I'd just like to

know, one way or the other, does the government have the

Brodjik family A files?

12         MR. PASTORE:  I really -- so I don't know how to

answer that question.  I didn't hear what Agent Gordon said to

Mr. Gerzog.  As far as I know, I have all of the relevant alien

files for Refeal Brodjik and Rachel Brodjik.

16         Oh, you know what?  There might be confusion if he was

asking about the children's files.  That may --

18         MR. GERZOG:  Well, I said the family.

19         MR. PASTORE:  Okay.  So that may -- I have no idea.

Again, I was not present for --

21         MR. GERZOG:  Could I ask the government to check with

Agent Gordon and report back in the morning as to what they

have and what they don't have?  Again, I'm not going to -- I'm

not seeking to put Agent Gordon back on the stand.  I just want

the jury to have the right impression as to what's going on.

D1v1cib7

1    If they don't have the children's A files, big deal.  If they

2    have -- if the A files -- if they have the parents' A files,

3    then fine.  If they have them.  If they don't have them, I'd

4    like the jury to know that.

5         THE COURT:  Well --

6         MR. GERZOG:  Because what that means is that they used

7    the files found at Mr. Brodjik's home as exhibits.

8         MR. PASTORE:  Oh, no, your Honor.  We made the

9    entire -- okay.  We made the entire A file available for

10   inspection for both Refeal Brodjik and Rachel Brodjik, as well

11   as the T file that we located for Mr. Brodjik.  That's been

12   available for inspection in the hard copy form both prior to

13   the trial, and it's been here the entire time.

14        MR. GERZOG:  Well, then, so why didn't you just say

15   yes, we have it, here it is?  Do you have the A files for

16   Mr. and Mrs. Brodjik?

17        (Counsel conferring)

18        MR. GERZOG:  In any event, I'm not trying to embarrass

19   her or accuse her of perjury.  I just simply want to know as a

20   matter of fact --

21        THE COURT:  I mean, to cut through all of this,

22   whether or not the Brodjik files were someplace else because

23   they were the subject of an investigation, I'm pretty confident

24   the US Attorney's Office could get them back, given that he is

25   a defendant in this case, unlike the situation where she was

D1v1cib7

1    not going to pull everything --

2            MR. GERZOG:  They've had seven years to do it.  If

3    they don't have it --

4            THE COURT:  They have it.  So whether or not --

5            MR. GERZOG:  Well, that's all I wanted to know.

6            THE COURT:  Well, but the point is --

7            MR. GERZOG:  That's all I wanted to know.  The

8    originals -- I want to make sure they have the originals.

9    That's all I asked.  If the answer is yes, the answer is yes.

10   It's that simple.

11           THE COURT:  Well, my only point, that she said that at

12   some point, that files that could be in litigation, files that

13   could be in deportation proceedings, files -- and there was a

14   third, I just don't remember it -- might have been things that

15   she couldn't generally have gotten her hands on.

16           MR. GERZOG:  Right.

17           THE COURT:  My only point is, regardless of where the

18   Brodjik files were, I'm confident that they can get their hands

19   on them.

20           MR. GERZOG:  They probably could.

21           THE COURT:  And they did, apparently.

22           MR. GERZOG:  And that's not the point.  The point is

23   whether they did or not.  They tell me they do have them.

24           THE COURT:  You've been assured of that.

25           MR. PASTORE:  Because the record now is perhaps a

D1v1cib7

little muddy, let me be very clear.  Government Exhibit 400,

the 400 series, is the Rachel Brodjik actual A file.  There's

documents taken from that A file and only from that A file.

The entire A file has been in the courtroom and available for

inspection the entire time.

          Government Exhibit 410 is the N-400 application,

Mr. Brodjik's naturalization application.  It came out of a T

file in a green folder, also present in the courtroom

throughout trial.

          Government's 410-1 through 410-4 are actual documents

retrieved from Mr. Brodjik's A file, which, once again -- it's

the brown file -- that's also been available in the courtroom

every day during trial.  So --

          MR. GERZOG:  Fine.  That's all I wanted to know.

          THE COURT:  You want to make your Rule 29 motion?

          MR. GUTMAN:  Has the government rested?

          THE COURT:  They're exhausted, beyond rested.

          MR. PASTORE:  The government does rest.

          MR. GERZOG:  Sure.  I mean, no point putting form over

substance.

