D241cib1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          11-CR-424 (NRB)

5  GULAY CIBIK, REFAEL BRODJIK,
   a/k/a "Rafi," NATHAN SCHWARTZ,
6  HAROLD TISCHLER, a/k/a
   "Hershy,"
7
                  Defendants.          Jury Trial
8
   ------------------------------x
9
                                       New York, N.Y.
10                                     February 4, 2013
                                       9:18 a.m.
11

12 Before:

13              HON. NAOMI REICE BUCHWALD,

14                                     District Judge

15                     APPEARANCES

16 PREET BHARARA
17      United States Attorney for the
        Southern District of New York
18 JANIS ECHENBERG
   JAMES J. PASTORE, JR.
19      Assistant United States Attorneys
   MICHAEL DINET, Paralegal Specialist
20
   DONALDSON CHILLIEST LLP
21      Attorneys for Defendant Gulay Cibik
   BY:  XAVIER R. DONALDSON, ESQ.
22
   LAWRENCE D. GERZOG, ESQ.
23 JEREMY L. GUTMAN, ESQ.
        Attorneys for Defendant Refeal Brodjik
24

25

D241cib1

                              APPEARANCES
                              (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D241cib1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Is there something you wanted to put on

4     the record before the jury comes out?

5          MS. ECHENBERG:  Just briefly, your Honor, and I've

6     spoken to Mr. Gerzog about this, and I think we've resolved it,

7     but I just want to put on the record.

8          You may remember that we had a sidebar during

9     Mr. Salamon's cross-examination where Mr. Gerzog was attempting

10    to get Mr. Salamon to admit that he had heard Rafi Brodjik

11    running around the office claiming to be a cook and that that

12    was hilarious and bragging about it.  We had a sidebar, and

13    there was an allegation that Mr. Salamon was committing perjury

14    by not -- that he couldn't have possibly heard that.

15          I've gone back through the transcript.  There was no

16    testimony by Mr. Salamon that he heard that, that he saw Rafi

17    Brodjik running around claiming to be a cook, but I think there

18    was just some confusion on Mr. Gerzog's part about what the

19    testimony actually was on that issue.  Mr. Gerzog has assured

20    me he's not going to raise that in his closing and I think,

21    like I said, we've resolved it, but I just wanted to put that

22    on the record so it was clear that Mr. Salamon didn't say

23    something on direct that couldn't possibly be true, and that

24    those allegations of perjury were unfounded.

25          MR. GERZOG:  Since we're on the record, I agree with

D241cib1

1    my colleague that I am not going to mention that in my

2    summation so it's really academic, but I think the record

3    reflects Mr. Salamon's testimony on my cross-examination that

4    he did hear Mr. Brodjik say that.  And it's academic, I'm not

5    going to refer to it in my summation, but I just didn't want

6    Ms. Echenberg's statement that it doesn't exist not -- to go

7    without comment by me.

8              THE COURT:  Okay.  Well, we have to deal with real

9    matters.

10             There's only one small thing that I wanted to raise,

11   and obviously I reread the charge over the weekend.  Maybe not

12   obviously, but appropriately.  And there is one change which I

13   made, and it is simply that at the beginning of the section on

14   visa fraud, in the conspiracy context, that there was a listing

15   of four elements.  On the copy I was working on -- and I don't

16   know whether it was your copy, but it was a section entitled

17   Elements of Visa Fraud, and it says first, second, third,

18   fourth.  I took out that list because that list was written in

19   the context of a substantive offense, not a conspiracy, and I

20   just eliminated it and left, you know, the longer description

21   that followed per element.

22             MR. DONALDSON:  On page 33?  Is that --

23             THE COURT:  Well, the copy I was working from was the

24   2/1 draft.

25             MR. DONALDSON:  Okay.

D241cib1

1           THE COURT:  And it was page 32 in the copy I was

2     working on.

3           MR. DONALDSON:  Okay.

4           THE COURT:  Okay?  So it's just that first, second,

5     third, fourth is not there as a list anymore.  The rest remains

6     the same, with I guess one addition, and that is that on

7     element 1, the language that was used in the false statement

8     element 1, which on my copy was on page 35 to 36, a sentence

9     that begins, "In this regard, the government need not prove

10    that the conspirators agreed to physically make or otherwise

11    personally prepare the statement, writing, or document.  It is

12    sufficient if the conspirators agreed to cause the statement or

13    representation or letter or document to be made or used."  I

14    inserted that language also in visa fraud element 1, at the end

15    of the first paragraph.  Okay?

16          I mean, there were probably some other very, very

17    minor adjustments.  I took out the reference to 5K1.1.  It's

18    never been mentioned here.  That's probably just about it.

19    Okay?  So -- yes.

20          MR. PASTORE:  There were also references to Rule 35.

21          THE COURT:  Oh, yes, that whole paragraph.

22          MR. PASTORE:  Okay.

23          THE COURT:  So I think the jurors have all finally

24    arrived.  I think we can bring them in.

25          MR. GUTMAN:  Your Honor, but there's still something

D241cib1

 1    about the government, you know, will advise the court of the

 2    cooperation.

 3              THE COURT:  Oh, yes.  It's just -- I'll tell you

 4    exactly.  It eliminates the paragraph that begins, "In this

 5    regard, you have heard counsel use the terms 5K1 and Rule 35,"

 6    but everything else stays.

 7              MR. GUTMAN:  Okay.  Thank you.

 8              THE COURT:  Yes.

 9              (Jury present)

10              THE COURT:  Good morning, everyone.

11              THE JURORS:  Good morning.

12              THE COURT:  All right.  As I told you, we have three

13    orders of business this morning.  First, we have summation by

14    Mr. Gerzog on behalf of Mr. Brodjik; then we have a rebuttal

15    summation from the government; and then charge from me.

16              So, Mr. Gerzog?

17              MR. GERZOG:  Thank you, your Honor.

18              Good morning, ladies and gentlemen.

19              THE JURORS:  Good morning.

20              MR. GERZOG:  It is traditional for someone giving a

21    summation to say thank you to the jury for their hard work.  I

22    don't do it.  The reason I don't do it is not because

23    Mr. Brodjik and Mr. Gutman and I are not very grateful to you

24    for the long time you've put into this so-called two-week

25    trial, but it's because it has a sort of a valedictory sound to

1    me.  It sounds like:  Okay, the case is over, thank you very

2    much, good-bye.  The case is by no means over.  The hardest

3    part of the case is just about to begin.  You're going to have

4    to deliberate, determine whether the jury -- whether the

5    government has proved beyond a reasonable doubt the charges

6    against my client, Refeal Brodjik.

7         Now remember what I said at the beginning.  These four

8    defendants on trial, good for them, god bless them, you know, I

9    wish them every good thing in their lives.  All I care about at

10   this trial is Refeal Brodjik.  So I hope you have been able to

11   sort through the evidence and keep in your minds what evidence

12   has come in against Refeal Brodjik.  But if you have had some

13   trouble with it -- and I know I have -- I hope to be able to go

14   through it with you a little bit and to discuss it with you a

15   little bit and show you just how it is that the government

16   failed to meet its very significant burden.

17        I would submit to you, ladies and gentlemen, that

18   these have been the three most important weeks in Rafi

19   Brodjik's life.

20        Let me just get a bottle of water.

21        And I know you will take your responsibilities with

22   respect to him and with respect to that very seriously.

23        Let's talk about the evidence.  The story in this case

24   starts somewhere in 1980 -- 1998 or 1999.  And the dates in

25   this case are really rather fuzzy.  No one remembers much about

D241cib1                    Summation - Mr. Gerzog

1    exactly what happened.  Of course they remember the day they

2    got arrested, of course they remember the day the place got

3    raided, things like that, but otherwise, it's:  Well, it was

4    around 2000, 1999, 2001.  I don't really remember.

5            And what happened?  Well, two things happened.  First,

6    a man named David Grynsztajn is living in a homeless shelter in

7    the Bronx, and Mr. Grynsztajn has 14 children now, I don't know

8    how many he had then, but there were a lot.  And they were

9    young children.  And he was in a very difficult situation.  He

10   had tried -- he was in his mid 40s by then, and he had tried

11   all his life to make a living to support his family, and he was

12   unable to do it, and they ended up in a shelter.  And as he

13   said -- or as I asked him:  That must have been embarrassing

14   for you.  Certainly no father wants to tell his children:  This

15   is the best I can do for you, a homeless shelter.  I'm sorry.

16           And so he went to his friend, his friend from

17   childhood, Earl David, and he said to Mr. David, "Look, I'm in

18   deep trouble.  Is there anything you can do for me?"  And Earl

19   David said, "You can come to work at my law firm.  You can work

20   in the copy room."  And he did.  And he was making $20 or $30 a

21   day, and it really just wasn't enough, as you might imagine.

22   Those of you who live alone probably can't live on $20 a day.

23   Certainly if you had ten children, you couldn't live on $20 a

24   day.  There's just no question about that.

25           So as Mr. Grynsztajn was working there, he finally

D241cib1                    Summation - Mr. Gerzog

said to Mr. David, "Isn't there something else I can do to make
some more money?"  And Mr. David said, "Well, you could do the
immigration work.  You could do some immigration work."  And
Mr. Grynsztajn testified that at the beginning he didn't know
what that really meant, and he didn't know it was fraudulent.
But soon, sooner rather than later, he came to discover it was
fraudulent, and he had no choice but to do it.  And I'm not
saying the ends justify the means and I'm not saying that David
Grynsztajn did not tell you untruths.  He did.  But you have to
have at least a little bit of sympathy for a guy like David
Grynsztajn, who was doing what he had to do to survive.  He was
doing what he had to do to keep his life and his family's life
afloat.  And now he's in a similar situation.  His house is in
foreclosure.  If the bank finally takes his house away, he
might have to move back to that shelter in the Bronx.  He's got
nothing.  He's unemployed, no money.  And I submit to you,
ladies and gentlemen, that he has to do what he has to do here
in the courtroom as well.  He said that, you know, "I didn't
want to commit fraud.  I'm not -- I'm not that kind of person
at heart, but I had to do what I had to do."  And I'm not
saying even that he's a perjurer at heart.  I'm not even saying
that he's someone who will get up and lie just for the fun of
lying.  But he has to do what he has to do.  He has to come in
here and he has to work with the government, convince the
government that he's helping them, and try to convince you of

D241cib1                     Summation - Mr. Gerzog

1    the guilt of the people he's testifying about.

2            Now also in 1999 another thing happened.  A man named

3    Sam Salamon was asked to sign a couple of job certifications,

4    or job applications, and he was asked to swear that he had jobs

5    in the photocopier business that he was a 10 percent partner

6    in.  And Sam Salamon's situation was quite a bit different than

7    David Grynsztajn's.  Sam Salamon had a job, Sam Salamon had a

8    house, Sam Salamon had ownership in the business.  And he

9    testified to you, "I had no idea that what I was doing was

10   fraudulent.  I really genuinely needed technicians.  And they

11   said they were going to pay me to sign and I signed, but I

12   really genuinely needed technicians.  It wasn't fraud."

13           Well, first of all, why would Earl David pay Sam

14   Salamon money to sign those forms if what was really happening

15   was that Sam Salamon needed technicians and was going to Earl

16   David to get technicians?  Earl David was providing a service

17   to Sam Salamon.  When have you heard of someone providing a

18   service to someone else and paying them for the privilege of

19   providing that service to him?  We've talked -- we talked a lot

20   in the openings about common sense.  Use your common sense.

21   That doesn't happen.

22           But we know he was lying to you because when he was

23   interviewed by the case agent in the case, Deidre Gordon, he

24   said, "It was false and I knew it was false."  And when I

25   confronted him with that, he said, "Oh, I was misquoted."  And

D241cib1                    Summation - Mr. Gerzog

1    then I asked Agent Gordon, "Was he misquoted?  Did you make a

2    mistake about that?"  She said, "No.  He said it was

3    fraudulent."  So he lied to you about that.

4            And the next thing that happened, Grynsztajn is busily

5    working away at the firm, and 2001 Salamon is -- has a -- Earl

6    David makes an order for a Xerox machine, photocopy machine,

7    and Salamon walks into his office and he sees the line of

8    people.  The office is full of people.  And his eyes light up

9    like Hanukkah candles.  They get so bright, you can't believe

10   it.  He says, "Holy cow.  Earl David is making a fortune.  I

11   want in on this."  What right does he have to be in on Earl

12   David's business?  Is he a lawyer?  No.  Is he an immigration

13   specialist?  No.  But he wants money.  Didn't Sam Salamon reek

14   of the kind of person that wants money?  And look, the guy's

15   got cancer, and I'm sorry for that.  Nobody should get cancer,

16   not the worst person in the world, and let me just put that

17   out -- right out there.  I'm sorry that he has cancer, I'm

18   sorry that he's sick.  But that doesn't apologize for -- that

19   doesn't excuse for what he did in this courtroom.

20           Now he said to Earl David, "Well, I can get you other

21   sponsors."  And Earl David said, "Sure.  Fine.  I need all the

22   sponsors I can get."  And they started on that basis.  He got

23   Earl David sponsors, he got paid by Earl David.

24           And then there came a time when he walked into the

25   firm and he saw some guy sitting at a conference table signing

D241cib1                    Summation - Mr. Gerzog

1  hundreds and hundreds of these applications, and Earl David

2  said to him, "I don't need you anymore.  I have this big

3  company that's going to sponsor hundreds of people at a time."

4  And Sam Salamon thought to himself, "Uh-oh.  I'm about to be

5  cut out of the gold mine.  I'd better think of something else

6  that I can do."  And he -- he wiggled and wormed and nudged

7  himself into a position at Earl David's office where, let's

8  face it, the truth is that after Earl David's off the scene,

9  he's the boss.  There wasn't any doubt about that.  He becomes

10  the boss after Earl David's off the scene.

11          Now so we've got two guys established at the Earl

12  David law firm -- David Grynsztajn and Sam Salamon.

13          Fast forward a little bit, and we've got a young

14  Israeli couple, and some of you may have heard the expression

15  greenhorn or FOB -- fresh off the boat -- young people who

16  aren't really used to American ways who are coming to America

17  to start a new life.  And they were coming on visitors visas

18  and they overstayed their visitors visas, and there's no

19  denying that, and, you know, immigration is a very hot topic in

20  our country today, and there's a lot of people who are very

21  angry about people overstaying their tourist visas and there's

22  a lot of people who are very angry about immigration issues,

23  but this case is not about whether they overstayed their visa

24  or not.

25          And they're knocking around New York City.  They're

D241cib1                    Summation - Mr. Gerzog

1   living in Borough Park in Brooklyn.  And what do they have?

2   Well, Rachel Brodjik, the wife, has experience as a baker, and

3   she has a letter of reference from the baker that she worked

4   for --

5           MS. ECHENBERG:  Objection.

6           THE COURT:  Sustained.  There's no evidence of that.

7           MR. GERZOG:  It's Government's Exhibit 400.

8           MS. ECHENBERG:  Is he talking about the letter that's

9   in the file?

10          MR. GERZOG:  Government's Exhibit 400.

11          THE COURT:  All right.  Well, the government will

12  respond.

13          MR. GERZOG:  She's got an experience letter, a

14  reference letter, Government's Exhibit 400.  Now what the

15  government's going to say and why they objected is, they're

16  going to say:  Oh, that's a phony.  That was made up by the

17  firm.  And I'm going to ask you, is there any credible evidence

18  of that?  Is there any credible evidence that Rachel Brodjik's

19  letter from the bakery in Jerusalem is a phony?

20          Now what could they have done to show you the proof to

21  prove to you beyond a reasonable doubt that Rachel Brodjik's

22  letter was a phony?  Well, there's a name and an address and a

23  phone number and a fax number and they could have had Agent

24  Gordon call the bakery and say, "Have you ever heard of Rachel

25  Brodjik?"  They could have faxed them a letter.  They could

D241cib1                      Summation - Mr. Gerzog

1    have written them a letter.  Didn't do it.  Or did it and got

2    the answer they didn't want to hear and didn't want to tell

3    you.  I don't know which.  But don't let them tell you that

4    because they put in front of you evidence of other phony

5    experience letters that Rachel Brodjik's experience letter was

6    phony, because there's no evidence of it.  They have to prove

7    it beyond a reasonable doubt.  They can't.

8           So Rachel Brodjik's got this experience letter, and

9    she hears through the grapevine that there's a law firm that --

10          And keep in mind, it's not my burden to prove things

11   to you.  So I don't have to prove to you that that letter is

12   genuine.  They have to prove to you that the letter is false.

13   Okay?  Just keep that in mind throughout.  And I'll talk about

14   that throughout the case.  I'll talk about their burden of

15   proof and my burden of proof, which is zero.  I don't have to

16   prove anything to you.  They have to prove everything to you.

17          So the Brodjiks hear about this law firm, and they go

18   for a visit.  And the law firm is known for getting people

19   green cards who have specialty professions.  Now frankly, it

20   was news to me when I sat down in this courtroom that being a

21   carpenter or a plumber or a baker was a specialty profession

22   and that we don't -- that you can't get enough Americans to do

23   that kind of work and that people are entitled to green cards

24   for being carpenters and plumbers and bakers.  But, hey, I

25   don't make the law.  That's apparently what the law was, at

D241cib1                    Summation - Mr. Gerzog

1    least at that time.

2         And so they go to the law firm, and there is a -- they

3    are told that there is a bakery in Lakewood, New Jersey that is

4    hiring bakers.  And I'm not here to tell you that what they

5    were told was true.  I don't know whether it was true or not.

6    And they put in a lot of evidence about Mr. Flam and his

7    bakeries and his businesses and his house in Lakewood, New

8    Jersey.  But they have not proven to you that the Brodjiks

9    knew -- if in fact Mr. Flam was a phony, if in fact the job

10   offer was a phony, the government has not put forth evidence

11   beyond a reasonable doubt that the Brodjiks, who are just

12   showing up at the law firm, know that it's a phony job offer.

13   It might be one.  It's possible that it was a phony job offer.

14   But there's no proof beyond a reasonable doubt that the

15   Brodjiks knew it was.

16        So they substitute Mrs. Brodjik in for another person,

17   a person with an unpronounceable Polish name.  I have it

18   written down.  I'll read it to you, but you know where it is.

19   It's Government's Exhibit -- I think it's 401-1.

20        And they substitute her in, and we see the date on

21   that substitution, on the submission of that substitution.  And

22   there's actually a couple of dates.  There's an October 2002

23   date and a November 2002 date.  And they submit it.  And it's

24   approved.  And it's approved in February 2005.

25        Now let's talk about a couple of things Sam Salamon

D241cib1                         Summation - Mr. Gerzog

1    said.

2            Sam Salamon said that it was Refeal Brodjik who was

3    coming in to get the green card.  We know that's not true.

4    There's no application for Rafi Brodjik anywhere.  All we have

5    is Sam Salamon's testimony on that, not corroborated by

6    anything.

7            And then we have something else that Sam Salamon told

8    you.  He said that he heard or that Rafi Brodjik said to him,

9    "Oh, gee.  Listen to Earl having a fight with his wife and

10   listen to his wife threatening to call the Feds and get rid of

11   my green card, and, oh, what a problem that is.  Oh, what

12   troubles I have."  He didn't get his green card until February

13   of 2005.  Earl David was long gone from 110 Wall Street by

14   February of 2005.  That could not have happened.  Earl David

15   left 110 Wall Street when he was suspended from the practice of

16   law in 2004, and he went to 90 Washington Street.  We know

17   that.  So when Sam Salamon testified to you that Rafi Brodjik

18   overheard an argument and was worried about his green card, it

19   is false.  All right?

20           Now David Grynsztajn testified that when Rafi Brodjik

21   arrived at the law firm, he met Earl David, and he described

22   Earl David as very charismatic and brilliant, or appeared to be

23   brilliant, and they found out -- he found out -- withdrawn.

24   Earl David is a believer in the so-called Torah codes.  Now you

25   may not be a believer in that, I may not be a believer in that.

1    Or you may be. I don't know. But there are people that

2    believe that god has given his people hidden messages in the

3    Jewish Bible, the Torah, and that if you can figure out the

4    hidden messages, you know, you will get blessings or things

5    that other people don't get, information, help. And we know

6    that Earl David was into this because he had a publishing

7    company, and his publishing company was called Mazel & Bracha,

8    and that publishing company published a book that he didn't

9    write called The Torah Codes and published a book that he did

10   write called The Code of the Heart, both about that subject.

11   And we found out that Rafi Brodjik is a what they call mystical

12   Jew, someone who believes in that sort of thing, mysticism,

13   Jewish mysticism. And they got on. They started chatting

14   about that and they got friendly. And I asked Mr. Grynsztajn,

15   "Is it fair to say that their relationship was something like

16   uncle and nephew?" And he said yes. Younger -- older man

17   taking the younger man under his wing. And Sam Salamon

18   described his job at that time as a personal assistant to Earl

19   David. Not having anything to do with immigration but someone

20   who worked with Earl David, a personal assistant, doing

21   personal things for Earl David related to the publishing.

