D250cib1                          Deliberations

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                        11-CR-424 (NRB)

5    GULAY CIBIK, REFAEL BRODJIK,
     a/k/a "Rafi," NATHAN SCHWARTZ,
6    HAROLD TISCHLER, a/k/a
     "Hershy,"
7
                        Defendants.           Jury Trial
8
     ------------------------------x
9
                                              New York, N.Y.
10                                            February 5, 2013
                                              9:18 a.m.
11

12   Before:

13                   HON. NAOMI REICE BUCHWALD,

14                                            District Judge

15
                          APPEARANCES
16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
19        Assistant United States Attorneys
     MICHAEL DINET, Paralegal Specialist
20

21   DONALDSON CHILLIEST LLP
          Attorneys for Defendant Gulay Cibik
     BY:  XAVIER R. DONALDSON, ESQ.
22

     LAWRENCE D. GERZOG, ESQ.
23   JEREMY L. GUTMAN, ESQ.
          Attorneys for Defendant Refeal Brodjik
24

25

D250cib1                          Deliberations

                              APPEARANCES
                              (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D250cib1                    Deliberations

 1              (Trial resumed)

 2              (In open court; jury not present)

 3              THE COURT:  All right.  I understand there is some

 4     matters you want to raise.

 5              MR. DONALDSON:  No, your Honor.

 6              MR. HERZOG:  Yes, Judge.  A couple of things.

 7              In going over the exhibit list, I agreed to all but

 8     one, I think, the descriptions of the exhibits.  I gave Ms. --

 9              THE COURT:  Echenberg --

10              MR. HERZOG:  -- Echenberg, thank you.

11              THE COURT:  -- I have it written out --

12              MR. HERZOG:  What I would like to say about -- one of

13     the exhibits, Brodjik's exhibit 1, is a photograph of Jed David

14     Philwin.  And the significance of it was, is, that when they

15     showed it to Mr. Grynsztajn, he said he didn't know who it was,

16     maybe it was his brother, and --

17              THE COURT:  Whose brother?

18              MR. HERZOG:  Grynsztajn's brother.

19              THE COURT:  Mr. Grynsztajn thought it was a picture of

20     his own brother.

21              MR. HERZOG:  Apparently.  And that was 11 days before

22     the trial started.  I think it's not enough to just say photo

23     of Jed David Philwin, because --

24              THE COURT:  No.  No, no, no.  This is a list of

25     exhibits, not a -- you know, a commentary.

D250cib1                    Deliberations

1              MR. HERZOG:  All right.  If that's the Court's ruling,

2       that is fine.

3              THE COURT:  Okay.

4              MR. HERZOG:  The second is that, yesterday, I was

5       asking Agent Gordon whether during Ms. Cibik's first statement

6       she mentioned Rafi Brodjik -- or, I'm sorry, in my summation I

7       was saying that Ms. Cibik did not mention Refael Brodjik.

8       There was an objection.  And Mr. Pastore said:  All I'll say is

9       Bruton.

10             Your Honor sustained the objection.

11             And I stopped talking.

12             I went back and looked at the Cibik proffers.  And I

13      can't find any reference, anywhere, in anything Cibik ever said

14      about Mr. Brodjik.  So I would think that that would make your

15      sustaining of the objection -- that that would influence your

16      thinking as to whether the objection was properly sustained.

17      And I would ask for an instruction to the jury that there was

18      nothing in the Cibik --

19             THE COURT:  I think the -- well, I'll let the

20      government respond.

21             MR. PASTORE:  Yes, your Honor.

22             First, I have to apologize, I confused Mr. Brodjik's

23      proffer with Ms. Cibik's proffer which, in some way, in some

24      sense, actually makes this a worse argument from Mr. Gerzog's

25      standpoint, I think.

D250cib1                    Deliberations

1              Mr. Brodjik said Abdullah knew, Gulay knew, and David

2      Grynsztajn, who had their own clients, would also give money to

3      Brodjik for David.  So it's in Mr. Brodjik's proffer statement.

4      I think, yesterday, I misspoke and said it was in Ms. Cibik's

5      proffer statement.  In the government's view, it makes it even

6      worse, because the protections were there.

7              As your Honor knows, we moved at the conclusion of

8      cross-examination by Mr. Gerzog when he stated that -- to Mr.

9      Salamon you didn't see Brodjik picking up money from Cibik

10     because that didn't happen, right?  We moved to admit the

11     proffer statement.  And I understand your Honor denied the

12     government's motion.  But I think this is along the same lines

13     that, as your Honor said "it is not cricket" with Mr. Brodjik

14     saying they collected money from Ms. Cibik, and then suggesting

15     an argument that they never interacted.

16             MR. GUTMAN:  I think we believe that is missing the

17     point completely.

18             THE COURT:  Well, why don't we try it this way.

19             Let's assume that the agent was on the stand.  Could

20     you have asked her, without creating a situation where you were

21     exposing Mr. Brodjik's proffer statement, questions about

22     whether some other person that she interviewed put Mr. Brodjik

23     at the scene?

24             MR. GUTMAN:  I think so.  And I think this goes --

25             THE COURT:  After he admitted it?  No, I don't think

D250cib1                    Deliberations

 1    so, I really don't.

 2           MR. GUTMAN:  I believe based on that same case that I

 3    cited during Mr. Donaldson's discussion on this, and, I'll look

 4    it up again because I can't remember how to pronounce it, but

 5    the Court of Appeals has made it clear as long as defense

 6    counsel does not assert as truth a fact that is --

 7           THE COURT:  Look, the fact is, that during the trial,

 8    the government really failed to press, as I recall it, the

 9    issue about Mr. Brodjik's proffer.  They raised it and kind of

10    dropped it.  And I don't really recall ruling on it.  And,

11    actually, I thought they had a pretty good argument, better

12    than the one that they had with respect to Mr. Donaldson.

13           So, you probably have a record that's in better shape,

14    given what happened, because I think you really have exposed

15    Mr. Brodjik's proffer.  And had I been pressed on it, there was

16    a really good chance that it would have come in.  So I think

17    you should be, on balance, content with the record as it is.

18           MR. GUTMAN:  Your Honor, on -- I understand the

19    Court's position.  We -- first of all, that didn't happen.  Had

20    it happened, we would have argued about why --

21           THE COURT:  Right, I --

22           MR. GUTMAN:  -- why the government's position was

23    wrong.

24           But whatever the correct ruling might have been, I

25    think on summation, counsel is entitled and has an obligation,

D250cib1                    Deliberations

1  as he sees fit, to comment on the evidence that is before the

2  jury.  And I think, you know, this goes back to this whole

3  idea, a trial isn't a search for the truth in the sense that if

4  the Court --

5          THE COURT:  No, I fully understand it is not a search

6  for truth.

7          MR. GUTMAN:  And that, for better or worse, that is

8  the law.  And if the Court is aware of a confession that

9  someone made that's suppressed, that doesn't mean that because

10  that is there, but it's not before the jury, the defense can't

11  challenge the evidence and whether it proves beyond a

12  reasonable doubt the government's case.

13          THE COURT:  Two things.  One, there is nothing that

14  was suppressed here, which is a major difference.

15          Secondly, the fact remains that I did sustain the

16  objection.  I was presented with a certain set of facts.  I

17  don't pretend to have memorized the exhibits in this case.  And

18  so as a consequence, by the time the government got up to do

19  their rebuttal, that was not something before the jury that

20  they could have responded to.  So I think we're going to have

21  to live with it the way it happened.

22          All the -- look, you're all entitled -- and I take it

23  very seriously -- to a fair trial.  But fair and perfect are

24  not the same things.  I try to be perfect.  Counsel tries.  But

25  it's just like, you know, ineffective assistance of counsel is

1    not against a perfection standard.  It is a competence standard

2    and an overall fairness standard.  It is what it is.  And I

3    think there is -- and you may have had a ruling that went, you

4    know, against you, I think you wound up avoiding one -- well

5    excuse me, you may have had one ruling that went against you,

6    but you avoided a bigger one that I think would have gone

7    against you.

8           MR. PASTORE:  And just for the record, the government

9    obviously concede that the Court's sustaining of the objection,

10   if presented and knowing that Mr. Brodjik had himself admitted

11   to contact with Cibik, and we would have still made the same

12   objection on the same grounds, and for same reasons.  And we

13   would argument that it would have been appropriate to sustain

14   the objection.

15          THE COURT:  I'm not saying you are wrong.  I think I

16   agree with you.  I was just saying that, you know, it would be

17   ideal if trials proceeded, at all times, at a pace that allowed

18   for briefing with 30-day gaps and, you know, time to fully

19   consider every possible way of looking at an issue.  The

20   reality is trials proceed at a much more fast pace.  And,

21   therefore, there is a certain level of forgiveness that is

22   accorded both the Court and counsel.  We live with it.  We do

23   our best.  Everybody has tried, no one is suggesting, I

24   don't -- everybody has worked hard.  And we, you know, demand a

25   lot of ourselves.  We hold ourselves to a high standard, but it

D250cib1                    Deliberations

1   doesn't mean that we're perfect, even if we are --

2           MR. GUTMAN:  And we're even less perfect.  And we're

3   not suggesting any intent to do anything other than what the

4   Court believes is right and fair.

5           THE COURT:  The point is, you can't get away with

6   something on summation that you really couldn't have gotten

7   away with, you know, in the course of the trial itself.  It is

8   even worse because, you know, the summation is gonna be all of,

9   you know, an hour, an hour and a half.

