UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                           :

       - v. -                                          :      S2 11 Cr. 424 (NRB)

GULAY CIBIK,                                          :
REFAEL BRODJIK,
HAROLD TISCHLER, and                                 :
NATHAN SCHWARTZ

                                       :

                Defendants.

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING MEMORANDUM FOR GULAY CIBIK, REFAEL BRODJIK, HAROLD TISCHLER AND NATHAN SCHWARTZ**




                                    PREET BHARARA
                                      United States Attorney for the
                                      Southern District of New York
                                      Attorney for the United States of America

Janis Echenberg
James J. Pastore, Jr.
Assistant United States Attorneys
       - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                        :

        - v. -                                  :        S2 11 Cr. 424 (NRB)

GULAY CIBIK,                                    :
REFAEL BRODJIK,
NATHAN SCHWARTZ, and                            :
HAROLD TISCHLER

                                                :
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with sentencing for defendants Gulay Cibik, Refael Brodjik, Nathan Schwartz and Harold Tischler, ("Cibik," "Brodjik," "Schwartz," and "Tischler,"  respectfully, or the "defendants"), which is currently scheduled for June 17, 2013 at 2:30 p.m.  In their respective Presentence Investigation Reports, ("Cibik PSR, " "Brodjik PSR," "Schwartz PSR," and "Tischler PSR," all dated June 13, 2012), the United States Probation Department ("Probation Department") calculates the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range for Cibik, Brodjik and Schwartz to be 33 to 41 months' imprisonment.  Because the Probation Department imposes an enhancement for obstruction of justice for Tischler, his applicable Guidelines range is 41 to 51 months' imprisonment.   The Probation Department recommends a sentence of incarceration at the bottom of the applicable Guidelines range for each defendant.  In their respective

submissions, each defendant argues for a significantly below-Guidelines, non-incarceratory, sentence.

The Probation Department recommends a sentence of 33 months' incarceration for Cibik. (Cibik PSR at 28).  Cibik seeks a sentence of four years' probation, arguing primarily that she was not a "critical piece of the fraud," and that her participation ceased in 2006 after she was approached by law enforcement.  In fact, Cibik was a vital part of the fraud – assisting scores of clients over at least five years with two types of phony immigration applications – fake employment sponsorships and, Cibik's own specialty, bogus claims of "extraordinary ability."

The Probation Department recommends a sentence of 33 months' imprisonment for Brodjik.  (Brodjik PSR at 30).  Brodjik also argues for a non-incarceratory sentence, largely based on his claim that Probation miscalculated his Guidelines range by: (i) holding him responsible for more than 25 fraudulent documents; (ii) not acknowledging what he argues was a minor role in the fraud; and (iii) not reducing his Guidelines range for acceptance of responsibility, despite his having proceeded to trial.  To the contrary, Brodjik's Guidelines range is consistent with his key role in advancing the fraud in multiple ways as well as Brodjik's vigorous defense during a 13-day trial where he maintained his innocence (despite having made prior admissions of guilt to the Government) by, among other things, asserting that the cooperating witnesses were making false statements about him, and claiming that he did not author certain inculpatory emails.

The Probation Department recommends a sentence of 33 months' incarceration for Schwartz.  (Schwartz PSR at 24).  Schwartz argues for a sentence of home confinement, probation and/or community service, claiming that he is similar to, and should be treated like, his

phony employment sponsor co-defendants who pleaded guilty before trial.  In fact, Schwartz is distinct from those defendants, not only because he is not entitled to a reduction for acceptance of responsibility and because he was personally involved with many more fraudulent applications than those other sponsor-defendants, but, most critically, because he did more than fraudulently sponsor aliens.  Schwartz assisted in the creation of fake documents during the course of the fraud, and, after law enforcement had uncovered the fraud, facilitated the creation of fraudulent checks and allowed the use of a mailbox he controlled in order  to obtain fraud proceeds.

The Probation Department recommends a sentence of 41 months' incarceration for Tischler.  (Tischler PSR at 32).  Tischler argues that the Court should consider his various good deeds in the community in support of a non-incarceratory sentence.  Tischler further claims that the enhancement for obstruction of justice should not apply.  Both because Tischler sent a menacing text message to a cooperating witness in the lead up to trial, and because Tischler allowed the Earl David Law Firm, which he knew to be committing fraud, to respond to a Grand Jury subpoena on his behalf, an enhancement for obstruction of justice is entirely appropriate.  Tischler's good deeds do not outweigh the fact that he was once before convicted of an immigration-related offense – smuggling an alien in his trunk and lying about it – and he nonetheless actively involving himself in the instant fraud for approximately five years, both as a sponsor as well as allowing the use of his company's name on a lease for office space for the Earl David Law Firm.

Consistent with the Probation Department's recommendations, and for the reasons set forth below, given the nature and circumstances of the massive fraud in which these defendants

were involved, their respective roles, and the great need in this case to promote deterrence, respect for the law and ensure just punishment, sentences within the applicable Guidelines ranges are entirely appropriate for each defendant.