          THE COURT:  Do you want to say something?

          MR. GERZOG:  Mr. Gutman is going to take care of that

for us.

          MR. GUTMAN:  We move for judgment of acquittal

pursuant to Rule 29.  I think -- going backwards, I think that

D1v1cib7

1   with regard to the Count Four, I think the government has not

2   met its burden of showing statements that under any reasonable

3   interpretation are false and that the -- that meets that

4   definition.  I know there's -- a part of my argument is based

5   on a view of the law that may not -- doesn't appear to be the

6   court's as to the literal truth requirement.

7              THE COURT:  Look, the law clearly draws a distinction.

8   The cases in the Supreme Court draw a distinction between the

9   rules that are applicable when the issue is perjury in the

10  connection with relationship to testimony, where there's a

11  back-and-forth between the questioner and the witness, versus

12  false statements and even perjury in documents.  That's a

13  distinction.  What you're asking for is verbal exchange.

14  That's my point.  If I was not --

15             MR. GUTMAN:  I take the court's point.  I respectfully

16  would suggest that the distinction between a verbal question

17  and answer -- and actually, some of this is verbal because it's

18  taking place at an interview.

19             THE COURT:  But --

20             MR. GUTMAN:  But even on the written form, it's a

21  question and answer, and whether it was a deposition or a

22  interrogatory, I think those are all --

23             THE COURT:  The point is that the defendant here has

24  the questions in front of him, has the time to consider what

25  answers he wants to write, and it's not an interactive

D1v1cib7

experience with a questioner, and the witness who testified

about interviewing of him did not say that he ever challenged

him about anything.  He just asked him to confirm things, so it

didn't change the written answer.

MR. GUTMAN:  Well, again, I would address this further

after the government explains its theory, but in our view, a

question, "Did you commit a crime?" requires someone to make a

judgment about whether he had a criminal intent, and I think

that there is -- I know -- I know in my experience as a

criminal defense attorney, the question I get regularly from,

you know, all sorts of people, whether they're clients or

friends or relatives, is, "If I do this, would I be committing

a crime?"  And I often don't know the answer, and I do this for

a living.  I think the idea of knowing, in a way that you

could -- it could be considered a falsehood, whether what you

did was criminal, especially when, you know, you obviously take

the view that you did not act with criminal intent and you're

exercising your right to proceed to trial on that theory or

whatever theory, I don't think that can be literally false or

can be so clearly false that a reasonable juror would have to

find that's the only interpretation of that.

I think the same for, "Have you ever been detained?"

I don't even think -- I do think that's an ambiguous question,

because as I read it, the question is not asking -- is not

concerned with, have you ever been stopped at the border, it's

D1v1cib7

```
 1    not asking, you know, has there ever been a roadblock that your
 2    car was stopped in.  It's looking for, have you ever been
 3    questioned because you were a suspect in a crime.  And so that
 4    one, even under the definition that looks to the ambiguity, the
 5    question, there's not -- there is a reasonable interpretation
 6    where the no answer is a truthful answer.
 7              I should bring up the document to look at what else
 8    there is, but I am interested in hearing the government -- what
 9    the government's relying on, and then I really think, since
10    it's their burden, rather than me anticipating their argument,
11    I'd ask for the government to set forth its theory and I can
12    respond to it.
13              MR. BRILL:  Judge, I'm sorry to interrupt the court.
14    On behalf of Mr. Schwartz, I wanted to make a pro forma Rule 29
15    motion.
16              THE COURT:  And I'll give you a response.  Denied.
17              MR. BRILL:  Thank you.
18              THE COURT:  And you're excused.
19              MR. GREENFIELD:  And on behalf --
20              THE COURT:  You want to be excused?  And your argument
21    is to make a pro forma Rule 29, and denied.
22              MR. GREENFIELD:  Thank you.
23              THE COURT:  Good.
24              MR. DONALDSON:  On behalf of Ms. Cibik, I'll do the
25    same as well.  I don't know if it's pro forma, but I don't
```

D1v1cib7

1    believe the government has proven their case, so yes, pursuant

2    to Rule 29, I move on behalf of Ms. Cibik as well.

3            THE COURT:  Denied.  And you're excused.

4            MR. DONALDSON:  And just one further thing.

5            THE COURT:  Sure.

6            MR. DONALDSON:  I have my summation suit on today.

7            THE COURT:  Oh, I'm sorry.  Do you want to wear it

8    again tomorrow?