22           Now they both later say, and Ms. Echenberg said in her

23   opening statement, that Mr. Brodjik worked on immigration

24   cases. Well, let me remind you of an e-mail, and unfortunately

25   I don't have the number written down here, but I think you all

1    remember it.  It's the e-mail that Refeal Brodjik had written,

2    and no disrespect to Mr. Brodjik, but it's gibberish, it's

3    barely intelligible, and that's because Mr. Brodjik can't write

4    in English, and Sam Salamon told you that and David Grynsztajn

5    told you that.  Now we could put it up on the screen, and I

6    invite the government to do that during their rebuttal, but you

7    remember what it looked like.  And you can have it.  You can

8    ask for it.  You can look at it.  I submit to you, ladies and

9    gentlemen, that someone who writes English as Mr. Brodjik

10   writes English, it doesn't make any sense -- again, use your

11   common sense.  This was a law firm that was trying to fool the

12   federal government, and they did so very successfully.  Are

13   they going to use someone to write false applications that can

14   barely write English?  Did the government proved to you beyond

15   a reasonable doubt that Rafi Brodjik wrote applications?

16           And then they mention these R-1s, these Jewish -- or

17   they're not only for Jews.  They're special religious worker

18   visas.  And they say, well, Rafi Brodjik worked on the R-1s.

19   Same -- same point.  Why would you have Rafi Brodjik work on

20   R-1s if he can barely write English?  These documents are in

21   English.

22           And let's go through some of these documents that were

23   shown to us on the first summation.

24           One of the documents that was shown to us on the first

25   summation is a notice of action.  And it's Government's

1    Exhibit 3041.  And the government made a big deal of the fact

2    that it was found in Refeal Brodjik's house.  Well, guess what?

3    It was found in Refeal Brodjik's house.  What was it doing in

4    Refeal Brodjik's house?  We know what it was doing in Refeal

5    Brodjik's house.  When they closed the 90 Washington Street

6    office, when Mr. David went to Canada, they put the stuff which

7    was in the 90 Washington Street office in the storage facility,

8    and you have the storage records, which are incredibly out of

9    sorts and unkempt and hard to figure, but there's some things

10   you can figure out about them.  One is that that storage

11   facility was opened in November/December of '05, and the other

12   thing is -- and that's when they moved from 90 Washington to

13   Canada.  You heard that in '04, when he was suspended -- and

14   there are those letters.  Do you remember those letters in the

15   files where they sent the applicants letters that said:  You

16   have a G-28 in the name of Earl David and we're writing to you

17   to let you know that Earl David is being suspended from the

18   practice of law, so he can't represent you anymore.  And those

19   letters are written in August and October of '04.  So we know

20   from the government that that's when Earl David was suspended.

21   And they said -- everybody is in agreement that Earl David

22   moved from 90 -- from 110 Wall Street once he was suspended to

23   90 Washington, and that's when they got this guy Jed David

24   Philwin involved, because Mr. David didn't want to raise any

25   red flags that a suspended attorney was on premises.  And we

D241cib1                    Summation - Mr. Gerzog

1    also know that they closed the storage facility in August of

2    '06 because it says so on the storage facility form.  And we

3    also know that Mr. David -- Mr. Brodjik took the stuff out of

4    the storage facility and brought it home.  And we know whose

5    stuff it is.  How do we know whose stuff it is?  Because Earl

6    David called the storage facility, and there's a note to that

7    effect, and that was something that was admitted into evidence

8    by the government in which Earl David told the storage

9    facility:  Those things in storage were put there by an

10   employee of mine.  They belong to me.  And when you saw those

11   huge unkempt boxes that these things came out of, they said

12   David on them, for Earl David, 'cause they were Earl David's

13   boxes.  And that's where this stuff came out of, Earl David's

14   boxes that Rafi was holding for him.

15          Now Rafi knew, in 2006, according to Mr. Grynsztajn,

16   that Mr. Grynsztajn had been to the government, and yet he held

17   onto those boxes till 2009, when they were found in his house

18   by Agent Gordon.  Has the government proved to you beyond a

19   reasonable doubt that a rational person would hold onto boxes

20   for three years that incriminated him?  For what reason?  He

21   did it out of loyalty to Mr. David.  The government has not

22   proven that he knew or thought or had -- or there was any

23   reason for him to believe that those boxes incriminated him.

24          Now let's look at what they showed you to suggest that

25   the things that came out of those boxes incriminate him.

D241cib1                    Summation - Mr. Gerzog

1              Well, first, there is a notice of action on an R-1 --
2       I think it's an R-1, I'm pretty sure it's an R-1, I'm not an
3       immigration lawyer -- visa.  And I'm guessing that they want
4       you to believe that because there was an R-1 visa in a box
5       belonging to Earl David in Rafi Brodjik's house that Rafi
6       Brodjik must have had something to do with it.  Well, there's
7       no evidence about that.  No one testified about that.  I have a
8       brother who lives in a single -- who's single who lives in a
9       studio apartment, small studio apartment, and I have a house in
10      the suburbs.  30 of his boxes are in my basement.  I don't know
11      what's in those boxes, but they don't belong to me.  They
12      belong to my brother.  I'm holding them for him.  Maybe some of
13      you have done the same thing.
14             When we look -- here, we can go through the pages and
15      page by page, you know, this document, but then you look on the
16      inside, right, of the first page, and it says, "Dear Earl,
17      Faxing this to you.  Hope all is well.  Thanks so much for
18      everything."  (Reading Hebrew), which means good job.  Rabbi --
19      Molechem or something.  Malcolm.  Rabbi Malcolm.  Is that proof
20      beyond a reasonable doubt that Rafi Brodjik filled out any R-1
21      applications?  I asked David Grynsztajn whether he could show
22      me a single R-1 application that Rafi Brodjik filled out.  He
23      said he couldn't.  Sam Salamon didn't show you a single R-1
24      application that Rafi Brodjik -- that the government proved
25      Rafi Brodjik filled out.

D241cib1                         Summation - Mr. Gerzog

1              The next thing in that -- those boxes of Earl David's

2       is a deposit slip in the amount of $2200 deposited into Earl

3       David's account, and correct me if I'm wrong, but I believe

4       Mr. Pastore actually said that Rafi Brodjik deposited it into

5       Earl David's account.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    What proof has the government given you that Rafi Brodjik

2    deposited this money into Earl David's account.

3           Now, it's true that it's dated May of '06.  And we

4    know Earl David was in Canada, so we know Earl David wasn't

5    depositing into this account.  But what proof, much less proof

6    beyond a reasonable doubt, is there that Rafi Brodjik deposited

7    this into Earl David's account?  Zero.

8           They could have proved it to you, if it was true.

9    They could have gotten what we know is called a writing

10   exemplar from Rafi Brodjik.  And they could have tried to match

11   it to the -- the writing for Earl David.  They could have, if

12   they wanted to prove it to you beyond a reasonable doubt, gone

13   to CitiBank and gotten the records for this account.  We know

14   you can get records for bank accounts, because we have records

15   for bank accounts in evidence.

16          We do not have, in evidence, our deposit slips

17   supposedly -- what the government said they would prove to you

18   beyond a reasonable doubt is that Rafi Brodjik made deposits

19   nearly every day during the period of time he was making

20   deposits, supposedly making deposits for Earl David.

21          Yet, all we have is one deposit slip; hundreds and

22   hundreds of alleged deposits, one deposit slip.  And so on and

23   so forth.  Found in that box, those boxes, are checks for Y.M.

24   Pollack.  And they have Josh and Earl and other things written

25   on them.  Nothing to do with Mr. Brodjik.

 1          Pieces of paper that say R1, and term, and -- a tax,

 2   and numbers.  What's that got to do with Mr. Brodjik.  How does

 3   that prove, beyond a reasonable doubt, anything about

 4   Mr. Brodjik.

 5          There is a letter from a -- some kind of Kosher

 6   service discussing an application.  Doesn't mention

 7   Mr. Brodjik.  How is this proof beyond a reasonable doubt that

 8   Rafi Brodjik did anything.

 9          There is paper similar to the kind that the law firm

10   used to defraud the government, blank pieces of paper in Earl

11   David's boxes.  We don't know if it was by the way at the top

12   of the box -- where no one could see it, at the top of the box,

13   in the middle of the box.  How does this prove beyond a

14   reasonable doubt, beyond a reasonable doubt that Rafi Brodjik

15   is guilty.

16          We see a bunch of envelopes.  And the envelopes say

17   Earl, and some money, and Jed.  And it says Jed David Philwin

18   on the return address typed in, on all of them.  And it has

19   money listed.

20          And I believe, I don't know remember, but I believe

21   Mr. Pastore said Rafi Brodjik's envelopes.  Says who?  Where is

22   the evidence that these are Rafi Brodjik's envelopes?

23          Okay.  Now, we know Rafi Brodjik can't write in

24   English.  So maybe they're gonna say, well, he can write in

25   Hebrew.  So that's what he was doing, he was writing in Hebrew.

D140cib2                        Summation - Gerzog

1    And here is a letter in Earl David's box written in Hebrew.

2    What evidence is there linking this letter written in Hebrew to

3    Rafi Brodjik.  Earl David spoke Hebrew too.  Sam Salamon spoke

4    Hebrew too.  How can the government prove to you, beyond a

5    reasonable doubt, that Rafi Brodjik had anything to do with

6    this letter written in Hebrew, or that they hired him to do

7    Hebrew things, or write in Hebrew.

8            And then there is a bunch of other stuff in the box.

9    Contour Framing, Castillo Gonzales, Hernando; you know, lots of

10   labor applications.  Contour Framing again.

11           Now, this is kind of interesting, actually.  When they

12   tell you that Rafi Brodjik, or that Rachel Brodjik's experience

13   letter was forged, okay, compare it to government's 1114-7,

14   which is what they showed you before.  Which has that kind of

15   cheezy letterhead, you know that kind of generic letterhead and

16   which has sort of the generic job description, and see if it

17   conforms.  Look at other experience letters.  This is a job

18   offer letter, but look at other experience letters.  Ask to see

19   them if you want to.  And see if they are the same kind of

20   experience letters as government exhibit 400.

21           And, another thing.  On the application for the work

22   at Lakewood Bakery, there is a description of the kind of work

23   that the person is going to be doing.  And it says bake cakes,

24   cookies, cherry pies, seven layer cake; that kind of thing.

25   Rachel Brodjik's experience letter says she knows how the bake

D140cib2                    Summation - Gerzog

1    Challah and how to make coated cakes.  If the government could

2    prove to you beyond a reasonable doubt that it was a forgery,

3    wouldn't they have done a better job matching her so-called

4    skills to the so-called job description.  If they were writing

5    both of them, why would they write them so differently.

6        So, we now have David Grynzstein at the law firm, Sam

7    Salamon at the law firm.  And Sam Salamon testified that the

8    Brodjiks came in, and that Rafi Brodjik was supposed to be the

9    one getting the green card.  And you know that is wrong.  And

10   we know about the so-called argument.  And we know that's

11   impossible.

12       And then they're gonna get up and say to you, well, we

13   know, we heard a lot about Flam.  We heard a lot about Abraham

14   Flam and that he is a phony.  And that tax returns are listed

15   as going to his home address, and other tax returns are listed

16   as going to 225 Second Street, which is the supposed address of

17   the bakery itself.  And this shows that it's all phony.  Well,

18   I don't have to prove to you that it isn't phony.  And it might

19   be phony, I don't know.

20       What the government has to prove to you, beyond a

21   reasonable doubt, is that Rafi and Rachel Brodjik knew it was

22   phony when they filled out the application.

23       Keep in mind that the law did not say you are

24   obligated to take the job you are offered.  And there's no

25   doubt that Rachel Brodjik never worked at the Lakewood Bakery.

D140cib2                        Summation - Gerzog

1              Now, they may get up and tell you there is no such

2        thing as the Lakewood Bakery, it doesn't exist.  Well, maybe

3        that's true, I don't know.  But have they proved to you beyond

4        a reasonable doubt that Rafi and Rachel Brodjik knew that it

5        wasn't true?  And when I asked Agent Gordon if she had to be

6        Lakewood, New Jersey, she told me very proudly she had been

7        there four times.  And that she had been to Abe Flam's house on

8        four different occasions.  Remember, I was voir diring her on

9        the picture.  And I said, well, did it look like that when you

10       were out there and she said, well, I was out there four times,

11       so which one are you talking about.

12             Okay, did she testify that when she was in Lakewood

13       she went to 225 Second Street to see if there was a bakery

14       there?  No, she did not testify to that.  What does that mean

15       to you?  Either an agent of 21 years forgot that it might be a

16       good idea to go look at 225 Second Street, or perhaps it means

17       that she went and she looked and she didn't like what she saw

18       as far as proving things to you.

19             THE COURT:  No --

20             MS. ECHENBERG:  Objection.

21             THE COURT:  That is truly over the line.

22             You know, and I know, what the government's obligation

23       is to disclose to you evidence contrary to the position that

24       they are asserting.

25             MR. GERZOG:  Your Honor, that would, in my view --

D140cib2                    Summation - Gerzog

1          THE COURT:  Let's not argue about it.  Go on.

2          It's the second time you did this.

3          MR. GERZOG:  Well, I don't believe I've done it --

4    most respectfully I respect you very highly, but I don't

5    believe I have done it again.

6          Now, the government says that its proved that Rafi

7    Brodjik was part of this conspiracy.  And they said they proved

8    that to you because Rafi Brodjik started cases.  I suggest to

9    you there is no proof that Rafi Brodjik started cases.  And as

10   I have suggested to you -- and they said there is proof of that

11   because Rafi Brodjik collected money.  And that David

12   Grynsztajn said he collected money.  And that Sam Salamon said

13   he collected money.  And that's how he is involved in the

14   conspiracy.  And the proof of that is from the grandstanding

15   testimony on the Salamon testimony, and also from the e-mails.

16         Now, let's talk about collecting money.  What the

17   government has to prove to you, not only is that -- the

18   government has to prove to you beyond a reasonable doubt, that

19   he collected the money, that he deposited the money or got the

20   money to Earl David in some way, and that he knew what the

21   money was.

22         Has the government proved to you beyond a reasonable

23   doubt that he knew what the money was?  Has the government

24   proven to you beyond a reasonable doubt that he got the money

25   through Earl David.  And Sam Salamon said, oh, Earl would have

1    pitched a terrible fit if he had not gotten the money.  But we

2    know later on that Sam Salamon is accused of stealing a lot of

3    money from Earl David.  I mean it's fraudulent money, but it's

4    still money that Earl David thinks is his.  And Earl David

5    says, look, aren't we all Jews, can't we be peaceful?  This is

6    no big deal.

7         This is Earl David's reaction.  Sam Salamon said,

8    because probably Sam Salamon feels this way if he was getting,

9    not getting money he wanted, that he would raise holy heck, if

10   that's what was happening.  That there is no evidence that that

11   money got to Earl David.

12        Now, again, there is a deposit slip here.  He could

13   have gotten those bank records.  The government has not proven

14   to you beyond a reasonable doubt that Rafi Brodjik did what

15   they said he did.

16        Now, a couple of other things.  The government said

17   that it found a bunch of e-mails, or that it got a bunch of

18   e-mails from Rafi Brodjik's house.  And they're in this folder.

19   And they're marked as government exhibit 3031-1 through

20   3031-10.  And they say, oh, you can tell these are genuine or

21   original or something, because they're in color and because

22   they were found in Rafi Brodjik's house.  Well, we know all

23   about finding stuff from Rafi Brodjik's house.  And I submit to

24   you that the fact that they were in color means that whoever

25   printed them has a color printer, and not a black-and-white

1    printer, but they had a computer forensics expert who worked

2    for them on the stand.  And they didn't show these exhibits to

3    the computer forensic expert and say: What is the significance

4    of the fact that they are in color, and we found -- these were

5    found in Rafi Brodjik's house, and they are in color, and look

6    at them and try to figure them out.  And they have been

7    investigating this case for years, and years, and years, and

8    they didn't have him look at these exhibits?  Because these

9    exhibits were seized in 2009.  And never had them look at them?

10   And they never had their computer forensics expert look at the

11   exhibits and ask him what the significance really was.  They

12   asked Agent Gordon what the significance here was.  And she

13   said something, I forgot what.  And she is a fine woman, and a

14   dedicated agent.  But not a computer expert.

15        And they say this exhibit is the definitive proof that

16   Rafi Brodjik was collecting money and getting it to Earl David.

17   And he knew that it was fraudulent money, 3031-1.  And it says:

18   Over the past year, you and your partner have directly and

19   indirectly swindled me, personally, not to mention Earl, out of

20   at least a $1,000 to $2,000 a week, you do the math.  My

21   conservative estimate is at least 50 to $75,000.

22        Well, now, we know Davi Grynzstein said that Rafi

23   Brodjik was supposed to get 20 percent of the money he

24   collected, but we know that's wrong.  Sam Salamon said it was

25   10 percent.  And there are a couple of references to 10 percent

D140cib2                    Summation - Gerzog

1    in the e-mails.

2            So it isn't clear to me whether Rafi Brodjik is saying

3    that you cheated Sam Salamon out of 50 to $75,000 a year, in

4    which case I, Rafi Brodjik, was entitled to 10 percent or 5 --

5    or 5,000 to 7,500, or whether you cheated me, Rafi Brodjik, out

6    of $50,000, to $75,000, which means he would have cheated Earl

7    David out of $500,000 thousand to $750,000 thousand in one

8    year.

9            And Sam Salamon got up on the stand and told you he

10   made $250,000 a year? Which is a lot of money. If he made

11   $250,000 a year, he is a snake. But who says he only made

12   $250,000 a year? Only Sam Salamon. There is no books and

13   records to show that that is what Sam Salamon made. We have

14   Sam Salamon's word, only. And David Grynsztajn said, oh, well

15   one year, my best year, I made $150,000. But, oh, is it less

16   than that. How has the government proven beyond a reasonable

17   doubt that either David Grynzstein or Sam Salamon were telling

18   the truth about that. All you have is their word. And we know

19   what their word is worth.

20           Now, the government then goes on to say that Rafi

21   Brodjik is guilty of filing false immigration documents. And

22   they do that in two ways. They say that when Rachel Brodjik

23   filed her immigration documents, he either knowingly -- in

24   other words, he either like wrote them, he was responsible for

25   them, or that he aided and abetted her in filing them. And I

D140cib2                    Summation - Gerzog

1    believe the judge will instruct you on the law, that when you

2    aid and abet someone in order to break the law --

3            MS. ECHENBERG:  Objection.  I mean just to clarify,

4    are we talking about count four?

5            (Discussion off the record)

6            They claim that with respect to Rachel Brodjik's claim

7    for a green card, that Rafi Brodjik is either responsible for

8    it in total, which means like he wrote it, that they have

9    proved to you, beyond a reasonable doubt that he wrote it.

10   Which they haven't.  How could they.  Or that he helped her,

11   aided and abetted her, and I expect the judge will charge you

12   that aiding and abetting means when someone else is committing

13   a crime, that other person knows they are committing a crime

14   and you do something to help them to further their commission

15   of that crime.

16           So the government, in order to find Rafi Brodjik

17   guilty of that count, the government would have to prove to you

18   beyond a reasonable doubt, beyond a reasonable doubt, that

19   either Rafi Brodjik filled in that application and told

20   untruths in it, or that his wife was aware that the application

21   was untrue and that he helped her in some way accomplish her

22   crime of visa fraud of getting a green card fraudulently.

23           Now, what evidence beyond a reasonable doubt or

24   otherwise is there that Rachel Brodjik knew that this was

25   fraudulent, that she was filling out a fraudulent form.  Is

D140cib2                    Summation - Gerzog

1    there any evidence of that?  And what evidence is there that

2    Rafi Brodjik knew it was fraudulent, and exposed his wife to

3    criminal exposure -- to doing something criminal without

4    letting her know.  What evidence is there of that?  The

5    government has not proved that to you beyond a reasonable

6    doubt.

7           And then, final count, is that Rafi Brodjik told lies

8    when he filled out his application for naturalization.

9           Well, before we get to that, I am going to get to

10   that.  But before we get to that, let's just do a couple of

11   other quick things.

12          You recall that Agent Gordon said that she interviewed

13   Gulay Cibik at some point, and that Gulay Cibic told her

14   certain things about the law firm.  Gulay Cibik allegedly at

15   least told her that Sam Salamon worked there, and David

16   Grynsztajn worked there, and Earl David worked there and --

17          MR. PASTORE:  Judge --

18          THE COURT:  I'm sorry.  I was checking something else.

19   Hold on a second.

20          MR. PASTORE:  In light of this argument, where it's

21   going, I'll just -- United States v. Bruton, that's all I'll

22   say.

23          MR. GERZOG:  Can we have a sidebar on that, Judge?

24          MR. DONALDSON:  I think that may be necessary.

25          MR. GERZOG:  I assume, Mr. Pastore's point is that

D140cib2                     Summation - Gerzog

1    Ms. Cibic mentioned Mr. Brodjik.  And the reason that he didn't

2    have Agent Gordon say that is for Bruton purposes.  But it's my

3    understanding that she didn't say it.  And I think Mr.