10          It's a much harder situation to deal with corrections.

11   You have a trial and something happens.  In this case, in week

12   two, we had all of the time, you know, in week three to fix it.

13   You don't call a witness back, come up with elaborate

14   instructions, all sorts of things.  But in the midst of a

15   summation, that's very hard to create a solution if something,

16   you know, is improper.

17          So it would have been -- the scene of Mr. Gerzog

18   asking the agent during trial did Ms. Cibik mention

19   Mr. Brodjik, whoa, up to the sidebar.  And I think we, you

20   know, would have known what the answer would be.  No,

21   sustained.  So he can't do it on summation what he couldn't

22   have done as a question and answer at trial.

23          MR. GUTMAN:  Your Honor, we accept your ruling, but

24   just we stand by our request.

25          THE COURT:  Okay.  All right.

1          MR. HERZOG:  Finally, Judge, as you remember there was

2     a contretemps yesterday about Agent Gordon and 225 Second

3     Street, and whether there was a bakery there and so forth.

4          THE COURT:  Also, the Israeli experience letter.  That

5     was the first.

6          MR. HERZOG:  But speaking of the bakery, specifically,

7     I have good reason to believe, on a definite good-faith basis

8     that there is a bakery there now.  And there is also a report

9     in the discovery of an agent's investigation in which he went

10    to that spot, I believe in '06, and spoke to -- it was, at that

11    time, it was a Jewish bakery -- and spoke to the owners of the

12    Jewish bakery.  And they said Mr. Flam doesn't own the bakery

13    now, but he used to own the bakery.

14         So there is a very real point that Mr. Flam owned a

15    Jewish bakery at Second Street in 2002, when Mrs. Brodjik sent

16    in her application.  And you know, I was not playing any games.

17    These are all facts that I believe to be true.  And I, again,

18    object respect respectfully to the fact that you somehow

19    described it as Brady material, that you somehow suggest that I

20    was inappropriate in saying what I said, and making the point I

21    made.  I don't think I was.

22         I think it was perfectly acceptable for me to ask the

23    jury to think about why something was not testified to, and to

24    give them an -- now, I'm not -- again, I'm not saying that I

25    know that Agent Gordon did something wrong, I'm not saying that

D250cib1                    Deliberations

1    I even personally think she did something wrong.  But it's not

2    about what I think, and what I personally feel.  It is about

3    what my responsibilities are to Mr. Brodjik.  And I think it

4    was entirely appropriate for me to make the statement, sum up

5    on that statement, et cetera.

6         THE COURT:  The essence of defense summations in this

7    case, other than attacking the credibility of the two

8    cooperating witnesses, was a drumbeat of attacks on the

9    government's investigative techniques, or lack thereof.

10        I was silent, the Court was silent.  This was –– my

11   reaction was the combination of your claim, which you are not

12   even today claiming the basis for, that the government, the

13   agent contacted the Israeli experience letter author and

14   learned that, either confirmed it or learned that, in fact, she

15   had the experience.  If that were the case, the government had

16   a Brady obligation.  And when we got to this second issue it

17   was the same kind of argument.  It was not simply an argument

18   that the government could have gone to an address and confirmed

19   something and they failed to do it.  It was a further

20   suggestion that they had done so, learned a bad fact, and

21   didn't disclose it.  And the reaction was, had you just done

22   one, just like the first time, which I –– they have not gone

23   past me on the Israeli letter, you would have gotten no

24   reaction.  But it was the second time, so.

25        MR. HERZOG:  That's all I have.

D250cib1                     Deliberations

1          THE COURT:  And there still is no basis, I think, for

2     you're saying that Agent Gordon went and did, you know, found

3     something which with she failed to disclose.

4          MR. HERZOG:  I think what I said, Judge, was that

5     there was no testimony that Agent Gordon contacted the bakery.

6     And I think what I said was, why not.  Did she forget to, did

7     she not think of it?  Or was she afraid of finding out

8     something that she didn't want to know.  I don't believe, I

9     don't have a transcript in front of me, but I don't believe I

10    said she contacted the bakery, and the bakery told her

11    something that she --

12         THE COURT:  The Israeli thing was absolutely clear, so

13    I don't know what -- I don't have a --

14         MR. PASTORE:  Judge, I have the transcript right here.

15    And we didn't object until the later part of this.  So Mr.

16    Herzog is right, for first part, he says:  Either an agent of

17    21 years forgot that it might be a good idea to go look at 225

18    Second Street.  We didn't object to that point.  But then he

19    adds:  Or perhaps it means that she went and she looked and

20    didn't like what she saw as far as proving things to you, and

21    that is when there was the simultaneous --

22         MR. HERZOG:  We are talking about the Israeli

23    experience letter.

24         MR. PASTORE:  No, no, that's the bakery.

25         THE COURT:  That's the bakery.

D250cib1                    Deliberations

1              MR. PASTORE:  Right.

2              MR. HERZOG:  Excuse me.  Your Honor said that I said

3    that she called Isreal, and --

4              THE COURT:  No, she didn't --

5              MR. HERZOG:  I beg your pardon?

6              THE COURT:  They'll read it to you.

7              Look, you know, there are two possibilities here.

8    Either you did realize what you were doing, and the Brady issue

9    that you raise, or you were pushing the line and there was a

10   reaction.

11             MR. HERZOG:  It isn't -- with respect to the Israeli

12   experience letter, there is no Brady issue in saying either she

13   didn't -- either she forgot or chose not to call, or she didn't

14   call because she was afraid of what she might find out.  Now

15   that's, with respect to the Israeli --

16             THE COURT:  Well, the government will read what you

17   said.

18             MR. PASTORE:  So it says:  Didn't do it.  Or, did and

19   got the answer they didn't want to hear, and didn't want to

20   tell you.

21             THE COURT:  Okay.

22             MR. HERZOG:  No, if that's --

23             MR. PASTORE:  So the Court's recollection is --

24             MR. HERZOG:  If that's what it says, then --

25             THE COURT:  Argument over.

D250cib1                         Deliberations

1          Look, you know and I know that you have gotten many

2    favorable rulings on issues far more important than a line in

3    your summation about the government's investigative techniques.

4    You got changes in the charge that were significant to you.

5    You got, through my, in effect, good offices, the government to

6    tell you in advance of your summation, exactly what they were

7    going to be arguing with the false statements.  Those things

8    are really important.  This is a blip along with other, you

9    know, objection sustained, not sustained, some perfect, some

10   not perfect.  There was no question I believe I was totally

11   correct.  But when you, you know, push the envelope, sometimes

12   you get a reaction.

13          MR. HERZOG:  We have your ruling.  Thank you, your

14   Honor.

15          THE COURT:  Okay.  All right, so they're back at work.

16   We'll stay tuned.  I think at least yesterday my description to

17   them of what happens when they send a note did somewhat reduce,

18   you know, what I was afraid was gonna be one every 15 minutes,

19   so.

20          MR. PASTORE:  On a logistical point, Judge, once we

21   complete the exhibit list --

22          THE COURT:  Right.

23          MR. PASTORE:  -- should we have provide it to your law

24   clerk in order to provide it to the marshal to go to the jury?

25          THE COURT:  That's fine, that works.

D250cib1                     Deliberations

1             MR. PASTORE:  Is everyone comfortable with that?

2             MR. DONALDSON:  Yes.

3             MR. GUTMAN:  Of course.

4             MR. HERZOG:  Yes.

5             THE COURT:  Sounds good.

6             MR. PASTORE:  Thank you, Judge.

7             (Recess)

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D250cib2                         Verdict

1                   (2:29 p.m.)

2                   THE COURT:  At 2:12, we received the following note:

3                   Your Honor, we the jury have reached a verdict on all

4        counts.

5                   Signed by the foreperson.

6                   So we're going to bring them in.

7                   I just would request that everybody remain silent

8        through the reading of the verdict; okay?

9                   THE DEPUTY CLERK:  All rise.

10                  (Jury present)

11                  THE COURT:  Good afternoon, everyone.

12                  THE DEPUTY CLERK:  Will the jurors please answer

13       present when your name is called.