## BACKGROUND

### A.     The Massive Immigration Fraud and the Defendants' Roles

For over a decade, the Earl David law firm (the "David Firm") was home to a massive immigration fraud – one of the largest immigration fraud schemes ever committed in the United States -- resulting in over 25,000 fraudulent applications submitted to immigration authorities at United States Customs and Immigration Services ("USCIS") and the United States Department of Labor ("DOL").  As Your Honor is well aware after presiding over trial in this case, the scheme exploited several immigration laws, including an amnesty period that ended in 2001 and a law permitting aliens to petition for legal status after obtaining a certification from the DOL signifying that a U.S. employer wished to employ, or "sponsor," them, as well as special immigration provisions for religious workers and individuals with extraordinary abilities. Defendants Cibik and Brodjik were fraud insiders – employees of the firm – who each helped the fraud succeed.  Cibik dealt directly with clients, recruiting them and collecting substantial fees from them in exchange for preparing hundreds of fraudulent applications.  Brodjik facilitated the fraud's continued success when Earl David, the firm's head lawyer and architect of the fraud, was disbarred and later fled to Canada, by setting up a remote office for David and collecting and laundering David's share of the fraud proceeds.  Brodjik also prepared fraudulent religious worker applications for certain clients.  And, as set forth in a separate charge for which he was convicted, Brodjik lied in his own citizenship application.  Tischler and Schwartz were

facilitators of the fraud who worked outside the firm – individuals who were paid to pose as phony employment sponsors for hundreds of applications.  Tischler and Schwartz each also played other supporting roles beyond sponsorship.  Tischler assisted the firm in securing office space for its sham operations.  Schwartz helped prepare phony documents to support back-dated applications and also helped co-conspirator Sam Salamon access fraud proceeds after the fraud was uncovered by law enforcement.

**B.      The Indictment and the Guidelines Calculation**

On May 17, 2001, a grand jury in this District returned an indictment charging Cibik and another co-conspirator, Ali Gomaa (who is a fugitive), in two counts: conspiracy to commit immigration fraud and make false statements, in violation 18, U.S.C. § 371 (Count One); and making false statements in connection with immigration documents, in violation of 18 U.S.C. §§ 1546(a) and 2 (Count Two).

On October 5, 2011, a grand jury in this District returned a superseding indictment charging Cibik, Brodjik, Tischler, Schwartz and eight co-defendants, including Earl David, in three counts: conspiracy to commit immigration fraud and make false statements, in violation 18, U.S.C. § 371 (Count One); making false statements in connection with immigration documents, in violation of 18 U.S.C. §§ 1546(a) and 2 (Count Two); and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count Three) (the "Superseding Indictment").  Earl David was also charged in the Superseding Indictment with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Four).

On December 12, 2012, a grand jury in this District returned a superseding indictment against Cibik, Brodjik, Tischler, Schwartz and co-defendant Abraham Flam.  Indictment S2 11

Cr. 424 (NRB) (the "Second Superseding Indictment"), upon which the Government proceeded to trial against Cibik, Brodjik, Tischler and Schwartz, charged each defendant with (i) conspiracy to commit immigration fraud and make false statements, in violation 18, U.S.C. § 371 (Count One); (ii) making false statements in connection with immigration documents, in violation of 18 U.S.C. §§ 1546(a) and 2 (Counts Two, Three, Six and Seven); and (ii) conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 1349.  Brodjik was also charged with making false statements in connection with his own application for naturalization, in violation of 18 U.S.C. §§ 1015(a) and 2 (Count Four).[1]

The Probation Department calculates the Base Offense Level under the Guidelines for each of the four defendants to be 11, pursuant to U.S.S.G §2L2.1, and adds 9 points because the offense involved more than 100 documents, pursuant to U.S.S.G. §2L2.2(b)(2)(C), resulting in a Total Offense Level of 20 for Cibik, Brodjik and Schwartz.  They each have a Criminal History Category of I, resulting in a Guidelines range for each of 33 to 41 months' imprisonment.  (Cibik PSR ¶ 114, Brodjik PSR ¶ 114, Schwartz PSR ¶ 104).  Because Tischler "sent a menacing text message" to co-conspirator Sam Salamon, who Tischler correctly believed was cooperating against him, and because Tischler allowed the David Firm to "fraudulently respond to a Grand Jury subpoena," the Probation Department recommends a two-point enhancement for obstructing or impeding the administration of justice, pursuant to U.S.S.G. §3C1.1.  (Tischler PSR ¶¶ 52, 60.)  Tischler also has a Criminal History category of I, resulting in a Guidelines range of 41 to 51 months' imprisonment.  (Tischler PSR ¶ 109).  The Government agrees with these Guidelines calculations.

---

[1] The Government did not pursue the mail and wire fraud charge at trial.

**B.**     **Evidence At Trial**

After a 13-day trial before Your Honor, all four defendants were convicted of the

immigration fraud conspiracy and substantive false statement charges against each of them

(Counts One, Two, Three, Six and Seven) and Brodjik was convicted of the additional crime of

making false statements in connection with his own application for naturalization (Count Four).

The primary evidence elicited at trial against each defendant is summarized below.

<u>**Gulay Cibik**</u>

Cibik, an employee of the law firm from 2001 to 2006, was deeply involved in the fraud.

She prepared hundreds of fraudulent applications; worked side-by-side with David; developed

her own base of clients; and personally charged aliens thousands of dollars for her services.