9            MR. DONALDSON:  I can't.

10           THE COURT:  Well, you know what, don't blame me.

11           MR. DONALDSON:  I just thought I'd bring that up.  I

12   thought I'd tell you all that.

13           THE COURT:  Do you have something nice in blue?

14           MR. DONALDSON:  I don't have anything nice in blue

15   that's clean, actually.  I'll wear my running suit tomorrow.

16           MR. GERZOG:  Let's make a shopping trip.  Macy's is

17   open till 9, although he looks down his nose at Macy's.

18           MR. PASTORE:  Your Honor, with respect to -- I believe

19   we're just addressing Count Four right now, so I'm happy -- I'm

20   happy to go through -- the first set of false statements

21   involves Part 5 -- I'm sorry -- Part 6, Section B of the N-400

22   application, which is Government's 410.  In that -- in that

23   section, Mr. Brodjik knowingly failed to report that he was

24   employed by the Earl David law firm.  The government has proven

25   beyond a reasonable doubt that Mr. Brodjik was in fact employed

D1v1cib7

by that law firm on -- among other things, e-mails from his own

home, recovered from his own home, indicate that he's employed

at that law firm.  His conservative estimate, as he put it, was

that he had been essentially cheated out of 50 to $75,000, so

obviously there was a substantial amount of money that he felt

he was owed.  He failed to report that knowingly on his

immigration form, and the reason he did that was because he was

engaged in immigration fraud, and the Earl David law firm

certainly would have been aware of the investigation given,

among other things, David Grynsztajn and others being

approached.  It makes perfect sense that he wouldn't report

that.  It's also consistent with the fact that it is -- doesn't

show up on his federal tax returns, further confirming that he

knowingly lied.  Indeed, he reports on his 400 -- N-400 that

he's self-employed during the time period -- and by this time

period, I mean January of 2006 through August 31st, 2007 --

self-employed with Gift Packaging.  It's clear he knowingly

failed to report his employment.  As the CIS witness testified,

that is a material omission in connection with adjudicating --

          THE COURT:  Simply, leaving aside the economics of it,

it's straightforward failed to disclose accurately where he

worked.

          MR. PASTORE:  Correct.

          THE COURT:  Okay.  So it doesn't slide over to that he

also committed tax fraud on his tax returns, and you're relying

D1v1cib7

1    on that as a crime that he's not been arrested for.

2              MR. PASTORE:  We're not relying on it for that reason.

3    We're just showing that what he said in his tax returns,

4    separate and apart from the Earl David law firm, even if he had

5    never worked there, what he reported in his tax returns was

6    that he was self-employed -- well, he reported he was

7    unemployed, but at some point he was self-employed as a

8    computer -- computer repairman, and that is also inconsistent

9    with what he told immigration, which is that he was

10   self-employed at Gift Packaging.  So that would be yet another

11   way for the government to prove that the employment information

12   was false.

13             Question 5, "Do you owe any federal, state, or local

14   taxes that are overdue?"  Actually, Mr. Gerzog raises an

15   interesting point, so although the government had initially

16   planned to argue that, we're going to think about that

17   overnight, but we do think that there's enough evidence that

18   the jury can conclude, based on the amounts mentioned in

19   Mr. Brodjik's e-mail about what he was owed, that he

20   underreported his federal income taxes in 2006.

21             MR. GERZOG:  Does he suggest from the amount he

22   believed he was owed but not paid that he underreported his

23   income?

24             MR. PASTORE:  Among other things.  There's also

25   testimony about how much money was being generated by the law

D1v1cib7

1    firm from both cooperate -- both cooperating witnesses --

2         MR. GERZOG:  If they have evidence that he received

3    the money that he did not report, fine.  But to argue that

4    because he was -- felt he was owed money that he never received

5    that -- you don't have to report money that you don't receive,

6    whether you're owed it or not.  Whatever it is, you don't have

7    to report it if you didn't receive it, and it's clear that he

8    didn't receive it.