4    Donaldson getting up an saying that it was necessary to have a

5    sidebar, I think it's his understanding, as well, that

6    Ms. Cibik did not, in that interview with Agent Gordon, mention

7    Rafi Brodjik.

8            THE COURT:  What -- I'm sorry, I am lost.

9            MR. PASTORE:  Mr. Gerzog actually correctly identifies

10   our concern that the government didn't elicit certain testimony

11   regarding what Ms. Cibik said about Mr. Brodjik.  Certainly in

12   the proffer, certainly in the proffer --

13           MR. GERZOG:  The proffer has nothing do with that.  We

14   are talking about whether Agent Gordon went to her, didn't

15   arrest her, told her she wanted to ask some questions.  And

16   said she wanted to ask some questions, said tell me about the

17   Earl David law firm.  Ms. Cibik apparently told him -- her

18   about the Earl David law firm and the people who worked there.

19   And did not mention Rafi Brodjik.

20           MR. PASTORE:  She mentioned Mr -- She does mention --

21   she mentioned Mr. Brodjik in the proffer, and to suggest

22   Brodjik --

23           MR. GUTMAN:  Two different things.

24           MR. PASTORE:  To suggest she didn't mention Rafi

25   Brodjik --

D140cib2                        Summation - Gerzog

1              MR. GERZOG:  I said she didn't mention him in the

2     interview.

3              THE COURT:  I think it's --

4              MR. GERZOG:  They don't even know about the proffers.

5              THE COURT:  That's the whole point, is that the

6     defendant is highly protected.  And then for you to argue that

7     because in the initial interview she didn't mention that when,

8     you know, that later on she did and the government is precluded

9     from using that, is to create the type of false impression that

10    just is not cricket.

11             MR. GERZOG:  I don't think that is right.

12             Go ahead.

13             MR. GUTMAN:  I mean a proffer agreement is a contract

14    between two parties.  I don't think any possible theory that

15    her proffer statement becomes admissible against Mr. Brodjik --

16             THE COURT:  When you guys want to push the line, as

17    you have done over and over again, raise it in advance, get

18    some law on your side, and don't try to do these things last

19    minute.  I'm not going to just -- doesn't seem right to me.

20             MR. DONALDSON:  And just for the record, regarding

21    Mrs. Cibik, I just really don't want any avenues to be opened

22    and made, in my opinion, start prejudicing her regarding these

23    proffers and these interviews.  So I'm a little concerned about

24    where this might go, so.

25             THE COURT:  I think we should go away from it also.

D140cib2                        Summation - Gerzog

1   Totally confused about the last argument.  I don't recall it

2   being the government's theory that Mr. Brodjik wrote

3   Mrs. Brodjik's application.

4            MR. GERZOG:  Either guilty --

5            THE COURT:  And that -- and that is, you know, I

6   mean --

7            MR. GERZOG:  He's either guilty outright; in other

8   words, he did something -- he did something that makes him

9   guilty in his eyes, in his own right, of Rachel's application

10   being fraudulent, or he aided and abetted her.

11            MR. PASTORE:  No, he --

12            THE COURT:  That's not really the focus of the case.

13   It's like a straw man up there.  He did it.

14            MR. PASTORE:  That he aided and abetted Earl David and

15   David Grynsztajn, but we think -- we didn't object.  Your

16   Honor's instructions are clear to aiding and abetting.

17            THE COURT:  Yeah, right.  Okay.

18            MR. GERZOG:  And I --

19            THE COURT:  You stuck up a straw man, but got away

20   with it.

21            MR. GERZOG:  What I'm saying, she would have to know,

22   Rachel --

23            MR. PASTORE:  No.

24            THE COURT:  You put up a straw man.

25            But stay away from the interview.

D140cib2                          Summation – Gerzog

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           (In open court)

2           MR. GERZOG:  The final count in the indictment against

3    Rafi Brodjik is that he lied to the government when he filled

4    out his application for naturalization.

5           And the lies he supposedly told, Mr. Pastore went over

6    them, the lies he supposedly told, were that when he was asked

7    have you ever committed a crime for which you have not been

8    arrested, he lied by not admitting to these crimes that he has

9    charged with now.

10          The other things that he supposedly lied about was

11   omitting working for Earl David.  And the only relevant period

12   on the form, the form asks for the last five years.  So the

13   only relevant period would have been that I guess he allegedly

14   worked for Earl David was January 6 -- January '06, I'm sorry,

15   to about June or July of '06.  And that he lied when he said he

16   had never tried to defraud the government in an immigration

17   matter before.  And I gather that means that the government is

18   gonna put forward that he tried to defraud the government with

19   respect to Rachel Brodjik's worker application.

20          Now, we have been through Rachel Brodjik's worker

21   application.  We know the answer there.  The questions become

22   did he lie when he said he had never committed a crime, and did

23   he lie when he didn't put working for Earl David.

24          Now, let's look at the evidence.  The crime he

25   allegedly lied about is this crime, these crimes; that he

D140cib2                    Summation - Gerzog

committed these crimes and had not told the government about

them.

         Well, I think I've gone over in pretty good detail as

to how the government has not proven that he committed those

crimes.

         So what we're left with is listing or not listing Earl

David on the form.  And I believe the government's theory is

that he didn't list Earl David on the form because he didn't

want Earl to be associated with Earl David on an official

immigration form.  Because the immigration people -- he is

filling out the form in the -- by this time, you know,

everybody has been arrested.  He had not been arrested, by the

way, but a lot of people have been arrested.  And, it was

mighty clear the government had certain attitude about the Earl

David law firm, and that he didn't want to be associated with

it.

         Well, first of all, the government told you that in

2009 he had had his home searched in connection with the Earl

David case.  So what.  He thought Agent Gordon was not going to

mention to anybody that I did a search warrant on Rafi

Brodjik's home, and I suspect Rafi Brodjik of committing

crimes?  All of these, the Department of Immigration has this A

number system.  So it's not like, you know, you put into the

form, you put into the system I did a search warrant on John

Doe, and then you have got to rely on them to check every John

D140cib2                      Summation - Gerzog

1    Doe there is --

2              MS. ECHENBERG:  Objection.

3              THE COURT:  Yes, sustained.

4              MR. GERZOG:  They have an A number.  And that's how

5    they track aliens.  And Mr. Brodjik's home had been searched in

6    2009.  So I don't believe the government has proved to you,

7    beyond a reasonable doubt or otherwise, that Rafi Brodjik had a

8    motive to lie in order to hide his association with Earl David.

9              Or, with the Bracha -- let me just -- by the way, let

10   me get this off my chest.  Do you remember I asked David

11   Grynsztajn what does Barucha mean?  David Grynsztajn went to

12   Yeshiva, the Jewish religious school, for at least we know from

13   13 to 17 here in the United States.  We can guess he went to

14   Jewish religious school in Poland, because his parents said,

15   when he dropped out of Jewish Religious school, that they would

16   rather he be a high school drop-out than go to public school.

17   Maybe he did, maybe he didn't, I don't know.  But if any of you

18   are Jewish, you know --

19             THE COURT:  Mr. Gerzog --

20             MR. GERZOG:  Yes, your Honor.

21             THE COURT:  If any of you are Jewish.

22             MR. GERZOG:  Okay.  Whether or not any of you are

23   Jewish, Barucha is the beginning word of half, Hebrew prayers.

24   It is impossible.  It's like saying someone who is Catholic

25   doesn't know what a Hail Mary means.  And when he said to me,

1    well, I don't speak Hebrew.  And I said, well, do you pray in

2    Hebrew?  Well, I don't pray.  Well, you know, maybe he has had

3    a falling out with the church, I don't know, I don't care.  But

4    he knows what Barucha means, come on.

5         Now, I want to talk to you about the tax records

6    vis-a-vis what Rafi Brodjik wrote on the naturalization form

7    about Earl David.

8         The tax records are government's 402 through 409.  And

9    if you will look at the tax records, you will see -- well, you

10   will see a couple of things.  You will see, first of all, that

11   the real criminals, Sam Salamon and David Grynsztajn, didn't

12   file taxes.  They were making a lot of money, illegally, and

13   they didn't file taxes.  And I submit to you that's the normal

14   course of business.

15        Rafi Brodjik filed taxes during the period of time he

16   was supposedly working for Mazel and Barucha, or Earl David, or

17   whatever it is they testified he was doing.  Okay.  So

18   number 1, he filed taxes.

19        Number 2, they show that the Brodjiks didn't file

20   taxes for 2002 and 2003.  Don't let the government get up and

21   tell you that they have proved beyond a reasonable doubt that

22   there is anything wrong with that.  Because if you don't make a

23   certain amount of money, you don't have to file taxes.

24        THE COURT:  Just a second, I thought we dealt with

25   this.

D140cib2                         Summation - Gerzog

1           MR. GERZOG:  I'm sorry, Judge, I --

2           THE COURT:  We have an exact instruction that the only

3      false statements are those that the government argued.  So

4      there is no need to throw up a straw man to knock it down.

5           MR. GERZOG:  All right.  I just didn't want any

6      trouble --

7           THE COURT:  I have a charge on that, and we have

8      discussed it more than once.

9           MR. GERZOG:  There is, in government exhibit -- in the

10     taxes for '04, '05, '06, '07, it says, on the second page of

11     Form 1040 that:  Rafi Brodjik listed himself as unemployed.

12     But then he lists himself as having Schedule C income, self

13     employment income.  So he was not unemployed.  He just didn't

14     have a W-2.  He didn't have that kind of employment.  And in

15     2008 when he got a W-2 because he became a driver for someone

16     else, he listed himself as driver.  Okay, now, I'm employed, I

17     got a W-2.

18           Well, we know being self-employed doesn't mean

19     unemployed.  Rafi Brodjik is a greenhorn.  Rafi Brodjik's first

20     language is not English.  And we know he didn't get a W-2 from

21     Barucha Publishing.  We know he didn't get a W-2 from Earl

22     David.  And that's consistent with the way he filled out his

23     taxes.  No W-2, no job.

24           Now, I believe those are the -- let me just -- I

25     believe those are the things that the government is arguing to

D140cib2                     Summation - Gerzog

1    you are his false statements, that he didn't want to put --

2    that they have proven beyond a reasonable doubt that he didn't

3    put Earl David or Mazel Barucha or something like that on

4    purpose in order to hide his involvement.  And that just

5    doesn't make any sense.  They keep talking about common sense,

6    it just doesn't make any sense.

7             Now, ladies and gentlemen, as I stood up in the

8    beginning, I said it's a little counterintuitive in trial.  I

9    said the defendant is presumed innocent.  Mr. Brodjik, as he

10   sits there when we started on January 15th, he was presumed

11   innocent.  He has been presumed innocent all along.  He is

12   presumed innocent today.  And he is presumed innocent when

13   Mr. Pastore closed against him.  He will be presumed innocent

14   when, I think it's gonna be Ms. Echenberg who rebuts my

15   summation, or rebuts all of our summations.  He is presumed

16   innocent.  That means that the government has to prove beyond a

17   reasonable doubt, the highest standard of proof in the law --

18   and her Honor will define that for you -- before you can

19   convict.  There is no shame in a verdict of not guilty.

20            This is not some kind of lawyer's trick.  This is not

21   some kind of loophole.  This is not some kind of, whew, I just

22   slid him -- you know, we all really know he did something, but

23   I just slid him under the door jamb.

24            If they don't prove beyond a reasonable doubt that

25   Rafi Brodjik committed each and every one of these crimes, you

D140cib2                    Summation - Gerzog

 1    have a duty, it would be breaking the law if you didn't vote

 2    not guilty if you felt that they had not proved his guilt

 3    beyond a reasonable doubt.

 4              Now, none of the defendants testified, including

 5    Mr. Brodjik.  And again, you may think, well, gee, you know, if

 6    people were gonna get up and say all of these bad things about

 7    me, I sure as heck would want to say something back.  Well,

 8    that's not the way the system works.  And you cannot hold --

 9    and I will ask you, because I have had too many experiences

10    myself bumping into a juror in the hallway and having had

11    jurors say why didn't your guy tell me his side of the story.

12    And I -- and I -- I go like this.  Because I say I tried to

13    explain that he has the Constitutional right to silence.  And

14    that you can't hold his silence against him in any way, shape,

15    or form.  And that those rights are as important as the rights

16    you have to freedom of religion, to freedom in your politics,

17    to freedom in every other way we, as Americans, enjoy freedom.

18    They are fundamental Constitutional rights.  They are not

19    lawyer's tricks, they are not loopholes.  You are required.

20    Judge Buchwald made it very clear to you I believe when she

21    selected you and during the selection process, that you are

22    required, whether you like it or not, whether you think it's

23    good idea or not, whether if you were in Congress or the

24    Continental Congress or some kind of Constitutional convention

25    you would vote for that yourself, that is the law and you must

D140cib2                           Summation - Gerzog

1    follow it.

2         And ladies and gentlemen, the government, all 1, 2, 3,

3    4, 5 people at this table, have not proven any of the crimes

4    charged against Rafi Brodjik beyond a reasonable doubt.

5         Now, I'll say thank you, although your work is not yet

6    done.  And I will ask for a verdict of not guilty for my

7    client.

8         THE COURT:  All right.  Now we'll have the

9    government's summation.  After that, I'll give you a break

10   before we do the charge.  Just candidly, it's less interesting,

11   but not less important, than the summations.  It's little

12   dryer.

13        MS. ECHENBERG:  Good morning, everyone.  When I spoke

14   to you at the beginning of the trial, I asked you to do three

15   things.  You have done one of those things.  You sat here

16   patiently.  You have been very attentive to all of the evidence

17   that has come in.  Judge Buchwald is going to give you very

18   specific instructions on the law as soon as I'm done.  And the

19   last thing for you to do is to use your common sense, to

20   continue to use your common sense as I point out some of the

21   pieces of evidence in light of the four summations that you

22   have heard from defense counsel.

23        I'm going to talk about each defendant, I'm going to

24   talk about them in order, and I'm going to start with

25   Mr. Brodjik because that's, of course, most fresh in your mind.

D240cib2                    Summation - Mrs. Echenberg

1    There are several things that Mr. Gerzog just told you that

2    just aren't true.  So I'm going to go over those first.

3            Let's start with government exhibit 410-2.  This is

4    Rafi Brodjik's green card application.  Rafi Brodjik had a

5    green card application.  His own green card application through

6    the law firm.  It was a derivative application from his wife's

7    application.  If you look at part two on the first page, 410-2,

8    it's right here.  If you look at the original exhibit, it's

9    Part 2B:  My spouse or parent applied for adjustment of status

10   and was granted permanent residence, and I'm applying

11   derivative of that.

12           So what does that mean?  Rafi Brodjik applied

13   derivative of his wife's fraudulent application.

14           How do you know it is fraudulent?  Because Abraham

15   Flam was her sponsor for a bakery that was at a residence.

16           If you could bring up government exhibit 56.  This is

17   a house, this is Abraham Flam's house.  That's where the bakery

18   was, ladies and gentlemen.  Come on, this whole thing was made

19   up.  And you know it's made up because you heard testimony that

20   Rafi Brodjik was worried that Libney Milano or Earl David's

21   wife was going to blow the cover on the whole thing and he was

22   going to lose this application that is in process.  Mr. Gerzog

23   talked about some dates.  Again, he got it wrong.  This

24   application, 410-2, if you look at the date of the application,

25   it is submitted September 30 of 2002.  So of course Earl David

D240cib2                    Summation - Mrs. Echenberg

 1    is involved; of course there could have been a conversation

 2    about Rafi Brodjik being concerned that the whole thing was

 3    going to fall apart because the fraud is going to be exposed.

 4    So you can put that out of your mind.

 5         With regard to the substantive count, because of

 6    course there is a conspiracy count here.  And Judge Buchwald

 7    will instruct you on that.  That is about making an agreement

 8    to break the law.  There is also a substantive visa fraud count

 9    for each of these defendants.  And with respect to Rafi

10    Brodjik, it's very simple.  He had his own green card

11    application that was based on fraud.  And he aided and abetted

12    Earl David and David Grynsztajn in a false application for his

13    wife.

14         So all that you just heard about his wife, and what

15    she knew or didn't know, none of that matters to whether he

16    aided and abetted this application process that went through

17    for his wife, and then there is his own application that is

18    based on his wife's fraudulent application.

19         Nothing unclear about any of that.

20         Let's move on to his naturalization application.

21    Again, very clearcut.  If we can bring up government

22    exhibit 410, page 3, section D on the bottom.  Talks about

23    where he worked.  There is no ambiguity here, ladies and

24    gentlemen.  He does not list the Earl David law firm anywhere

25    in this list of where he has worked.  And he covers the time

1    period where you know he worked there.  You saw a picture of

2    him in the law firm.  You heard testimony about him being.

3            MR. GERZOG:  Objection.  The picture was taken, it

4    showed on the picture, 2003, not covered by this period.

5            THE COURT:  Well, the jury's recollection on that will

6    govern.

7            MR. PASTORE:  And regardless, ladies and gentlemen,

8    there is no real dispute that he worked at the law firm.

9    Nobody is disputing that.  He doesn't list it on the

10    application.  Why doesn't he list it?  Because the law firm is

11    deep in investigation by then.  And he doesn't want to raise up

12    to immigration that he worked at that law firm.

13            What else does he leave out?  Let's look at page 8,

14    the top, section D.  He doesn't say, when he is asked, have you

15    committed a crime for which you have not been arrested, he says

16    no.  And now you have heard all of this evidence about the

17    fraud that he committed in Earl David law firm.  But of course

18    he does not want immigration to know about that, because he is

19    not going to get to be a citizen if they know he is involved

20    with that.  There is no ambiguity here, either.

21            Agents have already been to his house.  He has already

22    interacted with law enforcement on this.  You heard Nicholas

23    Cycyk tell you.  The questions he is asked is have you had any

24    interaction with the police, with law enforcement.  Yes, of

25    course, he has had interaction with the police and law

1    enforcement.

2          MR. GERZOG:  Objection.  There is nothing on the form

3    that asks if you have had interaction.

4          THE COURT:  But the interview is relevant to the

5    subsequent charge.

6          MR. PASTORE:  So he answers that question no.

7          And Mr. Gerzog talked about why would he still have

8    all of these fraud documents in his house so long after?  Lots

9    of people did.  You heard about the files under the tarp in the

10   back of the house.  You saw all of the client files that were

11   in the law firm when he was arrested.  This stuff hung around,

12   regardless of the government's investigation.  So I don't think

13   that gives you anything to hang your hat on there.

14         And don't forget about the lies he tells on page 8 at

15   the bottom.  Questions 23 and 24.  How have you ever given

16   false or misleading information to U.S. Government officials

17   when applying for immigration benefits.  Take you back to the

18   green card application.  Yes, that was fraud.  And he doesn't

19   own up to that.  So there is three places where there is

20   unambiguous lies in the naturalization application.

21         Now, there is another area where Mr. Gerzog tried to

22   tell you it wasn't clear, but it's very clear.  There is

23   e-mails that Rafi Brodjik wrote, couldn't be clearer.

24         Let's bring out government exhibit 3608.  Now,

25   Mr. Gerzog made an argument that Refael Brodjik's English isn't

D240cib2                    Summation - Mrs. Echenberg

1    very good.  And it may be that he had someone else write this

2    e-mail for him.  But the contents of the e-mail, and the e-mail

3    address, they're him, there is no question about that.  If we

4    can go down to the middle where the e-mails starts,

5    Rafibar@arye1998@yahoo.  You know that is his e-mail address.

6    You saw it on the public storage application where he gave his

7    drivers license, he gave his home address, and he gave that

8    e-mail address.

9             And you know it's his e-mail address because in an

10   exhibit that defense counsel submitted themselves, this is

11   slide C 48.  You see that Rafi Brodjik is using this e-mail as

12   recently as January 9th of 2013.  So this is his e-mail

13   address.  He still using it in 2013.  No question it's his

14   e-mail address.

15            And what about the content of the e-mail.  He talks

16   about moving things to storage.  If we could bring up 3608

17   again.  And we went through this e-mail many times, so I'm not

18   going to go through it all again, but he talks about moving

19   things to storage.  He talks about he and his wife working like

20   dogs to move the office.  You know that is something that Rafi

21   Brodjik did.  He talks about the money Sam Salamon stole, Sam

22   Salamon stole.  You saw all of the other e-mails that Rafi

23   Brodjik wrote about his belief that Sam Salamon had stolen

24   money from him.  You see the reference to Sunrise Food and

25   Monet in immigration applications.  Why all of this detail, if

D240cib2                 Summation - Mrs. Echenberg

1    this is not Rafi Brodjik writing this e-mail.

2             He talks about giving Earl David the ability to

3    operate remotely.  And he says, right there in midst of his

4    role in the fraud, paragraph 7; you make it sound like all I

5    did was go into the office and collect money.

6             And then at the bottom, paragraph 11, he says:  I will

7    deposit the money you think I stole from you.  I will deposit

8    it into your account.  And that matches up with that receipt

9    that Mr. Gerzog was waiving around.