14                  Juror number one, Paul Frisch.

15                  THE JUROR:  Present.

16                  THE DEPUTY CLERK:  Juror number two, Vito Gironda.

17                  THE JUROR:  Present.

18                  THE DEPUTY CLERK:  Juror number three, Saul Diaz.

19                  THE JUROR:  Present.

20                  THE DEPUTY CLERK:  Juror number four, Susan Otto-Peek.

21                  THE JUROR:  Present.

22                  THE DEPUTY CLERK:  Juror number five, Laura Mayer.

23                  THE JUROR:  Present.

24                  THE DEPUTY CLERK:  Juror number six, Roya Shojai.

25                  THE JUROR:  Present.  Juror number seven, Norma

D250cib2                         Verdict

1   Goldstein.

2          THE DEPUTY CLERK:  Juror number eight, Sindia Massas

3   Cuenca.

4          THE JUROR:  Present.

5          THE DEPUTY CLERK:  Juror number nine, Jessica Rodwick.

6          THE JUROR:  Present.

7          THE DEPUTY CLERK:  Juror number 10, Rosemary Romeo.

8          THE JUROR:  Present.

9          THE DEPUTY CLERK:  Juror number 11, Louis Rivera.

10          THE JUROR:  Here.

11          THE DEPUTY CLERK:  Juror number 12, Paulette Damiano.

12          THE JUROR:  Present.

13          THE DEPUTY CLERK:  Will the foreperson please rise.

14          Has the jury agreed upon a verdict?

15          THE FOREPERSON:  Yes.

16          THE DEPUTY CLERK:  Do you find that the government has

17   proven beyond a reasonable doubt that the defendant, Gulay

18   Cibik is guilty of conspiring to commit visa fraud or to make

19   false statements to the United States government, as charged in

20   count one of the indictment; guilty or not guilty?

21          THE FOREPERSON:  Guilty.

22          THE DEPUTY CLERK:  Do you find that the government has

23   proven beyond a reasonable doubt that the defendant, Refael

24   Brodjik is guilty of conspiring to commit visa fraud or to make

25   false statements to the United States government as charged in

D250cib2                           Verdict

1    count one of the indictment; guilty or not guilty?

2             THE FOREPERSON:  Guilty.

3             THE DEPUTY CLERK:  Do you find that government has

4    proven beyond a reasonable doubt that the defendant, Nathan

5    Schwartz, is guilty of conspiring to commit visa fraud or to

6    make false statements to the United States government as

7    charged in count one of the indictment; guilty or not guilty?

8             THE FOREPERSON:  Guilty.

9             THE DEPUTY CLERK:  Do you find that the government has

10   proven beyond a reasonable doubt that the defendant, Harold

11   Tischler, is guilty of conspiring to commit visa fraud or to

12   make false statements to the United States government as

13   charged in count one of the indictment; guilty or not guilty?

14            THE FOREPERSON:  Guilty.

15            THE DEPUTY CLERK:  Do you find that the government has

16   proven beyond a reasonable doubt that the defendant, Gulay

17   Cibik is guilty of having committed visa fraud as charged in

18   count two of the indictment; guilty or not guilty?

19            THE FOREPERSON:  Guilty.

20            THE DEPUTY CLERK:  Do you find that the government has

21   proven beyond a reasonable doubt that the defendant, Refael

22   Brodjik is guilty of having committed visa fraud as charged in

23   count three of the indictment; guilty or not guilty?

24            THE FOREPERSON:  Guilty.

25            THE DEPUTY CLERK:  Do you find that the government has

D250cib2                          Verdict

1    proven beyond a reasonable doubt that the defendant, Refael

2    Brodjik, is guilty of having made false statements in a

3    naturalization proceeding as charged in count four of the

4    indictment; guilty or not guilty?

5           THE FOREPERSON:  Guilty.

6           THE DEPUTY CLERK:  Do you find that the government has

7    proven, beyond a reasonable doubt, that the defendant, Nathan

8    Schwartz, is guilty of having committed visa fraud as charged

9    in count five of the indictment; guilty or not guilty?

10          THE FOREPERSON:  Guilty.

11          THE DEPUTY CLERK:  Do you find that government has

12   proven beyond a reasonable doubt that the defendant, Harold

13   Tischler, is guilty of having committed visa fraud as charged

14   in count six of the indictment; guilty or not guilty?

15          THE FOREPERSON:  Guilty.

16          THE DEPUTY CLERK:  Ladies and gentlemen of the jury,

17   listen to your verdict as it stands recorded.

18          Do you find that the government has proven beyond a

19   reasonable doubt that the defendant, Gulay Cibik is guilty of

20   conspiring to commit visa fraud, or to make false statements to

21   the United States government as charged in count one of the

22   indictment; guilty.

23          Do you find that the government has proven beyond a

24   reasonable doubt, that the defendant, Refael Brodjik, is guilty

25   of conspiring to commit visa fraud or to make false statements

D250cib2                          Verdict

1    to United States government as charged in count one of the

2    indictment; guilty.

3            Do you find that the government has proven beyond a

4    reasonable doubt that the defendant, Nathan Schwartz, is guilty

5    of conspiring to commit visa fraud or to make false statements

6    to the United States government as charged in count one of the

7    indictment; guilty.

8            Do you find that the government has proven beyond a

9    reasonable doubt that the defendant, Harold Tischler, is guilty

10   of conspiring to commit visa fraud, or to make false statements

11   to the United States government as charged in count one of the

12   indictment; guilty.

13           Do you find that the government has proven beyond a

14   reasonable doubt that the defendant, Gulay Cibik, is guilty of

15   having committed visa fraud as charged in count two of the

16   indictment; guilty.

17           Do you find that the government has proven beyond a

18   reasonable doubt that the defendant, Refael Brodjik, is guilty

19   of having committed visa fraud as charged in count three of the

20   indictment; guilty.

21           Do you find that the government has proven beyond a

22   reasonable doubt that the defendant, Refael Brodjik, is guilty

23   of having made false statements in a naturalization proceeding

24   as charged in count four of the indictment; guilty.

25           Do you find that the government has proven beyond a

D250cib2                    Verdict

reasonable doubt that the defendant, Nathan Schwartz, is guilty

of having committed visa fraud as charged in count five of the

indictment; guilty.

        Do you find that the government has proven, beyond a

reasonable doubt, that the defendant, Harold Tischler, is

guilty of having committed visa fraud as charged in count six

of the indictment; guilty.

        THE DEPUTY CLERK:  Mr. Frisch, is that the jury's

verdict?

        THE FOREPERSON:  Yes.

        THE DEPUTY CLERK:  Mr. Frisch, is that your verdict?

        THE FOREPERSON:  Yes.

        THE DEPUTY CLERK:  Mr. Gironda, is that your verdict?

        THE JUROR:  Yes.

        THE DEPUTY CLERK:  Mr. Diaz, is that your verdict?

        THE JUROR:  Yes.

        THE DEPUTY CLERK:  Ms. Otto-Peek; is that your

verdict?

        THE JUROR:  Yes.

        THE DEPUTY CLERK:  Ms. Mayer; is that your verdict?

        THE JUROR:  Yes.

        THE DEPUTY CLERK:  Ms. Shojai; is that your verdict?

        THE JUROR:  Yes.

        THE DEPUTY CLERK:  Ms. Goldstein, is that your

verdict?

D250cib2                      Verdict

1                THE JUROR:  Yes.

2                THE DEPUTY CLERK:  Ms. Massas Cuenca, is that your

3      verdict?

4                THE JUROR:  Yes.

5                THE DEPUTY CLERK:  Ms. Rodwick, is that your verdict?

6                THE JUROR:  Yes.

7                THE DEPUTY CLERK:  Ms. Romeo, is that your verdict?

8                THE JUROR:  Yes.

9                THE DEPUTY CLERK:  Mr. Rivera, is that your verdict?

10               THE JUROR:  Yes.

11               THE DEPUTY CLERK:  Ms. Damiano; is that your verdict?

12               THE JUROR:  Yes.

13               THE COURT:  Finally, counsel, is there any reason we

14     need keep the jury any further?

15               MR. PASTORE:  Nothing from the government.

16               MR. GUTMAN:  No, your Honor.

17               MR. DONALDSON:  No, your Honor.

18               THE COURT:  Let me thank you, once again, as I have

19     indicated yesterday, we thank you for your service.  It is not

20     the custom of the Court to thank you for your specific verdict.

21     And I do apologize, once again, that your service lasted longer

22     than I had anticipated.  You were very good sports about it.

23     And I thank you on behalf of the entire court.

24               You were a terrific jury, really.  You know, you got

25     here on time, and paid spectacular attention throughout the

D250cib2                    Verdict

1    trial, some of which I would say, candidly, is not the most

2    scintillating testimony I have ever heard, but you were

3    certainly totally alert.  And, as I say, we thank you very much

4    for your service.

5            You are excused.  Thanks.

6            THE COURT:  Mr. Frisch, I just need that verdict form

7    from you.

8            THE DEPUTY CLERK:  All rise.

9            (Jury excused)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D250cib2                          Verdict

1          THE COURT:  All right.  Other than setting sentencing

2     dates, is there anything else we need to talk about at this

3     time?