Cibik first became involved with the David Firm as a client, and petitioned for adjustment of

status through the David Firm.  (Trial Transcript ("Tr.") at 2007-2008.)  Cibik then began

working as a translator for the firm, taking advantage of the fact that she spoke Turkish and

English.  (Tr. 2008.)  Eventually, after receiving training from Earl David, Cibik began servicing

her own clients.  (Tr. 1382-1385.)  For a time, Cibik advertised her services in a Turkish-

language newspaper, and listed her own phone number in the advertisement.  Her practice

became so busy that she eventually discontinued the advertisement.  (Tr. 2008.)

Bank records introduced at trial provided a snapshot of the large sums of money that

Cibik earned at the firm:

| Month and Year | Amount Deposited |
|---|---|
| September 2005 | $11,756.89 |
| October 2005 | $12,487.50 |

| | |
|---|---|
| November 2005 | $20,594.61 |
| December 2005 | $37,845.33 |
| January 2006 | $22,581.31 |
| February 2006 | $31,461.46 |
| March 2006 | $20,474.93 |
| April 2006 | $41,646.20 |
| May 2006 | $29,015.64 |

(GX 700; Tr. 1991-1993.)  The bank records further revealed that, in May 2006, Cibik emptied

her bank account by withdrawing $35,834.01.  That is particularly significant because, on May 9,

2006, Cibik was interviewed by law enforcement officers regarding her participation on the

fraud.  (Tr. 1993.)  Thus, the evidence established that, in the same month she was questioned by

law enforcement, Cibik withdrew more than $35,000 from her bank account and stopped using

the account.  While Cibik argues that she did not earn large sums of money from the fraud (Cibik

Subm. at 4), her bank records tell a different story.  Bank records also revealed that Cibik spent

thousands of dollars on jewelry, designer brands such as Coach and Kenneth Cole and trips to

Turkey.  (GX 700, at pp. 67, 69, 74, 86).  Simply put, the bank records introduced at trial

revealed that Cibik's account was credited more than a quarter of a million dollars in just a nine-

month period.  That amount represents only a fraction of the proceeds from the fraudulent

scheme, which, as noted above, persisted for several years.

At trial, Ilhan Altintas, one of Cibik's many clients, testified.  As Altintas explained, he

and his wife met with Cibik for the purpose of becoming legal permanent residents and obtaining

green cards.  (Tr. 449-450.)  Cibik initially said that, for a fee, she could provide a nursing home

that would falsely agree to "sponsor" Altintas's wife.  (Tr. 450-451; Tr. 457-458.)  Later, Cibik

recommended that Altintas, rather than his wife, apply for a green card because Altintas spoke

better English.  (Tr. 460.)  Cibik then sold Altintas a phony sponsor, called American Girl

Fashion, and provided tax returns and other supporting documents for Altintas's application.

(Tr. 461-463.)  In addition, Cibik directed Altintas to obtain phony experience letters to support

the application, which Altintas did at Cibik's direction.  (Tr. 464-466.)  Cibik also assisted

another relative of Altintas, providing that relative with an automotive repair shop as a phony

sponsor.  (Tr. 480, 529, 1996-1997.)  According to Altintas, he personally paid Cibik

approximately $6,000 for her work on his and his family's applications.  (Tr. 485.)

　　　　Strangely, Cibik argues that Altintas' testimony indicates that because, at times, Cibik

consulted with Earl David by phone, she "couldn't or didn't know how to [commit the fraud] by

herself."  (Cibik Subm. at 4).  To the contrary, Cibik recruited her own clients and both

cooperating witnesses made clear that she was quite proficient at committing the fraud.  In fact,

as described below, she even expanded her practice to a new form of fraud through the

extraordinary ability program.

　　　　Moving beyond exploiting the DOL certification program, Cibk also filed applications

that falsely claimed clients of the firm were aliens of extraordinary ability.  At trial, David

Grynsztajn, a cooperating witness, testified that Cibik filed extraordinary ability applications not

only for her clients, but also for Grynsztajn's clients.  (Tr. 797-798.)  As he explained, the filing

of the applications would result in the aliens receiving temporary work authorization, even if

their applications for green cards ultimately were denied.  (Tr. 798.)  Corroborating this

testimony, law enforcement officers identified several extraordinary ability applications filed by the David Firm. Those applications were associated with aliens who paid fees to Cibik. (Tr. 1999-2000.) Moreover, another cooperating witness, Sam Salamon, testified at trial that Cibik worked on extraordinary ability applications for her clients. (Tr. 1389.) Salamon further explained that, as far as he was aware, none of the firm's clients met the requirements to be considered an alien of extraordinary ability. (Tr. 1389-1390.)

Whatever feelings she may have had for Earl David (Cibik Subm. at 3), Cibik was fully aware that the conduct in which she was engaged was fraudulent. Cibik threatened on several occasions to turn her co-conspirators into the authorities when she became angry with them, or felt that she was not getting her fair share of the fraud proceeds. (Tr. 925-927; 1388-1389.) And, when interviewed by law enforcement authorities, Cibik admitted that she sometimes falsified aliens' work experience so that their applications for green cards had a higher chance of being approved. (Tr. 2009.) Moreover, Cibik admitted that she obtained sponsors from her co-conspirators, which she then used on her clients' applications. As Cibik admitted, in certain instances, her clients expressed concern because they visited the address of their purported "sponsor" companies, only to discover that the business was not at that location. (Tr. 2009-2010.) Salamon confirmed in his testimony that, from time to time, he provided Cibik with phony sponsors to be used on her clients' applications. (Tr. 1383-1384.)