9         MR. PASTORE:  Question 15 on the form, Part 10, says,

10   "Have you ever committed a crime or offense for which you were

11   not arrested?"  He answered no.  Clearly he was showing up to

12   the law firm day after day, assisting in the immigration fraud,

13   and he knows it was immigration fraud, and he knows that

14   because he turned around and threatened people with turning

15   them in to the authorities, and he wouldn't have been able to

16   do that, that wouldn't have been a threat that made any sense

17   unless he himself believed that he had some leverage, he

18   himself believed that this was a crime and in fact that his

19   threats to turn people in would be effective because they were

20   in fact committing crimes that they could be turned in for.

21        With respect to question 16, "Have you ever been

22   arrested, cited, or detained by any law enforcement officer,

23   including USCIS or former INS and military officers for any

24   reason?" there is an e-mail from the defendant that says that

25   he was placed, as he put it, under investigation for over an

D1v1cib7

1    hour when he took a car to Earl David in Toronto, and he said,

2    "I was placed under investigation for your crap," I believe

3    were his words.  So clearly he understood that it had been, as

4    he put it, placed under investigation by law enforcement.

5            And then finally, question 23, "Have you ever given

6    false and misleading information to any US government official

7    while applying for any immigration benefits or to prevent

8    deportation, exclusion, or removal?"  And of course, the

9    defendant aided and abetted the providing of false information

10   to the US immigration authorities when he had an application

11   submitted in his wife's name falsely claiming that she had a

12   job offer with an Abraham Flam company but in truth and in

13   fact, there was no such job offer.  We heard testimony from not

14   one but two cooperating witnesses that he was quite proud that

15   he was getting a green card under a substitution, that he knew

16   that it was fraudulent, and that he was present for

17   conversations with Earl David, David Grynsztajn, and Sam

18   Salamon discussing that it was a phony application.

19           So for all those reasons, we believe the government

20   has carried its burden, certainly that it should go to a jury

21   under Rule 29.

22           (Continued on next page)

23

24

25

D1VLCIB8

1          MR. GUTMAN:  Your Honor, I think addressing some of

2   this, I will be somewhat pro forma on the Rule 29 motion in

3   general.

4          But as to certain of these theories, there really is

5   not a basis for going to the jury or permitting it to go to the

6   jury because the detention question, again, is necessarily

7   ambiguous.  And so the government is now saying when you're

8   asked a question about have you ever misled an agency, that

9   includes an aiding and abetting theory and that wouldn't occur

10  to me, I don't think, as a criminal defense attorney, the idea

11  that -- and, you know, it may make perfect sense to

12  Mr. Pastore.  The idea that it is not at the very least a

13  reasonable interpretation by a layperson that you're not being

14  asked about an aiding and abetting theory or that you don't

15  even understand how that legal principle works, it is just

16  not -- it's a theory as to which the government cannot, even

17  under the high standard that applies on a Rule 29, in the light

18  most favorable to the government, they can't say that is an

19  unambiguously false statement and that a juror would be

20  reasonable in finding it to be unambiguously false.

21          MR. PASTORE:  Judge, I should add, I shouldn't have

22  limited myself.  Mr. Brodjik's own I-485, which was obviously

23  submitted prior to naturalization and is separate from

24  naturalization, contains a similar series of questions.  We

25  heard testimony about their significance from CIS witness Faith

D1VLCIB8

1    Campbell, who was the first witness.  Among other things,

2    question one part three, which is on page 3 of the I-485, asks

3    have you ever in or outside the U.S., A, knowingly committed

4    any crime of moral turpitude or drug related offense for which

5    you have not been arrested, among other things.

6              MR. GUTMAN:  That suffers from the same problem as the

7    one on the naturalization application.

8              MR. PASTORE:  And then, finally -- I shouldn't say

9    finally -- question ten, are you under a final order of civil

10   penalty for violating Section 274C of the Immigration Act for

11   use of fraudulent documents or have you, by fraud or willful

12   misrepresentation of a material fact, ever sought to procure or

13   procured a visa other documentation entry into the U.S. or any

14   other immigration benefit.

15             He certainly did that.  He attempted to procure by

16   fraud a green card.  There was a derivative application based

17   on his wife's phony application.  So in ways large and small he

18   clearly lied.

19             THE COURT:  Okay.

20             MR. GUTMAN:  We'll just reiterate our position.

21             MR. GERZOG:  As far as Rule 29 goes, I understand.

22   But I hope your Honor will at least think about that overnight

23   as far as whether he can argue that to the jury.  I just don't

24   think being detained by a guy at the border is you have to

25   answer that question yes, I have been detained.