10            This is a May 2006 e-mail, that's a may 2006 receipt.

11   So, again, no ambiguity about any of this  So that is Refael

12   Brodjik.

13            Now, these e-mails, again, another point where there

14   is no ambiguity.  These e-mails, they are found at his house.

15   These are original e-mails from Rafi Brodjik.  They are printed

16   out in his house.  They match up to the e-mails that were found

17   on Sam Salamon's computer.

18            If you look at government exhibit 3031-1, it's the

19   exact same e-mail, the content is the same as government

20   exhibit 3605.  So these are Rafi Brodjik's e-mails, and the

21   ones on Sam Salamon's computer, they are all Rafi Brodjik's

22   e-mails, no question about it.

23            And the documents in his house.  If we could just

24   bring up 3017, these are notes from Maritza Diaz, you remember

25   her, she is one of the lawyers involved in the fraud.  She is

D240cib2                    Summation - Mrs. Echenberg

1    laying out in detail all of the fraud documents that they need

2    to perpetrate this fraud.  This stuff is sitting in his house.

3            Now, unless he just closed his eyes and didn't want to

4    know anything, he has to know what's going on in this fraud.

5    Just from what's in his house, putting aside all of the

6    testimony you heard about how he knew, and in his own words how

7    he tells you he knew.

8            And with regard to the religious worker applications.

9    His ability to speak English, might not matter that much.  He

10   speaks Hebrew.  So he can write experience letters in Hebrew.

11   He can interact with clients in Hebrew.  And he has blank

12   letterhead for a religious organization in Brooklyn in his

13   house in Monsey.  Why you does he have this in his house if he

14   is not working on religious worker applications, like the

15   cooperating witnesses told you that he was.

16           So those are all of the reasons that -- not all of the

17   reasons.  Mr. Pastore told you many reasons.  But those are

18   many of the reasons why Rafi Brodjik is guilty of the crimes

19   that he committed.

20           Before I move on to Ms. Cibik, I just want to spend a

21   moment on the to cooperating witnesses.  All of the defendants'

22   counsel spent a lot of time talking to you about cooperating

23   witnesses, and their credibility, and trying to tell you you

24   shouldn't trust them, you shouldn't believe what they said.

25           Well, David Grynsztajn and Sam Salamon committed

1    fraud.  They committed a massive fraud.  They're criminals.  No

2    one is asking you to condone their behavior.  What the

3    government is asking you to do is to evaluate their testimony

4    carefully.

5            Compare what David Grynsztajn said to what Sam Salamon

6    said, and compare what each of them said to all of the other

7    witnesses and all of the other documents.  And when you do

8    that, you'll see that on the important components of their

9    testimony, it lines up, it is consistent and it is corroborated

10   with the documents.

11           Let's look at slide C43, please.  If we could possibly

12   have the two testimonies side by side.  Now this may be a

13   little bit hard for you to read.  But what this is, is David

14   Grynsztajn and Sam Salamon's testimony -- if we could just --

15   David Grynsztajn's testimony and Sam Salamon's testimony about

16   Gulay Cibik's rants around the office where she would say she's

17   going to turn everyone in.  The description is virtually

18   identical.  She's jealous of David Grynsztajn's -- of Earl

19   David's wife.  And she would go around and say she's gonna

20   bring everyone down.

21           Now, that's the kind of thing you would remember if

22   that happened in your office, right?  And you remember it the

23   same way.  These two men haven't spoken to each other in

24   7 years.  They are not friends.  But they both have this

25   distinct recollection of this sort of bizarre thing happening

1    in the office.

2              And how can she go around threatening she's going to

3    bring everyone down?  Because she has something on them.

4    Because she's in on the fraud; she's doing it, too.

5              Let's look at screen slide C 44, please.  Again, David

6    Grynsztajn and Sam Salamon describe Rafi Brodjik collecting

7    money in the same way.  They say it's every night, they say he

8    is coming around, how much did you make today.  And he is

9    collecting money to transmit to Earl David.  They describe it

10   in the same way.

11             They also both knew that Rafi Brodjik's application

12   for a green card was based on a substitution.  Again, a small

13   fact, but a fact that they both remembered distinctly about

14   that application.

15             And if you look at the documents -- and I -- I only

16   have a limited time here, so I'm not going to go through

17   everything that Mr. Pastore went through.  But if you go

18   through the documents, if you look at the client files, if you

19   look at this piece of paper, they both identified for those

20   fake work experience letters, fake job offer letters.  On key

21   elements, they line up, they say the same thing of how the

22   fraud worked, and how the defendants were involved in the

23   fraud.

24             Now, defense counsel focused on these cooperating

25   witnesses only wanting to please the government.  He said they

D240cib2                    Summation - Mrs. Echenberg

would lie to please the government.  I think what you need to

focus on here is what they didn't say.  If they were just

trying to please the government, wouldn't they have lots to say

about every single defendant, and wouldn't they tie every

defendant to every piece of the fraud.

That's not what they did.  David Grynsztajn didn't

have very much to say about Harold Tischler.  He talked about

some plumbing business, he couldn't remember the name.  He

talked about 387 Quincy, and he talked about the fact that the

sponsored businesses associated with Harold Tischler all came

back to the same address.  That's it.  He didn't have much more

to say.  And that makes sense, because he was not dealing

directly with Harold Tischler.

He remembers a fight.  He remembers Harold Tischler

wanting more money.  But he doesn't have a lot of details on

Harold Tischler.  And he had nothing to say about Nathan

Schwartz.  And that makes sense.

So he is not pointing the finger at everyone, he is

not -- Mr. Gerzog talked about he is gonna do what he has to

do.  Yeah.  What he has to do, is tell the truth.  That's what

he has to do.  And he tells you what he knows, and what he

doesn't know.

Now, let me turn to Sam Salamon.  He also told you

what he knew, and what he didn't know.  He told you that Harold

Tischler would call back the Department of Labor when they

1    called, he would speak to them when they called.  He told you

2    Nathan Schwartz was a little skittish about that, he wouldn't

3    do it.  Leo Teitelbaum would do it for him.  Again, if he

4    wanted to nail these guys to the wall, he would say, yeah, they

5    both held back, they were both in on it.  But, no, he tells you

6    the way it happened.  And the Department of Labor call records

7    bear that out.  And the telephone records bear that out.  And

8    these are documents that Sam Salamon doesn't have.  These are

9    documents Sam Salamon has no control of.  But the story that he

10   tells you about what happened is born out by the documents.

11        He also tells you that the sponsors didn't know

12   anything about the phony tax records in the file.  He kept that

13   from them.  He told you that.  He owned up to that.  He didn't

14   point the finger at them for that part of the fraud.  And the

15   lease that Harold Tischler signed.  He tells you Harold

16   Tischler signed lease, but he is not sure about the guaranty

17   and he tells you that he signed the Maiden Lane lease without

18   Harold Tischler's knowledge.  Again, if he wanted to point the

19   finger as strongly as he could, he would have said more.  But

20   he only tells you what is true.  He is not trying to please the

21   government, he is saying what is true.

22        On every major issue, the cooperators are consistent

23   with each other, they are consistent with the other witnesses,

24   and they are consistent with the documents in this case.

25        Now, let me turn to Ms. Cibik.  Mr. Donaldson spent a

D240cib2                        Summation - Mrs. Echenberg

1    lot of time talking about David Grynsztajn's words, Sam

2    Salamon's words, Ilhan Altintas' words.  But you know what he

3    didn't talk about at all?  Gulay Cibik's her own words.  Her

4    confession to Agent Gordon.  What did she tell Agent Gordon on

5    May 9, 2006, in her home?  That she worked for Earl David.  And

6    then she worked for Jed Philwin after Earl David lost his

7    license.  That she worked with Ali Gomaa, he's up on the board.

8    And Abduhl and Josh.  She talked about the co-conspirators that

9    she worked with.  She talked about working at 110 Wall Street,

10   and in moving to 8082 Wall Street.  And she talked about what

11   she did at the firm, that she was a Turkish translator first,

12   and then she started working with clients.  She started

13   recruiting clients by putting an ad in the newspaper with her

14   phone number.  And she took money from clients.  She charged

15   them $4,000 that if they had a sponsor, and $7,000 if they

16   needed a sponsor.  And you know why, because it cost more money

17   to perpetrate the fraud without the sponsors.  And she obtained

18   the sponsors from Sam and Lipa.  And you know who they are,

19   that's Sam Salamon and Leo Teitelbaum.  And her own checks bear

20   this out.  If we can bring up government exhibit 700, page 37.

21            (Continued on next page)

22

23

24

25

1          MS. ECHENBERG:  Her checks bear this out.  The top

2    check is a check to Sam Salamon and the bottom check is a check

3    to Hygia.  That's another one of those phony sponsors, Andre

4    Herbst's company.  He's right up there on the bottom row with

5    all the other fraud -- fraudulent sponsors here.

6          And here's the key point that she admits to the

7    agents.  She says she understood that some professions were

8    easier to get approved, so she changed an alien's work

9    experience so they would match a job that had a better

10   likelihood of getting approved.  That's the fraud right there,

11   ladies and gentlemen.  That's exactly what Ilhan Altintas told

12   you happened when he took the stand and he testified.

13         Now let's take a quick look at Government Exhibit

14   3611, another document that Mr. Donaldson didn't talk about,

15   where Earl David says that Gulay Cibik made a hundred thousand

16   dollars off of him.  And if you look at her bank statements,

17   they bear this out.  Every month there's 10 or $20,000 getting

18   deposited.  And where did it go?  Thousands of dollars in

19   jewelry, designer brands, trips to Turkey, all there in

20   Government Exhibit 700.  And then in May of 2006, when she is

21   confronted by the agents, that's when it goes to zero.  That's

22   when all the money --

23         MR. DONALDSON:  Object to the fancy jewelry and all

24   the other stuff.

25         THE COURT:  Ladies and gentlemen, you will have the

1    bank records, and you can read them for yourselves and see what

2    the expenditures are, what checks are written, and what is

3    deposited.

4            MS. ECHENBERG:  So let's talk for a moment about Ilhan

5    Altintas.  Yes, he committed a fraud.  He told you that.  He

6    owned up to that.  Where did he go to commit his fraud?  He

7    went to Gulay Cibik.  And she was good at it.  So he brought

8    his relatives too.  And who was the sponsor for one of his

9    relatives?  Andre Herbst.  Same guy we were just talking about.

10   Fraudulent sponsor.  This time it was a mechanics shop.  But if

11   you look at the application, the e-mail address is Hygia,

12   @hygia.

13           Now Mr. Donaldson tried to confuse you with some

14   dates, but let's go over the dates that matter.  In Ilhan

15   Altintas' application -- this is 1501-2, page 9 -- the

16   application date is May 2nd, 2006.  And if you look at

17   Government Exhibit 707 -- that's Ilhan Altintas' check to her,

18   to Gulay Cibik, to the law firm -- that's May 6, 2006, and he

19   says Case Approval Fee.  The Department of Labor application

20   goes in on May 2nd, 2006.  And then they're moving on to the

21   next part of the process on May 6, 2006.  And then, Ilhan --

22   Ilhan Altintas said, then she disappears, and he can't find her

23   anymore.  Well, that makes sense, because she's approached by

24   the government on May 9th, 2006.

25           You saw Mr. Altintas testify.  You are the judge of

1    his credibility.  I submit to you that he was calm and he was

2    thoughtful when he was answering questions, his answers made

3    sense in the context of the other testimony and the documents,

4    and his testimony is corroborated by Gulay Cibik's own words in

5    her confession to the agents.

6         I'm going to talk for just a moment about the

7    extraordinary ability applications.  You heard what the CIS

8    witness said about the extraordinary ability.  It's a receipt

9    of nationally or internationally recognized prizes, and when

10   she was asked, "Would a Nobel Prize do it?" she said, "Yeah,

11   that would do it."  So these are people who are out-of-bounds

12   extraordinary.  And how many of these clients did Gulay Cibik

13   have?  Well, just based on a small stack of checks found in Leo

14   Teitelbaum's house that were associated with Gulay Cibik -- if

15   we could look at Government Exhibit 3032 starting with page 10.

16        This is just one example, but there were three checks

17   that had the name of an alien and they have Gulay written next

18   to them.  Three checks found in Leo Teitelbaum's house with

19   Gulay Cibik's name on them.  And what do we find when we look

20   at the coordinating exhibits?  They're all extraordinary

21   disability.  So miraculously, she has three.  And there's a

22   fourth in Refeal Brodjik's house.  Government Exhibit 3040.

23   There's another file, and with that file there's a letter to

24   Ms. Gulay.  So at a firm where there's no dispute there's a

25   tremendous amount of fraud going on, Gulay Cibik has the good

1    fortune to have four clients who are so extraordinary, so

2    recognized in their field that they qualify for this very

3    special type of application?  No.  It's a fraud.  They're not

4    extraordinary.  These clients don't have extraordinary ability.

5    It's fraud.  Gulay Cibik is making it up, just like the

6    witnesses told you that she was.

7            I want to turn now to Nathan Schwartz.  I want to

8    start with Slide C47.

9            What we have on this slide is a comparison of his

10   taxes, and you see where it says no payroll and then it says he

11   permanently ceased paying wages, please list the date, and the

12   date there is hard to see, but it's July 31st, 2006.  So as

13   of July 31st, 2006, he has no payroll and he's permanently

14   ceased wages.

15           But if you look at Government Exhibit 1209-5 and look

16   up the next page of this slide -- oh, it's right there on the

17   bottom.  Sorry.  There it is.  On his application for his two

18   legitimate workers, he certifies, "I will be able to place the

19   alien on payroll on or before the date of the alien's entrance

20   into the United States."  And he signs this document on

21   July 13th, 2006.  So he's cert -- Nathan Schwartz is

22   certifying to the Department of Labor that these two employees,

23   you know, he can put them on payroll and they're going to have

24   a job and he's sponsoring them for that job.  Well, at the same

25   time he's telling the tax authorities that he's not paying

1    payroll anymore, that he has no payroll.

2              So even if you just focus on those two applications

3    for Henry Castillo and José Torres, those are fraudulent.  But

4    you know that's not all Nathan Schwartz did.  Between July 2006

5    and January 2009 -- that's a 31-month period -- there are 173

6    applications associated with his company submitted -- his

7    companies submitted to the Department of Labor.  And they go to

8    three different addresses.  The mail associated with those

9    applications goes to three different addresses that are

10   controlled by Nathan Schwartz.  There's no serious dispute that

11   214 Route 59, that first address, is his.  He couldn't deny it

12   because he's associated with that address through his own

13   corporate documents.  And we see that -- you don't need to

14   bring it up, but it's Government Exhibit 306, 3072, and the

15   Department of State records.  Now all of the mail associated

16   with these five applications goes to 214 Route 59.  Right?

17             Now you also have 46 Main Street.  There's also no

18   dispute that that address is associated with Nathan Schwartz.

19   He couldn't deny it because we showed you the document where he

20   applied for that mailbox.  That's Government Exhibit 303.  And

21   the owner of the shop, Isaac Srugo, took the stand and told you

22   he knows Nathan Schwartz and he's seen him in that mailbox

23   location, so he couldn't deny that.  All the mail associated

24   with these applications, these and these and these

25   (indicating), those all go to 46 Main Street.  That's 38

D241cib3                         Rebuttal Summation - Ms. Echenberg

1    applications.

2            So even if he only knew about and participated in the

3    fraud associated with these 43 applications, he's guilty.  But

4    you know it's more than that.  You know there's a third

5    address.  That's 455 Route 306.  That's the rest of the

6    documents in this cart up on the top.  Now you know that Nathan

7    Schwartz is getting bank statements to 455 Route 306.  He

8    changes his address with his bank in February 2010 to reflect

9    that address.  That's Government Exhibit 301.  If you look at

10   page 16, versus page 17, he has one address, and then in

11   February of 2010, he changes it to 455 Route 306.  This is his

12   bank account.  This is him changing it to that address.

13           So what defense counsel would have you believe is that

14   Nathan Schwartz didn't control that mailbox when mail

15   associated with those 130 applications came between August 2006

16   and 2009, but in some bizarre and very unlucky coincidence,

17   Nathan Schwartz takes over a mailbox in 2010 that's been

18   receiving mail for him for the last three years.  It doesn't

19   make any sense.  Of course he had control over that mailbox

20   that entire time period, and that's where the mail associated

21   with these additional 130 applications went.

22           So that's 173 applications, over a 31-month period.

23   That's about five pieces of mail a month.  Now I don't care how

24   smooth of a schmoozer you are.  You can't talk your way out of

25   that much mail.  There's no way there can be that much mail

D241cib3                   Rebuttal Summation - Ms. Echenberg

1   associated with something that you don't know anything about

2   and you're not a part of it and you don't understand.

3          Now it's not just the volume of mail.  It's the phone

4   calls from the Department of Labor.  Three times when the

5   Department of Labor calls, Nathan Schwartz calls Sam Salamon

6   immediately after.

7          If we could bring up Slide C23.

8          And you see that right after the Department of Labor

9   called up, the top call on the call record, there's outgoing

10  calls to Sam Salamon and then to Leo Teitelbaum, and then

11  eventually there's a 14-minute call with Leo Teitelbaum.  Now

12  Nathan Schwartz and Leo Teitelbaum aren't friends.  They're

13  involved in this fraud together, and that's why they're talking

14  about this.  And then the call notes bear this out.  See

15  number 3 at the top.  "Leo called back and confirmed

16  sponsorship."  It's just like how Sam Salamon described to you

17  that it would work.  And you see this again.

18          If we can bring up Slide C49.

19          This is actually an exhibit that defense counsel

20  admitted.  This was NS2.  And you see again, it's Leo

21  Teitelbaum's number that's calling back and confirming

22  sponsorship.  And that's after the Department of Labor called.

23  And then there's a three-way phone call that involved Sam

24  Salamon, right after the Department of Labor called.

25          And if you can bring up quickly C24.

D241cib3                    Rebuttal Summation - Ms. Echenberg

1            Again, same thing.  Immediately the call is to

2    Department of Labor -- excuse me.  Immediately the call is to

3    Sam Salamon after Department of Labor calls and ultimately,

4    it's confirmed.

5            And then if we can bring up C35.

6            Same thing, except now they're using an alias, Arnold

7    Goldenberg, but it's the same number.  It's that 7455 number,

8    and there's no dispute that that's Nathan Schwartz's phone

9    number.

10           And then there are the voice mails.  Nathan Schwartz

11   checks his voice mail on days where the Department of Labor

12   call logs reflect that they left a voice mail for Nathan

13   Schwartz, and then the very next communication is with Sam

14   Salamon or Leo Teitelbaum.  In one instance there's a call out

15   to Sam Salamon and there are also calls coming in from Sam

16   Salamon, and Mr. Schwartz tried to make you believe that that

17   means something.  But when you look at the evidence and you use

18   your common sense, you know that Nathan Schwartz and Sam

19   Salamon communicated by text message.  You know they

20   communicated by e-mail.  There are other ways that Nathan

21   Schwartz can let Sam Salamon know:  Hey, Department of Labor

22   left me a voice mail.  You've got to do something about it.

23   And then they do.  They confirm it, the application is

24   approved, it comes to him at one of these addresses, and what

25   does he do?  He brings it over to Sam Salamon, gets paid, and

D241cib3                    Rebuttal Summation - Ms. Echenberg

1    it proceeds to the immigration process.

2            There's also Government Exhibit 1054-A.  That's the

3    number that goes in and out of service.  And again, those line

4    up with the phone records showing that phone was out of service

5    for a while and then it came back into service, and Nathan

6    Schwartz, or someone on his behalf, confirmed that sponsorship.

7    And where is that phone number registered, the phone number

8    that's associated with this application?  It's registered to

9    Bliss 9, although the company for this application is the Sharp

10   Shopper, which you know is Nathan Schwartz's company because

11   his home address is used to register this company and his name

12   is on the application.  But the phone number that's associated

13   with this application is registered to Bliss 9, another one of

14   the Nathan Schwartz companies used in these applications.  And

15   what address is that phone registered to?  455 Route 306.

16   Again, another unlucky coincidence?  No.  This is an address

17   and these are companies that Nathan Schwartz is providing to

18   Sam Salamon to perpetrate this fraud.

19           Now Mr. Schwartz would have you believe that he's some

20   sort of victim of ID theft by his old friend Sam Salamon, that

21   Sam Salamon stole information from some binders, although of

22   course there was no evidence about the existence of those

23   binders, and that Sam Salamon went into his office, although

24   there was no evidence that Sam Salamon was in his office until

25   after the fraud.  Putting that all aside, Mr. Schwartz would

1    have you believe that he was the victim of an ID theft by Sam

2    Salamon.  If that's the case, why didn't he withdraw a single

3    application?  Why did he let those calls from Department of

4    Labor go to voice mail?  Why didn't he pick up the phone and

5    say, "No, I'm not the sponsoring these people, I don't know

6    anything about this, stop calling me"?  He doesn't do that.  He

7    lets it go on and on and on and on because he's part of it.