4          MR. PASTORE:  Yes, your Honor.  With respect to the

5     bail conditions of the defendants, with respect to Nathan

6     Schwartz and Harold Tischler, at this time the government is

7     not seeking any adjustment to their bail conditions.  We will

8     want to talk, in particular, to Mr. Schwartz' counsel, because

9     it has come to our attention allegations of additional fraud

10    committed by Mr. Schwartz since he has been out on bail.  We

11    don't think remand is necessary at this time, but there may be

12    increasing conditions that we'll negotiate with Mr. Brill.

13          With respect to defendants Brodjik and Cibik, we are

14    seeking remand at this time based on risk of flight.  With

15    respect to Mr. Brodjik, I'm happy to lay out the reasons --

16          THE COURT:  First of all since, I didn't set bail on

17    any of these defendants.  I guess I did with Ms. Cibik --

18          MS. ECHENBERG:  Right.

19          MR. PASTORE:  Right.

20          THE COURT:  -- but I don't think I set bail for

21    Mr. Brodjik.  But it's possible I did.

22          Could you tell me what his bail conditions are now.

23    Does anyone know?

24          MR. PASTORE:  I apologize for not knowing, your Honor.

25    I believe they are relatively minimal conditions, but I don't

D250cib2                        Verdict

1    want to misspeak.

2            THE COURT:  Let me ask you another question, maybe you

3    know the answer to this one.

4            MR. PASTORE:  Sorry.

5            THE COURT:  What are the guidelines that Mr. Brodjik

6    faces in light of these convictions?

7            MR. PASTORE:  The guidelines are, I believe, in the

8    three-year range for the crime.

9            THE COURT:  Okay.

10           MR. PASTORE:  It's over 100 documents, the government

11   would certainly be alleging --

12           THE COURT:  Does the personal naturalization count

13   have any impact on the guidelines calculation?

14           MR. PASTORE:  It may.  We have to basically see.  If

15   it's going to add, about a half unit.  It won't be drastic if

16   it is grouped, which it very well may be, won't have any

17   effect -- at most, one offense level difference.

18           THE COURT:  Okay.  All right.  So speak to your

19   application.

20           MR. PASTORE:  So with respect to Mr. Brodjik, as your

21   Honor points out, he has now been convicted of false statements

22   in his own naturalization application.  Accordingly, he faces

23   mandatory deportation.

24           His green card is likely -- well, his green card will

25   be revoked, that's our understanding.  I understand he has a

D250cib2                      Verdict

1   family here, and I understand that his wife is here.  But as

2   your Honor has heard, there has been a great deal of testimony

3   that his wife's application is also based on fraud.  And that's

4   certainly something that can be considered by immigration

5   courts.  And so for all intent and purposes the Brodjiks' life

6   here in America is essentially over.

7           Mr. Brodjik maintains strong ties to Isreal.  And in

8   fact, the Court saw in government's 3031-8 an e-mail from

9   Mr. Brodjik from May 2006 in which he talked about selling his

10  house and moving back to Isreal.  Obviously, he didn't do that.

11  And obviously, he has shown up.  But the burden is now on him,

12  not just the presumption, but the burden to demonstrate by

13  clear and convincing evidence that he -- so the burden is now

14  on Mr. Brodjik to demonstrate by clear and convincing evidence

15  that he is not a risk of flight.  We don't believe he can do

16  that.  He obviously invested a lot of time, resources, and

17  efforts in attempting to naturalize here as a United States

18  citizen.  He was not able to do that.  And because he was not

19  able to do that, he is now faced with the prospect of remaining

20  here for a period of likely incarceration, followed by

21  deportation, or to self deport.  And so I think the family ties

22  become substantially less significant when he knows that he is

23  going to, in all likelihood, be in prison and then immediately

24  go into deportation proceedings.  And so he is not going to see

25  his family for, depending obviously on the Court's sentence, a

 1   number of years.  So there is powerful incentive to self

 2   deport.  And it's not just something that is possible, but

 3   something that he has specifically, himself, contemplated in

 4   the past.

 5          His current employment is that he runs a business,

 6   Nini Eyewear.  And our understanding of that business is he has

 7   contacts in Isreal that provide him with an inventory of

 8   eyeglasses, among other things, also demonstrating his strong

 9   ties to Isreal.  So here, that's not just a hypothetical he may

10   go somewhere.  There is a specific country, there is a specific

11   risk that the defendant himself contemplated the last time that

12   things sort of got difficult for him.

13          As your Honor knows, he came in and proffered with the

14   government.  The reason, or one of the reasons that was

15   ultimately charged is when it came time to plead guilty, he

16   vanished, we couldn't reach him, we were unable to find him.

17   And then we ultimately charged him.  I think that is another

18   factor that weighs in favor of detention in this case.

19   Particularly because the burden is on him to establish by clear

20   and convincing evidence that he is not a flight risk.  The fact

21   that both him and his wife are -- well him, certainly, he is

22   going to lose his legal status here.  His wife may very well

23   loose here legal status here.  So the Brodjiks are, like I

24   said, their life in America is essentially over.  Given the

25   strong ties to Isreal, given his prior mention of going to

1   Isreal, given his current involvement in a business where he is

2   importing eyewear from Israel, we just don't think he can carry

3   his burden to establish by clear and convincing evidence that

4   he is not a flight risk.

5          MR. HERZOG:  Your Honor, Mr. Brodjik is married.

6   Mr. Brodjik has five children.  Mr. Brodjik, if he had had good

7   legal counsel, would not have come in and proffered.  He didn't

8   disappear anywhere.  His wife is very, very ill.  And we will

9   be asking the Court at the time of sentencing to give a

10  nonguidelines sentence based on her very, very serious illness.

11         THE COURT:  What is her very, very serious illness?

12         MR. HERZOG:  She, as I explained to you when we were

13  seeking a delay in the trial, she had a stomach surgery, which

14  was designed to help her lose weight or to reduce her weight.

15  And it went terribly awry.  Six months ago, she had to have

16  essentially a complete reconstruction of her gastro GI tract.

17  You may recall that she was taken by hospital to the emergency

18  room on New Year's Day, came all of the way down from Monsey to

19  Mt. Sinai hospital, because it was so serious they thought she

20  had had a stroke.  We almost were going to call the Court and

21  ask for permission to Mr. Brodjik to miss today's session

22  because she is in very bad shape today.  The youngest of his

23  children is very young.  Even if they -- of course, they wanted

24  a life in the United States, I can't deny that.  If they can't

25  have it, fine, they'll go back to Isreal.  They are both

D250cib2                        Verdict

1    Israelis.

2              THE COURT:  Regardless of what sentence he gets, he is

3    going back.

4              MR. HERZOG:  We know that.  Of course, of course.

5              THE COURT:  He has no right to stay.

6              THE JUROR:  Of course.  And that's that.

7              But the point is, to put him in jail pending sentence,

8    it would be an incredible burden on his family.  We

9    respectfully believe we have meritorious issues on appeal.

10   There is actually a lawsuit pending against her first surgeon.

11   And they want to -- they want to be in the United States as

12   long as they can.  Obviously they wouldn't be able to be here

13   forever.  But it is in their best interest to stay in the

14   United States as long as they can.  They have a house to sell.

15   They are not -- they are not going to run off in the middle of

16   the night.  He has come every time he is supposed to be here.

17   There is absolutely -- he has done nothing wrong.  We know

18   people of his community don't split up families.  His family is

19   going to stay together, you know, and together in Isreal.

20   But --

21             THE COURT:  Well, I mean --

22             MR. HERZOG:  -- as far as the children and the wife

23   and everything --

24             THE COURT:  -- but Isreal is an appealing other

25   location.  It is not -- it's, in every way, it is an appealing

1    location.

2              MR. HERZOG:  You know --

3              THE COURT:  They have excellent medical care.

4              THE JUROR:  -- they have many, many reasons to stay in

5    the United States pending sentence.  She has doctors here.  Her

6    care is here.  They have a pending lawsuit here.

7              This is we're talking about a three-year guideline.

8    You know, I wouldn't want to be 3 years in prison, but it's not

9    the longest prison sentence your Honor has ever imposed.  He

10   has children that need taken care of, being taken care of and

11   his wife is really not in a position to take care of them.

12   She -- I mean she does the best she can, but she is very, very

13   badly constrained from taking care of those children.  And she

14   needs Mr. Brodjik at home.  If he has to go the jail at the end

15   of all of this, so be it, but -- but we are going to make what

16   I think will be a very strong case to your Honor for a reduced

17   sentence.

18             You know, we'll see what your Honor -- we'll see what

19   your Honor does with that information, but there is absolutely

20   no reason to remand.

21             THE COURT:  Well, the reason is that being deported to

22   Isreal is inevitable.  And the issue is why would someone want

23   to spend some time in jail before going to his home country,

24   which is, as I say, is an attractive place.  So I think that

25   is --

1          MR. HERZOG:  They don't --

2          THE COURT:  And the concept that you really think that

3    it's realistic that even if he gets a nonguidelines sentence --

4    and I -- that he will get zero jail time --

5          MR. HERZOG:  I didn't say that.  I didn't say that,

6    Judge.  And the point is, that as Mr. Pastore said, they want

7    to stay in the United States, their life is better in the

8    United States.  If he has to do a year, or two, or even three

9    in jail, so be it.  But it would be better for his family to be

10   in the United States.  He is -- his wife is not gonna -- he is

11   not going to desert his family, he is a Hasidic Jew, he is not

12   going to go to Isreal and leave his family here in the United

13   States.  That's just not going to happen, not in a million

14   years.  And they have a house to sell.  It is the middle of the

15   school term.