In sum, Cibik was in fact a critical participant in the fraudulent scheme, who worked cheek-by-jowl with Earl David at his law firm, personally filling out and preparing phony applications. Indeed, she continued to work at the firm even after David was suspended from the practice of law and had himself stopped coming to the office.

**Refael Brodjik**

The evidence at trial showed that from at least 2002 to 2011, Brodjik played several critical roles in the David Firm's fraud scheme. Brodjik also committed an additional crime by lying in his own naturalization application.

Hardly a minimal participant, Brodjik was a trusted associate of Earl David, and handled several different aspects of the fraud. Brodjik first came to the law firm as a client, and began talking with David about a book that David was writing. (Tr. 780.) Brodjik subsequently was hired as David's assistant, and helped David with his book, "Code of the Heart." (Tr. 780.) David, in turn, assisted Brodjik and his wife in their efforts to fraudulently obtain green cards. Specifically, David directed Grynsztajn to take an already approved labor certification, and to replace the approved alien with Rachel Brodjik, the defendant's wife. (Tr. 823-24.) That application falsely stated that Mrs. Brodjik had a job offer at a company operated by Abraham Flam, one of the phony sponsors who has pled guilty in this case. (Tr. 824.) As David explained to Brodjik and Grynsztajn, he believed that it would be easier for Mrs. Brodjik to pass any immigration interview associated with the phony application. (Tr. 824.)

Mrs. Brodjik's application for a green card ultimately was approved, and Brodjik himself received a green card through a derivative application. (Tr. 833; GX 400-4; 410-2.) Becoming a legal permanent resident was Brodjik's first step in his effort to, through fraud, obtain United States citizenship. Brodjik later filed an application to naturalize, and that application contained several false statements. Among other things, Brodjik failed to disclose his employment at the David Firm, failed to disclose that he was involved in immigration fraud while employed at the law firm, and failed to disclose that he had obtained a green card through fraud. As a witness

from CIS testified, that information is material to CIS's decision whether to grant an individual

citizenship.  (Tr. 349-50 and 352-53.)  In addition, the CIS witness testified that Brodjik

personally appeared for an immigration interview on August 17, 2011.  (Tr. 355.)  During that

interview, Brodjik repeated the falsehoods that were contained in his paper application.  Among

other things, Brodjik denied that he had any contact with law enforcement when, in truth and in

fact, Brodjik already had been interviewed by law enforcement in connection with his activities

at the David law firm.  (Tr. 353.)  Brodjik also again failed to disclose his work at the David

Firm.

Brodjik not only committed immigration fraud in his own application, he assisted with

the larger immigration fraud scheme.  Most significantly, after Earl David fled to Canada,

Brodjik served as David's personal representative in the office, collecting fraud proceeds and

transmitting them to David.  In several emails recovered pursuant to a search warrant, Brodjik

described in detail his role in the fraud:

> You make it sound like all I did was go into the office and collect money! Well let
> me tell you this. If I DID NOT go.. You would have nothing at all. I sat in that
> office and fought for every penny of your money. I was the only one you could
> trust and it was ME that enabled you to go sit in Canada.. You know yourself you
> didn...t and don...t trust anyone there. If it was not for me you would have gotten
> NOTHING from that office.

(GX 3607.)

As payment, Brodjik took approximately 20% of all fraud proceeds that he collected from

his co-conspirators.  (Tr. 1133.)  Brodjik profited handsomely from the fraud.  Indeed, in one

email exchange, he estimated that his co-conspirators had withheld from him some $50,000 to

$75,000 in fraud proceeds, thus indicating that his profits were substantially greater than those amounts.  (GX 3605.)

In addition to collecting fraud proceeds on David's behalf, Brodjik enabled David to facilitate to the fraud even while he was in Canada.  Brodjik set up David's computer, Internet access, and fax machine in Canada.  (Tr. 1373.)  In Brodjik's own email he stated, "Your whole hook-up with the office and your ability to operate remotely was MY idea  MY setup.. against all the losers in the office who said ...it would never work......."  (GX 3607.)  Indeed, Brodjik noted that he was temporarily detained on one of his trips to visit David in Canada:

> Do you remember the first time I had to take the chance of coming to Toronto to bring your car??? I had to sit for an hour under investigation for your crap??? Who else would have done that for you?  Lipa? Sam? Greenstein? Sharoni? Your Wife? Where is your appreciation? SHAME ON YOU!

(GX 3607.)

Brodjik also provided David with assistance in other ways as well, including by helping move Earl David's office out of a location in New York, and by obtaining and paying for a storage unit where Brodjik stored many of the fraud-related documents.  (Tr. 1970-1972; GX 3607.)  Those documents – which included paperwork related to religious worker visas, as well as phony sponsors – were later recovered in Brodjik's home.  (Tr. 1970.)   In an email, Brodjik described his assistance to David:

> When we moved from W90.. who was it that moved the office for you???? Myself and my wife worked like dogs to move the office to save you the money for movers. Yes!! Me and my wife like Mexican workers. Did you pay me for that?? Did you so much as Thank me?? Shame on you!!!! When I went to Marcy Printing and picked up 4 pallets of books  shlepped them myself and took them to storage??? How much did u pay me for that??? Shame on you!! Did you even pay for the truck I rented??? Noooooo!