D1VLCIB8

| | |
|---|---|
| 1 | THE COURT:  The issue isn't did he understand that in |
| 2 | Fourth Amendment language.  The issue is in English.  In other |
| 3 | words, in common parlance detained means stopped.  It doesn't |
| 4 | mean detained and sufficiently so certain rights come your way. |
| 5 | It means have you ever been stopped. |
| 6 | MR. GERZOG:  Does your Honor mean to suggest if you've |
| 7 | been pulled over by the police you have to answer that question |
| 8 | yes? |
| 9 | THE COURT:  For half an hour. |
| 10 | MR. GERZOG:  For a traffic stop?  You blow a red light |
| 11 | and the police pull you over. |
| 12 | THE COURT:  The question was not that.  The |
| 13 | question -- |
| 14 | MR. GERZOG:  We don't know anything about that |
| 15 | detention. |
| 16 | THE COURT:  Excuse me.  The question involved being |
| 17 | detained by immigration, correct? |
| 18 | MR. PASTORE:  Among others.  It says any law |
| 19 | enforcement officer for any reason.  And the nub of this and |
| 20 | the nub of this is that he himself puts in an email, I was |
| 21 | under investigation for an hour.  This isn't -- |
| 22 | MR. GERZOG:  He doesn't know. |
| 23 | THE COURT:  Listen, don't lose track of the fact that |
| 24 | part of the government's burden here, which we charge, is that |
| 25 | he has to do this knowingly and willfully and with an intent to |

D1VLCIB8

1    make a false statement.  This is not just something, you know,

2    where you simply have A and B and you're comparing them.  There

3    is the government's burden is greater than that and, therefore,

4    you get the opportunity to make your argument.

5            MR. GUTMAN:  I understand that.  I guess the concern I

6    have is that we're defining something or permitting something

7    to possibly be the basis for a federal criminal conviction and

8    it seems so de minimis or it seems to reach something so de

9    minimis that I don't think the Court should permit it to be a

10   basis for a conviction.  And after, unless we get a special

11   interrogatory, we'll never know which of the government's

12   theories may have been relied on.

13           THE COURT:  And it will all become moot if he is

14   convicted of the conspiracy and the substantive charge.

15           MR. GERZOG:  Well, of course.

16           THE COURT:  We agree about that.

17           MR. PASTORE:  I understood the Court was actually

18   taking care of the defense counsel's concern by charging they

19   could only find, the jury could only find based on what we

20   argue in closing, so I thought that had been closed off.

21           THE COURT:  I think that what Mr. Gutman is arguing

22   is -- or maybe it was Mr. Gerzog, two Gs, what can I do -- that

23   the argument about were you detained is, in the scheme of

24   things, of the types of crimes of falsehoods that people could

25   commit, so small that it shouldn't be included in the list.

D1VLCIB8

1    And perhaps a way to think about that is would you, if that was

2    all you had on him, would you indict him for that, in contrast

3    of I think some of the other things you're arguing are clearly

4    much more substantive in a weighting sense.  I think that was

5    the last argument.

6            MR. GERZOG:  Yes, Judge.

7            MR. PASTORE:  Judge, I hear the concern.  Maybe if we

8    can think on it overnight.  It may just make sense given, in

9    other words, given what this case is really about.

10           MR. GERZOG:  Exactly.  And I appreciate Mr. Pastore's

11   understanding.

12           THE COURT:  Okay.  Well, you guys have some work to

13   do.  But Mr. Gerzog says he's been prepared for weeks so he's

14   got nothing to do.

15           MR. GERZOG:  All I said, Judge, is I'm going to watch

16   the Superbowl come hell or high water.

17           (Adjourned to February 1, 2013 at 9 a.m.)