8    Because he's getting paid to participate in it.

9            Finally, turning to Harold Tischler.  Mail -- now this

10   bottom row of this cart (indicating) -- and I'm not going to

11   load it all up for you again.  You've seen it.  But I'll tell

12   you that the bottom row of this cart is all of the applications

13   associated with Harold Tischler.  99 applications.  Mail

14   associated with 99 applications goes to his home, mail

15   associated with 30 applications goes to his office, and mail

16   associated with another 108 applications goes to the law firm,

17   but much of it is cc'd to his house or to his office.

18           So between July 2005 and January 2009 -- that's 43

19   months -- let's just take what's goes directly to his house and

20   his office and forget about what he's cc'd on.  That's 108

21   applications.  And that's just having one piece of mail for

22   each application.  And you know Department of Labor sometimes

23   sent sometimes two or three pieces of mail.  And then there's

24   all the immigration mail; right?  So again, a tremendous

25   quantity of mail coming to his house and to his office.

1           But it's the call notes that are really devastating to

2   Mr. Tischler's claims of confusion and gullibility.  Let's look

3   at the questions that are actually being asked during those

4   calls.

5           This is Government Exhibit 3104-A, page 4.  If you see

6   page 4 -- actually, go back one page.  I'm sorry.  Yeah.  You

7   see those sponsorship questions at the bottom?  If we could

8   blow those up.

9           These are the questions that Alyssa McGovern explained

10  to you are asked.  I want you to focus in on that last

11  question.  "Are you sponsoring Padam Shreshta for this

12  position?"  Department of Labor is asking:  Are you sponsoring

13  this particular person?  The question is, are you sponsoring

14  this person for this job, construction, carpenter, and are you

15  doing so because you can't find an American to do the job?

16  Not, did you hire some unexperienced people a long time ago who

17  approached you on the street?  No.  Are you hiring this

18  particular person?

19          And what does Harold Tischler say over and over when

20  the Department of Labor calls?  "Yes, I'm hiring this person."

21  "Yes, I'm hiring this person."  He never met these people.  He

22  has nothing to do with these people.  But he's lying over and

23  over to the Department of Labor and saying, "Yes, I'm hiring

24  this person."

25          Let's go very quickly through Slide C12 through C21.

1    Starting with C12.

2             You see, "Spoke with Harold Tischler, who confirmed

3    sponsorship."  And the call records bear this out.

4             C13.  "Verified information with contact."

5             C15.  And there -- let's blow up line 1, if we could,

6    under the call.  Sorry.  Yes.  If you could blow that up,

7    please.

8             "Spoke with Harold Tischler and confirmed sponsorship

9    for Ruslam Maletych.  This case has passed."  And I submit to

10   you, if you look at the other call notes, they're the same.

11   Confirmed sponsorship for these particular people who you know

12   he's not sponsoring.  He's getting paid to say that to the

13   Department of Labor.

14            Now you know he signed that lease too.  You heard the

15   testimony about it.  And if we can look at Slide C40.

16            Mr. Grynsztajn suggested that you compare --

17            MR. GREENFIELD:  Greenfield.

18            MS. ECHENBERG:  Excuse me.  Greenfield.  I apologize.

19   Mr. Greenfield suggested that you compare the signature on the

20   lease to the signature on this application for a post office

21   box, which there's no dispute is Harold Tischler's own

22   application.  So I prepared that for you.

23            If we can look at Government Exhibit C41.

24            If you look at both the handwriting and the signature.

25   Now you are the judges, not me, but I submit to you that the

1    signature and the handwriting looks very similar on the lease

2    that Harold Tischler signed and on his own P.O. box

3    application.

4           There's another company that came up briefly.  That's

5    L & T Realty.  That's a Delaware company that was established

6    in Harold Tischler's name, and I submit to you that Harold

7    Tischler knew about this too.  If you look at Government

8    Exhibit 3043, page 1, there's a letter that goes to Harold

9    Tischler's home address talking about the phone forwarding

10   that's been set up in connection with this company, and if you

11   look at pages 3 and 4 in this exhibit, you'll see that it's all

12   of Harold Tischler's personal information again, his home

13   address, the HARRYTHEMN e-mail, everything associated with him.

14          But what Mr. Greenfield didn't focus on when he was

15   talking about this document is page 22.  And if we could blow

16   up the very top of that, you'll see that there's a fax header

17   at the top.  And what does that fax header say?  It says from

18   Harold Tischler to Sam Salamon.  So you know Harold Tischler is

19   involved because he's forwarding this fax for the incorporation

20   documents for this company from him to Sam Salamon.

21          So I want to end with Harold Tischler's own words.

22   Let's bring up Government Exhibit 505-A.

23          He says in this text, "Always keeping me waiting,

24   always making me come back."  Waiting for what?  Come back for

25   what?  To get paid, for turning over the new pieces of paper so

1    that they could be used in phony immigration applications.  And

2    he talked about filing documents with Department of Labor.  He

3    knows about it.  He knows what's going on.  And he's part of

4    it.

5                And if we could look now at Government Exhibit 501.

6                What does Harold Tischler say to Sam Salamon, last

7    summer?  "Moiser you put me in jail wow."  Sam Salamon, you're

8    a rat, you're a snitch, you told the government what I did.

9    That's what he's saying in that text.

10               So ladies and gentlemen, when you use your common

11   sense, when you apply that common sense to all of the evidence

12   that you've heard in this case and the law as Judge Buchwald is

13   going to instruct you, you will come to the only conclusion

14   that's consistent with the facts and the law, that each of

15   these defendants -- Gulay Cibik, Refeal Brodjik, Harold

16   Tischler, and Nathan Schwartz -- were all active and knowing

17   participants in this massive fraud.  They are all guilty as

18   charged.

19               Thank you.

20               THE COURT:  Thank you.  Okay.  Let's take our break.

21   The rules still apply.  A little longer, guys.  All right.  No

22   talking about the case.  Keep an open mind.  And see you soon.

23               (Jury excused)

24               THE COURT:  Okay.  Why don't we get back at ten to 12.

25               (Recess)

D241cib3

1            (In open court; jury not present)

2            MR. GUTMAN:  Your Honor, I'd like to raise something

3    before the jury comes back.

4            THE COURT:  What's that?

5            MR. GUTMAN:  I have an application.

6            THE COURT:  Okay.

7            MR. GUTMAN:  And I didn't want to make this until

8    after consulting with my client about the potential

9    ramifications, were we to raise this motion.

10            In our view, we most respectfully object to the

11    court's rebuking of Mr. Gerzog with regard to the suggestion

12    that the jury could draw an inference based on Agent Gordon's

13    testimony or lack of testimony.  We submit that it is proper

14    and -- to draw the jury's attention to what the agent testified

15    to and to what the agent didn't testify to.

16            THE COURT:  That's not what he did.  What he did was

17    on two occasions say -- I remember clearly the first, with

18    respect to the Israeli bakery.  What he said was, maybe she

19    called or contacted them and they returned an answer that she

20    didn't like or she didn't do it.  That raised a *Brady* problem.

21    That was the problem.  It wasn't anything about government

22    techniques.  And he did it a second time.  He got away with it

23    time one.  The government didn't pop up fast enough.  I noticed

24    it.  By time two, that's unacceptable.

25            MR. GERZOG:  Most respectfully, Judge, I don't think

D241cib3

1    you have the right to vouch for the honesty of the government.

2    I'm not saying the government's dishonest, but I don't think

3    you have the right to vouch for the honesty of the government.

4             MR. GUTMAN:  And your Honor, I have a somewhat

5    different recollection of what he said, and we can check the

6    transcript.  I don't believe he talked about getting an answer

7    she didn't like.  He talked about --

8             THE COURT:  Yes, he did.

9             MR. PASTORE:  That was actually the exact words.  I

10   just checked the transcript prior to your Honor coming out.

11            MR. GUTMAN:  Well, I believe what he said is she

12   testified about going to a particular location.  She didn't

13   testify about the other location that was associated with the

14   bakery.  But our true concern, your Honor, is that particularly

15   because the court is held in high esteem by the jury, to

16   insinuate that Mr. -- or not insinuate -- to state that

17   Mr. Gerzog was doing something improper and with the

18   implication that he's trying to get away with something, when I

19   don't think that was the case, and also, to state, whether it's

20   true or not, that in the court's view, the government would

21   have done the honorable thing or the right thing in a

22   particular context, I think it put Mr. Gerzog and the entire

23   defense in an unfair light and I think it has prejudiced

24   Mr. Brodjik's right to a fair trial, and based on that, I most

25   respectfully move for a mistrial.

D241cib3

1          THE COURT:  Denied.

2          Is there anything else that prevents us from calling

3     the jury in?

4          MR. GERZOG:  No, your Honor.

5          MR. DONALDSON:  I'm just maximizing my standup time.

6          THE COURT:  That's okay.

7          (Jury present)

8          THE COURT:  Ladies and gentlemen, it's not necessary

9     to start reading the indictment out.  I'm just going to ask you

10    to read portions of it to yourself to enable me to save my

11    voice.

12         All right.  Ladies and gentlemen, my duty at this

13    point is to instruct you as to the law.  I will endeavor to be

14    as clear as possible.  It is your duty to accept these

15    instructions of law as I give them to you and apply them to the

16    facts as you determine them.  I know that you will try the

17    issues that have been presented to you according to the oath

18    which you have taken as jurors in which you promised that you

19    would well and truly try the issues in this case and render a

20    true verdict.

21         You, the members of the jury, are the sole and

22    exclusive judges of the facts.  You pass upon the weight of the

23    evidence; you determine the credibility of the witnesses; you

24    resolve any conflicts in the testimony; and you draw whatever

25    reasonable inferences you decide to draw from the facts as you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D241cib3                       Charge

1  have determined them.

2         You should not single out any instruction as alone

3  stating the law, but you should consider my instructions as a

4  whole when you retire to deliberate in the jury room.  To that

5  end, you will be permitted to take a copy of these instructions

6  with you into the jury room.

7         The defendants in this case, Gulay Cibik, Refeal

8  Brodjik, Nathan Schwartz, and Harold Tischler, entered pleas of

9  not guilty to the indictment.  As I told you before, the law

10 presumes the defendants to be innocent of all the charges

11 against them.  I therefore instruct you that each defendant is

12 to be presumed by you to be innocent throughout your

13 deliberations until such time, if ever, you as a jury are

14 satisfied that the government has proven him or her guilty

15 beyond a reasonable doubt.

16        The burden is on the prosecution to establish each of

17 the defendants' guilt beyond a reasonable doubt with respect to

18 each element of the offenses charged against that defendant.

19 The burden of proof never shifts to a defendant in a criminal

20 case, and the law never imposes on a defendant the obligation

21 of doing anything in a criminal trial.  Nor does the law impose

22 upon a defendant the burden or duty of calling any witnesses or

23 of producing any evidence.  The presumption of innocence alone

24 is sufficient to require an acquittal of the defendants unless

25 and until, after careful and impartial consideration, of all

the evidence, you, as jurors, unanimously are convinced of each
of the defendants' guilt beyond a reasonable doubt.

The law does not require that the government prove
guilt beyond all possible doubt; proof beyond a reasonable
doubt is sufficient to convict.  The question that naturally
comes up is – what is a reasonable doubt?  The words almost
define themselves.  Reasonable doubt is a doubt that appeals to
your reason, your judgment, your experience, your common sense.
It is doubt that a reasonable person has after carefully
weighing all the evidence.  It is not caprice, whim, or
speculation.  It is not an excuse to avoid the performance of
an unpleasant duty.  It is not sympathy for a defendant.  Proof
beyond a reasonable doubt must therefore be proof of such
convincing character that a reasonable person would not
hesitate to rely and act upon it in the most important of his
or her own affairs.

If, after a fair, impartial, and careful consideration
of all the evidence, you can candidly and honestly say that you
are not satisfied of the guilt a defendant, that is, if you
have such a doubt as would cause you, as a prudent person, to
hesitate before acting in matters of importance to yourself,
then you have a reasonable doubt, and in that circumstance it
is your duty to acquit that defendant.

On the other hand, if, after a fair, impartial, and
careful consideration of all of the evidence, you can candidly

D241cib3                    Charge

1    and honestly say that you are satisfied of the guilt of a

2    defendant and that you do not have a doubt that would prevent

3    you from acting in important matters in the personal affairs of

4    your own life, then you have no reasonable doubt, and under

5    such circumstances you should convict that defendant.

6         The indictment charges a total of six counts.  Each

7    count charges one or more defendants with a different crime.

8         There are four defendants on trial before you.  You

9    must, as a matter of law, consider each count of the indictment

10   and each defendant's involvement in that count separately, and

11   you must return a separate verdict on each defendant for each

12   count in which that defendant is charged.

13        In reaching your verdict, please bear in mind that

14   guilt is personal and individual.  Your verdict of guilty or

15   not guilty for each defendant must be based solely upon the

16   evidence about that defendant.  The case against each

17   defendant, on each count, stands or falls upon the proof or

18   lack of proof against that defendant alone, and your verdict as

19   to any defendant on any count should not control your decision

20   as to any other defendant on the same or any other count.  No

21   other considerations are proper.

22        The evidence before you consists of the answers given

23   by witnesses – the testimony they gave, as you recall it – the

24   exhibits that were received in evidence, and the stipulations

25   entered into by the parties.

1          As I indicated to you at the beginning of the trial,

2    certain things are not evidence and must not be considered by

3    you in your deliberations.

4          First, the exhibits marked for identification but not

5    received may not be considered by you as evidence.

6          Second, what the lawyers say in opening statements, in

7    closing arguments, or in objections is not evidence.

8    Similarly, you should bear in mind that a question put to a

9    witness is never evidence; it is only the answer that is

10   evidence.  Be mindful that it is the duty of the attorney for

11   each side of the case to object when the other side offers

12   testimony or other evidence that the attorney believes is not

13   properly admissible.  Nor is anything I may have said during

14   the trial or may say during these instructions with respect to

15   a matter of fact to be taken in substitution for your own

16   independent recollection, nor should you consider anything I

17   have said or may say as indicating that I have any opinion as

18   to what your verdict should be.  However, testimony that the

19   court has excluded or told you to disregard is not evidence and

20   must not be considered.  If you are instructed that some item

21   of evidence is received for a limited purpose only, you must

22   follow that instruction.

23         Third, anything you have heard outside the courtroom

24   is not evidence and must be disregarded.  You are to decide the

25   case solely on the evidence presented here in the courtroom.

D241cib3                    Charge

1           Fourth, any notes that you may take are not evidence.

2   Your notes may be used solely to assist you and are not to

3   substitute for your recollection of the evidence in the case.

4   The fact that a particular juror has taken notes does not

5   entitle that juror's views to any greater weight than those of

6   any other juror.

7           Now there are two types of evidence that you may

8   properly use in reaching your verdict.

9           One type of evidence is direct evidence.  Direct

10  evidence is when a witness testifies about something he or she

11  knows by virtue of his or her own senses -- something he or she

12  has seen, felt, touched, or heard.  Direct evidence may also be

13  in the form of an exhibit, where the fact to be proved is its

14  present existence or condition.

15          Circumstantial evidence is evidence that tends to

16  prove a disputed fact by proof of other facts.  There is a

17  simple example of circumstantial evidence that is often used in

18  this courthouse.

19          Assume that when you came into the courthouse this

20  morning, the sun was shining and it was a nice day.  Assume

21  that the courtroom blinds were drawn and you could not look

22  outside.  As you were sitting here, someone walked in with an

23  umbrella that was dripping wet.  Then a few minutes later

24  another person also entered with a wet umbrella.  Now you

25  cannot look outside the courtroom and you cannot see whether or

D241cib3                       Charge

1    not it is raining, so you have no direct evidence of that fact.

2    But on the combination of facts that I have asked you to

3    assume, it would be reasonable and logical for you to conclude

4    that it had been raining.

5         That is all there is to circumstantial evidence.  You

6    infer on the basis of reason, experience, and common sense from

7    one established fact the existence or nonexistence of some

8    other fact.

9         Circumstantial evidence is of no less value than

10   direct evidence.  As a general rule, the law makes no

11   distinction between direct and circumstantial evidence, and you

12   may consider both in reaching your conclusion as to whether the

13   government has proven its case against any defendant beyond a

14   reasonable doubt.

15        Many material facts -- such as state of mind -- are

16   rarely susceptible of proof by direct evidence.  Usually such

17   facts are established by circumstantial evidence and the

18   reasonable inferences that you draw.

19        In this case you have heard evidence in the form of

20   stipulations that contain facts that were agreed by the parties

21   to be true.  You must accept those stipulated facts as true.

22        You have also heard evidence in the form of

23   stipulations of testimony.  A stipulation of testimony is an

24   agreement among the parties that, if called as a witness, a

25   person would have given certain testimony.  You must accept as

1    true the fact that the witness would have given that testimony.

2    However, it is for you to determine the weight to be given to

3    that testimony.

4              The government has presented exhibits in the form of

5    charts and summaries.  These charts are visual representations

6    of information as set forth in the testimony of witnesses,

7    stipulations, or documents.  They purport to summarize the

8    underlying evidence that was used to prepare them and were

9    shown to you to make other evidence more meaningful and to aid

10   you in considering the evidence during your deliberations.

11   They're not themselves independent evidence.  Therefore, you

12   are to give no greater weight to these charts and summaries

13   than you would give to the evidence on which they are based.

14             It is for you to decide whether the charts, schedules,

15   and summaries correctly present the information contained in

16   the testimony and in the exhibits on which they were based.  In

17   the event that a chart, schedule, or summary differs from your

18   recollection of the testimony or actual documents on which the

19   schedule or summary is based, you are to rely on the testimony

20   or actual document, not the chart, schedule, or summary.  You

21   are entitled to consider the charts, schedules, and summary if

22   you find that they are of assistance to you in analyzing and

23   understanding the evidence.

24             You have heard evidence during the trial that

25   defendant Gulay Cibik made statements to law enforcement

1    authorities.  Evidence of those statements was properly

2    admitted in this case and may be properly considered by you.

3    You may give the statements such weight as you feel they

4    deserve in light of all the evidence.  However, whether you

5    approve or disapprove of the use of these statements may not

6    enter into your deliberations.

7         You have also heard testimony about evidence seized in

8    searches of various locations.  Evidence obtained from these

9    searches was properly admitted in this case and may be properly

10   considered by you.  Whether you approve or disapprove of how

11   the evidence was obtained should not enter into your

12   deliberations, because I instruct you that the government's use

13   of this evidence is entirely lawful.  You must, therefore,

14   regardless of your personal opinion, give this evidence full

15   consideration along with all the other evidence in the case in

16   determining whether the government has proved each defendant's

17   guilt beyond a reasonable doubt.

18        You have heard reference, in the arguments and

19   cross-examination of defense counsel in this case, to the fact

20   that the government did not use certain investigative

21   techniques.  There is no legal requirement, however, that the

22   government prove its case through any particular means.  While

23   you are to carefully consider the evidence adduced by the

24   government, you are not to speculate as to why they used the

25   techniques they did or why they did not use other techniques.

1    Your focus should be on whether, on the evidence or lack of

2    evidence, the defendants' guilt has been proven beyond a

3    reasonable doubt.  The government is not on trial, and law

4    enforcement techniques are not your concern.

5           There are people whose names you heard mentioned

6    during the course of the trial but who did not appear to

7    testify.  One or more of the attorneys has referred to their

8    absence from the trial.  The government is not required to

9    prove its case through the testimony of any particular

10    witnesses.  Nor do the defendants have any burden or duty to

11    call any witnesses or produce any evidence.  You should not

12    draw any inferences or reach any conclusions about what these

13    uncalled witnesses would have testified to had they been

14    called.  Their absence should not affect your judgment in any

15    way.  Again, your concern is to determine whether, on the

16    evidence that has been admitted or the lack thereof, the guilt

17    of the defendants has been proven beyond a reasonable doubt.

18           During the trial you have heard the attorneys use the

19    term "inference," and in their arguments they have asked you to

20    infer, by using your reason, experience, and common sense, the

21    existence of some fact from one or more established facts.  An

22    inference is not a suspicion or a guess.  It is a reasoned and

23    logical decision to conclude that a disputed fact exists on the

24    basis of another fact that you know exists.  In drawing

25    inferences, you should exercise your common sense.  There are

 1    times when different inferences may be drawn from facts,

 2    whether proved by direct or circumstantial evidence.  The

 3    government asks you to draw one set of inferences while the

 4    defense attorneys ask you to draw another.  Whether or not to

 5    draw a particular inference is, of course, a matter exclusively

 6    for you to determine, as are all determinations of fact.

 7            You have heard testimony from government witnesses who

 8    have pleaded guilty to the same or similar charges as those

 9    contained in the indictment.  You are instructed, however, that

10    you are to draw no conclusions or inferences of any kind about

11    the guilt of the defendants merely from the fact that a

12    government witness or an alleged co-conspirator pleaded guilty

13    to the same or similar charges.  The decisions of those

14    individuals to plead guilty were personal decisions about their

15    own guilt and may not be used by you in any way to infer the

16    guilt of the defendants.

17            Further, you are not being asked whether any person

18    other than the defendants here on trial has been proven guilty.