16         I mean, basically, I don't know what you think of

17   Mr. Brodjik, but Mr. Brodjik is a -- a family man.  I mean he

18   is -- he may, or may not, have done something stupid with Earl

19   David, but that's not really -- I mean even your Honor knows --

20   I don't want to start arguing sentence now, but Mr. Brodjik was

21   the lowest cog in a very low-cogged operation.  And, you know,

22   when you compare him to Sam Salamon or David Grynsztajn and all

23   of these other people, I mean he is a schlepper.  And, you

24   know, so -- so there is there is just no reason.  He is not

25   gonna abandon his family so that he can -- to avoid 3 years in

D250cib2                          Verdict

1    prison.  It's just not that long of a sentence.  I mean it if

2    it was a 20-year sentence --

3              THE COURT:  Despite the evidence adduced against him,

4    despite his proffer statement, he didn't choose to plead.  So

5    that might give you a clue as to his view about going to jail.

6              MR. HERZOG:  No.  In fact, your Honor, quite the

7    opposite.  We told him, and I am sure he will give me

8    permission to tell you this attorney/client conversation.  We

9    told him that if he pled guilty, he was much less likely to get

10   a jail sentence from your Honor.  And he -- in fact,

11   Mr. Pastore told him, in front of me, that he was much less

12   likely to get a jail sentence from your Honor if he pled guilty

13   than if he went to trial.  He asked me what I would do.  I said

14   I couldn't go to jail.  I, personally, Lawrence Gerzog,

15   couldn't go to jail.  He said I could go to jail if I have to.

16   He is not gonna flee.

17             THE COURT:  Well what, other than his word, which

18   isn't, after this conviction, worth very much, what are you

19   offering beyond his word.

20             MR. HERZOG:  I mean I can offer you what he has.  He

21   has a house.  He has -- you can give him house arrest, if you

22   think that's appropriate.  You know, obviously, he has already

23   got travel limitations.

24             THE COURT:  Well, what is the extradition treaty

25   between the United States and Isreal, if any; do we know?

D250cib2                    Verdict

1          MR. PASTORE:  I don't believe there is one.  I don't,

2    I'm not 100 percent sure of that, but --

3          MR. HERZOG:  There definitely is one.  To be

4    completely candid, I don't know whether it covers fraud.  I

5    know it covers crimes of violence, for example.  And I know

6    that as a fact.

7          MR. PASTORE:  If I may with respect to your Honor's

8    first question, currently, the bail is simply 250,000-dollar

9    personal recognizance bond cosigned by two individuals.

10          The other fact that I wanted to raise, Mr. Gerzog has

11    mentioned what kind of man is Mr. Brodjik.

12          I mean Mr. Brodjik aided, essentially aided and

13    abetted Mr. David when he fled.  We saw the e-mail in which

14    Mr. Brodjik drove a car to Canada, spent an hour under

15    investigation as he said for Earl David's -- and then helped

16    Earl David set up a remote office.  And I read that he e-mail,

17    part of that e-mail, during my closing.  It was my idea to help

18    you set up remotely, is essentially what he said.  So that you

19    can operate remotely.  I know I'm not getting the words exactly

20    right.

21          But the fact that not only does he engage in this

22    fraud, not only when sort of everything is coming down does he

23    say, oh, oh, time to scoot to Isreal.  But when someone does

24    run away, what does he do?  He helps him run away.  He enables

25    them to evade detection by law enforcement by driving a car

D250cib2                          Verdict

1    over the border, leaving his family apparently, driving a car

2    over the border, and giving it to Earl David, and then helping

3    him to set up to enable him to remotely control the fraud.

4    That is -- that is -- that says something I think about his

5    respect for law enforcement and his willingness to help others

6    from being captured by --

7          MR. HERZOG:  First of all, Earl David was under no

8    Court order to stay in the United States.

9          Second of all, we know that Refael Brodjik was his

10   adopted nephew.

11         Third of all, Sam Salamon is lying through his teeth

12   when he said that Mr. Brodjik helped Mr. David move.  He did go

13   to Toronto, to be sure.  But he did not help Mr. Dazed move.

14         And when we talk about this -- you know, I was gonna

15   say this to the jury, except I couldn't figure out how.  He

16   helped set up the network operation so they could communicate.

17   This is not the CIA.  What did he do, plug in a fax machine and

18   plug in a computer?  That's all you have to do to communicate

19   between Toronto and United States.  This is an not encrypted

20   spy software.  There is nothing to be done.  Anyway, maybe he

21   did it.  Maybe Earl David asked him to do it.  Maybe he and

22   Earl David like each other, and Earl David asked him to do that

23   favor, and maybe he shouldn't have done that.  But if Earl --

24   if he saw Earl David running away, and if David Grynsztajn told

25   him in January of '06 that he was cooperating with the

D250cib2                    Verdict

1    government, and if his house was searched in '09 and if he made

2    a proffer when he did, he had to know there was a pretty darn

3    good chance of his getting convicted and going to jail.

4          And yet he stayed, and yet he fired a free lawyer, and

5    went around hat in hand to his community.  He doesn't have any

6    money.  He went around hat in hand begging for money from his

7    community, so that he could hire me and Mr. Gutman to do this

8    trial for him.

9          You know, if he was gonna flee, he would have fled a

10   long time ago.  He is not gonna flee.  He is not going to

11   abandon his family.  His kids are in school.  His wife is sick.

12   He would -- he -- it is incomprehensible that he would go

13   anywhere.  He -- he --

14          THE COURT:  Why can't they all go?

15          MR. HERZOG:  Because his wife is sick.  His kids are

16   in school.  They own a home.  They have to -- the time, as much

17   as no one wants to be in jail.  But the time is in their best

18   interest.  They will sell their house.  She will continue to

19   get care.  Hopefully her care will make her better enough to be

20   fully in a position to take care of her family if you sent her

21   husband to jail.

22          You know, with all due respect to my brothers in

23   Isreal, and with all due respect to the fact that they have

24   good medical care there, they do not have the same kind of

25   medical care that we have in the United States and especially

1    not in New York City.  They just don't.  And they don't know

2    her case.  They have not been working with her for months.  And

3    so there is -- there is no --

4              THE COURT:  Do you know the number of patents,

5    biomedical patents, that Hebrew University gets?  It is

6    outstanding.  The Hadassah Hospital is outstanding.  I'm sorry,

7    you can pull this on somebody else, but you're not pulling it

8    on me.

9              MR. HERZOG:  If you were sick, you would not go to

10   Tel Aviv.

11             THE COURT:  I am not a religious Jew who has an

12   affiliation.  I am not Israeli, I'm an American.

13             MR. HERZOG:  Right.

14             THE COURT:  Period.

15             MR. HERZOG:  People don't travel.  No one travels from

16   New York to Isreal to get medical care.  Lots of people travel

17   from Israel to New York to get medical care, okay.  That's just

18   a fact.  I'm not putting down the Israeli medical system.

19             THE COURT:  Be careful.

20             MR. HERZOG:  I'm not saying the Israeli medical system

21   isn't probably the second best medical system in the country --

22   in the world, I know that.  I'm not saying it is Jamaica or

23   some third world undeveloped country.  But we all know that the

24   United States has the best care.  Her doctors are here.  The

25   people who have been -- the people who took care of her, who

D250cib2                        Verdict

1     operated on her, are at Mt. Sinai Hospital.  She wants to get

2     better at Ms. Sinai Hospital.  And Mr. Brodjik wants to be by

3     her side as she gets better.  Not in Isreal.  He is going to

4     stay.  And if he has to go the jail to do it, then he'll go to

5     jail.  He told me so himself.  He had no reason -- he had no

6     reason to lie to me.  Maybe he has a reason to lie to you,

7     Judge --

8               THE COURT:  He can repeat it to me.

9               MR. HERZOG:  -- but he has no reason to lie to me.

10              MR. PASTORE:  Judge, if we also put this in context,

11    Mr. Brodjik proffers in 2009.  He then files a naturalization

12    application claiming he has never committed a crime.  He then

13    proffers again with the United States government.  So he

14    proffers once, files a naturalization application saying, yep,

15    no crimes, no problem.  They then -- then he proffers again

16    with the United States government, and goes into a

17    naturalization interview after that and lies again.