> And the storage... I have paid OUT OF MY OWN POCKET $400 a month for the last at least 6 months???? Did you ever stop to think why the hell I should be paying to store YOUR stuff?? Did you ever offer to re-imburse me for that??? Nooo  SHAME ON YOU!!!

(GX 3607.)

Brodjik's involvement in the fraud went even beyond assisting Earl David.  In fact, Brodjik prepared and submitted immigration applications for clients.  Most of those applications were for religious worker visas.  (Tr. 921.)  That information was corroborated by, among other things, Brodjik's own email in which he stated

> About Sunrise food. I sent out the file to immigration.. If they didn...t cash the check Its not my problem?  So now you trying accuse me of cashing the immigration check for myself??? I did what I was supposed to do.

(GX 3607.)

Given the enormous volume of the bogus applications prepared by the Earl David firm, just during the approximately one year period Brodjik was transmitting fraud proceeds to Earl David, Brodjik easily facilitated the preparation of over 100 applications.  And when all of the other ways in which Brodjik assisted the fraud – including his work on religious worker applications – is considered, the enhancement for an offense involving 100 or more documents is certainly appropriate.  Indeed, that Brodjik was convicted of a conspiracy count, and given his constant presence at the firm and his deep personal involvement in the fraud, the fact that the fraud involved more than 100 documents was reasonably foreseeable to him.

In sum, Brodjik was an integral part of the fraud.  He was a trusted and close associate of Earl David, who provided assistance in many ways, from helping David set up a remote office in Canada, to moving and storing fraud-related materials, to collecting and remitting David's share

of the fraud proceeds.  Brodjik also filed false and fraudulent applications on behalf of his own

clients at the firm.  And, finally, Brodjik sought and obtained legal permanent resident status

through a fraudulent application filed in his wife's name.  Brodjik then sought to obtain United

States citizenship, and boldly repeated his lies in an in-person interview with immigration

authorities.

### Nathan Schwartz

The evidence at trial showed that from at least in or about 2006 until in or about January

2009, Schwartz played a critical role in this massive immigration fraud scheme.  In exchange for

payment, Schwartz agreed to falsely represent to DOL that various of his companies were

sponsoring aliens for employment.  Schwartz also signed, and allowed others to sign his name,

on hundreds of DOL Alien Labor Certification applications in which he falsely claimed that he

had more than a dozen people on his payroll, that he intended to hire particular aliens, and that he

would pay these aliens a prevailing wage, knowing that he did not intend to hire the aliens nor

was he able to pay them a prevailing wage.  Schwartz provided the David Firm with six different

companies for use in this fraud.  Schwartz also used at least three mailboxes to receive mail from

the DOL and USCIS in connection with the fraud, and in an apparent effort to hide his role in the

fraud.  As established at trial, Schwartz role in the conspiracy involved over 150 fraudulent

documents, which were all shown to the jury at trial.  *See generally*, 1/16/13 Tr. at 152-187;

1/17/13 Tr. at 375-388; 1/18/13 Tr. at 553-581; 1/25/13 Tr. at 1201-1330; 1/29/13 Tr. at 1396-

1423; and 1/31/13 Tr. at 1903-1970.

Schwartz made false representations in documents submitted to DOL and USCIS as well

as through phone calls with the DOL in which he allowed others (including co-conspirator Leo

Teitelbaum) to confirm his intent to hire these aliens.  (Tr. at 152-187, 1313, 1948).  Like the mailboxes, Schwartz had several different phone numbers which were used as contact numbers for the DOL.  Schwartz was paid by Salamon approximately $500 each time he provided Salamon with an approved DOL certification for use in fraudulent work authorization and green card applications to USCIS.  Salamon estimated that he paid Schwartz approximately $30,000 over the course of the fraud.  (Tr. at 1319).

Schwartz was not merely a sponsor.  He also assisted the fraud in several other ways.  First, Schwartz assisted Salamon in creating fraudulent checks to obtain money from Teitelbaum's bank account after law enforcement had uncovered the fraud and arrested Teitelbaum. (Tr. at 1272-1280).  Schwartz also allowed Salamon to receive a check from a law firm client at one of Schwartz's mailboxes, also after the fraud had been uncovered, and the firm's office shut down.  (Tr. at 1317).  In addition, Schwartz assisted with the preparation of fake DOL documents to fraudulently claim that certain aliens had applied for immigration benefits during the amnesty period that ended in April 2001.  (Tr. at 1322).  Finally, Schwartz assisted the sham operations at the office by ordering a Pitney Bowes stamp machine for the office's use to expedite the preparation of applications.  (Tr. at 1325).