18

19

20

21

22

23

24

25

<pre>
 1                   INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    GREGORY TALLEY
 4    Direct By Mr. Greenfield . . . . . . . . . .1841
 5    Cross By Ms. Echenberg . . . . . . . . . . .1845
 6    KOYLE M. THOMAS
 7    Direct By Mr. Greenfield . . . . . . . . . .1849
 8    Cross By Ms. Echenberg . . . . . . . . . . .1852
 9    ALLAN ASHBY
10    Direct By Mr. Greenfield . . . . . . . . . .1855
11    Cross By Ms. Echenberg . . . . . . . . . . .1862
12    RUDOLPH JONES
13    Direct By Mr. Greenfield . . . . . . . . . .1868
14    Cross By Ms. Echenberg . . . . . . . . . . .1874
15    Redirect By Mr. Greenfield . . . . . . . . .1883
16    Recross By Ms. Echenberg . . . . . . . . . .1885
17    YEHEZKEL FISHBACH
18    Direct By Mr. Greenfield . . . . . . . . . .1886
19    Cross By Ms. Echenberg . . . . . . . . . . .1893
20    Redirect By Mr. Greenfield . . . . . . . . .1894
21    DEIRDRE GORDON
22    Direct By Mr. Pastore  . . . . . . . . . . .1895
23    Cross By Mr. Brill . . . . . . . . . . . . .2020
24    Cross By Mr. Greenfield  . . . . . . . . . .2063
25    Cross By Mr. Donaldson . . . . . . . . . . .2089
</pre>

1  Cross By Mr. Gerzog  . . . . . . . . . . . .2094

2  Redirect By Mr. Pastore  . . . . . . . . . .2101

3  Recross By Mr. Brill . . . . . . . . . . . .2104

4  Redirect By Mr. Pastore  . . . . . . . . . .2104

5                      GOVERNMENT EXHIBITS

6  Exhibit No.                              Received

7   S-16, 224  . . . . . . . . . . . . . . . .1898

8   1341-1, 1341-2 . . . . . . . . . . . . . .1903

9   1207-1 through 1207-6  . . . . . . . . . .1904

10  1209-1 through 1209-5  . . . . . . . . . .1909

11  1210-1 through -4  . . . . . . . . . . . .1913

12  116, 106-25-A, and 102-36-A  . . . . . . .1931

13  1213-1 and 1213-2  . . . . . . . . . . . .1932

14  307, 307-1 through 307-3 . . . . . . . . .1944

15  S15 and 321  . . . . . . . . . . . . . . .1948

16  S-13, 313  . . . . . . . . . . . . . . . .1965

17  3067-1, 3068-1, 3070 . . . . . . . . . . .1976

18  3014 through 3029  . . . . . . . . . . . .1976

19  400-1 through 400-11 . . . . . . . . . . .1980

20  410 and 410-1 through 410-4  . . . . . . .1981

21  401 through 409 and 322  . . . . . . . . .1982

22  1102-1, 1102-3 through 1102-6  . . . . . .1984

23  1106-1 through 1106-8 and 1106-10  . . . .1984

24  1112-1 through 1112-20 . . . . . . . . . .1985

25  1113-1 through 1113-5 and 1113-8 . . . . .1985

```
 1              through 1113-14

 2    1114-1 through 1114-20  . . . . . . . . . .1985

 3    1501-1 through 1501-4, 1501-6 and . . . . .1995

 4              1501-8 through 1501-12

 5    1501-1 through 1501-4  . . . . . . . . . .1996

 6    1503-1 and 1503-2 and 1502-1 and 1502-2  . .1999

 7    1505-1, 1505-2 . . . . . . . . . . . . . .2001

 8    3031, 3033, and 3041 . . . . . . . . . . .2002

 9    3072 and 3073  . . . . . . . . . . . . . .2002

10    3074-1 through 3074-3  . . . . . . . . . .2004

11    225 and 226  . . . . . . . . . . . . . . .2016

12    S10  . . . . . . . . . . . . . . . 1937

13    52   . . . . . . . . . . . . . . . 1936

14    56   . . . . . . . . . . . . . . . 1988

15    62   . . . . . . . . . . . . . . . 1970

16    325  . . . . . . . . . . . . . . . 2101

17    1218   . . . . . . . . . . . . . . 1919

18    3032   . . . . . . . . . . . . . . 1989

19    3040   . . . . . . . . . . . . . . 1977

20    3064-2   . . . . . . . . . . . . . 2005

21    3071   . . . . . . . . . . . . . . 1990

22                  DEFENDANT EXHIBITS

23    Exhibit No.                        Received

24    NS1, NS2, NS3, and NS4 . . . . . . . . . .2037

25    HT-7, HT-12  . . . . . . . . . . . . . . .2064
```

1    HT-5    . . . . . . . . . . . . . . 1888

2    HT9    . . . . . . . . . . . . . . 2087

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25