19    In that vein you may not draw any inference, favorable or

20    unfavorable, toward the government or the defendants from the

21    fact that certain persons are not on trial here.  Those matters

22    are wholly outside your concern and have no bearing on your

23    function as jurors in deciding the case before you.

24            Now you have had an opportunity to observe all of the

25    witnesses.  It is now your job to decide how believable the

1    witnesses were in their testimony.  You are the sole judges of

2    the credibility of each witness and of the importance of their

3    testimony.

4              Your decision whether or not to believe a witness may

5    depend on how that witness impressed you.  Was the witness

6    candid, frank, and forthright, or did the witness seem as if he

7    was hiding something, being evasive or suspect in some way?

8    How did the way the witness testified on direct examination

9    compare with how the witness testified on cross-examination?

10   Was the witness consistent in his or her testimony, or did the

11   witness contradict himself or herself?  Did the witness appear

12   to know what he or she was talking about, and did the witness

13   strike you as someone who was trying to report his or her

14   knowledge accurately?

15             How much you choose to believe a witness may be

16   influenced by their potential bias.  Does the witness have a

17   relationship with the government or a defendant that may affect

18   how he or she testified?  Does the witness have some incentive,

19   loyalty or motive that might cause them to shade the truth; or

20   does the witness have some bias, prejudice, or hostility that

21   may have caused them -- consciously or not -- to give you

22   something other than a completely accurate version of the facts

23   they testified to?

24             Even if a witness was impartial, you should consider

25   whether that witness had an opportunity to observe the facts he

1    or she testified about.  Also, ask yourselves whether the

2    witness' recollection of the facts stands up in light of all

3    the other evidence.

4            Witnesses may be inaccurate, contradictory, or even

5    untruthful in some respects and yet may be entirely credible in

6    the essence of their testimony.  It is for you to say whether a

7    witness' testimony is truthful or not, in whole or in part, in

8    light of the witness' demeanor, statements, and all of the

9    evidence.

10           You have heard from witnesses who testified that they

11   were actually involved in the crimes charged in the indictment,

12   as well as other crimes, and who subsequently pled guilty to

13   their criminal conduct pursuant to what is called a cooperation

14   agreement with the government.  There has been a great deal

15   said about these so-called cooperating witnesses and whether or

16   not you should believe them in the summations of counsel.

17           The government is permitted to enter into these kinds

18   of agreements.  Indeed, not only does the law allow the use of

19   cooperating witness testimony, but such testimony may be enough

20   in itself for a conviction if the jury finds that the testimony

21   establishes a defendant's guilt beyond a reasonable doubt.

22           However, you should bear in mind that a witness who

23   has entered into a cooperation agreement has an interest in

24   this case different from that of an ordinary witness.  A

25   witness who realizes that he may be able to obtain his own

1    freedom or receive a lighter sentence by giving testimony

2    favorable to the prosecution may have a motive to testify

3    falsely.  Therefore, you should examine such testimony with

4    great care and view it with special caution.

5            You may consider the fact that a witness is

6    cooperating as bearing upon that witness' credibility.  It does

7    not follow, however, that simply because a person has admitted

8    to participating in one or more crimes that he or she is

9    incapable of giving truthful testimony.  You should ask

10   yourselves whether the witness would benefit more from lying or

11   by telling the truth.  If you find that testimony was false,

12   you should reject it.  However, if after careful examination of

13   a cooperating witness' testimony and demeanor on the witness

14   stand you are satisfied that the witness told the truth, you

15   should accept it as credible and act upon it accordingly.

16           As with any witness, if you find that the cooperating

17   witness has testified falsely in one part, you may still accept

18   their testimony in other parts as true.  Or you may disregard

19   it all.  That determination is left entirely up to you.  Like

20   the testimony of any other witness, a cooperating witness'

21   testimony should be given such weight as it deserves in light

22   of all the facts and circumstances.

23           You may also consider a witness' relationship to or

24   interest in the outcome of the controversy.  An interested

25   witness is not necessarily less credible than a disinterested

1    witness.  The fact that a witness is interested in the outcome

2    does not mean that he or she has not told the truth or is not

3    capable of telling the truth.  It is for you to determine from

4    the witness' demeanor on the stand and such other tests that

5    your experience dictates whether or not their testimony has

6    been colored, intentionally or unintentionally, by interest.

7           Now the defendants, Gulay Cibik, Refeal Brodjik,

8    Nathan Schwartz, and Harold Tischler, did not testify in this

9    case.  Under our Constitution, a defendant in a criminal case

10   has no obligation to testify or to come forward with any

11   evidence.  This is because, as I've told you, the burden of

12   proof beyond a reasonable doubt remains on the government at

13   all times.  A defendant is presumed innocent and has no duty to

14   prove that he or she is innocent.

15          You may not attach any significance to the fact that

16   the defendants did not testify.  You may not draw any adverse

17   inference against the defendants because they did not take the

18   witness stand, and you may not consider this fact in any way in

19   your deliberations in the jury room.

20          Additionally, the fact that the prosecution is brought

21   in the name of the United States of America entitles the

22   government to no greater or no less consideration than that

23   accorded to any other party to a litigation.  All parties,

24   whether the government or individuals, stand as equals under

25   the law.

D241cib3                         Charge

1            You have heard the testimony of individuals employed

2    by certain government agencies.  The fact that a witness may be

3    employed by the government does not mean that his or her

4    testimony is necessarily deserving of more or less

5    consideration or greater or lesser weight than that of an

6    ordinary witness.  At the same time, it is quite legitimate for

7    defense counsel to try to attack the credibility of witnesses

8    employed by the government on the grounds that their testimony

9    may be colored by personal or professional interest in the

10   outcome of the case.  It is your decision, after reviewing all

11   the evidence, whether to accept the testimony of those

12   witnesses and to give that testimony whatever weight, if any,

13   you find it deserves.

14           You have heard evidence during the trial that

15   witnesses have discussed the facts of the case and their

16   testimony with the lawyers before those witnesses appeared in

17   court.

18           Although you may consider that fact when you are

19   evaluating a witness' credibility, there is nothing unusual or

20   improper about a witness meeting with lawyers before testifying

21   so that the witness can be aware of and focus on the subjects

22   he will be questioned about and have the opportunity to review

23   relevant exhibits before being questioned about them.  Such

24   consultation helps to conserve your time and the court's time.

25   In fact, it would be unusual for a lawyer to call a witness

1    without such consultation.

2            Again, the weight you give to the fact or the nature

3    of the witness' preparation for his or her testimony and what

4    inference you draw from such preparation are matters completely

5    within your discretion.

6            You have heard testimony from witnesses who have given

7    their opinion that defendant Harold Tischler has a reputation

8    for being trusting in the community where they live.  That

9    testimony bears on a defendant's character.  It is not to be

10   taken by you as the witness' opinion as to whether a defendant

11   is guilty or not guilty.  Character testimony should be

12   considered together with all the other facts and all the other

13   evidence in the case when determining whether a defendant is

14   guilty or innocent of the charges.

15           Your verdict must be based solely on the evidence

16   developed at trial or the lack of evidence.  In reaching your

17   decision as to whether the government sustained its burden of

18   proof, it would be improper for you to consider any personal

19   feelings -- positive or negative -- you may have about the

20   race, religion, national origin, sex, or age of any of the

21   witnesses or the defendants in this case.  The parties in this

22   case are entitled to a trial free from prejudice, and our

23   judicial system cannot work unless you reach your verdict

24   through a fair and impartial consideration of the evidence.

25           As you know, the defendants are formally charged in an

D241cib3                    Charge

1    indictment.  As I instructed you at the outset of the case, the

2    indictment is a charge or accusation.  It is not evidence, and

3    it is not to be considered by you as any evidence of the guilt

4    of the defendants.

5            As I mentioned earlier, the indictment in this case

6    contains six counts.  I now want to give you an overview of

7    these counts and also explain how I will present them to you.

8            Count One of the indictment charges each of the four

9    defendants with participating in a criminal conspiracy.

10   Specifically, it alleges that the objectives of the conspiracy

11   were (i) to commit visa fraud by making false statements in

12   documents required by the U.S. immigration laws and presenting

13   documents containing such false statements, and (ii) to make

14   false statements to the United States government.  As I will

15   explain in more detail in a few moments, conspiracy, such as

16   the one charged in Count One, is a criminal agreement to

17   violate the law.

18           Counts Two, Three, Five, and Six of the indictment

19   charge each of the four defendants separately with the crime of

20   visa fraud.  These counts allege what is called a substantive

21   crime.  Unlike the conspiracy charge in Count One, which is a

22   charge of agreeing to commit certain offenses, the substantive

23   charges in Counts Two, Three, Five, and Six allege the actual

24   commission of a substantive offense.

25           (Continued on next page)

D240cib4                          Charge

1    Count two of the indictment charges Gulay Cibik with the

2    commission of visa fraud.

3              Count three of the indictment charges defendant Rafael

4    Brodjik with the commission of visa fraud.

5              Count five of the indictment charges Defendant Nathan

6    Schwartz with the commission of visa fraud.

7              And count six of the indictment charges Harold

8    Tischler with the commission of visa fraud.

9              Count four charges defendant Rafael Brodjik with the

10   substantive crime of making false statements in connection with

11   his own naturalization proceeding.

12             Now, count one, charges each of the defendants, Gulay

13   Cibik, Refael Brodjik, Nathan Schwartz and Harold Tischler with

14   the crime of conspiracy to commit visa fraud and to make false

15   statements to the United States government.

16             The jurors are now requested to please read count one

17   of the indictment to themselves.

18             Count one goes from page 1 to page 11.

19             Let me just say one thing, I just noticed something

20   that is in the written charge is incomplete.  You'll see when

21   you get to the description of count one, in the written charge,

22   that it only recites what we might call the statutory

23   allegations.  It doesn't have any of the background material

24   that you have.  So in every case, when you're focusing on what

25   the indictment actually says, use the indictment, don't use the

1    charge version, because it's shorter.   It's just not complete.

2    Okay?  And that's also true for some of the later charges which

3    left out a sentence.

4              Anyway, a conspiracy is a kind of criminal

5    partnership.  An agreement with two or more persons to join

6    together to accomplish some unlawful purpose.

7              The crime of conspiracy or agreement to violate a

8    federal law as charged in this indictment is an independent

9    offense.  It is separate and distinct from the actual violation

10   of any specific federal laws, which the law refers to as

11   substantive crimes.

12             Indeed, you may find one or more of the defendants

13   guilty of the crime of conspiracy to commit visa fraud, and to

14   make false statements, even if you find that the substantive

15   offenses of visa fraud and making false statements were never

16   actually committed.  Congress has deemed it appropriate to make

17   conspiracy, standing alone, a separate crime, even if the

18   conspiracy is not successful.

19             By the same token you can find one or more of the

20   defendants guilty of the substantive crime of committing visa

21   fraud, even if you find them not guilty of the conspiracy to

22   commit visa fraud charged in count one.

23             I will now instruct you on the elements of count one.

24             In order to sustain its burden of proof with respect

25   to the conspiracy charged in count one, the government must

1    prove the following three elements beyond a reasonable doubt:

2              First, the existence of the conspiracy charged in the

3    indictment; that is, that two or more persons formed an

4    agreement or an understanding to violate the laws of the United

5    States which make it illegal to commit visa fraud, and to make

6    false statements to the United States government.

7              Second, that the defendant knowingly and willfully

8    became a member of the conspiracy; that is, that they knowingly

9    and willfully associated themselves with, and participated in,

10   the alleged conspiracy to commit visa fraud, and to make false

11   statements to the government; and third, that any one of the

12   co-conspirators, not necessarily one of the defendants of any

13   of the individuals alleged to be a member of the conspiracy

14   knowingly committed at least one overt act in the Southern

15   District of New York in furtherance of some object of the

16   conspiracy during the life of the conspiracy.

17             First you must determine whether the evidence proves

18   beyond a reasonable doubt the existence of the conspiracy

19   charged in the indictment.  To establish this first element,

20   the government is not required to show that members of the

21   conspiracy met together and entered into any express or formal

22   agreement, or that the alleged conspirator stated, either in

23   words or in writing what the scheme was, its object or purpose,

24   its precise details, or the means by which its object or

25   purpose was to be accomplished.  Your common sense will tell

D240cib4                      Charge

1    you that when people in fact agree to enter into a criminal

2    conspiracy, much is left to unexpressed understanding.

3            From its very nature, conspiracy is usually secret.

4    Even if actions are taken in the open, the purpose behind those

5    actions is often known only to the conspirators.

6            Thus, to establish the existence of a conspiracy, it

7    is sufficient if the government proves that there was a mutual

8    understanding, either spoken or unspoken between two or more

9    people to cooperate with each other to violate the law and

10   accomplish at least one of the objectives of the conspiracy

11   charged in the indictment.

12           If you find beyond a reasonable doubt that two or more

13   alleged conspirators came to such an understanding through any

14   contrivance, express or applied, then the government will have

15   sustained its burden of proof as to this element.

16           When people enter a conspiracy to accomplish an

17   unlawful end, they become agents or partners of one another in

18   carrying out the conspiracy.  To determine whether there has

19   been an unlawful agreement that is alleged, you may consider

20   the acts and conduct of the alleged conspirators that were done

21   to carry out the apparent criminal purpose.  Often, the only

22   evidence that is available with respect to the existence of a

23   conspiracy, is that of disconnected acts and conduct on the

24   part of the alleged individual conspirators.  When taken all

25   together and considered as a whole, however, those acts of

D240cib4                    Charge

1    conduct may warrant the inference that a conspiracy existed as

2    conclusively as would direct proof.  On this question you

3    should refer back to my earlier instructions on direct and

4    circumstantial evidence and inferences.

5         In sum, if upon consideration of all of the evidence

6    direct or circumstantial, you find beyond a reasonable doubt

7    that at least two of the alleged conspirators agreed to work

8    together in furtherance of the unlawful scheme alleged in the

9    indictment, then the first element of conspiracy is

10   established.

11        Now, the objects of conspiracy are the illegal goals

12   the conspirators agree to or plan to achieve.  As I have

13   already mentioned, the indictment here charges the conspiracy

14   alleged in count one had two objects:  First, that the

15   defendants here on trial, and others, agreed to commit visa

16   fraud by making false statements in documents required by the

17   immigration laws and by presenting documents that contain such

18   false statements; and second, that the defendants and others

19   agreed to make statements to the federal government.

20        If the government fails to prove that at least one of

21   the objects of the conspiracy was an object of the conspiracy

22   in which a defendant participated, you must find that defendant

23   not guilty as to count one.

24        However, if you find that the charged conspiracy

25   existed, and that it had at least one of the charged

D240cib4                    Charge

1    objectives, the illegal purpose element will be satisfied.  You

2    need not find that the conspiracy had both objectives alleged

3    in the indictment.

4            I will now instruct you as to the elements of each of

5    the alleged objects of the conspiracy charged in count one.

6    Again, I remind you that the government need only prove that

7    the conspirators agreed to achieve one or more of these

8    objects.

9            There are four elements of the offense of visa fraud.

10   The first alleged object of the charged conspiracy.

11           The first element that government must prove beyond a

12   reasonable doubt, is that the conspirators agreed to make a

13   false statement.  The government can satisfy this element in

14   one of two ways.  First, the government can prove that two or

15   more conspirators agreed to make a false statement under oath;

16   second, that the government can prove that two or more

17   conspirators agreed to present a false statement made by

18   another, whether or not the false statement was made under

19   oath.

20           In this regard, the government need not prove that the

21   conspirators agreed to physically make or otherwise personally

22   prepare the false statement in question.  It is sufficient if

23   the conspirators agreed to cause the statement to be made or

24   used.

25           A statement is false, if it was untrue when made.

1          A statement is made under oath, if the maker of the

2    statement took an oath, testified truly before the United

3    States Citizenship and Immigration Services, or the maker of

4    the statement, under penalty of perjury, subscribed as true,

5    written information that was submitted to the United States

6    Citizenship and Immigration Services.

7          The second element which the government must prove

8    beyond a reasonable doubt is that two or more conspirators

9    agreed to make the statement described in element one in an

10   application, affidavit, or other document required under the

11   United States immigration laws.  However, it is not required

12   that the statement be made in an official form of the United

13   States Citizenship and Immigration Services.  It is sufficient

14   if the false statement was to be included in any affidavit or

15   other document required to be attached to an application,

16   affidavit, or other document required under the immigration

17   laws.

18         In this regard, I instruct you as a matter of law that

19   an application for an alien labor certification, and a petition

20   to adjust an alien's immigration status, including attachment

21   and documents submitted by the applicant in support of such

22   allegations, are required by United States immigration laws and

23   regulations.

24         The third element which the government must prove

25   beyond a reasonable doubt, is that the statement described in

D240cib4                    Charge

1    element one was related to a fact that was material.  A fact is

2    material if it could have influenced the government's decisions

3    for activities.  However proof of the government's actual

4    reliance on the statement is not required.

5         The fourth element which the government must prove

6    beyond a reasonable doubt is that the defendant knew that the

7    statement was false when made.

8         To act knowingly means to act voluntarily and

9    deliberately, rather than mistakenly or inadvertently.

10        There are five elements of the offense of making false

11   statements to the United States government, the second alleged

12   object of the charged conspiracy.

13        The first element requires that the government prove

14   beyond a reasonable doubt that two or more conspirators, one,

15   agreed to make a statement or a presentation; or two, agreed to

16   use a writing or document.  In this regard the government need

17   not prove that the conspirators agreed to physically make or

18   otherwise personally prepare the statement, writing, or

19   document in question.  It is sufficient if the conspirators

20   agreed to cause the statement or representation or writing or

21   document to be made or used.  Under the false statements

22   statute there is no distinction between written and oral

23   statements.

24        The second element requires that the government prove

25   beyond a reasonable doubt that the statement described in

D240cib4                    Charge

1    element one is material.  You may refer to my earlier

2    instruction on materiality.

3            The third element that the government must prove

4    beyond a reasonable doubt is that the statement described in

5    element one was false, fictitious, or fraudulent.  A statement

6    or representation is false or fictitious if it was untrue when

7    made and known at the time to be untrue by the person making

8    it, or causing it to be made.

9            A statement or representation is fraudulent if it was

10   untrue when made, and was made or caused to be made, with the

11   intent to deceive the government agency to which it was

12   submitted.

13           If the governmental agency's question request in

14   response to which the statement or representation was ambiguous

15   so that it reasonably could have been interpreted in several

16   ways, then the government must prove that the defendant's

17   answer was false, under any reasonable interpretation of the

18   question.

19           The fourth element that the government must prove

20   beyond a reasonable doubt, is that the statement described in

21   element one concerned a matter within the jurisdiction of the

22   United States government.  I charge you that the United States

23   Customs and Immigration Services is a part of the Executive

24   Branch of the government and is a department of the United

25   States government.

1          I also charge you that the Department of Labor is a

2     part of the Executive Branch of the government, and is a

3     Department of the United States government.

4          There is no requirement that the conspirators must

5     have contemplated that the statement be actually directed or

6     given to the United States Customs and Immigration Services or

7     the Department of Labor.  It is sufficient if you find that

8     they contemplated that the document would be utilized in a

9     manner which was within the jurisdiction of the United States

10    Customs and Immigration Services or the Department of Labor, or

11    which concerned an authorized function of those two agencies.

12         If you find that the government has established

13    elements one, two, three and four, the fifth and final element

14    that the government must prove beyond a reasonable doubt is

15    that the statement described in element one was made

16    knowingly, willfully, and with a specific intent to make a

17    false statement to the United States government.

18         You may refer to my earlier instructions on the

19    definition of knowingly here.

20         To act willfully means to act knowingly and

21    purposefully with the intent to do something the law forbids;

22    that is to say with a bad purpose to disobey or to disregard

23    the law.

24         Keep in mind that direct proof of knowledge,

25    willfulness, and fraudulent intent is not required because such

1    proof of a person's state of mind is almost never available.

2    It would be a rare case where it could be shown that a person

3    wrote or stated that as of a given time in the past he

4    committed an act with fraudulent intent.  The question of

5    whether a person acted knowingly, willfully, and with intent to

6    defraud is for you to determine in light of all of the

7    evidence, like any other issue of fact.

8        I have instructed you on the elements of each of the

9    two alleged objects of the conspiracy.  In considering these

10   two alleged objects, you should keep in mind that you need not

11   find that the conspirators agreed to accomplish both of these

12   objects.

13       Instead, you need only find that there was an

14   agreement to accomplish either one of these objects.  However,

15   you must all agree on the specific object that the conspirators

16   agreed to try to accomplish as the goal of their criminal

17   conspiracy.  In other words, the government must prove that the

18   intended unlawful conduct of which the conspirators agreed

19   included all of the elements of the objects as I have just

20   described them to you.  If you find that two or more persons

21   agreed to accomplish at least one of the objects charged in the

22   indictment, the illegal purpose element will be satisfied,

23   regardless of whether or not that object was in fact

24   accomplished.  However, if the government fails to prove beyond

25   a reasonable doubt that at least one of the two objects was in

D240cib4                    Charge

1    fact an agreed-upon object of the conspiracy, then you must

2    find the defendants not guilty on count one.