18              So I think your Honor hit the nail on head.  What is

19    different now, is that it's clear to him he is not going to get

20    away with it, that he has been caught to be admitting on the

21    one hand in a proffer that you have committed immigration

22    fraud, and then to walk into 26 Federal Plaza and say, no, I

23    have never committed a crime for which I have not been

24    arrested, face to face with a United States immigration

25    official?  I just don't trust anything Mr. Brodjik says.  He

1   has a powerful incentive to flee.  The community, as your Honor

2   has pointed out can take care of his children.  It's very easy

3   for him to flee and have the family meet him there.  I just

4   don't think, given that the burden is now clear and convincing

5   evidence, and it's on him, I just don't think he can meet that

6   burden.

7          MR. HERZOG:  There is no reason to think that

8   Mr. Brodjik -- it's one thing to go hat in hand saying can I

9   please have some money to pay some lawyers for my trial.  It is

10  another to say, will you please see my wife through an illness

11  which almost killed her, will you please take care of my

12  children, who are, some of whom are very young and in total

13  need of parental care, not community care.

14          I don't care how wonderful his community is, or isn't.

15  I don't care whether Hillary Clinton thinks it takes a village

16  to raise as family, it takes a father and a mother to raise a

17  family.  And Refael Brodjik knows that. and he if he is gong to

18  have to go to jail for some period of time in the future to pay

19  for this crime, then so be it.  That's what he is gonna have to

20  do.  But for now, his family needs him home.  His family needs

21  him to help take care of the family.  His family needs him to

22  help get his wife better.  He has not missed a day of court.

23  There has not been any situation -- what Mr. -- I'm sorry,

24  I'm -- Pastore is telling you is because he got convicted he

25  should be remanded.

1          We know he committed a crime, okay.  We know he went

2     in there and said to the guy, you know, I have never been

3     convicted of any crime.  Frankly, honestly, just between you

4     and me, Judge, has anybody ever checked yes on that box?  But

5     that's not the point.  The point is that that is not an excuse

6     for him to have checked no.  But I mean, come on, you know, why

7     go in to the interview and check yes on that box.  If you are

8     going to check yes on that box, just don't apply.

9          THE COURT:  But there is a little higher level of

10    chutzpah to have proffered and then go and deny that you have

11    committed a crime.  That just -- I agree with you, that's

12    unlikely that most people would admit to having committed a

13    crime for which they have not been arrested when it was obvious

14    that that would result in the denial of their application.  But

15    this --

16         MR. HERZOG:  And probably deportation.

17         THE COURT:  Right.  But this is -- well, yes and no.

18    This is a slightly higher level OF arrogance.

19         MR. HERZOG:  He may be arrogant, Judge.  It may be

20    Chutzpah, it may be stupid as hell.  He didn't ask me whether

21    he should do it, I was not his lawyer then.  If he had asked me

22    do you think it's good idea, having proffered to the government

23    to go apply for my citizenship, I would have given him

24    different advice than he apparently got.

25         THE COURT:  Well, I wonder if he got any advice, but

D250cib2                    Verdict

1   be that as it may.

2          MR. HERZOG:  He actually did get advice, but I'm sure

3   he didn't tell the people he got advice from that whole story.

4          THE COURT:  You can't give advice unless you have full

5   disclosure of the facts so.

6          MR. HERZOG:  If you want to put him on house arrest,

7   Judge --

8          THE COURT:  Let me.  I guess, Mr. Pastore, the

9   question is, if Mr. Brodjik was on house arrest with electronic

10  monitoring, and we have an extremely high level of telephonic

11  reporting, and we had Mr. Brodjik's passport, and we made sure

12  that his counsel got an assurance from the Israeli consulate

13  that they would not grant him a replacement passport,

14  realistically, how does he get out of the country in the few

15  months before he is sentenced?

16         MR. HERZOG:  And Judge --

17         THE COURT:  I'm not interested in taking his word.

18         MR. HERZOG:  Keep in mind -- let's be fair.  He is

19  not -- you know, this is not -- he is not a member of some, you

20  know, guerilla organization with a network that is gonna

21  smuggle him out.  I mean, you know, he is not that kind of

22  criminal.  He committed a crime, okay.  But he is not that kind

23  of criminal that -- that, you know, deviously knows where to

24  obtain a false passport and all this kind of stuff.  I mean he

25  is no more that kind of criminal, frankly, than Mr. Gutman or I

D250cib2                        Verdict

1   am.   I would never know --

2              THE COURT:  I wouldn't involve Mr. Gutman.

3              MR. GUTMAN:  Thank you very much, Judge.

4              MR. HERZOG:  I wouldn't know where to get a false

5   passport.  I wouldn't know how to flee the United States and,

6   frankly, neither does Mr. Brodjik.

7              THE COURT:  I wouldn't trust the Israelis to recognize

8   a false passport, okay.  So, the issue is, he is an Israeli

9   citizen.  And as an Israeli citizen, he can go to the, you know

10  to his consulate say I have lost my passport and seek a new

11  one.  I have to bring that possibility to an end, because this

12  is not someone -- this is not an American citizen where the

13  U.S. Attorney's Office can communicate with the State

14  Department and the passport office and take care of that.

15             MR. HERZOG:  We will write a letter in the most -- you

16  know, your Honor can write a letter to add to it, that --

17             THE COURT:  I want their agreement that they wouldn't

18  do it.

19             MR. HERZOG:  I have not spoken to them, but I assume

20  they would give that, why wouldn't they?

21             THE COURT:  I don't know.  I mean I -- in other

22  words --

23             MR. HERZOG:  I mean we can put in the letter that

24  Mr. Brodjik will waive whatever rights he might otherwise have.

25  You know, he will waive them in writing.  He will say, you

D250cib2                       Verdict

1     know, I don't -- you may not issue me a passport.

2                THE COURT:  So we lock him down in his house with

3     electronic monitoring, and figure out a way to keep him from

4     getting -- you know, we get his current passport.

5                MR. HERZOG:  Which I assume they have already.

6                THE COURT:  Do you have his passport?

7                MS. ECHENBERG:  We should.  Pretrial should have it.

8     And we'll confirm that.

9                THE COURT:  Okay.  And we prevent him from getting

10    another one, you know.  I mean if it would be a -- if there

11    was, you know, repeated monitoring of his bracelet, and I think

12    his bracelet also, I assume, has a locator, right.  It's pretty

13    hard to really get out of the country that fast.  In other

14    words, once -- let's say he decided he wanted to go via Canada,

15    it takes time.  I think that we could divine a mechanism to

16    keep him here.  As I say, it's not based on his word but based

17    on, you know, measurable restraints.

18               MR. PASTORE:  Provided, you know -- that sounds

19    reasonable.  Provided of course that he would be remanded until

20    those conditions are put in place.  I believe it takes a couple

21    of days to confirm there is a land line.  And given that this

22    is electronic monitoring, the bracelet is not the standard one.

23    In other words, there is a GPS locator.  My understanding,

24    based on my experience, is that could, especially if your Honor

25    were to order it today, could potentially be done by the end of

D250cib2                    Verdict

1    the week.  So if he was remanded for that short time period

2    while we put those conditions in place, including the

3    communication with the consulate, make sure they sign off, and

4    also confirm that there have not been any new passports issued

5    to, frankly, to him or his family members.  I think another

6    concern is that if the family is relocated, then there is

7    really no reason to stay.  I think that's the argument, is that

8    the family is what's keeping him here, and his wife is what's

9    keeping him here.  And so we want some assurances that his

10   family members are not sort of --

11              MR. HERZOG:  Your Honor, his family can't relocate.

12   His wife was in the emergency room on New Year's Day.  She came

13   by ambulance from Monsey to Mt. Sinai Hospital.  She couldn't

14   relocate if you gave her $10 million, if her life depended on

15   it, because her life depends on it.

16              MR. PASTORE:  Then there shouldn't be any problem with

17   turning in the passports of the family members.

18              MR. HERZOG:  I have no problem with that.  Three of

19   his children are U.S. citizens.  But to put him in jail for two

20   or three days while we set this up, I think, respectfully,

21   is punitive and unnecessary.  And you know for anyone to think

22   that a family of five is gonna just pack up and disappear in

23   two days, especially a family man, a normal, you know,

24   citizen -- who committed a crime, okay, but, not a crime of

25   violence, not a crime -- not a drug crime, not a crime where

1    he -- where he stole widows' and orphans' money.  I mean he was

2    not involved in the actual immigration fraud.  The only thing

3    he is accused of is transferring the money --

4            THE COURT:  I don't need to give you a lecture on the

5    law of conspiracy, do I?

6            MR. HERZOG:  No, but you know what I mean, Judge.  He

7    didn't fill out any applications.

8            THE COURT:  So what?

9            MR. HERZOG:  He collected money.  So he is the bottom

10   of the totem pole, is what I'm trying to say.  It's not -- if

11   we are talking about veniality, if we are talking about -- you

12   know, look at Sam Salamon and tell me that --

13           THE COURT:  It's like saying that the guy at the top

14   of the pyramid who gets the benefit of all of the worker bees

15   is, you know, the bottom of the totem?  No, he, you know --

16           MR. HERZOG:  The guy at the top is more venial than

17   the guy at the bottom, yes.