### Harold Tischler

The evidence at trial showed that from at least in or about 2004 until in or about January 2009, Tischler played a critical role in this massive immigration fraud scheme.  Tischler also signed, and allowed others to sign his name, on hundreds of DOL Alien Labor Certification applications in which he falsely claimed that he intended to hire particular aliens, and that he would pay these aliens a prevailing wage, knowing that he did not intend to hire the aliens nor

was he intending to pay them a prevailing wage.  Tischler provided the David Firm with nine

different companies for use in this fraud.  The majority of the mail from the DOL and USCIS in

connection with the fraud went directly to Tischler at his home or office.  He also allowed the

Firm to set up one Delaware company in his name, which was associated with him through his

home address, phone number and email address, but the mail from DOL and USCIS went to an

address he did not control.  As was shown to the jury, document by document, Tischler's role in

the conspiracy involved well over 250 fraudulent documents.  See generally, 1/16/13 Tr. at 187-

203; 1/25/13 Tr. at 1213-1215; 1330-1345; 1/29/13 Tr. at 1423-1440; and 1/31/13 Tr. at 1742-

1934.

Tischler made false representations in documents submitted to DOL and USCIS as well

as through phone calls with the DOL in which he *personally* confirmed his intent to hire

particular aliens.  (Tr. at 1330-1345).  Tischler was paid by Salamon (sometimes through other

co-conspirators) approximately $300-500 each time he provided Salamon with an approved DOL

certification for use in fraudulent work authorization and green card applications to USCIS.

Tischler was even paid for rejected applications because he complained that he was not making

enough money.

Tischler was also not merely a sponsor –he assisted the fraud in other ways.  First, in

exchange for approximately $5,000, Tischler signed the lease for the law firm's offices at 17

Battery Place, falsely claiming the space would be used for his business, Fix Anything

Construction and Plumbing.  (Tr. 1213-1215).  The law firm was ultimately evicted because,

among other reasons, the space was being used as a law firm (with crowds in the hallway and

shared bathroom), as opposed to as a construction business office.  Tischler also accepted

another approximately $5,000 from Salamon after the fraud was uncovered.  The payment was for two reasons – because Tischler learned that Salamon had rented another office in Tischler's name and to pay for a lawyer for Tischler.  (Tr. 1266-1272).

Tischler also allowed the David Firm – which he knew was engaged in fraud – to respond to a 2006 grand jury subpoena seeking information about his companies who were "sponsoring" aliens.  (Tr. at 1438-39).  In addition, approximately five months before trial, he sent a menacing text message to cooperating witness Sam Salamon stating "Moiser (a Yiddish word for rat or informant), you put me in jail.  WOW."  (Tr. at 1344-45).  Each of these actions alone, which are specifically listed in the examples of covered conduct in the Commentary to Guidelines Section 3C1.1, easily qualifies Tischler for an enhancement for obstruction of justice.  (§3C1.1, Note 4(A) and (C)).

## ARGUMENT

A Guidelines sentence is warranted for each defendant in this case.   The Government has identified at least 25,000 immigration applications filed with U.S. government agencies by the David Firm – the vast majority of which have been determined to contain false, fraudulent, and fictitious information.  Each defendant played a long-standing and critical role in facilitating this massive fraud.

For the reasons set forth below, as well as for the importance of deterrence, promoting respect for the law, and providing just punishment in this case, the Government respectfully submits that a sentence within the Guidelines range of 33 to 41 months' imprisonment for Cibik, Brodjik and Schwartz, and 41 to 51 months' imprisonment for Tischler, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

### I.  Applicable Law

Although they are no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).  After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id*. § 3553(a)(7).  *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

>    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>    (B)    to afford adequate deterrence to criminal conduct;

>    (C)    to protect the public from further crimes of the defendant; and

>    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  To the extent District Court imposes a sentence outside the range

recommended by the Guidelines, the Court must "'consider the extent of the deviation and

ensure that the justification is sufficiently compelling to support the degree of the variance.'"

*United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (quoting *Gall*, 128 S. Ct. at 596).

### II.  The Nature And Circumstances Of This Offense Are Serious

As set forth above, this is one of the largest immigration fraud schemes ever committed

in the United States.  The fraud only succeeded because insiders like Cibik recruited clients and

prepared their fraudulent paperwork, because Brodjik prepared other sham applications and

helped the fraud's architect continue to oversee the fraud even after he was disbarred and fled the

country, and because facilitators like Tischler and Schwartz served as regular, and repeated,

phony sponsors for hundreds of aliens, and provided other key assistance including helping rent

office space and fraudulently accessing the ill-gotten proceeds.   Each of their roles was

important, and the overall crimes were serious.  While each defendant argues that his or her

personal circumstances (primarily health concerns and good deeds in the community) weigh in

favor of a non-Guidelines sentence, none are so substantial that they outweigh the gravity,

complexity and long-standing nature of the defendants' offenses.

Brodjik and Cibik further argue that, becuase they are likely to be deported as a result of

their convictions, they should receive lighter sentences.  Judges are not required to consider a

defendant's deportability when considering the appropriate sentence. *See United States v.*

*Gumbs,* 286 F.App'x 763, 766 (2d Cir. 2008); *United States v. Restrepo*, 999 F.2d 640, 646-47

(2d Cir. 1993) ("We have seen no indication that Congress, . . .or the Sentencing Commission, . .