3           We now turn to the second element that the government

4    must prove to establish the offense of conspiracy, which is

5    whether each defendant was in fact a member of the charged

6    conspiracy.  If you conclude that the government has proven

7    beyond a reasonable doubt that the conspiracy charged in

8    count one existed, you must next determine whether the

9    government has proven beyond a reasonable doubt that the

10   particular defendant you are considering knowingly, willfully

11   and voluntarily joined the charged conspiracy with the criminal

12   intent to further its specific unlawful objective; that is,

13   with a purpose to violate the law.  You must ask yourselves,

14   did the defendant you are considering participate in the

15   conspiracy with knowledge of its unlawful purpose, and with the

16   intent to commit the substantive offense of visa fraud, or

17   making false statements to the United States government, or

18   both, that you find to have been the objective of the

19   conspiracy.

20          I have previously defined the terms knowingly and

21   willfully for you, and I instruct you to consider those

22   definitions here.

23          Unlawfully simply means contrary to law.  In order to

24   prove that the defendant acted unlawfully, the government need

25   not prove that the defendant knew that he or she was breaking

any particular law or any particular rule.  The government must

only show that the defendant was aware of the generally

unlawful nature of his or her acts.

        The indictment alleges that all four defendants were

part of the same conspiracy; that is the conspiracy charged in

count one.  However, to conclude that a particular defendant

joined the conspiracy, you need only find that the defendant

conspired with one other person who need not be another

defendant in this case.

        Furthermore, the duration and extent of the

defendant's participation in the alleged conspiracy has no

bearing on the issue of that defendant's guilt.  A defendant

need not have joined the conspiracy at it outset.  To be a

member of the conspiracy, a defendant may have joined it at any

time; at the beginning, in the middle, or at the end.

        It is important for you to note that the defendant's

participation in the conspiracy must be established by

independent evidence of his own acts or statements.  However,

you may consider the defendant's acts and statements in the

context of the acts and statements of the other alleged

conspirators, and reasonable inferences which may be drawn

therefrom.

        A defendant's knowledge is a matter of inference from

the facts proved.  In that connection, I instruct you that to

become a member of the conspiracy, a defendant need not have

1    known the identities of each and every other member, nor need

2    he or she have been apprised of all of the activities.

3    Moreover, a defendant need not have been fully informed as to

4    all of the details or the scope of the conspiracy in order to

5    justify an inference of knowledge on his or her part.

6    Furthermore a defendant need not have joined in all of the

7    conspiracy's unlawful objectives to be a member of the

8    conspiracy.

9              I want to caution you, however, that the defendant's

10    mere association with one or more members of the conspiracy

11    does not, in and of itself, make that defendant a member of the

12    conspiracy.  A person they know, or may be friendly with, or

13    may be related to a criminal, without being a criminal himself.

14              I also want to caution you that mere knowledge of, or

15    acquiescence in the unlawful plan, without participation in it,

16    is not sufficient.  Moreover, the fact that a defendant's act

17    merely happened to further the purposes or objectives of the

18    conspiracy, without more, does not make that defendant a

19    member.  The defendant must have participated in the conspiracy

20    with knowledge of its unlawful objective and with the intention

21    of aiding in the accomplishment of that objective.

22              In that regard, it has been said that in order for a

23    defendant to be deemed a participant in a conspiracy, he or she

24    must have had a stake in the venture or its out come.  I

25    instruct you that while proof of a defendant's financial

D240cib4                    Charge

1    interest in the outcome of the scheme is not essential, if you

2    find that any defendant had such an interest, that is one

3    factor which you may properly consider in determining whether

4    or not the defendant was a member of the conspiracy charged in

5    count one of the indictment.

6         If you determine that the defendant became a member of

7    the conspiracy, the extent of his or her participation in that

8    conspiracy has no bearing on the issue of his or her guilt.

9    The conspirator's liability is not measured by the extent or

10   duration of that conspirator's participation.  Indeed, each

11   member may perform separate and distinct acts, and may perform

12   them at different times.  Some conspirators play major roles,

13   while others play minor roles in the scheme.  An equal role is

14   not what the law requires.  In fact, even a single act may be

15   sufficient to draw the defendant within the ambit of the

16   conspiracy.

17        In sum, the defendant you are considering, with an

18   understanding of the unlawful character of the conspiracy

19   charged in the indictment, must have intentionally engaged,

20   advised, or participated in it for the purpose of furthering

21   its illegal objective.  He or she thereby becomes a knowing and

22   willing participant in the unlawful agreement; that is to say a

23   conspirator.

24        The third element which the government must prove

25   beyond a reasonable doubt to establish the offense of

1    conspiracy, is that at least one of the conspirators committed

2    at least one overt act in the Southern District of New York in

3    furtherance of the conspiracy charged in count one of the

4    indictment.

5        The Southern District of New York encompasses the

6    Manhattan, the Bronx, Westchester, Rockland, Putnam, Duchess

7    and Orange and Sullivan counties.  Therefore, anything that

8    occurs in those counties, occurs in the Southern District of

9    New York.

10       In order for government to prove that the crime of

11   conspiracy was committed, there must have been something more

12   than an agreement, some overt step or action must have been

13   taken in furtherance of that agreement.  In other words, the

14   overt act is a requirement that the agreement went beyond the

15   mere talking stage, the mere agreement stage.

16       The jurors are requested to read the overt acts

17   charged in count one of the indictment to themselves.

18       Okay, those -- you may have read them already.  Did

19   you?  Yes?  Okay then we'll move on.

20       In order for the government to satisfy the overt act

21   element, it is not required to prove that any of the defendants

22   charged in this case committed any of the overt acts alleged.

23   It is sufficient for the government to show that any one of the

24   alleged co-conspirators knowingly committed an overt act in

25   furtherance of the conspiracy.  Similarly, it is not necessary

1    for the government to prove that each member of the conspiracy

2    committed or participated in an overt act.  However, you must

3    all agree that A conspirator committed at least one specific

4    overt act.  In other words, it is not sufficient for you to

5    agree that some overt act was committed without agreeing on

6    which overt act was committed.

7         Moreover, the government need not prove that an overt

8    act specifically alleged in the indictment was committed.  To

9    satisfy this element, you must find that one or more specific

10   overt acts were committed that are not alleged in count one of

11   the indictment, nor is it necessary -- I'm sorry, let me start

12   that again.  Let me just start the paragraph.

13        Moreover, the government need not prove that an overt

14   act specifically alleged in the indictment was committed.  To

15   satisfy this element, you may find that one or more specific

16   overt acts were committed that are not alleged in count one of

17   the indictment.  Nor is it necessary for the overt act to have

18   been committed at precisely the time alleged in the indictment,

19   so long as you are convinced, beyond a reasonable doubt, that

20   it occurred at or about the time and place stated, and that it

21   occurred during the life of the conspiracy.

22        Finally, you should bear in mind that the overt act,

23   standing alone, may be an innocent, lawful act.  Frequently an

24   apparently innocent act sheds it harmless character if it is a

25   step in carrying out, promoting, aiding, or assisting the

1    conspiratorial scheme.  You are, therefore, instructed that the

2    overt act does not have to be an act which, in and of itself,

3    is criminal or constitutes an objective of the conspiracy.

4              The indictment states that the conspiracy existed from

5    at least in or about 1996, up to and including in or about

6    2011.  It is not necessary for the government to prove that the

7    conspiracy started and ended within this exact time period.  It

8    is sufficient if you find that the conspiracy was formed, and

9    that it existed for some time within the period set forth in

10   the indictment.  And that at least one overt act was committed

11   in furtherance of the conspiracy during approximately that

12   time.

13             Now, I have instructed you that in order to sustain

14   its burden of proof, the government is required to prove that

15   each defendant acted knowingly.  In determining whether the

16   defendant you are considering acted knowingly, you may consider

17   whether the defendant deliberately closed his or her eyes to

18   what otherwise would have been obvious to him or her.  The law

19   calls think conscious avoidance.  If you find beyond a

20   reasonable doubt that the defendant acted with, or that the

21   defendant's ignorance was solely and entirely the result of a

22   conscious purpose to avoid learning the truth, then that

23   defendant has acted knowingly.

24             Now, I want to be very clear about what this means,

25   and does not mean, with respect to the conspiracy alleged in

D240cib4                    Charge

1    count one of the indictment.

2            First, conscious avoidance cannot be used as a basis

3    for finding that the defendant you are considering knowingly

4    joined the conspiracy.  It is impossible for a defendant to

5    join a conspiracy unless he or she actually knows the fact that

6    the conspiracy exists.  However, if you find beyond a

7    reasonable doubt that the defendant chose to participate in the

8    joint undertaking, you may then consider whether the defendant

9    deliberately avoided confirming that the purpose of the

10   partnership he or she joined was to commit immigration fraud

11   and/or submit false statements to government.  If you find that

12   the defendant you are considering was aware that there was a

13   high probability that his or her co-conspirators objective was

14   to commit immigration fraud and/or submit false statements to

15   the government, but that the defendant deliberately avoided

16   confirming this fact, you may treat this deliberate avoidance

17   of positive knowledge as the equivalent of knowledge of the

18   objects of the charged conspiracy.  However, if you find that

19   the defendant actually believed that he or she and other

20   members of the conspiracy were acting in a lawful manner, that

21   defendant may not be convicted of the charge in count one.

22           It is important to understand that conscious avoidance

23   may not be established by demonstrating that the defendant was

24   merely careless, negligent, foolish, or mistaken.  If a

25   defendant actually believed that the conspiracy was about

D240cib4                    Charge

1    something else entirely, or if a defendant was merely careless,

2    or even reckless about the risk that he or she was wrong, then

3    you cannot find that defendant guilty.  Conscious avoidance can

4    only be established if a defendant deliberately decided not to

5    confirm a key fact when it was obvious or highly probable that

6    the fact was true.

7           You will recall that I have admitted into evidence the

8    acts and statements of other individuals who did not appear as

9    witnesses at trial.  Because the government argues that the

10   persons who committed such acts or statements were confederates

11   or co-conspirators of the defendants on trial -- let me start

12   that over, I got the wrong emphasis.

13          You will recall that I have admitted into evidence the

14   acts and statements of other individuals who did not appear as

15   witnesses at trial, because the government argues that the

16   persons who committed such acts or statements were confederates

17   or co-conspirators of the defendants on trial.

18          The reason for the admitting this evidence has to do

19   with the nature of the crime of conspiracy.  Under the law,

20   when people knowingly enter into a conspiracy to accomplish an

21   unlawful end, each and every member becomes an agent for the

22   other conspirators in carrying out the conspiracy.

23          Therefore, any reasonably foreseeable act or statement

24   of a member of the conspiracy, committed or made in furtherance

25   of the conspiracy, is deemed to be the act or statement of all

D240cib4                    Charge

1    of the members, and all of the members are responsible for it.

2              If you find beyond a reasonable doubt that one or more

3    of the defendants was a member of the conspiracy charged in

4    count one of the indictment, then any acts committed, or

5    statements made in furtherance of the conspiracy by a member of

6    the same conspiracy, may be considered against that defendant.

7    This is so even if such acts were committed or such statements

8    were made in the defendant's absence and without his or her

9    knowledge.

10              However, before you may consider the acts or

11   statements of a co-conspirator in deciding the guilt of the

12   defendant, you must first determine that the acts or statements

13   occurred during the existence of the unlawful scheme.

14   Furthermore, if you do not find the person who committed the

15   act or made the statement to have been a member of the

16   conspiracy, or if the act or statement in question did not

17   further the conspiracy, you may not consider that in deciding

18   whether a defendant is guilty or not guilty.

19              Now, counts two, three, five, and six charged the

20   defendants, respectively, Gulay Cibik, Rafael Brodjik, Nathan

21   Schwartz and Harold Tischler, with committing visa fraud by

22   making false statements in documents required by the United

23   States immigration laws, and by presenting documents containing

24   false statements, and with aiding and abetting the same.

25              We now ask the jurors please to read counts two,

D240cib4                    Charge

1    three, five, and six to themselves.  And, again, when you are

2    back in the jury room, don't rely on the charge recital.  On

3    each of these counts, it leaves out the preceding sentence.

4            (Pause)

5            The indictment charges each of the defendants with the

6    substantive offense of visa fraud, or making false statements

7    in an application or other document required by the United

8    States immigration laws in violation of Title 18 of the United

9    States Code Section 1546.

10           That statute reads in pertinent part at follows:

11   Whoever knowingly makes under oath, or as permitted under

12   penalties of perjury, knowingly subscribes as true any false

13   statement with respect to a material fact in any application,

14   affidavit, or other document required by the immigration laws

15   or regulations subscribed thereunder, or knowingly presents any

16   such application, affidavit, or other document which contains

17   any false statement, or which fails to contain any reasonable

18   basis in law or fact, shall be guilty of a crime.

19           Further, the indictment charges each of the defendants

20   with aiding and abetting the substantive offense of visa fraud

21   in violation of the federal aiding and abetting statute, which

22   is Title 18 United States Code Section 2(a).  That section

23   provides as follows: Whoever commits an offense against the

24   United States or aides, and abets, counsels, commands, induces,

25   or procures its commission, is punishable as a principal.

D240cib4                    Charge

1           In order to sustain its burden of proof with respect

2    to the allegation that the defendant made a false statement in

3    an application or document required by the immigration laws,

4    the government must prove beyond a reasonable doubt with

5    respect to each defendants charged, each of the following

6    elements:

7           First, that the defendant either made a false

8    statement under oath, or presented a document containing a

9    false statement; second, that the statement was made in a

10   document required by the United States immigration laws or

11   regulations; third, that the statement was false as to a

12   material fact; and fourth, that the defendant knew that the

13   statement was false when made.

14          You may consult my instructions on the first alleged

15   object of the conspiracy charged in count one for further

16   details as to each of these elements.

17          The government alleges that the defendants made a

18   number of false statements to immigration authorities.  The

19   government need not prove that each and every statement it

20   alleges was false was, in fact, false.  However, to find any

21   statement false, the government must prove beyond a reasonable

22   doubt, all of the required elements of the substantive offense

23   of visa fraud as to that statement.  Accordingly, as you

24   consider counts, two, three, five, and six, in order to find a

25   particular defendant guilty of visa fraud, you must unanimously

1    agree that the defendant you considering made at least one

2    false statement, and you must be unanimous as to which false

3    statement that defendant made.

4         When determining whether any defendant acted knowingly

5    with respect to the visa fraud charged against that defendant,

6    you may consider whether that defendant deliberately closed his

7    or her eyes to what otherwise would have been obvious to him or

8    her.  You may refer to my earlier instruction on the definition

9    of conscious avoidance here.  I remind you that it is entirely

10   up to you whether you find a particular defendant deliberately

11   closed his or her eyes with respect to the substantive offense

12   of visa fraud, and what inference if any is to be drawn from

13   the evidence on this issue.

14        First, as I mentioned earlier, with respect to

15   counts two, three, five, and six, the government also charges

16   each of the defendants with aiding and abetting the substantive

17   offense of visa fraud.

18        Under the aiding and abetting statute, it is not

19   necessary for the government to show that the defendant

20   physically committed a crime in order for you to find that

21   defendant guilty of that crime.  A person who aides and abets

22   another to commit an offense is just as guilty of that offense

23   as if he committed it himself.  Accordingly, you may find a

24   defendant guilty of the substantive crime of visa fraud.  If

25   you find that the government has proven beyond a reasonable

D240cib4                    Charge

1    doubt that another person actually committed the crime and that

2    the defendant aided and abetted that person in the commission

3    of the offense.  Obviously, no one can be convicted of aiding

4    and abetting the criminal act of another if no crime was

5    committed by the other person in the first place.  But if you

6    do find that a crime was committed, then you must consider

7    whether each of the defendants aided or abetted the commission

8    of that crime.

9          In order to aid or abet another to commit a crime, it

10   is necessary that a defendant willfully and knowingly associate

11   himself or herself with the crime, and that he or she willfully

12   and knowingly seeks, by some act, to help make the crime

13   succeed.

14         Participation in a crime is willful if action is taken

15   voluntarily and intentionally; that is to say, with a bad

16   purpose, either to disobey or disregard the law.

17         You may refer to my earlier instruction on the meaning

18   of have knowingly here.

19         The mere presence of a defendant when a crime is being

20   committed, even coupled with knowledge by that defendant that a

21   crime is being committed, or the mere acquiescence by a

22   defendant in a criminal conduct of others, even with guilty

23   knowledge, is not sufficient to establish aiding and abetting.

24   An aider and abetter must know that a crime is being committed

25   and act in a way that is intended to bring about the success of

D240cib4                        Charge

1    the criminal venture.

2            To determine whether any defendant aided or abetted

3    the commission of the crime with which he or she was charged,

4    ask yourself whether the defendant participated in the crime

5    charged as something he or she wished to bring about,

6    associated himself or herself with a criminal venture knowingly

7    and willfully, and sought by his or her actions to make the

8    criminal venture succeed.

9            If the defendant did, then he or she is an aider and

10   abetter and, therefore, guilty of the offense of visa fraud.

11           If, on the other hand, your answer to any one of those

12   questions is no, then the defendant is not an aider and

13   abetter, and you may not find him -- or her -- and you must

14   find him or her not guilty.

15           Okay.  Now, turning to count four.  Count four of the

16   indictment charges the defendant, Rafael Brodjik with making a

17   false statement in a naturalization proceeding in his own

18   behalf.

19           At this time, I would request the jurors read

20   count four to themselves.

21           (Pause)

22           Now the indictment in count four charges the defendant

23   Rafael Brodjik with making false statements in an application

24   for a naturalization petition in violation of Section 1015(a)

25   of Title 18 of the United States Code.  That section provides

1  in pertinent part: Whoever knowingly makes a false statement

2  under oath in any case, proceeding, or matter relating to, or

3  under, or by virtue of any law of the United States relating to

4  naturalization, citizenship, or registered aliens, shall be

5  guilty of a crime.  In order to establish that the defendant,

6  Rafael Brodjik, is guilty of making a false statement in a

7  naturalization proceeding, the government must prove each of

8  the following four elements beyond a reasonable doubt:  First,

9  that the defendant made a false statement as alleged in the

10 indictment; second, that the statement was made during the

11 naturalization proceeding in a document required by the U.S.

12 immigration laws and regulations; third, that the statement was

13 made under oath; and fourth, that the defendant knew that the

14 statement was false when made.

15         The first element the government must prove beyond a

16 reasonable doubt is that the defendant, Rafael Brodjik, made a

17 false statement as alleged in count four of the indictment.  As

18 I previously instructed you, a statement is false if it was

19 untrue when made.  As I instructed you earlier, in order to

20 find the defendant guilty, you must unanimously agree that the

21 defendant made at least one false statement, and you must be

22 unanimous as to which false statement or statements defendant

23 made.

24         You may not consider any alleged false statements

25 other than those the government enumerated in its summation

D240cib4                    Charge

1    with respect to count four.  You should not speculate as to any

2    other possible misstatements based on the evidence you have

3    heard throughout the course of the trial.

4          The second element that the government must prove

5    beyond a reasonable doubt is that the statement described in

6    element one was made during the naturalization proceeding in a

7    document required by the U.S. immigration laws or regulations.

8          To satisfy the element, the government must prove that

9    the statement was made to the Bureau of Citizenship and

10   Immigration Services in a proceeding concerning the defendant's

11   attempt to obtain United States citizenship or in a written

12   form required as part of that proceeding.  It is sufficient if

13   the false statement was included in any affidavit, attachment,

14   or other document required to be attached to an application.

15         The third element that the government must prove

16   beyond a reasonable doubt is that the statement described in

17   element one was made under oath.  To satisfy this element, the

18   government must prove that the defendant, Rafael Brodjik, took

19   an oath to testify truthfully before the Bureau of Citizenship

20   and Immigration Services, or that the defendant under penalty

21   of perjury, subscribed as true, written information submitted

22   to the United States Citizenship and Immigration Services.  The

23   fourth and final element that the government must prove beyond

24   a reasonable doubt, is that the defendant knew that the

25   statement was false when made.  To act knowingly means to act

D240cib4                    Charge

1   voluntarily and deliberately, and not because of ignorance,

2   mistake, act, or carelessness.

3           Now in addition to dealing with the elements of each

4   of the charged offenses, you must also consider the issue of

5   venue as to each defense, namely whether any act in furtherance

6   of each crime occurred within the Southern District of New

7   York.  As I told you before, the Southern District of New York

8   encompasses Manhattan, the Bronx, Westchester, Rockland,

9   Dutchess, Putnam, Orange, and Sullivan County.  So anything

10  that occurs in those counties occurs in the Southern District

11  of New York.  In this regard, the government need not prove

12  that the crime itself was committed in this district, or that

13  the defendant or defendants were present here.  It is

14  sufficient to satisfy this element if any act in furtherance of

15  the crime you are considering occurred within this district.

16  Moreover, the act need not be a criminal act.  The act need not

17  be taken by any defendant or a co-conspirator as long as the

18  act is caused by the conduct of the defendant, or

19  co-conspirator, or is reasonably foreseeable.