18           MR. PASTORE:  It's this dangerous reasoning that for a

19   short period of time while we agreeing to these conditions and

20   while we get these conditions in place, we think it's

21   appropriate, especially this is the kind of reasoning, frankly,

22   that concerns us.  The idea that he was some minor participant,

23   that he didn't go to Canada and he didn't aid and abet Earl

24   David.  He played a very, very significant role.  He says it

25   himself.

1            MR. HERZOG:  Look, I -- I mean we'll argue his role at

2    sentencing, Judge.  You know, we have time for that.  But to --

3    for Mr. Pastore to actually get up and stand up on his two hind

4    legs and tell you that he --

5            THE COURT:  He doesn't have hind legs; only two legs.

6            MR. HERZOG:  Rumpole reference, your Honor, and say

7    that, you know, Refael Brodjik is some kind of criminal

8    mastermind is beyond absurd.

9            THE COURT:  He didn't say that.

10           MR. HERZOG:  That's what he implied.

11           THE COURT:  No, I don't think that is what he implied.

12   I think what he said was he was up to his eyeballs in the

13   criminal activity.

14           Is Mr. Brodjik's pretrial officer in White Plains?

15           MR. HERZOG:  Yes, apparently.

16           THE COURT:  What's the officer's name?

17           MR. HERZOG:  Vincent Adams.

18           And if you want, Judge, he can sit from nine to five

19   in the lobby of the White Plains Pretrial Office until things

20   are put in place if you think.  You know, I mean he would sit

21   there 24 hours if he -- I mean it's just --

22           THE COURT:  Mr. Brodjik have a land line in his house?

23           MR. HERZOG:  Yes.

24           THE COURT:  And what's the phone number, please.

25           MR. HERZOG:  (845)354-0630.

D250cib2                         Verdict

 1           THE COURT:  Bail is set as follows:  On top of the

 2     existing bail conditions, by the end of Thursday, there will be

 3     a monitoring bracelet with GPS in place.

 4           Mr. Brodjik will be on home detention.

 5           And the government will have received assurance in

 6     writing from the Israeli Embassy that no new passports have

 7     been issued to Mr. Brodjik.

 8           MR. HERZOG:  Can I just ask, your Honor, did you mean

 9     embassy or consulate?

10           THE COURT:  Whatever the appropriate.

11           MR. HERZOG:  Embassy is in Washington, consulate is in

12     New York.

13           THE COURT:  Anyone speaking to the Israeli government.

14           The consulate should say that no new passports have

15     been issued to Mr. Brodjik.  And that they will not issue new

16     passports to him or any family member.

17           That by tomorrow, the end of tomorrow, all current

18     passports of family members are to be delivered to pretrial

19     services.  That Mr. Brodjik will call pretrial services every

20     three hours, except during the middle of the night, from his

21     land line.

22           MR. HERZOG:  Can we just, so there is no confusion,

23     would you mind specifying from what hour to what hour you would

24     like him to call so that -- to make sure he complies?

25           THE COURT:  All right.  Well, 8:00 in the morning to

D250cib2                     Verdict

1    11:00 at night.

2              MR. HERZOG:  Okay.

3              THE COURT:  And he is to make that call from his home

4    land line, unless he has been excused to go with his lawyer to

5    the Israeli Consulate to do what he needs to do to achieve

6    letter assurance.

7              MR. HERZOG:  Right.

8              THE COURT:  Okay?  Okay.

9              MR. HERZOG:  And that excusal may come from his

10   pretrial services officer to go to the embassy, or does your

11   Honor want to --

12             THE COURT:  Or I mean I could excuse him, as well.

13             MR. HERZOG:  Whichever, your Honor.

14             THE COURT:  His pretrial officer will need to know

15   that that is what's going on.

16             MR. HERZOG:  I want to make sure that we're in strict

17   compliance.

18             THE COURT:  But then he can't call from his home

19   phone.

20             MR. PASTORE:  Judge --

21             MR. HERZOG:  I just want to make sure we are in strict

22   compliance with your Honor's order.  I don't want there to be

23   any --

24             THE COURT:  His pretrial officer will need to know

25   that he has my permission to go, with his lawyer, to the

D250cib2                    Verdict

1    Israeli consulate, if that is what is necessary to obtain the

2    letter assurance that is part of his bail.  And I wouldn't be

3    shocked if they would like to see him in person.

4              MR. HERZOG:  I understand.

5              MR. PASTORE:  Can we just ensure that the number will

6    be unblocked?  I know a lot of folks nowadays have blocking

7    features on their home phone number.  In other words, it will

8    come up as a blocked number.

9              MR. HERZOG:  It is currently not blocked.

10             MR. GUTMAN:  The Court can issue an order.

11             MR. HERZOG:  His service is Verizon.  The Court can

12   issue an order, if that's what you want to do.

13             MR. PASTORE:  There is a way to unblock it just by

14   dialing a few digits.

15             THE COURT:  That's apparently not blocked.  It will

16   remain unblocked.

17             MR. HERZOG:  Not blocked.

18             THE COURT:  It will not achieve anything if he calls

19   the pretrial officer from another number, or a blocked number.

20             MR. HERZOG:  Right.

21             THE COURT:  Okay.  And I think you mentioned

22   Ms. Cibik.

23             MR. PASTORE:  Yes, your Honor.  With respect to --

24             MR. GUTMAN:  I'm sorry, your Honor.  Could I address

25   this, just out of caution.

D250cib2                    Verdict

 1           The only part of this that is not really in our

 2     control is the setting up of the electronic monitoring.  Just

 3     in the event -- I'm sure that, you know, efforts will be made

 4     to expedite that process.  But if for some reason, through no

 5     fault of our own, it takes an extra day or two, some amount of

 6     time for pretrial to do that.

 7           THE COURT:  I think it will get communicated both by

 8     me and by, you know, the U.S. Attorney's Office that this is

 9     something that has to happen.

10           MR. GUTMAN:  I understand.

11           THE COURT:  What I have said, has to happen.

12           MR. PASTORE:  Yes, your Honor.

13           With respect to Mrs. Cibik.  First, the current bail

14     conditions are as follows: $50,000 personal recognizance bond

15     cosigned by one individual.

16           The defendant has surrendered all travel documents.

17     She's under strict pretrial supervision with a curfew in

18     residence from 11:30 p.m. to 11:30 a.m.  And she's subject to

19     random voice verification from 11:30 p.m. to 11:30 a.m.  She

20     reports in -- was required the report in in person until a land

21     line was installed.  I understand that a land line -- well, I

22     actually don't have an understanding, I should say, about

23     whether the land line has been installed or not.

24           With respect to Ms. Cibik, the government has

25     consistently held or argued for detention largely based on her

1  prior flight.  Your Honor, knows there was some discussion of

2  flight.  We ultimately didn't introduce it at trial, but we did

3  go back to the record, the tax records, the travel records.

4  What they reveal is that on -- well, on May 9 the defendant was

5  served with a grand jury subpoena.  On May 11, she left the

6  United States for Canada.  She, at some point, went abroad to

7  Turkey.  And travel records show that she didn't return to the

8  United States until August, when she took a flight back from

9  Turkey.  She acknowledged this in her proffer with the

10  government.  And the travel records confirm that she left just

11  two days after being visited by agents.  We didn't introduce

12  this at trial, in part, because we don't know the timing of

13  when Ms. Cibik bought the ticket.  And because, ultimately,

14  obviously, she came back.

15          The situation now is different.  She is a legal

16  permanent resident.  She is likely to be deported.  She

17  maintains substantial ties with Turkey.  She previously fled

18  there.  And in her bank record there is at least one other trip

19  to Istanbul.  And so given her prior flight, given her ties to

20  Turkey and given, really, I don't know of any family ties.  But

21  maybe Mr. Donaldson can speak to that.  I don't know of any

22  family ties that would keep her in the New York area.

23          In that respect, she seems to be differently situated

24  than Defendant Brodjik.

25          THE COURT:  Mr. Donaldson.

D250cib2                        Verdict

1            MR. DONALDSON:  Your Honor, I actually believe that

2       the current bail conditions, as set are, or were, strict enough

3       to maintain her appearance in the jurisdiction.

4            The bail conditions were I think altered throughout

5       the course of Mrs. Cibik's case.  I believe at one point

6       because of her consistent lack of issue with pretrial, I

7       believe it was modified.

8            She does not -- I don't believe -- she does have

9       family or significant family in the jurisdiction, but I don't

10      think that is the -- should be the standard.  I believe that if

11      we had to go to the home detention aspect, I think that would

12      be sufficient.  But I honestly don't believe that the

13      conditions currently set are not sufficient to make sure she

14      does not leave the jurisdiction.  A lot of what my colleague

15      said was also true regarding Ms. Cibik in pretrial matters, the

16      offers and things like that regarding the communication with

17      the government, actually very similar.  So I don't believe the

18      conviction, in and of itself, is the -- would be the motivating

19      factor for her to leave.