. considered the interplay between deportability and sentencing provisions."); *see also United*

*States v. Ogobondah*, 16 F.3d 498, 500 (2d Cir. 1994).  Furthermore, a defendant's inevitable post-conviction deportation is typically not an extraordinary circumstance warranting departure. *See United States v. Duque*, 256 F. App'x 436, 437 (2d Cir. 2007) ("[t]he collateral effects of deportability . . . generally do not justify a departure from the Guidelines range.").  Accordingly, the Court need not consider Brodjik or Cibik's claims of inevitable deportation in determining their respective sentences.

### III.  The Need to Promote Respect for the Law, to Ensure Just Punishment, and for Deterrence in This Case

There is a critical need in this case to promote respect for the law and ensure just punishment.  This massive fraud continued for over a decade, even after Earl David was disbarred and fled to Canada, and for three years after the Government began its investigation. The tenacity of the members of the conspiracy, especially the four defendants convicted at trial, helped the fraud persist for so long.  The defendants' assistance including, among other things:

- Cibik's willingness to adapt the fraud by creating phony "extraordinary ability" applications when it became more difficult to get labor-certification applications approved;

- Cibik's extended travel to Turkey after she was approached by law enforcement in 2006;

- Brodjik's various assistance to David, allowing him to remotely operate, and profit from, the fraud;

- Schwartz and Tischler's willingness to continue to provide additional "sponsor" companies, and their use of multiple phone numbers and mailboxes in an effort to prevent immigration authorities from detecting the fraud;

- Tischler's assistance to allow the firm to move a new location, further frustrating the Government's efforts to identify the source of the fraud; and

- Tischler's allowance of misleading documents to be produced in response to a grand jury subpoena.

Each of these defendants repeatedly broke the immigration laws over long stretches of time. Accordingly, deterrence here is paramount.

Deterrence is of particular importance with respect to Tischler, who has a prior conviction for alien smuggling. As previously briefed before Your Honor in the parties' motions *in limine*, on or about August 19, 1986, in the United States District Court for the Northern District of New York, defendant Harold Tischler was convicted, subsequent to a guilty plea, of conspiring to smuggle an alien in to the United States, in violation of Title 8, United States Code, Sections 1325 and Title 18, United States Code, Section 371, a misdemeanor punishable by up to six months' imprisonment. Tischler was sentenced to six months' imprisonment, a sentence which was suspended, and he was placed on probation for one year. While this sentence does not result in any criminal history points for Tischler, it is relevant to his sentence because, in committing the crime, Tischler lied repeatedly to United States Immigration officials, denying knowledge of his illegal conduct and blaming others for taking illegal actions about which he claimed to be unaware. His defense in the instant case was similar, trying to establish that he was unaware of the criminal nature of his actions when, especially given his prior encounter with

immigration authorities, he should have been leery.  He should not now get *another* break after

violating immigration laws again, in a much more significant way.

The Government has also learned that Tischler and his 21-year old son, who are both

registered filing representatives (a/k/a "expediters") with the New York City Department of

Buildings ("DOB"), are currently under investigation by DOB for another document fraud.  They

are alleged to have submitted at least three phony death certificates in an effort to obtain

dismissal of building violations for their clients under a rule that allows violations to be

dismissed if the owner of record of the property is deceased.  Essentially, authorities suspect

Tischler and his son used one legitimate death certificate, but changed the decedent's name (on

three separate occasions) and submitted the death certificate as genuine (albeit low-quality

copies) to seek dismissal of various buildings violations for three different clients.

Schwartz, too, needs to be deterred not just from committing immigration fraud, but from

the check fraud about which there was testimony at trial.  Although he was not separately

charged with bank fraud, it is certainly relevant that Schwartz committed an additional crime to

assist the immigration fraud.

Similarly, neither Brodjik nor Cibik was deterred from participating in the fraud even

though they were aware that David had fled to Canada after learning his firm was under

investigation.  To the contrary, Brodjik assisted David in fleeing by establishing a remote office

from which David could continue to control the fraud.  Similarly, Cibik continued to participate

in the fraud and visited David in Canada after he fled.  (Indeed, her bank account reflects a hotel

stay in Canada.)  It was not until she was personally approached by law enforcement that she

withdrew all of the money in her bank account, and fled to Turkey.

General deterrence to others who may be considering such frauds – especially given how many individuals were involved in this fraud – is also important here.

### IV. A Guidelines Sentence Is Consistent With Sentences of Other Defendants In This Case and In Related Cases

A Guidelines sentence would not create any unwarranted sentencing disparities. Contrary to Brodjik's claim that only three co-conspirators were sentenced to incarceration (Brodjik Subm. at 4), in fact seven have been sentenced to incarceration, all of whom pleaded guilty and were afforded acceptance of responsibility reductions to their Guidelines.   Many of the defendants who worked at the law firm received Guidelines or near-Guidelines sentences of incarceration.  Earl David, who faced a Guidelines of 78-97 months' imprisonment, was sentenced to 60 months' imprisonment.  Jed Philwin, who faced a Guidelines 24 to 30 months' imprisonment, was sentenced to 24 months' imprisonment.   Abdulbassit Choudary, who worked at the firm as a paralegal, and faced Guidelines of 24 to 30 months' imprisonment, was sentenced to 24 months' imprisonment.  Mir Hussain, another firm employee, faced Guidelines of 15 to 21 months' imprisonment and was sentenced to one year and one day in prison.  David Vago, an accountant who prepared fictitious tax returns for the firm, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to one year and one day in prison.  John Albert Nolan, a corrupt DOL employee who helped create fake documents to support fraudulent applications, faced Guidelines of 18 to 24 months' imprisonment and was sentenced to 18 months.  Janine Sitao, who was a sponsor, but also ran a separate fraud involving hiring undocumented workers, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to 15 months.