20          I note that on this issue, and this issue alone, the

21  government need not offer proof beyond a reasonable doubt.  It

22  is sufficient if the government proves venue by mere

23  preponderance of the evidence.  A preponderance of the evidence

24  means to prove that the fact was more likely true than not

25  true.

1          THE COURT:  Thus the government has satisfied its

2     venue obligations if you conclude that it is more likely than

3     not that any act in furtherance of the crimes you are

4     considering occurred within the Southern District of New York.

5     If you find that the government has failed to prove this venue

6     requirement as to any count, then you must acquit the defendant

7     or defendants charged on that count.

8          The indictment alleges certain acts occurred on or

9     about various dates.  It does not matter if the indictment

10    charges that a specific act occurred on or about a certain date

11    and the evidence indicates that, in fact, the act occurred on a

12    different date.  The law requires only a substantial similarity

13    between the dates alleged in the indictment and the dates

14    established by the evidence.  It is for you to determine

15    whether any such difference is material, and if you find that

16    it was material, then you must find that defendant not guilty.

17         Each juror -- these are my final instructions.  We're

18    almost at the end.

19         Each juror is entitled to his or her opinion.  Each

20    should, however, exchange views with his or her fellow jurors.

21    That is the very purpose of jury deliberations -- to discuss

22    and consider the evidence; to listen to the arguments of fellow

23    jurors; to present your individual views; to consult with one

24    another; and to reach an agreement based solely and wholly on

25    the evidence -- if you can do so without violence to your own

D241cib5                    Charge

1    individual judgment.

2            Each of you must decide the case for yourself, after

3    consideration, with your fellow jurors, of the evidence in the

4    case.  But you should not hesitate to change an opinion which,

5    after discussion with your fellow jurors, appears erroneous.

6            However, if, after carefully considering all of the

7    evidence and the arguments of your fellow jurors, you entertain

8    a conscientious view that differs from the others, you are not

9    to yield your conviction simply because you are outnumbered.

10            To report a verdict, it must be unanimous.

11            Your final vote must reflect your conscientious

12    conviction as to how the issues should be decided.

13            I want to say a word about punishment and sentencing.

14    The question of possible punishment of any defendant is of no

15    concern to the jury and should not in any sense enter into or

16    influence your deliberations.  The duty of imposing sentence

17    rests exclusively with the court.  Your function is to weigh

18    the evidence in the case and to determine whether or not the

19    defendant is guilty beyond a reasonable doubt, solely upon the

20    basis of such evidence.  Under your oath as jurors, you cannot

21    allow consideration of the punishment which may be imposed upon

22    the defendant, if convicted, to influence your verdict in any

23    way or in any sense enter into your deliberations.

24            Now that I have charged you as to what the law is,

25    you're about to go into the jury room and begin your

D241cib5                          Charge

1    deliberations.  I'm going to have the exhibits that have been

2    admitted into evidence brought to you in the jury room.  And I

3    just urge you, if you take anything out of the folder, to be

4    sure that you put it back, you know, into the folder.  And I

5    also want to tell you that if you want to have any of the

6    testimony read back to you, that can be done, if you send us a

7    note.  But please remember that it's not always easy to locate

8    what you might want, so please be as specific as you possibly

9    can in requesting any portions of the testimony you may want.

10         I will also, as I said, give you a copy of the charge

11   on the law for you to use during deliberations.  If you feel

12   that you need any of the legal principles clarified during your

13   deliberations, you may write me a note and I will be happy to

14   do so.  Again, remember to rely on the indictment itself for a

15   description of its contents rather than on the written charge,

16   just only because the written charge is incomplete.  It's not

17   incorrect.  It's just incomplete.

18         Your requests for testimony or for any additional

19   instructions on the law -- in fact any communication with the

20   court -- should be made to me in writing, signed by your

21   foreperson, and given to one of the court officers who will be

22   outside the jury room.  I will respond to any questions or

23   requests you have as promptly as possible, either in writing or

24   by having you return to the courtroom so I can speak with you

25   in person.  In any event, do not tell me or anyone else how the

D241cib5                    Charge

1    jury stands on the issue of each of the defendants' guilt with

2    respect to each count with which he or she is charged until

3    after a unanimous verdict is reached.

4          Earlier you were given a copy of the indictment.

5    Again, you may use it to read the crimes with which the

6    defendants are charged with committing.  You are reminded once

7    again that an indictment is merely an accusation and is not to

8    be used by you as any proof of the conduct charged.

9          At this point I want to tell you that juror number 1,

10   Paul Frisch, will serve as the jury's foreperson.  But he's not

11   sitting in seat 1.  That's because I mixed you guys up

12   purposely.  It's a little trick I learned.  It keeps you all

13   attentive because none of you know who the alternates are.  So

14   anyway, Mr. Frisch, as your foreperson, will be responsible for

15   signing all communications to the court on behalf of the jury

16   and for handing them to the court officer during your

17   deliberations.  This should not be understood to mean that an

18   individual cannot send the court a note should the foreperson

19   refuse to do so.  After you have reached a verdict, your

20   foreperson will advise the court officer outside your door that

21   you are ready to return to the courtroom.

22         I will stress once again that each of you should be in

23   agreement with the verdict that is announced in court.  Once

24   your verdict is announced by the foreperson in open court and

25   officially recorded, it cannot ordinarily be revoked.

D241cib5                        Charge

 1            The custom and tradition in this court requires,

 2    although I know it's totally unnecessary, that I admonish you

 3    to be polite and respectful towards each other in the course of

 4    your discussions in the jury room so that each juror will have

 5    his or her position made clear and so that when you reach a

 6    verdict, you will know that it is a just one.

 7            Finally, let me remind you that under your oath as

 8    jurors, you're not to be swayed by sympathy.  Once you let fear

 9    or prejudice or bias or sympathy interfere with your thinking,

10    there is a risk that you will not arrive at a just and true

11    verdict.  Your oath sums up your duty, and that is: without

12    fear or favor to anyone you will well and truly try the issues

13    between the government and the defendants based solely upon the

14    evidence and this court's instructions as to the law.

15            I assume I don't need to talk to counsel about

16    anything.  There is something?

17            MR. GUTMAN:  Briefly, about one thing?

18            THE COURT:  Okay, yes.

19            (At the sidebar)

20            MR. GUTMAN:  Your Honor, I apologize for not noting

21    this before, because I must have made an incorrect assumption,

22    but the language that actually the government added at the end

23    of I believe on page 37 about looking to any reasonable

24    interpretation of the question in determining whether a

25    statement is false, I think is equally applicable to Count

D241cib5                        Charge

1    Four, and I mistakenly thought there was a reference back to

2    that but there's not.

3              MS. ECHENBERG:  We have no objection to that.

4              THE COURT:  What page?

5              MR. GUTMAN:  It's 37, on the draft.  Of the false

6    statements in the visa fraud count.

7              (Pause)

8              MR. GUTMAN:  I have the passage on my computer if it

9    would help.

10             THE COURT:  Your computer is not going to solve the

11   problem.

12             (Pause)

13             THE COURT:  You want that inserted in element 1?  You

14   want it just --

15             MR. GUTMAN:  Yes.

16             THE COURT:  Okay.  So you want it here (indicating) or

17   you want it here (indicating)?

18             MR. GUTMAN:  No.  I would say here (indicating).

19             THE COURT:  Okay.  You made copies of this already?

20             THE LAW CLERK:  Yes, but I can --

21             THE COURT:  Okay.

22             MS. ECHENBERG:  Just because we're up here, I noticed

23   that your Honor changed (indicating) --

24             THE COURT:  I did.

25             MS. ECHENBERG:  Which is correct.

D241cib5                          Charge

1            THE COURT:  I found it last night.

2            MS. ECHENBERG:  So it is corrected in what's going to

3    the jury?

4            THE COURT:  It will get corrected.

5            MS. ECHENBERG:  Okay.

6            (In open court)

7            THE COURT:  Counsel correctly points out that I have

8    the charge in the earlier discussion of false statements which

9    should also be included in connection with Count Four, which is

10   the count concerning Mr. Brodjik and his naturalization

11   application.  Let me read what was omitted, and in the written

12   copy of the charge that we'll give you, we'll make sure it's in

13   the right place as well.  We've all agreed as to where it

14   should go.  And the sentence that appeared earlier that should

15   have also appeared in Count Four is:  If the governmental

16   agency's question in response to which the statement or

17   representation was made was ambiguous so that it reasonably

18   could have been interpreted in several ways, then the

19   government must prove that defendant's answer was false under

20   any reasonable interpretation of the question.

21            Okay.  I think that takes care of any objection to the

22   charge as delivered.  Which gets us to that question of who are

23   the alternates.

24            Look, let me first say, before I tell you who you are,

25   that the alternates are not actually excused.  They're not

D241cib5

1    actually excused from jury duty.  They're going to be permitted

2    to leave the building, but we need to keep your contact

3    information, and you still have to follow the rule about not

4    talking about the case, because it can happen that you'll need

5    to be called back in case, for some reason, we, you know, lose

6    a juror -- not permanently, but just for our purposes -- during

7    deliberations.

8            And it's very important -- I forgot once to tell some

9    alternate jurors -- you can't talk to each other about the case

10   either.  And the other thing is that we promise that as soon as

11   there is a verdict, we will call you and let you know, because

12   I think it must be totally frustrating to be here for three

13   weeks and now learn that you're an alternate.  Two alternates,

14   actually.  But I think you know why we needed alternates.  You

15   just can't be sure that you're not going to lose people,

16   especially given the fact that the judge got sick.

17           And let me also just take this occasion to thank all

18   of you for your service, and it's true your service isn't over,

19   but we never thank you for your verdict in this court.  We only

20   thank you for your service.  And that service is the time that

21   you've all taken out of your lives, the attention that you've

22   paid, and it is the way our Constitution works.  Some of these

23   instructions concerned elements of our Constitution, and unless

24   we have jurors who are prepared to put their time in and take

25   time out of their regular lives, our constitutional system

1    can't function.  So we appreciate that.  And let me thank the

2    alternates, who are Natascha Patterson and Sharon Leibowitz.

3    But remember, you can't talk to each other, and I assume that

4    whatever contact information you gave, that is still good, that

5    we can get you during the day if we need to call you back, and

6    we will, as I say, call you as soon as there is a verdict.  And

7    we thank you again.  We thank everybody.

8              So at this point, Brett is no longer your -- I don't

9    know how to describe it -- your caretaker.  But we have a court

10   officer, court security officer who I think, Brett, you have to

11   swear in.

12             (Court security officer sworn)

13             THE COURT:  As I said, go back.  Don't start talking

14   to each other as the two alternates, you know, pack up.  And

15   you know, if your sandwich is there, take it.  And we will

16   bring you copies of the charge, and we just have to make a

17   couple little corrections in it.  Okay?

18             (Jury retired to deliberate)

19             THE COURT:  All right.  So we'll gather up the

20   exhibits and Brett has in her hands some defense exhibits.

21             MR. BRILL:  I gave her mine already.

22             MR. GREENFIELD:  I have mine here.

23             THE COURT:  Okay.  Just between you agree that

24   everything is complete, okay?

25             MR. PASTORE:  Judge, just a matter for the record.  We

D241cib5

1    have the exhibits in the courtroom.  They're in two carts.  We

2    personally checked them several times.  But they're available

3    if defense counsel wants to, you know, confirm or do anything

4    with them.  I don't know if they do want to look through them,

5    but they're here and available.

6              MR. GUTMAN:  Is there an official list of the exhibits

7    that have been received in evidence?

8              THE COURT:  Yes.  Now that you have that piece of

9    information, do you want to do something with it?

10             MR. GUTMAN:  I trust it is correct.  I just thought it

11   would be helpful.

12             MR. BRILL:  Judge, what's your preference in terms

13   of -- assuming you want us in the building.

14             THE COURT:  I do.

15             MR. BRILL:  So I guess we can go to the cafeteria?

16             THE COURT:  Yes.  Hopefully we get a little bit of a

17   break.  I actually have a preliminary injunction hearing in my

18   other courtroom in less than an hour.  It was supposed to be

19   this morning, then I put it off to 2, decided I did need a

20   brief break before I did that.

21             (Recess pending verdict)

22

23

24

25

D240cib6                         Deliberations

1          THE COURT:  All right.  I have given you copies of the

2     two notes --

3          MR. DONALDSON:  Yes.

4          THE COURT:  -- that we received.  Let me read them

5     into the record.

6          First note we received at 2:15:

7          Can we get a copy of the complete indictment to

8     review.  Second, an English translation of the letter,

9     parentheses, extraordinary experience, close parenthesis,

10    written in Turkish, made available to us?  Signed by the

11    foreperson.

12         Second note, we received 2:35.  Can we get an index or

13    directory for the evidence?  How can we find a particular piece

14    of evidence?  Specifically, the transcript of the interview

15    between Deidre Gordon and Gulay Cibik, again signed by the

16    foreperson.

17         Well, obviously, the answer to the first question is

18    you have, actually, 12 copies of the complete indictment.  It

19    may be confusion between the word "indictment" and the word

20    "charge" and since I told them that my charge was incomplete.

21    But beyond that, they have 12 complete indictments.

22         The second question, was, was an English translation

23    of the letter written in Turkish made available to us?

24         MS. ECHENBERG:  I believe --

25         THE COURT:  I don't know the answer.

D240cib6                    Deliberations

1          MS. ECHENBERG:  Yeah, I believe what they are

2     referring to, your Honor, is government exhibit 340-3, which

3     says:  Dear Ms. Gulay.  But the remainder is in another

4     language.  There is no translation of that document.

5          THE COURT:  Okay.

6          Okay, then they ask for an index or directory for the

7     evidence.

8          MS. ECHENBERG:  And, your Honor, we of course have our

9     own internal index.  We're working right now on sanitizing that

10    to possibly go back to the jury.  It is 44 pages long, so I

11    assume defense counsel would want to look at it.  What I might

12    suggest, is if there is anything in particular we are looking

13    for, we can help them along the way, but we can certainly work

14    on --

15         THE COURT:  They also took a lot of notes, so --

16         MR. GERZOG:  They also, your Honor say -- although

17    this is not my client, they say specifically the transcript of.

18    So that I think that relates to the question on the bottom.

19         THE COURT:  I think it does.  Am I right, then?

20         MS. ECHENBERG:  Yeah.  And in response to that, we

21    have made copies of the relevant pages, which is 2006, starts

22    at line 3.  And it goes to 2011, also line 3.

23         So we can -- I'm not sure what your Honor's preference

24    is.  This can go back to the jury, nothing is redacted --

25         THE COURT:  No, I give them transcripts.  I don't read

```
 1    that.
 2              MR. GERZOG:  Is that direct and cross?
 3              MS. ECHENBERG:  This is the direct of that testimony.
 4              MR. GERZOG:  I think there was cross of that.
 5              MR. DONALDSON:  Not that I saw.  But I'll look at it
 6    some more.  There was not intentionally significant cross on
 7    the statement allegedly given by Ms. Cibik to Ms. Gordon.  I
 8    don't recall there being cross of that, if at all that I
 9    crossed the witness.  So we did speak to the government about
10    those pages, and those are the page that I thought were
11    appropriate.
12              All the question was was whether or not you were going
13    to read to it them, or give them the transcript.
14              THE COURT:  My practice is to give them the
15    transcript.
16              MR. GERZOG:  I wouldn't mind quickly going over it, if
17    I may.
18              THE COURT:  I was thinking that it might be just most
19    efficient to just call them back in and respond to these two
20    notes, rather than trying to give them a written response.
21              MS. ECHENBERG:  Right.  The government has no issue
22    with that, your Honor.
23              MR. DONALDSON:  Your Honor, I'm sorry, I was being
24    lectured just now by my client, I didn't hear you.
25              Would you say that again?
```

D240cib6                    Deliberations

1            THE COURT:  I said I just think it might be more

2    efficient, in this instance, to have them come back and let me

3    orally respond to their notes, rather than trying to send them

4    a written response.

5            MR. DONALDSON:  Right.  And I just want to put on the

6    record, because it's -- I need to put this on the record.  I

7    hope I'm not taking up too much of the Court's time.

8            My client is asking me things that I know are not

9    legally appropriate to -- let me just say this.  I'm informing

10   my client that it is not appropriate, at this time, for us to

11   start trying to ask the jurors questions, or tell the jurors

12   questions about -- tell the jurors statements about the

13   statement that they claim Ms. Gordon took with my client

14   regarding the truthfulness of it and --

15           THE COURT:  Okay.

16           MR. DONALDSON:  -- whether her rights were violated

17   regarding Miranda and things like that.  We have been through

18   that often, but that appears to be coming up again right now.

19           THE COURT:  Ms. Cibik, it's very clear.  None of us,

20   not me, not you, none of the lawyers, can have a dialogue with

21   the jury.  There is simply no conversation that can occur,

22   beyond if they send us a note and we're able to respond to it,

23   you know, we can.  But there is no dialogue.  And, if they are

24   in the room, I don't want to hear a word out of your mouth,

25   okay?  Do you understand?

D240cib6                        Deliberations

1              DEFENDANT CIBIK:  Uh-huh.

2              THE COURT:  Yes?

3              DEFENDANT CIBIK:  Yes.

4              THE COURT:  Okay?

5              MS. ECHENBERG:  Did you want me to pass that up, the

6    section of the transcript.

7              THE COURT:  Yes, please.

8              (Jury present)

9              THE COURT:  Okay sometimes when you send a note, I

10   send you back a note as an answer.  I thought this time it

11   might be just more efficient to speak to you.

12             First, you asked for a complete indictment.  You have

13   12 complete indictments.  What I was trying to explain, and

14   it's probably just my fault, is that the jury instructions are

15   also called the jury charge.  And we also refer to charges in

16   the indictment.  So maybe that's the source of the confusion.

17             In any event, you have 12 complete indictments.

18             At for the English translation of a letter to

19   Ms. Cibik, there is no English translation in the record.  You

20   asked for an index or directory to the evidence.  We do not,

21   the Court does not maintain a directory or index with

22   descriptives.  It simply is numbers.  So, you know, whatever

23   the number in evidence.  I don't think that's what you are

24   looking for.

25             The government has a more fulsome directory which they

D240cib6                    Deliberations

1   use for their internal purposes.  They are going to make an

2   effort to see if it can be appropriately, I would say the word

3   probably "sanitized," so that it doesn't have anything in it

4   that would be inappropriate, you know, for you to see.  But,

5   that's a big project.  And it would probably be better, in the

6   interim, if you used one of two sort of methods.

7          One, you all -- a lot of you took notes.  And I'm

8   assuming you wrote down numbers.  Well, you have all of the

9   actual exhibits.  So you could use your notes to guide you to

10  find what you're looking for.  That's a possibility.

11         The other things is you can, as you did with respect

12  to the subject of the interview between Agent Gordon and

13  Ms. Cibik, you can ask us for something specific.  And we do

14  have -- I'm going to give you the transcript of the testimony

15  of Agent Gordon about that interview.  So, I think, you know,

16  that covers everything.  I just, you know, want to say that if

17  you have a means, internally, of figuring out -- finding the

18  exhibit that you are looking for, you'll probably get it faster

19  than if you send us a note to get it for you.  Because I'll

20  just explain the process.  Every note that comes in, the Court

21  officer calls my chambers.  We come up.  We get it.  We make

22  copies of it for every lawyer.  And then we all have to

23  reconvene in the courtroom to discuss the appropriate response.

24  The process of that is at least 15 minutes, 20 minutes.  We

25  have to get the court reporter.  You might have found it

D240cib6                    Deliberations

1    yourself, using the notes, because you have all of the

2    documents.  I assume they are in some reasonable numerical

3    order.  Yes, they are in numerical order.  But, you know, if

4    you need anything, you ask us.

5             Okay?  All right?  Anything else?  Okay.

6             Yes.

7             A JUROR:  When you speak about the indictment, is

8    there a difference between the smaller packet that we got and

9    these larger packets that you were reading from?

10            THE COURT:  Yeah, they are entirely different.

11            The smaller -- the thing which says "indictment"on it,

12   that is the indictment.  Those are the charges that the

13   government brings.

14            The larger document was what I read to you.  That's my

15   instructions on the law.  When I changed topics, substantive

16   topics, portions of the indictment were copied into my charge.

17   But as I explained, those were only portions.  I did not copy

18   the entire indictment.  So when you want to find out what

19   charge one says, use the thin version, use the thing that says

20   indictment, don't look in my charge.  Just because my charge on

21   that is incomplete, it's not wrong, but it is incomplete.  And

22   because it is incomplete in the sense it is wrong, but it is

23   not an inaccurate transcript.  It's an accurate copy, but it's

24   incomplete, okay, so use the indictment.  If you want to know

25   as you go through the counts, use that.  But if you want to

D240cib6                        Deliberations

1    understand the law related to a particular count, then you use

2    the thicker document, the charge, okay.  All right, very good.

3    Thank you.

4                (Jury excused)

5                (Adjourned until Tuesday, February 5, 2013 at 10:00

6    a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25