20           I think the curfew is fine.  She works every day, has

21      been working every day since 2006.  She has not had any arrests

22      or any criminal contact or anything of the sort since May of

23      2006.  She came back in June.  She had a trip prior to

24      receiving the grand jury subpoena.  So there is actually not a

25      significant flight risk involved with Ms. Cibik besides the

D250cib2                    Verdict

1    conviction.  I mean it's clear that poses some, but I believe

2    that when the person comes to Court, particularly a federal

3    court, there is always that -- I don't want to say possibility,

4    but probably probability of some type of verdict against you.

5    Again, she still came to my office throughout her release, I

6    would say at least 25, 30 times, minimum.  So she's consistent

7    with that.

8             She has not had any incident since she was released.

9    She has worked every day.  She works now.  She leaves Court

10   every day during trial, goes to work and calls me from work.

11            So she, in my opinion, is a responsible person,

12   notwithstanding what happened in 2004 through 2006, which was

13   several years ago.

14            So I humbly believe that some bail conditions can be

15   set.  I really do not believe that home detention is necessary.

16   But if that's what the Court feels is appropriate, then we

17   won't object to that.  The only issue with that is that she

18   doesn't have a land line right now.

19            So we request to put her in pending that happening.

20   You know, I'm not happy, because she'll be in.  So if the Court

21   is leaning towards home detention, we would not object to that,

22   but would ask time to get that land line to be put in place.

23            Again, she has been on the significant 11:30 to 11:30

24   time period for the last almost 15 or 16 months.  She has not

25   traveled.  She surrendered all travel documents.  She has not

D250cib2                       Verdict

1    gone anywhere.  It is not a violent case, as my colleague

2    indicated, not a drug case as my colleague indicated.  She's

3    not a very sophisticated woman, as is clearly indicated.  So I

4    do not believe flight is a significant issue.  But again, we

5    wouldn't object to some type of home detention if that is what

6    the Court is thinking.

7              MR. PASTORE:  And Judge, just on this record, the

8    defendant failed to appear for grand jury subpoena, after

9    confessing to her crime, and cleaned out her bank account and

10   disappears.  I'm sorry, August was when she got in touch with

11   the -- the agents again.  June is when she came back.  She got

12   in touch with the agents.

13             THE COURT:  Right.

14             MR. PASTORE:  We just can't agree that she has met her

15   burden by clear and convincing evidence that she is not a risk

16   of flight.

17             THE COURT:  She left and came back within a month,

18   right?

19             MR. PASTORE:  Yeah.  So cleaning out her bank account

20   and failing to appear for a grand jury subpoena, that concerns

21   us and that makes us believe that we can't agree that she has

22   met her burden by clear and convincing evidence to stay out.

23             THE COURT:  Mr. Donaldson, what hours does Ms. Cibik

24   work?

25             MR. DONALDSON:  She talking to me.  When she talks to

D250cib2                        Verdict

1    me, I talk back.

2                (Pause)

3                Before the trial started, it was 8:00 to 2:00 p.m.

4    8:00 a.m. to 2:00 p.m.  Like that for quite sometime.  After

5    trial started, they switched the schedule to 3:00 to 10:00.

6                THE COURT:  So how has she been on her curfew?

7                MR. DONALDSON:  I think that's been relaxed.

8                THE COURT:  I think there was a change, I don't

9    remember.

10               MR. DONALDSON:  We came back here several months ago

11   because of her work hours shifting so much.  Prior to -- prior

12   to that, she had been on telephone curfew for whatever hours it

13   was.  But we came back because of her work schedule.  She was

14   working from 8:00 to 6:00 or sometimes from 6:00 to whatever it

15   was.  So we modified that.  But I don't -- she never violated,

16   of course.  But I know we came back to Court and modified it

17   because of her work schedule.

18               And, again, the work schedule was something that she

19   worked -- she has really been working every day for the last, I

20   believe, six, seven years.  So I don't know exactly what her --

21   I don't believe she has a curfew.  I don't believe she has a

22   curfew, honestly.  I know at some point in time it was 11:00 to

23   11:00 like Mr. Pastore said.  But I really believe it was

24   modified about six or seven months ago.  I think.  I'm not

25   certain of the exact date.  I think.

D250cib2                          Verdict

1          Judge, one further thing I forgot to add.  She still

2     does visit pretrial services twice a week, Tuesday and

3     Thursday.  And she's been doing that since the case began, so

4     that's another reason why I'm suggesting that she has been

5     particularly responsible.

6          THE COURT:  All right.  With respect to Ms. Cibik, I'm

7     gonna place her on electronic monitoring with a curfew from

8     10:00 p.m. to 6:00 a.m.  That does require to obtain a land

9     line.

10          I also want to add to her conditions that she send a

11     letter, obviously to be drafted by Mr. Donaldson, to the

12     Turkish embassy or consulate, explaining the current legal

13     situation, and waiving any right she might have to obtain a new

14     or replacement passport, except in the context of a deportation

15     proceeding.

16          And as far as in-person reporting to her pretrial,

17     it's up to pretrial.  If they want to continue what she's

18     doing.  Now, they may conclude that electronic monitoring is

19     sufficient.

20          Ms. Cibik, Mr. Donaldson, what is that name of

21     Mrs. Cibik's pretrial officer?

22          MR. DONALDSON:  Mildred Santana.

23          THE COURT:  Okay, sure.

24          Mr. Pastore.

25          MR. PASTORE:  Yes, Judge.

D250cib2                          Verdict

1            In terms of the date for the letter to be sent for the

2     electronic monitoring.

3            THE COURT:  Fair enough.  Electronic monitoring by the

4     end of the week, I think that's sufficient.  And the letter,

5     likewise.

6            MR. PASTORE:  Just to clarify, does the Court have any

7     objection to us reaching out the either of the pretrial

8     services officers to make sure they are aware.

9            THE COURT:  No, that will save me the effort.

10           MR. PASTORE:  Well, to the extent the Court wants to

11    add its voice, I'm sure that carries more weight.

12           THE COURT:  When I go back, I'll -- if I reach them,

13    I'll try to do so, all right.

14           I think we need a sentencing date.

15           And I guess with everyone out, we're supposed to leave

16    120 days.

17           Sentence is set for June 5 for everybody.  Sentencing

18    June 5, 2:00, everybody.

19           Okay I'll ask the question once again.

20           Anything else.

21           Mr. Schwartz.

22           MR. BRILL:  The Court, I believe knows this already.

23    Mr. Brill in Florida, he's under pretrial supervision in

24    Florida.  I'm not sure how that works in terms of the probation

25    investigation.  But I just wanted that to be clear for the

D250cib2                        Verdict

1    record that he is gonna be returning to Florida, continuing in

2    the current conditions unless we change those conditions as to

3    what Mr. Pastore mentioned.

4              THE COURT:  Well, I think he can come back here for

5    his interview.

6              MR. BRILL:  I assume that's right.  He'll obviously

7    comply with it.

8              THE COURT:  Okay.  Anything else?

9              MR. PASTORE:  Just --

10             THE COURT:  That's right.  We should have submission

11   dates for the sentence, just a moment.

12             I would like the defendant's submissions by

13   May 24th and the government's by May 30th.

14             MR. PASTORE:  Judge, just in the interest of clarity

15   is Mr. Brodjik to report to pretrial services, or I guess when

16   does the call every three hours, when should that begin?

17             THE COURT:  Commence?

18             MR. PASTORE:  Yeah, exactly.  This evening at 7:00 or

19   how much time he needs to get home?

20             THE COURT:  I think if we -- yeah, I guess maybe this

21   evening at 8:00.  So 8:00 and 11:00 will work.

22             MR. PASTORE:  And we'll get the appropriate phone

23   number from Mr. Adams, Pretrial Services Officer Adams.

24             THE COURT:  Well, he -- do you need Mr. Adams' phone

25   number, we can look that up if he doesn't have it.

D250cib2                     Verdict

1            MR. HERZOG:  He doesn't know the number.

2            THE COURT:  Okay, we'll just --

3            MR. PASTORE:  I guess it's just the after hours, that

4     number.

5            THE COURT:  Oh, I don't know what that is.

6            MR. PASTORE:  Okay.

7            THE COURT:  Yeah.

8            MR. HERZOG:  Wouldn't it make more sense, your Honor,

9     for him to call Mr. Adams' answering machine, have Mr. Adams

10    check and make sure he did it.  I mean unless do they have a

11    monitored line, a 24-hour monitored line?

12           THE COURT:  No, I think it is a recording, but I --

13    I'm not sure.  Remind me -- actually, I don't remember.  I said

14    until 11:00 at night and what was the beginning time?

15           MR. PASTORE:  8:00 a.m.

16           THE COURT:  Well, what I can do is go downstairs and

17    try to reach Mr. Adams.  I know I have reached him before.

18           Unless for some reason -- Brett, do you happen to have

19    his phone number on our -- all right.  So we can do that, if

20    you will just wait here we can see if we can get you the right

21    phone number to use.

22           (Trial adjourned)

23

24

25