Another firm employee, Alexandra Urbanek, received a probationary sentence after facing a Guidelines range of 24 to 30 months' imprisonment; however, even her plea agreement recognized the extraordinary circumstances present there, and noted that the Government agreed that a below-Guidelines sentence was appropriate due to her personal circumstances.  Another accountant, Mohammed Saleem, faced Guidelines of 8 to 14 months' imprisonment, but Probation recommended he not be incarcerated, and he was sentenced to 3 years' probation. And, as described above, one other lawyer, Maritza Diaz, who faced Guidelines of 24 to 30 months' imprisonment, was sentenced to three years' probation, in large part due to Probation's recommendation that she not be incarcerated due to personal obligations to an ill son and elderly mother.

With regard to the sponsors in this case, those who pleaded guilty before trial faced various lower Guidelines including, zero to 6 months (Flam, involving less than 6 documents and as a minor participant); 4 to 10 months (Flohr, involving 6 to 25 documents and who was considered a minor participant), 10 to 16 months (Herbst, Weber, Walter, involving 25 to 99 documents and who were minor participants).  In accordance with their less significant roles  and the fact that they were afforded a reduction for acceptance of responsibility, all were all sentenced to terms of Probation, some including home detention and community service. Tischler and Schwartz, however, can be distinguished from each of them.

First, Tischler and Schwartz were personally involved with significantly more fraudulent documents– well over 100 each – and each one of those documents was presented to the jury. Tischler's and Schwartz's criminal conduct also went beyond fraudulently sponsoring aliens. The name of Tischler's company was literally on the door of the firm.  Schwartz assisted in the

commission of an additional fraud to help Salamon unlock the fraud proceeds after Teitelbaum was arrested.

With regard to Schwartz specifically, despite the overwhelming evidence at trial, it appears from statements of family members to the Probation Department (*see* PSR ¶¶ 81, 82), Schwartz has not accepted responsibility for his actions.  He has apparently allowed his family to believe that Salamon lied about him at trial, making Schwartz's argument that he should be viewed like other sponsors who accepted responsibility and pleaded guilty (Schwartz Subm. at 3-4) all the more unpalatable.  Schwartz also claims he has faced "great animosity" from his religious community for "choosing to go to trial and 'air his dirty laundry."  (Schwartz Subm. at 3).  This was a choice Schwartz made, and the reaction of his community has no relation to the application of the Guidelines here.  The Court should note, however, that the person who truly suffered the wrath of his community as a result of his testimony at trial is cooperating witness Sam Salamon, who has been shunned from his synagogue as well as other synagogues in his (and Brodjik's and Schwartz's) community of Monsey, New York.

With regard to Brodjik, his claim to have accepted responsibility is irreconcilable with his instant arguments, in which he challenges the sentencing enhancements applied to him and, in the face of overwhelming trial evidence to the contrary, continues to insist he was at most a minor participant in the fraud.  Brodjik Subm. at 1-2).  As set forth above, Brodjik is easily responsible personally, and certainly as a member of the conspiracy, for more than 100 fraudulent documents.  Incredibly, Brodjik now seeks an adjustment of his Guidelines range for acceptance of responsibility as one of those "relatively rare" defendants who is eligible for a post-trial 2 point reduction (Brodjik Subm. at 2).  As the relevant Guidelines Commentary

explicitly states: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of his guilt, is convicted, and only then admits guilty and expresses remorse." (§3E1.1, Note 2). The Commentary goes gone to carve out defendants who "clearly demonstrate acceptance of responsibility" even though they go to trial by, for example, proceeding to trial to "assert and preserve issues that do not relate to factual guilt," such as "making a constitutional challenge to a statute or challenging the applicability of a statute to the defendant's conduct." (*Id*.). Unlike these very narrow exceptions, Brodjik mounted a vigorous and at times vituperative defense at trial which asserted his factual innocence . Brodjik often refused to stipulate to basic business records, accused both cooperating witnesses of lying, challenged the claim that Rachel's Brodjik's "sponsorship" by Flam's company was a sham (notwithstanding that Flam already had pled guilty to fraudulently sponsoring aliens), asserted that Brodjik did not author incriminating emails that were found in his home and in his email account, and suggested to the jury that the Government had in its possession exculpatory evidence that had been withheld from the jury. . While he was certainly entitled to do so, Brodjik "put the government to its burden of proof at trial by denying the essential factual elements of his guilt," and therefore is not entitled to a reduction for acceptance of responsibility. Indeed, even now, the defendant contests his role in the fraud despite overwhelming evidence that he was a critical participant in the fraud. .

**Conclusion**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines range for each of the defendants is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Dated: New York, New York
June 13, 2013

Respectfully Submitted,

PREET BHARARA
United States Attorney

By: _____/S/_____
Janis M. Echenberg
James J. Pastore, Jr.
Assistant United States Attorneys
(212) 637-2597/2418